**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC., <br> 20 S. Wacker Drive <br> Chicago, IL 60606, <br><br> *Plaintiff,* <br><br> v. <br><br> MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission, <br> Three Lafayette Centre <br> 1155 21st Street, NW <br> Washington, DC 20581, and <br><br> COMMODITY FUTURES TRADING COMMISSION, <br> Three Lafayette Centre <br> 1155 21st Street, NW <br> Washington, DC 20581, <br><br> *Defendants.* | Civil Case No.: _____ |

**COMPLAINT**

Plaintiff Chicago Mercantile Exchange Inc. files this suit against Defendants Michael S. Selig, in his official capacity as Chairman of the Commodity Futures Trading Commission, and the Commodity Futures Trading Commission.

**INTRODUCTION**

1.      On May 29, 2026, the Commodity Futures Trading Commission ("CFTC") issued an order that overnight transformed federal regulation of a derivative instrument called a "perpetual contract." A perpetual contract is an agreement under which parties exchange payments based on the fluctuating value of a commodity, without delivering any interest in that commodity

1

on any fixed date. Congress contemplated derivative instruments with this form and called them *swaps*, in the same breath legislating special requirements to address the role swaps had played in the 2008 financial crisis. Consistent with Congress's directive, the CFTC long treated such instruments as swaps, including in high-profile enforcement actions and consent decrees filed in federal court. But suddenly, the CFTC changed course: on May 29, it approved a request by KalshiEX LLC ("Kalshi") to list a perpetual contract for trading in U.S. markets as a *future*, a different form of financial instrument that receives different regulation and favorable tax treatment. That order, issued without public comment or reasoned decisionmaking, violates the plain terms of the Commodity Exchange Act ("CEA"). If allowed to stand, it would enable Kalshi—and any other futures exchange seeking to list similar perpetual contracts—to circumvent the strict regulatory requirements set by Congress.

2.      After the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), to impose (among other important regulatory reforms) registration, recordkeeping, margin, and other requirements with respect to swap transactions. In Dodd-Frank, Congress recognized the special dangers that unregulated swaps posed to the U.S. economy. Congress defined the term "swap" broadly to reach any agreement involving an exchange of "[one] or more payments" tied to a commodity's value that transfers price risk "between the parties" without conveying an interest in the underlying asset at a date certain. *Id.* § 721(a)(21), 124 Stat. at 1666 (codified at 7 U.S.C. § 1a(47)). Consistent with that definition, the CFTC classified perpetual contracts as swaps, and it brought a series of enforcement actions involving offshore perpetual contracts on that basis.

3.      Congress also provided that the definition of swaps does not include "contract[s] of sale of a commodity for future delivery," 7 U.S.C. § 1a(47)(B)(i)—products colloquially called

2

"futures." Derivatives that require "future delivery" of an interest in a commodity are not subject to the same restrictions Congress mandated for swaps. The tax code also provides advantageous treatment for regulated futures products, but not swaps.

4.      Under the CEA, the CFTC may not approve a new contract for listing if it would violate either the CEA or CFTC regulations. This case concerns the CFTC's decision to approve a perpetual contract as a future, thereby relieving that derivative of the regulatory burdens Congress imposed on swaps and affording it favorable tax treatment.

5.      A perpetual contract is a derivative that is intended to track the current price of an underlying asset, such as Bitcoin. Fitting the statutory definition of swaps, perpetuals are agreements "between the parties" to exchange "[one] or more payments" based on the underlying value of the commodity, without any delivery date of that commodity or an interest therein. *See* 7 U.S.C. § 1a(47) (defining "swap"). When a perpetual is trading above the spot price of the underlying commodity, the long side pays the short side; when it is trading below the spot price, the short side pays the long side. Unlike a futures contract, a perpetual contract has no expiration date—that is where the perpetual gets its name. Neither party is obligated, at a fixed future date, to deliver the underlying asset to the other or to pay the cash value of the delivered commodity. A party may hold its position *perpetually*.

6.      Before May 29, 2026, perpetual contracts were not traded in the United States. Whether and on what terms perpetuals should be domestically available has been a source of contentious and protracted debate. On April 21, 2025, the CFTC requested comment on more than a dozen policy questions on this subject, including whether these products should be classified as swaps (consistent with the CFTC's prior enforcement actions) or as futures (changing course and

shifting from the statutory definition). The CFTC did not address any of the more than 150 comments it received, nor did it issue a final rule.

7.     Instead, one day after receiving an application from Kalshi, Chairman Michael S. Selig—acting alone as the sole confirmed Commissioner of the five-member CFTC—approved Kalshi to list, as futures, perpetual contracts based on the value of Bitcoin. The CFTC's order repeats Kalshi's reasoning almost verbatim. The order does not acknowledge, much less grapple with, Congress's directive that instruments with the structural features of Kalshi's perpetual contracts are swaps and must be regulated as such. Nor does the order acknowledge or explain the CFTC's departure from its previous and consistent position that perpetuals are swaps.

8.     The CFTC did not stop there. Together with an accompanying policy statement, the order purports to authorize *any* futures exchange to automatically self-certify, without prior CFTC approval, *any* similar perpetual contract based on the value of a cryptocurrency.

9.     With one stroke of his pen, the Chairman overrode Congress's definition of the term "swap" and circumvented the regulatory regime Congress required for that form of derivative. In the short time since, Kalshi has self-certified over a dozen additional cryptocurrency perpetuals in reliance on the Chairman's order and brought those perpetuals to market, resulting already in more than a billion dollars of trades.[1]

10.     Plaintiff Chicago Mercantile Exchange Inc. ("CME") has standing to challenge the CFTC's actions. The agency has greenlit Kalshi to offer new derivatives products that will directly compete with CME's existing offerings in the market for retail investors. The agency's actions thus inflict textbook competitive injury on CME.

---

[1] *See* Davis Giangiulio, *Kalshi Trading in 'Perps' Crosses $1 Billion in Volume Within a Week of Launch*, CNBC (June 9, 2026), https://www.cnbc.com/2026/06/09/kalshi-perpetual-futures-trading-perps-crosses-1-billion-in-volume-within-a-week-of-launch.html.

11. The CFTC's actions violate the CEA and are therefore contrary to law. The CFTC's order and policy statement are also arbitrary and capricious for failing to analyze the applicable statutory scheme, recognize the departure from the CFTC's prior (and correct) position that perpetuals are swaps, or acknowledge the important real-world implications of this new sweeping approach. The Court should vacate these actions and issue a declaration that cryptocurrency perpetual contracts are swaps and not futures.

**PARTIES**

12. Plaintiff is Chicago Mercantile Exchange Inc., or "CME," a Delaware corporation with its principal place of business in Chicago, Illinois. CME is a subsidiary of CME Group Inc. ("CME Group"), which, as the world's leading derivatives marketplace, operates four designated contract markets ("DCMs") that have some of the highest volumes for the trading of futures contracts globally. CME is one of those DCMs.

13. Defendant Michael S. Selig is the Chairman of the Commodity Futures Trading Commission and is presently its only Commissioner. He is sued in his official capacity.

14. Defendant Commodity Futures Trading Commission is a federal agency headquartered in Washington, D.C.

**JURISDICTION, VENUE, AND PREREQUISITES FOR SUIT UNDER THE ADMINISTRATIVE PROCEDURE ACT**

15. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because the action arises under the Administrative Procedure Act ("APA") and the CEA, which are laws of the United States.

16. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because both defendants reside in the District of Columbia and a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

17.    The CFTC order authorizing Kalshi to list a Bitcoin perpetual contract as a future and authorizing all futures exchanges to self-certify and list similar digital commodity perpetuals as futures, Order Approving KalshiEX LLC BTCPERP Futures Contract, *In re Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract* (CFTC May 29, 2026) (attached as Exhibit 1) (the "Kalshi Order" or "Order"), is final agency action under the APA, and there is no other adequate remedy in a court.  Accordingly, judicial review is available under 5 U.S.C. § 704.

18.    To the extent the policy statement accompanying the Kalshi Order, Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160, 33,160–61 (June 3, 2026) (adopted May 29, 2026) (attached as Exhibit 2) (the "Policy Statement"), purports to independently establish the authority of futures exchanges to list similar perpetual contracts referencing digital commodities as futures, the Policy Statement is final agency action subject to judicial review under 5 U.S.C. § 704.

19.    This Court is authorized to award the requested relief under 5 U.S.C. § 706, 28 U.S.C. §§ 2201 and 2202, and its inherent equitable powers.

