# EXHIBIT 1

UNITED STATES OF AMERICA

Before the

COMMODITY FUTURES TRADING COMMISSION

---

In the Matter of the Request for Approval
by KalshiEX LLC of the BTCPERP Futures Contract

---

### ORDER APPROVING KALSHIEX LLC BTCPERP FUTURES CONTRACT

On May 28, 2026, KalshiEX LLC ("Kalshi" or the "Exchange"), a designated contract market ("DCM"), submitted to the Commodity Futures Trading Commission (the "Commission") for review and approval, pursuant to section 5c(c)(4) of the Commodity Exchange Act ("CEA") and Commission Regulation 40.3, a perpetual futures contract that references the spot price of bitcoin (the "BTCPERP Contract").[1]

### THE BTCPERP CONTRACT

The BTCPERP Contract is a cash-settled derivative contract that references the spot price, in U.S. dollars, of one bitcoin, as measured by the CF Benchmarks Bitcoin Real Time Index ("BRTI").[2]  The BRTI provides a continuous measure of the U.S. dollar price of bitcoin, derived from observable transactions on major crypto asset trading platforms.[3]  The BRTI is administered by CF Benchmarks Ltd. ("CF Benchmarks"), which is the source agency for the

---

[1] Kalshi, KalshiEX LLC– Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the BTCPERP Futures Contract (May 28,2026) (the "Submission").

[2] *Id*. at 3 and App. A at 8-11.

[3] *Id.* at App. A at 8, App. C at 14-15, and App. D at 16-18.

1

BTCPERP Contract.[4]  The BTCPERP Contract will trade in units of one ten-thousandth (1/10,000) of one bitcoin.  It will trade 24 hours per day, 7 days per week, throughout the lifetime of the contract, subject to any trading halts imposed by the Exchange.

The BTCPERP Contract has an indefinite (or "perpetual") term, such that it will not expire on a fixed date.  Positions are marked to market on a continuous basis.  In order to maintain price convergence with the underlying reference price, the BTCPERP Contract employs a periodic funding mechanism whereby long and short position holders exchange funding payments that are based on the difference between the contract's mark price and the underlying reference price.

According to Kalshi, the BTCPERP Contract's "perpetual structure, combined with the funding rate mechanism is designed to maintain convergence with the spot reference price, makes the [BTCPERP] Contract functionally superior to dated alternatives for participants whose economic exposure [to bitcoin] is itself perpetual or indefinite in duration."[5]  In this regard, Kalshi explains that perpetual contracts such as the BTCPERP Contract "eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates."[6]

### CONTRACT CLASSIFICATION

As required by Commission Regulation 40.3(a)(4), Kalshi included with its request for Commission approval of the BTCPERP Contract an explanation and analysis of the contract and

---

[4] CF Benchmarks is authorized by the UK Financial Conduct Authority under the EU/UK Benchmarks Regulation (FRN 847100), with compliance independently audited by KPMG under ISAE 3000 reasonable assurance. Submission, App. C at 14-15 and App. D at 16.

[5] *Id*. at App. C at 14.

[6] *Id.*

its compliance with applicable provisions of the CEA, including DCM Core Principles and the Commission's regulations thereunder.[7]  Kalshi states that, based on its analysis, Kalshi is of the view that the BTCPERP Contract is appropriately categorized as a "futures contract" – a contract for sale of a commodity for future delivery – for purposes of compliance with the DCM Core Principles and other provisions of the CEA and Commission regulations thereunder.[8]

Kalshi states that it analyzed whether the BTCPERP Contract "constitutes a futures contract by evaluating the contract's characteristics against relevant judicial precedent and Commission guidance."[9]  Kalshi notes that "[n]either the CEA nor Commission [regulations thereunder] offer a fixed definition of what constitutes a "futures contract,"' and that the Commission and courts have instead "assess[ed] each transaction 'as a whole with a critical eye toward its underlying purpose' by evaluating whether certain characteristics common to futures contracts are present."[10]

Kalshi explains that, historically, the Commission has described futures contracts "as 'standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or "margin" . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities.'"[11]  Kalshi notes that courts "have similarly

---

[7] *Id*. at 1-3, App. E, and App. F.

[8] *Id.* at App. E at 20.

[9] *Id*.

[10] *Id.,* quoting *CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").

