# EXHIBIT 2

program in the same application under appeal during the next quarter of the program, but both of these filings count towards appellant's petition filing limit.

## III. Prosecution of the Application Granted Special Status Under the Pilot Program

### A. Replies by the Applicant Under the Pilot Program

The time periods set for reply in Office actions for an application granted special status under the pilot program will be the same as those set forth in section 710.02(b) of the MPEP. A reply to an Office action must be fully responsive to the rejections, objections, and requirements made by the examiner. Any amendment filed in reply to an Office action may be treated as not fully responsive if it attempts to: (1) add claims that would result in more than three independent claims or more than 20 total claims pending in the application; or (2) add any multiple dependent claim(s).

If a reply to a non-final Office action is not fully responsive for failing to comply with the pilot program's claim requirements but is a bona fide attempt to advance the application to final action, the examiner may, at the examiner's discretion, issue a Notice of Non-Responsive Amendment and provide a shortened statutory period of two months for the applicant to supply a fully responsive reply. Extensions of this time period under 37 CFR 1.136(a) to the Notice of Non-Responsive Amendment will be permitted, but in no case can any extension carry the date for reply to this notice beyond the maximum period of six months set by statute (35 U.S.C. 133). However, any further non-responsive amendment typically will not be treated as bona fide, and as such, the time period set in the prior notice will continue to run.

### B. After-Final and Appeal Procedures

Any amendment, affidavit, or other evidence after a final Office action and prior to appeal must comply with 37 CFR 1.116. During the appeal process, the application will be treated in accordance with the normal appeal procedure (*see* MPEP Chapter 1200) unless the appeal is granted special status under this program or another program.

### C. Application Cannot Be Withdrawn From the Pilot Program

There is no provision to withdraw an application undergoing expedited examination from the pilot program. An applicant may abandon an application that has been granted special status

under the pilot program in favor of a continuing application. A continuing application will not be granted special status based on the petition filed in the parent application. Each application (including each continuing application) must, on its own merit, meet all requirements for special status under the pilot program, and be accompanied by its own petition as detailed in Part I above.

## IV. Conduct of Appeals Accepted Into the Pilot Program

### A. Hearings

A petition to participate in the pilot program may be filed for *ex parte* appeals in which the appellant seeks an oral hearing before the PTAB, that is, ''heard'' appeals, as well as those appeals for which no oral hearing is requested, that is, ''on-brief'' appeals. Hearings in *ex parte* appeals accorded special status under the pilot program will be conducted according to the standard PTAB hearing procedures. Appellants seeking an oral hearing should submit, along with the request for oral hearing, any preferences as to the time, date, or location of the hearing. The PTAB will make best efforts to schedule a hearing in accordance with such preferences. If the PTAB is unable to accommodate an appellant's preferences, it will schedule the hearing in an available hearing room at any office, including a regional office. An appellant may waive the hearing and continue under the pilot program for consideration and decision on the briefs. An appellant may not reschedule the date or time of a hearing and remain in the pilot program. If an appellant in an *ex parte* appeal accorded expedited status must reschedule the date or time of a hearing and is not willing to waive the oral hearing, then the appellant may opt out of the pilot program, thereby regaining the ability to reschedule or relocate the hearing as per standard PTAB hearing procedures.

### B. Termination of Expedited Status of Appeal

Under the pilot program, special status will be maintained in an *ex parte* appeal from the date the petition for inclusion in the pilot program is granted until the PTAB's jurisdiction ends under 37 CFR 41.35(b). Activities subsequent to an appellant's withdrawal from the pilot program or the PTAB's decision, including any reopened prosecution, will not be treated as subject to expedited status, nor will filing a petition to expedite an appeal under the pilot program cause an application to be accorded expedited

status outside the jurisdiction of the PTAB. Additionally, any request by an appellant causing a delay in the conduct of the appeal, such as for an extension of time under 37 CFR 1.136(b) or for additional briefing, will be cause for removal of expedited status.

**John A. Squires,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2026–11098 Filed 6–2–26; 8:45 am]

**BILLING CODE 3510–16–P**

## COMMODITY FUTURES TRADING COMMISSION

### Policy Statement Concerning the Listing of Perpetual Contracts

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Policy statement.

**SUMMARY:** This policy statement describes the views of the Commodity Futures Trading Commission (the ''CFTC'' or ''Commission'') concerning the listing of perpetual contracts. Contemporaneously with the issuance of this policy statement, the Commission has issued an order (the ''Order'') permitting the listing of a perpetual contract that references the spot price of bitcoin by a designated contract market (''DCM'') as a futures contract. Given the unique characteristics of perpetual contracts, which tend to vary based on the underlying asset they reference, the Commission is of the view that the case-by-case review process detailed in Commission Regulation 40.3 is appropriate for the listing of perpetual contracts that reference asset classes that are not contemplated in the Order.

