# EXHIBIT 4

May 28, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the BTCPERP Futures Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.3(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a designated contract market (DCM) registered with the Commission, hereby voluntarily submits the BTCPERP contract (the Contract) for Commission review and approval. The Exchange intends to list the Contract on a continuous basis. The Exchange intends to list this Contract shortly following approval by the Commission.

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Appendix B with enhanced trading prohibitions applicable to the Contract;
- Appendix C with further considerations regarding the Contract;
- Appendix D with information regarding the Source Agency for the Contract;
- Appendix E describing the Contract's compliance with the Core Principles;
- Confidential Appendix F with further information on the Contract's compliance with the Core Principles;
- Confidential Appendix G with the Exchange's agreement with the Source Agency; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**KalshiEX LLC**
**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**
**Summary: Bitcoin Perpetual Future**
**May 28, 2026**

### CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Regulation 40.3(a)(4), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendices E and F), and the Commission's regulations thereunder.

## I.    Introduction

The BTCPERP Contract is a perpetual futures contract related to digital assets.

**What is a perpetual future?** A perpetual future is a cash-settled futures contract with no fixed expiration or delivery date. Rather than converging to a deliverable cash price on a stated settlement day, it remains economically tethered to a continuously observed reference price through a periodic funding mechanism: at regular intervals, holders of the side trading at a premium to the reference price pay holders of the side trading at a discount, so that any divergence between the contract's mark price and the underlying spot price generates an offsetting carrying cost that draws the two back into alignment. The instrument therefore functions as an indefinitely renewing near-dated future, allowing a participant to hold a position open for as long as the underlying exposure persists without rolling from one expiration to the next.

**Why are these important?** Perpetual futures have become the dominant form of derivative and the principal locus of price discovery in the markets in which they have emerged, yet that activity occurs almost entirely on offshore, unregulated venues. Listing a perpetual on a CFTC-registered DCM brings this economically significant activity into a regulated environment featuring trade surveillance, know-your-customer verification, risk-based margin, central clearing, and disciplinary procedures consistent with the CEA, protecting U.S. participants and preserving U.S. price discovery rather than ceding both abroad. For hedgers whose economic exposure is itself continuous or indefinite—miners with ongoing production, ETP market makers and authorized participants carrying inventory, OTC desks, lenders holding collateral, and institutional holders of the underlying asset—a perpetual is structurally superior to a strip of dated futures: it eliminates roll cost and roll-date basis risk, tracks spot more tightly through the funding mechanism, and concentrates liquidity in a single instrument rather than fragmenting it across expirations. Listing a regulated domestic perpetual thus directly advances the Commission's stated objective of onshoring novel derivatives products that developed offshore due to regulatory uncertainty.

*KalshiEX LLC*

**Perpetuals are appropriate for Bitcoin, but likely not all commodities. Bitcoin is especially well-suited to the perpetual, 24/7 structure.** Bitcoin trades continuously and globally, has no delivery date, no storage or seasonality constraints, and no natural point of termination; the exposure it represents is itself perpetual. A cash-settled contract that never expires and stays tethered to spot through a funding mechanism therefore mirrors the economic reality of the underlying far more closely than a strip of dated futures, eliminating roll cost and roll-date basis risk for the continuous hedging needs described above. That fit is strongest for assets whose cash market is deep, continuously traded, and homogeneous across venues, as Bitcoin's is. Where a commodity's economic information lives instead in its calendar term structure — regional, seasonal, and grade- and location-specific cash prices, constrained deliverable supply, and date-certain physical exposure — dated contracts and the term structure they encode remain valuable hedging tools, so that the perpetual and dated structures are complementary rather than substitutes. The Commission should strongly consider and discuss with Exchanges whether or not such structures are appropriate and whether they comply with Core Principle 3's requirements that Contracts not be readily susceptible to manipulation before novel perpetuals are listed.

The analysis that follows is strictly limited to Bitcoin, though many of its principles and arguments also would apply to other digital assets, in particular.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Appendices C, D and E and Confidential Appendix F.

**General Contract Terms and Conditions:** As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract is a cash-settled futures contract with no fixed expiration date. Each Contract represents a continuous obligation to make or receive cash payments based on changes in the Contract's mark price and periodic funding payments. Positions are marked to market on a continuous basis, and margin is collected and paid in accordance with the Exchange's margin methodology. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. Members may enter and exit positions at any time during trading hours by executing offsetting trades. Members holding long positions profit when the Contract price increases and incur losses when it decreases; Members holding short positions profit when the Contract price decreases and incur losses when it increases. To maintain price convergence with the underlying reference price, the Contract employs a periodic funding mechanism whereby long position holders and short position holders exchange funding payments based on the difference between the Contract's mark price and the Reference Price, as specified in

*KalshiEX LLC*

Appendix A. A Member's gain or loss at any point is equal to the change in the Contract's mark price since the position was established, multiplied by the Trading Unit, plus or minus net funding payments received or paid. Settlement of all payments is made in cash; no physical delivery occurs.

