# EXHIBIT 5

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026



COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581
www.cftc.gov

Commission Staff Interpretation and No-Action
Market Participants Division
Duncan Hennes, Director

**Re: Staff Interpretation Regarding the Categorization of Deribit Perpetuals as Foreign Futures and No-Action Position Regarding Digital Commodities and Payment Stablecoins Deposited to Margin Customer Positions with a Foreign Broker Under a Right of Re-Use**

Dear Mr. Ferrara:

The Market Participants Division (**"Division"**) of the Commodity Futures Trading Commission (**"Commission"**) is issuing this letter in response to a request from Coinbase Financial Markets, Inc. (**"CFM"**),[1] a registered futures commission merchant (**"FCM"**), for an interpretative and no-action letter under Commission Regulation 140.99.[2] CFM requests that the Division issue an interpretative letter confirming that CFM may categorize the Deribit Perpetuals (as defined below) as foreign futures as defined by Commission Regulation 30.1 when transacted by customers through CFM.[3] CFM further requests that the Division issue a no-action letter

---

[1] Letter from Eugene Ferrara, Chief Compliance Officer, Coinbase Financial Markets, Inc. to the Market Participants Division dated May 28, 2026 (the **"Request"**).

[2] 17 C.F.R. § 140.99. Commission regulations are set forth in Chapter I of Title 17 of the Code of Federal Regulations and are available for review at the Commission's website, www.cftc.gov.

[3] The term "foreign futures" is defined to mean any contract for the purchase or sale of any commodity for future delivery made, or to be made, on or subject to the rules of any foreign board of trade (**"FBOT"**). 17 C.F.R. § 30.1. As used in this letter, the term "FBOT" is to be distinguished from an FBOT registered with the Commission under

1

CFTC Letter No. 26-17   No-Action, Interpretive   May 29, 2026

stating that it will not recommend enforcement action against: (i) CFM under Commission Regulation 30.7[4] if CFM posts customer-owned digital commodities[5] and payment stablecoins[6] (together **"Customer Digital Assets"**) with an affiliated foreign broker to margin customers' foreign futures and foreign option positions[7] traded on an affiliated FBOT, under circumstances where the foreign broker has obtained a right of re-use over the Customer Digital Assets or (ii) such an affiliated foreign broker for a violation of its obligation under the Acknowledgment Letter (defined below) for taking title to, or invoking a right of re-use over, Customer Digital Assets deposited by CFM.[8]

## I.    Factual Background

CFM is a subsidiary of Coinbase Global, Inc. (**"Coinbase Global"**)[9] and has been registered with the Commission as an FCM and a member of the National Futures Association

---

Part 48 of Commission's regulations and providing "direct access" as defined in Commission Regulation 48.2(c). 17 C.F.R.§ 48.2(c).

[4] 17 C.F.R. § 30.7.

[5] For purposes of this letter, the term "digital commodity" has the meaning given to it in the U.S. Securities and Exchange Commission's (**"SEC"**) and CFTC's interpretation and guidance issued in March of 2026. *See* Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, 91 Fed. Reg. 13714 (Mar. 23, 2026), https://www.govinfo.gov/content/pkg/FR-2026-03-23/pdf/2026-05635.pdf (**"Digital Commodity Interpretation"**). The Digital Commodity Interpretation provides that a "digital commodity" is a crypto asset that is intrinsically linked to and derives its value from the programmatic operation of a crypto system that is functional, as well as supply and demand dynamics, rather than from the expectation of profits from the essential managerial efforts of others. *Id.* at 13718. The Digital Commodity Interpretation further lists Aptos (APT); Avalanche (AVAX); Bitcoin (BTC); Bitcoin Cash (BCH); Cardano (ADA); Chainlink (LINK); Dogecoin (DOGE); Ether (ETH); Hedera (HBAR); Litecoin (LTC); Polkadot (DOT); Shiba Inu (SHIB); Solana (SOL); Stellar (XLM); Tezos (XTZ); and XRP (XRP) as examples of "digital commodities." *Id.*

[6] For purposes of this letter, the term "payment stablecoin" means: (i) prior to the effective date of the Guiding and Establishing National Innovation for U.S. Stablecoins Act, 12 U.S.C. §§ 5901-5916 (July 18, 2025) (**"GENIUS Act"**), a USD-denominated stablecoin that is issued by a state-regulated money transmitter, state-regulated trust company, or a national trust bank; maintains reserve assets limited to direct or indirect investments in cash, U.S. treasury securities or overnight U.S. Treasury repurchase agreements; and publishes monthly attestations regarding the composition of the reserve assets and whether the fair value of the assets held in reserve is equal to the amount of stablecoins in circulation; and (ii) following the effective date of the GENIUS Act, a stablecoin that meets the requirements contained in the GENIUS Act's definition of "payment stablecoin" and is issued by a "permitted payment stablecoin issuer" or a "foreign payment stablecoin issuer" that complies with the GENIUS Act's requirements applicable to such issuers. *See* 12 U.S.C. §§ 5901(11)-(12), (22).

[7] Commission Regulation 30.1 defines the term "foreign option" to mean, in relevant part, any transaction or agreement which is or is held out to be of the character of, or is commonly known to the trade as, an "option" made or to be made on or subject to the rules of any FBOT. 17 C.F.R. § 30.1.

