# EXHIBIT A

August 18, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the US500 Futures Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.3(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a designated contract market (DCM) registered with the Commission, hereby voluntarily submits the US500 contract (the Contract) for Commission review and approval. The Exchange intends to list the Contract on a continuous basis. The Exchange intends to list this Contract shortly following approval by the Commission.

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Appendix B with enhanced trading prohibitions applicable to the Contract;
- Appendix C with further considerations regarding the Contract;
- Appendix D with information regarding the Source Agency for the Contract;
- Appendix E describing the Contract's compliance with the Core Principles;
- Appendix F with further information on the Contract's compliance with the Core Principles;
- Confidential Appendix G with the Exchange's agreement with the Source Agency; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name:** US500
**Rulebook:** US500
**Summary:** MerQube US Large Cap Index Perpetual Future
**August 18, 2026**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Regulation 40.3(a)(4), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendices E and F), and the Commission's regulations thereunder.

### I. Introduction

The US500 Contract is a perpetual futures contract on the MerQube US Large Cap Index (Bloomberg: MQ5C; Reuters: .MQ5C), a broad-based securities index composed of the 500 largest companies listed and domiciled in the United States, weighted by float-adjusted market capitalization and administered by MerQube.

**What is a perpetual future?** A perpetual future is a cash-settled futures contract with no fixed expiration or delivery date. Rather than converging to a deliverable cash price on a stated settlement day, it remains economically tethered to a continuously observed reference through a periodic funding mechanism: at regular intervals, holders of the side trading at a premium to the reference pay holders of the side trading at a discount, so that any divergence between the contract's mark and the underlying reference generates an offsetting carrying cost that draws the two back into alignment. The instrument therefore functions as an indefinitely renewing near-dated future, allowing a participant to hold a position open for as long as the underlying exposure persists without rolling from one expiration to the next.

**Why are these important?** Perpetual futures have become the dominant form of derivative and a principal locus of price discovery in the markets in which they have emerged, yet that activity has historically occurred almost entirely on offshore, unregulated venues. Listing a perpetual on a CFTC-registered DCM brings this economically significant activity into a regulated environment featuring trade surveillance, know-your-customer verification, risk-based margin, central clearing, and disciplinary procedures consistent with the CEA, protecting U.S. participants and preserving U.S. price discovery rather than ceding both abroad. For investors whose exposure to the broad U.S. equity market is itself continuous and indefinite—asset managers and institutional investors maintaining long-horizon exposure to U.S. large-cap equities, funds tracking or benchmarked to a broad large-cap index, participants managing ongoing equity-beta exposure, and dealers warehousing equity-index risk from client facilitation—a perpetual is structurally superior to a strip of dated futures: it eliminates roll cost and roll-date basis risk, tracks the reference more tightly through the funding mechanism, and concentrates liquidity in a single instrument rather than fragmenting it across expirations. Listing a regulated domestic perpetual thus directly

advances the Commission's stated objective of onshoring novel derivatives products that developed offshore due to regulatory uncertainty.[1]

**Perpetuals are an especially natural fit for a broad equity market index.** Of the things on which a derivative can be written, a broad equity market index is among the most natural candidates for a perpetual, indefinitely renewing structure, because the exposure it represents—participation in a diversified basket of the market's largest companies—is itself continuous and has no terminal date. There is always a prevailing level of the U.S. large-cap market; the economic variable does not mature, expire, or settle on a delivery day. The Underlying is the *level of the index* itself—not a dated delivery price—so, unlike a dated equity index future, it does not carry a fixed expiration to which it must converge, roll down a basis to that expiration, or require participants to migrate from one listed month to the next. A perpetual on that index therefore mirrors the economic reality of continuous, long-horizon equity exposure far more closely than the existing exchange-traded tools for taking or hedging it. Dated equity index futures, such as the quarterly E-mini contracts on major U.S. large-cap benchmarks, must be rolled every calendar quarter, incurring roll cost, roll-date basis risk, and the operational burden of managing the front-month-to-back-month transition. The Contract collapses that maintenance into a single, continuously held instrument that tracks the current index level without any roll. Where a participant's information instead lives in the term structure—calendar spreads, the path of expected dividends and financing to specific tenors, or date-certain settlement needs—dated equity index instruments remain valuable, so that the perpetual and dated structures are complementary rather than substitutes.

**The funding mechanism has a well-defined economic interpretation for an equity index.** Because the Contract synthesizes a continuously held, financed position in the underlying large-cap basket, its equilibrium funding is not zero but reflects the net cost of carrying that position—the short-term financing rate on the capital required to hold the basket, less the dividend yield accruing to the constituent securities. Because the Underlying is a price-return index, which excludes reinvested dividends, a holder of the Contract does not itself receive the dividends paid by the constituents; the funding mechanism is accordingly the perpetual analog of the cost-of-carry basis embedded in a dated equity index future, passing this financing-minus-dividend differential between the two sides at each Periodic Transfer so as to keep the Contract's traded level tethered to the index. For prevailing financing rates and dividend yields this per-period carry is small—on the order of the net carry accruing over a single day, a small fraction of one percent of the index level. The Contract's deadband is accordingly set below the typical per-period carry, so that it filters microstructure noise without suppressing the genuine carry, while the clamp is set far above it and functions as a manipulation and tail-risk backstop rather than a routine constraint.

**The Contract trades on the twenty-four-hour, five-day schedule of the U.S. equity-index futures market, while its funding mechanics are anchored to the real-time level of the Index during regular U.S. equity trading hours.** The Underlying Price Index is the level of the Index as calculated and disseminated by the Source Agency

[1] Remarks of CFTC Chairman Michael Selig, The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

in real time during regular trading hours on each Index Business Day — from the 9:30 A.M. Eastern open to the 4:00 P.M. Eastern close of regular trading — from the prices of the constituent securities on their primary listing exchanges. The Index is not calculated outside regular trading hours, on weekends, or on reference market holidays. The Contract's methodology accordingly computes a per-minute Premium for every one-minute interval during which the Index is being calculated and the feed is current, and derives a single daily Funding Rate — the equally weighted mean of those Premiums — at a Periodic Transfer Time coinciding with the 4:00 P.M. close. No Premium is computed, and no Funding Rate payment is derived, from any period during which the Index is not being calculated; in such periods the most recent published level remains in effect. This is the same principle applied across the Exchange's perpetual suite: Premiums are computed whenever, and only when, the underlying reference market is open and priced — approximately the six and one-half hours of regular equity trading for this Contract. Because the Index's constituents do not trade overnight, confining funding measurement to regular hours leaves no unfunded price discovery. The Source Agency separately publishes an official closing level of the Index struck from official closing prices, which the Exchange uses as a daily validation benchmark for the real-time series, as described in Appendix D.

**The Contract is a futures contract on a broad-based security index, within the Commission's exclusive jurisdiction.** The Underlying is a security index and therefore an "excluded commodity" under Section 1a(19) of the CEA.[2] Because the Index is a broad-based security index—and not a narrow-based security index—the Contract is not a "security future" or "security futures product," and its listing and trading fall within the Commission's exclusive jurisdiction under Section 2(a)(1)(C) of the CEA, rather than the jurisdiction the Commission shares with the Securities and Exchange Commission over futures on single securities and narrow-based security indices.[3] As set forth in Appendix E, the Contract satisfies each of the three requirements of Section 2(a)(1)(C)(ii) of the CEA: it is settled exclusively in cash; it is not readily susceptible to manipulation, nor to being used to manipulate any underlying security; and the Index is not a narrow-based security index.[4] The Index fails each of the four disqualifying criteria of Section 1a(35) of the CEA by a wide margin: it comprises five hundred component securities; no single component exceeds approximately seven percent of its weight; its five highest-weighted components together account for approximately one-quarter of its weight; and the

---

[2] 7 U.S.C. § 1a(19) (defining "excluded commodity" to include, among other things, an interest rate, exchange rate, currency, security, security index, or other financial or macroeconomic index or measure). A broad-based security index is a "security index" within this definition.

[3] See 7 U.S.C. § 1a(45) (defining "security future" as a contract of sale for future delivery of a single security or of a narrow-based security index, and excluding a contract on a broad-based security index); id. § 1a(35) (defining "narrow-based security index"). Futures on single securities and narrow-based security indices are "security futures products" subject to the joint jurisdiction of the Commission and the Securities and Exchange Commission; futures on broad-based security indices are within the Commission's exclusive jurisdiction.

[4] 7 U.S.C. § 2(a)(1)(C)(ii). A futures contract on a group or index of securities may be traded subject to the Commission's exclusive jurisdiction where (I) settlement is effected in cash or by means other than the transfer or receipt of any security; (II) the contract is not readily susceptible to manipulation of its price, nor to being used to manipulate the price of any underlying security or option thereon; and (III) the group or index of securities is not a narrow-based security index. See also id. § 2(a)(1)(C)(iv) (prohibiting the offer of such a contract except as permitted under clause (ii) or as a security futures product).

aggregate dollar value of the average daily trading volume of the component securities comprising its lowest-weighted quartile exceeds the applicable statutory threshold by orders of magnitude.[5] The Exchange will monitor the composition of the Index on an ongoing basis and, consistent with Section 1a(35)(B) of the CEA and the joint rules of the Commissions thereunder, will apply the applicable tolerance period and, should the Index cease to be broad-based beyond that period, treat the Contract in accordance with those rules.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Appendices C, D and E and Appendix F.

