# EXHIBIT B

August 18, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the COPPERPERP Futures Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.3(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a designated contract market (DCM) registered with the Commission, hereby voluntarily submits the COPPERPERP contract (the Contract) for Commission review and approval. The Exchange intends to list the Contract on a continuous basis. The Exchange intends to list this Contract shortly following approval by the Commission.

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Appendix B with enhanced trading prohibitions applicable to the Contract;
- Appendix C with further considerations regarding the Contract;
- Appendix D with information regarding the Source Agency for the Contract;
- Appendix E describing the Contract's compliance with the Core Principles;
- Appendix F with further information on the Contract's compliance with the Core Principles;
- Confidential Appendix G with the Exchange's agreement with the Source Agency; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name:** COPPERPERP
**Rulebook:** COPPERPERP
**Summary:** Copper Perpetual Future
**August 18, 2026**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Regulation 40.3(a)(4), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendices E and F), and the Commission's regulations thereunder.

### I. Introduction

The COPPERPERP Contract is a perpetual futures contract on the spot price of copper, quoted in U.S. dollars per pound, referencing the Pyth Network XCU/USD price feed.

**What is a perpetual future?** A perpetual future is a cash-settled futures contract with no fixed expiration or delivery date. Rather than converging to a deliverable cash price on a stated settlement day, it remains economically tethered to a continuously observed Reference Price through a periodic funding mechanism: at regular intervals, holders of the side trading at a premium to the Reference Price pay holders of the side trading at a discount, so that any divergence between the contract's mark price and the underlying spot price generates an offsetting carrying cost that draws the two back into alignment. The instrument therefore functions as an indefinitely renewing near-dated future, allowing a participant to hold a position open for as long as the underlying exposure persists without rolling from one expiration to the next.

**Why are these important?** Perpetual futures have become the dominant form of derivative and a principal locus of price discovery in the markets in which they have emerged, yet that activity has historically occurred almost entirely on offshore, unregulated venues. Listing a perpetual on a CFTC-registered DCM brings this economically significant activity into a regulated environment featuring trade surveillance, know-your-customer verification, risk-based margin, central clearing, and disciplinary procedures consistent with the CEA, protecting U.S. participants and preserving U.S. price discovery rather than ceding both abroad (where perpetual contracts have for years been offered on largely unregulated platforms). For hedgers whose economic exposure is itself continuous or indefinite—miners and smelters managing production and metal in process, fabricators of wire, cable, tube, and sheet carrying work-in-process inventory, merchants and physical traders warehousing and financing cathode, and industrial end-users with recurring copper input-cost exposure—a perpetual is structurally superior to a strip of dated futures: it eliminates roll cost and roll-date basis risk, tracks spot more tightly through the funding mechanism, and concentrates liquidity in a single instrument rather than fragmenting it across expirations. Listing a regulated

domestic perpetual thus directly advances the Commission's stated objective of onshoring novel derivatives products that developed offshore due to regulatory uncertainty.[1]

**Perpetuals are well-suited to copper, a continuously traded industrial metal.** Copper is a homogeneous, fungible, and durable industrial commodity traded to globally recognized standards—LME Grade A and COMEX Grade 1 cathode. It does not spoil and can be stored, though, as with industrial metals generally, holding physical copper carries storage and financing costs that are offset by a convenience yield when physical supply is tight, so that its term structure moves between contango and backwardation with the supply-and-demand balance rather than being fixed by a pure cost of carry.[2] Unlike gold, copper is consumed in industrial use and its deliverable supply can be constrained; copper has historically been subject to episodes of physical tightness and attempted squeezes, which is precisely why the enumerated COMEX Copper contract carries a federal spot-month position limit and why the Contract adopts that limit, as described in Appendix A and Appendix F.[3] The exposure copper represents—the ongoing cost of a core industrial input—is continuous and indefinite for the producers, fabricators, merchants, and end-users who manage it. A cash-settled contract that never expires and stays tethered to spot through a funding mechanism therefore mirrors the economic reality of that exposure far more closely than a strip of dated futures, eliminating roll cost and roll-date basis risk for the continuous hedging needs described above.

**The Contract trades on a continuous weekday schedule, and its funding and settlement mechanics are anchored to the underlying reference market.** The Contract trades twenty-four hours a day, five days a week, from 6:00 PM Eastern Time on Sunday to 5:00 PM Eastern Time on Friday, and is closed over the weekend, when the global copper futures and physical markets are closed. Because the copper reference market observes a daily maintenance window and closes on weekends and on market holidays, the Contract's methodology computes per-minute Premiums and derives Funding Rate payments only over periods during which the Source Agency reports the underlying reference market as open and the feed as current. No Funding Rate payment is derived from, and no Settlement Price is determined during, periods in which the underlying reference market is closed; in such periods the prior Settlement Price remains in effect. Because funding calculations cease whenever the underlying reference market is closed, the settlement process is protected from thin liquidity or other problems that might arise outside active trading. Kalshi's surveillance, compliance, risk-management, and enforcement systems, including real-time monitoring, remain active during off-peak periods to address market disruption. Consistent with the Commission's Policy Statement, the Exchange has assessed whether the perpetual structure is appropriate for this

[1] Remarks of CFTC Chairman Michael Selig, The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance (Jan. 29, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

[2] Copper is a homogeneous, fungible, and durable industrial metal traded to LME Grade A and COMEX Grade 1 cathode standards. Because copper is consumed in industrial use, holding physical copper carries a convenience yield that offsets storage and financing costs, so that its forward curve moves between contango and backwardation with the physical supply-and-demand balance rather than being fixed by a pure cost of carry.

[3] Copper's deliverable supply can be constrained, and the copper market has historically been subject to episodes of physical tightness and attempted squeezes. See In re Sumitomo Corp., CFTC Docket No. 98-14 (May 11, 1998). Under 17 C.F.R. Part 150, the enumerated COMEX Copper contract is subject to a federal spot-month position limit, which the Contract adopts.

underlying and whether the Contract complies with Core Principle 3's requirement that contracts not be readily susceptible to manipulation; for the reasons set out in this submission, the Exchange believes the COPPERPERP Contract satisfies that standard.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Appendices C, D and E and Appendix F.

**General Contract Terms and Conditions:** As outlined in Rule 5.16 of the Rulebook, trading shall be available during the Contract's trading hours (as set forth in Appendix A) outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. The Source Agency for the Contract is Pyth Network, and a new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract is a cash-settled futures contract with no fixed expiration date. Each Contract represents a continuous obligation to make or receive cash payments based on changes in the Contract's mark price and periodic funding payments. Positions are marked to market on a continuous basis, and margin is collected and paid in accordance with the Exchange's margin methodology. During the time that trading on the Contract is open, Members are able to adjust their positions and trade. Members may enter and exit positions at any time during trading hours by executing offsetting trades. Members holding long positions profit when the Contract price increases and incur losses when it decreases; Members holding short positions profit when the Contract price decreases and incur losses when it increases. To maintain price convergence with the underlying Reference Price, the Contract employs a periodic funding mechanism whereby long position holders and short position holders exchange funding payments based on the difference between the Contract's mark price and the Reference Price, as specified in Appendix A. A Member's gain or loss at any point is equal to the change in the Contract's mark price since the position was established, multiplied by the Trading Unit, plus or minus net funding payments received or paid. Settlement of all payments is made in cash; no physical delivery occurs.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.3, 17 C.F.R. § 40.3**

Based on the above analysis, the Exchange certifies that:

- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.



By: Xavier Sottile
Title: Head of Markets
Date: August 18, 2026

**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Appendix C - Further Considerations
Appendix D - Source Agency
Appendix E - Compliance with Core Principles
Appendix F - Additional Compliance with Core Principles
Appendix G - (Confidential) - Agreement with Pyth Network

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name:** COPPERPERP
**Rulebook:** COPPERPERP

## COPPERPERP

**Scope:** These rules shall apply to this Contract.

**Underlying:** The Underlying for this Contract is the spot price of copper (XCU) in U.S. dollars per pound. A long position in the Contract increases in value when the price of copper rises and decreases in value when it falls; a short position is affected in the opposite manner.

