# EXHIBIT C

**As approved by the Commission**
*(subject to Office of the Federal Register technical corrections)*

**6351-01-P**

**COMMODITY FUTURES TRADING COMMISSION**

**17 CFR Parts 1, 38**

**RIN 3038-AF77**

**Request for Comment on the Listing of Compute Derivatives Contracts**

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Request for Comment.

**SUMMARY:** The Commodity Futures Trading Commission ("CFTC" or "Commission") is seeking public responses to this Request for Comment to better inform its understanding and oversight of derivatives markets in compute.

**DATES:** Comments must be received on or before **[INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]**.

**ADDRESSES:** You may submit comments, specifically referencing **"Request for Comment on the Listing of Compute Derivatives Contracts"** and RIN 3038-AF77, by any of the following methods:

- **Regulations.gov:** Go to *https://www.regulations.gov* and press the "Search" button, then proceed as follows:

1. Under Refine Documents Results – check the box to "Only show documents open for comment";

2. Under Agency – select "See More" and check the box for "Commodity Futures Trading Commission," then press the Apply button;

3. Identify this proposal in the list of CFTC documents open for comment, press the "Comment" button to open the submission form, and follow the instructions on the form.

Alternatively, if you are viewing this proposal on *www.federalregister.gov*, click the "Submit A Public Comment" button at the top of the page to open the comment form. Follow the instructions on the form to submit your comment to Regulations.gov.

- **Mail:** Send to – Christopher Kirkpatrick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.
- **Hand Delivery/Courier:** Address to – CFTC Comment Submission, Attn: Christopher Kirkpatrick, Secretary of the Commission, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

Please submit your comments using only one of these methods. To avoid possible delays with mail or in-person deliveries, submissions through Regulations.gov are encouraged.

All comments must be submitted in English or, if not, accompanied by an English translation. Do not include in your comment text or attachments any personal identifying information or business information that you do not want published online. Comments (regardless of submission method) will be published without review for, and without removal of, any personal identifying information or information your business may consider confidential.

If you wish to submit confidential information for the Commission's consideration, please contact the CFTC personnel listed in this Notice under FOR

FURTHER INFORMATION CONTACT before making any submission. Please also carefully review the Commission's procedures in 17 CFR 145.9 for requesting confidential treatment under the Freedom of Information Act ("FOIA") of information submitted to the Commission.

The CFTC reserves the right, but shall have no obligation, to review, pre-screen, filter, or redact all or any part of your comment submission. The CFTC also reserves the right, without further notification, to refuse to publish or to remove from public view all or any part of your submission to the extent it contains content inappropriate for publication in a comment file, such as – without limitation – obscene language, threats of violence, solicitations for commercial sales or illegal activity, or obvious spam. If a submission that is refused for or withdrawn from publication because of inappropriate content also contains comments on the merits of this proposal, such submission will be retained in the record for the matter and will be considered as required under the Administrative Procedure Act and other applicable laws, and may be accessible under the FOIA.

**FOR FURTHER INFORMATION CONTACT:**

Tyler S. Badgley, General Counsel, rulemaking@cftc.gov, 202-418-5000, Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581; Stephen Andrews, Deputy General Counsel for Regulation, rulemaking@cftc.gov, 202-418-5000, Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581; Aaron Levine, rulemaking@cftc.gov, 646-746-9700, Office of the General Counsel, Commodity Futures Trading Commission, 290 Broadway,

New York, NY 10007; and, CFTC Innovation Task Force, Innovation@CFTC.gov, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

*a. Background*

The derivatives markets that the Commission oversees pursuant to the Commodity Exchange Act ("CEA" or the "Act") are "affected with a national public interest" because they facilitate risk management and price discovery "through trading in liquid, fair and financially secure trading facilities."[1] Under the Commission's oversight, the Act seeks to deter disruptions to market integrity, ensure the financial integrity of transactions, avoid systemic risk, and promote responsible innovation and fair competition.[2] In its oversight of the derivatives markets subject to the Act and in order to minimize market disruptions and protect market participants, the Commission may prescribe by rule, regulation, or order the terms and conditions on which a designated contract market ("DCM") may list a contract for trading.[3]

As discussed further below, this request for comment addresses an emerging class of derivatives contracts that reference the price of access to computing power ("compute"),[4] which is the processing power primarily used by the large language models ("LLMs") at the center of the artificial intelligence ("AI") economy. AI anchors a large and

---

[1] CEA section 3, 7 U.S.C. 5.

