**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission; COMMODITY FUTURES TRADING COMMISSION,<br><br>Defendants. | Case No. 1:26-cv-02157 |

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

I. The CFTC's Regulation of U.S. Derivatives Markets ..... 3

II. Commission approval of perpetual-futures contracts ..... 6

LEGAL STANDARD ..... 10

ARGUMENT ..... 10

I. CME lacks standing to bring its claims ..... 10

A. There is no injury to CME ..... 11

1. CME fails to allege a financial injury to its bottom line ..... 12

2. CME fails to allege actual or imminent increase in competition ..... 17

B. CME's alleged injury would not be redressed by a favorable decision ..... 19

II. CME's claim is not in the "zone of interests" protected by the CEA ..... 22

CONCLUSION ..... 24

## TABLE OF AUTHORITIES

Cases

*Air Courier Conference v. American Postal Workers Union*,
498 U.S. 517 (1991) ....................21, 22

**Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)....................11, 12, 17–18

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015)....................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................10, 13

*Banner Health v. Burwell*,
126 F. Supp. 3d 28 (D.D.C. 2015)....................14

*CFTC v. R.J. Fitzgerald & Co.*,
310 F.3d 1321 (11th Cir. 2002) ....................24

*Citizens for Responsibility & Ethics in Washington v. Trump*,
971 F.3d 102 (2d Cir. 2020) ....................13

*Citizens for Responsibility & Ethics in Washington v. Trump*,
953 F.3d 178 (2d Cir. 2019) ....................11

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013) ....................10, 20

*County of Delaware v. Department of Transp.*,
554 F.3d 143 (D.C. Cir. 2009)....................19

*CSL Plasma Inc. v. U. S. Customs & Border Protection*,
33 F.4th 584 (D.C. Cir. 2022)....................22, 23

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ....................21

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)....................10

*Friends of Animals v. Ashe*,
174 F. Supp. 3d 20 (D.D.C. 2016)....................20

*Fulani v. Brady*,
935 F.2d 1324 (D.C. Cir. 1991)....................17

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) ....................14

*Honeywell Int'l Inc. v. EPA*,
374 F.3d 1363 (D.C. Cir. 2004)....................20

*Hurd v. District of Columbia*,
864 F.3d 671 (D.C. Cir. 2017)....................10

*Immigrant Advocates. Response Collaborative v. United States*,
2026 WL 746923 (D.D.C. Mar. 17, 2026) ....................10

*KERM, Inc. v. FCC*,
353 F.3d 57 (D.C. Cir. 2004)....................12, 13

*Lexmark International v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................22

*Louisiana Energy & Power Auth. v. FERC*,
141 F.3d 364 (D.C. Cir. 1998)....................19

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................11

*Mackinac Ctr. for Public Policy v. Cardona*,
102 F.4th 343 (6th Cir. 2024)....................13–14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ....................3

*ModernWest Longmont, LLC v. FAA*,
177 F.4th 290 (D.C. Cir. 2026)....................21

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002)....................13

**PSSI Global Services., L.L.C. v. FCC*,
983 F.3d 1 (D.C. Cir. 2020)....................12, 13, 16, 17–18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................1

Statutes

7 U.S.C. § 1a....................22

7 U.S.C. § 2....................2, 5

7 U.S.C. § 5....................5, 23, 24

7 U.S.C. § 7 ..........3, 4

7 U.S.C. § 7a-2 ..........5, 6, 20, 23

Commodity Futures Modernization Act of 2000,
Pub. L. No. 106-554, App. E, § 105(b), 114 Stat. 2763A–365, 2763A–379 (2000) ..........5

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010) ..........5

Regulations

17 C.F.R. § 40.2 ..........5, 6, 20

17 C.F.R. § 40.3 ..........6, 8, 9

Rules

Fed. R. Civ. P. 12(b)(1) ..........11

Fed. R. Civ. P. 12(b)(6) ..........21

Fed. R. Evid. P. 201(b) ..........14

Other Authorities

Policy Statement Concerning Swap Transactions,
54 Fed. Reg. 30,694 (July 21, 1989) ..........4

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
77 Fed. Reg. 48,208 (Aug. 13, 2012) ..........5, 20

Policy Statement Concerning the Listing of Perpetual Contracts,
91 Fed. Reg. 33,160 (June 3, 2026) ..........9, 10

Henry T.C. Hu, Swaps, *The Modern Process of Financial Innovation and the Vulnerability of a Regulatory Paradigm*, 138 U. Pa. L. Rev. 333, 347 (1989) ..........4

Jerry W. Markham, *The History of Commodity Futures Trading and its Regulation* 233 (1987) ..........4

Mark D. Young & William L. Stein, *Swap Transactions Under the Commodity Exchange Act: Is Congressional Action Needed?*, 76 Geo. L.J. 1917, 1938 (1988) ..........4

CFTC Letter No. 26-19, No-Action Positions Regarding Removal of Expiration Dates from Existing Digital Commodity Perpetual-Style Futures Contracts (June 12, 2026) ..........8, 9

Defendants Michael S. Selig and the Commodity Futures Trading Commission ("CFTC" or "Commission") file this statement of points and authorities in support of their motion to dismiss the complaint filed by Plaintiff Chicago Mercantile Exchange Inc. ("CME"), Dkt. No. 1 ("Compl.").

## INTRODUCTION

This lawsuit is much ado about nothing. CME claims to be injured by a CFTC order authorizing "perpetual futures contracts" on digital assets like bitcoin, *see* Dkt. No. 1.1 ("Order"), as well as a policy statement concerning perpetual futures more generally, *see* Dkt. No. 1.2 ("Policy Statement"). CME does not argue that it could not list this same type of futures contract—indeed, the Order and Policy Statement clarify that *any* CFTC-registered exchange can list perpetual futures on digital assets. Nor does CME argue that the Commission lacked authority to approve the listing of this type of contract. Instead, it claims that the Commission should have labeled them as "swaps" rather than "futures."

