**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission, and COMMODITY FUTURES TRADING COMMISSION,<br><br>*Defendants*. | No. 1:26-cv-02157<br><br>Hon. Colleen Kollar-Kotelly |

**BRIEF OF HYPERLIQUID POLICY CENTER AS *AMICUS CURIAE***
**IN SUPPORT OF DEFENDANTS**

Elizabeth B. Prelogar
*Counsel of Record*
Elias S. Kim (*pro hac vice* application pending)
Claire Groden
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae Hyperliquid Policy Center*

## CORPORATE DISCLOSURE STATEMENT

I, the undersigned, counsel of record for Hyperliquid Policy Center, certify that to the best of my knowledge and belief, Hyperliquid Policy Center has no parent companies, subsidiaries, or affiliates. No company owns at least 10% of the stock of Hyperliquid Policy Center.

Dated: September 9, 2026

/s/ *Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Amicus Curiae Hyperliquid Policy Center*

# TABLE OF CONTENTS

**Page**


INTERESTS OF AMICUS CURIAE ........ viii

INTRODUCTION ........ 1

ARGUMENT ........ 4

I. PERPETUALS BUILD ON LONGSTANDING ECONOMIC PRINCIPLES TO EXPAND ACCESS TO FUTURES MARKETS ........ 4

A. A Perpetual Is A Futures Contract That Allows Market Participants To Take A Position On The Price Of An Asset For An Indefinite Period Of Time ........ 4

B. Perpetuals Continue An Enduring Pattern Of Futures-Market Innovation ........ 7

C. Perpetuals Increase Trading Volume And Attract New Traders To Futures Markets ........ 14

II. CME HAS NOT ADEQUATELY ALLEGED THAT IT HAS SUFFERED AN INJURY IN FACT ........ 16

A. Competitor Standing Requires Demonstrating That The Challenged Agency Action Intensifies Competition, Thereby Injuring The Plaintiff As A Matter Of Economic Logic ........ 16

B. The CFTC's Order Did Not Intensify Competition And Thereby Injure CME As A Matter Of Economic Logic ........ 19

III. CME IS AN UNSUITABLE CHALLENGER TO THE CFTC ORDER ........ 20

A. Plaintiffs Must Assert Interests Within The Zone Of Interests Protected By The Invoked Statute ........ 21

B. CME's Asserted Competitive Interest Does Not Fall Within The Zone Of Interests Protected By The Commodity Exchange Act's Swap Provisions ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ........17, 18, 20

*Am. Inst. of Certified Pub. Accts. v. IRS*,
804 F.3d 1193 (D.C. Cir. 2015) ........17

*Amgen v. Smith*,
357 F.3d 103 (D.C. Cir. 2004) ........21

*Arnold Tours, Inc. v. Camp*,
400 U.S. 45 (1970) ........23, 25

*Ass'n of Data Processing Serv. Orgs. v. Camp*,
397 U.S. 150 (1970) ........23

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
198 U.S. 236 (1905) ........10

*Bloomberg L.P. v. CFTC*,
949 F. Supp. 2d 91 (D.D.C. 2013) ........24

*Castro v. Scanlan*,
86 F.4th 947 (1st Cir. 2023) ........17

*Cement Kiln Recycling Coal. v. EPA*,
255 F.3d 855 (D.C. Cir. 2001) ........23

*CFTC v. Zelener*,
373 F.3d 861 (7th Cir. 2004) ........4

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ........22, 23, 25

*CSL Plasma Inc. v. U.S. Customs & Border Prot.*,
33 F.4th 584 (D.C. Cir. 2022) ........22, 23

*First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.*,
988 F.2d 1272 (D.C. Cir. 1993) ........22, 25

*Hardin v. Ky. Utils. Co.*,
390 U.S. 1 (1968) ........23

*Hazardous Waste Treatment Council v. Thomas*,
885 F.2d 918 (D.C. Cir. 1989) ........21-23

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Int'l Union of Bricklayers & Allied Craftsmen v. Meese*,
761 F.2d 798 (D.C. Cir. 1985) .....18, 20

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017).....24

*Invest. Co. Inst. v. Camp*,
401 U.S. 617 (1971).....22, 23

*Invest. Co. Inst. v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) .....24

*KERM, Inc. v. FCC*,
353 F.3d 57 (D.C. Cir. 2004) .....18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014).....17, 21

*Liquid Carbonic Indus. Corp. v. FERC*,
29 F.3d 697 (D.C. Cir. 1994) .....23

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992).....16

*Lujan v. Nat'l Wildlife Fed.*,
497 U.S. 871 (1990).....21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012).....21, 22

*MD Pharm., Inc. v. DEA*,
133 F.3d 8 (D.C. Cir. 1998) .....18, 22, 23

*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .....18

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) .....22, 23

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*,
522 U.S. 479 (1998).....23

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002) .....17, 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Save Jobs USA v. DHS*,
942 F.3d 504 (D.C. Cir. 2019) ....................19

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) ....................17

*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010) ....................17, 18, 20

*Twin Rivers Paper Co. v. SEC*,
934 F.3d 607 (D.C. Cir. 2019) ....................22, 24, 25

*U.S. Telecom Ass'n v. FCC*,
295 F.3d 1326 (D.C. Cir. 2002) ....................18

*United Transp. Union v. I.C.C.*,
891 F.2d 908 (D.C. Cir. 1989) ....................18

**Statutes**

5 U.S.C. § 702 ....................21

7 U.S.C.
§ 1a(47) ....................23
§ 5(a) ....................7, 8
§ 5(b) ....................24
§ 7b-3(a) ....................25

Pub. L.
No. 93-463, 88 Stat. 1389 ....................10
No. 111–203, 124 Stat. 1376 ....................24

**Miscellaneous**

Alexander Belozertsev & Jerry W. Markham, *Commodity Exchanges and the Privatization of the Agricultural Sector in the Commonwealth of Independent States—Needed Steps in Creating a Market Economy*, 55 Law & Contemp. Probs. 119 (1992) ....................9

Hachmi Ben Ameur et al., *Revisiting the relationship between spot and futures markets: evidence from commodity markets and NARDL framework* (July 27, 2021) ....................8

Anastasia Chernikova, *How Perpetual Futures Could Make More Assets Tradable*, Forbes (Aug. 27, 2026) ....................16

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Crude Oil Futures – Contract Specs*, CME Group ....................5, 15

Adam K. Gehr, Jr., *Undated Futures Markets*, 8 Journal of Futures Markets 89 (1988)....................12

John Paul Hampstead, *BitMEX CEO: what a trader wants, what a trader needs* (July 23, 2018) ....................14