## **BACKGROUND**

### I.    **Plaintiff CME**

#### A.    **CME's Role in the Derivatives Industry**

20.    CME Group is the world's leading derivatives marketplace.  Market participants all over the globe come to CME Group's DCMs to manage risk as part of their trading strategies.

21.    CME Group's four subsidiary DCMs—CME, Chicago Board of Trade, New York Mercantile Exchange, and Commodity Exchange—have some of the highest volumes for the trading of futures contracts across a wide range of products and all major asset classes.

22.    These DCMs list futures contracts across every major asset class, including agricultural commodities, energy, metals, interest rates, foreign exchange, equity indices, and, more recently, digital commodities.

23.    For more than 150 years, CME Group and its DCMs have been at the forefront of the futures industry.

24.    CME is part of a group of DCMs that has invested time, money, and expertise to build its reputation as the foremost group of futures exchanges in the world.  CME and CME Group's other DCMs have spent billions building the technological prowess, efficient and safe market design, and effective regulatory infrastructure to operate their exchanges.  These investments, the DCMs' vigilance, and other efforts have made these markets the gold standard for numerous derivatives products.

25.    The success of CME and CME Group's other DCMs depends in large part on robust, even-handed, and predictable regulation.

26.    Both institutional and retail customers invest their money through CME and CME Group's other DCMs because they are confident that these markets are safe, reliable, and secure.

27.    CME thus has an interest in ensuring that nationwide derivatives markets—CME Group's DCMs and others'—are properly monitored and that the CEA and related regulations are fairly and uniformly enforced.

28.    The CFTC's failure to evenhandedly, consistently, and correctly apply the CEA risks harming competition and destabilizing derivatives markets.

**B.    CME's Standing**

29.    CME has standing to challenge the Kalshi Order and accompanying Policy Statement based on a competitive injury.  These agency actions allow entry into the market of a

product targeting retail investors that is intended to, and will, directly compete with CME's products aimed at the same customer base.

30. The principal users of CME's futures contracts have historically been institutional market participants: agricultural producers and end users hedging crop and livestock prices; energy producers and consumers hedging fuel costs; banks and asset managers hedging interest-rate, currency, and equity exposures; and pension funds, hedge funds, and proprietary trading firms taking speculative positions on future price movements. CME's institutional business remains the foundation of its operations.

31. For many years, however, CME has also actively developed products designed to make futures markets accessible to retail and other smaller customers.

32. In 1997, CME launched the E-mini S&P 500 futures contract, a contract one-fifth the size of its original S&P 500 futures contract.

33. The E-mini has since become one of the most actively traded futures contracts in the world.

34. In 2019, CME introduced the Micro E-mini suite on a variety of equity indices, each one-tenth of its corresponding E-mini contract and designed to further enable retail-account-sized participation in equity-index futures.

35. CME has applied that same retail-sized-contract approach across asset classes, including in cryptocurrencies like Bitcoin and Ether.

36. As a result of these and similar initiatives, retail customers now constitute a substantial and growing component of trading activity in smaller-sized contracts across the CME Group DCMs.[2]

37. CME has listed Bitcoin futures contracts since 2017.

38. In 2021, CME added Micro Bitcoin ("MBT"), a contract with a notional value that tracks one-tenth of a Bitcoin and is one-fiftieth the size of CME's institutional-sized Bitcoin contract.

39. MBT was designed and marketed in part for retail customers seeking exposure to Bitcoin price movements through smaller-sized, U.S.-regulated futures contracts.

40. CME's MBT contract is a leading U.S.-regulated, retail-accessible Bitcoin futures product.

41. As a true futures contract, MBT has an expiration date.

42. CME has similar futures contracts for other cryptocurrencies, including Micro Ether, Micro Solana, Micro XRP, Micro Chainlink, and Micro Sui.

43. The Order enables Kalshi to enter the market for cryptocurrency futures and to compete—on an unfair and unlawful basis—with CME.

44. As explained, the Order approves Kalshi and other futures exchanges to list, as futures, perpetual contracts on digital commodities (also known as cryptocurrencies).

45. These products, and Kalshi's Bitcoin perpetual contract ("BTCPERP Contract" or "BTCPERP") in particular, are designed to draw away CME's customers who currently trade true Bitcoin and cryptocurrency futures, including MBT and other products.

---

[2] *See* CME Grp., CME Group Overview 8 (Apr. 2026), https://www.cmegroup.com/investor-relations/files/cme-group-investor-presentation.pdf (noting that CME Group's "retail customer base has nearly quadrupled in the past decade and grew 23% in 2025").

46.    Following the Order, Kalshi self-certified perpetuals for Ether, Solana, XRP, Chainlink, and Sui that are designed to compete with CME's retail futures products for these same cryptocurrencies.

47.    Kalshi has explicitly positioned BTCPERP and its other cryptocurrency perpetuals as new competitors to CME's true futures.

48.    Kalshi has argued that these perpetuals are superior to true futures contracts—like CME's—with fixed expirations.

49.    For example, Kalshi's Chief Executive Officer, Tarek Mansour, has stated: "[P]erpetual futures are different from futures [in] that they don't expire.  And so . . . they're simpler for retail participants."[3]  He emphasized that the "innovation really comes on the expiry point" and that perpetuals "just don't expire."[4]

50.    Citing this feature, Mr. Mansour explained that Bitcoin perpetuals put "competitive pressure" on CME's rollover fees on true futures.[5]

51.    Kalshi's beginner-level guide to perpetuals—directed at retail customers—likewise highlights as a principal feature the absence of any expiration date, which allows a position to be held indefinitely without the need to roll from one contract month to the next.[6]  Kalshi describes

---

[3] *Kalshi CEO on Perpetual Futures Trading: 'The Demand Is There,'* CNBC, at 1:19–:25 (June 9, 2026), https://www.cnbc.com/video/2026/06/09/kalshi-ceo-on-perpetual-futures-trading-the-demand-is-there.html ("Mansour June 9 Interview").

[4] *Id.* at 3:10–:14.

[5] *Id.* at 2:00–:02.

[6] Kalshi, *What Are Perpetual Futures?: A Beginner's Guide*, Kalshi News (June 3, 2026), https://news.kalshi.com/p/what-are-perpetual-futures.

the product to retail customers as "a leveraged directional bet on the price of an asset—Bitcoin rising or falling—with no forced expiry."[7]

52.    Those features distinguish BTCPERP from CME's existing Bitcoin futures suite, in which customers seeking continuous Bitcoin exposure must roll their positions into a new future at each monthly expiration, consistent with the conditions Congress imposed on futures as part of the favorable regulatory treatment they receive.

53.    Kalshi's statements regarding BTCPERP are consistent with the company's broader stance in seeking to compete with CME.

54.    Kalshi has repeatedly and publicly positioned itself as a competitor of CME.

55.    In a February 2025 interview, for example, Mr. Mansour stated that "the comp for Kalshi is CME."[8]

56.    Likewise, in October 2025, Kalshi described itself in a press release as "a next-generation CME for the 21st century."[9]

57.    Mr. Mansour has also cast Kalshi as attempting "a replica of the robust, well-tested model that CME and some of the incumbent exchanges have used."[10]

58.    The newly authorized cryptocurrency perpetuals represent Kalshi's bid to enter CME's retail futures market.

---

[7] *Id.*

[8] Sourcery with Molly O'Shea, *How Kalshi Built a $2 Billion Prediction Market*, at 6:49–8:07 (YouTube, Feb. 28, 2025), https://youtu.be/XR86_cwhp8M?si=7VuGzG9L21XsYE88&t=409.

[9] Kalshi, *Kalshi Hits $5 Billion Valuation amid International Expansion*, Kalshi News (Oct. 10, 2025), https://news.kalshi.com/p/kalshi-hits-5-billion-valuation-amid-international-expansion.

[10] Mansour June 9 Interview, *supra* note 3, at 3:04–:10.

11

59.     As Mr. Mansour put it: "CME has Bitcoin futures and Kalshi has Bitcoin perpetuals."[11]

60.     In a June 1, 2026 appearance on CNBC, Mr. Mansour confirmed that Kalshi was planning to take a maximalist approach to perpetuals: it is "starting with perpetual futures on Bitcoin" and then "expand[ing] from there."[12]

61.     In the same interview, Mr. Mansour acknowledged that, prior to the CFTC's issuance of the Order, *all* trading of perpetuals had been done "offshore."[13]

62.     Thus, the CFTC's actions precipitated Kalshi's entry into CME's market.

63.     The CFTC has acknowledged as much.  Chairman Selig characterized the CFTC's actions as authorizing "a whole new market here with lots of new participants."[14]  According to Chairman Selig:  "A lot of this market was offshore for too long. . . .  We are bringing these markets to the United States . . . ."[15]

64.     Chairman Selig also stated that "there are many incumbents out there, you named one," referring to CME, "that are afraid of this technology," noting that "[i]t's limited the transaction fees, maybe, they're receiving on their exchange."[16]

---

[11] *Kalshi CEO Addresses 'Perps' Demand and Critics in CNBC Exclusive*, CNBC Pro, at 6:35–:38 (June 9, 2026), https://www.cnbc.com/video/2026/06/09/kalshi-ceo-addresses-perps-demand-and-critics-in-cnbc-exclusive.html.