[11] Submission at App. E at 20, quoting *In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) (*"Stovall"*).

focused on standardization, fungibility, and offset as the key characteristics of futures contracts."[12]

Kalshi further notes, however, that more recently, in the case of contracts involving intangible commodities such as bitcoin, courts have shifted away from the kind of "totality of circumstances" analysis described above and "have identified whether an executory contract is a futures contract based on whether there is trading 'in the contract.'"[13]  Kalshi states that, when evaluating whether trading "in the contract" exists for a given contract, "courts have looked to whether the contract is standardized and fungible, as evidenced by (i) the contract trading at a fixed, standardized unit quantity, (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements, and (iii) the ability of holders to exit their positions by offset."[14]

Kalshi submits that the BTCPERP Contract "will exhibit all of these futures contract characteristics: the [BTCPERP] Contract will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to … [a] central counterparty; holders will be able to exit their positions via offset; the [BTCPERP] Contract will be available to the general public, including retail participants; parties will enter into the [BTCPERP] Contract for the purpose of assuming or shifting the risk of change in value of the [u]nderlying [(*i.e.*, bitcoin)],

---

[12] Submission at App. E at 20, citing, as an example, to *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms.  The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."), and to *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable.  Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[13] *Id*. at App. E at 21, citing, as examples, to *CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) (*"Erskine"*), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) (*"CME v. SEC"*).

[14] *Id*. at App. E at 21(internal citations omitted).

without the possibility of transferring ownership of the [u]nderlying; and the [BTCPERP] Contract will trade on the centralized market of a DCM."[15]

Kalshi then analyzes whether the indefinite duration of the BTCPERP Contract should affect its categorization as a futures contract. Kalshi states that while courts, at times, have described a futures contract "as providing for the purchase or sale of a commodity 'at a fixed date in the future,' or 'on a date certain,' or 'at or before a stated future time,'"[16] courts have not viewed this characteristic as *necessary* to conclude that a contract is a futures contract.[17] Rather, Kalshi states that "courts have repeatedly explained that, '[w]hile futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[18] In particular, Kalshi notes that "the Seventh Circuit in *CME v. SEC* concluded that contracts of 'indefinite duration' can possess the attribute of 'futurity' – generally associated with futures contracts – because futurity means 'value that is set in the future' and exists where contracts provide for future executory payment obligations, not only where a contract has a final settlement date and fixed term."[19]

Based on its analysis, Kalshi concludes that the BTCPERP Contract is appropriately categorized as a "futures contract" – a contract for sale of a commodity for future delivery – and states that Kalshi intends to treat the BTCPERP Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder.[20]

---

[15] *Id*. at App. E at 21.

[16] *Id.* at App. E at 21(internal citations omitted), quoting, respectively, *CME v. SEC* at 542, *Tauber* at 971, and *Erskine* at 323.

[17] *Id.* at App. E at 21.

[18] *Id*. at App. E at 21-22, quoting *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29.

[19] *Id*. at App. E at 22, citing to *CME v. SEC* at 541.

[20] *Id*. at App. E at 22.

**LEGAL STANDARD**

CEA section 5c(c)(5)(B) provides that, where a DCM has requested that the Commission approve a new contract pursuant to CEA section 5c(c)(4), the Commission shall approve the new contract unless the Commission finds that the contract violates the CEA, including the Commission's regulations.[21]

**FINDINGS AND RULINGS**

Kalshi seeks Commission approval of the BTCPERP Contract, which it categorizes as a perpetual futures contract on the price of bitcoin, with a periodic funding rate mechanism designed to maintain price convergence with the underlying.

Having reviewed the complete record in this matter, the Commission makes the following findings:

The Commission finds that listing the BTCPERP Contract or making the BTCPERP Contract available for clearing or trading as a futures contract – a contract for sale of a commodity for future delivery – would not violate the CEA or the Commission's regulations thereunder.  This finding is based on the Commission's review of Kalshi's analysis of the categorization of the BTCPERP Contract, as described above.  This finding is additionally informed by certain characteristics of the bitcoin spot market that allow that funding rate mechanism to function consistently with DCM Core Principle 3.

Traditional futures contracts converge to the spot price because at expiry of the futures contract, the potential obligation to make or take delivery, or make a payment based on the settlement reference price, incentivizes the futures contract's price to converge to the spot market price of the underlying commodity.  That terminal convergence is why a futures contract is a

---

[21] 7 U.S.C. § 7a-2(c)(5)(B).

hedging and price discovery instrument. A perpetual contract has no expiry and requires a different convergence mechanism. The BTCPERP Contract uses a funding rate mechanism. Market participants with long and short positions exchange periodic payments based on the difference between the mark price of the contract and a reference price that continuously changes reflecting the underlying spot market price. When the price of the contract is above the spot price, market participants with long positions are required to pay on settlement, while market participants with short positions receive payments; when the price of the contract is below the spot price, the reverse occurs. The requirement to make these payments imposes a periodic cost on whichever side is "trading away" from the spot price, creating a continuous economic incentive for the price of the contract to converge towards the spot price. When the price of the contract is below the spot price, there is an incentive to buy the contract to receive periodic payments, which drives up the price of the contract. When the price of the contract is above the spot price, the reverse is true.