**DATES:** The Commission's policy statement is adopted as of May 29, 2026.

**FOR FURTHER INFORMATION CONTACT:** Roger Smith, 202–418–5344, *rsmith@ cftc.gov,* Division of Market Oversight, Commodity Futures Trading Commission, 77 West Jackson Blvd., Suite 800, Chicago, Illinois 60604 or Stephen Andrews, Deputy General Counsel for Regulation, 202–308–7563, *sdandrews@cftc.gov,* Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

### I. Introduction and Background

Perpetual contracts are derivative contracts that have no fixed expiration date, and which rely on a periodic

funding rate mechanism, rather than a fixed expiration date, to maintain relative price parity with the underlying asset's spot price. Perpetual contracts have become a dominant form of crypto derivative trading in global markets. However, given the regulatory uncertainty concerning the appropriate classification of these types of contracts in the U.S. derivatives markets, the market for perpetual contracts has largely developed outside of the United States, with the majority of trading occurring on offshore trading venues.

The Commission has taken a series of steps over the past year to develop a workable domestic framework for these products. On April 21, 2025, Commission staff issued a Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (the "Request").[1] The Request solicited public input on the characteristics, use cases, regulatory classification, and risks of perpetual contracts. The Request was issued in conjunction with a Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis, which sought public input on the operational, surveillance, clearing, and margin implications of extending CFTC-regulated derivatives trading to a continuous basis.[2]

On July 30, 2025, the President's Working Group on Digital Asset Markets issued its report, Strengthening American Leadership in Digital Financial Technology (the "PWG Report").[3] The PWG Report recommended that the Commission and the U.S. Securities and Exchange Commission permit eligible market participants to access derivatives, including perpetual contracts, through regulated intermediaries and that the agencies use existing exemptive and interpretative authorities to provide near-term clarity for innovative derivatives products.

As discussed, this policy statement is being released in conjunction with the Order,[4] which approved the listing of a perpetual contract that references the spot price of bitcoin by a DCM as a futures contract. The Commission issues this policy statement to articulate, for

the benefit of registrants, market participants, and the public, its view that perpetual contracts that reference underlying asset classes that are not contemplated in the Order[5] should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.[6]

This policy statement is a general statement of policy issued under 5 U.S.C. 553(b)(A). It does not impose any obligation on any person, modify or supersede any provision of the Commodity Exchange Act ("CEA") or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity, and is not subject to the notice-and-comment requirements of the Administrative Procedure Act. Each contract submitted to the Commission under part 40 will continue to be evaluated on its own terms.

## II. The Structural Distinctiveness of Perpetual Contracts

Traditional futures contracts rely primarily on a fixed expiration date to achieve convergence with the underlying asset's spot price. Futures contracts have emerged as a primary instrument in the U.S. derivatives markets for hedgers and traders to effectively secure a price for an asset today in connection with a transaction that will occur in the future. Price convergence with the underlying spot price at expiration is thus inherent to the design of a traditional futures contract and ultimately what makes them a useful instrument for hedging and price discovery.

A perpetual contract has no fixed expiration date through which it can achieve convergence. It therefore requires a substitute mechanism to maintain relative price parity with the underlying spot price of the asset that it references. The mechanism that has emerged in the global crypto asset markets is known as a funding rate, or a periodic payment between the long and short sides of the contract, the direction and magnitude of which is generally determined by the difference

between the perpetual contract's market price and the underlying asset's spot price. When a perpetual contract trades above the spot price, the traders with long positions make payments while the traders with short positions receive payments; and vice versa. These payments are intended to create an economic incentive for market participants to arbitrage away the price differential by opening positions on whichever side of the market is accruing the payments. In this way, the funding rate is designed to keep closely aligned a perpetual contract's price to the underlying asset's price and functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies.

Perpetual contracts raise novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency with the Core Principles applicable to registrants under the CEA. For example, a perpetual contract's design and characteristics raise important considerations with respect to DCM Core Principle 3, which requires that a DCM list only those contracts that are not readily susceptible to manipulation.[7] For a traditional, cash-settled futures contract, the susceptibility-to-manipulation analysis directed at the cash settlement reference price is an analysis of one moment in time: the settlement reference price must be reliable at expiry. For a perpetual contract, however, the reference must be reliable at every funding interval, without interruption, for as long as the contract remains active.

It is therefore the Commission's view that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.

The Commission notes that Regulation 40.2 permits registrants to self-certify new products where the submitting registrant determines that the product complies with the CEA and Commission regulations thereunder.[8] However, given the novel characteristics of perpetual contracts, including their lack of a traditional expiration date and the complex questions concerning, among others, market structure and customer protections, the Commission

---

[1] CFTC Release No. 9069–25, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* (April 21, 2025).

[2] CFTC Release No. 9068–25, *Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis,* (April 21, 2025).

[3] President's Working Group on Digital Asset Markets, *Strengthening American Leadership in Digital Financial Technology* (July 30, 2025), available at *https://www.whitehouse.gov/wp-content/uploads/2025/07/Digital-Assets-Report-EO14178.pdf*.

[4] *See* Order Approving KalshiEX LLC BTCPERP Futures Contract, May 29, 2026.

[5] These types of asset classes include, but are not limited to, agricultural products, precious metals, equity securities, and narrow-based security indexes. Each asset class will raise different considerations and merit independent analysis and review based on their unique circumstances. For example, perpetual contracts are likely particularly ill-suited for agricultural products based on the considerations identified in the Order, while perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission.

[6] 17 CFR 40.3.

[7] 7 U.S.C. 7(d)(3); *see also* 17 CFR part 38, app. C.

[8] 17 CFR 40.2.

believes that the public interest is best served by requiring perpetual contracts that reference assets that are not contemplated in the Order to undergo Commission review and approval pursuant to Commission Regulation 40.3.

### III. Submissions Under Commission Regulation 40.3

The Commission believes that the Commission Regulation 40.3 process provides important benefits for regulators, market participants, and the public. Prior review promotes transparency, facilitates engagement between Commission staff and registrants during product development, and provides greater regulatory clarity for market participants and members of the public seeking to responsibly innovate within the CFTC's regulatory framework.

In accordance with the purpose of the CEA, the Commission remains committed to promoting responsible innovation and fair competition in the U.S. derivatives markets.[9] The Commission believes that clear regulatory pathways and transparent supervisory expectations are essential to ensuring that emerging technologies and novel financial products can develop responsibly within regulated U.S. markets rather than migrating to less regulated jurisdictions outside of the United States.

This policy statement is intended solely to provide the Commission's views concerning the listing of perpetual contracts and does not alter or amend the CEA or the Commission's regulations thereunder. Nothing in this policy statement is intended to be binding or foreclose the possibility that, on appropriate facts and contract design, the Commission might in the future address perpetual contracts through separate policy statements, interpretative guidance, or the rulemaking process; the Commission makes no determination as to that possibility here.

Issued in Washington, DC, on May 29, 2026, by the Commission.

**Christopher Kirkpatrick,**

*Secretary of the Commission.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

---

[9] 7 U.S.C. 5(b).

### Policy Statement Concerning the Listing of Perpetual Contracts—Commission Voting Summary

On this matter, Chairman Selig voted in the affirmative. No Commissioner voted in the negative.

[FR Doc. 2026–11020 Filed 6–2–26; 8:45 am]

**BILLING CODE 6351–01–P**

---

## DEPARTMENT OF DEFENSE

### Office of the Secretary

**[Docket ID: DOD–2026–OS–1222]**

### Proposed Collection; Comment Request

**AGENCY:** Office of the Under Secretary of Defense for Acquisition and Sustainment (OUSD(A&S)), Department of Defense (DoD).

**ACTION:** 60-Day information collection notice.

---

**SUMMARY:** In compliance with the *Paperwork Reduction Act of 1995,* the OUSD(A&S) announces a proposed public information collection and seeks public comment on the provisions thereof. Comments are invited on: whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; the accuracy of the agency's estimate of the burden of the proposed information collection; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the information collection on respondents, including through the use of automated collection techniques or other forms of information technology.

**DATES:** Consideration will be given to all comments received by August 3, 2026.

**ADDRESSES:** You may submit comments, identified by docket number and title, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Mail:* Department of Defense, Office of the Director of Administration and Management, Oversight and Compliance Directorate, Regulatory Division, 4800 Mark Center Drive, Mailbox #24, Suite 05F16, Alexandria, VA 22350–1700.

*Instructions:* All submissions received must include the agency name, docket number and title for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the internet at *http://www.regulations.gov* as they are

received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** To request more information on this proposed information collection or to obtain a copy of the proposal and associated collection instruments, please write to the Office of the Assistant Secretary of War for International Armaments Control, 3010 Defense Pentagon, Washington, DC 20301–3010, Katherine Coyne, 703–545–5899.

**SUPPLEMENTARY INFORMATION:**

*Title; Associated Form; and OMB Number:* America First Arms Transfer Strategy OMB Control Number 0704–AFAT.

*Needs and Uses:* Effective execution of Executive Order 14383 requires immediate, up-to-date market intelligence regarding defense articles and the private sector's current production capabilities, supply chain dependencies, product offerings, and export readiness. This information collection is a strategic market research effort to inform execution of Executive Order 14383. It is not an acquisition or procurement action, and no federal contracts will be solicited or awarded based on these submissions. The analysis derived from this collection will facilitate the analytical prioritization of U.S. defense articles, enabling the curation of a comprehensively assessed data set for the Government.

*Affected Public:* Businesses or other for-profit.

*Annual Burden Hours:* 375.

*Number of Respondents:* 150.

*Responses per Respondent:* 5.

*Annual Responses:* 750.

*Average Burden per Response:* 30 minutes.

*Frequency:* As required.

Dated: May 29, 2026.

**Aaron T. Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2026–11025 Filed 6–2–26; 8:45 am]

**BILLING CODE 6001–FR–P**

---

## DEPARTMENT OF EDUCATION

## DEPARTMENT OF LABOR

### Notice Announcing American History and Civics Education National Activities Program Competition; Correction

**AGENCY:** Department of Education; Department of Labor.

**ACTION:** Notice; correction.