*KalshiEX LLC*

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.3, 17 C.F.R. § 40.3**

Based on the above analysis, the Exchange certifies that:

❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: May 28, 2026

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Appendix C - Further Considerations

Appendix D - Source Agency

Appendix E - Compliance with Core Principles

Appendix F - (Confidential) - Additional Compliance with Core Principles

Appendix G - (Confidential) - Agreement with CF Benchmarks

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**

*KalshiEX LLC*

# BTCPERP

**Scope:** These rules shall apply to this Contract.

**Underlying:** The Underlying for this Contract is the spot price of one Bitcoin (BTC) in U.S. dollars.

**Underlying Price Index:** For a given time t, the Underlying Price Index (UPIt) is the last recorded value of the CF Benchmarks Bitcoin Real Time Index.

**Source Agency:** The Source Agency is CF Benchmarks.

**Type:** The type of Contract is a Perpetual Futures Contract.

**Trading Hours:** 24 hours per day, 7 days per week, throughout the lifetime of the Contract, subject to any trading halts imposed by the Exchange.

**Trading Unit:** One ten-thousandth (1/10,000) of one Bitcoin (BTC).

**Price Quotation:** Prices for the Contract are quoted in U.S. dollars per one Bitcoin.

**Minimum Price Increment:** The Minimum Price Increment for the Contract shall be $1.00 per Bitcoin.

**Tick Value:** A one-increment price movement equals $0.0001 per Contract, calculated as the Minimum Price Increment multiplied by the Trading Unit ($1.00 × 1/10,000 BTC = $0.0001).

**Position Accountability Level:** $5,000,000 mark-to-market position value (in the case of a short position, the equivalent long position value is considered).

**Periodic Transfer Criterion:** At each Funding Calculation Interval, the Funding Rate is computed as defined below. If the Funding Rate is zero, no Periodic Transfer is made. If the Funding Rate is positive, long-side holders must contribute an amount equal to the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to short-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. If the Funding Rate is negative, short-side holders must contribute an amount equal to the absolute value of the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to long-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. Periodic Transfer obligations are determined at the end of each Funding Calculation Interval and are settled in cash at the next Settlement Time. Revisions to the Underlying made after any Funding Calculation Interval will not be accounted for in determining the applicable Periodic Transfer.

**Funding Calculation Interval:** The Funding Rate is calculated for each interval ending at 12:00 AM ET, 8:00 AM ET, and 4:00 PM ET. Each such interval ordinarily comprises eight (8) hours. Because these times are anchored to U.S. Eastern Time, on the calendar day on which U.S. daylight saving time commences the interval ending at 8:00 AM ET comprises seven (7) hours, and on the calendar day on which U.S. daylight saving time ceases the interval ending at 8:00

AM ET comprises nine (9) hours; in each case the Funding Rate for that interval is computed over the actual number of one-second observations in the interval, as set forth in the definition of Funding Rate below.

**Premium Index:** For each second during each funding interval, the Exchange computes a Premium Index as follows:

$$PI(t) = (\max(0,\ IBP_t - UPI_t) - \max(0,\ UPI_t - IAP_t)) / UPI_t$$

where:

> *Impact Notional (IN)* is $1,000, meant to approximate the median trade size in the market.

> *Impact Ask Price (IAP$_t$)* is the average execution price, per contract, of a long market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IAP_t$ is considered to be undefined.

> *Impact Bid Price (IBP$_t$)* is the average execution price, per contract, of a short market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IBP_t$ is considered to be undefined.

If $IBP_t$ is undefined, $\max(0,\ IBP_t - UPI_t)$ is considered to evaluate to 0. Similarly if $IAP_t$ is undefined, $\max(0,\ UPI_t - IAP_t)$ is considered to evaluate to 0.

Within each one-second range, t is selected uniformly at random for the purposes of computing the IAP and IBP.

Number of Contracts = IN / (UPIt × Trading Unit). The resulting number of Contracts shall be rounded to the nearest whole Contract.

**Funding Rate:** The n per-second Premium Index calculations which make up each sample (in ascending chronological order PIt(1), PIt(2), …, PIt(n)) are combined to compute the Weighted Average Premium Index (WAPI) as: WAPI = ( Σ from i=1 to n of [ i × PIt(i) ] ) / ( Σ from i=1 to n of i ), where n is the number of one-second Premium Index calculations in the interval (28,800 for a standard eight-hour interval) and the denominator equals n(n+1)/2. For the avoidance of doubt, this is not a time-weighted average price (TWAP), which would weight each per-second sample equally. The Funding Rate for a given interval is derived from the Weighted Average Premium Index (WAPI) for that interval by applying the following adjustments to the WAPI:

> (a) **Deadband:** If the absolute value of the WAPI falls below 0.01%, the Funding Rate shall be set to zero.

> (b) **Clamp:** If the absolute value of the WAPI exceeds 2%, the Funding Rate shall be clamped to +2% or –2%, as applicable (the "Maximum Funding Magnitude").

**Clearing**:  The Contract will be centrally cleared by Kalshi Klear LLC (Klear or the Clearinghouse), a derivatives clearing organization registered with the Commission, as central counterparty.

**Settlement Date/Times:** 12:00 PM ET and 4:00 PM ET, on every day throughout the lifetime of the Contract. At each Settlement Time, the Exchange settles all outstanding obligations, including variation margin and any accrued Periodic Transfer obligations calculated since the prior Settlement Time.

**Settlement Price:** For the purposes of calculating variation margin and Periodic Transfer obligations, the Settlement Price shall be determined according to the following tiered methodology, applied in order:

**Tier 1 (Trade VWAP).** If one or more trades in the Contract occur during the 60 seconds immediately preceding the Settlement Time (the "Settlement Period"), the Settlement Price shall be the volume-weighted average price (VWAP) of those trades. Transactions occurring precisely at the Settlement Time are excluded. This VWAP calculation will be adjusted to exclude outliers; generally this will be performed via a median-based Mean Absolute Difference (MAD) filter, but the Exchange reserves the right to exercise discretion to exclude other outlier or manipulative transactions.

For purposes of Tiers 2 and 3, sixty (60) Observation Points are defined, occurring at exactly N seconds before the Settlement Time for each integer N from 1 to 60. The prevailing best bid and prevailing best ask at an Observation Point are the best bid and best ask resting on the order book as of that instant. An Observation Point is "two-sided" if both a prevailing best bid and a prevailing best ask are present at that instant, and the Midpoint at a two-sided Observation Point is the arithmetic mean of its prevailing best bid and prevailing best ask.

**Tier 2 (Sampled Midpoint Average).** If no trades in the Contract occur during the Settlement Period and at least one Observation Point is two-sided, the Settlement Price shall be the arithmetic mean of the Midpoints at all two-sided Observation Points.

**Tier 3 (Index Net Change).** If no trades in the Contract occur during the Settlement Period and no Observation Point is two-sided, the Settlement Price shall equal the prior Settlement Price plus the net change in the CF Benchmarks Bitcoin Real Time Index between the prior Settlement Time and the current Settlement Time.

If a Settlement Price cannot be determined under any of the above Tiers, the Exchange may determine the Settlement Price pursuant to Rule 7.1 of the Rulebook.

**Initial and Maintenance Margin:** Initial margin and maintenance margin requirements for the Contract shall be calculated using the Exchange's risk-based margin methodology.

**Last Trading Date:** As this is a Perpetual Futures Contract, it has no Last Trading Date.

**Expiration Date:** As this is a Perpetual Futures Contract, it has no Expiration Date.

**Expiration Time:** As this is a Perpetual Futures Contract, it has no Expiration Time.

**Pre-Trade Risk Controls:** The Exchange may impose pre-trade risk controls, including price banding, order size limits, and position exposure limits, to ensure orderly trading and mitigate market disruption risk.

**Market Integrity:** The Exchange may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If a Funding Rate or Settlement Price cannot be determined, the Exchange has the right to determine payouts or margin requirements pursuant to Rule 7.1 of the Rulebook. If the Funding Rate cannot be determined for a given interval (including due to insufficient order book liquidity), the Funding Rate shall be set to zero. In the event of an Emergency, as defined in Rule 2.8 of the Rulebook, the Exchange may take such actions as it deems necessary and appropriate, including but not limited to adjusting the Maximum Funding Magnitude, modifying margin requirements, or imposing additional risk controls, in accordance with the procedures set forth in Rule 2.8. The Exchange will monitor the performance of the Funding Rate in keeping the Contract economically tethered to the Underlying Price Index and may amend the Funding Rate methodology in accordance with applicable Exchange rules and Commission filing requirements. Any such amendment shall apply prospectively only and shall not alter the Funding Rate or any Periodic Transfer obligation for any Funding Calculation Interval ending prior to the amendment's effective date.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the Contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Officers, directors, and employees of CF Benchmarks Ltd., including members of its Oversight Committee, and its parent company
- Members of the CME CF Oversight Committee responsible for governance of the CF Benchmarks index family
- Officers, directors, and employees of the Constituent Exchanges contributing data to the CF Benchmarks Bitcoin Real Time Index (currently Coinbase, Bitstamp, Kraken, Gemini, itBit/Paxos, LMAX Digital, Bullish, and Crypto.com), to the extent such persons have access to non-public order flow data, surveillance data, or advance knowledge of exchange operational changes that could materially affect the Underlying Price Index
- Third-party auditors (e.g., KPMG engagement teams) currently engaged in auditing or assuring CF Benchmarks' index methodology or BMR compliance
- Immediate family members (parents, siblings, spouses, domestic partners) and household members of all persons listed above

## APPENDIX C – FURTHER CONSIDERATIONS

The BTCPERP Contract serves critical risk mitigation functions for a broad range of market participants with bona fide economic exposure to Bitcoin. Bitcoin miners incur fixed costs denominated in U.S. dollars — electricity, hardware, facility leases — while earning revenue denominated in Bitcoin, creating a structural currency mismatch that a perpetual futures contract is uniquely suited to hedge. CoinShares' Q4 2024 mining report found that the weighted average cash cost to produce one Bitcoin among listed miners reached $82,162, with all-in costs at approximately $137,000 per BTC.[1] Riot Platforms reported a cost per BTC of approximately $49,645 in 2025, before depreciation, up from $32,216 in 2024.[2] Multiple publicly traded miners have disclosed derivatives-based hedging programs in SEC filings: Marathon Digital Holdings (now MARA Holdings) ran a bitcoin collar program overseen by a formal Investment Committee of its senior executives;[3] Bitfarms disclosed a board-approved hedging program authorizing management to implement hedges using BTC option contracts for up to 20% of expected monthly production;[4] and CleanSpark listed the possibility that mining costs may exceed mining revenues as a principal risk factor.[5] Academic research confirms the structural nature of this risk: Alexander, Deng & Zou (2023), published in the *European Journal of Operational Research*, find that perpetual futures hedging costs "are hardly influenced by the swings between backwardation and contango that can induce a high degree of roll-cost uncertainty into hedging with standard futures contracts."[6] Hashrate Index research quantifies the benefit: mining companies that hedge with derivatives achieve an average 109 basis point reduction in cost of equity, while a 12-month hashprice forward reduces cash flow volatility by 64%.[7]

Beyond miners, institutional holders of spot Bitcoin require continuous hedging instruments: U.S. spot Bitcoin ETFs now hold approximately $95–113 billion in assets under management, with 24% of U.S. Bitcoin ETF AUM held by 13F institutional filers including financial advisors holding an estimated 185,000 BTC-equivalent exposure.[8] Authorized participants and market makers for these ETPs — including Jane Street, Virtu Americas, Goldman Sachs, Citadel Securities, and others disclosed in IBIT's prospectus — carry inventory risk that must be hedged

---

[1] CoinShares, *Bitcoin Mining Report Q4 2024* (2025).

[2] Riot Platforms, *Full Year 2025 Financial Results and Strategic Highlights* (March 2026), available at https://www.riotplatforms.com/riot-platforms-reports-full-year-2025-financial-results-and-strategic-highlights/.

[3] MARA Holdings, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2023, filed with the SEC, available at https://www.sec.gov/Archives/edgar/data/0001507605/000162828024007680/mara-20231231.htm.

[4] Bitfarms Ltd., Annual Information Form, available at https://investor.bitfarms.com/static-files/d92f5e96-db8d-4453-a5cd-b193b3d187be

[5] CleanSpark, Inc., Annual Report (Form 10-K) for the fiscal year ended September 30, 2024, filed with the SEC.

[6] Carol Alexander, Jun Deng & Bin Zou, *Hedging with Automatic Liquidation and Leverage Selection on Bitcoin Futures*, 306 Eur. J. Operational Res. 478–493 (2023).

[7] Hashrate Index, relying on corporate-hedging literature and a hashprice-forward case study, estimates that miner hedging can reduce cost of equity by 109 basis points and that a 12-month hashprice-forward hedge would reduce cash-flow volatility by 64% in the modeled example.

[8] CoinShares, *Institutional Report: 13F Filings of Bitcoin ETFs Q3 2025* (2025), available at https://coinshares.com/us/insights/research-data/13f-filings-of-bitcoin-etfs-q3-2025-institutional-report/.

in real time.[9] Further, OTC crypto trading volumes more than doubled in 2024 (106% annual growth),[10] with OTC desks holding up to 410,000 BTC in inventory requiring continuous hedging.[11] And the crypto lending market reached $36.5 billion as of Q4 2024, growing to a record $73.6 billion by Q3 2025 — all collateralized lending that creates liquidation risk correlated to spot price declines and that a regulated perpetual futures contract would allow participants to hedge with precision.[12]

The perpetual structure, combined with the funding rate mechanism that maintains convergence with the spot reference price, makes the Contract functionally superior to dated alternatives for participants whose economic exposure is itself perpetual or indefinite in duration: as Coinbase Derivatives stated in its comment letter to the CFTC's request for comment on perpetual contracts, perpetual contracts eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates.[13]

Perpetual futures, such as the Contract, also provide substantial price discovery and transparency benefits that serve the public interest. Kaiko reports that perpetual futures account for 68% of all Bitcoin trading volume in 2025, up from 66% in 2024, and that derivatives make up over 75% of all trading activity in crypto markets;[14] CoinGecko's 2025 Annual Report found the top 10 centralized perpetual exchanges recorded $86.2 trillion in volume, up 47% year-over-year.[15] Academic research by Alexander & Heck (2020), published in the *Journal of Financial Stability*, established that perpetual swaps traded on unregulated exchanges are "the strongest instruments for bitcoin price discovery."[16]

Yet the vast majority of this activity occurs on offshore, unregulated venues. Listing the BTCPERP Contract on a CFTC-registered DCM brings this economically significant activity into a regulated environment with robust trade surveillance, know-your-customer verification, risk-based margin requirements, and disciplinary procedures consistent with the CEA and Commission regulations thereunder.

Further, the Contract's use of the CF Benchmarks Bitcoin Real Time Index ensures that the reference price is derived from a regulated benchmark administrator: CF Benchmarks is authorized by the UK Financial Conduct Authority under the EU/UK Benchmarks Regulation

---

[9] iShares Bitcoin Trust ETF (IBIT), Post-Effective Amendment to Form S-3 (May 9, 2025), SEC Archives, available at https://www.sec.gov/Archives/edgar/data/1980994/000143774925015853/bit20250418_posam.htm.

[10] Finery Markets, as reported in The Block, *Crypto OTC Trading Volume Surged Over 100% in 2024* (January 2025), available at https://www.theblock.co/post/334300/.

[11] CryptoQuant, as reported in CoinDesk, *Crypto OTC Desks Now Hold Over $22B in Bitcoin* (August 22, 2024); CoinDesk, *Bitcoin Bull Run in Question as Balances on OTC Desks Rise to 410K* (October 1, 2024).

[12] Galaxy Research, *The State of Crypto Lending* (April 2025); Yahoo Finance, *Crypto Lending Hits $73.6B Record as DeFi Captures Two-Thirds of Market* (November 19, 2025).

[13] Coinbase Derivatives, LLC, Comment Letter to the CFTC on Perpetual Derivatives (May 21, 2025), available at https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=35619.

[14] Kaiko, *Perps are Coming to America* (June 2025), available at https://www.linkedin.com/pulse/perps-coming-america-kaikoindices-girie/.

[15] CoinGecko, *2025 Annual Crypto Industry Report* (2025), available at https://www.coingecko.com/research/publications/2025-annual-crypto-report.

[16] Carol Alexander & Daniel F. Heck, "Price Discovery in Bitcoin: The Impact of Unregulated Markets," 50 J. Fin. Stability 100776 (2020).

(FRN 847100), with compliance independently audited by KPMG under ISAE 3000 reasonable assurance.[17] The CME CF Bitcoin Reference Rate, administered by CF Benchmarks, serves as the settlement benchmark for CME Group's Bitcoin futures[18] and is the pricing benchmark for six of the eleven U.S. spot Bitcoin ETFs, including BlackRock's IBIT.[19] And the funding rate mechanism has been rigorously studied in peer-reviewed literature: Ackerer, Hugonnier & Jermann (2025), published in *Mathematical Finance*, derive no-arbitrage perpetual futures prices and demonstrate that the pricing formula "is closely related to Covered Interest Parity used to price futures and forwards"[20] — while He, Manela, Ross & von Wachter (2024) find that deviations from no-arbitrage in crypto perpetuals "diminish over time as crypto markets develop and become more efficient."[21] A BIS Working Paper (No. 1087, Schmeling, Schrimpf & Todorov, 2023) documents that the CME Bitcoin basis can reach "exceptionally high levels, sometimes exceeding 40% per annum," and that a 10% increase in standardized carry predicts a 22% increase in short-futures liquidations — identifying "limited deployment of arbitrage capital due to regulatory and margin frictions" as a key driver, a friction that a regulated domestic perpetual futures contract directly addresses.[22]

Finally, CFTC Chairman Selig has stated that the CFTC will "use the tools at its disposal to onshore perpetual and other novel derivative products so that they can flourish across both centralized and decentralized markets, subject to appropriate safeguards," confirming that the listing of a regulated Bitcoin perpetual futures contract directly advances the Commission's stated policy objectives of deterring manipulation, protecting market participants, and promoting responsible innovation.[23]

---

[17] CF Benchmarks Ltd., FCA Financial Reference Number 847100; CF Benchmarks, *CF Benchmarks Authorised and Regulated by the FCA under EU BMR* (September 13, 2019), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr.

[18] CME Group, *FAQ: CME CF Cryptocurrency Benchmarks*, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html.

[19] BlackRock, iShares Bitcoin Trust ETF (IBIT) fact sheet, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf.

[20] Damien Ackerer, Julien Hugonnier & Urban Jermann, "Perpetual Futures Pricing," Mathematical Finance (2025). DOI: 10.1111/mafi.70018. NBER Working Paper No. 32936.

[21] Songrun He, Asaf Manela, Omri Ross & Victor von Wachter, *Fundamentals of Perpetual Futures* (2024), available at https://arxiv.org/abs/2212.06888.

[22] Maik Schmeling, Andreas Schrimpf & Karamfil Todorov, *Crypto Carry*, BIS Working Paper No. 1087 (April 2023, revised October 2025), available at https://www.bis.org/publ/work1087.pdf.

[23] Remarks of CFTC Chairman Michael Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (January 29, 2026), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

## APPENDIX D – SOURCE AGENCY

The Source Agency for the BTCPERP Contract is CF Benchmarks Ltd ("CF Benchmarks"), the administrator of the CF Benchmarks Bitcoin Real Time Index (the "Underlying Price Index" or "BRTI"), which provides a real-time measure of the U.S. dollar price of Bitcoin calculated from consolidated order book data from Constituent Exchanges, rather than from executed trade data.

### Regulatory Status and Governance

CF Benchmarks is authorized and regulated by the UK Financial Conduct Authority ("FCA") as a benchmark administrator under the UK Benchmarks Regulation (FCA Financial Reference Number 847100). CF Benchmarks was the first cryptocurrency index provider to obtain FCA authorization under the BMR framework, which it received in September 2019.[24] The UK Benchmarks Regulation transposes the IOSCO Principles for Financial Benchmarks (published July 2013) into binding regulatory requirements, imposing governance, methodology transparency, conflict-of-interest management, and oversight obligations on benchmark administrators. CF Benchmarks is registered in England and Wales (company number 11654816) and is a wholly owned subsidiary of Payward, Inc. (d/b/a Kraken), acquired in February 2019.

CF Benchmarks' BMR compliance has been independently verified through a KPMG audit conducted under International Standard on Assurance Engagements 3000 (ISAE 3000) — a reasonable assurance engagement — covering the period from September 2022 to September 2024. This is the same assurance standard applied to benchmark administrators of traditional financial indices. CF Benchmarks maintains an independent Oversight Committee, composed of industry experts and external members, that reviews the methodology and governance of all CF Benchmarks indices in accordance with BMR requirements. The Oversight Committee has authority to recommend changes to methodology, review complaints, and escalate concerns to the FCA.

### Index Methodology

The CF Benchmarks Bitcoin Real Time Index is calculated in real time based on the Relevant Order Books of its Constituent Exchanges. A Relevant Order Book consists of currently unmatched limit orders to buy or sell Bitcoin against the relevant quote asset on a Constituent Exchange, aggregated by price and reported through the exchange's API to CF Benchmarks' Calculation Agent. As of the date of this filing, the Constituent Exchanges include Coinbase, Bitstamp, Kraken, Gemini, itBit/Paxos, LMAX Digital, Bullish, and Crypto.com. For the CME CF Bitcoin Real Time Index, the methodology specifies an Effective Time every 200 milliseconds, a 10-second retrieval-lag threshold, a dynamic order size cap, a 0.5% deviation-from-mid parameter, and a 5% potentially erroneous data parameter. The methodology is publicly available and subject to periodic review and consultation in accordance with CF Benchmarks' benchmark-governance procedures.

---

[24] CF Benchmarks Ltd., CF Benchmarks Authorised and Regulated by the FCA under EU BMR (September 13, 2019), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr; FCA Financial Services Register, FRN 847100.

The BRTI is designed to provide a real-time indication of the Bitcoin-U.S. dollar exchange rate by consolidating order books across Constituent Exchanges. At each Effective Time, CF Benchmarks adds the Relevant Order Book from each Constituent Exchange to a joint list, aggregates those inputs into a consolidated order book, applies a dynamic order size cap, calculates bid, ask, mid-price, and mid-spread volume curves, determines the utilized depth, and weights the mid-price-volume curve using the normalized probability density of an exponential distribution to produce the index value. If an exchange's Relevant Order Book is delayed, erroneous, or potentially erroneous, that exchange's order book is disregarded for the affected Calculation Time, subject to the methodology's calculation-failure rules.

CF Benchmarks also administers the CME CF Bitcoin Reference Rate ("BRR"), a once-daily benchmark calculated during a one-hour observation window (3:00–4:00 PM London time), partitioned into twelve five-minute intervals, using an equally weighted average of volume-weighted median trade prices across constituent exchanges. While the BTCPERP Contract uses the real-time BRTI for funding rate calculations and settlement pricing, the BRR is referenced here to describe CF Benchmarks' broader institutional track record. The BRR and BRTI are administered under the CF Benchmarks/CME CF governance framework and use constituent exchanges selected under applicable constituent-exchange criteria, but they use different calculation methodologies: the BRR is a once-daily transaction-price benchmark based on volume-weighted medians during a one-hour observation window, while the BRTI is a real-time, order-book-based index.

### Institutional Adoption and Track Record

The CF Benchmarks index family is among the most widely adopted cryptocurrency pricing benchmarks in the regulated financial industry. CME Group has used the CME CF Bitcoin Reference Rate as the settlement benchmark for its Bitcoin futures, Micro Bitcoin futures, and Bitcoin options contracts since the launch of CME Bitcoin futures in December 2017. Six of the eleven U.S. spot Bitcoin ETFs approved by the SEC in January 2024 use the CME CF Bitcoin Reference Rate – New York Variant ("BRRNY") as their pricing benchmark, including BlackRock's iShares Bitcoin Trust (IBIT), the world's largest Bitcoin ETF with approximately $68–70 billion in assets under management.[25] Other ETFs using BRRNY include ARK 21Shares Bitcoin ETF (ARKB), Bitwise Bitcoin ETF (BITB), Franklin Bitcoin ETF (EZBC), Valkyrie Bitcoin Fund (BRRR), and WisdomTree Bitcoin Fund (BTCW). In total, CF Benchmarks states that its indices carry over $80 billion of assets through investment funds, ETFs, and other financial products globally.

The selection of CF Benchmarks by BlackRock, CME Group, and other major regulated financial institutions reflects a market determination that the index methodology, governance, and regulatory oversight are sufficient to serve as the pricing backbone for products holding tens of billions of dollars in customer assets and settling billions of dollars in daily futures volume.

### Resilience and Manipulation Resistance

---

[25] CME Group, FAQ: CME CF Cryptocurrency Benchmarks, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html; BlackRock, iShares Bitcoin Trust ETF (IBIT) fund page, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf

The multi-exchange, order-book-based construction of the BRTI provides inherent resistance to manipulation on any single venue. Any attempt to manipulate the index would require simultaneous, coordinated activity across multiple independently operated, regulated trading platforms — each of which maintains its own surveillance, KYC/AML, and market integrity programs. The constituent exchange selection criteria require that exchanges demonstrate adequate trade volume, operational reliability, and compliance with applicable regulatory standards; exchanges that fail to meet these standards are removed from the index. CF Benchmarks periodically reviews and updates its constituent exchange universe through a formal consultation process subject to Oversight Committee approval.

The transparency of the methodology — publicly documented and subject to regulatory review by the FCA — provides market participants, regulators, and the public with the ability to independently replicate and verify the index value at any point in time. This level of transparency stands in contrast to proprietary index calculations used by offshore, unregulated exchanges, where methodology changes may be made without notice or external review.

In addition, the BRTI's constituent exchanges are themselves subject to regulatory oversight: Coinbase operates under state money transmitter licenses and is a publicly traded company (NASDAQ: COIN) subject to SEC reporting requirements; Bitstamp holds a BitLicense from the New York Department of Financial Services; Gemini is a New York trust company regulated by NYDFS; itBit (Paxos) is a New York-chartered limited purpose trust company; Kraken holds licenses in multiple jurisdictions; LMAX Digital is part of the FCA-regulated LMAX Group; Bullish is a publicly traded company (NYSE: BLSH) that holds a BitLicense and Money Transmission License from NYDFS and is registered as a Money Services Business with FinCEN; and Crypto.com is registered as a Money Services Business with FinCEN.

**Accuracy and Continuity**

The BRTI has a multi-year operating history, including through significant crypto-market stress periods, such as during periods of extreme market stress — including the March 2020 COVID crash, the May 2021 China mining ban selloff, the November 2022 FTX collapse, and the August 2024 global carry-trade unwind, demonstrating operational resilience under adverse conditions. The redundancy of the multi-exchange data aggregation model ensures that the index remains calculable even if one or more constituent exchanges experience outages or trading halts.

In summary, the data used to determine the Reference Price and Funding Rate of the Contract is prepared and published by CF Benchmarks, an FCA-authorized benchmark administrator operating under the UK Benchmarks Regulation, independently audited by KPMG, adopted by CME Group and BlackRock as the pricing backbone for the world's largest regulated Bitcoin derivatives and ETF products, and constructed from consolidated order book data sourced from Constituent Exchanges selected under the applicable CME CF/CF Benchmarks criteria. The Exchange believes that CF Benchmarks is a highly reliable, transparent, and manipulation-resistant Source Agency.

*KalshiEX LLC*

*KalshiEX LLC*

**APPENDIX E – COMPLIANCE WITH CORE PRINCIPLES**

**Compliance with Core Principles**

A. *The Exchange has Exercised Reasonable Discretion by Categorizing the Contract as Futures Contracts for Purposes of Compliance with the Core Principles and Other Provisions of the CEA and Commission Regulations.*

Section 5(d)(1)(B)[26] of the CEA and Regulation 38.100(b)[27] thereunder provide that a DCM has reasonable discretion in establishing the manner in which it complies with the Core Principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Contract as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.[28]

*First,* we analyzed whether the Contract constitutes a futures contract by evaluating the characteristics of the Contract against relevant judicial precedent and Commission guidance. Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[29] by evaluating whether certain characteristics common to futures contracts are present.[30]

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[31] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[32]

---

[26] 7 U.S.C. § 7(d)(1)(B).

[27] 17 C.F.R. § 38.100(b).

[28] Kalshi and Klear intend to treat the Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.

[29] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").

[30] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("*Letter 98-73*"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

[31] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*"). *See, also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989) (adopting a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public) and Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993) (adopting an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility).

[32] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contracts involving intangible commodities such as the Underlying, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[33] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[34] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[35] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[36] and (iii) the ability of holders to exit their positions by offset.[37]

The Contract will exhibit all of these futures contract characteristics: the Contract will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty; holders will be able to exit their positions via offset; the Contract will be available to the general public, including retail participants; parties will enter into the Contract for the purpose of assuming or shifting the risk of change in value of the Underlying, without the possibility of transferring ownership of the Underlying; and the Contract will trade on the centralized market of a DCM.

*Then*, we analyzed whether the Contract's indefinite duration should affect their categorization. We focused on this term of the Contract because courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[38] or "on a date certain,"[39] or "at or before a stated future time."[40] Courts have not, however, viewed this characteristic as necessary to conclude that a contract is a futures contract. To the contrary, courts have repeatedly explained that, "While futures contracts generally have a specified future

---

purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd.* v. *BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc.* v. *Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[33] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro. See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). Because the Contract is a derivatives on the Underlying, which is an intangible commodity (*i.e.,* the spot price of Bitcoin), this request does not address the regulatory categorization of contracts on tangible commodities.

[34] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[35] *Id.*

[36] *CME v. SEC* at 542. Although the Dodd-Frank Act arguably changed the historical analysis, at least in part, by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on swap execution facilities, which may lack the centralized market characteristics of a DCM because they can permit trading via request for quote in addition to an order book.

[37] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

[38] *CME v. SEC* at 542.

[39] *Tauber* at 971.

[40] *Erskine* at 323.

delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[41]  For example, the Seventh Circuit in *CME v. SEC* concluded that contracts of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[42] – because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[43]  And, in *Zelener*, the Commission took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[44]

Based on this analysis, Kalshi is of the view that the Contract is appropriately categorized as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.

  B.  *The Contract Complies with the Core Principles*

The Exchange has conducted a comprehensive analysis of the designated contract market core principles ("Core Principles") as set forth in Part 38 of the Act. The Core Principles relevant to the Contract are outlined and discussed in further detail in the confidential appendices.

---

[41] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29.  *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v. International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[42] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[43] *CME v. SEC* at 541.  The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index.  The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale.  *Id.* at 539.  The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter.  *Id.*  The IPs thus resemble the Contract in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contract, the funding payments) determined following initiation of the contract.  Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out" date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[44] *See Zelener* at 863.  Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here.  In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery.  *Zelener* at 863.  Notably, customers in that case did not purchase identical contracts, and their contracts did not provide a right of offset.  *Id.* at 867.  By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on Kalshi.