[8] The term "right of re-use" in this letter refers to a CFM customer granting a legal right of use of such Customer Digital Assets deposited with CFM as margin collateral for the customer's foreign futures or foreign option positions pursuant to an agreement between the parties and subject to the right of re-use being authorized or required under the local regulatory regime of the relevant foreign broker, FBOT, and/or foreign clearing organization.

[9] Coinbase Global (CIK: 0001679788) is a publicly traded company registered with the SEC.

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

since August 15, 2023. Coinbase Inc., an affiliate of CFM and subsidiary of Coinbase Global, provides crypto trading, custody, and infrastructure services. CFM currently offers its customers access to futures and cleared swap transactions listed for trading on Commission designated contract markets (**"DCMs"**).

CFM plans to offer its customers access to trading in certain digital commodity derivative products listed on Deribit FZE (**"Deribit"**), an affiliated FBOT.[10] CFM states that its customers will transact in Deribit digital commodity products through CFM, as their FCM. CFM will route the customers' orders to its foreign broker affiliate, Coinbase Bermuda Limited (**"CBBM"**), via an automated order routing system.[11] CBBM will then route the CFM customer orders to Deribit. Deribit's matching engine executes orders anonymously on a price-time priority basis. If a CFM customer's order is successfully matched by Deribit, the matched parties become counterparties to a trade, but Deribit will not provide either party with information about their trade counterparty. In addition, a CFM customer may close out a position by entering into a reverse trade on Deribit through CBBM, even if the counterparty on the reverse trade is different from the original counterparty.

CFM is seeking to offer its customers three products traded on Deribit: Deribit Futures, Deribit Options on Futures and Deribit Perpetuals (individually **"Deribit Futures," "Deribit Options,"** and **"Deribit Perpetuals,"** and collectively, the **"Products"**). Deribit Futures are net-settled contracts for the future delivery of a referenced digital commodity, such as Bitcoin or Ether, at a specified expiry date.[12] Deribit Options are physically settled, European-style options[13] on underlying Deribit Futures (**"Underlying Contracts"**).[14] Upon exercise of a put option on behalf of the long holder of a Deribit Option, the short option holder will incur the obligation to assume a long position in the Underlying Contract at the option's strike price. Upon

---

[10] Deribit is a Virtual Asset Service Provider regulated by the Dubai Virtual Assets Regulatory Authority.

[11] CBBM is a member of Deribit and is a Class F digital assets business located in Bermuda and regulated by the Bermuda Monetary Authority. CFM represents that CBBM will rely on the FCM registration exemption set forth in Commission Regulation 30.4(a), which provides, in relevant part, that a foreign futures and options broker is not required to register as an FCM in order to accept orders from or to carry a U.S. FCM's foreign futures and foreign option customer omnibus account. 17 C.F.R. § 30.4(a).

[12] CFM states that each Deribit Future will specify both a base (or settlement) currency and a quote currency. For a linear contract, the base currency and quote currency will both be a payment stablecoin, such as USDC, meaning that the price of the contract will be quoted in amounts of USDC and the contract will settle via a net payment of USDC. For an inverse contract, the base currency will be the referenced digital commodity, such as Bitcoin, and the quote currency will be a payment stablecoin, such as USDC, meaning that the price of the contract will be quoted in amounts of USDC and the contract will settle via a net payment of Bitcoin.

[13] A European-style option is an option that cannot be exercised prior to the expiry date.

[14] The expiry date of the Deribit Option will fall before, or coincide with, the expiry date for the Underlying Contract.

3

CFTC Letter No. 26-17   No-Action, Interpretive   May 29, 2026

exercise of a call option on behalf of the long holder of a Deribit Option, the short option holder will incur the obligation to assume a short position in the Underlying Contract at the option's strike price. Upon the expiration date, an Underlying Contract will settle by a net exchange of assets between the long party and the short party depending on whether the price of the specified digital commodity was above the Underlying Contract's price or below the Underlying Contract's price.

Deribit Perpetuals are perpetual-term derivative contracts that provide their holders with long or short, as applicable, economic exposure to the spot price of an underlying digital commodity through a "funding rate" mechanism.[15] CFM states that if a Deribit Perpetual trades at a price higher than the spot price of the underlying digital commodity, measured by reference to a Deribit index on the digital commodity's spot price, holders of long positions in the Deribit Perpetual pay a funding payment to traders holding short positions in the Deribit Perpetual, thereby incentivizing market participants to take short positions in the Deribit Perpetual. Conversely, if the Deribit Perpetual trades at a price lower than the digital commodity's spot price as measured by the relevant index, holders of short positions in the Deribit Perpetual pay a funding payment to long holders, making long positions in the Deribit Perpetual more attractive.

CFM states that it will hold its customers' positions in the Products and related margin collateral in 30.7 customer accounts (as defined by Commission Regulation 30.1) on its books. CFM will in turn deposit the relevant 30.7 customer funds (as defined by Commission Regulation 30.1) in a customer omnibus account at CBBM (**"CBBM Customer Omnibus Account"**). The CBBM Customer Omnibus Account will reflect the aggregate Product positions and margin of all CFM customers on a gross basis. Each individual CFM customer's positions and margin included in the CBBM Customer Omnibus Account will be reflected in a pseudonymized subaccount under the CBBM Customer Omnibus Account. The subaccounts will solely enable CBBM to manage margin and defaults on a gross basis at the subaccount level. The subaccounts do not afford CBBM any direct legal rights against, or operational contact with, any

---

[15] CFM states that Deribit calculates funding payments owed or due to holders of Deribit Perpetuals every millisecond. Each funding payment will be the product of: (i) a funding rate, which is based on the difference between the mark price of the Deribit Perpetual at a given time and the price of the underlying digital commodity (by reference to the relevant index) at that time subject to applicable damping rates and caps, as described in the Deribit Perpetual's product specifications; (ii) the holder's open position size; (iii) the holder's position side (long or short); and (iv) the fraction obtained by dividing the amount of time over which the funding rate was applied by eight hours. At daily settlement, Deribit will distribute or collect margin obligations from all members with open long or short positions in the Deribit Perpetuals, including aggregate funding payment obligations and/or entitlements accrued since the prior settlement period. Each Deribit Perpetual will have a standard size corresponding to a fixed amount of the underlying digital commodity. For example, each Deribit Perpetual on Bitcoin will correspond to 0.0001 Bitcoin. As with the Deribit Options, the Deribit Perpetuals may be linear (settled in a stablecoin, such as USDC) or inverse (settled in the underlying digital commodity).

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

individual CFM customer. CFM also states that Deribit will maintain assets with a value equal to 100 percent of the net liquidating equity with respect to 30.7 Customers (as defined below) trading on Deribit in one or more accounts at Coinbase Custody Trust Company, LLC, a New York state limited purpose trust company owned by Coinbase Global.

CFM states that settlement on Deribit occurs on a daily basis through mark-to-market processes that take place each day at 08:00 Coordinated Universal Time. Deribit calculates mark-to-market values and margins all open positions in real time and, at the daily settlement time, credits or debits each member's account accordingly. Each Deribit member is also required to maintain a margin balance that meets or exceeds the maintenance margin requirement.

CFM further states that if a member fails to comply with its maintenance margin requirement, Deribit may initiate its default management framework, which involves the liquidation of the member's positions. If the member's account is negative after the liquidation of positions, an "insurance fund" maintained by Deribit (the **"Insurance Fund"**) will satisfy the account's remaining financial obligations. If the defaulting account or the aggregate of defaulting accounts during that trading session continues to have a negative balance following application of the Insurance Fund, Deribit may apply prorated variation margin gains haircutting to all Deribit members that experienced a profit in the prior 24-hour settlement cycle.

## II.    Regulatory Background

Section 4(b)(2) of the Commodity Exchange Act (**"Act"**)[16] authorizes the Commission to adopt rules, in relevant part, to safeguard customer funds received by an FCM to margin customer foreign futures and foreign option positions entered into on an FBOT. Pursuant to this authority, the Commission adopted Regulation 30.7, which imposes requirements regarding an FCM's treatment and holding of funds deposited by customers (**"30.7 Customers"**) as margin for foreign futures and foreign option transactions (**"30.7 Customer Funds"**), including that an FCM must maintain at all times a sufficient amount of funds in specially designated accounts to satisfy the account balances of all 30.7 Customers.[17] In addition, 30.7 Customer Funds must be held in clearly identifiable accounts at certain permitted categories of depository institutions (**"Permitted Depositories"**),[18] and an FCM must obtain an acknowledgment letter

---

[16] 7 U.S.C. § 6(b)(2).

[17] Commission Regulation 30.1 defines the term "30.7 customer" to include both U.S. and non-U.S. persons who trade foreign futures or foreign options through an FCM. Regulation 30.1 also defines the term "30.7 customer funds" to mean any money, securities, or other property received by an FCM from, for, or on behalf of 30.7 Customers to margin, guarantee or secure foreign futures or foreign option positions, or money, securities or other property accruing to 30.7 customers as a result of foreign futures and foreign option positions. 17 C.F.R. § 30.1.

[18] Permitted Depositories under Commission Regulation 30.7 include banks and trust companies located in the United States, banks and trust companies located outside of the United States that have in excess of $1 billion of

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

(**"Acknowledgment Letter"**) from each depository it uses to hold 30.7 Customer Funds. Pursuant to the terms of the Acknowledgment Letter, each depository acknowledges, among other things, that (i) the FCM opened the account for the purpose of depositing 30.7 Customer Funds belonging to 30.7 Customers for trading foreign futures and/or foreign options; (ii) the depository will hold the 30.7 Customer Funds separate from its own funds and separate from any proprietary funds deposited by the FCM; and (iii) the 30.7 Customer Funds will be treated in accordance with the provisions of Section 4(b) of the Act and Commission Regulation 30.7.[19]

Commission Regulation 30.7 also requires an FCM holding 30.7 Customer Funds in accounts maintained outside of the United States, such as with a foreign broker or Permitted Depository located in a foreign jurisdiction, to (i) deposit the 30.7 Customer Funds under the laws and regulations of the foreign jurisdiction that provide the greatest degree of protection to such funds and (ii) not waive (by contract or otherwise) any of the protections afforded customer funds under the laws of the foreign jurisdiction.[20]

### III. Request for Confirmation that CFM may Categorize the Deribit Perpetuals as Foreign Futures Under Commission Regulation 30.1

#### A. Summary of the Request for Interpretation

As noted above, CFM requests that the Division confirm that CFM may categorize the Deribit Perpetuals as foreign futures as defined by Commission Regulation 30.1 when transacted by customers through CFM. CFM states that there is considerable uncertainty regarding the regulatory categorization of perpetual-term derivative contracts, such as the Deribit Perpetuals, and that this uncertainty presents challenges because the regulatory treatment of the Deribit Perpetuals informs the applicability of foreign futures regulation under Section 4(b) of the Act[21] and Part 30 of the Commission's regulations[22] to the offer of these products to 30.7 Customers and the treatment of the Deribit Perpetuals as "foreign futures" for purposes of Subchapter IV of

---

regulatory capital, FCMs registered with the Commission, derivatives clearing organizations registered with the Commission, clearing organizations of FBOTs, members of FBOTs and designated depositories of members of FBOTs or foreign clearing organizations. 17 C.F.R. § 30.7(b).

[19] Commission Regulation 30.7(d) requires an FCM to obtain an Acknowledgment Letter from each depository with which it opens an account to hold 30.7 Customer Funds. 17 C.F.R. § 30.7(d). Appendix E to Part 30 contains the standard form Acknowledgment Letter that an FCM is required to execute with each depository.

[20] 17 C.F.R. § 30.7(c). Pursuant to Commission Regulation 30.7(c), CFM is limited to the amount of 30.7 Customer Funds it may deposit with CBBM to no more than 120 percent of the required margin on the 30.7 Customers' positions. *Id.*

[21] 7 U.S.C. § 6(b).

[22] 17 C.F.R. part 30.

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

Chapter 7 of the Bankruptcy Code[23] and Part 190 of the Commission's regulations.[24] In support of its request for confirmation that CFM may categorize the Deribit Perpetuals as foreign futures contracts, CFM asserts that the Deribit Perpetuals exhibit all of the key characteristics of a futures contract,[25] including: (i) futurity;[26] (ii) risk transference;[27] (iii) offset;[28] (iv) standardized terms;[29] (v) margin requirements related to price movements;[30] (vi) central clearing;[31] and (vii) public dissemination of prices.[32] CFM specifically analyzes whether the indefinite duration of the Deribit Perpetuals should affect its categorization as a futures contract. In that regard, CFM states that courts have repeatedly explained that "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[33] CFM further submits that the attribute of "futurity" – generally associated with futures contracts[34] – exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[35] CFM thus asserts that the Deribit Perpetuals are appropriately categorized as futures contracts and, accordingly, foreign futures under Commission Regulation 30.1 when traded on Deribit, an FBOT.

---

[23] 11 U.S.C. §§ 761-767.

[24] 17 C.F.R. part 190.

[25] CFM notes that the Act does not define "futures contract," which has resulted in the Commission and courts assessing each transaction "as a whole with a critical eye toward its underlying purpose" by evaluating whether certain characteristics common to most futures contracts are present. Request at p. 6 (quoting *Commodity Futures Trading Comm'n v. Co Petro Marketing Group*, *Inc*., 680 F.2d 573, 581 (9th Cir. 1982)).

[26] Request at p. 8 (stating that the Deribit Perpetuals exhibit futurity by providing for "future executory payment obligations" in the form of funding rate payments).

[27] *Id.* (stating that the Deribit Perpetuals provide for risk transference by shifting the price risk of the underlying digital commodity between parties without transferring the digital commodity itself).

[28] *Id.* (stating that holders will be able to exit their positions by offset).

[29] *Id.* (stating that the Deribit Perpetuals trade in fixed, standardized unit sizes).

[30] *Id.* (stating that the Deribit Perpetuals have margin requirements related to price movements).

[31] *Id.* at p. 9 (stating that each party's obligations will be centrally cleared by Deribit).

[32] *Id.* (stating that the Deribit Perpetuals have prices disseminated publicly by Deribit).

[33] *Id.* at p. 7 (quoting *Commodity Futures Trading Comm'n v. Standard Forex, Inc.*, 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29 (July 25, 1996). *See also Commodity Futures Trading Comm'n v. Int'l. Fin. Servs.*, 323 F. Supp. 2d 482, 498 (S.D.N.Y. 2004); *Commodity Futures Trading Comm'n v. Int'l Foreign Currency*, 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004)).

[34] *Id.* at p. 8 (citing *Commodity Futures Trading Comm'n v. First Lexington Group, LLC et. al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008)).

[35] *Id.* (citing *Chicago Mercantile Exch. v. Sec. and Exch. Comm'n*, 883 F.2d 537, 541 (7th Cir. 1989)).

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

**B. Staff Interpretation Regarding the Categorization of the Deribit Perpetuals as Foreign Futures Under Commission Regulation 30.1**

Based on the facts presented in CFM's Request, the Division confirms that the Deribit Perpetuals may be categorized as foreign futures as this term is defined in Commission Regulation 30.1. In issuing this interpretation, the Division has considered the analysis provided by CFM, as well as the analysis included in the May 29, 2026 Commission order which found that the listing of a similarly structured product as a futures contract on a DCM did not violate the Act or the Commission's regulations.[36] Specifically, the Perpetual Contract Order approved a DCM to list for trading, and make available for clearing, as a contract for sale of a commodity for future delivery, or "futures contract," a cash-settled perpetual derivative contract based on the spot price of Bitcoin as measured by a benchmark real time index. In determining that the DCM would not violate the Act and Commission regulations by listing the perpetual contract as a futures contract, the Commission considered the structure and characteristics of the contract, including the functioning of the funding rate mechanism designed to maintain convergence with the spot reference price, as well as the characteristics of the underlying spot market for the contract. In particular, the Commission noted that the market for the underlying digital commodity (e.g., Bitcoin) is deep, broadly distributed, active, and provides spot price data continuously, which supports the effective functioning of the funding mechanism employed by the perpetual contract.

In addition, under the rules of the applicable foreign jurisdiction – Dubai Virtual Assets Regulatory Authority – perpetual contracts are classified as a subcategory of exchange-traded derivatives.[37] The Dubai Virtual Assets Regulatory Authority's rules do not characterize perpetuals as swaps or contain other provisions that would contradict a regulatory categorization of perpetuals as futures.

Consistent with the Perpetual Contract Order, the Division's interpretation is limited in scope to perpetual contracts that are structured similarly to the Deribit Perpetuals, as described above, and that are based on the spot price of digital commodities that have deep, active and continuous spot market trading. The interpretation does not extend to perpetual contracts based on underlying asset classes other than digital commodities.[38]

---

[36] Order Approving KalshiEX LLC BTCPERP Futures Contract, May 29, 2026 (**"Perpetual Contract Order"**).

[37] Virtual Assets Regulatory Authority, *Exchange Services Rulebook* (Dubai Mar. 31, 2026), https://www.vara.ae. Perpetuals are listed in Part V (Exchange Traded Derivative Service Rules), subsection H.

[38] The Commission noted in the Perpetual Contract Order that it expects to address the regulatory treatment of, and compliance considerations relating to, perpetual contracts more generally at a future date.

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

### IV.   Request for No-Action Position Regarding CFM's Transfer of Customer Digital Assets to CBBM with a Right of Re-Use as Margin for Foreign Futures and Foreign Option Positions Under Commission Regulation 30.7

#### A.   Summary of the Request for No-Action Position

As noted above, CFM plans to offer Deribit Futures, Deribit Options, and Deribit Perpetuals to its 30.7 Customers. CFM states that it will accept customer-owned digital commodities and payment stablecoins, including Bitcoin and Ether, as margin collateral from its 30.7 Customers. CFM will maintain a CBBM Customer Omnibus Account with CBBM to hold 30.7 Customer Funds, including the Customer Digital Assets.

CFM requests that the Division issue a no-action letter clarifying that CFM may post Customer Digital Assets as margin collateral for foreign futures and foreign option positions (including Deribit Futures, Deribit Options, and Deribit Perpetuals) with CBBM under a right of re-use over such margin collateral. In this regard, CFM requests confirmation that the Division will not recommend an enforcement action if CFM posts Customer Digital Assets to the CBBM Customer Omnibus Account to margin its 30.7 Customers' foreign futures or foreign option positions, including Deribit Futures, Deribit Options, and Deribit Perpetuals, where CFM grants CBBM a right of re-use over the Customer Digital Assets to allow CBBM to post the Customer Digital Assets to Deribit for purposes of margining or securing 30.7 Customer obligations arising from foreign futures and foreign options listed on Deribit and cleared by Deribit. CFM further requests that the Division confirm that it would not recommend enforcement action against CBBM for being in violation of its obligations under the Acknowledgment Letter required by Commission Regulation 30.7 by invoking a right of re-use over Customer Digital Assets deposited with it by CFM to margin its 30.7 Customer foreign futures and foreign option positions.

In support of its request, CFM notes that the Division issued a no-action letter in December 2025 providing that the Division would not recommend an enforcement action against an FCM that accepts certain non-securities crypto assets from customers as margin for futures, foreign futures, or cleared swap transactions and, subject to specified conditions: (i) takes into account the value of the customer-owned non-securities crypto assets when (a) determining whether or to what extent a customer's account (including a 30.7 Customer's account) is undermargined for purposes of calculating undermargined capital charges under Commission Regulation 1.17(c)(5)(viii)[39] and (b) calculating the value of customer funds held in segregation

---

[39] Commission Regulation 1.17(c)(5)(viii), as applicable, requires an FCM to take a capital charge on undermargined customer accounts, including an account of a 30.7 Customer, in the amount necessary for the account to meet maintenance margin requirements of the applicable board of trade. 17 C.F.R. § 1.17(c)(5)(viii). Commission

CFTC Letter No. 26-17   No-Action, Interpretive   May 29, 2026

when performing daily segregation calculations (including the daily calculation required for 30.7 Customer Funds by Commission Regulation 30.7(f)(2)).[40] CFM states that while Staff Letter 26-05 contemplates that 30.7 Customers may deposit non-securities crypto assets (including Customer Digital Assets) as margin collateral as the letter defines the treatment of such collateral by the FCM in computing undermargined capital charges and in performing segregation calculations of customer funds, Staff Letter 26-05 did not address how non-securities crypto assets must be held in a foreign jurisdiction as 30.7 Customer Funds.

CFM further notes that the Division issued an interpretative letter in November 2025 confirming that an FCM is not in violation of Commission Regulation 30.7 if the FCM transfers, subject to a right of re-use or title transfer, securities owned by 30.7 Customers to a foreign broker, FBOT, or foreign clearing organization to margin the 30.7 Customers' foreign futures and foreign option positions under circumstances where the foreign broker, FBOT, or foreign clearing organization is authorized or required by local law to obtain title to, or a right of re-use over, the securities and the securities are being transferred solely for purposes of margining or securing 30.7 Customer obligations arising from 30.7 Customers' foreign futures and foreign option positions.[41] CFM states that Staff Letter 25-38 clarifies that an FCM would not be in violation of its obligations under Commission Regulation 30.7, and a foreign broker or foreign clearing organization would not be in violation of its obligations under the Acknowledgment Letter, if it took title to or invoked a right of re-use over 30.7 Customers' securities that the FCM deposited as 30.7 Customer Funds. CFM further states, however, that Staff Letter 25-38 does not explicitly apply to Customer Digital Assets, as such crypto assets are not securities.

---

Regulation 1.17(c)(5)(viii) permits the FCM to reduce the resulting undermargined amount by deducting margin calls issued by the FCM to customers which are outstanding no more than one business day. *Id.* Commission Regulation 1.17(c)(5)(viii)(D) further provides that if the owner of a customer account, including a 30.7 Customer, deposits an asset other than cash to margin the account, the value attributable to such assets for purposes of determining the undermargined amount of the account shall be the lesser of: (i) the value attributable to the asset pursuant to the margin rules of the applicable board of trade, or (ii) the market value of the assets after application of the percentage deductions (haircuts) specified in Commission Regulation 1.17(c)(5). *Id.* § 1.17(c)(5)(viii)(D).

[40] CFTC Staff Letter No. 25-40, *Staff No-Action Position Regarding Digital Assets Accepted as Margin Collateral* (Dec. 8, 2025) (**"Staff Letter 25-40"**), re-issued on February 6, 2026, as CFTC Staff Letter No. 26-05 with a limited revision to the definition of "payment stablecoin" (**"Staff Letter 26-05"**). Commission Regulation 30.7(f) requires an FCM to compute as of the close of each business day: (i) the total amount of 30.7 Customer Funds on deposit in segregated accounts for 30.7 Customers; (ii) the amount of 30.7 Customer Funds required by Commission regulations to be on deposit in 30.7 Customer Funds segregated accounts; and (iii) the amount of the FCM's residual interest in the 30.7 Customer Funds segregated accounts. 17 C.F.R. § 30.7. In computing the amount of 30.7 Customer Funds required to be in 30.7 Customer Funds segregated accounts, an FCM may offset any net debit or deficit against the current market value of readily marketable securities, less applicable haircuts. *Id.*

[41] CFTC Staff Letter No. 25-38, *Staff Interpretation Regarding FCM Deposits of Securities with Foreign Brokers and Foreign Clearing Organizations to Margin Customer Positions Entered into on, or Subject to the Rules of, a Foreign Board of Trade* (Nov. 25, 2025), (**"Staff Letter 25-38"**).

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

CFM states that its requested no-action position seeks to further effectuate Staff Letter 26-05 and the use of Customer Digital Assets as margin collateral by extending the interpretation set forth in Staff Letter 25-38 such that CFM may transfer 30.7 Customer owned Customer Digital Assets to CBBM (as a foreign broker) and, subsequently, to Deribit (as an FBOT and foreign clearing organization), subject to appropriate guardrails and Commission oversight, given the nascent nature of the global digital asset derivatives industry. CFM further states that its requested no-action position is similar to the position in Staff Letter 25-38, as the request is limited to rights of re-use obtained by a foreign broker that is authorized or required under applicable local regulatory regimes or rules of an FBOT or foreign clearing organization. CFM also proposes that it will only use or re-use Customer Digital Assets for the purpose of margining or securing 30.7 Customer obligations arising from foreign futures or foreign option positions.

In addition, CFM proposes that the Division's no-action position be subject to conditions to address potential risks to customer protection and market integrity arising from the fact that the Commission, market participants, and markets generally have less experience with the use of Customer Digital Assets as margin collateral relative to securities. CFM's proposed conditions provide: (i) CFM, CBBM, and Deribit must remain wholly-owned subsidiaries of Coinbase Global, a public reporting company; (ii) CFM must ensure that Deribit and CBBM enter into an agreement consistent in substance with the Acknowledgment Letter set forth in Appendix E to Part 30 that is required of FCMs opening 30.7 Customer Funds accounts with Permitted Depositories, subject to conforming changes as appropriate to reflect the naming convention for the account, which also must be filed with the Commission; (iii) CFM must make available to relevant 30.7 Customers, directly or indirectly through CBBM and/or CFM, its annual audited financial statements and System and Organization Controls 2 report; (iv) neither Deribit nor CBBM nor any of their respective affiliates may be subject to a criminal disqualification;[42] (v) CFM must ensure that CBBM and Deribit have agreed to handle Customer Digital Assets in accordance with a program of risk analysis and oversight with respect to their operations and automated systems that includes information security controls and is integrated into risk management at the consolidated entity level;[43] (vi) the right of re-use of 30.7 Customer margin

---

[42] CFM defines the term "criminal disqualification" for purposes of its request to mean the person has plead to, or been convicted of, a felony or a misdemeanor that provides the Commission with the grounds to refuse to register or to revoke, condition, or restrict the registration of the person pursuant to the applicable provision of Sections 8a(2)(D), 8a(3)(D), 8a(3)(E) or 8a(3)(H) of the Act. *See* 7 U.S.C. §§ 12a(2)(D), 12a(3)(D), 12a(3)(E), 12a(3)(H).

[43] CFM further defines the program of risk analysis and oversight as a program that includes controls relating to: (i) access to systems and data (including least privilege, separation of duties, account monitoring and control); (ii) user and device identification and authentication; (iii) security awareness training; (iv) audit log maintenance, monitoring, and analysis; (v) media protection; (vi) personnel security and screening; (vii) automated system and communications protection (including network port control, boundary defenses, encryption); (viii) system and information integrity (including malware defenses, software integrity monitoring); (ix) vulnerability management;

11

collateral must be authorized or required under the local regulatory regime applicable to CBBM or Deribit, including, Deribit's exchange rules; (vii) the Customer Digital Assets may be used or re-used by CBBM solely for the purpose of margining or securing 30.7 Customer obligations arising from 30.7 Customers' foreign futures and foreign option positions; (viii) CFM must provide 30.7 Customers with a disclosure statement describing the transaction and 30.7 Customer Funds flow, the role of each Coinbase Global affiliate involved in the offer and settlement of the Products and Deribit's default management framework, in addition to the standard disclosure statement required by Commission Regulations 1.55(b) and 30.6; and (ix) CFM must comply with the conditions enumerated in Letter 26-05. CFM states that the proposed conditions are designed to provide enhanced protection of 30.7 Customers through: (i) appropriate segregation and treatment of 30.7 Customer Funds, not only by CFM at CBBM, but also by CBBM at Deribit; (ii) audit and disclosure of Deribit's financial statements and operational controls; (iii) robust information security systems risk management controls that are integrated as part of the enterprise risk management program of an affiliated group that includes a U.S. public reporting company;[44] and (iv) parent company management responsibility for and independent assessment of internal controls as required under Section 404 of the Sarbanes-Oxley Act (**"SOX"**).[45]

## B. Staff No-Action Position Regarding CFM's Transfer of Customer Digital Assets to CBBM under a Right of Re-Use

Based on the facts presented in CFM's Request for a no-action letter, and for the reasons stated below, the Division has determined that it will not recommend enforcement action against CFM under Commission Regulation 30.7 if CFM posts Customer Digital Assets with CFM's foreign broker affiliate, CBBM, to margin its 30.7 Customers' foreign futures and foreign option positions on CFM's affiliated FBOT, Deribit, where each entity in the transaction chain is a wholly-owned subsidiary of a U.S. public reporting company, under circumstances where CBBM has obtained a right of re-use over the Customer Digital Assets. The Division also will not recommend enforcement action against CBBM for violating its respective obligations under the Acknowledgment Letter set forth in Appendix E to Part 30 if CBBM receives Customer Digital

---

(x) penetration testing; (xi) security incident response and management; and (xii) any other elements of information security included in generally accepted best practices.

[44] CFM states that this condition would enhance customer protection by ensuring that Deribit's acceptance and handling of Customer Digital Assets are subject to comprehensive information security systems risk-management controls and procedures designed to promote prompt and effective identification, escalation and mitigation of the unique risks posed by the use of Customer Digital Assets as collateral and integrated within a broader, enterprise-wide risk-management program.

[45] Sarbanes-Oxley Act of 2002, 15 U.S.C. §§ 7201-7266.

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

Assets from CFM under a right of re-use, provided that the right of re-use is authorized or required under the applicable local regulatory regime and/or rules governing CBBM and the Customer Digital Assets are transferred to CBBM or Deribit solely for purposes of margining or securing CFM's 30.7 Customer obligations arising from 30.7 Customers' foreign futures and foreign option positions.

As the Division stated in Staff Letter 25-38, the Part 30 regulations were adopted under Section 4(b) of the Act and set forth a regulatory framework for FCMs to provide 30.7 Customers with access to foreign futures and foreign option markets. Part 30 is designed to protect 30.7 Customers by, for example, imposing segregation and financial reporting regimes on FCMs holding 30.7 Customer Funds, establishing minimum criteria for entities to qualify as Permitted Depositories of 30.7 Customer Funds, and requiring Permitted Depositories to execute Acknowledgment Letters addressing the rights and obligations of the FCM and depositories holding 30.7 Customer Funds. The Division, however, recognizes that foreign brokers, FBOTs, and foreign clearing organizations operate under laws and regulations that may differ from the Commission's, including the laws and regulations governing the holding of 30.7 Customer Funds. In this regard, the Part 30 regulations are intended to ensure that 30.7 Customer Funds are held in accordance with the applicable laws and regulations governing the holding of customer funds deposited for trading foreign futures and foreign options in the relevant foreign jurisdiction and that the 30.7 Customer Funds are used by the FCM and foreign intermediaries solely to margin 30.7 Customers' foreign futures and foreign option positions. Part 30 also imposes disclosure requirements designed to explain the implications and risks associated with foreign futures transactions.[46]

In reviewing the protections afforded, and transparency provided, to CFM's 30.7 Customers, as represented in the Request, the Division acknowledged the fact that CBBM and Deribit are wholly-owned subsidiaries of a publicly traded U.S. company (i.e., Coinbase Global). As a public company, Coinbase Global is required by the SEC, pursuant to the Securities Exchange Act of 1934, to make publicly available periodic and current reports, including annual financial reports, quarterly financial information, and prompt disclosures of specified material

---

[46] *See* 17 C.F.R. § 30.6(a); *see also* 17 C.F.R. § 1.55(b).

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

events.[47] Coinbase Global is also required, pursuant to Section 404 of SOX,[48] to maintain internal controls over its financial reporting.[49]

The Division's no-action position is subject to the following conditions:

1. CFM, CBBM, and Deribit remain wholly-owned subsidiaries of Coinbase Global, a public reporting company;

2. CFM ensures that CBBM and Deribit enter into an agreement consistent in substance with the "Acknowledgment Letter for CFTC Regulation 30.7 Customer Secured Account" set forth in Appendix E to Part 30, subject to conforming changes as appropriate to reflect the naming convention for the account, and files the agreement with the Division via the WinJammer electronic filing system;

3. CFM makes available to relevant 30.7 Customers Deribit's annual audited financial statements and System and Organization Controls 2 report;

4. Neither Deribit nor CBBM nor any of their respective affiliates is subject to a criminal disqualification as defined in this letter;

5. CFM ensures that CBBM and Deribit agree to handle Customer Digital Assets in accordance with a program of risk analysis and oversight with respect to their operations and automated systems that includes information security controls and that

---

[47] The disclosure requirements also include a requirement to provide information regarding the company's cybersecurity risk management and strategy in the company's periodic reports and a requirement to report material cybersecurity incidents. *See* 17 C.F.R. § 229.106, 229.600, 249.308.

[48] Section 404(a) of SOX requires that annual reports by securities issuers contain an internal control report which shall: (i) state the responsibility of management for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (ii) contain an assessment, as of the end of the most recent fiscal year of the issuer, of the effectiveness of the internal control structure and procedures of the issuer for financial reporting. 15 U.S.C. § 7262(a). Further, Section 404(b) requires each registered public accounting firm that prepares or issues the audit report for the issuer to attest to, and report on, the internal control assessment made by the management of the issuer. 15 U.S.C. § 7262(b).

[49] SEC Regulation S-K requires in relevant part that public companies provide a report of management on the company's internal control over financial reporting. 17 C.F.R. § 229.308(a). "Internal control over financial reporting" is defined as a process to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements. 17 C.F.R. § 240.13a-15(f). These requirements promote management accountability and provide stakeholders with assurance regarding the accuracy of financial reporting by public companies.

is integrated at the consolidated entity level as part of an affiliated group that includes a U.S. public reporting company;

6. The right of re-use is authorized or required under the local regulatory regime applicable to CBBM or Deribit or rules of Deribit;

7. The Customer Digital Assets are used or re-used by CBBM solely for the purpose of margining or securing 30.7 Customer obligations arising from 30.7 Customers' foreign futures and foreign options positions;

8. In addition to the standard disclosure statement required by Commission Regulations 1.55(b) and 30.6, CFM provides 30.7 Customers with a disclosure statement describing the transaction and 30.7 Customer Funds flow, the role of each Coinbase Global affiliate involved in the offer and settlement of the Products, and Deribit's default management framework; and

9. CFM complies with the conditions enumerated in Staff Letter 26-05, including the conditions addressing the qualifications that the Customer Digital Assets must meet in order for CFM to take into account the value of such Customer Digital Assets (and the applicable haircuts to such value) when (i) determining whether or to what extent a 30.7 Customer account is undermargined for purposes of Commission Regulation 1.17(c)(5)(viii) and (ii) performing segregation calculations as required by Commission Regulation 30.7(f)(2).

## V.    Conclusion

The interpretation and no-action positions in this letter represent the positions of the Division only and do not necessarily represent the views of the Commission or those of any other division or office of the Commission. This letter and the interpretation and no-action positions taken herein are not binding on the Commission or other Commission staff.[50] Except as explicitly provided in this letter, the interpretation and no-action positions taken in this letter do not excuse persons relying on it from compliance with any other applicable requirements contained in the Commodity Exchange Act or Commission regulations. The interpretation and no-action positions taken herein are based upon the facts and circumstances represented to the staff of the Division. Any different, changed, or omitted material facts or circumstances may require a different interpretation or no-action positions or render the interpretation or no-action positions taken in this letter void. As with all staff interpretation and no-action positions, the

---

[50] *See* 17 C.F.R. § 140.99(a)(2)-(3).

CFTC Letter No. 26-17   No-Action, Interpretative   May 29, 2026

Division retains the authority to condition further, modify, suspend, terminate, or otherwise restrict the interpretation and no-action positions provided herein, in its discretion.

   If you have any questions concerning this correspondence, please contact Liliya Bozhanova, Associate Director, Market Participants Division, lbozhonova@cftc.gov, Jennifer Narvaez, Attorney-Advisor, Market Participants Division, jnarvaez@cftc.gov, or Christine McKeveny, Attorney-Advisor, cmckeveny@cftc.gov.

Sincerely,

_____

Duncan Hennes
Director
Market Participants Division

16