**General Contract Terms and Conditions:** As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times the Contract is open as specified in Appendix A, outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. The Source Agency for the Contract is MerQube, the administrator and calculation agent of the Index, and a new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract is a cash-settled futures contract with no fixed expiration date. The Contract is quoted in Index points; each Contract has a notional value equal to the level of the Index multiplied by the Contract Multiplier of US$1.00 per Index point, and a one-point change in the Index level corresponds to a fixed US$1.00 change in value per Contract. Each Contract represents a continuous obligation to make or receive cash payments based on changes in the Contract's mark and periodic funding payments. Positions are marked to market on a continuous basis, and margin is collected and paid in accordance with the Exchange's margin methodology. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. Members may enter and exit positions at any time during trading hours by executing offsetting trades. A Member holding a long position profits when the Index level rises and incurs losses when it falls; a Member holding a short position is affected in the opposite manner. To maintain convergence with the Underlying, the Contract employs a periodic funding mechanism whereby long and short holders exchange funding payments based on the difference between the Contract's mark and the Underlying Price Index, as specified in Appendix A. A Member's gain or loss at any point is equal to the change in the Contract's mark since the position was established, multiplied by the Contract Multiplier, plus or minus net funding payments received or paid. Settlement of all payments is made in cash; no physical delivery occurs.

[5] 7 U.S.C. § 1a(35)(A). A security index is narrow-based if it meets any of four criteria: (i) it has nine or fewer component securities; (ii) any component comprises more than 30% of the index's weighting; (iii) the five highest-weighted components comprise more than 60% of the index's weighting; or (iv) the lowest-weighted components accounting in the aggregate for 25% of the index's weighting have an aggregate dollar value of average daily trading volume of less than $50 million (or, for an index with 15 or more components, $30 million). An index meeting none of these criteria is broad-based.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.3, 17 C.F.R. § 40.3**

Based on the above analysis, the Exchange certifies that:

- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

By: Xavier Sottile
Title: Head of Markets
Date: August 18, 2026

**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Appendix C - Further Considerations
Appendix D - Source Agency
Appendix E - Compliance with Core Principles
Appendix F - Additional Compliance with Core Principles
Appendix G - (Confidential) - Agreement with MerQube

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name:** US500
**Rulebook:** US500

**US500**

**Scope:** These rules shall apply to this Contract.

**Underlying:** The Underlying for this Contract is the MerQube US Large Cap Index (Bloomberg: MQ5C; Reuters: .MQ5C), a broad-based, float-market-capitalization-weighted, price-return securities index composed of the 500 largest companies listed and domiciled in the United States, as calculated and administered by MerQube. The Contract is quoted in Index points. A long position in the Contract increases in value when the level of the Index rises and decreases in value when the level of the Index falls; a short position is affected in the opposite manner.

**Underlying Price Index:** For a given time t, the Underlying Price Index (UPIt) is the most recent level of the Index as calculated and disseminated in real time by the Source Agency. During any period in which the Source Agency reports the Index as not being calculated (including outside regular U.S. equity trading hours, on days that are not Index Business Days, and during any suspension of calculation), or reports the feed as stale or unavailable, the Underlying Price Index shall be the last level published while calculation was live. Whether the Index is being calculated, and whether the feed is current, is determined as reported by the Source Agency.

**Type:** The type of Contract is a Perpetual Futures Contract.

**Source Agency:** The Source Agency is MerQube. MerQube is the Index Sponsor, Index Administrator, and Index Calculation Agent for the Index, and MerQube UK Limited is the Benchmark Administrator for the MerQube US Index Series under the United Kingdom Benchmarks Regulation. MerQube calculates and disseminates the level of the Index in real time during regular U.S. equity trading hours on each Index Business Day, from the prices of the constituent securities on their primary listing exchanges, and separately calculates and publishes an official closing level of the Index for each Index Business Day from the official closing prices of the constituent securities, in each case subject to MerQube's automated validation and quality-control procedures. The real-time series and the official closing level are computed under the same methodology, constituent set, and divisor. Appendix D describes the Source Agency in detail. A new Source Agency may be added or substituted via a Part 40 amendment.

**Trading Hours:** The Contract trades continuously from 6:00 P.M. Eastern Time on Sunday to 5:00 P.M. Eastern Time on Friday, throughout the lifetime of the Contract, subject to any trading halt or maintenance window imposed by the Exchange. This schedule corresponds to the weekly trading session of the U.S. equity-index futures market: like the E-mini equity-index futures listed on CME, the Contract trades continuously through each weekday and overnight and is closed over the weekend, when the U.S. equity market and its futures market are closed; the Contract trades continuously through each weekday session without a daily maintenance halt. Funding and settlement, however, are keyed to the Index, which is calculated only during regular trading hours on Index Business Days; accordingly, Premiums are computed only during such hours, and Periodic Transfers, Funding Rate determinations, and Settlement Price determinations occur only on Index Business Days, as provided below. An "Index Business Day" is a day on which the primary U.S. securities exchanges on which the Index's constituents are listed—the

New York Stock Exchange, Nasdaq, and Cboe BZX—are open for regular trading and the Index is scheduled to be calculated.

**Contract Multiplier:** US$1.00 per Index point. Each Contract has a notional value equal to the level of the Index multiplied by US$1.00.

**Price Quotation:** Prices for the Contract are quoted in Index points (e.g., 8360.00).

**Minimum Tick:** The Minimum Tick size for this Contract shall be 0.05 Index points.

**Tick Value:**A one-tick price movement equals **$0.05 per Contract**, calculated as the Minimum Tick multiplied by the Contract Multiplier (0.05 × US$1.00 = $0.05).

**Minimum Unit:** The minimum unit of trading is one ten-thousandth of one Contract, unless otherwise specified in a Contract's terms and conditions or on the Contract's market page.

**Position Accountability Level:** $25,000,000 mark-to-market position value (in the case of a short position, the equivalent long position value is considered).

**Position Limits:** The Contract is subject to the Position Accountability Level set forth herein and to the position accountability framework of the Exchange Rulebook. Because the Underlying is a broad-based security index — an excluded commodity under Section 1a(19) of the CEA — the Contract is not subject to federal speculative position limits under 17 CFR Part 150, which applies to physical-commodity contracts linked to the core referenced futures contracts enumerated in Regulation 150.2(d); the Contract is cash-settled, has no delivery obligation, and has no expiration and therefore no spot month. The Exchange may, consistent with Commission standards and applicable filing requirements, supplement this accountability framework with exchange-set position limits as open interest develops.

**Periodic Transfer Criterion:** At each Periodic Transfer Time, the Funding Rate is computed as defined below. If the Funding Rate is zero, no Periodic Transfer is made. If the Funding Rate is positive, long-side holders must contribute an amount equal to the Funding Rate multiplied by the Settlement Price at the Periodic Transfer Time, multiplied by the Contract Multiplier (US$1.00 per Index point), to short-side holders, for each Contract held. If the Funding Rate is negative, short-side holders must contribute an amount equal to the absolute value of the Funding Rate multiplied by the Settlement Price at the Periodic Transfer Time, multiplied by the Contract Multiplier (US$1.00 per Index point), to long-side holders, for each Contract held. Revisions to the Underlying made after any Periodic Transfer Time will not be accounted for in determining the applicable Periodic Transfer.

**Periodic Transfer Time:** The Periodic Transfer Time is 4:00 P.M. Eastern Time on each Index Business Day or, on any Index Business Day on which the primary U.S. securities exchanges close early, the scheduled early close of regular trading. No Periodic Transfer, Funding Rate determination, or Settlement Price determination occurs on a day that is not an Index Business Day; in that case the most recent Settlement Price and published Index level remain in effect until the next Index Business Day. Each Funding Period runs from the immediately preceding Periodic Transfer Time to the current Periodic Transfer Time.

**Premium Index:** For each minute during which the Source Agency reports the Index as being calculated and the feed as current, the Exchange computes a per-minute Premium as follows:

*Premium(t) = ( Perpetual Price(t) − Reference Price(t) ) / Reference Price(t)*

where Perpetual Price(t) is the volume-weighted average price of the Contract during the applicable one-minute interval; if no trades in the Contract occurred during that interval, the Premium for that interval is undefined and shall be excluded from the Funding Rate calculation; and Reference Price(t) is the time-weighted average of the Underlying Price Index over the applicable one-minute interval.

**Funding Rate:** Let Premium(1), Premium(2), …, Premium(N) be the per-minute Premiums computed during the Funding Period, where N is the number of one-minute intervals during the Funding Period for which a Premium was computed (excluding any interval excluded under Reference Market Closed Periods, Reference Market Halts and Feed Outages, or any other provision herein, and any interval during which no trades in the Contract occurred). The Funding Rate shall equal the Weighted Average Premium Index (WAPI) of those per-minute Premiums, computed by weighting each Premium equally: Funding Rate = ( Σ from k=1 to N of Premium(k) ) / N. For the avoidance of doubt, this is an equally weighted (simple) average of the computed per-minute Premiums: each Premium computed during the Funding Period receives identical weight regardless of its chronological position, and no Premium is weighted by recency. If N is zero, the Funding Rate shall be zero. The Funding Rate is subject to the following adjustments:

(a) Deadband: If the absolute value of the Funding Rate falls below 0.002%, the Funding Rate shall be set to zero.

(b) Clamp: If the absolute value of the Funding Rate exceeds 2.00%, the Funding Rate shall be clamped to +2.00% or −2.00%, as applicable (the "Maximum Funding Magnitude").

**Reference Market Closed Periods:** The Index is calculated only during regular U.S. equity trading hours on Index Business Days. During any period in which the Index is not being calculated — including outside regular trading hours on Index Business Days, over the weekend, on Exchange holidays, and on any other day that is not an Index Business Day — no per-minute Premiums are computed and no Funding Rate payment is derived from price action, and the most recent Settlement Price and published Index level remain in effect. The Contract continues to trade during its weekday trading session throughout such periods; the exclusion operates at the level of the Funding Rate computation, not as a close in trading. For this purpose, whether the Index is being calculated is determined as reported by the Source Agency.

**Reference Market Halts and Feed Outages:** During any period in which the Source Agency suspends or defers calculation of the Index (including in connection with a market-wide trading halt or a Market Disruption Event under the Index methodology), or reports the feed as stale or unavailable, no Premiums shall be computed for the duration, and the Funding Period shall exclude all such one-minute intervals. The Weighted Average Premium Index used to compute the Funding Rate shall be calculated solely over the one-minute intervals during which the Index

was being calculated and the feed was current. The Contract continues to trade during its weekday trading session throughout any such period.

**Reference Market Scheduled Early Closes and Holidays:** On any Index Business Day on which the primary U.S. securities exchanges close early (for example, on certain days adjacent to public holidays), the Funding Period in progress shall run to the scheduled early close, and the corresponding Periodic Transfer Time and Settlement Price shall be determined as of that early close. In all cases the Contract continues to trade on the Exchange.

**Clearing:** The Contracts will be centrally cleared by Kalshi Klear LLC (Klear or the Clearinghouse), a derivatives clearing organization registered with the Commission, as central counterparty.

**Settlement Price:** For the purposes of calculating variation margin and Periodic Transfer obligations, the Settlement Price as of the Periodic Transfer Time on each Index Business Day shall be determined according to the following tiered methodology, applied in order:

> **Tier 1 (Trade VWAP).** If one or more trades in the Contract occur during the sixty (60) seconds immediately preceding the Periodic Transfer Time (the "Settlement Period"), the Settlement Price shall be the volume-weighted average price of those trades, adjusted to exclude outliers via a median-based Mean Absolute Difference (MAD) filter; the Exchange reserves the right to exercise discretion to exclude other outlier or manipulative transactions. Transactions occurring precisely at the Periodic Transfer Time are excluded.
>
> For purposes of Tiers 2 and 3, sixty (60) Observation Points are defined at exactly N seconds before the Periodic Transfer Time for each integer N from 1 to 60. An Observation Point is "two-sided" if both a prevailing best bid and a prevailing best ask rest on the order book at that instant, and its Midpoint is the arithmetic mean of the two.
>
> **Tier 2 (Sampled Midpoint Average).** If no trades in the Contract occur during the Settlement Period and at least one Observation Point is two-sided, the Settlement Price shall be the arithmetic mean of the Midpoints at all two-sided Observation Points.
>
> **Tier 3 (Index Net Change).** If no trades in the Contract occur during the Settlement Period and no Observation Point is two-sided, the Settlement Price shall equal the prior Settlement Price plus the net change in the Underlying Price Index between the prior Periodic Transfer Time and the current Periodic Transfer Time.

If a Settlement Price cannot be determined under any of the foregoing Tiers, the Exchange may determine the Settlement Price pursuant to Rule 7.1 of the Rulebook.

**Initial and Maintenance Margin:** Initial margin and maintenance margin requirements for the Contract shall be calculated using the Exchange's risk-based margin methodology.

**Trading Halts:** The Exchange may halt trading in the Contract in its discretion or in connection with an Emergency as defined in Rule 2.8 of the Rulebook. Because the Contract trades

continuously during its weekday trading session, an intraday halt in the U.S. equity markets, a weekday that is not an Index Business Day, or a suspension of the calculation of the Index does not by itself halt trading in the Contract during that session; rather, no Premiums are computed and the affected one-minute intervals are excluded from the Funding Rate, as provided above. Over the weekend, the Contract does not trade, as set forth under Trading Hours. The Exchange may, however, halt or otherwise constrain trading in the Contract where trading in a significant portion of the Index's constituent securities is halted or where the Exchange determines that the Contract's price is no longer reliably tethered to the prevailing value of the Index's constituents.

**Last Trading Date:** As this is a Perpetual Futures Contract, it has no Last Trading Date.

**Expiration Date:** As this is a Perpetual Futures Contract, it has no Expiration Date.

**Expiration Time:** As this is a Perpetual Futures Contract, it has no Expiration Time.

**Pre-Trade Risk Controls:** The Exchange may impose pre-trade risk controls, including price banding, order size limits, and position exposure limits, to ensure orderly trading and mitigate market disruption risk. During regular trading hours, the Exchange may, in particular, apply dynamic price bands that constrain the Contract's traded price by reference to the real-time Underlying Price Index and the prevailing prices of the Index's constituent securities. Outside regular trading hours, when the Index is not calculated and the constituents do not trade, bands reference the Contract's own market and the most recently published Index level, calibrated to permit legitimate repricing on new information while constraining dislocations.

**Market Integrity:** The Exchange may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If a Funding Rate or Settlement Price cannot be determined, the Exchange has the right to determine payouts or margin requirements pursuant to Rule 7.1 of the Rulebook. If the Funding Rate cannot be determined for a given Funding Period (including because no Premium was computed during the Funding Period), the Funding Rate shall be set to zero. The Exchange will monitor the performance of the Funding Rate in keeping the Contract economically tethered to the Underlying Price Index and may amend the Funding Rate methodology in accordance with applicable Exchange rules and Commission filing requirements. Any such amendment shall apply prospectively only and shall not alter the Funding Rate or any Periodic Transfer obligation for any Funding Period ending prior to the amendment's effective date. In the event of an Emergency, as defined in Rule 2.8 of the Rulebook, the Exchange may take such actions as it deems necessary and appropriate, including but not limited to adjusting the Maximum Funding Magnitude, modifying margin requirements, or imposing additional risk controls, in accordance with the procedures set forth in Rule 2.8.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the Contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Officers, directors, and employees of MerQube, Inc. and MerQube UK Limited, in their capacity as Index Sponsor, Index Administrator, Index Calculation Agent, or Benchmark Administrator of the Index, to the extent such persons have access to non-public information regarding the composition, calculation, or operation of the Index or the Underlying Price Index
- Persons with access to non-public information concerning the official closing prices used to calculate the Index, or concerning pending additions to, deletions from, or reweightings of the Index's constituents, in advance of their public dissemination, to the extent such information could be used to anticipate or influence movements in the Underlying Price Index
- Members of the MerQube Index Oversight Committee, and personnel of the Source Agency's index-calculation, data-validation, and benchmark-administration functions, with advance knowledge of methodology changes, constituent or weighting changes, or operational changes that could materially affect the Index
- Persons involved in the constituent selection, rebalancing, or corporate-action processing for the Index with advance knowledge of changes that could materially affect the Index or its composition
- Third-party vendors, auditors, and reviewers currently engaged in supplying constituent price data to, or in auditing or assuring, the Source Agency's calculation methodology, data inputs, or benchmark-administration controls
- Immediate family members (parents, siblings, spouses, domestic partners) and household members of all persons listed above

## APPENDIX C – FURTHER CONSIDERATIONS

The US500 Contract serves critical risk mitigation functions for a broad range of market participants with bona fide economic exposure to the U.S. large-cap equity market. The U.S. equity market is the largest and most liquid equity market in the world, and the 500 companies that constitute the Index represent the large-capitalization segment of that market, with an aggregate market capitalization in the tens of trillions of U.S. dollars and daily share-trading volume in the constituents measured in the hundreds of billions of U.S. dollars.[6] Broad exposure to the U.S. large-cap equity market is continuous, indefinite in duration, and pervasive across the economy—held by pension plans, insurers, mutual funds, and individual investors as the core of long-horizon portfolios—making it an especially natural reference for a perpetual, indefinitely renewing instrument.

A wide range of participants carry continuous, indefinite-duration exposure to the U.S. large-cap equity market that a perpetual futures contract is uniquely suited to hedge or express. Asset managers and institutional investors maintain long-horizon exposure to broad equity beta; funds and separately managed accounts track or are benchmarked to a broad large-cap index; pension plans and insurers hold strategic equity allocations that must be adjusted and hedged on an ongoing basis; and dealers warehouse equity-index risk arising from client facilitation. For each of these participants the relevant exposure is ongoing and indefinite, not date-certain, so a continuously held instrument that tracks the prevailing level of the Index without a quarterly roll maps more closely to the economic exposure than a strip of dated equity index futures.

The perpetual structure, combined with the funding mechanism that maintains convergence with the Underlying, makes the Contract functionally superior to dated alternatives for participants whose equity exposure is itself continuous or indefinite in duration. As with perpetuals generally, the Contract eliminates the need to roll positions from one expiration to the next—the dominant exchange-traded equity-index hedging instrument, the quarterly E-mini future on a major U.S. large-cap benchmark, must be rolled every calendar quarter, incurring roll cost and roll-date basis risk—trades with a much smaller basis to the reference through the funding mechanism, and allows liquidity to be concentrated in a single instrument rather than fragmented across expirations. Because the Underlying is the level of the Index itself, the Contract does not carry a fixed expiration to which it must converge, so a holder is not exposed to the roll and calendar-basis effects inherent in holding a dated contract. Where a participant's information instead lives in the term structure—calendar spreads, the path of expected dividends and financing to specific tenors, or date-certain settlement needs—dated equity index instruments remain valuable, so that the perpetual and dated structures are complementary.

Perpetual and other continuously traded instruments also provide substantial price discovery and transparency benefits that serve the public interest. Price discovery in U.S. large-cap equities today is the product of the continuous interaction of the deepest and most liquid equity market in the world and the regulated exchange-traded equity index futures market: the E-mini futures on major U.S. large-cap benchmarks trade under CFTC oversight and are among the most actively

[6] The U.S. equity market is the largest and most liquid equity market in the world. The 500 constituents of the Index represent its large-capitalization segment, with an aggregate float-adjusted market capitalization in the tens of trillions of U.S. dollars, and its constituents are among the most actively traded securities in the world.

traded equity index futures in the world.[7] Listing a regulated domestic perpetual on a broad U.S. large-cap index on a CFTC-registered DCM brings continuous, funding-anchored equity-index price discovery into a regulated environment with robust trade surveillance, know-your-customer verification, risk-based margin requirements, and disciplinary procedures consistent with the CEA and Commission regulations thereunder.

The Contract's reference is the real-time level of the Index, derived from the prices of a broad basket of large-capitalization securities on their primary U.S. listing exchanges during regular trading hours, and validated daily against the official closing level MerQube separately publishes from official exchange closing prices. MerQube calculates the Index once per Index Business Day from those official closing prices, sourced through a third-party market-data vendor directly from the listing exchanges, and MerQube UK Limited administers the Index as an authorized benchmark administrator under the United Kingdom Benchmarks Regulation.[8] Because the reference is a rules-based, float-capitalization-weighted aggregate of 500 independently traded large-cap securities, struck from official exchange closing prices and subject to the administrator's automated validation and quality-control procedures, it is transparent, auditable, and resistant to manipulation through any single constituent. Appendix D describes the Source Agency in detail.

Finally, CFTC Chairman Selig has stated that the Commission will use the tools at its disposal to onshore perpetual and other novel derivative products so that they can flourish across both centralized and decentralized markets, subject to appropriate safeguards, confirming that the listing of a regulated equity-index perpetual futures contract directly advances the Commission's stated policy objectives of deterring manipulation, protecting market participants, and promoting responsible innovation.[9]

[7] E-mini futures on major U.S. large-cap benchmarks are among the most actively traded equity index futures in the world and trade on designated contract markets under the Commission's oversight, providing continuous, regulated price discovery for the U.S. large-cap equity market alongside the underlying cash market.

[8] The Index is administered by MerQube UK Limited as an authorized benchmark administrator under the United Kingdom Benchmarks Regulation and is calculated by MerQube once per Index Business Day from the official closing prices of its constituent securities. See Appendix D.

[9] See supra note 1.

## APPENDIX D – SOURCE AGENCY

The Source Agency for the US500 Contract is MerQube. MerQube is the Index Sponsor, Index Administrator, and Index Calculation Agent for the MerQube US Large Cap Index (the "Index"), and MerQube UK Limited is the Benchmark Administrator for the MerQube US Index Series. MerQube is a technology-driven index provider that designs, calculates, and administers rules-based indices for asset managers, banks, and other financial institutions, and it calculates and publishes the official level of the Index and its constituent weights pursuant to a published, rules-based methodology.[10]

### Benchmark Administration and Governance

MerQube UK Limited administers the MerQube US Index Series as an authorized benchmark administrator subject to the United Kingdom Benchmarks Regulation, and has published a Benchmark Statement for the series in accordance with Article 27 of that regulation.[11] The Index is calculated and maintained in accordance with the published MerQube US Index Series methodology, which sets out the eligibility criteria, selection rules, weighting scheme, rebalancing schedule, corporate-action treatment, and disruption procedures for the Index. MerQube maintains a documented governance framework, including an Index Oversight Committee that reviews, at least annually, any exercise of discretion or expert judgment in the determination of the Index, together with policies and procedures for methodology changes, error correction, and benchmark cessation.[12]

### Index Construction and Calculation

The Index is designed to track the performance of the 500 largest companies listed and domiciled in the United States, selected pursuant to the methodology's size and eligibility criteria and weighted by float-adjusted market capitalization, and it is reconstituted and rebalanced on a quarterly schedule. The Index is published in price-return, total-return, and net-total-return versions; the US500 Contract references the price-return version (Bloomberg: MQ5C; Reuters: .MQ5C). The Index is calculated and disseminated in real time during regular U.S. equity trading hours on each Index Business Day, and an official closing level is separately calculated at the end of each Index Business Day from the official closing prices of the constituent securities, computed to twelve decimal places and published to four decimal places. The real-time series and the official closing level share the same methodology, constituent set, and divisor. The Index

[10] MerQube is the Index Sponsor, Index Administrator, and Index Calculation Agent for the MerQube US Large Cap Index, and MerQube UK Limited is the Benchmark Administrator for the MerQube US Index Series. See MerQube US Index Series Index Methodology (Sept. 2025); MerQube US Large Cap Benchmark Statement.

[11] MerQube UK Limited administers the MerQube US Index Series as a benchmark administrator subject to the United Kingdom Benchmarks Regulation and has published a benchmark statement in accordance with Article 27 thereof; the series is a non-significant benchmark under Article 3.1(27). See MerQube US Large Cap Benchmark Statement; MerQube Compliance Statement (Art. 26(3)).

[12] See MerQube US Index Series Index Methodology (Sept. 2025) §§ 10.1–10.9 (governance, recalculation, methodology change, benchmark cessation, input data, and exercise of discretion). Any exercise of discretion or expert judgment in determining the Index is reviewed at least annually by the MerQube Index Oversight Committee.

was launched in January 2023 with an index base date of December 20, 2002, and values prior to the applicable launch dates are backtested.[13]

**Input Data and Validation**

The official closing level of the Index is calculated from the official closing prices of its constituent securities as set by each constituent's primary listing exchange. MerQube obtains those closing prices through a third-party market-data vendor that sources them directly from the relevant exchanges, and it performs automated validations on both the underlying constituent prices and the calculated Index level on each Index Business Day. Where updated data would result in a potential change to an already-published Index level, MerQube treats the discrepancy as a potential error, investigates it, and, if warranted, recalculates and republishes the affected level in accordance with its error-correction policy.[14]

For the real-time series, constituent prices are sourced from the exchanges. MerQube's recalculation policy distinguishes computation errors from selection decisions: an incorrect computation of the return of the constituent basket is recalculated, while a recalculation that would retroactively alter constituent selection or weighting already implemented is not made. Closing prices are received from a third-party vendor and verified by comparison against prices from an alternative vendor, and MerQube maintains an audit trail of all index calculations, including any restated values, with records retained for a minimum of five years.

**Corporate Actions**

Corporate actions affecting the Index's constituents—including stock splits, dividends, mergers, acquisitions, spin-offs, and delistings—are absorbed at the level of the Index in accordance with the methodology's corporate-action rules, so that the Index level is adjusted to preserve its continuity and the Contract, which references only the Index level, requires no constituent-by-constituent adjustment. When Lennar Corporation spun off Millrose Properties, Inc. in January 2025, for example, MerQube added the spun-off entity to each index for which Lennar was a constituent and priced it in accordance with the announced share terms until it began trading separately, adjusting the affected indices without disrupting their continuity.[15]

**Market Disruptions**

The methodology further specifies the consequences of market disruption events. If, on any Index Business Day, a market disruption event materially affects the Index, MerQube may, among other measures, use a published closing value for a disrupted constituent, defer or

[13] See MerQube US Index Series Index Methodology (Sept. 2025) §§ 2, 7, 9.1 (selection of the 500 largest U.S.-listed and U.S.-domiciled companies, float-market-capitalization weighting, quarterly rebalancing, and end-of-day calculation of the Index level from the official closing prices of the constituents, computed to twelve decimal places and published to four).

[14] See MerQube US Large Cap Benchmark Statement (the benchmarks are calculated each day using the closing prices of the constituent securities at the relevant exchanges, as provided by a third-party market-data vendor that sources them directly from those exchanges, subject to automated validation of the underlying prices and the calculated benchmark values and to an error-correction policy).

[15] See MerQube US Index Series Index Methodology (Sept. 2025) § 8 (corporate actions). For example, in connection with Lennar Corporation's January 2025 spin-off of Millrose Properties, Inc., MerQube added the spun-off entity to each index for which Lennar was a constituent and priced it in accordance with the announced share terms until it began trading separately. See MerQube, Spin-Off by Lennar Corp Effective January 21, 2025 (Jan. 17, 2025).

suspend the calculation and publication of the Index level until the disruption is no longer continuing, or make such adjustments to the calculation as it considers necessary to preserve the objectives of the Index.[16] As provided in Appendix A, no Premiums are computed for any period during which the Source Agency suspends or defers calculation of the Index or the feed is stale or unavailable, the affected one-minute intervals are excluded from the Funding Rate, and the most recent Settlement Price and published Index level remain in effect until calculation resumes.

**Resilience and Manipulation Resistance**

The rules-based, float-capitalization-weighted construction of the Index provides inherent resistance to manipulation through any single constituent. The Index aggregates the exchange prices of 500 independently traded large-capitalization securities, each of which trades in the deepest and most liquid equity market in the world and is separately subject to the surveillance and listing standards of its primary exchange and to the federal securities laws. Because the Index is float-capitalization-weighted across 500 constituents, no single constituent represents more than a small fraction of the Index, so that distorting the Index level would require moving the prices of a large number of highly liquid securities simultaneously—a prohibitively costly and readily detectable undertaking. The real-time series is calculated from primary-exchange prices and reconciled each Index Business Day against an official closing level struck from official exchange closing prices, in each case subject to the administrator's automated validation and quality-control procedures and to the published methodology and governance framework described above. The Exchange believes that, for purposes of the US500 Contract, MerQube is a transparent, rules-based, and manipulation-resistant Source Agency, and that the Index's reliance on official exchange closing prices for a broad basket of large-cap securities makes it well-suited to serve as the reference for the Underlying Price Index. The Exchange will monitor the performance of the Source Agency on an ongoing basis and may, consistent with the Contract's terms and applicable Commission filing requirements, add or substitute a Source Agency via a Part 40 amendment.

[16] See MerQube US Index Series Index Methodology (Sept. 2025) § 5 (consequences of market disruption events, including use of a published closing value for a disrupted constituent, deferral or suspension of the calculation and publication of the Index level until the disruption is no longer continuing, and such adjustments as the Index Administrator considers necessary to preserve the objectives of the Index).

## APPENDIX E – COMPLIANCE WITH CORE PRINCIPLES

### Compliance with Core Principles

A. ***The Exchange has Exercised Reasonable Discretion by Categorizing the Contract as Futures Contracts for Purposes of Compliance with the Core Principles and Other Provisions of the CEA and Commission Regulations.***

Section 5(d)(1)(B)[17] of the CEA and Regulation 38.100(b)[18] thereunder provide that a DCM has reasonable discretion in establishing the manner in which it complies with the Core Principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Contract as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.[19]

On May 29, 2026, the Commission approved for listing on Kalshi the first domestic perpetual contract as a contract for the sale of a commodity (bitcoin) for future delivery.[20] In the BTCPERPs Order, the Commission determined that it would not violate the CEA or the Commission's regulations thereunder for Kalshi and other DCMs to list for trading, as futures contracts, the BTCPERP Contract. However, the Commission made clear that "[c]ontract categorization analysis is done on a case-by-case basis" such that the analysis in the BTCPERPs Order was "limited to the BTCPERP Contract and similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities that have deep, active, and continuous spot market trading."[21] The Commission further stated that the "market attributes of the asset class underlying a perpetual contract—including the presence, or absence, of continually available spot price data—may be relevant to such regulatory treatment and compliance considerations."[22]

Contemporaneously with the BTCPERPs Order, the Commission released a policy statement (the "Policy Statement") describing its views concerning the listing of perpetual contracts that reference underlying asset classes that are not contemplated in the BTCPERPs Order, including that such contracts "should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3."[23] In both the BTCPERPs Order and the Policy Statement, the Commission focused on the role of the funding rate mechanism of perpetual contracts, which "functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies."[24]

---

[17] 7 U.S.C. § 7(d)(1)(B).
[18] 17 C.F.R. § 38.100(b).
[19] Kalshi and Klear intend to treat the Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.
[20] CFTC Order, In the Matter of the Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract (May 29, 2026) (the "BTCPERPs Order").
[21] BTCPERPs Order at 8.
[22] BTCPERPs Order at 9.
[23] Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160, 33,161 (June 3, 2026).
[24] BTCPERPs Order at 6–8; see also Policy Statement, supra (the funding-rate mechanism "functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies").

In the BTCPERPs Order, the Commission concluded that listing the BTCPERP Contract as a futures contract would not violate the CEA or the Commission's regulations thereunder on the basis that: (i) the BTCPERP Contract exhibited all of the key features of futures contracts identified in relevant judicial precedent and Commission guidance, including the contract's trading at a fixed, standardized unit quantity, each party's obligations being guaranteed via novation to a central clearing house that sets margin requirements, the ability of a holder to exit their position via offset, availability to the general public, risk transference, and trading on the centralized market of a DCM;[25] and (ii) certain characteristics of the spot market of the underlying commodity (i.e., bitcoin) supported the effective functioning of the funding rate mechanism employed by the BTCPERP Contract, including continuous and broadly distributed trading in, and depth and liquidity of, the underlying spot market.[26]

The Contract resembles the BTCPERP Contract in all respects relevant to the regulatory categorization analysis. The Contract will have a fixed, standardized contract size (a Contract Multiplier of US$1.00 per Index point). Each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty and set margin requirements.[27] Holders will be able to exit their positions via offset.[28] The Contract will be available to the general public, including retail participants. Parties will enter into the Contract for the purpose of assuming or shifting the risk of change in value of the Underlying, without the possibility of transferring ownership of the Underlying. And the Contract will trade on the centralized market of a DCM and settle exclusively in cash, with no delivery of any security or of any interest in the Index.

Further, the market underlying the Contract---the U.S. equity market from whose prices the Index is calculated in real time throughout regular trading hours---possesses the characteristics that led the Commission to find that the underlying spot market of the BTCPERP Contract allowed the "funding rate mechanism to function consistently with DCM Core Principle 3."[29] Because the Index is a broad-based index calculated in real time from the exchange prices of a large basket of highly liquid securities, and validated each Index Business Day against an official closing level struck from official closing prices, the reference against which the Contract's funding is computed is a reliable, validated convergence signal rather than a thin or synthesized price. The Index is not calculated on weekends or on days that are not Index Business Days; on any such day, no Premiums are computed, no Funding Rate is determined, and no Settlement

---

[25] BTCPERPs Order at 6–8.

[26] BTCPERPs Order at 7.

[27] Although the Dodd-Frank Act arguably changed the historical analysis in part by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant.

[28] See BTCPERPs Order at 2–5; see also CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 579–580 (9th Cir. 1982) ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); In re Stovall, [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 6 (CFTC Dec. 6, 1979) (describing futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."); Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 971 (4th Cir. 1993) ("Tauber") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss.").

[29] BTCPERPs Order at 6.

Price is determined, and the most recent Settlement Price and published Index level remain in effect. During any period in which the Source Agency suspends calculation of the Index or reports the feed as stale or unavailable, no Premiums are computed for the affected intervals. In consequence, the Contract's continuous trading in those periods does not result in "settlement payments being calculated against stale or synthesized prices that are less reliable convergence signals."[30] The Index's constituent securities are actively traded across the broadly distributed trading centers of the U.S. national market system—including the New York Stock Exchange, Nasdaq, and Cboe and their linked trading centers—and the U.S. equity market from which the Index is derived is the deepest and most liquid equity market in the world, as described in Appendix C.

The BTCPERPs Order and the Policy Statement have recently been challenged in litigation brought by the Chicago Mercantile Exchange Inc. ("CME"), one of the largest incumbent marketplaces for traditional dated futures.[31] In its complaint, CME argues that perpetual contracts are swaps under the CEA because, by virtue of the funding payment mechanism, perpetual contracts "provide[] on an executory basis for the exchange . . . of 1 or more payments based on the value or level of . . . commodities."[32] However, regardless of whether a contract falls within any clause in subparagraph (A) of the CEA's swap definition, it is per se excluded from the swap definition to the extent it falls within any of the exclusions in subparagraph (B) of that definition, including the exclusion for futures contracts.[33]

CME argues that perpetual contracts are not futures contracts because they lack what CME calls the "defining characteristic" of futures contracts—"'future delivery' by a date certain."[34] Not only does this argument conflict with the position taken by CME in its comment letter responding to the Commission's request for comment on perpetual-style derivatives, where it stated that "certain perpetual-style derivative contracts may accurately be classified as futures,"[35] but it is predicated on a red herring. Although courts have, at times, described futures contracts as providing for the purchase or sale of a commodity "on a date certain"[36] or "at or before a stated future time,"[37] no court has held that future delivery on a specified future date is a necessary condition for a contract to be a futures contract. To the contrary, courts have repeatedly explained that "[w]hile futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[38]

---

[30] See supra note 26.
[31] See Chicago Mercantile Exchange Inc. v. Selig and Commodity Futures Trading Commission, Case No. 26-cv-02157 (D.D.C. June 18, 2026) ("CME v. Selig").
[32] 7 U.S.C. § 1a(47)(A)(iii).
[33] 7 U.S.C. § 1a(47)(B)(i).
[34] CME v. Selig at 35, 36.
[35] Letter from Jonathan Marcus, Senior Managing Dir. & Gen. Couns., CME Grp. Inc., to Christopher J. Kirkpatrick, Sec'y of the Comm'n, 2 (May 21, 2025).
[36] Tauber at 971.
[37] CFTC v. Erskine, 512 F.3d 309, 323 (6th Cir. 2008).
[38] Standard Forex II, 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29; see also CFTC v. Intern. Fin. Servs., 323 F. Supp. 2d 482, 498 (S.D.N.Y. 2004) ("defendants wrongly characterize certain indicia of futures contracts as essential features of such contracts . . . [t]hey cite no authority" for the proposition that a transaction without a fixed date for future delivery cannot be a futures contract); CFTC v. International Foreign Curren., 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

For example, in a holding to which CME was the very beneficiary, the Seventh Circuit in CME v. SEC concluded that contracts of "indefinite duration" can possess the attribute of "futurity"—generally associated with futures contracts[39]—because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[40] And, in Zelener, the Commission itself took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[41]

As described above, the Contracts possess all of the relevant characteristics of futures contracts, and their disqualification from categorization as futures contracts on the basis of their indefinite duration cuts directly against established precedent. And, as discussed above, if the Contracts qualify as futures contracts, then they are not swaps.

CME attempts to support its misguided argument that perpetual contracts must be swaps, and not futures, by noting that "[t]he swap-future distinction does not turn on whether a product is standardized, exchange-traded, or centrally cleared" because "[a]lthough swaps historically were traded over-the-counter, many swaps are now standardized, DCM-traded, and centrally cleared."[42] As CME itself has explained in a prior comment letter to the Commission, although it is true that, following enactment of the Dodd-Frank Act, several of the "significant distinctions between futures and swaps [were] eliminated," the Dodd-Frank Act "preserves 'customer choice.' That is, under [the Dodd-Frank Act] market participants retain the option to trade products as either 'futures' or 'swaps.'"[43]

The changes brought about by Dodd-Frank led CME and other market participants to request that the Commission clarify that a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a SEF, since futures and swaps are indistinguishable in material economic effects."[44] The Commission declined to provide that clarification, underscoring the continued relevance of standardization and exchange-trading in

[39] See CFTC v. First Lexington Group, LLC, No. 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).
[40] CME v. SEC at 541. The contracts at issue in CME v. SEC—"index participations" or "IPs"—were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day," while the buyer paid the seller for the IP in cash on the date of sale. Id. at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the index stocks paid during the prior quarter. Id. The IPs thus resemble the Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract.
[41] See CFTC v. Zelener, 373 F.3d 861, 863 (7th Cir. 2004) ("Zelener"). Although the court ruled against the CFTC in Zelener, the facts in that case contrast with those here. There, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign-currency prices without taking delivery. Id. Customers did not purchase identical contracts, and their contracts did not provide a right of offset. Id. at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on Kalshi.
[42] CME v. Selig at 18.
[43] Letter from Craig S. Donohue, Chief Exec. Officer, CME Grp. Inc., to David A. Stawick, Sec'y of the Comm'n, 4 (July 22, 2011).
[44] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48,303 (Aug. 13, 2012) (the "2012 Definitional Release").

the product categorization analysis.[45] Although the Commission noted that "the presence or absence of clearing . . . may no longer be relevant" to distinguish futures from swaps in light of Dodd-Frank's grant of authority to the Commission to mandate swaps for central clearing,[46] the Commission did not address the other relevant factors, such as standardization, exchange trading, and retail participation. Those factors continue to be relevant to distinguish futures contracts from centrally cleared swaps, such as interest-rate swaps and credit default swaps, which in many cases are not standardized as to tenor or size (among other terms) and trade on swap execution facilities ("SEFs"), which may lack the centralized market characteristics of a DCM (e.g., SEFs can permit trading via request for quote in addition to an order book) and lack retail participation. The Commission went on to say that "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."[47] This is consistent with the view expressed by CME in its response to the Commission's recent request for comment regarding the trading and clearing of perpetual-style derivatives—that certain perpetual-style derivatives contracts may be appropriately categorized as futures[48]—but inconsistent with its argument in the CME v. Selig complaint.

CME also argues that the Commission's approval of the BTCPERP Contract for listing as a futures contract is inconsistent with its prior position, taken in certain enforcement actions, that perpetual-duration digital-asset derivative products constitute swaps.[49] However, in all but one of these cases, the Commission looked only to features of the products at issue relevant to whether they fell within the scope of CEA Section 1a(47)(A)(iii). The Commission did not address whether such products were futures contracts, which would be excluded from the swap definition. As discussed above, the fact that a contract falls within the scope of CEA Section 1a(47)(A)(iii)—because it "transfers, as between the parties to the transaction . . . the financial risk associated with a future change" in the price of the underlying asset—is not determinative of its regulatory categorization if the product qualifies as a futures contract.[50]

The only instance in which the Commission has addressed the possibility that perpetual-duration digital-asset derivative products could be excluded from the "swap" definition as futures contracts is in a single footnote in the Commission's response to Binance's Motion to Dismiss.[51] However, as noted by the Commission, Binance failed to meaningfully address why the perpetual contracts at issue were futures contracts under applicable case law and Commission precedent; in particular, Binance relied on the sole point that positions in their contracts could be closed by offset, and failed to reference any particular facts indicating the other key characteristics of futures contracts identified in the BTCPERPs Order.[52]

---

45 2012 Definitional Release at 48,303.
46 See id.; 7 U.S.C. § 2(h)(1).
47 See supra note 45.
48 See supra note 35.
49 See Complaint, CFTC v. Changpeng Zhao, No. 23-cv-01887 (Mar. 27, 2023) ("Binance"); Complaint, CFTC v. MEK Global Ltd., No. 24-cv-2255 (Mar. 26, 2024); Complaint, CFTC v. Eisenberg, No. 23-cv-00173 (Jan. 9, 2023); Complaint, CFTC v. HDR Global Trading Ltd., No. 20-cv-8132 (Oct. 1, 2020); In re Deridex, Inc., CFTC No. 23-42 (Sept. 7, 2023).
50 See supra note 33.
51 Plaintiff Response to Defendants' Motion to Dismiss, Binance, at note 14 (Sept. 22, 2023).
52 Brief in Support of Defendants' Motion to Dismiss, Binance, at note 19 (July 27, 2023).

Because no party in the Binance litigation, or any other litigation or enforcement action that we have identified, has raised the question of whether perpetual-duration digital-asset derivative products are futures contracts under the body of judicial and Commission case law identifying the key characteristics of futures contracts, the Commission has yet to squarely address this question. That the product categorization of perpetual contracts remained an open question at that time is made all the more clear by the fact that the Commission specifically requested comment as to whether perpetual derivatives should "be classified as swaps or futures contracts" in its request for comment on the trading and clearing of perpetual-style derivatives last year.[53]

Based on this analysis, Kalshi is of the view that the Contract is appropriately categorized as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.

### B. *The Contract Is a Future on a Broad-Based Security Index Within the Commission's Exclusive Jurisdiction*

The Contract is, in addition, a futures contract on a broad-based security index, over which the Commission has exclusive jurisdiction. The Underlying is a securities index, and a securities index is an "excluded commodity" under Section 1a(19) of the CEA.[54] A contract for the future delivery of a group or index of securities is subject to a distinct statutory regime: the Commission has exclusive jurisdiction over a futures contract on a broad-based security index, whereas a futures contract on a single security or on a narrow-based security index is a "security future" and "security futures product" subject to the joint jurisdiction of the Commission and the Securities and Exchange Commission. Because the Index is a broad-based security index, the Contract is excluded from the definition of "security future," is not a security futures product, and falls within the Commission's exclusive jurisdiction.[55]

Section 2(a)(1)(C)(ii) of the CEA permits a futures contract on a group or index of securities to be traded, subject to the Commission's exclusive jurisdiction, where three requirements are satisfied: settlement of and delivery on the contract must be effected in cash or by means other than the transfer or receipt of any security; the contract must not be readily susceptible to manipulation of its own price, nor to being used to manipulate the price of any underlying security; and the group or index of securities must not constitute a narrow-based security index.[56] The Contract satisfies each requirement. It is settled exclusively in cash, with no delivery of any security or of any interest in the Index. As set forth throughout this Appendix and in Appendix F, it is not readily susceptible to manipulation, whether of the Contract's price or of the prices of the underlying securities: the reference is a broad-based, float-capitalization-weighted index of 500 highly liquid large-cap securities, calculated in real time from primary-exchange prices, reconciled each Index Business Day against an official closing level struck from official exchange closing prices, and subject to the administrator's validation procedures, and the Exchange's surveillance, position accountability, and other safeguards apply to trading in the Contract. And, as demonstrated immediately below, the Index is not a narrow-based security index.

---

[53] CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives, question 13 (Apr. 21, 2025).

[54] See supra note 2.

[55] See supra note 3.

[56] See supra note 4.

A security index is a "narrow-based security index" under Section 1a(35)(A) of the CEA if it meets any one of four disqualifying criteria: (i) the index has nine or fewer component securities; (ii) any component security comprises more than thirty percent of the index's weighting; (iii) the five highest-weighted component securities together comprise more than sixty percent of the index's weighting; or (iv) the lowest-weighted component securities comprising, in the aggregate, twenty-five percent of the index's weighting have an aggregate dollar value of average daily trading volume of less than $50 million (or, in the case of an index with fifteen or more component securities, $30 million).[57] An index that meets none of these criteria is broad-based, and the Index meets none of them, by a wide margin. First, the Index comprises 500 component securities, far more than nine. Second, no single component exceeds thirty percent of the Index's weight; as of July 2, 2026, the largest single component represented approximately 7.05% of the Index. Third, the five highest-weighted components together comprise far less than sixty percent of the Index's weight; as of the same date, they represented approximately 25.4% of the Index in the aggregate. Fourth, the component securities comprising the lowest-weighted twenty-five percent of the Index's weight are themselves large-capitalization securities among the most actively traded in the world, and the aggregate dollar value of their average daily trading volume—computed as provided in Commission Regulation 41.11—exceeds the applicable $30 million threshold by orders of magnitude.[58] The Index is therefore a broad-based security index.

Accordingly, the Contract is a futures contract subject to the Commission's exclusive jurisdiction, to be listed and traded on the Exchange in the same manner as the Commission's other broad-based security index futures. The Exchange will monitor the composition of the Index on an ongoing basis to confirm that it remains broad-based, and will apply the tolerance period and conversion provisions of Section 1a(35)(B) of the CEA and the joint rules of the Commission and the Securities and Exchange Commission thereunder; should the Index cease to be broad-based for longer than the applicable tolerance period, the Contract would be treated in accordance with those rules.[59]

The Contract's cash-settlement provisions are consistent with the guidance in Appendix C to Part 38 of the Commission's regulations: the Contract's daily settlement and funding mechanics are anchored to the real-time level of a broad-based index calculated from the prices of a large basket of highly liquid securities on their primary listing exchanges, and validated each Index Business Day against a separately published official closing level---a cash-settlement reference that is reliable, acceptable, publicly available, timely, and not readily susceptible to

[57] See supra note 5.

[58] See 17 C.F.R. § 41.11 (method for determining the dollar value of average daily trading volume and market capitalization of component securities for purposes of the narrow-based security index definition). The lowest-weighted quartile of the Index consists of large-capitalization securities whose aggregate average daily trading volume, so measured, exceeds the applicable $30 million threshold by orders of magnitude.

[59] See 7 U.S.C. § 1a(35)(B) (grace and tolerance provisions governing an index's transition between broad-based and narrow-based status); 17 C.F.R. §§ 41.11–41.15 and Securities Exchange Act Rule 3a55-1 (joint rules of the Commission and the Securities and Exchange Commission implementing the narrow-based security index definition, including the tolerance period during which a security index future may continue to be traded before it is treated as a security futures product).

manipulation.[60] Finally, the conclusion that the Contract falls within the Commission's exclusive jurisdiction does not depend on its categorization as a future rather than a swap. Even if the Contract's funding mechanism were viewed as introducing a swap-like element—which, for the reasons set forth above, it does not—an agreement, contract, or transaction based on a broad-based security index is a "swap" within the Commission's jurisdiction, and not a "security-based swap" within the jurisdiction of the Securities and Exchange Commission, because a security-based swap is confined to instruments based on a single security or loan or on a narrow-based security index. Whether analyzed as a future or, counterfactually, as a swap, an instrument on this broad-based security index falls within the Commission's jurisdiction.[61]

### C. ***The Contract Complies with the Core Principles***

The Exchange has conducted a comprehensive analysis of the designated contract market core principles ("Core Principles") as set forth in Part 38 of the Act. The Core Principles relevant to the Contract are outlined and discussed in further detail in the next appendix.

---

[60] See 17 C.F.R. pt. 38, app. C (guidance on cash-settled contracts, providing, among other things, that the cash-settlement price should be reliable, acceptable, publicly available, and reported in a timely manner, and should not be readily susceptible to manipulation).

[61] See 7 U.S.C. § 1a(47) (defining "swap"); id. § 1a(42) (defining "security-based swap," limited to agreements based on a single security or loan or on a narrow-based security index); Securities Exchange Act § 3(a)(68). An agreement based on a broad-based security index is a "swap" within the Commission's jurisdiction, not a "security-based swap" within the jurisdiction of the Securities and Exchange Commission.

## APPENDIX F – ADDITIONAL COMPLIANCE WITH CORE PRINCIPLES

**Core Principle 2 - Compliance with Rules and Impartial Access:** The Exchange has adopted the Rulebook, which provides the requirements for accessing and trading on the Exchange. Pursuant to Chapters 2, 3, and 5 of the Rulebook, in utilizing the Exchange's services, all Members must comply with the Rules, cooperate with Exchange investigations, inquiries, audits, examinations and proceedings, and engage in conduct consistent with just and equitable principles of trade. Chapter 3 of the Rulebook also provides clear and transparent access criteria and requirements for Exchange Members. Trading in the Contract will be subject to all of the Rules, which are aimed at enforcing market integrity and customer protection. Further, Section 3.2 of the Klear rulebook includes clear and transparent criteria for clearing members eligible to clear transactions in the Contract through Klear, providing that the Contract will be available to all clearing members of Klear, either directly (for clearing members who are eligible contract participants) or indirectly through a futures commission merchant clearing member.

In particular, Chapter 5 of the Rulebook sets forth the Exchange's Prohibited Transactions and Activities and specifically prescribes the methods by which Members trade contracts, including the Contract. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. As described in Rule 9.1, the Exchange conducts trade practice surveillance, market surveillance, and real-time market monitoring to ensure that Members adhere to the Rules of the Exchange. The Exchange, through the compliance department, initiates review and, where appropriate, investigates unusual trading activity. The compliance department also investigates any time it has other reason to believe that inappropriate activity of any sort is taking place on the Kalshi Platform or its website.

Core Principle 2 also stipulates that an exchange shall establish means to provide market participants with impartial access to the market. Chapter 3 of the Rulebook, and Rule 3.1 in particular, provides clear and transparent access criteria and requirements for Members. The Exchange will apply access criteria in an impartial manner, including through the application process described in Rule 3.1.

**Core Principle 3 - Contract not Readily Subject to Manipulation:**

Core Principle 3 and Rule 38.200 provide that a DCM shall not list for trading contracts that are readily susceptible to manipulation. The Exchange's marketplace and contracts, including this Contract, have been designed in accordance with this fundamental principle. The Exchange maintains various safeguards against price manipulation and all other forms of manipulation, including (i) real-time market monitoring, automated trade surveillance, and suspicious behavior detection, (ii) Rulebook prohibitions, Member certification, and notification, (iii) Member monitoring and know-your-customer verification, and (iv) sanctions. These safeguards will be applied with respect to trading in the Contract and render the Contract not readily susceptible to manipulation.

**(i) Real-time market monitoring, automated trade surveillance, and suspicious behavior detection:** Kalshi conducts real-time market monitoring of all trading activity on the Exchange

to identify disorderly trading and any market or system anomalies. As described in Rule 5.11, Kalshi has the authority to adjust trade prices or cancel trades when necessary to mitigate market-disrupting events caused by malfunctions in its electronic trading platform or errors in orders submitted by members and market participants. Any trade price adjustments or trade cancellations must be transparent to the market and subject to standards that are clear, fair, and publicly available. Kalshi also maintains an automated trade surveillance system capable of detecting and investigating potential trade practice violations. The automated system loads and processes orders and trades as they occur on the Exchange (well within 24 hours after the completion of the trading day stated in Commission Regulation 38.156). The automated trade surveillance system has the ability to detect and flag specific trade execution patterns and trade anomalies; compute, retain, and compare trading statistics; compute trade gains, losses, and positions; reconstruct the sequence of market activity; perform market analyses; and support system users to perform in-depth analyses and ad hoc queries of trade-related data. As described in Rule 9.2(a), Kalshi's Compliance Department investigates unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of Kalshi's Rules, or upon the receipt of a request from Commission staff. The Exchange disciplinary process is conducted in accordance with Chapter 9 of the Exchange Rulebook, and penalties may be imposed in accordance with Rule 9.5.

**(ii) Rulebook prohibitions, member certification and notification:** The Exchange's Rulebook includes various provisions that prohibit manipulative behaviors and gives the Exchange the authority to investigate potential violations of its rules. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. The Exchange's Surveillance Officers, which operate within the Compliance Department, perform trade practice surveillance and real-time market monitoring. The Rulebook also imposes sanctions on Members who break rules, including fines, disgorgement, and revocation of membership. Only Members are allowed to trade on the Exchange, and Members cannot complete the account creation process and trade on the Exchange until they certify that they have read the Exchange's rules and agree to be bound by them.

**(iii) Member monitoring and know-your-customer verification ("KYC"):** The Exchange has a robust KYC process that helps flag and uncover higher-risk traders before they become Members of the platform, ensuring that the Exchange has access to all of its members' personal identifying information for use in its surveillance. During the application process, individual applicants are required to share personally identifiable information, such as their full legal name, social security number, date of birth, and address with the Exchange. Applicant information is run through a comprehensive set of databases that are actively compiled and maintained by an independent third party, and through adverse media databases, to trigger enhanced due diligence where appropriate.

**(iv) Sanctions:** Exchange Members must agree to the terms and conditions of the Exchange's Rulebook before being allowed to trade and are subject to disciplinary actions and fines for engaging in improper market conduct. In the event that suspicious trading activity is detected and results in an investigation, market participants are required to provide the Exchange with information relevant to the scope of the investigation under Rule 3.6. Chapter 9 of the Exchange's Rulebook details the process for discipline and rule enforcement, ranging from a

letter of warning to fines to referral to governmental authorities that can result in criminal prosecution.

In addition to the foregoing surveillance, enforcement, and KYC safeguards, the Exchange maintains pre-trade risk controls designed to prevent erroneous or manipulative order entry in the US500 Contract, including price banding, order size limits, and position exposure limits. The Exchange applies a price-band check to incoming orders before they are inserted into the order book, calculated by reference to the then-current relevant top-of-book price; incoming orders priced outside the applicable band are rejected before insertion. The price-band check is a pre-insertion control and does not operate as an automatic cancellation mechanism for resting orders. The Exchange may also impose order size limits and position exposure limits to mitigate excessive concentration and market disruption risk. Together, these pre-trade controls provide complementary protections against erroneous order entry, disorderly trading, excessive concentration, and related risks to market integrity.

Moreover, the specifics of the US500 Contract satisfy the Core Principle 3 standard through multiple, independent, and mutually reinforcing layers of structural design and institutional safeguards, as set forth below.

**[Remaining CP3 analysis filed confidentially]**

**Core Principle 4 - Prevention of Market Disruption:** Trading in the Contract will be subject to the Rules of the Exchange, which include prohibitions on manipulation. Trading activity in the Contract will be subject to monitoring and surveillance by the Exchange's Market Surveillance Department. In particular, the Exchange's trade surveillance system monitors the trading on the Exchange to detect and prevent activities that threaten market integrity and market fairness, including manipulation, price distortion, and disruptions of the settlement process. The Exchange also performs real-time market surveillance. The Exchange sets position accountability levels, maintains both a trade practice and market surveillance program to monitor for market abuses, including manipulation, and has disciplinary procedures for violations of the Rulebook.

**Core Principle 5 - Position Limitations:**

Core Principle 5 and Commission Regulation 38.300 require a designated contract market to adopt, for each contract, position limitations or position accountability for speculators, where necessary and appropriate to reduce the potential threat of market manipulation or congestion. The Contract specification includes a Position Accountability Level of US$25,000,000 of mark-to-market position value, with short positions evaluated on an equivalent long basis, and provides that position limits apply as set forth in the Exchange Rulebook.

The Contract is not subject to federal speculative position limits, because its Underlying is a broad-based security index. Section 1a(19) of the CEA defines an "excluded commodity" to include "an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure," and a broad-based security index is squarely a "security index" within that definition.[62] The federal speculative position limits in Part 150, and the deliverable-supply, bona

---

[62] 7 U.S.C. § 1a(19) (defining "excluded commodity" to include "an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other

fide hedging, and spot-month framework on which they rest, are directed at physical-commodity derivative contracts and the enumerated physical-commodity core referenced futures contracts listed in Regulation 150.2(d); by their terms they define "bona fide hedging" and "core referenced futures contract" in respect of a physical commodity, and there is no core referenced futures contract—and no federal speculative position limit—for a security index.[63] The Contract is therefore not a "referenced contract" subject to federal limits, and the deliverable-supply-corner and spot-month concerns that animate the federal regime are structurally inapposite: the Contract is cash-settled, has no delivery, has no expiration and therefore no spot month, and and references a broad-based securities index calculated from the prices of the deepest and most liquid equity market in the world.

Consistent with the standard and accepted treatment of financial and excluded-commodity contracts, the Exchange therefore satisfies Core Principle 5 through position accountability rather than a hard position limit.[64] The Position Accountability Level of US$25,000,000 of mark-to-market position value provides the Exchange's market surveillance team with a trigger to examine the circumstances surrounding any large position—including the participant's trading activity, hedging rationale, and potential impact on market integrity—to require information regarding the position and any related hedging, and to direct that a position be reduced or not increased, while preserving the flexibility to permit commercially justified positions. As open interest in the Contract develops, the Exchange may, consistent with Commission standards and applicable filing requirements, supplement this accountability framework with exchange-set position limits.

The depth of the underlying market further supports this approach. As described in Appendix C, the U.S. equity market is the largest and most liquid equity market in the world, and the 500 constituents of the Index represent its large-capitalization segment, with an aggregate market capitalization in the tens of trillions of U.S. dollars.[65] The depth of that market makes it extremely difficult for any single participant to amass a position in the Contract capable of exerting meaningful influence on the level of the Index, and the perpetual funding-rate mechanism itself acts as a natural economic check on position concentration, imposing carrying costs that discourage further accumulation as positions become crowded on one side. This approach—position accountability calibrated to a cash-settled contract on an excluded commodity, supported by real-time surveillance and a deeply liquid underlying market—appropriately balances market-integrity objectives against the risk of unnecessarily constraining legitimate hedging and trading activity.

---

macroeconomic index or measure"); CFTC Glossary (distinguishing a physical commodity, such as an agricultural product or natural resource, from a financial instrument such as a currency or interest rate).

[63] See 17 C.F.R. § 150.1 (defining "bona fide hedging transaction or position" as a transaction or position "in commodity derivative contracts in a physical commodity" and "core referenced futures contract" as a futures contract listed in § 150.2(d)); 17 C.F.R. § 150.2(d) (enumerating physical agricultural, metals, and energy core referenced futures contracts); Position Limits for Derivatives, 86 Fed. Reg. 3236 (Jan. 14, 2021). No core referenced futures contract is enumerated for an interest rate, and the federal speculative position limit regime applies to physical-commodity derivative contracts.

[64] 17 C.F.R. § 150.5 and 17 C.F.R. Part 38, App. B, Core Principle 5 (contemplating exchange-set position limits or position accountability); CEA § 5(d)(5), 7 U.S.C. § 7(d)(5). Position accountability, rather than a hard position limit, is the standard and accepted approach for cash-settled financial contracts referencing excluded commodities.

[65] See supra note 6.

**Core Principles 7 and 8 - Availability of General Information and Daily Publication of Trading Information:** Core Principles 7 and 8, implemented by Regulations Sections 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges, the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market, and the rules and specifications describing the operation of the contract market's electronic matching platform.

Rule 2.17 of the Rulebook sets forth the rules for publicizing information. The Rulebook and the specifications of each contract listed on the Exchange, including the Contract, are made public on the Exchange website and remain accessible via the platform. The Exchange will post non-confidential materials associated with regulatory filings, including the Rulebook, at the time the Exchange submits such filings to the Commission. Consistent with Rule 2.17 of the Rulebook, the Exchange website will publish contract specifications, terms, and conditions, as well as daily trading volume and open interest for the Contract. Each contract has a dedicated "Market Page" on the Kalshi Exchange platform, which will contain the information described above as well as a link to the Underlying. Chapter 5 sets forth the rules, regulations and mechanisms for executing transactions, and the rules and specifications for Kalshi's trading systems.

**Core Principle 11 - Financial Integrity of Transactions:** Each Member must be in good standing and in compliance with the Member eligibility standards set forth in Chapter 3 of the Rulebook. All contracts offered by the Exchange, including the Contract, are cleared through the Clearinghouse, a Derivatives Clearing Organization ("DCO") registered with the CFTC and subject to all CFTC Regulations related thereto. The Exchange requires that Members post initial margin before entering into positions and maintain maintenance margin throughout the life of a position. Margin requirements are calculated using the Exchange's risk-based margin methodology and are designed to ensure that the Exchange can liquidate positions in an orderly manner before losses exceed posted collateral. Positions that fall below maintenance margin levels are subject to liquidation. The protection of customer funds is monitored by the Exchange and ensured by the Clearinghouse as member property or futures commission merchant customer property.

**All Remaining Requirements:** All remaining Core Principles are satisfied through operation of the Exchange's Rules, processes, and policies applicable to the other contracts traded thereon.