**Underlying Price Index:** For a given time t, the Underlying Price Index (UPIt) is the last published aggregate price of the Pyth Network XCU/USD (copper) price feed, as produced and disseminated by Pyth Network (the Source Agency) from prices submitted by its first-party publishers. During any period in which the Source Agency reports the underlying reference market as closed, or reports the feed as stale or unavailable, the Underlying Price Index shall be the last aggregate price published while the underlying reference market was open.

**Source Agency:** The Source Agency is Pyth Network.

**Type:** The type of Contract is a Perpetual Futures Contract.

**Trading Hours:** The Contract trades contniuously from 6:00 PM Eastern Time on Sunday to 5:00 PM Eastern Time on Friday, throughout the lifetime of the Contract, subject to any trading halt or maintenance window imposed by the Exchange. This schedule corresponds to the weekly session of the underlying reference market. The Contract trades continuously through each weekday and overnight, including through the reference market's daily maintenance window from 5:00 PM to 6:00 PM ET Monday through Thursday, during which the Source Agency does not produce prices and the exclusions set forth under 'Reference Market Closed Periods' apply; the Contract itself observes no daily close. The Contract is closed over the weekend, when the reference market is closed.

**Trading Unit:** One thousand (1,000) pounds of copper. Each Contract has a notional value equal to the Underlying Price Index (in U.S. dollars per pound) multiplied by 1,000.

**Price Quotation:** Prices for the Contract are quoted in U.S. dollars per pound (e.g., 4.5000).

**Minimum Tick:** The Minimum Tick size for this Contract shall be $0.0005 per pound.

**Tick Value:** A one-tick price movement equals $0.50 per Contract, calculated as the Minimum Tick multiplied by the Trading Unit ($0.0005 × 1,000 pounds = $0.50).

**Minimum Unit:** The minimum unit of trading is one thousandth of one Contract, unless otherwise specified in a Contract’s terms and conditions or on the Contract’s market page.

**Position Accountability Level:** $5,000,000 mark-to-market position value (in the case of a short position, the equivalent long position value is considered).

**Position Limits:** The Contract is a cash-settled futures contract on the price of copper and is treated by the Exchange as a cash-settled Referenced Contract in copper within the meaning of 17 CFR Part 150, linked to the COMEX Copper (HG) core referenced futures contract. The federal spot-month position limit for the COMEX Copper (HG) contract is 1,000 contracts;

because the COMEX Copper contract represents 25,000 pounds of copper and each Contract represents 1,000 pounds, that limit corresponds to 25,000 Contracts. No person may hold or control positions in the Contract, net long or net short, in excess of 25,000 Contracts, at any time. Bona fide hedging and spread positions are exempt to the extent provided in 17 CFR 150.3.

**Reportable Level:** One hundred (100) Contracts, consistent with the reportable level for copper set forth in Commission Regulation 15.03(b).

**Periodic Transfer Criterion:** At each Periodic Transfer Time, the Funding Rate is computed as defined below. If the Funding Rate is zero, no Periodic Transfer is made. If the Funding Rate is positive, long-side holders must contribute an amount equal to the Funding Rate multiplied by the Settlement Price at the Periodic Transfer Time, multiplied by the Trading Unit (1,000 pounds), to short-side holders, for each Contract held. If the Funding Rate is negative, short-side holders must contribute an amount equal to the absolute value of the Funding Rate multiplied by the Settlement Price at the Periodic Transfer Time, multiplied by the Trading Unit (1,000 pounds), to long-side holders, for each Contract held. Revisions to the Underlying made after any Periodic Transfer Time will not be accounted for in determining the applicable Periodic Transfer.

**Periodic Transfer Time:** At 10:00 AM ET on each day on which that time falls within the Contract's Trading Hours (i.e., on each Monday through Friday), throughout the lifetime of the Contract, provided that a Periodic Transfer occurs at a given Periodic Transfer Time only if the underlying reference market was open for at least a portion of the immediately preceding Funding Period. No Periodic Transfer Time is scheduled, and no Periodic Transfer, Funding Rate determination, or Settlement Price determination occurs, outside the Contract's Trading Hours; accordingly, no Periodic Transfer occurs on any Saturday or Sunday. No Periodic Transfer, Funding Rate determination, or Settlement Price determination occurs at a scheduled Periodic Transfer Time falling entirely within a period during which the underlying reference market was closed (including market holidays observed by the underlying reference market); in that case the prior Settlement Price remains in effect until the next Periodic Transfer Time at which a Periodic Transfer occurs. Each Funding Period runs from the immediately preceding Periodic Transfer Time at which a Funding Rate was determined to the current Periodic Transfer Time and ordinarily comprises twenty-four (24) hours; the Funding Period ending at the Monday Periodic Transfer Time runs from the Periodic Transfer Time on the preceding Friday and ordinarily comprises seventy-two (72) hours, within which Premiums are computed, as provided below, only for one-minute intervals during which the underlying reference market was open.

**Premium Index:** For each minute during which the Source Agency reports the underlying reference market as open for regular trading, the Exchange computes a per-minute Premium as follows:

$$Premium(t) = ( Perpetual\ Price(t) - Reference\ Price(t) ) / Reference\ Price(t)$$

where Perpetual Price(t) is the volume-weighted average price (VWAP) of the Contract during the applicable one-minute interval; if no trades in the Contract occurred during that interval, the Premium for that interval is undefined and shall be excluded from the Funding Rate calculation; and Reference Price(t) is the time-weighted average of the Underlying Price Index over the applicable one-minute interval.

**Funding Rate:** Let Premium(1), Premium(2), …, Premium(N) be the per-minute Premiums computed during the Funding Period in ascending chronological order, where N is the number of one-minute intervals during the Funding Period for which a Premium was computed (excluding any interval excluded under Reference Market Closed Periods, Reference Market Halts and Feed Outages, or any other provision herein, and any interval during which no trades in the Contract occurred). The Funding Rate shall equal the Weighted Average Premium Index (WAPI) of those per-minute Premiums, computed by weighting each Premium equally: Funding Rate = ( Σ from k=1 to N of Premium(k) ) / N. For the avoidance of doubt, this is an equally weighted (simple) average of the computed per-minute Premiums: each Premium computed during the Funding Period receives identical weight regardless of its chronological position, and no Premium is weighted by recency. If N is zero, the Funding Rate shall be zero. The Funding Rate is subject to the following adjustments:

(a) Deadband: If the absolute value of the Funding Rate falls below 0.002%, the Funding Rate shall be set to zero.

(b) Clamp: If the absolute value of the Funding Rate exceeds 2.00%, the Funding Rate shall be clamped to +2.00% or –2.00%, as applicable (the "Maximum Funding Magnitude").

**Reference Market Closed Periods:** The Contract is closed over the weekend, from the Friday close of the underlying reference market until its Sunday open, coinciding with the weekend closure of the copper futures and physical markets. During any period in which the Source Agency reports the underlying reference market as closed (including the daily maintenance window from 5:00 PM to 6:00 PM ET Monday through Thursday, over the weekend, and on market holidays), no per-minute Premiums are computed and no Funding Rate payment is derived from price action, and the prior Settlement Price remains in effect until the reference market reopens. The Contract observes no regular daily settlement break. For this purpose, the underlying reference market is open or closed as reported by the Source Agency.

**Reference Market Scheduled Early Closes and Holidays:** The Exchange shall observe a published calendar reflecting the holiday and early-closure schedule of the underlying reference market. On a day on which the underlying reference market is scheduled to close early, the Funding Period in progress shall run to the scheduled early close, and the corresponding Periodic Transfer Time and Settlement Price shall be determined as of that early close. On a day on which the underlying reference market is closed for an entire session, no Premiums are computed, no Funding Rate is calculated, and no Periodic Transfer is made for that session. The Contract trades in accordance with the Exchange's published calendar, which reflects the trading calendar of the underlying reference market and its weekend closure.

**Reference Market Halts and Feed Outages:** During any period in which the Source Agency reports the underlying reference market as halted, or reports the feed as stale or unavailable, no Premiums shall be computed for the duration, and the Funding Period shall exclude all such one-minute intervals. The Weighted Average Premium Index used to compute the Funding Rate shall be calculated solely over the one-minute intervals during which the underlying reference market was open and the feed was current. The Contract continues to trade during its weekday trading session throughout any such period.

**Unscheduled Closure:** If the underlying reference market does not open for regular trading when expected, or closes unexpectedly before its scheduled close: (i) if no qualifying Premiums were computed during the affected Funding Period, no Funding Rate shall be calculated and no Periodic Transfer shall be made, and the Settlement Price from the immediately preceding determination shall remain in effect; (ii) if qualifying Premiums were computed for any portion of the Funding Period before the unexpected closure, the Funding Rate shall be calculated over the one-minute intervals during which regular trading actually occurred, the Periodic Transfer Time shall be the time of the unexpected closure, and the Settlement Price shall be determined as of that time under the methodology below. In all cases the Contract trades in accordance with its trading hours.

**Clearing:** The Contracts will be centrally cleared by Kalshi Klear LLC (Klear or the Clearinghouse), a derivatives clearing organization registered with the Commission, as central counterparty.

**Settlement Price:** For the purposes of calculating variation margin and Periodic Transfer obligations, the Settlement Price as of each Periodic Transfer Time shall be determined according to the following tiered methodology, applied in order:

> **Tier 1 (Trade VWAP).** If one or more trades in the Contract occur during the sixty (60) seconds immediately preceding the Periodic Transfer Time (the "Settlement Period"), the Settlement Price shall be the volume-weighted average price of those trades, adjusted to exclude outliers via a median-based Mean Absolute Difference (MAD) filter; the Exchange reserves the right to exercise discretion to exclude other outlier or manipulative transactions. Transactions occurring precisely at the Periodic Transfer Time are excluded.
>
> For purposes of Tiers 2 and 3, sixty (60) Observation Points are defined at exactly N seconds before the Periodic Transfer Time for each integer N from 1 to 60. An Observation Point is "two-sided" if both a prevailing best bid and a prevailing best ask rest on the order book at that instant, and its Midpoint is the arithmetic mean of the two.
>
> **Tier 2 (Sampled Midpoint Average).** If no trades in the Contract occur during the Settlement Period and at least one Observation Point is two-sided, the Settlement Price shall be the arithmetic mean of the Midpoints at all two-sided Observation Points.
>
> **Tier 3 (Index Net Change).** If no trades in the Contract occur during the Settlement Period and no Observation Point is two-sided, the Settlement Price shall equal the prior Settlement Price plus the net change in the Underlying Price Index between the prior Periodic Transfer Time and the current Periodic Transfer Time.

If a Settlement Price cannot be determined under any of the foregoing Tiers, the Exchange may determine the Settlement Price pursuant to Rule 7.1 of the Rulebook.

**Initial and Maintenance Margin:** Initial margin and maintenance margin requirements for the Contract shall be calculated using the Exchange's risk-based margin methodology.

**Trading Halts:** The Exchange may halt trading in the Contract in its discretion or in connection with an Emergency as defined in Rule 2.8 of the Rulebook. A halt or closure of the underlying reference market does not by itself halt trading in the Contract; rather, no Premiums are computed and no Funding Rate payment is derived during such periods, as provided above.

**Last Trading Date:** As this is a Perpetual Futures Contract, it has no Last Trading Date.

**Expiration Date:** As this is a Perpetual Futures Contract, it has no Expiration Date.

**Expiration Time:** As this is a Perpetual Futures Contract, it has no Expiration Time.

**Pre-Trade Risk Controls:** The Exchange may impose pre-trade risk controls, including price banding, order size limits, and position exposure limits, to ensure orderly trading and mitigate market disruption risk, including during periods when the underlying reference market is closed.

**Market Integrity:** The Exchange may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If a Funding Rate or Settlement Price cannot be determined, the Exchange has the right to determine payouts or margin requirements pursuant to Rule 7.1 of the Rulebook. If the Funding Rate cannot be determined for a given Funding Period (including because no Premium was computed during the Funding Period), the Funding Rate shall be set to zero. The Exchange will monitor the performance of the Funding Rate in keeping the Contract economically tethered to the Underlying Price Index and may amend the Funding Rate methodology in accordance with applicable Exchange rules and Commission filing requirements. Any such amendment shall apply prospectively only and shall not alter the Funding Rate or any Periodic Transfer obligation for any Funding Period ending prior to the amendment's effective date. In the event of an Emergency, as defined in Rule 2.8 of the Rulebook, the Exchange may take such actions as it deems necessary and appropriate, including but not limited to adjusting the Maximum Funding Magnitude, modifying margin requirements, or imposing additional risk controls, in accordance with the procedures set forth in Rule 2.8.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the Contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Officers, directors, and employees of Douro Labs LLC and the Pyth Data Association, in their capacity as core contributors to, and administrators of the governance of, the Pyth Network, to the extent such persons have access to non-public information regarding the composition, calculation, or operation of the Pyth Network XCU/USD price feed
- Members of the Pyth DAO's Price Feed Council and Pythian Council responsible for governance of the Pyth Network price feeds, the Pyth DAO, and the parameters of the Oracle Integrity Staking program, to the extent such persons have access to non-public information that could materially affect the Underlying Price Index
- Officers, directors, and employees of the first-party publishers contributing price and liquidity data to the Pyth Network XCU/USD price feed, to the extent such persons have access to non-public order flow data, surveillance data, or advance knowledge of operational changes that could materially affect the Underlying Price Index
- Third-party auditors and security reviewers currently engaged in auditing or assuring the Pyth Network's price-feed methodology, aggregation programs, or staking and slashing mechanisms
- Immediate family members (parents, siblings, spouses, domestic partners) and household members of all persons listed above

## APPENDIX C – FURTHER CONSIDERATIONS

The COPPERPERP Contract serves critical risk-mitigation functions for a broad range of market participants with bona fide economic exposure to copper. Copper is one of the world's most important industrial commodities and the base metal most central to the electrification of the global economy—essential to power generation and transmission, construction, electric vehicles, electronics, and the data-center and grid buildout driving artificial-intelligence infrastructure. Global refined-copper production is on the order of 26 million tonnes per year, and copper price risk is transferred continuously across a deep, regulated futures complex and a vast physical market.[4] Copper's centrality to industrial activity has long made its price a barometer of global economic conditions; the metal is widely referred to as "Dr. Copper" for its sensitivity to the business cycle.

A wide range of commercial participants carry continuous, indefinite-duration copper price exposure that a perpetual futures contract is uniquely suited to hedge. Miners and smelters manage price exposure on future production and on metal in process between concentrate and refined cathode. Fabricators and semi-fabricators—producers of wire, cable, tube, and sheet—carry work-in-process and finished inventory between purchase and sale and must hedge the price exposure that arises in the interim. Merchants and physical traders warehouse and finance cathode and run continuous principal books. And industrial end-users—in construction, electrical equipment, automotive, and electronics—carry recurring, open-ended input-cost exposure to copper that has no natural terminal date.[5] For each of these participants the exposure is continuous and indefinite, and a perpetual contract hedges it without the roll and calendar-basis management that a strip of dated futures requires.

The perpetual structure, combined with the funding mechanism that maintains convergence with the spot Reference Price, makes the Contract functionally superior to dated alternatives for participants whose economic exposure is itself perpetual or indefinite in duration. As with perpetuals generally, the Contract eliminates the need to roll positions from one expiration to the next, trades with a much smaller basis to the spot market through the funding mechanism, and allows liquidity to be concentrated in a single instrument rather than fragmented across multiple expiration dates.[6] These benefits are pronounced for an industrial metal such as copper, whose term structure moves between contango and backwardation with the physical

---

[4] See International Copper Study Group, World Copper Factbook 2025 (global refined-copper production on the order of 26 million tonnes per year). Copper is essential to power generation and transmission, construction, electric vehicles, electronics, and data-center and grid infrastructure, and copper price risk is transferred continuously across the London Metal Exchange, the COMEX copper market, the Shanghai Futures Exchange, and a large physical market.

[5] Commercial participants with continuous copper price exposure include miners and smelters (managing production and metal in process between concentrate and refined cathode), fabricators and semi-fabricators of wire, cable, tube, and sheet, physical merchants and traders (warehousing and financing cathode), and industrial end-users in construction, electrical equipment, automotive, and electronics.

[6] Coinbase Derivatives, LLC, Comment Letter to the CFTC on Perpetual Derivatives (May 21, 2025), https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=35619 (perpetual contracts eliminate the need to roll positions, trade with a smaller basis to spot through the funding mechanism, and concentrate liquidity in a single contract).

supply-and-demand balance, so that many hedgers of continuous exposure are better served by a single spot-tracking instrument than by a position on the calendar curve.

Perpetual and other continuously traded instruments also provide substantial price-discovery and transparency benefits that serve the public interest. Copper price discovery today is the product of the continuous interaction of deep, regulated futures markets—principally the London Metal Exchange, whose copper contract and official prices are the global pricing benchmark for physical copper, and the COMEX copper futures market operated by CME Group under CFTC oversight—together with the Shanghai Futures Exchange and bilateral OTC and physical flows.[7] COMEX copper is a deep, CFTC-regulated venue with substantial volume and open interest. Listing a regulated domestic copper perpetual on a CFTC-registered DCM brings continuous, funding-anchored copper price discovery into a regulated environment with robust trade surveillance, know-your-customer verification, risk-based margin requirements, and disciplinary procedures consistent with the CEA and Commission regulations thereunder.[8]

The Contract's use of the Pyth Network XCU/USD price feed ensures that the reference price is derived from a reliable, institutionally sourced market-data network whose aggregate is constructed from the proprietary prices of the same institutions—exchanges, market makers, and trading firms—that actively trade copper across the futures and physical markets.[9] Appendix D describes the Source Agency in detail.

Finally, CFTC Chairman Selig has stated that the Commission will use the tools at its disposal to onshore perpetual and other novel derivative products so that they can flourish across both centralized and decentralized markets, subject to appropriate safeguards, confirming that the listing of a regulated copper perpetual futures contract directly advances the Commission's stated policy objectives of deterring manipulation, protecting market participants, and promoting responsible innovation.[10]

---

[7] Copper price discovery occurs principally on the London Metal Exchange—a UK-regulated investment exchange whose official copper prices are the global benchmark for physical contracts—the COMEX copper futures market operated by CME Group under CFTC oversight, and the Shanghai Futures Exchange, together with bilateral OTC and physical flows.

[8] CME Group, COMEX Copper (HG) Futures (a CFTC-regulated futures market with substantial volume and open interest). Listing a copper perpetual on a CFTC-registered DCM brings continuous, funding-anchored copper price discovery into a regulated environment with trade surveillance, KYC verification, risk-based margin, and disciplinary procedures.

[9] The Pyth Network XCU/USD feed aggregates the proprietary prices of exchanges, market makers, and trading firms that actively trade copper across the futures and physical markets. See Appendix D.

[10] See supra note 1.

## APPENDIX D – SOURCE AGENCY

The Source Agency for the COPPERPERP Contract is Pyth Network ("Pyth"), the producer and disseminator of the Pyth Network XCU/USD price feed (the "Underlying Price Index"). Pyth is a first-party, institutionally sourced financial market-data network: rather than scraping or re-aggregating third-party quotes, Pyth obtains price and liquidity data directly from the trading and market-making activity of institutional publishers involved in the LME, COMEX, and the physical copper markets—including trading desks, market makers, and financial institutions active in the copper market—and aggregates those data into a continuously-updated XCU/USD reference price. Pyth publishes data for more than 1,000 assets spanning U.S. and international equities, fixed income, commodities, FX, and digital assets, and the venues and applications that consume Pyth data have processed more than US$2 trillion in cumulative trading volume.[11]

### Governance

Pyth is governed by the Pyth DAO pursuant to the on-chain Pyth DAO Constitution, which sets out the rules and procedures of the network and is generally enforced through on-chain contracts. The Pyth DAO is legally organized (as Pyth DAO LLC under the laws of the Republic of the Marshall Islands) to hold and manage governance and treasury functions.[12] Governance proposals are decided by holders of the PYTH governance token through a staking-based, one-token-one-vote system over a defined voting period subject to quorum requirements. Within that framework, a Price Feed Council and a Pythian Council, whose members are periodically re-elected, are responsible for overseeing the price feeds and data providers and for administering the parameters of the network, including the parameters of the Oracle Integrity Staking program described below.[13] Douro Labs LLC is a core contributor to the Pyth Network and to the development of its oracle software and tooling, and the Pyth Data Association supports the network's development and bootstrapped the Oracle Integrity Staking program.[14]

### Index Methodology

For each price feed, including the XCU/USD feed, Pyth combines publisher submissions using a robust aggregation that produces both an aggregate price and an aggregate confidence interval. Each publisher submits its own price together with a confidence interval reflecting its uncertainty as to the current price. The aggregation algorithm gives each publisher three votes—one at its submitted price and one at each of its price plus and minus its confidence interval—and takes the

[11] Letter from Douro Labs LLC (Brandon Ferrick, Gen. Counsel) to Christopher Kirkpatrick, Sec'y, CFTC, Re: Advance Notice of Proposed Rulemaking on Prediction Markets, RIN 3038–AF65 (Apr. 30, 2026), https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=35924 (the "Douro Labs Comment Letter") (describing Pyth's first-party institutional-publisher network and confidence-weighted aggregation methodology); Letter from Douro Labs LLC to CFTC, Re: Request for Input on Listing of Spot Crypto Asset Contracts (May 21, 2025).

[12] Pyth Network Documentation, What is PYTH? (the Pyth DAO Constitution is the governance framework, generally enforced through on-chain contracts); the Pyth DAO is legally organized as Pyth DAO LLC under the laws of the Republic of the Marshall Islands.

[13] Pyth Network Documentation, What is PYTH? (PYTH governance uses a 1:1 staked-token voting system over a seven-day voting period subject to quorum); Pyth DAO Constitution (Price Feed Council and Pythian Council, whose members are periodically re-elected, oversee the price feeds and data providers).

[14] Douro Labs LLC Comment Letter (Apr. 30, 2026), supra note 17 (Douro Labs is a core contributor to the Pyth Network); Pyth Network, Oracle Integrity Staking: Incentivizing Safer Price Feeds (the Pyth Data Association allocated 100 million unlocked tokens to bootstrap Oracle Integrity Staking).

median of all votes as the aggregate price; it then computes the distance from the aggregate price to the 25th and 75th percentiles of the votes and takes the larger as the aggregate confidence interval.[15] The result is a confidence-weighted median that behaves as a hybrid between a mean and a median: it gives more-confident publishers greater influence while capping the maximum influence of any single publisher, so that as long as fewer than one-quarter of publishers submit erroneous prices they cannot determine the location of the aggregate price.[16] The published confidence interval communicates the quality and dispersion of the underlying contributions in real time, and Pyth additionally publishes a slot-weighted, inverse-confidence-weighted exponential moving average of the aggregate price and confidence, which down-weights samples with wide confidence intervals.[17]

The Source Agency has confirmed to the Exchange that this aggregation logic applies to every feed it produces and that a new aggregate is generated every 200 milliseconds on its current production system. Publisher counts and update figures displayed on the Source Agency's public Insights website relate to the prior generation of the network (Pythnet) and may differ from current production figures.

Crucially for surveillance and dispute resolution, every publisher submission and every aggregate price is cryptographically signed, time-stamped, and recorded, producing a tamper-evident audit trail. Any market participant, DCM, or regulator can determine, for any moment in time, what each publisher submitted, how the aggregate was computed, and what the published confidence interval was.[18] This auditability stands in contrast to the proprietary, undisclosed index calculations used by many offshore, unregulated venues, and it permits the Exchange and the Commission to independently reconstruct and verify any reported value of the Underlying Price Index.

**Contributor Quality Controls**

The Source Agency's contributor-quality regime operates at admission and continuously thereafter. Each price contributor is evaluated against an independent benchmark — LSEG's Elektron real-time data service, which aggregates quotations from the substantial majority of banks and brokers active in the trade and publishes on the same schedule as the feed — and only contributors whose data achieves a normalized root-mean-square error below 0.01 against that benchmark are selected to contribute in production. Contributor accuracy is re-evaluated daily, each individual contribution is monitored in real time, and the Source Agency adds and removes contributors from the permissioned roster based on measured uptime and accuracy.

---

[15] Pyth Network, Price Aggregation, https://docs.pyth.network/price-feeds/core/how-pyth-works/price-aggregation (the algorithm gives each publisher three votes—at its price and at its price plus and minus its confidence interval—and takes the median of all votes as the aggregate price; the aggregate confidence interval is the larger of the distances from the aggregate price to the 25th and 75th percentiles).
[16] Id. (the algorithm behaves as a hybrid between a mean and a median, giving more-confident publishers more influence while capping the influence of any single publisher; as long as fewer than 25% of publishers submit erroneous prices they cannot determine the location of the aggregate price).
[17] Pyth Network, EMA Price Aggregation (the current Pyth averaging method is a slot-weighted, inverse-confidence-weighted exponential moving average of the aggregate price and confidence over a period of approximately one hour).
[18] Douro Labs LLC Comment Letter (Apr. 30, 2026), supra note 17 (every publisher submission and every aggregate price is signed, time-stamped, and recorded, producing a tamper-evident audit trail that permits ex-post reconstruction of any reference value).

In addition, the network's protocol design provides for Oracle Integrity Staking, under which publishers stake PYTH tokens against the integrity of their submissions and may be slashed where data fails defined integrity thresholds. In April 2026, by governance action OP-PIP-103, the Pyth DAO set the program's reward rate to zero, pausing its reward and slashing operation; the mechanisms are preserved in the protocol but are not currently operative, and publisher rewards remain a function of measured data quality. The Exchange does not rely on Oracle Integrity Staking as an operative safeguard for the Contract; the operative controls are the benchmarking, daily re-evaluation, real-time monitoring, and roster management described above.

**Data Quality and Institutional Adoption**

Pyth's data quality is quantitatively demonstrable and its adoption is broad. In an independent comparison published in Douro Labs' February 2026 submission to the Securities and Exchange Commission, Pyth reference prices for the top 100 U.S. equities by market capitalization fell within the consolidated National Best Bid and Offer 94.2% of the time over a four-week window covering more than 929 million observations (rising to 96.1% excluding the narrowest-spread mega-capitalization names); for the three most liquid equity index futures, Pyth prices fell within the NBBO 99.1% of the time across 1.29 billion observations; and for crude oil futures, Pyth prices fell within the NBBO 98.1% of the time across 322 million observations, with median deviations where outside the NBBO ranging from approximately 1.3 to 2.7 basis points.[19] In August 2025, the U.S. Department of Commerce selected Pyth to publish official U.S. macroeconomic data, beginning with gross domestic product—a first-of-its-kind engagement by a federal statistical agency.[20] And, as noted in Appendix C, the Exchange itself has selected Pyth as the resolution data provider for its Commodities markets, including its metals and energy Commodities markets.[21]

**The XCU/USD Feed and Its Relationship to the Regulated Copper Market**

The Pyth Network XCU/USD feed aggregates prices from institutional publishers with direct access to the LME, COMEX, and physical copper markets—trading desks, market makers, and financial institutions that actively trade copper across those venues—and generates a new aggregate every 200 milliseconds.[22] The feed is currently supported by price contributors — non-bank market makers, trading venues, and brokers and banks — against a minimum publisher count of three. If the number of active publishers falls below that minimum, the feed ceases producing an updated aggregate and repeats the last known value with a fixed feed-update timestamp, which the Exchange's systems detect as stale under Appendix A. Because the feed's

---

[19] Douro Labs, Beyond Reg NMS: A Market Structure Framework for the Modern Era (Feb. 2026), https://www.sec.gov/files/douro-labs-beyond-reg-nms-022026.pdf (reporting the results of an independent comparison of Pyth reference prices to the consolidated National Best Bid and Offer).

[20] Press Release, U.S. Dep't of Commerce, Department of Commerce Posts 2nd Quarter Gross Domestic Product to the Blockchain (Aug. 28, 2025).

[21] Press Release, Pyth Network, Pyth Network Selected as Resolution Source for Kalshi's Expanded Commodities Markets (Apr. 22, 2026); see also Douro Labs LLC Comment Letter, infra note 16 (Kalshi announced that Pyth is the resolution data provider for its Commodities Hub, where event contracts on gold, silver, oil, natural gas, copper, corn, soybeans, and wheat resolve against Pyth price feeds).

[22] Pyth Network Insights, XCU/USD price feed (the copper feed aggregates the prices of institutional publishers and updates on a sub-second basis); see Douro Labs LLC Comment Letter, supra note 16 (describing the Pyth aggregation methodology).

publishers are the very institutions that set prices on the regulated and regulated-adjacent venues where copper price discovery occurs, the Pyth aggregate is anchored to the same underlying liquidity that is reflected in the COMEX copper futures market (operated by CME Group under CFTC oversight), in the London Metal Exchange's copper contract and official prices—the global pricing benchmark for physical copper—and in the Shanghai Futures Exchange. Those venues are subject to established market oversight and provide continuous, independent price discovery against which the Pyth aggregate can be measured.[23] The existence of these deep, independent, regulated reference markets means that the Pyth aggregate can be continuously cross-checked against COMEX settlement prices and the LME official prices. The Exchange notes candidly that the U.S. and London copper markets can themselves diverge during episodes in which the physical arbitrage between them is impaired, as occurred during the 2025 tariff-driven dislocation in which COMEX copper traded at a sustained premium to the LME. The XCU/USD feed represents the U.S.-dollar spot price of copper as quoted by its contributors; during such episodes the published confidence interval widens to signal cross-venue dispersion, and the Exchange's pre-trade price bands, the staleness and closed-market exclusions in Appendix A, and the Maximum Funding Magnitude operate independently of any single reference venue.

**Resilience and Manipulation Resistance**

The multi-publisher, first-party construction of the Pyth XCU/USD aggregate provides inherent resistance to manipulation by any single contributor. Because the aggregate is a confidence-weighted median of the submissions of multiple independent institutional publishers, no single publisher can move the Reference Price materially, and distorting the aggregate would require coordinated mispricing by a substantial fraction of independent, reputable firms—each of which is subject to the contributor quality controls described above and has a reputational interest in accurate data, and each of which is separately subject to its own regulatory and compliance obligations. The on-chain aggregation automatically limits the influence of outliers, the published confidence interval widens to signal dispersion or stress, and the cryptographic attestation of every input makes any anomalous contribution immediately detectable after the fact. The Exchange believes that, for purposes of the COPPERPERP Contract, Pyth is a transparent, auditable, economically accountable, and manipulation-resistant Source Agency, and that its reliance on first-party institutional data anchored to the deep global copper market makes it well-suited to serve as the reference for the Underlying Price Index. The Exchange will monitor the performance of the Source Agency on an ongoing basis and may, consistent with the Contract's terms and applicable Commission filing requirements, add or substitute a Source Agency via a Part 40 amendment.

[23] London Metal Exchange, LME Copper and LME Official Prices, https://www.lme.com (the LME establishes the official copper prices used as the global benchmark for physical copper contracts); CME Group, COMEX Copper (HG) Futures (CFTC-regulated); Shanghai Futures Exchange, Copper Futures.

# APPENDIX E – COMPLIANCE WITH CORE PRINCIPLES

**Compliance with Core Principles**

A. ***The Exchange has Exercised Reasonable Discretion by Categorizing the Contract as Futures Contracts for Purposes of Compliance with the Core Principles and Other Provisions of the CEA and Commission Regulations.***

Section 5(d)(1)(B)[24] of the CEA and Regulation 38.100(b)[25] thereunder provide that a DCM has reasonable discretion in establishing the manner in which it complies with the Core Principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Contract as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.[26]

On May 29, 2026, the Commission approved for listing on Kalshi the first domestic perpetual contract as a contract for the sale of a commodity (bitcoin) for future delivery.[27] In the BTCPERPs Order, the Commission determined that it would not violate the CEA or the Commission's regulations thereunder for Kalshi and other DCMs to list for trading, as futures contracts, the BTCPERP Contract. However, the Commission made clear that "[c]ontract categorization analysis is done on a case-by-case basis" such that the analysis in the BTCPERPs Order was "limited to the BTCPERP Contract and similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities that have deep, active, and continuous spot market trading."[28] The Commission further stated that the "market attributes of the asset class underlying a perpetual contract—including the presence, or absence, of continually available spot price data—may be relevant to such regulatory treatment and compliance considerations."[29]

Contemporaneously with the BTCPERPs Order, the Commission released a policy statement (the "Policy Statement") describing its views concerning the listing of perpetual contracts that reference underlying asset classes that are not contemplated in the BTCPERPs Order, including that such contracts "should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3."[30] In both the BTCPERPs Order and the Policy Statement, the Commission focused on the role of the funding rate mechanism of perpetual contracts, which "functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies."[31]

---

[24] 7 U.S.C. § 7(d)(1)(B).
[25] 17 C.F.R. § 38.100(b).
[26] Kalshi and Klear intend to treat the Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.
[27] CFTC Order, In the Matter of the Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract (May 29, 2026) (the "BTCPERPs Order").
[28] BTCPERPs Order at 8.
[29] BTCPERPs Order at 9.
[30] Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160, 33,161 (June 3, 2026).
[31] BTCPERPs Order at 6–8; see also Policy Statement, supra (the funding-rate mechanism "functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies").

In the BTCPERPs Order, the Commission concluded that listing the BTCPERP Contract as a futures contract would not violate the CEA or the Commission's regulations thereunder on the basis that: (i) the BTCPERP Contract exhibited all of the key features of futures contracts identified in relevant judicial precedent and Commission guidance, including the contract's trading at a fixed, standardized unit quantity, each party's obligations being guaranteed via novation to a central clearing house that sets margin requirements, the ability of a holder to exit their position via offset, availability to the general public, risk transference, and trading on the centralized market of a DCM;[32] and (ii) certain characteristics of the spot market of the underlying commodity (i.e., bitcoin) supported the effective functioning of the funding rate mechanism employed by the BTCPERP Contract, including continuous and broadly distributed trading in, and depth and liquidity of, the underlying spot market.[33]

The Contract resembles the BTCPERP Contract in all respects relevant to the regulatory categorization analysis. The Contract will have a fixed, standardized unit size (1,000 pounds of copper). Each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty and set margin requirements.[34] Holders will be able to exit their positions via offset.[35] The Contract will be available to the general public, including retail participants. Parties will enter into the Contract for the purpose of assuming or shifting the risk of change in value of the Underlying, without the possibility of transferring ownership of the Underlying. And the Contract will trade on the centralized market of a DCM and settle exclusively in cash with no physical delivery of copper.

Further, the Contract's underlying spot market (copper) possesses the characteristics that led the Commission to find that the underlying spot market of the BTCPERP Contract allowed the "funding rate mechanism to function consistently with DCM Core Principle 3."[36] The copper spot market trades continuously on weekdays during periods when Funding Rate payments are calculated. Because the Contract's spot reference market closes on weekends and on market holidays—unlike the bitcoin spot market, which trades 24/7—no Funding Rate payment is derived from, and no Settlement Price is determined during, periods in which the underlying reference market is closed, such that the Contract's continuous trading in those periods does not result in "settlement payments being calculated against stale or synthesized prices that are less

---

[32] BTCPERPs Order at 6–8.
[33] BTCPERPs Order at 7.
[34] Although the Dodd-Frank Act arguably changed the historical analysis in part by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant.
[35] See BTCPERPs Order at 2–5; see also CFTC v. Co Petro Marketing Group, Inc., 680 F.2d 573, 579–580 (9th Cir. 1982) ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); In re Stovall, [1977–1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 6 (CFTC Dec. 6, 1979) (describing futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."); Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 971 (4th Cir. 1993) ("Tauber") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss.").
[36] BTCPERPs Order at 6.

reliable convergence signals."[37] The copper spot market is also actively traded across broadly distributed venues (e.g., the London Metal Exchange; the COMEX copper futures market; the Shanghai Futures Exchange; the physical market of producers, smelters, merchants, and fabricators; and the OTC and warehouse-warrant markets) and is a deep, globally distributed market, as described in Appendix C.

The BTCPERPs Order and the Policy Statement have recently been challenged in litigation brought by the Chicago Mercantile Exchange Inc. ("CME"), one of the largest incumbent marketplaces for traditional dated futures.[38] In its complaint, CME argues that perpetual contracts are swaps under the CEA because, by virtue of the funding payment mechanism, perpetual contracts "provide[] on an executory basis for the exchange . . . of 1 or more payments based on the value or level of . . . commodities."[39] However, regardless of whether a contract falls within any clause in subparagraph (A) of the CEA's swap definition, it is per se excluded from the swap definition to the extent it falls within any of the exclusions in subparagraph (B) of that definition, including the exclusion for futures contracts.[40]

CME argues that perpetual contracts are not futures contracts because they lack what CME calls the "defining characteristic" of futures contracts—"'future delivery' by a date certain."[41] Not only does this argument conflict with the position taken by CME in its comment letter responding to the Commission's request for comment on perpetual-style derivatives, where it stated that "certain perpetual-style derivative contracts may accurately be classified as futures,"[42] but it is predicated on a red herring. Although courts have, at times, described futures contracts as providing for the purchase or sale of a commodity "on a date certain"[43] or "at or before a stated future time,"[44] no court has held that future delivery on a specified future date is a necessary condition for a contract to be a futures contract. To the contrary, courts have repeatedly explained that "[w]hile futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[45]

For example, in a holding to which CME was the very beneficiary, the Seventh Circuit in CME v. SEC concluded that contracts of "indefinite duration" can possess the attribute of "futurity"—generally associated with futures contracts[46]—because futurity means "value that is

---

[37] See supra note 34.
[38] See Chicago Mercantile Exchange Inc. v. Selig and Commodity Futures Trading Commission, Case No. 26-cv-02157 (D.D.C. June 18, 2026) ("CME v. Selig").
[39] 7 U.S.C. § 1a(47)(A)(iii).
[40] 7 U.S.C. § 1a(47)(B)(i).
[41] CME v. Selig at 35, 36.
[42] Letter from Jonathan Marcus, Senior Managing Dir. & Gen. Couns., CME Grp. Inc., to Christopher J. Kirkpatrick, Sec'y of the Comm'n, 2 (May 21, 2025).
[43] Tauber at 971.
[44] CFTC v. Erskine, 512 F.3d 309, 323 (6th Cir. 2008).
[45] Standard Forex II, 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29; see also CFTC v. Intern. Fin. Servs., 323 F. Supp. 2d 482, 498 (S.D.N.Y. 2004) ("defendants wrongly characterize certain indicia of futures contracts as essential features of such contracts . . . [t]hey cite no authority" for the proposition that a transaction without a fixed date for future delivery cannot be a futures contract); CFTC v. International Foreign Curren., 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").
[46] See CFTC v. First Lexington Group, LLC, No. 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[47] And, in Zelener, the Commission itself took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[48]

As described above, the Contracts possess all of the relevant characteristics of futures contracts, and their disqualification from categorization as futures contracts on the basis of their indefinite duration cuts directly against established precedent. And, as discussed above, if the Contracts qualify as futures contracts, then they are not swaps.

CME attempts to support its misguided argument that perpetual contracts must be swaps, and not futures, by noting that "[t]he swap-future distinction does not turn on whether a product is standardized, exchange-traded, or centrally cleared" because "[a]lthough swaps historically were traded over-the-counter, many swaps are now standardized, DCM-traded, and centrally cleared."[49] As CME itself has explained in a prior comment letter to the Commission, although it is true that, following enactment of the Dodd-Frank Act, several of the "significant distinctions between futures and swaps [were] eliminated," the Dodd-Frank Act "preserves 'customer choice.' That is, under [the Dodd-Frank Act] market participants retain the option to trade products as either 'futures' or 'swaps.'"[50]

The changes brought about by Dodd-Frank led CME and other market participants to request that the Commission clarify that a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a SEF, since futures and swaps are indistinguishable in material economic effects."[51] The Commission declined to provide that clarification, underscoring the continued relevance of standardization and exchange-trading in the product categorization analysis.[52] Although the Commission noted that "the presence or absence of clearing . . . may no longer be relevant" to distinguish futures from swaps in light of

---

[47] CME v. SEC at 541. The contracts at issue in CME v. SEC—"index participations" or "IPs"—were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day," while the buyer paid the seller for the IP in cash on the date of sale. Id. at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the index stocks paid during the prior quarter. Id. The IPs thus resemble the Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract.

[48] See CFTC v. Zelener, 373 F.3d 861, 863 (7th Cir. 2004) ("Zelener"). Although the court ruled against the CFTC in Zelener, the facts in that case contrast with those here. There, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign-currency prices without taking delivery. Id. Customers did not purchase identical contracts, and their contracts did not provide a right of offset. Id. at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on Kalshi.

[49] CME v. Selig at 18.

[50] Letter from Craig S. Donohue, Chief Exec. Officer, CME Grp. Inc., to David A. Stawick, Sec'y of the Comm'n, 4 (July 22, 2011).

[51] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48,303 (Aug. 13, 2012) (the "2012 Definitional Release").

[52] 2012 Definitional Release at 48,303.

Dodd-Frank's grant of authority to the Commission to mandate swaps for central clearing,[53] the Commission did not address the other relevant factors, such as standardization, exchange trading, and retail participation. Those factors continue to be relevant to distinguish futures contracts from centrally cleared swaps, such as interest-rate swaps and credit default swaps, which in many cases are not standardized as to tenor or size (among other terms) and trade on swap execution facilities ("SEFs"), which may lack the centralized market characteristics of a DCM (e.g., SEFs can permit trading via request for quote in addition to an order book) and lack retail participation. The Commission went on to say that "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."[54] This is consistent with the view expressed by CME in its response to the Commission's recent request for comment regarding the trading and clearing of perpetual-style derivatives—that certain perpetual-style derivatives contracts may be appropriately categorized as futures[55]—but inconsistent with its argument in the CME v. Selig complaint.

CME also argues that the Commission's approval of the BTCPERP Contract for listing as a futures contract is inconsistent with its prior position, taken in certain enforcement actions, that perpetual-duration digital-asset derivative products constitute swaps.[56] However, in all but one of these cases, the Commission looked only to features of the products at issue relevant to whether they fell within the scope of CEA Section 1a(47)(A)(iii). The Commission did not address whether such products were futures contracts, which would be excluded from the swap definition. As discussed above, the fact that a contract falls within the scope of CEA Section 1a(47)(A)(iii)—because it "transfers, as between the parties to the transaction . . . the financial risk associated with a future change" in the price of the underlying asset—is not determinative of its regulatory categorization if the product qualifies as a futures contract.[57]

The only instance in which the Commission has addressed the possibility that perpetual-duration digital-asset derivative products could be excluded from the "swap" definition as futures contracts is in a single footnote in the Commission's response to Binance's Motion to Dismiss.[58] However, as noted by the Commission, Binance failed to meaningfully address why the perpetual contracts at issue were futures contracts under applicable case law and Commission precedent; in particular, Binance relied on the sole point that positions in their contracts could be closed by offset, and failed to reference any particular facts indicating the other key characteristics of futures contracts identified in the BTCPERPs Order.[59]

Because no party in the Binance litigation, or any other litigation or enforcement action that we have identified, has raised the question of whether perpetual-duration digital-asset derivative products are futures contracts under the body of judicial and Commission case law identifying the key characteristics of futures contracts, the Commission has yet to squarely address this

---

[53] See id.; 7 U.S.C. § 2(h)(1).
[54] See supra note 53.
[55] See supra note 43.
[56] See Complaint, CFTC v. Changpeng Zhao, No. 23-cv-01887 (Mar. 27, 2023) ("Binance"); Complaint, CFTC v. MEK Global Ltd., No. 24-cv-2255 (Mar. 26, 2024); Complaint, CFTC v. Eisenberg, No. 23-cv-00173 (Jan. 9, 2023); Complaint, CFTC v. HDR Global Trading Ltd., No. 20-cv-8132 (Oct. 1, 2020); In re Deridex, Inc., CFTC No. 23-42 (Sept. 7, 2023).
[57] See supra note 41.
[58] Plaintiff Response to Defendants' Motion to Dismiss, Binance, at note 14 (Sept. 22, 2023).
[59] Brief in Support of Defendants' Motion to Dismiss, Binance, at note 19 (July 27, 2023).

question. That the product categorization of perpetual contracts remained an open question at that time is made all the more clear by the fact that the Commission specifically requested comment as to whether perpetual derivatives should "be classified as swaps or futures contracts" in its request for comment on the trading and clearing of perpetual-style derivatives last year.[60]

Based on this analysis, Kalshi is of the view that the Contract is appropriately categorized as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.

### B. ***The Contract Complies with the Core Principles***

The Exchange has conducted a comprehensive analysis of the designated contract market core principles ("Core Principles") as set forth in Part 38 of the Act. The Core Principles relevant to the Contract are outlined and discussed in further detail in the next appendix.

---

[60] CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives, question 13 (Apr. 21, 2025).

## APPENDIX F – ADDITIONAL COMPLIANCE WITH CORE PRINCIPLES

**Core Principle 2 - Compliance with Rules and Impartial Access:** The Exchange has adopted the Rulebook, which provides the requirements for accessing and trading on the Exchange. Pursuant to Chapters 2, 3, and 5 of the Rulebook, in utilizing the Exchange's services, all Members must comply with the Rules, cooperate with Exchange investigations, inquiries, audits, examinations and proceedings, and engage in conduct consistent with just and equitable principles of trade. Chapter 3 of the Rulebook also provides clear and transparent access criteria and requirements for Exchange Members. Trading in the Contract will be subject to all of the Rules, which are aimed at enforcing market integrity and customer protection. Further, Section 3.2 of the Klear rulebook includes clear and transparent criteria for clearing members eligible to clear transactions in the Contract through Klear, providing that the Contract will be available to all clearing members of Klear, either directly (for clearing members who are eligible contract participants) or indirectly through a futures commission merchant clearing member.

In particular, Chapter 5 of the Rulebook sets forth the Exchange's Prohibited Transactions and Activities and specifically prescribes the methods by which Members trade contracts, including the Contract. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. As described in Rule 9.1, the Exchange conducts trade practice surveillance, market surveillance, and real-time market monitoring to ensure that Members adhere to the Rules of the Exchange. The Exchange, through the compliance department, initiates review and, where appropriate, investigates unusual trading activity. The compliance department also investigates any time it has other reason to believe that inappropriate activity of any sort is taking place on the Kalshi Platform or its website.

Core Principle 2 also stipulates that an exchange shall establish means to provide market participants with impartial access to the market. Chapter 3 of the Rulebook, and Rule 3.1 in particular, provides clear and transparent access criteria and requirements for Members. The Exchange will apply access criteria in an impartial manner, including through the application process described in Rule 3.1.

**Core Principle 3 - Contract not Readily Subject to Manipulation:**

Core Principle 3 and Rule 38.200 provide that a DCM shall not list for trading contracts that are readily susceptible to manipulation. The Exchange's marketplace and contracts, including this Contract, have been designed in accordance with this fundamental principle. The Exchange maintains various safeguards against price manipulation and all other forms of manipulation, including (i) real-time market monitoring, automated trade surveillance, and suspicious behavior detection, (ii) Rulebook prohibitions, Member certification, and notification, (iii) Member monitoring and know-your-customer verification, and (iv) sanctions. These safeguards will be applied with respect to trading in the Contract and render the Contract not readily susceptible to manipulation.

**(i) Real-time market monitoring, automated trade surveillance, and suspicious behavior detection:** Kalshi conducts real-time market monitoring of all trading activity on the Exchange

to identify disorderly trading and any market or system anomalies. As described in Rule 5.11, Kalshi has the authority to adjust trade prices or cancel trades when necessary to mitigate market-disrupting events caused by malfunctions in its electronic trading platform or errors in orders submitted by members and market participants. Any trade price adjustments or trade cancellations must be transparent to the market and subject to standards that are clear, fair, and publicly available. Kalshi also maintains an automated trade surveillance system capable of detecting and investigating potential trade practice violations. The automated system loads and processes orders and trades as they occur on the Exchange (well within 24 hours after the completion of the trading day stated in Commission Regulation 38.156). The automated trade surveillance system has the ability to detect and flag specific trade execution patterns and trade anomalies; compute, retain, and compare trading statistics; compute trade gains, losses, and positions; reconstruct the sequence of market activity; perform market analyses; and support system users to perform in-depth analyses and ad hoc queries of trade-related data. As described in Rule 9.2(a), Kalshi's Compliance Department investigates unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of Kalshi's Rules, or upon the receipt of a request from Commission staff. The Exchange disciplinary process is conducted in accordance with Chapter 9 of the Exchange Rulebook, and penalties may be imposed in accordance with Rule 9.5.

**(ii) Rulebook prohibitions, member certification and notification:** The Exchange's Rulebook includes various provisions that prohibit manipulative behaviors and gives the Exchange the authority to investigate potential violations of its rules. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. The Exchange's Surveillance Officers, which operate within the Compliance Department, perform trade practice surveillance and real-time market monitoring. The Rulebook also imposes sanctions on Members who break rules, including fines, disgorgement, and revocation of membership. Only Members are allowed to trade on the Exchange, and Members cannot complete the account creation process and trade on the Exchange until they certify that they have read the Exchange's rules and agree to be bound by them.

**(iii) Member monitoring and know-your-customer verification ("KYC"):** The Exchange has a robust KYC process that helps flag and uncover higher-risk traders before they become Members of the platform, ensuring that the Exchange has access to all of its members' personal identifying information for use in its surveillance. During the application process, individual applicants are required to share personally identifiable information, such as their full legal name, social security number, date of birth, and address with the Exchange. Applicant information is run through a comprehensive set of databases that are actively compiled and maintained by an independent third party, and through adverse media databases, to trigger enhanced due diligence where appropriate.

**(iv) Sanctions:** Exchange Members must agree to the terms and conditions of the Exchange's Rulebook before being allowed to trade and are subject to disciplinary actions and fines for engaging in improper market conduct. In the event that suspicious trading activity is detected and results in an investigation, market participants are required to provide the Exchange with information relevant to the scope of the investigation under Rule 3.6. Chapter 9 of the Exchange's Rulebook details the process for discipline and rule enforcement, ranging from a

letter of warning to fines to referral to governmental authorities that can result in criminal prosecution.

In addition to the foregoing surveillance, enforcement, and KYC safeguards, the Exchange maintains pre-trade risk controls designed to prevent erroneous or manipulative order entry in the COPPERPERP Contract, including price banding, order size limits, and position exposure limits. The Exchange applies a price-band check to incoming orders before they are inserted into the order book, calculated by reference to the then-current relevant top-of-book price; incoming orders priced outside the applicable band are rejected before insertion. The price-band check is a pre-insertion control and does not operate as an automatic cancellation mechanism for resting orders. The Exchange may also impose order size limits and position exposure limits to mitigate excessive concentration and market disruption risk, including during periods when the underlying reference market is closed. Together, these pre-trade controls provide complementary protections against erroneous order entry, disorderly trading, excessive concentration, and related risks to market integrity.

Moreover, the specifics of the COPPERPERP Contract satisfy the Core Principle 3 standard through multiple, independent, and mutually reinforcing layers of structural design and institutional safeguards, as set forth below.

**[Remaining CP3 analysis filed confidentially]**

**Core Principle 4 - Prevention of Market Disruption:** Trading in the Contract will be subject to the Rules of the Exchange, which include prohibitions on manipulation. Trading activity in the Contract will be subject to monitoring and surveillance by the Exchange's Market Surveillance Department. In particular, the Exchange's trade surveillance system monitors the trading on the Exchange to detect and prevent activities that threaten market integrity and market fairness, including manipulation, price distortion, and disruptions of the settlement process. The Exchange also performs real-time market surveillance. The Exchange sets position accountability levels, maintains both a trade practice and market surveillance program to monitor for market abuses, including manipulation, and has disciplinary procedures for violations of the Rulebook.

**Core Principle 5 - Position Limitations:**

Kalshi has conducted an analysis of position limits in connection with this product. The Contract specification includes a Position Accountability Level of $5,000,000 in mark-to-market position value, with short positions evaluated on an equivalent long basis, together with the hard federal position limit set forth in the Appendix A specification and the Exchange Rulebook. Unlike Bitcoin, copper is a commodity for which the Commission has established federal speculative position limits: COMEX Copper (HG) is one of the core referenced futures contracts enumerated in Regulation 150.2(d), and futures, options, and swaps that are directly or indirectly linked to the price of that core referenced futures contract, or to the price of the same commodity, may constitute "referenced contracts" within the meaning of Part 150. The Contract is treated as a cash-settled Referenced Contract in copper and is subject to the federal spot-month limit for COMEX Copper (1,000 contracts), which—expressed in the Contract's 1,000-pound unit, the COMEX Copper contract representing 25,000 pounds—corresponds to a limit of 25,000

Contracts, with bona fide hedge and spread exemptions under 17 CFR 150.3.[61] The Exchange has designed the Contract, and will administer position limits for it, with that framework squarely in view.

**Core Principles 7 and 8 - Availability of General Information and Daily Publication of Trading Information:** Core Principles 7 and 8, implemented by Regulations Sections 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges, the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market, and the rules and specifications describing the operation of the contract market's electronic matching platform.

Rule 2.17 of the Rulebook sets forth the rules for publicizing information. The Rulebook and the specifications of each contract listed on the Exchange, including the Contract, are made public on the Exchange website and remain accessible via the platform. The Exchange will post non-confidential materials associated with regulatory filings, including the Rulebook, at the time the Exchange submits such filings to the Commission. Consistent with Rule 2.17 of the Rulebook, the Exchange website will publish contract specifications, terms, and conditions, as well as daily trading volume and open interest for the Contract. Each contract has a dedicated "Market Page" on the Kalshi Exchange platform, which will contain the information described above as well as a link to the Underlying price index. Chapter 5 sets forth the rules, regulations and mechanisms for executing transactions, and the rules and specifications for Kalshi's trading systems.

**Core Principle 11 - Financial Integrity of Transactions:** Each Member must be in good standing and in compliance with the Member eligibility standards set forth in Chapter 3 of the Rulebook. All contracts offered by the Exchange, including the Contract, are cleared through the Clearinghouse, a Derivatives Clearing Organization ("DCO") registered with the CFTC and subject to all CFTC Regulations related thereto. The Exchange requires that Members post initial margin before entering into positions and maintain maintenance margin throughout the life of a position. Margin requirements are calculated using the Exchange's risk-based margin methodology and are designed to ensure that the Exchange can liquidate positions in an orderly manner before losses exceed posted collateral. Positions that fall below maintenance margin levels are subject to liquidation. The protection of customer funds is monitored by the Exchange and ensured by the Clearinghouse as member property or futures commission merchant customer property.

**All Remaining Requirements:** All remaining Core Principles are satisfied through operation of the Exchange's Rules, processes, and policies applicable to the other contracts traded thereon.

---

[61] Position Limits for Derivatives, 86 Fed. Reg. 3236 (Jan. 14, 2021) (final rule); 17 C.F.R. § 150.2(d) (listing COMEX Copper (HG) among the core referenced futures contracts, alongside COMEX Gold (GC), COMEX Silver (SI), NYMEX Palladium (PA), and NYMEX Platinum (PL)); 17 C.F.R. § 150.1 (defining "referenced contract").