[2] CEA section 3(b), 7 U.S.C. 5(b).

[3] CEA section 5c(c), 7 U.S.C. 7a-2(c); *see also* CEA section 5(d), 7 U.S.C. 7(d).

[4] This request for comment uses "compute", "compute capacity", "compute services" and similar terms interchangeably depending on the context.

growing share of the U.S. economy and public equity markets and, accordingly, compute has become a multi-hundred-billion-dollar enterprise[5] and is a scarce, capital-intensive commodity.

The Commission is seeking comment on the factors that a DCM should consider when addressing certain provisions of the CEA and CFTC regulations thereunder that are relevant to the listing for trading of derivatives with compute as the underlier ("compute derivatives").[6] The Commission recognizes that compute derivatives are a comparatively new and evolving class of products, and believes responses from industry participants may enable it to advance the standardization of such products in a manner that promotes transparency, liquidity, and responsible innovation. The Commission invites comment on the specific questions set forth in Section II related to the listing for trading of compute derivatives, as well as on all aspects of the compute markets (including those not mentioned herein).

*b. The Regulatory Framework for Designated Contract Markets*

DCMs are CFTC-regulated exchanges that provide participants in the derivatives markets with the ability to trade derivative contracts.[7] In order to obtain and maintain

---

[5] Federico M. Bandi, *(Early) AI Compute Asset Pricing* (Jul. 1, 2026) ("(Early) AI Compute Asset Pricing") ("The economic scale of AI compute is already macroeconomically material. Based on our calculations, the 2025-Q4 installed compute stock already implies a gross compute service flow of around $430 billion to $1.3 trillion per year, or approximately 1.4% to 4.0% of U.S. GDP.").

[6] While this request for comment primarily focuses on the listing of compute derivatives by DCMs, the Commission further seeks comment on issues that may arise in connection with a swap execution facility ("SEF") listing a contracts that settle to the price of compute, or physically-settled compute swap contracts.

[7] *See* CEA section 1a(6), 7 U.S.C. 1a(6) (defining the term "board of trade" to mean any organized exchange or other trading facility); CEA section 1a(51)(A), 7 U.S.C. 1a(51)(A) (defining the term "trading facility" to mean a person or group of persons that constitutes, maintains, or provides a physical or electronic facility or system in which multiple participants have the ability to execute or trade agreements, contracts, or transactions— (i) by accepting bids or offers made by other participants that are open to multiple participants in the facility or system; or (ii) through the interaction of multiple bids or multiple offers within a system with a pre-determined non- discretionary automated trade matching or execution algorithm); and CEA section 5(d)(1)(A), 7 U.S.C. 7(d)(1)(A) (providing that to be designated, and maintain a designation, as a contract

designation as contract markets with the CFTC, DCMs must comply with statutory "Core Principles" that are set forth in the CEA,[8] as well as applicable CFTC rules and regulations promulgated thereunder.[9] The statutory Core Principles for DCMs reflect the important role that these exchanges play in promoting the integrity of derivatives markets. DCMs are self-regulatory organizations, and each DCM has Core Principle obligations to, among other matters, establish and enforce rules for trading on the DCM[10] and provide a competitive, open and efficient market for trading.[11] Therefore, although each DCM is a commercial enterprise, the fact that each entity has self-regulatory obligations means that each entity "is not simply a corporation, but a corporation charged with the public trust."[12]

Section 3(b) of the CEA confers on the Commission the responsibility to ensure that each DCM appropriately prioritizes its self-regulatory obligations,[13] which include, *e.g.*, establishing and enforcing rules applicable to its member futures commission merchants ("FCMs") and other intermediaries with respect to their financial integrity,[14]

---

market, a board of trade shall comply with—(i) any core principle described in this subsection; and (ii) any requirement that the Commission may impose by rule or regulation pursuant to CEA section 8a(5)).

[8] *See, generally*, CEA section 5(d), 7 U.S.C. 7(d). There are 23 statutory Core Principles for DCMs.

[9] CEA section 5(d)(1)(A), 7 U.S.C. 7(d)(1)(A); 17 CFR part 38.

[10] DCM Core Principle 2 requires, among other things, that a DCM establish, monitor, and enforce compliance with the rules of the DCM, including access requirements, the terms and conditions of any contracts to be traded on the DCM, and rules prohibiting abusive trade practices on the DCM. DCM Core Principle 2 also requires a DCM to have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the DCM. CEA section 5(d)(2), 7 U.S.C. 7(d)(2); *see also* 17 CFR 38.150–.160.

[11] DCM Core Principle 9 requires, among other things, that a DCM provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market of the DCM. CEA section 5(d)(9), 7 U.S.C. 7(d)(9); *see also* 17 CFR 38.500.

[12] *See* "Requirements for Derivatives Clearing Organizations, Designated Contract Markets, and Swap Execution Facilities Regarding the Mitigation of Conflicts of Interest," Notice of Proposed Rulemaking, 75 FR 63732 (Oct. 18, 2010).

[13] CEA section 3(b), 7 U.S.C. 5(b).

[14] CEA section 5(d)(11), 7 U.S.C. 7(d)(11).

financial standards,[15] segregation of customer and proprietary funds,[16] custody of customer funds,[17] investment standards for customer funds,[18] default procedures,[19] and related recordkeeping.[20] Core Principle 11 also requires a DCM ensure the financial integrity of transactions entered into on or through its facilities by establishing and enforcing rules concerning the clearance and settlement thereof by a derivatives clearing organization.[21]

Each DCM also has a specific statutory obligation under DCM Core Principle 3 to only list for trading derivative contracts that are not readily susceptible to manipulation.[22] A DCM may elect to list a new derivative contract for trading either by “self-certifying” to the Commission that the contract complies with the CEA and CFTC regulations,[23] or by seeking Commission approval to list the contract.[24] In either case, the DCM must submit the contract’s terms and conditions, and other prescribed information relating to the contract, to the Commission prior to listing.[25]

Core Principle 4 further requires that DCMs have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash settlement

---

[15] 17 CFR 38.603.

[16] *Id.*

[17] *Id*.

[18] *Id*.

[19] *Id*.

[20] *Id*.

[21] CEA section 5(d)(11), 7 U.S.C. 7(d)(11).

[22] CEA section 5(d)(3), 7 U.S.C. 7(d)(3); *see also* 17 CFR 38.200–.201.

[23] CEA section 5c(c)(1), 7 U.S.C. 7a-2(c)(1); *see also* 17 CFR 40.2.

[24] CEA section 5c(c)(4)–(5), 7 U.S.C. 7a-2(c)(4)–(5); *see also* 17 CFR 40.3.

[25] *See generally* 17 CFR 40.2 and 40.3. Amendments to contract terms and conditions also must be submitted to the Commission in accordance with procedures set forth at CEA section 5c(c), 7 U.S.C. 7a-2(c), and 17 CFR part 40.

process, through market surveillance, compliance, and enforcement practices and procedures.[26]

For a number of the DCM Core Principles, the Commission has adopted rules that establish the manner in which a DCM must comply with the relevant Core Principle.[27] These implementing rules are set forth in part 38 of the Commission's regulations.[28] The Commission has also adopted, in appendix B to part 38,[29] guidance and acceptable practices for DCMs to consider with respect to certain of the Core Principles.[30] For example, the Appendix B Guidance provides that the detection and prevention of market manipulation, disruptions, and distortions should be incorporated into the design of programs a DCM uses to monitor trading activity.[31] Further, monitoring of intraday trading should include the capacity to detect developing market anomalies, including abnormal price movements and unusual trading volumes, and position-limit violations.[32]

Moreover, with respect to the DCM Core Principle 3 requirement that a DCM only list for trading derivatives contracts that are not readily susceptible to manipulation, the Commission has adopted guidance that is set forth in appendix C to part 38—Demonstration of Compliance That a Contract is Not Readily Susceptible to

---

[26] CEA section 5(d)(4), 7 U.S.C. 7(d)(4); *see also* 17 CFR 38.250–.258.

[27] Unless otherwise determined by the Commission by rule or regulation, a DCM has reasonable discretion in establishing the manner in which it complies with a Core Principle. CEA section 5(d)(1)(B), 7 U.S.C. 7(d)(1)(B).

[28] 17 CFR part 38.

[29] 17 CFR part 38, appendix B (the "Appendix B Guidance").

[30] *See* 17 CFR part 38, appendix C. Guidance set forth in the Appendix B Guidance states that a DCM may use the Appendix C Guidance as guidance in meeting DCM Core Principle 3 for both new product listings and existing listed contracts. 17 CFR part 38, Appendix B Guidance, Core Principle 3.

[31] Appendix B Guidance.

[32] *Id*.

Manipulation.[33] The Appendix C Guidance outlines certain relevant considerations for a DCM both when designing a derivative contract and providing supporting documentation and data in connection with the submission of the derivative contract listing to the Commission.[34] The Commission takes the considerations outlined in the Appendix C Guidance into account when determining whether, with respect to a particular contract, the DCM is satisfying its DCM Core Principle 3 obligation only to list derivatives contracts that are not readily susceptible to manipulation.

Among other matters, the Appendix C Guidance outlines, for both physically-settled and cash-settled derivatives contracts, certain considerations in connection with the design of the contract's rules and terms and conditions.[35] The Commission preliminarily understands that the majority of compute derivatives initially would be cash-settled because of the potential infrastructure-related challenges associated with delivering the underlying commodity. With respect to cash-settled derivative contracts, the Appendix C Guidance states that an acceptable specification of the cash settlement price would, among other things, include rules that fully describe the essential economic characteristics of the underlying commodity, as well as how the final settlement price is calculated.[36] The Appendix C Guidance further provides that the utility of a cash-settled contract for risk

---

[33] 17 CFR part 38, appendix C (the "Appendix C Guidance").

[34] *See Core Principles and Other Requirements for Designated Contract Markets*, 77 FR 36612, 36632 (June 19, 2012).

[35] Physically-settled derivative contracts are contracts that may settle directly into the commodity underlying the contract. If the holder of a position in a physically-settled derivative contract still has an open position at the expiration of trading in the contract, then the position holder must, in accordance with the rules for delivery set forth in the contract, make or take delivery (as applicable) of the underlying commodity. By contrast, cash-settled derivative contracts are, at the expiration of trading in the contract, settled by way of a cash payment instead of physical delivery of the underlying commodity.

[36] Appendix C Guidance, paragraph (c)(1).

management and price discovery purposes would be significantly impaired if the cash settlement price is not a reliable or robust indicator of the value of the underlying commodity.[37] Accordingly, the Appendix C Guidance states that careful consideration should be given to the potential for manipulation or distortion of the cash settlement price, as well as the reliability of that price as an indicator of cash market values.[38]

*c. Compute Markets*

*1. White House Directives*

The United States is in a race to achieve global dominance in AI. As the White House described in its July 2025 AI Action Plan ("AI Action Plan"), "whoever has the largest AI ecosystem will set global AI standards and reap broad economic and military benefits. . . . [I]t is imperative that the United States and its allies win this race."[39] Indeed, one of the recommended policy actions of America's AI Action Plan is to ensure access to large-scale compute for startups and academics by improving the financial market for compute.[40] President Trump took decisive steps toward achieving American AI leadership during his first days in office by signing Executive Order 14179, "Removing Barriers to American Leadership in Artificial Intelligence."[41] These actions echo the statutory purposes and objectives of the Commission that Congress codified in the Act in 1974,

---

[37] Appendix C Guidance, paragraph (c)(2).

[38] *Id.* The Appendix C Guidance requires appropriate consideration also should be given to the commercial acceptability, public availability, and timeliness of the price series that is used to calculate the cash settlement price.

[39] The White House, *Winning the Race: America's AI Action Plan* (July 23, 2025), *available at* https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

[40] *Id*. at 4.

[41] Executive Order 14179, *Removing Barriers to American Leadership in Artificial Intelligence*, 90 FR 8741 (Jan. 31, 2025).

including furthering the national public interest in the commodity derivative markets by promoting responsible innovation and fair competition therein.

### 2. *Overview of Potential Challenges in the Development in Compute Derivatives Markets*

The price of compute is one of the most material costs of AI that affects the entire AI production stack.[42] A compute futures market may therefore provide a means for managing and assuming price risks, discovering prices, or disseminating pricing information as to general trends in AI adoption. Futures markets aggregate the disparate views of individual market participants and are designed to reveal prices that allows such market participants to efficiently hedge risks or speculate (in this case, on, for example, the future scale of AI demand). In short, compute futures contracts would allow financial markets "to aggregate and reveal information about the future of the AI economy."[43]

However, there are potential challenges to the development of a mature compute derivatives market. The Commission preliminarily understands that compute markets are fragmented and price formation primarily occurs in opaque bilateral transactions, hindering the availability of current and historical price data, along with consensus still forming concerning the appropriate underlying "compute" commodity. Moreover, dominant market participants may wield significant pricing power that may lead to manipulability, preferential pricing arrangements, and, in turn, unfair market dynamics.

---

[42] NVIDIA CEO Jensen Huang described the AI stack as a five-layer cake, involving energy, chips, infrastructure, models, and applications. "The compute market sits at the interface between infrastructure and model production. Its price, therefore, contains information about both sides of the AI economy. On the supply side, it reflects the cost of deploying and operating data centers, which in turn depends on the cost of chips, energy and other inputs. On the demand side, it reflects the value of training and inference workloads, which in turn depends on the productivity of AI applications and, ultimately, on the scale of AI adoption." *(Early) AI Compute Asset Pricing*, at 3.

[43] *Id.*

Further, pricing can vary dramatically across providers, regions, and contract structures. In other words, the Commission preliminarily believes that compute may not yet exhibit certain of the characteristics of commodities that typically underlie a commodity derivatives market, including fungibility, standardization, and sufficient liquidity. [44] These complex issues are novel in some respects, but also informed by historical antecedents in the development of derivative markets in similar commodities.[45]

For example, with respect to fungibility and standardization, the Commission preliminarily understands that the commodity underlying a compute futures contract would typically be access to rented compute capacity from hardware the purchaser of such capacity does not own (*e.g.*, the hourly rental price of compute from a B200), though the underlier may be a different type of compute-related commodity, such as access to a stated volume of LLM inference tokens. The Commission preliminarily believes that the price of the compute underlying a futures contract would likely be derived from a bundle of factors (*e.g.*, provider, region, contract structures). Thus, it is the Commission's preliminary belief that the emergence of a compute derivatives market in accordance with Commission rules and regulations would likely require standardizing

---

[44] Dennis W. Carlton. *Futures markets: Their purpose, their history, their growth, their successes and failures*, 4 J. of Futures Mkts. 237–71 (1984); *see also Merrill Lynch v. Curran*, 456 U.S. 353 (1982) ("In the 19th century, the practice of trading in futures contracts led to the development of recognized exchanges or boards of trade. At such exchanges, standardized agreements covering specific quantities of graded agricultural commodities to be delivered during specified months in the future were bought and sold pursuant to rules developed by the traders themselves. Necessarily, the commodities subject to such contracts were fungible. For an active market in the contracts to develop, it also was essential that the contracts themselves be fungible. The exchanges therefore developed standard terms describing the quantity and quality of the commodity, the time and place of delivery, and the method of payment; the only variable was price. The purchase or sale of a futures contract on an exchange is therefore motivated by a single factor—the opportunity to make a profit (or to minimize the risk of loss) from a change in the market price.").

[45] *See, e.g.*, *Proposal To Exempt Certain Transactions Involving Not-for-Profit Electric Utilities*, 77 FR 164 (Aug. 23, 2012) ("Unlike many physical commodities, electric energy is not capable of being purchased in large commercial quantities ahead of time, delivered, and stored for later consumption or use. That is, electric energy must be used or consumed on an as-needed basis.").

variables typically associated with compute, both with respect to the price index used as a settlement reference, and with respect to the standards of compute that is required to be physically delivered.

## II. Request for Comment

The Commission has a statutory obligation under the CEA to, among other matters, foster the national public interest in the commodity derivatives markets by "promot[ing] responsible innovation" therein. In adherence to this obligation and the CEA's other purposes,[46] as well as the AI Action Plan and in light of the context set forth above, the Commission is seeking input on the following questions.

### 1. *Compute Cash Markets: Size, Liquidity, and Other Considerations*

a. How does observed price behavior in compute markets compare to price behavior in cash markets underlying derivatives that the Commission has customarily regulated? In responding, please distinguish between on-demand, spot, reserved, committed purchase modes, and state for each the volume transacted, the number of distinct counterparties transacting, and whether any transaction price is published. Are there particular commodity markets that the Commission should consider as being especially relevant or similar to the compute cash market?

b. What data sources, analyses, calculations, variables, or other factors should be used to determine the market size, liquidity, transaction volume, types of participants, and supplier concentration of compute markets? Please distinguish between

---

[46] *See* CEA section 3(b), 7 U.S.C. 5(b), providing that "it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets."

publicly available data sources and the data derived from non-public, bilateral agreements. How should the Commission consider the fact that, in the Commission's preliminary understanding, non-public, bilateral agreements carry the majority of economic value but tend to be undisclosed and negotiated privately?

c. What proportion of compute transactions occur at publicly disclosed prices, and what proportion does not? What data applicable to this question is available by voluntary disclosure, as opposed to obligations under statutory, regulatory, or contractual obligations? Would it be appropriate to permit trading in a derivative contract settling to a price computed from data that the Commission may not be able to observe, verify, or surveil, in whole or in part?

d. Have any audits, studies, or independent verifications of the transaction data referenced in question 1(c) above been conducted, and if so, what did they conclude?

e. How do the characteristics of the compute cash markets differ from those of the cash markets underlying derivatives customarily regulated by the Commission? Please address the following characteristics: (i) whether the underlying commodity is storable; (ii) whether a publicly observable transaction record exists, and what proportion of the total transaction volume it captures; (iii) the number of producers of the commodity and the share of commodity production attributable to the largest producers; (iv) the extent to which units of the commodity are fungible across producers without adjustment, and if not, what quality or grade adjustments are necessary to foster fungibility; and (v) whether any price reporting agency or enforced standardized methodology exists.

f. Please describe any potential effects on the cash market for compute that may arise in connection with the listing or trading of compute derivatives. In particular, would the existence of a listed futures contract settling to a published compute index change provider incentives with respect to the publication of posted rates, the pricing or structuring of bilateral reservations, the disclosure of utilization and committed capacity data, or the allocation of capacity amongst purchasers? How should the Commission consider whether the parties best positioned to influence the reference price are the same parties that supply capacity or contribute transactions or posted rates from which price is computed? Is this different from other derivative contracts and their commodity underliers?

g. Regarding DCM Core Principle 5, what would be an appropriate deliverable supply estimate methodology to evaluate the necessity and appropriateness of position limits or position accountability levels?

*2. Market Oversight and Susceptibility to Manipulation*

a. Core Principle 3 requires a DCM to list only contracts not readily susceptible to manipulation. What features would a compute derivatives contract that cash settles to an index calculated over predominantly bilateral and privately priced cash market transactions be required to demonstrate to satisfy that standard, consistent with the Appendix C Guidance?

b. Certain published compute price series are constructed in whole or in part from posted or listed rates that the compute capacity providers themselves administer, with the remainder of transactions executed on venues that a small number of participants operate or dominate. Are there protections or requirements that would

prevent a compute capacity provider from manipulating a cash settlement index by adjusting a posted rate, directing capacity onto or away from a venue whose transactions the index calculation methodology treats as input data, or by executing or declining to execute transactions during the observation window? Please describe any such protections or requirements which the Commission should consider.

c. What volume, transaction-frequency, and contributor concentration data typically characterize the population from which a compute reference price may be calculated? What thresholds would be appropriate for a compute settlement reference price given the idiosyncrasies of the cash markets for compute?

d. Core Principle 4 requires a DCM to have the capacity and responsibility to prevent manipulation, price distortion, and disruption of the delivery or cash-settlement process. What surveillance capabilities would be necessary to satisfy Core Principle 4 for compute derivatives, and are those capabilities presently feasible from a technological, operational, and legal perspective? Should a DCM be expected or required to maintain an information-sharing arrangement with each compute venue and each compute capacity provider whose transactions or posted rates enter a settlement reference price against which a compute derivative settles on the DCM?

e. What, if any, recalibration of market safeguards, risk controls, and liquidity protections should a DCM implement for compute derivatives to ensure price formation remains representative of genuine supply and demand, and to prevent thin liquidity conditions from resulting in disproportionate or runaway price movements that could influence benchmark markets?

f. Are there any types or patterns of trader or intermediary conduct that has occurred in the compute cash markets that raise market risks or challenges and should be monitored closely by trading venues or regulators? How do these risks and challenges compare to cash markets underlying more mature futures products?

g. Appendix C to part 38 provides that a cash-settled derivative contract is readily susceptible to manipulation if the settlement price is not reliable, acceptable, publicly available, and timely, and is computed from a cash market that is sufficiently liquid and not itself readily susceptible to manipulation. Is there a cash price series for compute cash markets that could serve as a reference price that satisfies those criteria? Please describe the series, its computation methodology and governance, and the venues and transaction volumes from which it is derived. What steps should the Commission take, if any, if no such cash price series is available?

h. The Appendix C Guidance addresses the adequacy of deliverable supply and susceptibility to squeezes and corners. What is the estimated deliverable supply for compute at the relevant pricing point or points and how are they measured? Please provide associated data.

i. Are there any other considerations the Commission should take into account with respect to evaluating a DCM's compliance with the Core Principles in connection with the listing and trading of compute derivatives?

*3. Customer Protection of Market Participants*

a. What heightened anti-money laundering and know your customers concerns, if any, are present in the compute markets, as compared to more mature commodities

markets? What challenges may introducing brokers, FCMs, and other intermediaries face in implementing a BSA/AML program for compute futures?

b. What customer-protection considerations, such as disclosure requirements arise from offering a compute derivatives contract settling against a geopolitically sensitive commodity, including to retail participants? How do these considerations differ, if at all, from derivatives that settle against other commodities, such as oil?

c. Should the terms and conditions of a compute futures contract be required to include any specific information related to idiosyncratic risks? If so, what are those idiosyncratic risks

d. What, if any, unique protections and prophylactic measures are appropriate or necessary for the protection of retail users of compute derivatives and markets, including as compared to other derivatives markets?

e. Are there any types of trader or intermediary conduct that are particular to compute cash markets and contemplated compute derivative markets, including any such conduct that may require additional action by the Commission?

*4. Perpetual Compute Futures*

a. Would perpetual compute futures have advantages for market participants over "traditional" or "fixed date" futures contracts? Would perpetual compute derivatives provide commercial risk management features that cannot be met with existing products?

b. Would perpetual compute derivatives pose any unique risks for market participants or the broader markets? Are there additional protections or safeguards that the

Commission or exchanges should adopt to mitigate risks associated with these products?

## III. General Request for Comment and Data

The Commission is requesting comment from the public on all aspects of these questions and encourages the public to provide any information that may provide value to the Commission as it considers compute derivatives markets. The Commission particularly encourages commenters to provide empirical and data-driven input.

## IV. Regulatory Planning and Review

This request for comment is a significant regulatory action under section 3(f) of Executive Order 12866, and has been reviewed by the Office of Management and Budget.

Issued in Washington, DC, on August 19, 2026, by the Commission.

Christopher Kirkpatrick,

Secretary of the Commission.