CME is wrong on the merits—perpetual futures *are* futures. But there is a more fundamental defect with this lawsuit: CME lacks standing. Article III requires that "plaintiffs must be able to sufficiently answer the question: 'What's it to you?[,]' " and CME has no serious answer to that question. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). It claims to suffer a "textbook competitive injury" because fellow exchange Kalshi (another CFTC Designated Contract Market or "DCM") can now "offer new derivatives products that will directly compete with CME's existing offerings in the market for retail investors." Compl. ¶ 10. But CME makes no plausible allegation that its bottom line will be affected by the Order. To the contrary, CME has publicly stated that its customers are not demanding perpetual futures, and its own publicly available data indicates that trading volume on its cryptocurrency futures contracts actually

*increased* after the Commission issued the Order. Furthermore, the Commission's Order clarifies that "Kalshi *and other DCMs* [can] list for trading" perpetual futures contracts based on digital commodities, Order at 8 (emphasis added), so CME is free to list the same type of perpetual futures as Kalshi or other DCMs. Thus, even if CME's vague assertions of competitive injury had any substance, those injuries are entirely self-inflicted and based on CME's refusal to list perpetual futures for trading.

Even if CME were injured by choosing not to list a contract that its competitors do, that injury is not redressable. CME's claim is not that the Commission *cannot* approve perpetual futures for trading. Rather, it is that the Commission should have classified these contracts as "swaps" rather than as "futures." Even if CME were right about that, a decision in its favor would not remedy any purported injury: Kalshi and other DCMs could simply offer the contracts as "swaps" rather than "futures" and, under CME's argument, would be on legally solid ground. That classification change may entail "regulatory and tax differences," Compl. ¶ 105, but there is no plausible allegation that CME's alleged competitive injuries would be abated simply because third-party DCMs and traders would be subject to different tax, reporting, or recordkeeping requirements.

Finally, CME is not within the "zone of interests" protected by the Commodity Exchange Act ("CEA"). Congress enacted the CEA to create a national system of futures markets with a national regulator and a self-regulatory structure to foster consumer protection and innovation in the CFTC's regulated marketplaces. CME's lawsuit seeks to use the CEA to protect its business from a competitor's classification decisions and stifle innovation. That goal is contrary to the interests the CEA protects and CME's claims should therefore be dismissed.

For these reasons, Defendants respectfully request that the Court dismiss the complaint.

## BACKGROUND

### I. The CFTC's Regulation of U.S. Derivatives Markets

The Commodity Exchange Act gives the CFTC "exclusive jurisdiction" to regulate American commodity derivatives markets. 7 U.S.C. § 2(a)(1)(A). A "derivative" is a financial instrument whose price "is directly dependent upon (i.e. derived from) the value of one or more underlying" assets or measures, like "commodities," "securities" or "any agreed upon pricing index or arrangement."[1] Futures contracts, options, and swaps are all types of derivatives.

Derivatives markets originated in agriculture. Prior to the 19th century, "[w]hen an entire crop was harvested and marketed within a short time-span, dramatic price fluctuations sometimes created severe hardship for farmers or for processors." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). To hedge against those fluctuations, farmers entered into futures contracts, which allowed them to fix "an agreed price on the basis of their judgment about expected market conditions at the time of delivery." *Id.* Their counterparties were speculators, "who owned no present interest in a commodity but anticipated a price [change]" and sought to profit from it. *Id.* While these contracts were nominally for "future delivery" of an agricultural commodity, they were virtually always financially settled and rarely involved actual delivery. Hedgers and speculators traded contracts with one another on organized exchanges, which today are CFTC-registered DCMs. 7 U.S.C. § 7.

Because the CEA does not contain a definition of a futures contract, exchanges have for decades pushed the frontier of what constitutes a futures contract, and those financial innovations have proven instrumental to the vibrancy of American capital markets. Indeed, CME has

[1] CFTC Glossary, "Derivative," https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm (last visited Aug. 4, 2026).

historically been at the forefront of this innovation. Over the course of the 20th century, CME expanded the futures contracts it offered to include a range of non-agricultural commodities—including precious metals, foreign-exchange rates, real estate, the level of the S&P 500, U.S. Treasury bonds, and the weather.[2] CME's launch of its "Globex" system in 1992 was instrumental in the evolution of the markets to electronic trading.[3] CME also launched the S&P 500 e-Mini suite to make futures trading of financially-settled products on this important financial index more accessible to retail investors.[4]

Swaps were another evolution in derivatives markets that first appeared in the 1980s. One of the first iterations was the interest-rate swap, which "[i]n its most basic form" involves (a) "one party (typically called the 'fixed rate payor') agreeing to make periodic payments to the other party which are fixed in amount in return for (b) the other party (typically called the "floating rate payor" or the "variable rate payor") agreeing to make periodic payments to the first party that vary with the 'prime rate,' 'LIBOR,' or some other benchmark of market interest rates." Henry T.C. Hu, *Swaps, The Modern Process of Financial Innovation and the Vulnerability of a Regulatory Paradigm*, 138 U. Pa. L. Rev. 333, 347 (1989). Markets quickly recognized that "swaps serve economic functions identical to futures contracts" and that "[m]any swaps [] satisfy the technical criteria of the futures contract definition." Mark D. Young & William L. Stein, *Swap Transactions Under the Commodity Exchange Act: Is Congressional Action Needed?*, 76 Geo. L.J. 1917, 1938

---

[2] CME Group, Midwest Grain Trade: History of Futures Exchanges, https://www.cmegroup.com/education/courses/introduction-to-futures/midwest-grain-trade-history-of-futures-exchanges (last visited Aug. 26, 2026); CME Group Overview, https://www.cmegroup.com/company/visit/files/cme-group-overview.pdf (last visited Aug. 26, 2026); CME Group, 2017 Product Anniversaries, https://www.cmegroup.com/company/product-anniversaries.html (last visited Aug. 26, 2026).

[3] *Id.*

[4] *Id.*; *see also* Compl. ¶¶ 31–36.

(1988); *see also* Jerry W. Markham, *The History of Commodity Futures Trading and its Regulation* 233 (1987) ("In effect, [swap] transactions provide many of the same benefits as the futures markets.").

After the Great Recession of 2008, which many attributed in large part to credit-default swaps, Congress subjected swaps to the CFTC's "exclusive jurisdiction." *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). Congress also required many swaps to be traded on a DCM. *Id.* § 723(a)(2) (codified at 7 U.S.C. § 2(e)). As CME itself recognized, the Dodd-Frank amendments "eliminated" "virtually all significant distinctions between futures and swaps."[5] *See also* 77 Fed. Reg. 48,208, 48,303 (Aug. 13, 2012) ("Prior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant.").

The CEA establishes a framework of "self-regulation" "under the oversight of the Commission," 7 U.S.C. § 5(b), and it contemplates that DCMs typically determine whether a derivatives contract will be listed as a future, option, or swap. *See id.* § 7a-2(c)(1) ("A registered entity may elect to list for trading or accept for clearing any new contract . . . by providing to the Commission . . . a written certification that the new contract . . . complies with this chapter (including regulations under this chapter)."). To that end, Commission Rule 40.2 allows a DCM to self-certify a contract by submitting information about the contract to the Commission and certifying that it complies with the CEA and Commission regulations. 17 C.F.R. § 40.2(a). Thus, "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view." 77 Fed. Reg. at 48,303. Unless the Commission issues a stay, a DCM

[5] Letter from Craig S. Donohue to David Stawick dated July 22, 2011, at 4, available at https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=47929.

can list its self-certified contract after one complete business day has elapsed. 17 C.F.R. § 40.2(a)(2), (c). And even where the Commission issues a stay, it nonetheless "*shall approve*" the contract "unless the Commission finds that the new contract . . . would violate [the CEA] (including regulations)." 7 U.S.C. § 7a-2(c)(5)(B) (emphasis added).

In the alternative, Commission Rule 40.3 allows a DCM to request that the Commission review and approve a new contract prior to listing it for trading and clearing. 17 C.F.R. § 40.3(a); *see also* 7 U.S.C. § 7a-2(c)(4)(A) ("A registered entity may request that the Commission grant prior approval to any new contract. . . ."). Again, "[t]he Commission *shall approve* a new product unless the terms and conditions of the product violate the Act or the Commission's regulations." 17 C.F.R. § 40.3(b) (emphasis added); *see also* 7 U.S.C. § 7a-2(c)(5)(B) (same). Unless the Commission issues a notice of non-approval, the contract is "deemed approved" after the conclusion of a review period of 45 days or more. 17 C.F.R. § 40.3(d).

## II. Commission approval of perpetual-futures contracts

This case is about "perpetual futures contracts." Like all futures contracts, perpetual futures allow traders to hedge and speculate on the future price movements of a commodity without acquiring that commodity. Specifically, a trader can take a "long" or "short" position on a commodity—the "long" profits when the price rises, and the "short" profits when the price falls. And like a future with a fixed expiration, perpetual futures require traders to post collateral, known as "margin," and when losses exceed the posted margin, the exchange will force closure of the trader's position. For example, imagine a trader takes a $10,000 "long" position on a bitcoin perpetual future and is required to post $1,000 (10%) in margin. If the price of the bitcoin perpetual increases by 5%, the trader will earn $500—which is a 50% return on the $1,000 margin. By contrast, if the price of the bitcoin perpetual falls by 5%, the trader will lose $500 (a 50% loss).

Futures with fixed expirations share the same dynamics and offer the same economic

exposure, with one key difference: fixed-date futures expire on a specified date; perpetuals do not expire. The expiration date ensures that the price of the future contract remains tethered to the market price of underlying commodity (the "spot" price).[6] Perpetual futures, by contrast, keep the contract price tethered to the spot price via a "funding rate" mechanism—a periodic payment that traders on one side of the contract make to traders on the other side. When the perpetual-future price is higher than the spot price, the demand for "long" positions is artificially high—so the "long" positions must pay the "short" positions, which decreases the incentive of holding a "long" position and forces the perpetual-future price down to the spot price. And when the perpetual-future price is below the spot price, the demand for "short" positions is artificially high—so payments flow the opposite direction and the perpetual-future price rises to the spot price. These payments often occur multiple times per day, which keeps the perpetual futures price in close sync with the spot price.

Perpetual futures have long been accessible to U.S. traders via offshore platforms, but the U.S. regulatory community has taken strides toward bringing these transactions onto U.S.-regulated exchanges where they can be subject to appropriate legal protections. In April 2025, the Commission sought public feedback on the issue, which prompted a number of comments from market participants.[7] Then in July 2025, the President's Working Group on Digital Asset Markets issued a report recommending that the Commission and the SEC permit various market

[6] This dynamic is called "convergence"—namely, that as the expiration date looms, the futures price and the spot price converge due to the threat of arbitrage. For example, if the price of a corn future was less than the spot price of corn, then a trader could simply buy a corn future, demand actual delivery of the corn, and immediately resell the corn at the market price for profit. Because of that potentiality, futures prices track spot prices.

[7] *See* CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Apr. 21, 2025), https://www.cftc.gov/media/12041/Perpetuals_RFC042125/download.

participants to access perpetual contracts through regulated intermediaries.[8]

U.S. exchanges, moreover, created "perpetual-style futures" that aimed to replicate the economics of true perpetual futures. For instance, Chicago Board Options Exchange ("Cboe") offers "continuous futures," which are futures with expirations extending up to 10 years.[9] Because the expiration is so distant, continuous futures use a "daily cash adjustment"—called a "Funding Amount"—to "keep[] futures prices closely aligned with their respective underlying reference rates."[10] By doing so, these long-dated futures "provide access to a perpetual-style futures product in a U.S.-regulated, intermediated environment and eliminate the need for investors to roll positions regularly."[11] Coinbase and Bitnomial likewise offered "perpetual-style futures [with] long-dated expiration dates, including up to 25 years," whose "fundamental mechanics . . . are identical to those" of a true perpetual.[12]

Against this backdrop, Kalshi—a CFTC-registered DCM—commenced efforts to list true perpetual futures in the United States, which culminated in a formal application under Commission Rule 40.3 to list a perpetual future that references the spot price of bitcoin (the "BTCPERP contract"). *See* Dkt. 1-4. In May, the Commission issued an Order approving the application. After explaining the contents of Kalshi's submission, Order at 1–5, the Commission found that "listing the BTCPERP Contract or making the BTCPERP Contract available for clearing or trading

---

[8] President's Working Group on Digital Asset Markets, *Strengthening American Leadership in Digital Financial Technology* at 143 (July 30, 2025), https://www.whitehouse.gov/wpcontent/uploads/2025/07/Digital-Assets-Report-EO14178.pdf.

[9] Cboe Continuous Futures, https://www.cboe.com/tradable-products/cryptocurrency/continuous-futures/ (last visited July 14, 2026).

[10] *Id.*

[11] *Id.*

[12] CFTC Letter No. 26-19, No-Action Positions Regarding Removal of Expiration Dates from Existing Digital Commodity Perpetual-Style Futures Contracts (June 12, 2026), https://www.cftc.gov/csl/26-19/download.

as a futures contract – a contract for sale of a commodity for future delivery – would not violate the CEA or the Commission's regulations thereunder," *Id.* at 6. The Commission further explained how the funding-rate mechanism would keep the perpetual price and spot price aligned, and why "characteristics of the underlying bitcoin spot market would support the effective functioning of the funding rate mechanism." *Id.* at 6–8. The Commission finally clarified that "Kalshi and other DCMs [could] list for trading, as futures contracts, the BTCPERP contract . . . and similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities," but that permission did not "extend to underlying asset classes other than digital commodities." *Id.* at 8; *see also* CFTC Letter No. 26-19, *supra* n.12 (no-action relief allowing Coinbase and Bitnomial to remove expiration dates from perpetual-style futures on digital commodities).

The Commission concurrently issued a Policy Statement. 91 Fed. Reg. 33,160 (June 3, 2026) (Dkt. 1-2). The Statement "does not impose any obligation on any person, modify or supersede any provision of the Commodity Exchange Act . . . or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity, and is not subject to the notice-and-comment requirements of the Administrative Procedure Act." *Id.* at 33,161. It simply expresses "the Commission's view that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3." *Id.*

CME filed this lawsuit against the Commission challenging the Order and Policy Statement. Dkt. No. 1.

## LEGAL STANDARD

"The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Although the Court "accept[s] the well-pleaded factual allegations as true and draw[s] all reasonable inferences from those allegations . . . threadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." *Id.* (citation modified). The plaintiff's "allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Immigrant Advocs. Response Collaborative v. United States*, 2026 WL 746923, at *3 (D.D.C. Mar. 17, 2026). "[A] court may consider materials outside the pleadings to determine its jurisdiction, and that includes materials necessary to determine whether the plaintiff has standing." Dkt. No. 29 at 2; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (same).

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (cleaned up). A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

### I. CME lacks standing to bring its claims

Article III requires a plaintiff to demonstrate a "concrete, particularized, and actual or imminent" injury that is "fairly traceable" to the defendant's "challenged action" and can be "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal citations omitted). CME lacks standing for two reasons. First, CME has suffered no injury: there is no plausible allegation that CME's bottom line has been or will be affected by the

offering of perpetual futures, and in any event, CME and its competitors are on identical footing because the Commission's Order and Policy Statement allow *any DCM, including CME,* to offer perpetual futures. Second, even if CME were harmed, a favorable decision would provide no redress because, even on CME's theory, perpetual contracts could be recertified as "swaps" rather than "futures," leaving CME in virtually the same position it is right now. Because CME lacks standing, the complaint should be dismissed for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

### A. There is no injury to CME

CME does not allege that a Commission action requires it do so something, or forbids it from doing something, as APA lawsuits usually allege. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that "there is ordinarily little question" of injury when "the plaintiff is himself an object of the action (or forgone action) at issue"). Rather, CME's theory is that the Order and the Policy Statement inflict *competitive injury*—that is, "because of unlawful conduct, [CME's] rivals enjoy a competitive advantage in the marketplace." *Citizens for Resp. & Ethics in Wash. v. Trump*, 953 F.3d 178, 190 (2d Cir. 2019), *vacated as moot sub. nom. Trump v. Citizens for Resp. & Ethics in Wash.*, 592 U.S. 1233 (2021); Compl. ¶¶ 10, 29.

Competitive-injury standing has two elements: (1) "a plaintiff must show that the challenged government action results in 'an actual or imminent increase in competition,'" and (2) "the plaintiff must also show that it is in fact 'a *direct* and *current* competitor' in that market, in which case the plaintiff's 'bottom line may be adversely affected by the challenged government action.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279–80 (D.C. Cir. 2023) (internal citations omitted). CME does not satisfy either of these elements: it has not alleged that its bottom line will be adversely affected or that it faces any actual or imminent increase in competition.

### 1. CME fails to allege a financial injury to its bottom line

For a plaintiff to show that its "bottom line may be adversely affected by the challenged government action," it "must make a concrete showing that it is in fact likely to suffer financial injury as a result of the challenged action." *KERM, Inc. v. FCC*, 353 F.3d 57, 60–61 (D.C. Cir. 2004); *see also PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020) (requiring a "concrete showing that the Order is likely to cause [the plaintiff] a financial injury"). Even if a competitor receives "favorable regulatory treatment" and there is increased competition, the plaintiff still must "identify a[] specific harm . . . that will result as a matter of economic logic." *PSSI Glob. Servs.*, 983 F.3d at 12. CME comes up short on the financial-injury prong for two independent reasons: first, the complaint fails plausibly to allege an actual or imminent financial injury, and second, CME's own public statements and trading data refute its threadbare allegations of injury.

**i.** The complaint does not allege any concrete financial consequences that are likely to result from the approval of perpetual futures. Instead, CME makes formulaic recitations that the approval of digital-asset perpetuals will "directly compete with CME's products aimed at the same customer base," Compl. ¶ 29, or that perpetual futures "are designed to draw away CME's customers who currently trade true Bitcoin and cryptocurrency futures," *id.* ¶ 45. At most, those allegations go to the first element of competitor standing ("actual or imminent increase in competition"), not the second ("the plaintiff's 'bottom line may be adversely affected by the challenged government action'"). *Air Excursions*, 66 F.4th at 279–80; *see, e.g., PSSI*, 983 F.3d at 11 ("Moreover, even if the SSOs did directly compete with the LSOs, they made no concrete showing that the Order is likely to cause them a financial injury."). If allegations of increased competition sufficed to give rise to standing, the financial-injury requirement would be surplusage.

Courts have rejected this sort of threadbare *ipse dixit* as insufficient to establish a competitive injury. *Iqbal*, 556 U.S. at 681 ("[B]are assertions" of injury that "amount to nothing more than a 'formulaic recitation of the elements'" are "conclusory and not entitled to be assumed true"). In *PSSI Global Services*, for instance, the plaintiffs asserted that "payments to [their competitors] will 'make the already strongest competitors even stronger,' give them 'much more flexibility when competing,' and allow them to 'corner niche markets.'" 983 F.3d at 11. "These statements," the D.C. Circuit held, do not "identify any specific harm to the [plaintiffs] that will result as a matter of economic logic." *Id.* at 12. Likewise, in *KERM*, the court of appeals held that the plaintiff "fail[ed] to establish standing on the basis of any competitive injury" by "vaguely assert[ing] only that it competes with" another and "serve[s] much of the same audience." 353 F.3d at 61. CME's allegations are more of the same.

To be sure, some forms of increased competition "harm competitors" "as a matter of 'economic logic,'" such as agency "orders permitting a new entrant into a fixed market" or "allowing a rival to sell a fungible good at a lower price." *PSSI Glob. Servs.*, 983 F.3d at 11. But it does not follow "as a matter of 'economic logic'" that the existence of perpetual futures will cause financial harm to CME. *Id.* To the contrary, CME's theory of injury requires speculating about a "chain of events" that "depends on the independent actions of third parties"—namely, that CME's customers will choose to stop trading CME's fixed-date futures on digital assets and will instead trade perpetual futures on digital assets offered on other exchanges. *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002). That chain of events can hardly be assumed, as "[m]arkets vary in terms of whether increased competition will yield harm." *Citizens for Resp. & Ethics in Washington v. Trump*, 971 F.3d 102, 108 (2d Cir. 2020) (Menashi, J., dissenting from the denial of rehearing en banc); *see Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 356

(6th Cir. 2024) (no competitor standing where "Plaintiffs' allegations regarding supply and demand and the impact of financial incentives on third-part[ies] . . . are wholly speculative"). CME makes no allegations beyond its say-so that customers will necessarily move from its existing products to perpetual futures. And there is no reason to think that result would necessarily follow. The derivatives market is not a zero-sum game—new product offerings can increase the pie for everyone. *See* Coalition Greenwich, *Drivers of derivatives markets growth in the year ahead* (Q1 2025) (explaining that "[r]etail participation in the derivatives markets is increasing around the world due to . . . new products" and that "[p]roduct innovation," including "digital asset contracts," "is driving growth in institutional markets as well").

**ii.** CME's failure to allege a financial injury notwithstanding, CME's own statements and data confirm that the company has suffered no financial injury and is not likely to imminently suffer one.[13] Nearly two months after the Commission issued the Order and Policy Statement, CME Group's Chairman and CEO stated on an earnings call that "[p]erpetual futures . . . do not appeal to our core customers" and that "[p]erpetual futures are in no way substitutes for the

[13] This Court has already acknowledged in this case it may "consider materials outside the pleadings … necessary to determine whether the plaintiff has standing." Dkt. No. 29 at 2. And elsewhere, it has held that "parties may cite to publicly available documents and that the Court may take judicial notice of such documents." *Banner Health v. Burwell*, 126 F. Supp. 3d 28, 61 (D.D.C. 2015) (Kollar-Kotelly, J.), *rev'd in part on other grounds* 867 F.3d 1323 (D.C. Cir. 2017); *see* Fed. R. Evid. P. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Indeed, CME has represented that "the Court's review would benefit from assessing [facts in] the record in evaluating Defendants' motion to dismiss," as it believes "[t]he record will almost certainly contain further evidence of CME's competitive injury." Dkt. No. 27 at 6. By the same token, the Court would "benefit from assessing" CME's own publicly available data, which is "evidence" that CME lacks "competitive injury." *Id.* "After all, in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).

institutional hedging tools that these customers rely on."[14] Further: "we have not heard demand from our customers for these products."[15] So according to CME's own public statements—and contrary to its conclusory assertions in its complaint—perpetual futures did not detract from its business in the two months following the Commission's Order and are not expected to detract from its business any time soon.

CME's assertions on its earnings call, rather than the allegations in its complaint, are backed up by CME's own publicly available data. CME's data show that the exchange saw *significantly increased* trading volume in digital-asset futures immediately after the Commission issued the Order and Policy Statement on May 29:

| | June 2026 Volume | May 2026 Volume | Percentage Change |
|---|---|---|---|
| Bitcoin Futures | 292,118 | 259,329 | +12.6% |
| Micro Bitcoin Futures | 1,611,107 | 1,113,719 | +44.7% |
| Ether Futures | 369,358 | 326,981 | +13.0% |
| Micro Ether Futures | 960,484 | 735,326 | +30.6% |

*See* CME Group, CME Exchange Volume Report – Monthly (July 2, 2026), available for download at https://www.cmegroup.com/ftp/webmthly/; *see also* Compl. ¶¶ 35 (emphasizing CME's offering of futures contracts in "cryptocurrencies like Bitcoin and Ether"). That data tracks CME Group's Q2 "Crypto Catch-Up" report, which stated that the Group's "Cryptocurrency suite demonstrated resilient momentum in Q2 2026, with [Average Daily Volume] rising 32% year-over-year to 250K contracts and average daily open interest (ADOI) holding steady at 216K

[14] CME Group Q2 2026 Earnings Introductory Script at 3 (July 22, 2026), https://investor.cmegroup.com/static-files/f03a4407-750b-4ce3-a3db-02d59b60b8a6.

[15] *Id.* at 4.

contracts."[16] Indeed, according to data from CME released on the date of the filing of this motion, CME's crypto futures continue to trade at higher volumes than they did before the Commisssion's Order and Policy Statement.

| | August 2026 Volume | May 2026 Volume | Percentage Change |
|---|---|---|---|
| Bitcoin Futures | 298,958 | 259,329 | +15.3% |
| Micro Bitcoin Futures | 1,370,250 | 1,113,719 | +23.0% |
| Ether Futures | 344,084 | 326,981 | +5.2% |
| Micro Ether Futures | 787,603 | 735,326 | +7.1% |

*See* CME Group, CME Exchange Volume Report – Monthly (Sept. 2, 2026); CME Group, CME Exchange Volume Report – Monthly (July 2, 2026), both available for download at https://www.cmegroup.com/ftp/webmthly/. If perpetual futures truly had an adverse effect on CME's dated futures, that surely would have appeared in the data three months in. But the data shows the opposite, and thus, CME cannot concretely show it has suffered, or will "likely" suffer, financial injury because of the Order and Policy Statement. *PSSI Glob. Servs.*, 983 F.3d at 11.

There is more. Although perpetual futures are new to U.S.-regulated exchanges, perpetual futures on offshore exchanges have long been available to U.S. traders, including CME's customers. Not only that, but perpetual-*style* futures with long-dated expiration dates have also traded on U.S. exchanges for some time. CME's CEO discussed that on the earnings call, too:

> Crypto perpetuals are not new, and existed before we even launched our crypto futures complex. We have built that business over the last nine years because our futures fill a market need that was not met by traditional crypto products, including perpetuals. *Our crypto futures volume is up over 7-fold in the past 3 years, despite the existence of crypto perpetuals.*

[16] *See* CME Group, Crypto Catch-Up | Q2 2026 (July 14, 2026), https://www.cmegroup.com/newsletters/quarterly-cryptocurrencies-report/2026-q2-cryptocurrency-highlights.html.

CME Group Q2 2026 Earnings, *supra* n.14 at 4 (emphasis added). If CME's crypto futures have historically thrived despite competition from perpetual futures, it does not follow "as a matter of economic logic" that it will suddenly face a financial setback from perpetual futures. *PSSI*, 983 F.3d at 12.

In short, CME has not alleged, and cannot plausibly allege, that it suffered a financial injury from the CFTC's authorization of perpetual futures contracts. CME therefore lacks standing.

### 2. CME fails to allege actual or imminent increase in competition

The complaint also fails to plausibly allege that CME will suffer an increase in competition as a result of the challenged actions. Critically, the Commission did not simply allow *Kalshi* to list perpetual futures for trading; it clarified that *any DCM*—including CME—can offer perpetual futures in digital commodities for trading. The basis of competitor standing, however, is that "a defendant's actions benefitted *a plaintiff's competitors*, and thereby caused the plaintiff's subsequent disadvantage"—not that the defendant treated the plaintiff and its competitor equally. *Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) (emphasis added).

Thus, to the extent CME's customers substitute toward perpetual futures over futures with fixed expirations (which apparently is not occurring, *supra* 14–17), CME is injured only if it chooses not to offer perpetual futures alongside its futures with fixed expirations. That would be a "self-inflicted harm," which "doesn't satisfy the basic requirements for standing." *National Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). And it certainly does not satisfy the requirements for *competitor* standing. As the D.C. Circuit has explained, even an agency action that "creates a skewed playing field" "does not confer competitor standing." *Air Excursions*, 66 F.4th at 280 (citation modified); *see also PSSI*, 983 F.3d at 11 ("favorable tax treatment" or "favorable regulatory treatment" that "has created an 'unfair

competitive atmosphere'" does not "establish competitor standing"). The Commission's Order and Policy Statement do not even do that: again, the Commission has created a level playing field that allows all DCMs to list perpetuals on digital assets.

CME, self-described as "the world's leading derivatives marketplace" which "offer[s] the widest range of global benchmark products across all major asset classes," would be well-positioned to list perpetual futures based on the Order and Policy Statement. *See* CME Group, "About Us," https://www.cmegroup.com/company/about-us.html. Again, CME's CEO recently acknowledged this:

> We have the full technical and operational capabilities to launch perpetual futures. In fact, we have contract specifications and are prepared to bring these products to market should evolving demand or structural shifts make it appropriate to do so. However, we have not heard demand from our customers for these products.

CME Group Q2 2026 Earnings, *supra* n.14 at 3–4. That should be the ball game. According to CME, CME's customers do not want to buy perpetual futures—so there is no current injury. *See supra* 14–15. And if customers begin to demand perpetual futures, CME has the capability and willingness to meet the demand. If CME loses business because customers eventually substitute toward perpetuals that it chooses not to list, that would be a problem entirely of CME's own making.

The complaint, to be sure, makes formulaic recitations of increased competition. Compl. ¶ 43 ("The Order enables Kalshi to enter the market for cryptocurrency futures and to compete—on an unfair and unlawful basis—with CME."); *id.* ¶ 46 (alleging that Kalshi's perpetuals "are designed to compete with CME's retail futures products"). But even if there is *potential* for competition, CME's own statements make clear that it is not facing *actual* competition. *E.g.*, CME Group Q2 2026 Earnings, *supra* n.14 at 3 ("Perpetual futures are in no way substitutes for the institutional hedging tools that these customers rely on."); *id.* at 4 ("Our crypto futures volume is

up over 7-fold in the past 3 years, despite the existence of crypto perpetuals."). And again, CME ignores that it could simply offer perpetual futures itself; any injury would stem from CME's decision.

Nor do the Commission's Order or Policy Statement resemble other agency actions that have been held to trigger competitor standing. "Agency action may increase competition, for example, if it allows new entrants into a fixed regulated market." *Air Excursions*, 66 F.4th at 280. The Commission's Order and Policy Statement do not allow any new entrants into the derivatives market; they allow all *existing* DCMs to expand their product offerings to include perpetual futures contracts. Next, agency action that "lifts price controls on a firm's competitor and therefore permits 'price competition' that would not otherwise occur" can trigger competitor standing. *Id.*; *see, e.g.*, *Louisiana Energy & Power Auth. v. FERC*, 141 F.3d 364, 366–67 (D.C. Cir. 1998) (utility had standing to challenge FERC order allowing competitor to sell electric energy at lower rates). But CME makes no allegation that there will be any "price competition" between perpetual futures and other futures. To the contrary, the two products serve different customer needs: fixed-expiration futures will appeal more to customers that seek to hedge or speculate on the price of an asset at a particular future date, while perpetual futures will appeal more to customers whose trading strategy is not tied to a particular date. That is not "price competition." *Air Excursions*, 66 F.4th at 280. And finally, competitor standing applies if an agency "reimburses a firm's competitor for selling its product or service at discounted rates"—also not true here. *Id.*

**B. CME's alleged injury would not be redressed by a favorable decision**

Even if CME were injured, a favorable decision from this Court would not provide any redress because it would not "likely alleviate the particularized injury alleged." *County of Delaware v. Department of Transp.*, 554 F.3d 143, 149 (D.C. Cir. 2009). Critically, CME does not allege that the Commission lacks authority to approve perpetual futures—only that the

Commission was required to reapprove these contracts as *swaps*. *See, e.g.*, Compl. ¶ 191 ("Kalshi's Bitcoin perpetual meets the CEA's definition of a swap; it is not a 'contract of sale of a commodity for future delivery' under that statute."); *id.* ¶ 192 ("Perpetual contracts fit the CEA's statutory definition of a 'swap' hand in glove . . . .").

The upshot is that, if CME were to prevail in this lawsuit, the perpetual futures approved by the Commission's Order could still trade on U.S. exchanges—just under the "swap" label rather than the "future" label. DCMs that list perpetuals could make that switch almost instantly. Under the CEA and the Commission's rules, DCMs can offer a product after certifying to the Commission that the product complies with the Act. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). And according to CME, a self-certification to list perpetual futures as swaps *would* comply with the Act. Compl. ¶ 11. So Kalshi and any other DCM could simply self-certify its perpetual contracts as swaps in compliance with the Court's order. *Cf.* 77 Fed. Reg. at 48,303 ("If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."). In that circumstance, CME would *still* have to "compete" against perpetual contracts. Because "a favorable opinion of the court" would not "remove the competing [products] from the market, redressability" is not satisfied. *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369–70 (D.C. Cir. 2004) (per curiam), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005).

To be sure, there are regulatory and tax differences between swaps and futures. *See* Compl. ¶¶ 106–10. But CME does not make any allegation that its competitive prospects would likely change if perpetuals were subject to the regulatory and tax regime for swaps rather than futures. Even if it had, those allegations would be utterly speculative. *Clapper*, 568 U.S. at 410 (no standing based on "a speculative chain of possibilities"); *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 28 (D.D.C. 2016) (it must be "likely, and not merely speculative, that the Court can redress

the injury"). It would require a prediction about "how regulated third parties not before the court will act in response to . . . judicial relief, which makes it substantially more difficult for [CME] to satisfy their burden of establishing standing." *ModernWest Longmont, LLC v. FAA*, 177 F.4th 290, 296 (D.C. Cir. 2026). Would CME's other futures offerings fare better if they competed against "perpetual swaps" that required a trader to post five days of margin, rather than competing against "perpetual futures" that require a trader to post one day of margin? Compl. ¶ 107. Or if CME's futures competed against "perpetual swaps" taxed as ordinary income as opposed to "perpetual futures" taxed partially as ordinary income and partially as capital gains? Compl. ¶ 110. CME has not alleged an answer to these questions, and even if it had, it would be sheer speculation.

Alternately, if CME were to establish that perpetual futures are actually swaps, DCMs could respond simply by converting perpetual offerings to perpetual-*style* futures with long-dated expirations, as several offered before the Commission's Order and Policy Statement (and which prominent exchange Cboe still offers). *Supra* 8. The "fundamental mechanics" of these perpetual-style futures "are identical to those" of a true perpetual, "including relying on a periodic funding rate mechanism, rather than a fixed expiration date, that is designed to maintain relative price parity with the underlying asset's spot price."[17] In that scenario, CME would face an identical competitive situation to what it faces now: perpetual-style contracts that receive the regulatory and tax treatment associated with futures.

In sum, since there is no "'predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury," CME fails the redressability prong of Article III standing. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 121 (2025).

[17] CFTC Letter No. 26-19, *supra* n.12.

## II. CME's claim is not in the "zone of interests" protected by the CEA.

The Court should also dismiss because CME's claims are not within the "zone of interests" that the CEA is intended to protect. The "zone of interests" analysis examines "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). Although the plaintiff need not show "that the statute directly regulate[s] [him]," it must prove that its "interests are such that they in practice can be expected to police the interests that the statute protects." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022) (quoting *Amgen Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004)). If the "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue," then the claim is subject to dismissal under Fed. R. Civ. P. 12(b)(6). *Id.* (quoting *Lexmark*, 572 U.S. at 130). Where, as here, "a claim arises under the APA, the zone of interests test requires considering the 'substantive provisions' of the underlying statute, the 'alleged violations of which serve as the gravamen of the complaint.'" *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997)).

For example, in *Air Courier Conference v. American Postal Workers Union*, a union of postal employees challenged USPS's suspension of the Private Express Statutes, which enabled private couriers to engage in international remailing. 498 U.S. 517, 519–20 (1991). While the district court held that the employees suffered an injury in fact "because increased competition through international remailing services might have an adverse effect on employment opportunities of postal workers," the Supreme Court held that the PES were not enacted "to protect jobs with the Postal Service" or were otherwise "intended for the benefit of postal workers." *Id.* at 524–26. Rather, the PES were "the means to achieve national integration [of mail delivery] and to ensure that all areas of the Nation were equally served by the Postal Service." *Id.* at 527.

Likewise here, even if "increased competition" causes an injury in fact to CME, there is no indication that Congress sought to "protect" one DCM's interest in the contract classifications of another DCM. *Id.* at 524–25. The two key provisions that form the "gravamen" of CME's complaint are 7 U.S.C. § 7a-2(c) and § 1a(47). *CSL Plasma*, 33 F.4th at 589; *see* Compl. ¶¶ 76, 190. Section 7a-2(c) establishes a process by which DCMs can self-certify their contracts, and unless the Commission intervenes, the contracts can be listed the very next day. 7 U.S.C. § 7a-2(c)(1), (3). That deliberate, self-regulatory design would be undermined if DCMs could use federal litigation to slow a competitor's innovation by challenging whether the competitor properly certified a contract as a "swap" rather than as a "future." *See* 7 U.S.C. § 5(b) ("purpose" of the CEA is to create "a system of effective *self-regulation* . . . under the oversight of the Commission" (emphasis added)).

Section 1a(47) also does not suggest that CME has a right to sue for its competitor's classification decisions. That language was added to the CEA in the 2010 Dodd-Frank Act. Before Dodd-Frank, the Commission had comprehensive jurisdiction over futures, but limited jurisdiction over swaps. Dodd-Frank did away with that bifurcation, enacting a broad "swap" definition and subjecting swap transactions to the Commission's exclusive jurisdiction. 7 U.S.C. §§ 1a(47), 2(a)(1)(A). While the "swap" definition excludes "futures," *id.* § 1a(47)(B)(i), nothing in the CEA suggests that Congress contemplated one DCM challenging another DCM's classification of a "future" as a "swap" (or vice versa). To the contrary, as CME stated in public comments to the Commission: "Dodd-Frank provisions [] now codify equivalent regulatory treatment for futures and 'economically equivalent' swaps," which "makes it extremely difficult, if not impossible, to separately define and categorize economically equivalent swaps and

futures."[18] The upshot, according to CME, is that Dodd-Frank "preserves 'customer choice,'" such that "market participants retain the option to trade products as either 'futures' or 'swaps.'"[19] So nothing about the swap definition suggests that Congress meant to greenlight lawsuits like this one.

More broadly, a central purpose of the CEA's regulatory framework is to protect market integrity by "deter[ring] and prevent[ing] price manipulation or any other distortions," "fraudulent or other abusive sales," and "misuses of customer assets." 7 U.S.C. § 5(b); *see, e.g., CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002) ("[T]he CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived."). Apart from that, the CEA seeks "to *promote* responsible innovation and *fair competition among boards of trade*, or markets and market participants." 7 U.S.C. § 5(b) (emphasis added). CME's lawsuit—which is designed to stifle innovation and competition among boards of trade—turns that purpose on its head. Thus, CME's claims do not fall within the zone of interests protected by the CEA and are accordingly subject to dismissal.

**CONCLUSION**

The Court should dismiss the complaint.

Dated: September 2, 2026

Respectfully Submitted,

*/s/ M. Jordan Minot*
M. Jordan Minot (DC Bar No. 1722554)

[18] Letter from Craig S. Donohue, *supra* n.5.
[19] *Id.* at 4.

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANNE W. STUKES
Senior Assistant General Counsel
CARLIN METZGER
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 209-1087
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
aweisberg@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
maisenbrey@cftc.gov

*Attorneys for Defendants*