Songrun He et al., *Fundamentals of Perpetual Futures* (Dec. 2024) ....................6, 13

Hyperliquid Policy Center, *Comment RE Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance* (Aug. 24, 2026).................... 14-16

Hyperliquid Policy Center, *Perpetual futures as complements to dated futures* (Aug. 21, 2026)....................16, 19

Hyperliquid Policy Center, *Statement in Connection with the Meeting of the Innovation Advisory Committee* (Aug. 27, 2026) ....................14

*In the Matter of the Application of KalshiEX LLC for Designation as a Contract Market* (Nov. 3, 2020) ....................20

*Index Futures*, ScienceDirect....................11

Leo Melamed, *Evolution of the International Monetary Market*, 8 Cato Journal 393 (1988)....................11

*Market Begins Trading in Eurodollar Futures*, N.Y. Times (Dec. 10, 1981) ....................11

Mercatus Energy, *The Fundamentals of Oil & Gas Hedging – Futures* ....................7

Gregory J. Millman, *Futures and Options Markets*, The Concise Encyclopedia of Economics....................8

Anthony Neuberger, *Using Futures Contracts for Corporate Hedging: The Problem of Expiry and a Possible Solution*, 2 European Fin. Mgmt. 263 (1996)....................12, 13

*NYMEX Rulebook: Clearing House and Performance Bonds*, CME Group....................5

S. Rep. No. 111-176, 111th Cong., 2d Sess. (2010) ....................24

Joseph Santos, *A History of Futures Trading in the United States*, EH.Net Encyclopedia (Mar. 16, 2008) .................... 8-10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Robert Shiller, *Measuring Asset Values for Cash Settlement in Derivatives Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, NBER Technical Working Paper #131 (Dec. 1992) ....12

*Specification Index*, trade[XYZ] ....7

## INTERESTS OF *AMICUS CURIAE* [1]

Amicus curiae is Hyperliquid Policy Center (HPC), an independent research and advocacy organization dedicated to advancing a clear, regulated path for Americans to access onchain markets, including those available on the Hyperliquid blockchain. HPC engages directly with lawmakers and regulators, produces rigorous technical research, and champions practical regulatory frameworks for onchain markets, with a focus on perpetual derivatives and onchain financial infrastructure. Recently, HPC published a research paper conveying its findings that perpetual futures trading does not degrade the quality of trading on incumbent markets.

HPC submits this brief to explain the nature of perpetual futures and to demonstrate that, because of the market-expanding nature of the CFTC's challenged action, the Chicago Mercantile Exchange (CME) lacks competitor standing to bring this suit. HPC also seeks to demonstrate that CME's interest in imposing more burdensome regulations on its competitors does not fall within the zone of interests contemplated by the Commodity Exchange Act's classification of swaps.

[1] Pursuant to Local Civil Rule 7(o)(5), which incorporates Federal Rule of Appellate Procedure 29(a)(4), amicus represents that this brief was authored by counsel for amicus and not by counsel for any party in whole or in part. No outside contributions were made to the preparation or submission of this brief.

## INTRODUCTION

This suit is an attempt by the Chicago Mercantile Exchange (CME) to halt innovation in the U.S. futures markets. Earlier this year, the Commodity Futures Trading Commission (CFTC) approved the first-ever true perpetual futures contract listed on a U.S.-regulated exchange. In doing so, it confirmed that every designated contract market (DCM), including CME, can list the same type of contract. At least for now, CME has decided not to. But instead of leaving other futures exchanges to make their own commercial decisions, CME asks this Court to take the decision out of their hands. This anticompetitive effort must fail.

Although rarely the focus of public discourse, the U.S. futures markets are fundamental to our daily lives. These markets allow companies and individuals to plan, borrow, and invest by connecting them with counterparties willing to take on risks that they cannot carry alone. As a result, they are the primary mechanism for managing risk across the real economy: without them, farmers could not price crops before planting; airlines could not fix fuel costs before flying; and homebuyers could not lock in mortgage rates before closing. The same markets anchor the prices of essential commodities in global trade.

The strength of the U.S. futures markets has always depended on their capacity to change with the times. Futures markets began with grain in 1850s Chicago and, through decades of relentless innovation, grew to encompass thousands of different products and serve millions of people across the world. CME deserves much of the credit. It brought the first currency futures, cash-settled contracts, and electronic futures trading platform into the United States.

Perpetuals are the latest product of that tradition of innovation. Put simply, a perpetual is a futures contract with no expiration date. Perpetuals regulated under the Commodity Exchange Act (CEA) share all the defining features of dated futures: they have standardized terms, match on a central order book, require margin on both sides, clear through a registered clearing house, and

may be closed through an offsetting trade. The only distinction is the mechanism that each uses to track the price of the underlying asset. Dated futures converge with that price through expiration, while perpetuals converge through a "funding rate," a small periodic payment between participants that have taken long positions and participants that have taken short positions. Each product is useful to address different types of risk. Dated futures hedge risks that end on a known date, such as crop harvests or bond maturities. Perpetuals hedge risks that do not, such as fuel needs or long-term investment portfolios.

There is already vast global demand for perpetuals. Last year, the notional value of perpetuals traded in global markets was nearly $90 trillion, with contracts referencing digital assets, oil, metals, and more. Yet, due to regulatory uncertainty, not one of those contracts traded on a U.S.-regulated exchange accessible to Americans. Instead, perpetual markets arose entirely offshore: foreign venues earned all the profit, foreign governments earned all the tax revenue, and foreign traders earned all the liquidity and risk management benefits.

This year, the CFTC set out to resolve the uncertainty and bring perpetuals inside the U.S. regulatory perimeter. In May, the CFTC issued an Order allowing KalshiEX LLC (Kalshi) to list a Bitcoin perpetual as a futures contract and confirming that any DCM can list a similar perpetual referencing a digital asset without seeking prior approval. The CFTC also issued a Policy Statement advising DCMs to seek approval before listing perpetuals on other asset classes. These measured steps represent great progress for U.S. futures markets and American end users.

CME now asks this Court to undo the progress that the CFTC has made. CME offers no basis to establish that the CFTC has caused it any injury; on the contrary, the CFTC created a business opportunity for CME by allowing it to offer a new product and compete for new market participants. CME is well within its rights to sit this one out. But it has no right to ask this Court

to make the same choice for every other U.S. exchange.

There is more at stake in this case than U.S. access to regulated perpetual futures. Once a titan of innovation, CME now advances a novel theory of standing under which an incumbent exchange is injured whenever its regulator permits a new product that it chooses not to offer. If CME prevails, every product that the CFTC approves will invite litigation from incumbents who prefer the status quo, and the pace of progress in the U.S. futures markets will slow to a crawl. The consequences would be disastrous. The CFTC is now working to bring other innovations onshore, including onchain markets that trade, clear, and settle on public blockchains, and each would face the same challenge from any incumbent that declines to adopt it. U.S. leadership in global finance depends on the CFTC's ability to approve products without CME's permission.

This brief addresses two defects in CME's suit. First, CME lacks Article III standing. CME relies on the doctrine of competitor standing to supply an injury in fact, but the doctrine applies only where government action intensifies competition in a fixed market so that injury to the plaintiff follows as a matter of economic logic. The Order did nothing of the kind. It enlarged the market rather than dividing it, opening DCMs to new market participants who would not have traded in dated futures contracts. And it added no new competitors to the marketplace, because Kalshi has been a DCM since 2020. Second, CME is an unsuitable challenger to the Order because its interests fall outside the zone of interests of the CEA provisions it invokes. The CEA's stated purposes include promoting responsible innovation and fair competition among exchanges, and its swap provisions were enacted to promote transparency and oversight of an otherwise opaque, largely unregulated swaps market. CME's interest in stymying its rivals' innovation frustrates each of those statutory objectives.

Therefore, the Court should grant the CFTC's motion to dismiss the complaint.

## ARGUMENT

### I. PERPETUALS BUILD ON LONGSTANDING ECONOMIC PRINCIPLES TO EXPAND ACCESS TO FUTURES MARKETS

In the 1980s, economists theorized that futures contracts with no expiration date would have significant benefits. Not only would they generally increase liquidity in futures markets, but they would also expand futures markets to new classes of participants and assets. It was not until the 2010s that foreign digital asset exchanges cracked the code to implement this theory. They began offering perpetuals, which have no expiration date but resemble traditional futures contracts in every other respect. Perpetuals build on centuries of futures-market innovation, adding a feature that maintains the core functions of futures markets while expanding them to new frontiers.

#### A. A Perpetual Is A Futures Contract That Allows Market Participants To Take A Position On The Price Of An Asset For An Indefinite Period Of Time

Futures contracts are contracts that allow the parties to "buy" or "sell" economic exposure to an underlying asset, either by agreeing to "buy or sell" the asset at "a fixed date in the future" or by agreeing to pay money when the price of the asset rises or falls. *See CFTC v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) (citation omitted). Futures contracts are traded through exchanges and are necessarily "fungible," because "they have standard terms and each side's obligations are guaranteed by a clearing house." *Id.* The clearing house marks participants' positions to their market price each day—by withdrawing or adding money to their accounts—and issues margin calls when participants' positions fall below a specified level. While it is theoretically possible to perform most futures contracts through "delivery of the commodity," the fungibility of futures contracts allows participants to instead "cancel their obligations by buying or selling offsetting positions." *Id.*

The New York Mercantile Exchange's (NYMEX) crude oil futures market illustrates how traditional futures markets and contracts work in practice. NYMEX offers the West Texas

Intermediate (WTI) benchmark futures contract, which is a contract to buy or sell 1,000 barrels of WTI-grade oil during a specified future month. *Crude Oil Futures – Contract Specs*, CME Group, https://bit.ly/4gKmFhC. Because NYMEX allows margin trades, a trader need not pay the full value of a contract to buy or sell it; instead, the trader deposits a "performance bond" above a certain amount (the "initial margin") with its broker, which in turn posts margin with the clearing house. *NYMEX Rulebook: Clearing House and Performance Bonds*, CME Group, https://bit.ly/4r3kpoX. At the end of each day, the clearing house marks every position to that day's settlement price, and gains or losses are credited or debited from the party's account. *See id.* If the amount in his account drops below a certain threshold (the "maintenance margin"), the trader receives a "margin call" that requires him to bring the amount back up to the initial margin. *See id.* To exit the market, he can sell an equivalent contract at the current price. *See id.*

The price of a contract sold on a traditional futures market like the NYMEX crude oil market accurately approximates the current price of the underlying asset because the contract's expiration date creates an arbitrage opportunity if the two prices diverge. Take, for example, a NYMEX crude oil contract that requires the delivery of 1,000 barrels of oil on November 1. If the current price of the futures contract is $80,000 and the current price of 1,000 barrels of oil (also known as the "spot" or "cash" price) is $75,000, then a trader can agree today to sell 1,000 barrels for $80,000 on November 1; immediately buy 1,000 barrels for $75,000; and then deliver those barrels on November 1 for a $5,000 profit. Traders will exploit that opportunity until it disappears, selling the futures contract and buying oil until the two prices come back into line—a process known as "convergence."

Perpetuals resemble traditional futures contracts in almost every respect. Like a traditional futures contract, a perpetual is a standardized contract that tracks the price of an underlying asset

and imposes payment obligations as the price rises or falls. *See* Songrun He et al., *Fundamentals of Perpetual Futures* at 1 (Dec. 2024), https://bit.ly/4yhSTqe. As the price rises, the buyer receives money; as it falls, the seller receives money. *See id.* Perpetuals have standardized terms and are entered through central limit order books. And as with traditional futures contracts, perpetuals are subject to margin requirements. If the value of a party's collateral falls below a certain level because the price has moved against the party, the platform closes out the position, much as a broker liquidates a traditional futures position when a margin call goes unmet. *See id.* Otherwise, parties close out their positions by buying offsetting perpetuals. *See id.*

There are, however, two significant differences between traditional futures contracts and perpetuals. Most centrally, perpetuals do not have an expiration date, so parties can hold their positions indefinitely, as long as adequate margin is maintained. *See* He, *supra* at 1. The second difference follows from the first. Because there is no expiration date, perpetuals use a different mechanism to ensure that the price of a perpetual tracks the price of the underlying asset. This mechanism is called the "funding rate," and it imposes a payment obligation on market participants whose positions cause the price of the perpetual to diverge from the price of the asset. *See* He, *supra* at 1-2. Specifically, exchanges periodically calculate a funding rate based on the difference between the prices of the perpetual and the reference asset, referencing reputable third-party sources to determine the latter. *See id.* at 7. If the price of a perpetual is *greater* than the price of the asset, all buyers of the perpetual (the "long" side of the market) must make periodic payments (based on the funding rate) to sellers of the perpetual (the "short" side of the market), and vice versa if the price of a perpetual is *lower* than the price of the asset. *See id.* at 2. These payments run between the long and short sides of the market collectively, not between the parties to any particular trade. The funding rate thus incentivizes participants to enter the market on whichever

side will pull the perpetual's price back toward spot. And because the payments grow with the gap, the mechanism works like a rubber band, pulling harder the more the prices diverge.

The market for WTI crude oil perpetuals on Hyperliquid illustrates how markets for perpetuals work. That market offers perpetuals that correspond to a single barrel of WTI-grade crude oil. *Specification Index*, trade[XYZ], https://bit.ly/46fGib9 (last visited Sept. 7, 2026). A party who wants to buy or sell a WTI perpetual must post collateral to open the position. For instance, at 10x leverage (similar to the leverage available on NYMEX), a party can open a position in a perpetual priced at $80 by depositing at least $8. The platform then continuously adds to or subtracts from the party's account—for example, if a party buys a WTI perpetual for $80 and the price rises to $81, the platform automatically adds $1 to the party's account. *Id.* The platform also enforces the funding rate every hour. As with traditional oil futures, a party can close his position by entering an offsetting position any time. *Id.*

The upshot is that perpetuals both resemble traditional futures contracts and differ from them in meaningful respects. That is no accident. For hundreds of years, U.S. futures market operators have continuously sought to innovate, offering new types of contracts that cover a broader range of assets and generally are easier to trade. Perpetuals are a direct result of that innovative process.

### B. Perpetuals Continue An Enduring Pattern Of Futures-Market Innovation

In the modern economy, futures markets serve two primary functions. First, they enable market actors to "manag[e] and assum[e] price risks." 7 U.S.C. § 5(a). For example, an actor whose business depends on cheap oil can hedge against the risk that oil prices will rise by buying an oil futures contract. *See* Mercatus Energy, *The Fundamentals of Oil & Gas Hedging – Futures*, https://perma.cc/PF3G-R63S. In turn, futures markets allow third-party speculators to assume that risk in pursuit of profit.

The second primary function of futures markets is "discovering prices." 7 U.S.C. § 5(a). Because the prices of futures contracts closely track the current prices of underlying assets, *see supra* at 5, market actors often reference futures markets to determine the prices of an underlying asset, especially if there is no robust public market for the asset. *See* Hachmi Ben Ameur et al., *Revisiting the relationship between spot and futures markets: evidence from commodity markets and NARDL framework* (July 27, 2021), https://bit.ly/468pbIe. Indeed, for most assets, it is significantly easier to trade a futures contract than to trade the asset itself. *See* Gregory J. Millman, *Futures and Options Markets*, The Concise Encyclopedia of Economics, https://bit.ly/4iRaHnz (last visited Sept. 7, 2026). That is true for physical commodities like oil, which are expensive to deliver, and for intangible assets like stock indexes. *See id.* Accordingly, when real-world events affect the price of an asset, the futures markets usually reflect price changes first. *See id.*

The history of futures markets is a history of relentless innovation to optimize these two functions and make them available to as many people as possible. The story, of course, starts with grain. In the 1830s, the advent of railroads, canals, and grain elevators enabled a genuine national grain market: farmers could sell to grain dealers, who could sell to regional merchants, who could sell to large-scale millers, who could process the grain and sell to wholesalers or end consumers. *See* Joseph Santos, *A History of Futures Trading in the United States*, EH.Net Encyclopedia (Mar. 16, 2008), https://bit.ly/3Sr3Uq9. But this supply chain was fragile, both because it required individualized negotiations at every level and because it was hard to predict what prices downstream buyers might be willing to pay. This price risk made it harder for the relevant actors to obtain the financing they needed to purchase grain in the first place and disincentivized them from investing to increase the scale of their operations. *See id.*

To address these risks and enable parties to negotiate prices more easily, grain merchants

and their financiers came up with two ideas that laid the groundwork for modern futures markets. The first was the "forward contract," which required the seller to deliver a specific amount of grain at a specific future time for a specific amount of money. *See* Alexander Belozertsev & Jerry W. Markham, *Commodity Exchanges and the Privatization of the Agricultural Sector in the Commonwealth of Independent States—Needed Steps in Creating a Market Economy*, 55 Law & Contemp. Probs. 119, 135 (1992). These contracts, which could be entered into at every level of the supply chain, protected parties against future price risk and allowed them to secure financing.

The second idea was "commodity exchanges," which were regional marketplaces where buyers and sellers could meet to negotiate prices for forward contracts. *See* Santos, *supra*. Although contracts still involved bespoke negotiations, these exchanges allowed for informal price discovery through the exchange of information about the contract prices. The exchanges also imposed grain standards to meet the high-volume grain trade's requirement that grains be fungible. *See id.* The largest and most important exchange was the Board of Trade of the City of Chicago, which is now owned by CME.

The emergence of forward contracts and commodity exchanges was a major development. But those innovations did not enable a national market for managing and assuming price risk, nor did they enable widespread price discovery. The main reason is that the bespoke contracts themselves were not fungible. It was therefore difficult for a party to find another party who was willing to take on its contractual obligations when the need arose. *See* Santos, *supra*.

In the 1870s, however, the major Boards of Trade introduced several innovations that made a common marketplace possible. To start, they required market participants to agree to certain standardized contract terms, including delivery dates and unit amounts, rendering contracts fungible. *See* Belozertsev, *supra* at 135-36. Around the same time, the Boards of Trade also

introduced a rudimentary clearing house system that eliminated the need for market participants to deal directly with each other. *See* Santos, *supra*. This system depended on a network of brokers, who served as the counterparties for every contract. *See id.* A market participant seeking to buy grain would contract with a broker, who would find a participant who wanted to sell grain or another broker who was working with a seller.

Critically, the combination of fungible contracts and a basic clearing house system allowed market participants to settle their obligations by entering into an offsetting contract, rather than through physical delivery or receipt. The practice became so prevalent so quickly that at the Chicago Board of Trade, "not less than three quarters of the transactions in the grain pit" involved "no physical handing over of any grain." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 246-47 (1905). The result was a liquid, national market where participants from across the country gathered to buy and sell contracts "exclusively for future delivery," i.e., futures contracts. *Id.* at 245. These early futures markets enabled nationwide price discovery because "the quotation of the prices continuously offered and accepted in [the markets] during business hours [we]re collected . . . and handed to the telegraph companies," then widely disseminated. *Id.*

Throughout the twentieth century, futures markets expanded to allow the buying and selling of contracts for all kinds of assets. Thus, when Congress created the CFTC, it granted the CFTC the authority to regulate "contracts for future delivery" of "all . . . goods and articles, except onions . . ., and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389, 1395.

But in the 1970s, it became apparent that there needed to be a way to manage and assume

price risk for assets that were not amenable to traditional futures contracts. Most notably, the breakdown of the Bretton Woods system and increasing inflation in the United States had led to volatile interest rates. Leo Melamed, *Evolution of the International Monetary Market*, 8 Cato Journal 393, 395-96 (1988). As a result, there was significant demand for a financial instrument to hedge against the risk of further changes to interest rates. *See id.* But because traditional futures contracts still required delivery of the underlying asset, they were not an option—there was simply no way for one party to "deliver" an interest rate to another.

Accordingly, the next major futures-market innovation was a contract that did not require physical delivery of the underlying asset: the "cash settle[d]" futures contract. *See* Melamed, *supra* at 402-03. Instead of requiring physical delivery of the asset at a certain price, cash-settled futures contracts require one party to pay the other the difference between the price of the asset on the day of the contract and the price of the asset on a specified future date. For example, the first cash-settled futures contract was the "Eurodollar futures contract," which referenced the interest rate on a $1,000,000 deposit of U.S. dollars in European banks. *See Market Begins Trading in Eurodollar Futures*, N.Y. Times (Dec. 10, 1981), https://bit.ly/46fLuvE. If the interest rate on that deposit increased in the specified time period, the "seller" would have to pay the "buyer" an amount determined by a preset formula; if the interest rate went down, the buyer would have to pay the seller. *Id.* Critically, the contract required the parties to agree to a specified "reference" price to determine the relevant interest rates. For Eurodollar futures contracts, the parties would reference the London Interbank Offered Rate (LIBOR). *Id.*

Today, cash-settled futures contracts are some of the most widely traded contracts in the global futures markets. The most prominent are futures contracts for stock indexes, which require the parties to exchange payments based on the value of a specific stock index. *See Index Futures*,

ScienceDirect, https://bit.ly/4xFNARy (last visited Sept. 2, 2026). These contracts allow parties to hedge against the risk that a broad swath of stocks will rise or fall and provide the broader market with valuable information about the price of those stocks.

Almost immediately after cash-settled futures contracts debuted, finance professors and economists began to theorize the next step in the evolution of futures contracts—contracts with no expiration dates. The motivation was twofold. First, expiration dates imposed significant transaction costs on parties who wanted to take long-term positions on the price of underlying assets, including to hedge against long-term price risk. *See* Adam K. Gehr, Jr., *Undated Futures Markets*, 8 Journal of Futures Markets 89, 91-92 (1988); Anthony Neuberger, *Using Futures Contracts for Corporate Hedging: The Problem of Expiry and a Possible Solution*, 2 European Fin. Mgmt. 263 (1996). Although most futures markets allow participants to "roll over" their dated contracts, doing so requires participants to pay additional fees and introduces timing and basis risk. Second, expiration dates limit futures contracts to assets for which there is a readily available reference price. And for certain assets, such a price may rarely be available. *See* Robert Shiller, *Measuring Asset Values for Cash Settlement in Derivatives Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, NBER Technical Working Paper #131, 1-2 (Dec. 1992).

The removal of expiration dates theoretically presented a solution for both issues. If futures contracts never expired, parties seeking long-term exposure would not need to roll over their contracts. *See* Gehr, *supra* at 89-90. Moreover, there would be no need to settle the futures contracts based on an unobservable reference price. *See* Shiller, *supra* at 2-3. Instead, the parties could simply trade the futures contracts using any observable information about the value of the asset. *Id.* And the market operator would continuously settle the parties' positions.

But there was a significant barrier to implementing futures contracts without an expiration

date—at least for assets that can be quickly purchased and sold on an underlying market. For such assets, the expiration date plays an important role: it keeps the price of the futures contract close to the price of the asset and thereby prevents traders from exploiting differences between the two prices. *See supra* at 5. Accordingly, futures markets cannot eliminate expiration dates for futures contracts involving such assets unless there is an alternative mechanism to ensure that the price of the futures contract and the price of the asset converge.

After more than two decades, futures-market innovators developed a mechanism that allows participants to trade futures contracts without an expiration date, i.e., perpetuals. And this time, the innovation came from the markets for digital asset futures. In 2016, the Bitcoin Mercantile Exchange (BitMEX) debuted a perpetual futures contract that featured a funding-rate mechanism. *See* He, *supra* at 8. In short, the contract allowed participants to take a position on the price of Bitcoin. And the funding-rate mechanism ensured that the price of the contract would approximate the price of Bitcoin. *See id.* at 9-10. Specifically, the platform would compare the price of the contract to the price of Bitcoin—as determined by a specified benchmark—every eight hours. *See id.* If the price of the contract was above the price of Bitcoin, buyers would pay a fee to the sellers; if the price of the contract was below the price of Bitcoin, sellers would pay a fee to buyers. *See id.* Beyond that, the contract operated like any other futures contract. Today, almost all markets for perpetuals rely on that funding-rate mechanism.

In sum, perpetuals are the latest in a long line of innovations to manage risk and discover prices. There is nothing foreign or unusual about them: They instead build on longstanding market principles to increase liquidity in futures markets and provide opportunities to new participants.

The development of the perpetual also provides a window into continuing innovation in market infrastructure. As noted, perpetuals emerged on BitMEX, which was a privately owned

and operated digital asset exchange. *See* John Paul Hampstead, *BitMEX CEO: what a trader wants, what a trader needs* (July 23, 2018), https://bit.ly/4x9UZri. But the expansion of perpetuals beyond digital assets into commodities and equities has unfolded largely on public blockchains like Hyperliquid, where trading, margining, and settlement occur on a public ledger rather than on the proprietary back-end systems of an exchange or clearing house. On that infrastructure, every order and position is publicly visible; margin and collateral are adjusted continuously; and every trade is written to a permanent, independently verifiable record. *See* Hyperliquid Policy Center, *Statement in Connection with the Meeting of the Innovation Advisory Committee* at 6 (Aug. 27, 2026), https://bit.ly/4cvS1G2.

Those properties—transparency, continuous risk management, and a complete audit trail—are ones that regulators have long sought from market infrastructure. Each generation of technology—from the telegraph to the electronic matching engine—has moved the markets closer to those objectives, leaving them more transparent and more efficient. Onchain perpetual markets are the innovation of this generation, and they sit comfortably within that tradition.

### C. Perpetuals Increase Trading Volume And Attract New Traders To Futures Markets

Like previous futures-market innovations, perpetuals decrease transaction costs and increase the options available to market participants. Four features of perpetuals are particularly important. First, as discussed, parties who wish to maintain a long-term hedge against future price risks can do so without rolling over their contracts. *See* Hyperliquid Policy Center, *Comment RE Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance* at 5 (Aug. 24, 2026), https://perma.cc/QV2X-KF3W. Previously, a party who wanted to maintain a one-year exposure had to so through monthly dated contracts, which required executing twelve rollovers per year and incurring significant costs as a result. Perpetuals

avoid those costs entirely. *Id.*

Second, perpetuals come in accessible contract sizes. In traditional futures markets, contracts for physical commodities require large unit sizes because of the substantial costs associated with physical delivery. *See* Hyperliquid Policy Center, *Comment RE Joint Request for Comment*, *supra* at 4-5. For example, transporting a single barrel of oil is not much easier than transporting 100 barrels of oil, so only the latter makes economic sense. By contrast, there is no risk that a party who wants to buy or sell a perpetual will be forced to receive or deliver the underlying asset—freeing the market to offer smaller contract sizes without concern for the disproportionate delivery costs. *See id.*

Third, perpetuals concentrate liquidity in a single contract for every reference asset. *See* Hyperliquid Policy Center, *Comment RE Joint Request for Comment*, *supra* at 4. This differs from traditional futures markets, which offer multiple date and quantity options for the same reference asset. For instance, a party seeking to buy or sell oil futures on NYMEX can choose between a 1,000-barrel and 100-barrel contract, plus different contract expirations for both. *Crude Oil Futures – Contract Specs*, CME Group, https://perma.cc/547V-H7LF. These options create multiple fragmented markets for the same reference asset, spreading trading activity across those markets. By contrast, because there is only one perpetual for every reference asset, liquidity is concentrated in the market for that contract.

Fourth, perpetuals simplify position management. *See* Hyperliquid Policy Center, *Comment RE Joint Request for Comment*, *supra* at 5. A party need not select a time frame when entering the position and need not monitor expiration over the life of the position.

The combination of these features has led to an explosion in trading volume. In 2025, markets on Hyperliquid alone accounted for nearly $3 trillion in notional trading volume. *See*

Hyperliquid Policy Center, *Comment RE Joint Request for Comment*, *supra* at 5. Overall, offshore markets for perpetuals grew to nearly $90 trillion in volume last year. *See* Anastasia Chernikova, *How Perpetual Futures Could Make More Assets Tradable*, Forbes (Aug. 27, 2026), https://perma.cc/WDV3-C5AS. Recent studies show that much of this volume comes from participants who would never have traded in traditional futures markets, including because of high fees and barriers to entry, as well as a lack of products suited to how they manage and assume risk. *See* Hyperliquid Policy Center, *Perpetual futures as complements to dated futures* (Aug. 21, 2026), https://perma.cc/943R-EJNW.

## II. CME HAS NOT ADEQUATELY ALLEGED THAT IT HAS SUFFERED AN INJURY IN FACT

CME alleges standing under a theory of competitor standing, claiming that the CFTC Order authorizes Kalshi (as well as any other DCM that self-certifies similar digital asset perpetuals) to list perpetuals that will compete with CME's existing products. Compl. ¶ 10. But as the CFTC points out, its Order is unlike any agency action in cases where the D.C. Circuit has found competitor standing, because the Order *expands* the market in which CME competes by inviting those who trade perpetuals into the U.S. derivatives markets for the first time. CFTC Mot. 14, 18. In this circumstance, where government action grows the pie rather than intensifying competition for the same pie, the logic of the competitor standing doctrine does not apply.

### A. Competitor Standing Requires Demonstrating That The Challenged Agency Action Intensifies Competition, Thereby Injuring The Plaintiff As A Matter Of Economic Logic

When the plaintiff challenging government action is not itself the object of the action, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (citation omitted). The competitor-injury doctrine is one such way to establish the injury-in-fact requirement. It does not alter the plaintiff's burden

to demonstrate an "imminently threatened . . . concrete and particularized 'injury in fact . . . .'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). Rather, the doctrine applies basic economic principles to "suppl[y] the link between increased competition and tangible injury," permitting plaintiffs to establish standing by showing "that the challenged government action results in 'an actual or imminent increase in competition,' . . . thereby injuring competitors 'as a matter of economic logic.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279-81 (D.C. Cir. 2023) (citations omitted).

At the root of the doctrine is the principle that, in a fixed market, "one direct competitor's gain of market share is another's loss." *Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023). Courts therefore presume that a plaintiff suffers an injury in fact when government action intensifies competition for a "share in a fixed amount of money" or market, *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010), because the action "almost surely injures a seller in one form or another," such as by forcing it to lower prices or expend more resources to maintain the same market share, *id.* at 72. Competitor standing therefore "simply acknowledge[s] a chain of causation 'firmly rooted in the basic law of economics'"—that when governmental action "provides benefits to an existing competitor or expands the number of entrants in the [plaintiff's] market," the plaintiff is almost certainly harmed. *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002).

The D.C. Circuit has held that plaintiffs have competitor standing when government action gives the plaintiffs' rivals a competitive edge, such as a credential that allows a rival to "more effectively compete with and take business away from" the plaintiff, *see Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015); that advantages a politician's rivals in an election, *see Shays v. FEC*, 414 F.3d 76, 85-86 (D.C. Cir. 2005); or that reimburses a firm's rival

for selling its product at a discounted rate, *see U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002). In all of these cases, the plaintiffs' rivals received a competitive benefit from the government while the markets in which the rivals competed (for tax preparation service customers, voters, and telecommunications customers, respectively) remained fixed.

Even more frequently, the D.C. Circuit has upheld competitor standing where a government action "allows new entrants into a fixed regulated market." *Air Excursions*, 66 F.4th at 280. In those cases, the government action increases supply in a market with unchanged demand, thereby intensifying competition among suppliers. *See, e.g.*, *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 802 (D.C. Cir. 1985) (union had standing where government action "allow[ed] aliens into the country to perform work" otherwise belonging to union members); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 12-13 (D.C. Cir. 1998) (drug manufacturer had standing to challenge new entrant to drug market); *Sherley*, 610 F.3d at 74 (researchers had standing to challenge action that increased grant applications without increasing research funding); *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014) (laborers had standing to challenge rules leading to increased supply of labor).

But "basic laws of economics" are not a one-way ratchet in favor of competitor standing. *United Transp. Union v. I.C.C.*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989). When agency action benefits a market actor but does not intensify competition, the actor's competitors lack standing. For this reason, an agency action that awards a "windfall" to a rival "falls short of establishing that 'any specific harm' will result 'as a matter of economic logic,'" and so does not support a theory of competitor standing. *Air Excursions*, 66 F.4th at 280 (citation omitted). Similarly, plaintiffs lack competitor standing when they are not "*direct* and *current* competitor[s] whose bottom line[s] may be adversely affected by the challenged agency action." *KERM, Inc. v. FCC*, 353 F.3d 57, 60

(D.C. Cir. 2004) (quoting *New World Radio*, 294 F.3d at 170). *See Save Jobs USA v. DHS*, 942 F.3d 504, 510 (D.C. Cir. 2019). And although the D.C. Circuit has never confronted such a case, the same result logically should follow where the government action grows the market in which the plaintiff competes, rather than intensifying competition for the same market share.

### B. The CFTC's Order Did Not Intensify Competition And Thereby Injure CME As A Matter Of Economic Logic

This case stands apart from the mine run of decisions applying the competitor standing doctrine. Rather than giving certain rivals a competitive edge in a fixed market, the CFTC Order alters the market itself, growing the potential market participant base for all DCMs, including CME and Kalshi. Before the CFTC Order, market participants who transacted in perpetuals were a massive and entirely untapped customer base for U.S.-regulated exchanges. *See supra* at 15-16.

Many participants who trade in perpetuals would not otherwise trade in dated futures for at least two reasons. First, some perpetual futures traders may lack the access or sophistication to trade in dated futures. *See* Hyperliquid Policy Center, *Perpetual futures as complements to dated futures*, *supra* at 2, 20. Second, dated futures do not meet the risk transfer needs of certain hedgers. *See id.* at 22. Consider, for example, a payments processor that must continuously hold Bitcoin because it accepts Bitcoin from customers and pays merchants in dollars. Hedging the risk of its Bitcoin holdings with dated futures would force the processor to close its expiring position and open a new one month after month, paying transaction costs on each trade and risking unfavorable prices at each replacement. For this type of market participant, perpetuals may be the *only* attractive product to hedge its risk.

The CFTC Order therefore expands choices available to all hedgers, opening the U.S. derivatives markets—whether on Kalshi, CME, or other DCMs—to market participants whose risks and profiles were never well-matched to dated contracts. The Order invites those traders'

dollars into the U.S. futures markets, creating an expanded market from which all DCMs stand to benefit. Indeed, nowhere in CME's complaint does it disclaim that the exchange intends to list perpetuals too. In this context, it does not follow as a matter of "economic logic" that CME will necessarily face intensified competition that causes a "detriment [to] its bottom line." *Sherley*, 610 F.3d at 72. Instead, the availability of the new product line of perpetual futures may financially benefit *all* DCMs—CME included. *See* CFTC Mot. 17-18.

Nor does the CFTC Order "allow[] new entrants into a fixed regulated market," thereby increasing supply-side competition. *Air Excursions*, 66 F.4th at 280. In many D.C. Circuit cases finding competitor standing, the government action introduced entirely new competitors into a regulated market, such as new laborers competing for work or researchers competing for government funding. *See Meese*, 761 F.2d at 802; *Sherley*, 610 F.3d at 74. Not so here. Contrary to CME's conclusory allegations, Kalshi is not a new market entrant. *Cf.* Compl. ¶¶ 62, 65. Kalshi has operated as a DCM since November 2020, and it has long competed in the same walled garden as CME and other derivatives exchanges. *See* Order of Designation, *In the Matter of the Application of KalshiEX LLC for Designation as a Contract Market* (Nov. 3, 2020). That Kalshi now offers a new product line does not make it a newcomer to the derivatives market.

In sum, because the CFTC Order simply approved a new product available to be listed on all DCMs, and without increasing the supply of rivals, CME lacks competitor standing to challenge the Order. CME's allegations that it perceives perpetuals as a competitive threat to its products, *see* Compl. ¶¶ 45-52, do not suffice to allege that the CFTC Order intensified competition in a fixed market such that CME will necessarily be injured as a matter of economic logic.

## III. CME IS AN UNSUITABLE CHALLENGER TO THE CFTC ORDER

Even if CME had standing, its challenge fails on the merits because its asserted interest in burdening its rivals with more onerous regulations does not fall within the zone of interests

protected by the Commodity Exchange Act. As the CFTC explains, Congress amended the Act to classify and regulate swaps in the wake of the 2008 financial crisis to bring transparency and oversight to the over-the-counter swap market—a policy that also led to more competitive pricing. *See* CFTC Mot. 23-24. CME's asserted interest in diminishing competition from its rivals is fundamentally misaligned with the Act's design.

### A. Plaintiffs Must Assert Interests Within The Zone Of Interests Protected By The Invoked Statute

To qualify as an "adversely affected or aggrieved" person entitled to judicial review under the Administrative Procedure Act, 5 U.S.C. § 702, "a plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Amgen v. Smith*, 357 F.3d 103, 108 (D.C. Cir. 2004) (quoting *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 883 (1990)). This zone of interests test, which courts previously framed as a question of prudential standing, limits the types of parties that "may invoke the cause of action" providing the basis for the lawsuit. *Lexmark*, 572 U.S. at 130. A plaintiff fails this test when its interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted).

Plaintiffs must satisfy one of two criteria to fall within a statute's protected zone. First, "a party is within that zone if it is among those whom Congress expressly or directly indicated were the intended beneficiaries of a statute." *Hazardous Waste Treatment Council v. Thomas* (*HWTC*), 885 F.2d 918, 922 (D.C. Cir. 1989). For example, a business that relies on aliens classified by statute as B-1 business visitors is an intended beneficiary of that statutory classification, which is "designed to protect . . . American businesses benefitting from transactions with B-1 business

visitors." *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 590 (D.C. Cir. 2022). Second, even if a plaintiff's interests are "not in any specific or obvious sense among those Congress intended to protect," *HWTC*, 885 F.2d at 922, the plaintiff is a "suitable challenger[]" if its "interests coincide 'systemically, not fortuitously' with those of intended beneficiaries," *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (quoting *HWTC*, 885 F.2d at 922-24). At bottom, the zone of interests test requires plaintiffs to be "reasonable—indeed, predictable—challengers of the [agency's] decisions." *Match-E*, 567 U.S. at 227.

When a plaintiff asserts a competitive injury, that interest satisfies the zone of interests test if the relevant statute imposes market-entry or other competitive restrictions that "reflect[] a congressional judgment that the constraint on competition is the means to secure the statutory end." *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1278 (D.C. Cir. 1993). In other words, where Congress seeks to protect consumers by limiting how economic actors compete, competitors' interests "in patrolling a statutory picket line" align with the interests protected by the statute, and competitors may sue to enforce those statutory provisions. *Id.* The D.C. Circuit has repeatedly applied this rule to hold that plaintiffs suing to bar their rivals from markets under "entry-restricting statute[s]" fall within the statutes' zones of interests because their "interests 'are generally congruent with a statutory purpose to restrict entry.'" *MD Pharm.*, 133 F.3d at 13 (citation omitted); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (holding that the plaintiff's "interest in limiting competition . . . is, 'by its very nature,' . . . linked with the statute's goal of limiting competition between generic manufacturers").

The Supreme Court has applied this rule in a series of decisions permitting economic actors to challenge agency actions relaxing statutory restrictions on the activities of national banks. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987); *Invest. Co. Inst. v. Camp*, 401 U.S. 617,

620-21 (1971); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46 (1970); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 156-57 (1970); *see also Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492-93 (1998) (similar analysis in context of statutory "interest in limiting the markets that federal credit unions can serve"). In these decisions, the statutes at issue restricted national banks from entering certain lines of business, *see, e.g.*, *Invest. Co Inst.*., 401 U.S. at 620-21 (securities); *Arnold Tours*, 400 U.S. at 46 (travel services); *Ass'n of Data Processing Serv. Orgs.*, 397 U.S. at 154-56 (data processing), or geographic markets, *see Clarke*, 479 U.S. at 403 (preventing national banks from "gaining a monopoly control over credit and money through unlimited branching"). Because the statutes "arguably legislated against the competition that [the plaintiffs sought] to challenge," the plaintiffs' competitive injuries fell within the scope of the statutes. *Clarke*, 479 U.S. at 403 (quoting *Invest. Co. Inst.*, 401 U.S. at 620); *accord Hardin v. Ky. Utils. Co.*, 390 U.S. 1, 6 (1968). But where the plaintiffs' interests do not align "systematically" with those the invoked statutes protect, courts have found that competitors do not fall within the zone of interests of the statute. *See, e.g.*, *HWTC*, 885 F.2d at 924; *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 704-06 (D.C. Cir. 1994); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 870-71 (D.C. Cir. 2001).

### B. CME's Asserted Competitive Interest Does Not Fall Within The Zone Of Interests Protected By The Commodity Exchange Act's Swap Provisions

CME's claimed competitive interest in increasing the regulatory burdens on its rivals does not fall within the zone of interests of the "substantive provision[]" upon which the "gravamen" of its complaint focuses, which is the CEA's classification of "swaps" in 7 U.S.C. § 1a(47). *See CSL Plasma Inc.*, 33 F.4th at 589 (citation omitted); Compl. ¶¶ 189-202. The CEA's classification of swaps does not operate by "limiting competition," *Mova Pharm. Corp.*, 140 F.3d at 1076, or "restrict[ing] entry into" the derivatives marketplace, *MD Pharm.*, 133 F.3d at 12-13.

Congress first amended the CEA to define and regulate swaps in the wake of the 2008 financial crisis, which was exacerbated in part by the lack of transparency in the unregulated, over-the-counter derivatives market, including swaps. *See Invest. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 172 (D.D.C. 2012). As part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress sought to protect taxpayers against future bailouts by creating a regulatory scheme requiring many swaps to be traded on regulated exchanges and swap dealers to be subject to capital, margin, and reporting requirements. *See* Pub. L. No. 111–203, 124 Stat. 1376, 1641 (2010). This regulatory sea change aimed to bring "transparency" to the swap markets, putting them on par with exchange-traded futures and securities, and to thereby facilitate meaningful oversight. *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017).

Far from evincing a congressional intent to somehow restrain competition, the Dodd-Frank amendments to the CEA improved price competition in the swap markets, because the prior "relative opaqueness of the [over-the-counter] market" had resulted in less competitive price setting. *See* S. Rep. 111-176, 111th Cong., 2d Sess. at 34 (2010). In this way, Dodd-Frank's enactment of the swap classification and regulatory regime aligns with one of the CEA's core express purposes, which is to "promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

CME's stated interest—in "forc[ing] [perpetuals] off the marketplace as futures," Compl. ¶ 68—is at cross-purposes with Dodd-Frank and the CEA, making CME's suit "more likely to frustrate than to further statutory objectives," *Twin Rivers Paper Co.*, 934 F.3d at 616. By defining and regulating swaps, Dodd-Frank's primary intervention was to require "all cleared swaps to be traded like futures," bringing transparency and regulatory oversight to the previously unregulated swap markets. *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 98 (D.D.C. 2013). The CFTC Order

achieves a similar result for perpetuals, treating the products not just *like* futures but *as* futures. CME's attempt to reclassify the products as swaps would result in no corresponding improvement in the transparency and oversight of perpetual futures markets.

Moreover, CME's competitive interests are not congruent with any statutory design to "constrain[] competition [a]s the means to secure the statutory end." *First Nat'l Bank & Trust Co.*, 988 F.2d at 1278. Contrast the interests protected by the CEA's classification of swaps with those protected by the statutes in *Investment Company Institute*, *Arnold Tours*, and *Association of Data Processing Service Organizations*. *See supra* at 22-23. In all of those cases, Congress created a "statutory demarcation" dividing two industries—national banks on the one hand, and data processing, travel services, and securities, on the other—such that the latter groups were "suitable challenger[s]" to enforce the line of demarcation when national banks infringed on their turf. *First Nat'l Bank & Trust Co.*, 988 F.2d at 1277-78. But here, the regulatory distinction between futures and swaps does not involve the same type of restraint on competition because DCMs are permitted to list futures *and* swaps. *See* 7 U.S.C. § 7b-3(a). Nor does the statute seek to restrict the growth of a particular industry (like the statutes in *Clarke* and *First Nat'l Bank & Trust Co.*), or to explicitly shield a party from competition (like the statute in *Mova Pharmaceuticals*).

At bottom, CME's interest in burdening its rivals with the categorization of perpetuals as swaps reveals a "systematic *mis*alignment with" the interests of taxpayers, whom the Commodity Exchange Act seeks to protect by ensuring that the derivatives markets are transparent, competitive, and subject to U.S. regulatory oversight. *Twin Rivers Paper Co.*, 934 F.3d at 618.

**CONCLUSION**

The Court should dismiss CME's complaint for lack of standing or, in the alternative, failure to state a claim for relief.

Dated: September 9, 2026

Respectfully submitted,

/s/ *Elizabeth B. Prelogar*
Elizabeth B. Prelogar (D.C. Bar No. 1011890)
*Counsel of Record*
Elias S. Kim (D.C. Bar No. 1673678) (*pro hac vice* application pending)
Claire Groden (D.C. Bar No. 1738682)
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Amicus Curiae Hyperliquid Policy Center*

## CERTIFICATE OF COMPLIANCE

This brief complies with all the applicable requirements set forth in Local Civil Rule 7(o), including all formatting requirements, and does not exceed 25 pages in length.

Dated: September 9, 2026

/s/ *Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Amicus Curiae Hyperliquid Policy Center*

**CERTIFICATE OF SERVICE**

I certify that on this 9th day of September, 2026, I electronically filed the foregoing with the United States District Court for the District of Columbia using the Court's CM/ECF system, which will effect service upon all registered parties.

Dated: September 9, 2026

/s/ *Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Amicus Curiae Hyperliquid Policy Center*