[12] *Kalshi CEO Tarek Mansour: Perpetual Futures Are the 'Purest Form of Trading,'* CNBC, at 2:20–:35 (June 1, 2026), https://www.cnbc.com/video/2026/06/01/kalshi-ceo-tarek-mansour-perpetual-futures-are-the-purest-form-of-trading.html.

[13] *Id.* at 0:45–1:10.

[14] Eleanor Mueller, *Trump's Prediction-Market Regulator to the Supreme Court: Bring It On*, Semafor (June 12, 2026), https://www.semafor.com/article/06/12/2026/trumps-prediction-market-regulator-to-the-supreme-court-bring-it-on.

[15] *Id.*

[16] *Id.*

65.    In short, by authorizing Kalshi and others to enter the derivatives marketplace by listing similar cryptocurrency perpetuals as futures, the CFTC ushered new entrants into CME's retail futures market that seek to compete with CME for retail customers.

66.    And the CFTC's actions authorize that new competition on unlawful and unfair terms. Under the Order, Kalshi and others may now offer products that Congress intended to be regulated as swaps on the favorable terms available only to futures. In contrast, CME's true futures products adhere to the requirements for futures and therefore lawfully benefit from those terms.

67.    Because cryptocurrency perpetual contracts are swaps and not futures under the CEA, the Kalshi Order and accompanying Policy Statement are contrary to law and must be vacated. The CFTC therefore may not approve such perpetual contracts as futures, and regulated entities may not self-certify or list them as futures.

68.    Vacating these agency actions and issuing an accompanying declaration would force these products off the marketplace as futures and redress CME's competitive injury.

## II.    Legal Background

### A.    The CFTC: Background and Framework

69.    The CFTC is a federal agency established by the Commodity Futures Trading Commission Act of 1974.

70.    The Commission is charged with administering and enforcing the Commodity Exchange Act, or "CEA," ch. 545, 49 Stat. 1491 (codified as amended at 7 U.S.C. § 1 *et seq.*), which provides the federal regulatory framework for various derivatives. The CEA vests the

CFTC with exclusive jurisdiction over exchange-traded markets for futures contracts, options on futures, and—since the enactment of Dodd-Frank in 2010—swaps.[17]

71.    Congress provided for the Commission to have five commissioners appointed by the President with the advice and consent of the Senate, one of whom serves as Chairman. *See* 7 U.S.C. § 2(a)(2).  Currently, however, Chairman Selig is the CFTC's sole member.

72.    The CFTC's jurisdiction extends to a broad range of derivative products, market infrastructure, and market participants.

73.    The Commission regulates the listing and trading of futures contracts, options on futures, and swaps on a wide array of underlying commodities and financial instruments—including agricultural products, energy, metals, digital commodities, interest rates, foreign exchange, and equity indices.

74.    The Commission also registers and supervises the exchanges and intermediaries that operate in these markets, including DCMs, swap execution facilities, derivatives clearing organizations, futures commission merchants, and swap dealers.

75.    Before a DCM may list a new regulated contract for trading, it must follow one of two procedural pathways.

76.    *First*, under 17 C.F.R. § 40.3 ("Regulation 40.3"), a DCM may submit a new contract to the Commission for review and approval before listing.  The Commission may not approve new contracts for listing if doing so would violate the CEA or the Commission's rules.  7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b).

---

[17] The CFTC and the Securities and Exchange Commission jointly regulate security futures products.

14

77.    *Second*, under 17 C.F.R. § 40.2 ("Regulation 40.2"), a DCM may "self-certify" that a new contract complies with the CEA and the Commission's regulations, in which case the DCM may list the contract within one business day after submission without prior Commission approval.

78.    This second route is subject to the Commission's authority to stay the listing if (among other reasons) the CFTC determines that the DCM's certification of statutory and regulatory compliance is false.

79.    DCMs may not self-certify contracts for listing that do not comply with the CEA.

**B.    Swaps Versus Futures: History and Definitions**

80.    "Contracts of sale of a commodity for future delivery" (commonly called "futures") and "swaps" have distinct regulatory histories reflecting Congress's evolving understanding of the risks posed by these financial instruments.

81.    Futures have been subject to federal oversight for over a century, tracing back to the Future Trading Act, ch. 86, 42 Stat. 187 (1921), and the Grain Futures Act, ch. 369, 42 Stat. 998 (1922), later amended by the CEA.

82.    In contrast, swaps were largely unregulated for most of that period, leading to the proliferation of complex financial instruments with little oversight.

83.    Then came the 2008 financial crisis.  In its aftermath, Congress found that unregulated swaps had played a foundational role in the crash of the global economy.

84.    Congress responded by passing Dodd-Frank to provide stringent regulations of swaps—stricter than for futures—and thereby protect the U.S. economy from the risks that had caused so much financial destruction.

85.    As amended by Dodd-Frank, the CEA sets forth separate definitions for swaps and futures.

15

86.    *Swaps.*  In Dodd-Frank, Congress for the first time added a definition of the term "swap" to the CEA.

87.    Under the CEA as amended by Dodd-Frank, a swap includes any "agreement, contract, or transaction . . . that provides on an executory basis for the exchange . . . of [one] or more payments based on the value or level of [one] or more . . . commodities . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level *without also conveying a current or future direct or indirect ownership interest in an asset* . . . or liability that incorporates the financial risk so transferred."  7 U.S.C. § 1a(47)(A)(iii) (emphasis added).

88.    The definition is broad by design: it captures the wide range of contracts under which parties exchange payments based on price changes in an underlying instrument or asset without taking ownership of the underlying or delivery of a cash payment of equivalent value.

89.    A swap is defined to *exclude* "any contract of sale of a commodity for future delivery"—*i.e.*, futures contracts.  *Id.* § 1a(47)(B)(i).

90.    *Futures.*  As noted, the CEA has long regulated any "contract of sale of a commodity for future delivery," colloquially (but not statutorily) called a "future."  *Id.* § 2(a)(1)(A).

91.    To qualify as a "contract of sale of a commodity for future delivery," an agreement must convey a direct or indirect interest in a commodity at a particular time in the future.

92.    A "contract of sale of a commodity for future delivery" is thus a standardized agreement for the purchase or sale of a commodity that has a specified expiration date, at which time physical delivery of the underlying commodity or delivery of the cash value of the underlying

commodity is required. Absent a specific agreement "for future delivery," the instrument is not a "contract of sale of a commodity for future delivery."

93.　The CFTC's glossary likewise defines the term "Futures Contract" as "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset."[18]

94.　As the CFTC summarized in recent litigation: "A futures contract is a standardized agreement to purchase or sell a 'commodity' at a future date for a price determined at the contract's inception."[19]

95.　"[C]ontracts of sale of a commodity for future delivery" cover a range of underlying commodities, but all possess these key features. Several examples are illustrative:

- CME's WTI Crude Oil futures contract is a standardized contract for the purchase or sale of 1,000 barrels of West Texas Intermediate crude oil, with physical delivery at Cushing, Oklahoma, on a specified future date.

- CME's E-mini S&P 500 futures contract is a standardized cash-settled contract that settles, on a specified expiration date, at a value equal to the official opening level of the S&P 500 Index multiplied by $50 per index point—delivering the economic equivalent of an interest in the S&P 500 at that moment.

---

[18] *Futures Glossary: Futures Contract*, CFTC, https://www.cftc.gov/LearnAndProtect /AdvisoriesAndArticles/CFTCGlossary/index.htm#futurescontract (last visited June 17, 2026).

[19] Amicus Brief of CFTC at 4, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. argued Apr. 16, 2026), ECF No. 37.2; *see* Amicus Brief of CFTC at 15, *Commonwealth v. KalshiEX LLC*, No. SJC-13906 (Mass. argued May 4, 2026) (same).

- Most apt here, CME's Micro Bitcoin futures contract is a standardized cash-settled contract that settles, on a specified expiration date, at a value equal to the CME CF Bitcoin Reference Rate multiplied by one-tenth of one Bitcoin, delivering the economic value of an equivalent interest in Bitcoin at that time.

96.     Each of these products is a "contract of sale of a commodity for future delivery" under the CEA because each has a predetermined future expiration date and each provides for final settlement of the contract when the commodity or its cash equivalent is tendered.  The latter (cash settlement) is the economic equivalent of receiving the commodity and immediately reselling it.

97.     The CFTC's glossary confirms that delivery exists in each of these examples.  The glossary defines "Delivery" as "[t]he tender and receipt of the actual commodity, the cash value of the commodity, or of a delivery instrument covering the commodity (e.g., warehouse receipts or shipping certificates), used to settle a futures contract."[20]

98.     By contrast, swaps do not "convey[] a . . . direct or indirect ownership interest" in any underlying asset, at any specified date.  7 U.S.C. § 1a(47)(A)(iii).

99.     The swap-future distinction does not turn on whether a product is standardized, exchange-traded, or centrally cleared.

100.    Although swaps historically were traded over-the-counter, many swaps are now standardized, DCM-traded, and centrally cleared.

101.    Indeed, prior to the Kalshi Order, Kalshi's entire product suite consisted of event contracts that are standardized, listed for trading on Kalshi's DCM, and centrally cleared, yet Kalshi had self-certified those products as swaps under the CEA.

---

[20] *Futures Glossary: Delivery*, CFTC, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#delivery (last visited June 17, 2026).

C.        **Swaps Versus Futures: Regulatory and Tax Consequences**

102.    Classifying a derivative as a swap rather than a "contract of sale of a commodity for future delivery" has significant consequences.

103.    Given the swap-specific risks Congress identified, Dodd-Frank created a comprehensive regulatory and tax regime for swaps that is distinct from the regime governing "contracts of sale of a commodity for future delivery."

104.    These requirements impose meaningful operational, financial, and competitive obligations on a venue that lists—and on the participants that trade—swap products.

105.    The principal regulatory and tax differences between "contracts of sale of a commodity for future delivery" and swaps are set forth herein.

106.    *Swap Dealer Registration.*    Section 4s of the CEA and the CFTC's related regulations require any person who makes a market in (meaning, essentially, provides liquidity to the market by regularly quoting bids and offers) or regularly trades swaps above a de minimis threshold to register with the Commission as a swap dealer.  *See* 7 U.S.C. § 6s.  Swap dealers are subject to capital, business-conduct, recordkeeping, and supervision requirements that resemble the broker-dealer regulatory regime in the securities markets.  *See id.*  No analogous registration requirement applies to a person who makes a market in or trades a "contract of sale of a commodity for future delivery."

107.    *Margin Treatment.*    The Commission's regulations govern the initial margin that a derivatives clearing organization must require for cleared positions.  *See* 17 C.F.R. § 39.13(g)(2). Under this rule, a derivatives clearing organization ("DCO") must size initial margin to cover the potential price movement during the time within which the DCO estimates it would be able to liquidate a defaulting clearing member's positions—the "liquidation time."  *Id.* § 39.13(g)(2)(ii).

19

The rule sets a minimum liquidation time of one day for futures; by contrast, for most swaps (including cryptocurrency swaps), the minimum liquidation time is five days. *See id.* § 39.13(g)(2)(ii)(A), (C).

108.    *Swap Data Reporting.* Parts 43 and 45 of the Commission's regulations impose extensive reporting obligations on the venues on which swaps are executed. Part 43 requires real-time public reporting of swap transactions and pricing data. *See id.* §§ 43.1–.7. And Part 45 requires reporting of swap transaction data to a registered swap data repository. *See id.* §§ 45.1–.15. Futures contracts are not subject to this regime.

109.    *Customer Collateral Segregation.* Section 4d(a) of the CEA requires that customer funds and property held in connection with contracts for the "sale of a commodity for future delivery" be segregated in a futures account at the futures commission merchant and at the DCO. *See* 7 U.S.C. § 6d. Customer funds and property held in connection with cleared swap positions are segregated under a different framework called "LSOC," short for "legally segregated, operationally commingled." *See id.* § 6d(f)(2); Protection of Cleared Swaps Customer Contracts and Collateral; Conforming Amendments to the Commodity Broker Bankruptcy Provisions, 77 Fed. Reg. 6336, 6339, 6370 (Feb. 7, 2012) (codified in 17 C.F.R. pts. 22, 190). Futures are not subject to LSOC.

110.    *Section 1256 Tax Treatment.* Section 1256 of the Internal Revenue Code provides that 60 percent of any gain or loss on a "regulated futures contract" is treated as long-term capital gain or loss, and 40 percent as short-term, regardless of the taxpayer's actual holding period. 26 U.S.C. § 1256(a)(3), (b)(1)(A). The Code also permits a taxpayer to carry back net losses on Section 1256 contracts to each of the three taxable years preceding the loss year. *See id.* § 1212(c). Commodity swaps are expressly excluded from this preferential treatment. *See id.*

§ 1256(b)(2)(B).  Instead, swaps are taxed like any other investment, subject to short-term capital gains taxation unless the position is held for more than one year.  *See id.* § 1222(1), (3).

## III.    Perpetual Contracts and the CFTC

### A.      Perpetual Contracts: Definitions

111.    A perpetual contract is a derivative that is intended to track the current ("spot") price of an underlying asset, such as Bitcoin.

112.    Unlike a "contract of sale of a commodity for future delivery," a perpetual contract has no expiration date.  Neither party is obligated, at any future expiration date, to deliver the underlying asset or to pay the cash value of the delivered commodity.  A party may hold its position perpetually—hence the name.[21]

113.    To keep the contract's price aligned with the price of the underlying asset, perpetual contracts use a mechanism called a "funding rate," which requires frequent payments exchanged between the long and short sides of the contract.

114.    When the perpetual is trading above the spot price of the underlying commodity, the long side pays the short side; when it is trading below the spot price, the short side pays the long side.

115.    An illustration demonstrates the mechanics.  Assume that Bitcoin trades on the spot market at $50,000 and that the perpetual contract on Bitcoin is trading at $50,500—*i.e.*, $500 above the spot price.  The funding mechanism will require holders of long positions in the perpetual to make periodic cash payments to holders of short positions, which is intended to incentivize trading in the perpetual to bring its price down toward the $50,000 spot price.  If the perpetual instead

---

[21] CME does not here challenge derivative products that have similar features to perpetuals but have expiration dates.

trades at $49,500, the funding mechanism operates in the opposite direction: holders of short positions pay holders of long positions, intended to incentivize trading in the perpetual to bring its price up toward spot.

116.    This instrument's features fit the CEA's statutory definition of a "swap."

117.    A perpetual contract "provides on an executory basis for the exchange . . . of [one] or more payments based on the value or level of . . . commodities"—those are the funding payments, which rise and fall with the difference between the perpetual contract price and the price of the underlying asset.  7 U.S.C. § 1a(47)(A)(iii).

118.    The perpetual "transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level." *Id.*  That is the contract's purpose: speculation—in real or near-real time—on the changing spot price of the underlying.

119.    The perpetual does so "without also conveying a current or future direct or indirect ownership interest in an asset . . . that incorporates the financial risk so transferred." *Id.*  No Bitcoin is delivered and no cash settlement occurs.

120.    A perpetual does not convey any interest in a commodity and lacks any expiration date so is not a "contract of sale of a commodity for future delivery."

B.    **The CFTC's Prior Approach to Perpetual Contracts**

121.    Until May 29, 2026, perpetual contracts were not traded in the United States.  As the CFTC explained, "the majority of trading occurr[ed] on offshore trading venues."  Policy Statement, 91 Fed. Reg. at 33,161.

22

122.   The CFTC has brought a series of enforcement actions against offshore entities offering trading in perpetuals based on the premise that perpetual contracts meet the definition of "swap" in the CEA as amended by Dodd-Frank.

123.   For example, in its 2023 action against Binance, the CFTC's predicate legal theory tracked the CEA's classification exactly.  The CFTC stated that "Binance ha[d] . . . offered two categories of digital asset derivatives that it calls 'futures'—one category, called quarterly futures, [was] composed of contracts that have pre-determined expiration dates while the other category, perpetual contracts, [was] composed of contracts that do not have an expiration date."  Compl. ¶ 60, *CFTC v. Zhao*, No. 23-cv-1887 (N.D. Ill. Mar. 27, 2023), ECF No. 1 ("*Zhao* Compl.").  The Commission explained that "Binance's perpetuals are swaps," citing the contracts' transfer of price risk between parties, their lack of any pre-determined expiration date, and their use of a funding-fee mechanism that required routine payments between the parties.  *Id.* ¶ 62.

124.   The Commission took the identical position in other enforcement actions involving offshore perpetuals.  *See* Compl. ¶ 125, *CFTC v. HDR Glob. Trading Ltd.*, No. 20-cv-8132 (S.D.N.Y. Oct. 1, 2020), ECF No. 1 ("*HDR Glob.* Compl.") (alleging that "[c]ertain products that have traded on BitMEX, including 'perpetual swaps' or 'perpetual contracts' on [B]itcoin, [E]ther, and [L]itecoin, are swaps as defined by 7 U.S.C. § 1a(47)"); Compl. ¶ 23, *CFTC v. Eisenberg*, No. 23-cv-173 (S.D.N.Y. Jan. 9, 2023), ECF No. 1 ("*Eisenberg* Compl.") (alleging that "'[p]erpetual futures' and 'perpetuals'" on the Mango Markets platform "meet the definition of 'swaps' under the Act"); Consent Order at 5, *In re Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023) ("*Deridex* Consent Order") (consent order entered against operator of "a multiple-to-multiple trading platform designed to facilitate the trading of perpetual contracts, which are 'swaps' under . . . Section 1a(47) of the Act"); Compl. ¶ 41, *CFTC v. Mek Glob. Ltd.*, No. 24-cv-2255 (S.D.N.Y.

23

Mar. 26, 2024), ECF No. 1 ("*Mek Glob.* Compl.") (alleging that "[p]erpetual futures"—"also . . . referred to in the digital asset industry as 'perpetual swaps,' 'perpetual contracts,' or simply 'perpetuals'"—"transfer, as between the parties to the transaction, the financial risk associated with a future change in one or more commodities without conveying a current or direct or indirect ownership in those commodities," and concluding that "[p]erpetual futures are 'swaps' under the Act").

125.    Whether and on what terms perpetuals should be available domestically—and how they should be classified—has been a topic of recent debate, including before the CFTC.

126.    In April 2025, the CFTC issued a Request for Comment to "better understand" perpetuals.[22]

127.    The request asked for comments to "inform . . . the Commission as it considers how current regulations would best apply to Perpetual[s]" and posed sixteen questions, including "[s]hould Perpetual Derivatives be classified as swaps or future contracts?"[23]

128.    The request also sought public input on the policy implications of allowing perpetuals to be available domestically, including input on the "unique risks" perpetuals pose for market participants and markets more broadly, the "unique concerns" about perpetuals' susceptibility to manipulation, and the likely user base for perpetuals.[24]

129.    The request received over 150 comments from interested parties.[25]

---

[22] CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives 1 (Apr. 21, 2025), https://www.cftc.gov/media/12041/Perpetuals_RFC042125/download (attached as Exhibit 3) ("Apr. 2025 Request for Comment").

[23] *Id.* at 1, 3.

[24] *Id.* at 2–3.

[25] *See* Comments for General CFTC Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (opened for comment Apr. 21, 2025),

130.    The CFTC never responded to any of those comments or issued a rule.

**C.    Kalshi's Application and CFTC's Blanket Approval of Cryptocurrency Perpetuals**

131.    Rather than address the policy questions that the CFTC had previously posed, the CFTC acted overnight on Kalshi's application to list BTCPERP as a futures contract on its exchange.

132.    On May 28, 2026, Kalshi submitted a request (the "Application") to the Commission, pursuant to 7 U.S.C. § 7a-2(c)(4) and Regulation 40.3, seeking approval to list BTCPERP—a perpetual contract pegged to the spot price of Bitcoin—as a futures contract.[26]

133.    The Bitcoin perpetual has no fixed expiration, or "future delivery" in the CEA's terms.  Instead, it persists indefinitely, with long and short position holders exchanging periodic "funding payments" calculated frequently based on the difference between the contract's mark price and the underlying Bitcoin spot price.[27]

134.    In support of its requested classification, Kalshi analyzed the Bitcoin perpetual against what it described as "relevant judicial precedent and Commission guidance."[28]

135.    Kalshi's authorities, however, all predated the 2010 enactment of Dodd-Frank— the legislation in which Congress for the first time defined the term "swap" and imposed a restrictive regulatory architecture specific to such instruments.[29]

---

https://comments.cftc.gov/publiccomments/CommentList.aspx?id=7584 (last visited June 17, 2026).

[26] Letter from Xavier Sottile, Head of Markets, KalshiEX LLC, to Sec'y, CFTC (May 28, 2026) (attached as Exhibit 4).

[27] *See id.* at 3–4.

[28] *Id.* at 20.

[29] *See id.* at 20–22 & nn.29–43 (collecting cases decided between 1979 and 2008).

136.    Kalshi's Application also did not cite the Dodd-Frank provision defining the term "swap," 7 U.S.C. § 1a(47), explain why the Bitcoin perpetual was a "contract of sale of a commodity for future delivery" rather than a swap under the statutory definition, or acknowledge the CFTC's consistent position treating perpetual contracts as swaps in enforcement actions against Binance, BitMEX, Mango Markets, Deridex, and KuCoin.  *See* ¶¶ 122–124, *supra*.

137.    The day after Kalshi filed its Application, on May 29, 2026, the Commission—acting through Chairman Selig, its lone current member—issued the Kalshi Order approving the listing of the Bitcoin perpetual as a futures contract.

138.    The Commission's regulations give it forty-five days to review such an application, with "an additional 45 days" available where, as here, the product raises "novel or complex issues." 17 C.F.R. § 40.3(c)(2).  The Commission can request to further "extend the review period for any period of time to which the registered entity agrees in writing."  *Id*. § 40.3(c)(3).

139.    In past approval actions, the CFTC has utilized such extensions to elongate review beyond the initial forty-five-day review period—and even further. [30]

---

[30] *See, e.g.*, Order Approving the Listing of the Chicago Mercantile Exchange's S&P 500 Dividend Index Futures Contract at 2, *In re Chi. Mercantile Exch.'s Approval Request for the S&P 500 Dividend Index Futures Contract* (CFTC July 22, 2015), https://www.cftc.gov/sites/default/files /groups/public/@otherif/documents/ifdocs/ProdCMEApprovalOrdrDividx_1507.pdf (approving an application after a 1,834-day review period due to multiple review period extensions, including an extension "by 45 days because of the novel and complex policy issues raised by the proposed contract" and subsequent "extensions agreed to in writing"); CFTC, Statement of the Commission 1, 11–12 (June 14, 2010), https://www.cftc.gov/sites/default/files/idc/groups/public/@otherif /documents/ifdocs/mdexcommissionstatement061410.pdf (approving an application after a 97-day review period); Letter from Eileen Donovan, Acting Sec'y, CFTC, to John Labuszewski, Managing Dir. of Rsch. & Prod. Dev., CME 1 (Jan. 31, 2007), https://www.newyorkfed.org/medialibrary/media/markets/AnnexC_CME_Memorandum_Exhibit s_Part_B.pdf ("Donovan Jan. 2007 Letter") (approving an application after a 106-day review period).

140.    The CFTC also commonly requests public comment before approving applications.[31]

141.    Though the CFTC recognized that the Kalshi Application raised "novel" and "complex" issues, Policy Statement, 91 Fed. Reg. at 33,161, the Commission decided the matter in a single day.

142.    The CFTC did not provide any opportunity for public comment on the Kalshi Application.

143.    In the Kalshi Order, the CFTC effectively parroted Kalshi's classification analysis.

144.    Like Kalshi's Application, the Order does not cite or analyze 7 U.S.C. § 1a(47), the Dodd-Frank provision defining "swap[s]," and does not explain why the Bitcoin perpetual is a "contract of sale of a commodity for future delivery" rather than a swap under that provision.

145.    Indeed, the word "swap" appears nowhere in the Order.

146.    At the same time, the Order admits that "[t]raditional futures contracts converge at the spot price because at expiry of the futures contract, the potential obligation to make or take delivery, or to make a payment based on the settlement reference price, incentivizes the futures contract's price to converge to the spot market price of the underlying commodity." Kalshi Order 6. The Order further recognizes that a "perpetual contract has no expiry." *Id.* at 7.

---

[31] *See, e.g.*, Press Release, CFTC, Statement of Richard Shilts, Director, Division of Market Oversight on Meeting of the Commodity Futures Trading Commission to Discuss: Futures and Binary Options Based on Box Office Receipts (May 19, 2010), https://www.cftc.gov/PressRoom /SpeechesTestimony/shiltstatement051910 (noting MDEX and Cantor "movie futures" contracts were "posted on the Commission's website for public comment" during the review period); Donovan Jan. 2007 Letter, *supra* note 30, at 1 ("The Commission posted all of the filings on its website with a request for public comment . . . ."); Letter from Eileen Donovan, Acting Sec'y, CFTC, to John Labuszewski, Managing Dir. of Rsch. & Prod. Dev., CME at 1 (June 5, 2007), https://www.newyorkfed.org/medialibrary/media/markets/AnnexC_CME_Memorandum_Exhibit s_Part_A.pdf ("The Commission requested public comment on the CME's Contract . . . .").

147. The Order does not acknowledge, much less justify, a departure from the CFTC's past consistent practice of classifying perpetuals as swaps across a series of enforcement actions. *See* ¶¶ 122–124, *supra*.

148. Instead, the Kalshi Order's classification analysis consists of a recitation of the arguments contained in Kalshi's Application, *see* Kalshi Order 1–6 & nn.2–20, including its extensive (and exclusive) reliance on pre-Dodd-Frank case law, *see id.* at 3–6 & nn.10–19.

149. But the Order fails even to engage with much of that case law, which confirms that, to be a "contract of sale of a commodity for future delivery," a derivative must have precisely what a perpetual contract lacks: a fixed future expiration.

150. The Fourth Circuit, for example, defined a future as an "agreement providing for the future delivery of a commodity *on a date certain* where the grade, quantity, and price at the time of delivery are fixed." *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) (emphasis added).

151. Rather than wrestle with that precedent, the Order merely reproduces out-of-context quotations that appear to support Kalshi's position. *See* Kalshi Order 4.

152. After setting out Kalshi's arguments, the Order purports to "find[] that listing the BTCPERP Contract . . . would not violate the CEA or the Commission's regulations thereunder." *Id.* at 6. The CFTC states that "[t]his finding is based on the Commission's review of Kalshi's analysis of the categorization of the [Bitcoin perpetual] contract." *Id.*

153. The Order's only substantive contribution is a short discussion of why, in the CFTC's view, certain characteristics of the Bitcoin spot market support the functioning of the Bitcoin perpetual's funding-rate mechanism for purposes of a single DCM core principle (of which there are more than twenty, *see* 7 U.S.C. § 7(d)). Per the CFTC, the Bitcoin perpetual satisfies

Core Principle 3, the requirement that listed contracts not be readily susceptible to manipulation. Kalshi Order 6–8; *see* 7 U.S.C. § 7(d)(3).

154.    That analysis does not purport to address the threshold question—whether Kalshi's product is a swap or a future—and, in any event, is deficient.

155.    A "contract for the sale of a commodity for future delivery" forces convergence between contract and spot prices by its structure: at a fixed expiration date, the contract *will* settle at the spot price (whether by physical delivery or cash settlement indexed to spot).

156.    A perpetual contract has no such anchor.  Convergence depends entirely on the funding-rate mechanism, the purpose of which is to force the contract's trading price to spot on an ongoing basis.

157.    That funding-rate mechanism reflects an economic incentive, and its effectiveness depends on how (at times unpredictable or irrational) market participants choose to respond.

158.    The Order does not address whether that incentive can be expected to reliably match the convergence a true future structurally compels, particularly in volatile cryptocurrency markets.

159.    The Kalshi Order's scope is not limited to BTCPERP or Kalshi.

160.    The Order expressly authorizes "Kalshi *and other DCMs* to list for trading, as futures contracts, the BTCPERP Contract . . . *and similarly structured perpetual contracts* that reference the spot price of [B]itcoin *or other digital commodities* that have deep, active, and continuous spot market trading."  Kalshi Order 8 (emphasis added) (footnotes omitted).

161.    Before the Order, *no* perpetual contract had been listed as a future by any DCM.

162.    The Order categorically alters that landscape, expressly authorizing Kalshi and other DCMs to introduce, including via self-certification pursuant to Regulation 40.2, a class of

29

products into the U.S.-regulated cryptocurrency futures market that the CEA and CFTC regulations otherwise foreclose.

163.    The Order concludes by noting that the CFTC "expects in the future to address the regulatory treatment of, and compliance considerations relating to, perpetual contracts more generally," *id.*, underscoring that the Commission has not yet conducted the comprehensive analysis needed to determine how perpetuals should be regulated—even as it simultaneously authorized the listing of a large swath of such contracts via the Order.

164.    Contemporaneously and "in conjunction with the [Kalshi] Order," the CFTC issued a Policy Statement Concerning the Listing of Perpetual Contracts, also dated May 29, 2026.

165.    As with the Kalshi Order, the Chairman acted alone in issuing the Policy Statement. The Policy Statement reads:  "On this matter, Chairman Selig voted in the affirmative.  No Commissioner voted in the negative."  91 Fed. Reg. at 33,162.

166.    The Policy Statement confirms that, prior to the CFTC's issuance of the Kalshi Order, there was no domestic framework for listing perpetual contracts on U.S. exchanges.

167.    It acknowledges that, "given the regulatory uncertainty concerning the appropriate classification of these types of contracts in the U.S. derivatives markets, the market for perpetual contracts has largely developed outside of the United States, with the majority of trading occurring on offshore trading venues."  *Id.* at 33,161.

168.    The Policy Statement nowhere mentions the word "swap" or cites the Dodd-Frank provision defining "swap."

169.    The Policy Statement admits, however, that a perpetual contract is structurally unlike a "contract of sale of a commodity for future delivery" because they "have no expiration date . . . to achieve convergence," raise distinctive regulatory concerns, and pose "novel and

30

complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency with the Core Principles applicable to registrants under the CEA." *Id.*

170.    For example, the Policy Statement points to "DCM Core Principle 3, which requires that a DCM list only those contracts that are not readily susceptible to manipulation." *Id.*

171.    While "traditional, cash-settled futures contract[s]" satisfy that requirement because "the susceptibility-to-manipulation analysis" looks only to "one moment in time" (*i.e.*, the time of expiry), the CFTC admits that the analysis for perpetuals is different. *Id.* "For a perpetual contract, . . . the reference must be reliable at every funding interval, without interruption, for as long as the contract remains active." *Id.*

172.    Despite these complexities, the Policy Statement draws a distinction between perpetuals "contemplated in the [Kalshi] Order"—namely, perpetuals referencing the spot price of Bitcoin or other similar digital commodities—and all other perpetual contracts. *Id.*

173.    With respect to perpetuals falling *outside* the Kalshi Order's scope, the Policy Statement says that such perpetuals "should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3." *Id.*

174.    In the same breath, the Policy Statement relieves DCMs of such requirements as to perpetuals referencing digital commodities of the type approved in the Kalshi Order, thus purporting to authorize DCMs to self-certify such contracts under Regulation 40.2 without obtaining prior Commission approval.

175.    In so doing, the Policy Statement acknowledges the new regulatory landscape that the Order created, literally overnight, for an entire category of "novel" and "complex" derivatives products. *Id.*

31

176. On the same day, Chairman Selig published an op-ed stating that the CFTC had taken "historic action" in approving cryptocurrency perpetuals and acknowledging that perpetual contracts are "[u]nlike a traditional futures contract" because they have "no fixed expiration date."[32]

### D. The Immediate Effects of the CFTC's Approval

177. The CFTC's sweeping actions had immediate effects on U.S. derivatives markets.

178. Also on May 29, 2026, CFTC staff issued a no-action letter to Coinbase, another DCM, indicating that, "[c]onsistent with the [Kalshi] Order," the CFTC would not prohibit Coinbase from listing as foreign futures certain perpetual contracts pegged to cryptocurrencies.[33]

179. Between June 1 and June 5, 2026, Kalshi proceeded to self-certify more than a dozen additional cryptocurrency-based perpetual contracts as futures pursuant to the Kalshi Order and Policy Statement's green light.[34]

---

[32] Michael S. Selig, *What American Crypto Asset Perpetuals Mean for the Future of Crypto*, CoinDesk (May 29, 2026), https://www.coindesk.com/opinion/2026/05/29/what-american-crypto-asset-perpetuals-mean-for-the-future-of-crypto.

[33] Duncan Hennes, Dir., Market Participants Div., CFTC, CFTC Letter No. 26-17, Re: Staff Interpretation Regarding the Categorization of Deribit Perpetuals as Foreign Futures and No-Action Position Regarding Digital Commodities and Payment Stablecoins Deposited to Margin Customer Positions with a Foreign Broker Under a Right of Re-Use 8 (May 29, 2026) (attached as Exhibit 5).

[34] *See Designated Contract Market Products: Search Designated Contract Market Products*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts (last visited June 17, 2026) (to access, select "KEX" from "Organization" dropdown, then type "06/01/2026" in "Status Date From" field, then type "06/05/2026" in "Status Date To" field).

180. On June 12, 2026, in response to letters from Bitnomial and Coinbase, the CFTC issued another no-action letter, authorizing DCMs to "remove the expiration dates" from their "digital commodity futures contracts" and convert them into perpetual contracts.[35]

181. The CFTC acknowledged that such a conversion "raises novel and complex issues that require additional time to analyze" and that market participants with open positions on those contracts might be "adversely affect[ed]."[36]

182. Nonetheless, the CFTC "determined, consistent with the [Kalshi] Order and the CFTC Perpetuals Policy Statement," that it would not "take action to issue a stay" on the conversions.[37]

183. The letter confirms that, until the Kalshi Order, the industry understood that even "perpetual-style" contracts were required to have expiration dates.[38]

184. Prior to the CFTC's issuance of the Kalshi Order and Policy Statement, DCMs like Kalshi seeking to list perpetual contracts as futures had not attempted to certify "that the product to be listed complies with the Act and Commission regulations thereunder" because the CFTC's position had been that perpetual contracts are swaps and not futures. 17 C.F.R. § 40.2(a)(3)(iv); *see* ¶¶ 77–79, *supra*.

185. The Kalshi Order purports to invite all DCMs to begin listing these products as futures without further review.

---

[35] Joshua Beale, Acting Dir., Div. of Market Oversight, CFTC, CFTC Letter No. 26-19, Re: No-Action Positions Regarding Removal of Expiration Dates from Existing Digital Commodity Perpetual-Style Futures Contracts (June 12, 2026) (attached as Exhibit 6).

[36] *Id.* at 5.

[37] *Id.* at 6.

[38] *Id.* at 2.

186. Chairman Selig has since characterized his actions as "put[ting] out kind of a rule, essentially," regarding the legal status of perpetuals.[39]

187. The events since the CFTC's Order and Policy Statement only underscore Chairman Selig's promise that these actions would be "historic."[40]

188. In one day, without reference to the applicable statute or the agency's own prior position, the CFTC swept away Congress's strict regulatory regime for swaps in order to approve as a contract for future delivery a product with no future delivery date and never previously available in domestic markets—and to do so for any futures exchange seeking to offer any similar product.

### COUNT ONE

**Unlawful Agency Action—Violation of Commodity Exchange Act
5 U.S.C. § 706(2) and 7 U.S.C. §§ 1a(47), 7a-2(c)(5)(B)**

189. The foregoing paragraphs of this complaint are repeated and realleged as if fully set forth herein.

190. Under the CEA, the CFTC may not approve a new contract for listing if it would violate either the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b). Under the CFTC's regulations, a request for approval of a new contract must establish the contract's "compliance with applicable provisions of the Act, including core principles, and the Commission's regulations thereunder." 17 C.F.R. § 40.3(a)(4).

191. The Kalshi Order is contrary to law because its conclusion that Kalshi's proposed Bitcoin perpetual is a "contract of sale of a commodity for future delivery" violates the plain terms

---

[39] *CFTC Chair Michael Selig Tackles Perpetual Futures "Misconceptions,"* CNBC, at 4:17–:21 (June 15, 2026), https://www.cnbc.com/video/2026/06/15/cftc-chair-michael-selig-tackles-perpetual-futures-amisconceptionsa.html.

[40] Selig, *supra* note 32.

of the CEA. Kalshi's Bitcoin perpetual meets the CEA's definition of a swap; it is not a "contract of sale of a commodity for future delivery" under that statute.

192. Perpetual contracts fit the CEA's statutory definition of a "swap" hand in glove, so they are subject to heightened regulatory requirements under Dodd-Frank. Again, a perpetual contract "provides on an executory basis for the exchange[] . . . of [one] or more payments based on the value or level of . . . commodities"—those are the funding payments, which rise and fall with the difference between the perpetual contract price and the price of the underlying asset. 7 U.S.C. § 1a(47)(A)(iii). A perpetual contract "transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level"— that is the contract's entire purpose (speculation on the price of the underlying). *Id*. And it does so "without also conveying a current or future direct or indirect ownership interest in an asset," *id*., at any "future delivery" or other expiration date, *id*. § 1a(47)(B)(i).

193. The CFTC's consistent prior position classifying perpetual contracts as swaps confirms the straightforward statutory construction. In its 2023 action against Binance, the CFTC's legal theory proceeded from the premise that "Binance's perpetuals are swaps," citing the contracts' transfer of price risk between parties, their lack of any pre-determined expiration date, and their use of a funding-fee mechanism that required routine payments between the parties. *Zhao* Compl. ¶ 62. The Commission took that same position across many different enforcement actions involving offshore perpetuals. *See HDR Glob*. Compl. ¶ 125; *Eisenberg* Compl. ¶ 23; *Deridex* Consent Order 5; *Mek Glob*. Compl. ¶ 41.

194. Contrary to the CFTC's conclusion, Kalshi's Bitcoin perpetual and similar digital commodity perpetuals are not "contracts of sale of a commodity for future delivery" under the CEA. 7 U.S.C. § 2(a)(1)(A). The defining characteristic is the demand for "future delivery" by a

date certain. In contrast, the defining feature of a perpetual contract—the one that gives the product its name and its commercial appeal—is the *absence* of any future delivery. By design, a perpetual contract does not involve delivery of a commodity (or the payment of its cash value by a date certain), and the parties' obligations never come due on any future date. A perpetual contract therefore cannot by definition be a contract "for future delivery" within the express terms of the CEA.

195.    Case law confirms that a contract lacking "future delivery" is not a "contract of sale of a commodity for future delivery." *See, e.g.*, *Salomon Forex*, 8 F.3d at 971 (defining a futures contract as requiring "future delivery of a commodity on a date certain"); *CFTC v. Erskine*, 512 F.3d 309, 323, 325–26 (6th Cir. 2008) (holding that a "futures contract" must specify expiration "at or before a stated future time" and finding the contracts at issue were not futures because they lacked such a date).

196.    As the D.C. Circuit has put it: "A commodities futures contract is an executory contract for the sale of a commodity executed at a specific point in time with delivery of the commodity postponed to a future date." *Hunter v. FERC*, 711 F.3d 155, 156 (D.C. Cir. 2013).

197.    So, too, the CFTC's own, consistent definition provides that a "Futures Contract" is "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset."[41]

---

[41] *Futures Glossary: Futures Contract*, *supra* note 18; *accord* Order Instituting Proceedings Pursuant to Sections 6(c), 6(d) and 8a of the Commodity Exchange Act & Making Findings & Imposing Remedial Sanctions at 3, *In re Daniel Shak & SHK Mgmt. LLC*, CFTC No. 14-03 (Nov. 25, 2013), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions /documents/legalpleading/enfshakorder112513.pdf ("A commodity futures contract . . . is an

198.   Chairman Selig's contemporaneous statements confirm that perpetual contracts are "[u]nlike a traditional futures contract" because perpetuals lack the "fixed expiration date" the statute requires of futures.[42]

199.   The key textual difference between a swap and a "contract of sale of a commodity for future delivery"—the "future delivery" element—also tracks Congress's heightened regulatory requirements for swaps. A futures contract, by virtue of its fixed expiration date, forces a market participant to confront its position at a date certain—to roll the contract into the next month, to close it out, or to hold it until expiration. That delivery date imposes a discipline on the use of futures as a financial product. As the Kalshi Order put it, "[t]raditional futures contracts converge at the spot price because at expiry of the futures contract, the potential obligation to make or take delivery, or to make a payment based on the settlement reference price, incentivizes the futures contract's price to converge to the spot market price of the underlying commodity." Kalshi Order 6. By contrast, a perpetual contract, as a swap, can be held indefinitely without any forced reassessment, even as funding payments accumulate and the holder's economic position drifts from any original investment strategy. This dynamic can lead to significant losses, as Congress recognized in Dodd-Frank by providing for special regulatory requirements for swaps.

200.   Fixed expiration imposes discipline not only on individual market participants, but also on the market itself. Because a true future settles at the spot price on a fixed date, market participants trade based on the spot price they expect at that future date. The forward delivery requirement thus generates a "forward curve" that reflects market expectations about prices at

---

agreement for the purchase and sale of a particular commodity for delivery on a fixed date in the future at a price that is determined at initiation of the contract, that obligates each party to the contract to fulfill the contract at the specified price, that is used to assume the price risk and that may be satisfied by delivery or offset.").

[42] Selig, *supra* note 32.

successive future dates.  A perpetual contract, on the other hand, uses a funding-rate mechanism that is recalculated multiple times daily and is intended to track the current spot price.  Perpetuals do not, then, reflect the market's view on futures prices and offer no analog to the forward curve that defines a true futures market.  The absence of any forward curve is itself evidence that the contract lacks the futurity the CEA's "future delivery" requirement contemplates.

201.    The Policy Statement is likewise invalid because it authorizes DCMs to self-certify cryptocurrency-based perpetual contracts as futures in reliance on the Kalshi Order, notwithstanding the fact that, as just discussed, those contracts are swaps and not "contract[s] of sale of a commodity for future delivery" as those terms are defined in the CEA.

202.    Furthermore, the CEA itself imposes additional procedural requirements upon the CFTC before approving the listing of a swap.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(iii)(I).  Because the CFTC here never considered whether Kalshi's Bitcoin perpetual was a swap, it failed to follow these extra steps.  This error, too, warrants vacatur.

## COUNT TWO
### Unlawful Agency Action—Arbitrary and Capricious Decisionmaking
### 5 U.S.C. § 706(2)

203.    The foregoing paragraphs of this complaint are repeated and realleged as if fully set forth herein.

204.    The CFTC may not approve the BTCPERP Contract if doing so would violate the CEA or its regulations.  *See* 7 U.S.C. § 7a-2(c)(5)(B) ("The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations).").

205.    In making that determination, the agency cannot "delegate its responsibility to the regulated party."  *Susquehanna Int'l Grp. v. SEC*, 866 F.3d 442, 446–47 (D.C. Cir. 2017) (an

38

agency's "unquestioning reliance on [a regulated party's] defense of its own actions is not enough" to satisfy an agency's obligation to make a statutorily required finding).

206.    The APA instead demands that agencies engage in independent decisionmaking. "An agency's decision is . . . arbitrary and capricious if it merely rubberstamps a regulated party's analysis." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1079 (D.C. Cir. 2026); *see also In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022) (concluding that an agency adjudication fails to provide a "'reasoned explanation'" where it "simply rubberstamp[s]" the analysis of one of the parties (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009))).  This is because there is "'little' supporting value in the 'self-serving views of the regulated entit[y].'" *Susquehanna Int'l*, 866 F.3d at 447 (alteration in original) (quoting *NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010)).

207.    The CFTC did not engage in its own analysis of whether its approval of Kalshi's Bitcoin perpetual as a future is consistent with law.  The CFTC did not even mention the relevant Dodd-Frank provision defining "swap."  Indeed, the word "swap" appears nowhere in the Order.

208.    Instead, the CFTC effectively delegated its responsibility to Kalshi and rubberstamped Kalshi's application.  The Order reproduces the arguments from Kalshi's Application, including its reliance on case law that exclusively predated the passage of Dodd-Frank. Kalshi Order 2–5.  The Order then concludes—with no independent analysis of the relevant statutory provision—that listing the Bitcoin perpetual as a futures contract "would not violate the CEA or the Commission's regulations thereunder." *Id.* at 6.

209.    In addition, the APA requires agency adjudicatory orders to be reasonable and reasonably explained. *See Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) ("The requirement of reasoned decisionmaking indisputably applies in situations involving judicial review of agency

adjudicatory actions."). The requirement of reasoned decisionmaking imposes a host of obligations on the agency.

210. Among them, the agency must consult the applicable statutory provisions and explain how its decision comports with them. *See Picur v. Kerry*, 128 F. Supp. 3d 302, 310 (D.D.C. 2015) (K.B. Jackson, J.) (failure "to consult *any* of the [relevant] statutory provisions" renders a decision arbitrary and capricious); *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 409, 416 (D.C. Cir. 2011) ("Given [the agency's] complete failure to explain its reading of the statute, we find it impossible to conclude that [its] cease-and-desist order was anything other than arbitrary and capricious, and hence unlawful.").

211. The APA likewise requires agencies to provide a reasoned explanation when they announce a change in position. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). This obligation is triggered when an agency changes position between adjudicatory orders, *see Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 186–87 (D.C. Cir. 2022); *Fox Television*, 556 U.S. at 506–12, 517–18, and requires the agency to both "acknowledge and provide an adequate explanation for its departure from established precedent," *Dillmon v. NTSB*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009); *see Fox Television*, 556 U.S. at 515 (the agency must "display awareness that it *is* changing position").

212. The APA also requires agencies to consider "important aspect[s] of the problem" in adjudications. *Saad v. SEC*, 718 F.3d 904, 910 (D.C. Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

213. The Kalshi Order does none of this. The Order does not analyze whether a perpetual contract qualifies as a swap under the CEA or even acknowledge the CFTC's prior classification of these products as swaps, let alone explain the change in position.

40

214. The Policy Statement likewise does not discuss these issues.

215. Nor does the Order or the Policy Statement so much as acknowledge the immense policy implications of greenlighting not only Kalshi's Bitcoin perpetual but also self-certification of *all* similar perpetual contracts based on digital commodities.

216. Specifically, in addition to authorizing Kalshi's BTCPERP Contract, the Kalshi Order also authorized "other DCMs to list for trading, as futures contracts, . . . similarly structured perpetual contracts that reference the spot price of Bitcoin or other digital commodities." Kalshi Order 8.

217. The Policy Statement further privileges this class of perpetual contracts, emphasizing that other perpetuals "should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3." 91 Fed. Reg. at 33,161.

218. That pronouncement effected a sea change in the regulatory landscape. Before the Order, no DCM in the United States had listed any perpetual contracts. After the Order, Kalshi self-certified more than a dozen additional cryptocurrency perpetuals in reliance on the CFTC's authorization.

219. The CFTC itself acknowledged that, before deciding whether and on what terms perpetuals should be available, it was important to understand the "unique risks" perpetuals pose to market participants and markets and the "unique concerns" that perpetuals are susceptible to manipulation.[43] The CFTC did not consider any of those implications.

220. Rather than explain or analyze how perpetual contracts should be regulated, the Kalshi Order states that the CFTC "expects in the future to address the regulatory treatment of,

---

[43] Apr. 2025 Request for Comment, *supra* note 22, at 2.

and compliance considerations relating to, perpetual contracts more generally." Kalshi Order 8. That statement only underscores that the CFTC failed to analyze important considerations before issuing the Kalshi Order and Policy Statement.

221. The CFTC's failure to engage in its own independent analysis, analyze the relevant statutory definitions, acknowledge—much less explain—its change of position, or grapple with important parts of the problem render its actions arbitrary and capricious under the APA, requiring vacatur of the Kalshi Order and Policy Statement.

## PRAYER FOR RELIEF

Based on the foregoing allegations, Plaintiff Chicago Mercantile Exchange Inc. requests that the Court grant the following relief:

A.     Vacatur of the CFTC's Order Approving KalshiEX LLC BTCPERP Futures Contract, dated May 29, 2026;

B.     Vacatur of the CFTC's Policy Statement Concerning the Listing of Perpetual Contracts, dated May 29, 2026;

C.     A declaration that Kalshi's Bitcoin perpetual contract and similar perpetual digital commodities contracts are "swaps" under the Commodity Exchange Act and that it is therefore unlawful for the CFTC to authorize Kalshi and other DCMs to list such products as futures;

D.     A declaration that the CFTC has acted unlawfully to the extent that, on the basis of the May 29, 2026 Order and Policy Statement, it has failed to stay the listing of perpetual digital commodities contracts submitted to the CFTC pursuant to 17 C.F.R. § 40.2; and

E.     Such other relief that this Court deems just and proper under the circumstances.

Dated:  June 18, 2026

Respectfully submitted,

*/s/ Ian Heath Gershengorn*

Gregory M. Boyle*
Michael F. Linden*
Simon A. de Carvalho*
Elijah N. Gelman*
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
gboyle@jenner.com
mlinden@jenner.com
sdecarvalho@jenner.com
egelman@jenner.com

Ian Heath Gershengorn (D.C. Bar No. 448475)
Elizabeth B. Deutsch (D.C. Bar No. 1719602)
Jonathan J. Marshall (D.C. Bar No. 90020637)†
Anne S. Warnke (D.C. Bar No. 90044560)
Jenner & Block LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com
edeutsch@jenner.com
jmarshall@jenner.com
awarnke@jenner.com

*Counsel for Plaintiff Chicago
  Mercantile Exchange Inc.*

* *pro hac vice* application forthcoming

† application for admission to practice
  before bar of this Court pending

43