Characteristics of the underlying bitcoin spot market support the effective functioning of the funding rate mechanism employed by the BTCPERP Contract, helping to ensure the accuracy of the periodic funding payments, promoting convergence, and reducing the susceptibility of the contract to manipulation. The bitcoin spot market trades 24/7 across broadly distributed trading venues, which allows for the reference price underlying the BTCPERP Contract to be continuously observable while the contract is trading. This broadly distributed trading and continuous observability protects against settlement payments being calculated against stale or synthesized prices that are less reliable convergence signals. Trading in the bitcoin spot market is also deep and liquid, such that the contract reference price cannot be changed at a relatively low cost. If the spot market were thinly traded, a market participant holding a large position in

the contract would need to spend relatively little to move the spot market price at the moment the settlement payment is calculated and thus receive larger settlement payments on the large position.  Further, 24/7 trading in the spot bitcoin market enables arbitrageurs to trade in the spot market when they trade the BTCPERP Contract; otherwise, the price convergence incentive could not be acted upon in real time, and price dislocations could grow, triggering liquidations or leading to settlement at distorted levels before the spot market reopens.  Accordingly, the deep, broadly distributed, active, and continuous trading in the bitcoin spot market supports the design of the BTCPERP Contract as a perpetual futures contract.

For the reasons set forth above, the Commission has determined that it would not violate the CEA or the Commission's regulations thereunder for Kalshi and other DCMs to list for trading, as futures contracts, the BTCPERP Contract.[22]  Contract categorization analysis is done on a case-by-case basis, and the analysis in this Order is, therefore, limited to the BTCPERP Contract and similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities[23] that have deep, active, and continuous spot market trading.  This analysis does not extend to underlying asset classes other than digital commodities.[24]  The Commission expects in the future to address the regulatory treatment of, and compliance considerations relating to, perpetual contracts more generally, but notes at this time that certain

---

[22] Any contract that a DCM seeks to list for trading must comply in all respects with applicable requirements of the CEA, including the DCM Core Principles, and Commission regulations thereunder. A DCM should ensure the compliance of any contract that it seeks to list for trading and should include in a contract submission to the Commission, pursuant to Part 40 of the Commission's regulations, the information prescribed by those regulations relating to contract compliance.  Compliance with the requirements of the CEA and Commission regulations thereunder is assessed by the Commission on a contract-by-contract basis.

[23] For purposes of this Order, the term "digital commodity" has the meaning assigned to it in the U.S. Securities and Exchange Commission and CFTC guidance concerning the application of the federal securities laws to certain types of crypto assets and certain transactions involving crypto assets. *See* Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, 91 Fed. Reg. 13,714, 13,718 (Mar. 23, 2026), available at: https://www.federalregister.gov/d/2026-05635/p-105.

[24] The Commission encourages market participants that seek to list perpetual contracts on underlying asset classes other than digital commodities to engage with the Commission and CFTC staff.

jurisdictional[25] and market attributes of the asset class underlying a perpetual contract – including the presence, or absence, of continually available spot price data – may be relevant to such regulatory treatment and compliance considerations.

The Commission has reviewed the information and documentation that Kalshi included with its request for Commission approval of the BTCPERP Contract, including its explanation and analysis of the contract pursuant to Commission Regulation 40.3(a)(4), and finds that the BTCPERP Contract does not violate the CEA, including the Commission's regulations thereunder.

**NOW THEREFORE:**

**IT IS HEREBY ORDERED** that, pursuant to section 5c(c)(5)(B) of the CEA and Commission Regulation 40.3, the BTCPERP Contract is hereby approved to be listed for trading on Kalshi, and made available for clearing, as a contract for sale of a commodity for future delivery, or "futures contract."

**ACCORDINGLY**, as futures contracts, customer positions in BTCPERP Contracts, and collateral margining of such positions, shall be held in the futures account at both the futures commission merchant and the derivatives clearing organization.

Issued in Washington, DC, on this 29th day of May, 2026.

By the Commission,

Christopher J. Kirkpatrick
Secretary of the Commission

---

[25] These types of asset classes include, but are not limited to, agricultural products, precious metals, equity securities, and narrow-based security indexes. Each asset class will raise different considerations and merit independent analysis and review based on their unique circumstances. For example, perpetual contracts are likely particularly ill-suited for agricultural products based on the considerations identified in the Order, while perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission.