# EXCERPTS FROM ADMINISTRATIVE RECORD

program in the same application under appeal during the next quarter of the program, but both of these filings count towards appellant's petition filing limit.

## III. Prosecution of the Application Granted Special Status Under the Pilot Program

*A. Replies by the Applicant Under the Pilot Program*

The time periods set for reply in Office actions for an application granted special status under the pilot program will be the same as those set forth in section 710.02(b) of the MPEP. A reply to an Office action must be fully responsive to the rejections, objections, and requirements made by the examiner. Any amendment filed in reply to an Office action may be treated as not fully responsive if it attempts to: (1) add claims that would result in more than three independent claims or more than 20 total claims pending in the application; or (2) add any multiple dependent claim(s).

If a reply to a non-final Office action is not fully responsive for failing to comply with the pilot program's claim requirements but is a bona fide attempt to advance the application to final action, the examiner may, at the examiner's discretion, issue a Notice of Non-Responsive Amendment and provide a shortened statutory period of two months for the applicant to supply a fully responsive reply. Extensions of this time period under 37 CFR 1.136(a) to the Notice of Non-Responsive Amendment will be permitted, but in no case can any extension carry the date for reply to this notice beyond the maximum period of six months set by statute (35 U.S.C. 133). However, any further non-responsive amendment typically will not be treated as bona fide, and as such, the time period set in the prior notice will continue to run.

*B. After-Final and Appeal Procedures*

Any amendment, affidavit, or other evidence after a final Office action and prior to appeal must comply with 37 CFR 1.116. During the appeal process, the application will be treated in accordance with the normal appeal procedure (*see* MPEP Chapter 1200) unless the appeal is granted special status under this program or another program.

*C. Application Cannot Be Withdrawn From the Pilot Program*

There is no provision to withdraw an application undergoing expedited examination from the pilot program. An applicant may abandon an application that has been granted special status under the pilot program in favor of a continuing application. A continuing application will not be granted special status based on the petition filed in the parent application. Each application (including each continuing application) must, on its own merit, meet all requirements for special status under the pilot program, and be accompanied by its own petition as detailed in Part I above.

## IV. Conduct of Appeals Accepted Into the Pilot Program

*A. Hearings*

A petition to participate in the pilot program may be filed for *ex parte* appeals in which the appellant seeks an oral hearing before the PTAB, that is, "heard" appeals, as well as those appeals for which no oral hearing is requested, that is, "on-brief" appeals. Hearings in *ex parte* appeals accorded special status under the pilot program will be conducted according to the standard PTAB hearing procedures. Appellants seeking an oral hearing should submit, along with the request for oral hearing, any preferences as to the time, date, or location of the hearing. The PTAB will make best efforts to schedule a hearing in accordance with such preferences. If the PTAB is unable to accommodate an appellant's preferences, it will schedule the hearing in an available hearing room at any office, including a regional office. An appellant may waive the hearing and continue under the pilot program for consideration and decision on the briefs. An appellant may not reschedule the date or time of a hearing and remain in the pilot program. If an appellant in an *ex parte* appeal accorded expedited status must reschedule the date or time of a hearing and is not willing to waive the oral hearing, then the appellant may opt out of the pilot program, thereby regaining the ability to reschedule or relocate the hearing as per standard PTAB hearing procedures.

*B. Termination of Expedited Status of Appeal*

Under the pilot program, special status will be maintained in an *ex parte* appeal from the date the petition for inclusion in the pilot program is granted until the PTAB's jurisdiction ends under 37 CFR 41.35(b). Activities subsequent to an appellant's withdrawal from the pilot program or the PTAB's decision, including any reopened prosecution, will not be treated as subject to expedited status, nor will filing a petition to expedite an appeal under the pilot program cause an application to be accorded expedited status outside the jurisdiction of the PTAB. Additionally, any request by an appellant causing a delay in the conduct of the appeal, such as for an extension of time under 37 CFR 1.136(b) or for additional briefing, will be cause for removal of expedited status.

**John A. Squires,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2026–11098 Filed 6–2–26; 8:45 am]

BILLING CODE 3510–16–P

# COMMODITY FUTURES TRADING COMMISSION

## Policy Statement Concerning the Listing of Perpetual Contracts

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Policy statement.

**SUMMARY:** This policy statement describes the views of the Commodity Futures Trading Commission (the "CFTC" or "Commission") concerning the listing of perpetual contracts. Contemporaneously with the issuance of this policy statement, the Commission has issued an order (the "Order") permitting the listing of a perpetual contract that references the spot price of bitcoin by a designated contract market ("DCM") as a futures contract. Given the unique characteristics of perpetual contracts, which tend to vary based on the underlying asset they reference, the Commission is of the view that the case-by-case review process detailed in Commission Regulation 40.3 is appropriate for the listing of perpetual contracts that reference asset classes that are not contemplated in the Order.

**DATES:** The Commission's policy statement is adopted as of May 29, 2026.

**FOR FURTHER INFORMATION CONTACT:** Roger Smith, 202–418–5344, *rsmith@cftc.gov,* Division of Market Oversight, Commodity Futures Trading Commission, 77 West Jackson Blvd., Suite 800, Chicago, Illinois 60604 or Stephen Andrews, Deputy General Counsel for Regulation, 202–308–7563, *sdandrews@cftc.gov,* Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction and Background

Perpetual contracts are derivative contracts that have no fixed expiration date, and which rely on a periodic

funding rate mechanism, rather than a fixed expiration date, to maintain relative price parity with the underlying asset's spot price. Perpetual contracts have become a dominant form of crypto derivative trading in global markets. However, given the regulatory uncertainty concerning the appropriate classification of these types of contracts in the U.S. derivatives markets, the market for perpetual contracts has largely developed outside of the United States, with the majority of trading occurring on offshore trading venues.

The Commission has taken a series of steps over the past year to develop a workable domestic framework for these products. On April 21, 2025, Commission staff issued a Request for Comment on the Trading and Clearing of ''Perpetual'' Style Derivatives (the ''Request'').[1] The Request solicited public input on the characteristics, use cases, regulatory classification, and risks of perpetual contracts. The Request was issued in conjunction with a Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis, which sought public input on the operational, surveillance, clearing, and margin implications of extending CFTC-regulated derivatives trading to a continuous basis.[2]

On July 30, 2025, the President's Working Group on Digital Asset Markets issued its report, Strengthening American Leadership in Digital Financial Technology (the ''PWG Report'').[3] The PWG Report recommended that the Commission and the U.S. Securities and Exchange Commission permit eligible market participants to access derivatives, including perpetual contracts, through regulated intermediaries and that the agencies use existing exemptive and interpretative authorities to provide near-term clarity for innovative derivatives products.

As discussed, this policy statement is being released in conjunction with the Order,[4] which approved the listing of a perpetual contract that references the spot price of bitcoin by a DCM as a futures contract. The Commission issues this policy statement to articulate, for the benefit of registrants, market participants, and the public, its view that perpetual contracts that reference underlying asset classes that are not contemplated in the Order[5] should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.[6]

This policy statement is a general statement of policy issued under 5 U.S.C. 553(b)(A). It does not impose any obligation on any person, modify or supersede any provision of the Commodity Exchange Act (''CEA'') or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity, and is not subject to the notice-and-comment requirements of the Administrative Procedure Act. Each contract submitted to the Commission under part 40 will continue to be evaluated on its own terms.

## II. The Structural Distinctiveness of Perpetual Contracts

Traditional futures contracts rely primarily on a fixed expiration date to achieve convergence with the underlying asset's spot price. Futures contracts have emerged as a primary instrument in the U.S. derivatives markets for hedgers and traders to effectively secure a price for an asset today in connection with a transaction that will occur in the future. Price convergence with the underlying spot price at expiration is thus inherent to the design of a traditional futures contract and ultimately what makes them a useful instrument for hedging and price discovery.

A perpetual contract has no fixed expiration date through which it can achieve convergence. It therefore requires a substitute mechanism to maintain relative price parity with the underlying spot price of the asset that it references. The mechanism that has emerged in the global crypto asset markets is known as a funding rate, or a periodic payment between the long and short sides of the contract, the direction and magnitude of which is generally determined by the difference between the perpetual contract's market price and the underlying asset's spot price. When a perpetual contract trades above the spot price, the traders with long positions make payments while the traders with short positions receive payments; and vice versa. These payments are intended to create an economic incentive for market participants to arbitrage away the price differential by opening positions on whichever side of the market is accruing the payments. In this way, the funding rate is designed to keep closely aligned a perpetual contract's price to the underlying asset's price and functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies.

Perpetual contracts raise novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency with the Core Principles applicable to registrants under the CEA. For example, a perpetual contract's design and characteristics raise important considerations with respect to DCM Core Principle 3, which requires that a DCM list only those contracts that are not readily susceptible to manipulation.[7] For a traditional, cash-settled futures contract, the susceptibility-to-manipulation analysis directed at the cash settlement reference price is an analysis of one moment in time: the settlement reference price must be reliable at expiry. For a perpetual contract, however, the reference must be reliable at every funding interval, without interruption, for as long as the contract remains active.

It is therefore the Commission's view that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.

The Commission notes that Regulation 40.2 permits registrants to self-certify new products where the submitting registrant determines that the product complies with the CEA and Commission regulations thereunder.[8] However, given the novel characteristics of perpetual contracts, including their lack of a traditional expiration date and the complex questions concerning, among others, market structure and customer protections, the Commission

[1] CFTC Release No. 9069–25, *Request for Comment on the Trading and Clearing of ''Perpetual'' Style Derivatives* (April 21, 2025).

[2] CFTC Release No. 9068–25, *Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis,* (April 21, 2025).

[3] President's Working Group on Digital Asset Markets, *Strengthening American Leadership in Digital Financial Technology* (July 30, 2025), available at *https://www.whitehouse.gov/wp-content/uploads/2025/07/Digital-Assets-Report-EO14178.pdf.*

[4] *See* Order Approving KalshiEX LLC BTCPERP Futures Contract, May 29, 2026.

[5] These types of asset classes include, but are not limited to, agricultural products, precious metals, equity securities, and narrow-based security indexes. Each asset class will raise different considerations and merit independent analysis and review based on their unique circumstances. For example, perpetual contracts are likely particularly ill-suited for agricultural products based on the considerations identified in the Order, while perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission.

[6] 17 CFR 40.3.

[7] 7 U.S.C. 7(d)(3); *see also* 17 CFR part 38, app. C.

[8] 17 CFR 40.2.

believes that the public interest is best served by requiring perpetual contracts that reference assets that are not contemplated in the Order to undergo Commission review and approval pursuant to Commission Regulation 40.3.

### III. Submissions Under Commission Regulation 40.3

The Commission believes that the Commission Regulation 40.3 process provides important benefits for regulators, market participants, and the public. Prior review promotes transparency, facilitates engagement between Commission staff and registrants during product development, and provides greater regulatory clarity for market participants and members of the public seeking to responsibly innovate within the CFTC's regulatory framework.

In accordance with the purpose of the CEA, the Commission remains committed to promoting responsible innovation and fair competition in the U.S. derivatives markets.[9] The Commission believes that clear regulatory pathways and transparent supervisory expectations are essential to ensuring that emerging technologies and novel financial products can develop responsibly within regulated U.S. markets rather than migrating to less regulated jurisdictions outside of the United States.

This policy statement is intended solely to provide the Commission's views concerning the listing of perpetual contracts and does not alter or amend the CEA or the Commission's regulations thereunder. Nothing in this policy statement is intended to be binding or foreclose the possibility that, on appropriate facts and contract design, the Commission might in the future address perpetual contracts through separate policy statements, interpretative guidance, or the rulemaking process; the Commission makes no determination as to that possibility here.

Issued in Washington, DC, on May 29, 2026, by the Commission.

**Christopher Kirkpatrick,**

*Secretary of the Commission.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

[9] 7 U.S.C. 5(b).

### Policy Statement Concerning the Listing of Perpetual Contracts—Commission Voting Summary

On this matter, Chairman Selig voted in the affirmative. No Commissioner voted in the negative.

[FR Doc. 2026–11020 Filed 6–2–26; 8:45 am]

BILLING CODE 6351–01–P

## DEPARTMENT OF DEFENSE

### Office of the Secretary

**[Docket ID: DOD–2026–OS–1222]**

### Proposed Collection; Comment Request

**AGENCY:** Office of the Under Secretary of Defense for Acquisition and Sustainment (OUSD(A&S)), Department of Defense (DoD).

**ACTION:** 60-Day information collection notice.

**SUMMARY:** In compliance with the *Paperwork Reduction Act of 1995,* the OUSD(A&S) announces a proposed public information collection and seeks public comment on the provisions thereof. Comments are invited on: whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; the accuracy of the agency's estimate of the burden of the proposed information collection; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the information collection on respondents, including through the use of automated collection techniques or other forms of information technology.

**DATES:** Consideration will be given to all comments received by August 3, 2026.

**ADDRESSES:** You may submit comments, identified by docket number and title, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Mail:* Department of Defense, Office of the Director of Administration and Management, Oversight and Compliance Directorate, Regulatory Division, 4800 Mark Center Drive, Mailbox #24, Suite 05F16, Alexandria, VA 22350–1700.

*Instructions:* All submissions received must include the agency name, docket number and title for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** To request more information on this proposed information collection or to obtain a copy of the proposal and associated collection instruments, please write to the Office of the Assistant Secretary of War for International Armaments Control, 3010 Defense Pentagon, Washington, DC 20301–3010, Katherine Coyne, 703–545–5899.

**SUPPLEMENTARY INFORMATION:**

*Title; Associated Form; and OMB Number:* America First Arms Transfer Strategy OMB Control Number 0704–AFAT.

*Needs and Uses:* Effective execution of Executive Order 14383 requires immediate, up-to-date market intelligence regarding defense articles and the private sector's current production capabilities, supply chain dependencies, product offerings, and export readiness. This information collection is a strategic market research effort to inform execution of Executive Order 14383. It is not an acquisition or procurement action, and no federal contracts will be solicited or awarded based on these submissions. The analysis derived from this collection will facilitate the analytical prioritization of U.S. defense articles, enabling the curation of a comprehensively assessed data set for the Government.

*Affected Public:* Businesses or other for-profit.

*Annual Burden Hours:* 375.

*Number of Respondents:* 150.

*Responses per Respondent:* 5.

*Annual Responses:* 750.

*Average Burden per Response:* 30 minutes.

*Frequency:* As required.

Dated: May 29, 2026.

**Aaron T. Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2026–11025 Filed 6–2–26; 8:45 am]

BILLING CODE 6001–FR–P

## DEPARTMENT OF EDUCATION

## DEPARTMENT OF LABOR

### Notice Announcing American History and Civics Education National Activities Program Competition; Correction

**AGENCY:** Department of Education; Department of Labor.

**ACTION:** Notice; correction.

S&C Draft of February 27, 2026
CONFIDENTIAL

[Kalshi Letterhead]

17 C.F.R. § 40.2(c)

February [●], 2026

**<u>Via E-mail</u>**

Frank Fisanich
Acting Director
Division of Market Oversight
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581

***Re: Request for No-Action Position Concerning CFTC Regulation 40.2(c)***

Dear Mr. Fisanich:

KalshiEx LLC (**Kalshi**) is writing to request that the Division of Market Oversight (the **Division**) of the Commodity Futures Trading Commission (**Commission** or **CFTC**) issue a no-action letter pursuant to 17 C.F.R. § 140.99 confirming that the Division will not recommend that the Commission stay Kalshi's listing of Perpetual Contracts (as described in Part II below) under Regulation 40.2(c)[1] or commence enforcement action against Kalshi for a false certification, solely on the basis that Kalshi certifies the Perpetual Contracts as contracts of sale of a commodity for future delivery (**futures contracts**), rather than swaps.

## I. Background on Kalshi

Kalshi was designated as a contract market (**DCM**) in 2020, when it became the first federally-regulated platform for event-contract trading. Kalshi currently lists a wide variety of fully collateralized event contracts on the outcomes of events ranging from global news, to macro-economic indicators to popular culture and sports. All contracts traded on Kalshi are cleared by Kalshi Klear LLC (**Klear**), a registered designated clearing organization (**DCO**). Klear's order of registration currently limits its activities to clearing fully collateralized positions in swaps.

## II. Proposed Perpetual Contracts

Klear has applied to the Commission to expand its DCO registration to permit it to clear margined positions. As an initial matter, Klear intends to clear margined positions in Perpetual Contracts, which will be listed on Kalshi and trade in its central

[1] 17 C.F.R. § 40.2(c)

limit order book, with pre- and post-trade transparency.

Each Perpetual Contract will provide its holder either long or short, as applicable, exposure to the spot price of a standard, fixed unit amount of digital asset that is neither a security nor a representation of, or an interest in, a nonfinancial commodity (such a digital asset, a **Subject Digital Asset**). Initially, Perpetual Contracts will reference 0.0001 Bitcoin.

Perpetual Contracts will provide exposure to a Subject Digital Asset by providing for the holder to make or receive "funding" payments that vary based on the price of the Subject Digital Asset relative to the price of a Perpetual Contract. When the Perpetual Contract price exceeds the price of the Subject Digital Asset, payment will be due from the long-side holders to short-side holders, and vice versa if the price of the Subject Digital Asset exceeds the Perpetual Contract price.

This funding mechanism is intended to align the price of the Perpetual Contracts with the price of the Subject Digital Asset by incentivizing market participants to (i) take on short positions in the Perpetual Contracts when the Perpetual Contract price exceeds the price of the Subject Digital Asset, thereby bringing the Perpetual Contract price down towards the price of the Subject Digital Asset and (ii) take on long positions in the Perpetual Contracts when the price of the Subject Digital Asset exceeds the Perpetual Contract price, increasing the Perpetual Contract price towards the price of the Subject Digital Asset.

Settlement in the Perpetual Contracts will occur twice daily and, upon settlement, Klear will calculate the mark-to-market value of all open positions in the Perpetual Contracts and, accordingly, determine and distribute or collect margin obligations from all of its members with open long or short positions in the Perpetual Contracts. A member's net margin obligation for each settlement period will include aggregate funding payment obligations and/or entitlements accrued since the prior settlement period, in addition to other risk-based margin charges.

The Perpetual Contracts will have an indefinite (or "perpetual") term. As such, they will not expire on a fixed date. Instead, a member of Kalshi wishing to exit all or part of its position in a Perpetual Contract will enter into an offsetting Perpetual Contract on Kalshi. Because Perpetual Contracts will be standardized and centrally cleared by Klear, acting as DCO and central counterparty, they will be fungible with each other. The Perpetual Contracts will not provide for physical settlement of the Subject Digital Asset, and will settle solely via the cash payments and offset.

## III. Need for No-Action Position

There is considerable uncertainty regarding the regulatory categorization of perpetual-term derivative contracts, such as the Perpetual Contracts, under the Commodity Exchange Act (**CEA**) and Commission regulations thereunder. For example, in a recent

request for comment regarding "perpetual" style digital-asset derivatives, Commission Staff expressly requested public comment regarding the proper regulatory categorization of these contracts.[2] That uncertainty presents challenges because swaps and futures contracts are subject to substantially different regulatory frameworks. For example, categorization of the Perpetual Contracts will affect matters such as the minimum initial margin requirements for the Perpetual Contracts,[3] reporting obligations for Kalshi and Klear, and registration obligations for market participants trading in the Contracts.[4] As a result, key aspects of Klear's pending application to amend its DCO registration depend on the categorization of the Perpetual Contracts.

The Commission has previously made clear that a DCM may self-certify a product as a futures contract, even if the product is "indistinguishable in material economic effects" from a swap.[5] In the present instance, however, Kalshi cannot self-certify the Perpetual Contracts in either category until the Commission approves Klear's application to amend its DCO registration because, in the absence of such approval, Kalshi could not list the Perpetual Contracts in compliance with the CEA and Commission regulations thereunder. On the other hand, determining the categorization of the Perpetual Contracts is a prerequisite to amending Klear's DCO registration to permit the listing and clearing of the Perpetual Contracts.[6] Accordingly, Kalshi is seeking the requested no-action position so that Klear's DCO application can proceed on the basis that, following approval, Kalshi can self-certify the Perpetual Contracts in a category that is consistent with how Klear's application treats them.

---

[2] CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* question 13 (Apr. 21, 2025). Further, the Commission has taken the view in past enforcement actions that certain perpetual-duration digital-asset derivative products constitute swaps. *See, e.g.,* Complaint, *CFTC* v. *Changpeng Zhao, et. al.*, No. 23-cv-01887 (March 27, 2023) ("*Binance*"); Complaint, *CFTC* v. *MEK Global Limited, et. al.,* No. 24-cv-2255 (March 26, 2024); Complaint, *CFTC* v. *Eisenberg,* No. 23-cv-00173 (Jan. 9, 2023); Complaint, *CFTC* v. *HDR Global Trading Limited, et. al.*, No. 20-cv-8132 (Oct. 1, 2020); *In the Matter of Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023). The Commission did not, however, analyze address whether such products were futures contracts in any of these enforcement actions. Moreover, the products at issue in each of these cases differ from the Perpetual Contracts in that they were not listed on Commission-regulated DCMs or centrally cleared by registered DCOs.

[3] *See* Commission Regulation 39.13(g)(2)(ii), 17 C.F.R. 39.13(g)(2)(ii) (setting different minimum liquidation times for futures, options, and swaps).

[4] These considerations are discussed in greater detail in Part IV.B. below.

[5] Specifically, the Commission noted, in response to a market participant's question regarding whether a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a [swap execution facility], since futures and swaps are indistinguishable in material economic effects", that "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48303 (Aug. 13, 2012) ("*2012 Definitions Release*").

[6] For the same reasons, it would not be practicable for Kalshi to seek Commission review and approval of the Perpetual Contracts under Regulation 40.3.

## IV. Rationale for No-Action Position

The requested no-action position is supported by Kalshi's exercise of reasonable discretion to categorize the Perpetual Contracts for purposes of Regulation 40.2. In addition, regulating the Perpetual Contracts as futures contracts would reduce regulatory arbitrage and promote competition.

### A. Kalshi Has Exercised Reasonable Discretion to Categorize the Perpetual Contracts for Purposes of Regulation 40.2

Regulation 40.2 requires a DCM's product self-certification to include, among other items, a concise explanation and analysis of the product's compliance with applicable provisions of the CEA, including core principles, and the Commission's regulations thereunder.[7] CEA Section 5(d)(1)(B)[8] and Regulation 38.100(b)[9] provide that a DCM has reasonable discretion in establishing the manner in which it complies with the core principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Perpetual Contracts as futures contracts for purposes of compliance with the core principles and other provisions of the CEA and Commission regulations thereunder.[10]

*First,* we analyzed whether the Perpetual Contracts would fall within the CEA's "swap" definition. Section 1a(47) of the CEA[11] provides that, "[e]xcept as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction" that meets any of six clauses set out in subparagraph (A) of that definition. Subparagraph (B) then sets out ten exclusions from the "swap" definition. If the Perpetual Contracts fall within one of the exclusions, they are not swaps, regardless of whether they would otherwise fit within one of the clauses set out in subparagraph (A).[12] One of those exclusions—clause (B)(i)—covers futures contracts.[13] We therefore turned to analyzing whether the Perpetual Contracts would constitute futures contracts.

---

[7] 17 C.F.R. § 40.2(a)(3)(v).

[8] 7 U.S.C. § 7(d)(1)(B).

[9] 17 C.F.R. § 38.100(b).

[10] Consistent with self-certification under Regulation 40.2, Kalshi and Klear intend to treat the Perpetual Contracts as futures contracts for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.

[11] 7 U.S.C. § 1a(47).

[12] Our analysis here is limited to the Perpetual Contracts. In contrast, the event contracts listed on Kalshi can be "structured as options" or "futures contracts." 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008).

[13] The *per se* nature of this exclusion is illustrated by the treatment of traditional, cash-settled futures contracts, such as a financially settled, quarterly Bitcoin contract. Such a contract provides for cash settlement at quarterly expiry based on the price of Bitcoin, without any physical delivery. But for

*Next*, we evaluated the characteristics of the Perpetual Contracts against relevant judicial precedent and Commission guidance. Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[14] by evaluating whether certain characteristics common to futures contracts are present.[15]

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[16] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[17]

---

subparagraph (B) of the "swap" definition, such a contract would fall within clause (A)(iii) of that definition as an agreement, contract, or transaction "that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . commodities . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred." 7 U.S.C. § 1a(47)(A)(iii). However, contracts of this sort are listed by other DCMs and regulated by the Commission as a futures contract because they fall within clause (B)(i), which provides, in relevant part, that "the term 'swap' does not include . . . any contract of sale of a commodity for future delivery." 7 U.S.C. § 1a(47)(B)(i)

[14] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").
[15] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

[16] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*"). *See, also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989) (adopting a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public) and Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993) (adopting an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility).

[17] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contracts involving intangible commodities, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[18] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[19] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[20] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[21] and (iii) the ability of holders to exit their positions by offset.[22]

The Perpetual Contracts will exhibit all of these futures contract characteristics: the Perpetual Contracts will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty; holders will be able to exit their positions via offset; the Perpetual Contracts will be available to the general public, including retail participants; parties will enter into the Perpetual Contracts for the purpose of assuming or shifting the risk of change in value of the Subject Digital Asset, without the possibility of transferring ownership of the Subject Digital Asset; and the Perpetual Contracts will trade on the centralized market of a DCM.

---

transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[18] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). Because the Perpetual Contracts are derivatives on Subject Digital Assets, which are intangible commodities, this request does not address the regulatory categorization of contracts on tangible commodities.

[19] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[20] *Id.*

[21] *CME v. SEC* at 542. Although the Dodd-Frank Act arguably changed the historical analysis, at least in part, by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on swap execution facilities, which may lack the centralized market characteristics of a DCM because they can permit trading via request for quote in addition to an order book.

[22] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

*Finally*, we analyzed whether the Perpetual Contracts' indefinite duration should affect their categorization. We focused on this term of the Perpetual Contracts because courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[23] or "on a date certain,"[24] or "at or before a stated future time."[25] Courts have not, however, viewed this characteristic as necessary to conclude that a contract is a futures contract. To the contrary, courts have repeatedly explained that, "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[26] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[27] – because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[28] And, in *Zelener*, the Commission took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[29]

---

[23] *CME v. SEC* at 542.

[24] *Tauber* at 971.

[25] *Erskine* at 323.

[26] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v. International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[27] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[28] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Perpetual Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out" date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[29] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that

Based on this analysis, Kalshi intends to categorize the Perpetual Contracts as futures contracts in its Regulation 40.2 self-certification.

### B. Regulating the Perpetual Contracts as Futures Contracts Would Reduce Regulatory Arbitrage and Promote Competition

As indicated above, categorization of the Perpetual Contracts as futures contracts or swaps will have significant implications for their regulatory treatment, and the regulatory categorization of perpetual digital-asset derivative contracts is unclear under existing law. The lack of clarity regarding the categorization of such contracts creates opportunity for unnecessary regulatory arbitrage due to the inconsistent treatment of substantively similar products.

The indefinite term of the Perpetual Contracts aligns them with similar products offered by non-U.S. exchanges. Meanwhile, other DCMs and DCOs have already begun offering "perpetual-style" futures contracts that are designed to mimic the economics of true perpetual contracts, but with an expiry date that presents unwanted risk near the contracts' expiry. One of those DCMs and DCOs has also begun to offer retail leveraged spot digital asset transactions, which it offers as futures contracts under Section 2(c)(2)(D) of the CEA.[30] Those transactions also bear a high degree of economic similarity to the Perpetual Contracts, but with the added potential for custody and other risks associated with physical digital asset trading.

Confirmation that Kalshi may self-certify the Perpetual Contracts under Regulation 40.2, like these other transaction types, without the threat of a stay or other enforcement action for false certification, would promote a consistent regulatory treatment across economically equivalent transactions. In contrast, requiring such contracts to be

---

case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Perpetual Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Perpetual Contracts bought or sold on Kalshi.

[30] Section 2(c)(2)(D)(iii) of the CEA applies the exchange-trading requirement in Section 4(a) of the CEA to retail leveraged commodity transactions as though they are futures contracts. Congress added this provision to the CEA as part of the Dodd-Frank Act, at the same time it amended the CEA to regulate swaps. We think it is notable that Congress elected, at that time, to treat retail leveraged commodity transactions as though they are futures contracts, not swaps. Congress did so in order to fix the *Zelener* "loophole" by subjecting rolling spot contracts to futures regulation, not swaps regulation. *See* 156 Cong, Rec. S5,924 (daily ed. July 15,2010) (statement of Sen. Lincoln); *see also* Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture, 111th Cong. 52-664 (2009) (statement of Hon. Jim Marshall, United States Representatives) ("What we are talking about [regarding expanding the Commission's authority over retail commodity transactions] though is expanding the-well, correcting would be the argument the Zelener interpretation of what a futures contract is. If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftsmanship is."). It would contradict Congressional intent to place the Perpetual Contracts, which likewise provide for cash-settled, leveraged retail exposure to commodities, in a different regulatory category.

categorized as swaps would subject them to higher initial margin requirements,[31] transaction reporting under Parts 43 and 45 of the Commission's regulations in addition to Part 16, and counting towards the swap dealer *de minimis* threshold. Applying those additional requirements to the Perpetual Contracts would discourage trading in them, even though they exhibit less risk than the over-the-counter swaps those requirements were designed to address. Regulating the Perpetual Contracts as swaps also would foster continuing incentives for U.S. market participants to seek to trade on unregulated, non-U.S. markets offering similar contracts without the protections of Commission regulation.

## V. Requested No-Action Position

For the foregoing reasons, and without asking that the Division or the Commission concur with our categorization analysis, we request that the Division issue a no-action letter confirming that it will not recommend that the Commission stay Kalshi's listing of Perpetual Contracts under Regulation 40.2(c) or commence enforcement action against Kalshi for a false certification, solely on the basis that Kalshi certifies the Perpetual Contracts as futures contracts, rather than swaps. This no-action position would expire on the effectiveness of any future rulemaking or interpretation by the Commission, guidance by the Division, or federal legislation addressing the categorization of Perpetual Contracts.

* * *

Thank you for your consideration of this letter. Please do not hesitate to contact me at [•] with any questions you may have.

Pursuant to Regulation 140.99(c)(3), the undersigned hereby certifies that the material facts set forth herein are true and complete to the best of their knowledge, and undertakes that, if at any time prior to the issuance of a no-action letter, any material representation made in this letter ceases to be true and complete, they will promptly inform Commission Staff in writing of all materially changed facts and circumstances.

Respectfully submitted,

---

[31] *See* Note 3, *supra*.

SULLIVAN & CROMWELL LLP

February 18, 2026

MEMORANDUM TO: KalshiEX LLC
Kalshi Klear LLC

FROM: Colin D. Lloyd
Natasha Vasan
(Sullivan & Cromwell LLP)

RE: Categorization of Proposed Perpetual Contracts

Kalshi Klear LLC ("Klear") has submitted to the Commodity Futures Trading Commission (the "Commission" or "CFTC") an application to amend Klear's order of registration as a derivatives clearing organization ("DCO") to permit it to clear perpetual contracts referencing Bitcoin (the "Contracts"), which will be traded on KalshiEX LLC ("KalshiEx"), a board of trade designated by the Commission as a contract market ("DCM").

To assist Klear with this application, you have asked that we address the categorization of the Contracts under the Commodity Exchange Act ("CEA") and Commission rules thereunder. Categorization of the Contracts will affect such matters as the scope of Klear's amended order of registration,[1] the minimum initial margin requirements for the Contracts,[2] reporting obligations for KalshiEx and Klear, and registration obligations for market participants trading in the Contracts.[3] For the reasons and subject to the assumptions set out below, in our view the Commission should categorize the Contracts as contracts of sale of a commodity for future delivery ("futures contracts"), not swaps.[4]

---

[1] Klear's existing order of registration permits it to clear fully collateralized swaps. Klear is applying to amend the order because the Contracts will be leveraged, not fully collateralized.

[2] *See* Commission Regulation 39.13(g)(2)(ii), 17 C.F.R. 39.13(g)(2)(ii) (setting different minimum liquidation times for futures, options, and swaps).

[3] These considerations are discussed in greater detail in Part II.C. below.

[4] The analysis herein is limited in scope to the Contracts and does not address any other contract listed or proposed to be listed by Kalshi, including event contracts. The regulatory categorization of any contract necessarily must take into account all of its terms, characteristics and other relevant facts and circumstances.

I. Factual Background

Each Contract will provide its holder either long or short, as applicable, economic exposure to the spot price of Bitcoin[5] by providing for the holder to make or receive "funding" payments that vary based on the price of Bitcoin relative to the price of a Contract. When the Contract price exceeds the price of Bitcoin, payment will be due from the long-side holders to short-side holders, and vice versa if the price of Bitcoin exceeds the Contract price. This funding mechanism is intended to align the price of the Contracts with the Bitcoin price by incentivizing market participants to (i) take on short positions in the Contracts when the Contract price exceeds the price of Bitcoin, thereby bringing the Contract price down towards the Bitcoin price and (ii) take on long positions in the Contracts when the Bitcoin price exceeds the Contract price, increasing the Contract price towards the Bitcoin price.

Klear will calculate funding payments due or owing to each Member with an open position in the Contracts every eight hours.[6] A Member that holds Contract positions through a funding rate period (*i.e.,* every eight hours) will accrue a funding payment obligation or entitlement. Contract settlement will take place in U.S. dollars, and will occur twice per day, at mid-day and end-of-day. Upon settlement, Klear will calculate the mark-to-market value of all open Contract positions and, accordingly, determine and distribute or collect margin obligations from all Members with open long or short positions in the Contracts. A Member's net margin obligation for each settlement period will include aggregate funding payment obligations and/or entitlements accrued since the prior settlement period, in addition to other risk-based margin charges (*i.e.,* a base margin obligation, a liquidity risk charge and an anti-procyclicality buffer).

Each Contract will have a standard notional size corresponding to 0.0001 Bitcoin. They will trade on KalshiEx's central limit order book, with pre- and post-trade price transparency. The Contracts will be centrally cleared by Klear, acting as central counterparty. Standardization and central clearing will make the Contracts fungible with each other.

The Contracts will have an indefinite (or "perpetual") term. As such, they will not expire on a fixed date. Instead, a Member wishing to exit all or part of its position will enter into an offsetting Contract on KalshiEx. The Contracts will not provide for physical settlement of Bitcoin; they will solely settle via the cash payments described above.

The indefinite term of the Contracts aligns them with similar products offered by non-U.S. exchanges. Klear has considered instead offering a product that has a fixed final settlement date but with margin payments adjusted to reflect spot prices,

---

[5] Klear will calculate the spot price of Bitcoin by reference to CF Benchmark's Bitcoin Real Time Index.

[6] Each funding payment will be the product of (i) a funding rate, determined by Klear pursuant to the Klear Margin Risk Framework, (ii) the Member's open position quantity, (iii) the Member's position side (long or short) and (iv) the Contract's mark-to-market price as determined by a 60-second volume-weighted average price formula.

which some other DCMs and DCOs offer as "perpetual-style" futures. However, Klear has received feedback from its Members that the residual expiry risk associated with those products, and resulting need to "roll" positions around expiry, presents risk management challenges and causes confusion, even if the expiry date is far into the future.

## II. Discussion and Analysis

Below we address why, from legal and policy perspectives, the Commission should categorize the Contracts as futures contracts.

### A. The CEA's "Swap" Definition *Per Se* Excludes Futures Contracts

Section 1a(47) of the CEA[7] provides that, "[e]xcept as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction" that meets any of six clauses set out in subparagraph (A) of that definition. Subparagraph (B) then sets out ten exclusions from the "swap" definition. The exclusions are not qualified in any respect; if an agreement, contract, or transaction falls within one of the exclusions, it is not a swap, regardless of whether it would otherwise fit within one of the clauses set out in subparagraph (A).

The *per se* nature of these exclusions is illustrated by the treatment of securities options. Clause (A)(i) covers any agreement, contract, or transaction "that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . . securities."[8] Clause (B)(iii) then further provides that "the term 'swap' does not include . . . any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to . . . the Securities Act of 1933 [and] the Securities Exchange Act of 1934."[9] As a consequence, securities options are not categorized as swaps, even though they would, but for the exclusion in clause (B)(iii), fall within clause (A)(i) of the "swap" definition.

The same is true for futures contracts. Take the financially settled Bitcoin futures contract listed by the Chicago Mercantile Exchange ("CME"). That contract provides for cash settlement at expiry (which is either monthly or quarterly) based on the price of Bitcoin, without any physical delivery.[10] But for subparagraph (B) of the "swap" definition, this CME contract would fall within clause (A)(iii) of that definition as an agreement, contract, or transaction "that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . commodities . . . and that transfers, as between the parties to the transaction, in

---

[7] 7 U.S.C. § 1a(47).

[8] 7 U.S.C. § 1a(47)(A)(i).

[9] 7 U.S.C. § 1a(47)(B)(iii).

[10] For more details about this contract's specifications, *see* https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/bitcoin.contractSpecs.html.

whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred."[11] However, this contract is instead listed by CME and regulated by the Commission as a futures contract because it falls within clause (B)(i), which provides, in relevant part, that "the term 'swap' does not include . . . any contract of sale of a commodity for future delivery."[12]

As these examples demonstrate, if the Contracts qualify as futures contracts, then they are not swaps.

B. The Contracts Should Qualify as Futures Contracts

Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[13] by evaluating whether certain characteristics common to futures contracts are present.[14] As laid out below, the Contracts exhibit all of the relevant characteristics of futures contracts.

1. The Contracts Exhibit the Characteristics of Futures Contracts

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[15] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[16]

---

[11] 7 U.S.C. § 1a(47)(A)(iii).

[12] 7 U.S.C. § 1a(47)(B)(i).

[13] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").

[14] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

[15] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*").

[16] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in

In the 1980s and 1990s, the Commission distinguished swaps from futures contracts based on similar characteristics. In 1989, the Commission adopted a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public.[17] In 1993, the Commission adopted an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility.[18]

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contacts involving intangible commodities, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[19] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[20] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[21] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[22] and (iii) the ability of holders to exit their positions by offset.[23]

---

physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[17] *See* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989).

[18] Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993).

[19] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). The Contracts are derivatives on Bitcoin, an intangible commodity. Accordingly, the analysis herein does not address the regulatory categorization of contracts on tangible commodities.

[20] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[21] *Id.*

[22] *CME v. SEC* at 542.

[23] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

The Dodd-Frank Act arguably changed this analysis, at least in part, by granting the Commission authority to mandate swaps for central clearing at DCOs[24] and trading on DCMs and swap execution facilities ("SEFs").[25] These changes led market participants to ask the Commission to clarify that a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a SEF, since futures and swaps are indistinguishable in material economic effects."[26] The Commission declined to provide that clarification, noting, "Prior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant."[27] The Commission then went on to say, "If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."[28]

Taken together, this precedent evidences a clear understanding, over multiple decades, that futures contracts are distinguished by standardization, fungibility, offset, and exchange trading. Even post-Dodd-Frank, those characteristics should remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on SEFs, which may lack the centralized market characteristics of a DCM (*e.g.*, SEFs can permit trading via request for quote in addition to an order book). The Commission's post-Dodd-Frank guidance also makes clear that a DCM can self-certify a product as a futures contract, even if the product is "indistinguishable in material economic effects" from a swap.[29]

The Contracts will exhibit all of the futures contract characteristics described above:

- The Contracts will have a fixed, standardized unit quantity;
- Each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty;

---

[24] *See* 7 U.S.C. 2(h)(1).

[25] *See* 7 U.S.C. 2(h)(8).

[26] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48303 (Aug. 13, 2012) ("*2012 Definitions Release*").

[27] *Id.*

[28] *Id.*

[29] We recognize that the Dodd-Frank Act also envisions that a DCM can list swaps. In particular, Section 2(e) of the CEA makes it unlawful for a person that is not an eligible contract participant to enter into a swap that is not entered into on, or subject to the rules of, a DCM. 7 U.S.C. 2(e). This accords with the fact that some exchange-traded contracts can fall within subparagraph (A) of the "swap" definition without being excluded by subparagraph (B)'s futures contract exclusion. For example, commodity options contracts (other than options on futures contracts) are swaps under the CEA. *See* 2012 Definitions Release at 48236.

- Klear will set and collect margin;
- Holders will be able to exit their positions via offset;
- The Contracts will be available to the general public, including retail participants;
- Parties will enter into the contracts for the purpose of assuming or shifting the risk of change in value of Bitcoin, without the possibility of transferring ownership of Bitcoin; and
- The Contracts will trade on, and be self-certified as futures contracts by, a DCM.[30]

2. The Contracts' Indefinite Duration Does Not Make Them Swaps

One characteristic that could be argued to distinguish the Contracts from a conventional futures contract is that they have an indefinite duration. Courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[31] or "on a date certain,"[32] or "at or before a stated future time."[33]

But that is a red herring. Courts have repeatedly explained that, "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[34] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts

---

[30] Trading on a DCM is not a necessary precondition for a transaction to qualify as a futures contract and be excluded from the "swap" definition. When legislating to enact Dodd-Frank, Congress considered the possibility of limiting the futures exclusion from the CEA's swap definition only to exchange-traded futures, but ultimately determined not to do so. *See,* H.R. 4173, as engrossed in the House of Representatives, excluded "(i) any contract of sale of a commodity for future delivery … traded on or subject to the rules of any board of trade designated as a contract market under section 5 or 5f" (emphasis added). *See* H.R. 4173 (E.H.), Section 3101. The Senate incorporated a similar exclusion in the Bill in its considerations in March 2010: "any contract of sale of a commodity for future delivery or security futures product traded on or subject to the rules of any board of trade designated as a contract market under section 5 or 5f." (emphasis added); *but see* 7 U.S.C. 1a(47)(B)(i) (excluding the requirement that futures contracts subject to exclusion from the swap definition be exchange-traded). Also, Section 4(a) of the CEA still prohibits off-exchange futures contracts, without treating them as swaps. That said, the fact that the Contracts will trade on a DCM and be cleared by a DCO bolsters the conclusion that there is trading "in the contract."

[31] *CME v. SEC* at 542.

[32] *Tauber* at 971.

[33] *Erskine* at 323.

[34] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v.*

of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[35] - because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[36] And, in *Zelener*, the Commission itself took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[37]

Accordingly, the Contracts' indefinite duration does not disqualify them from categorization as futures contracts. And, as discussed above, if the Contracts qualify as futures contracts, then they are not swaps.

3. <u>Prior Commission Enforcement Actions Do Not Bear on Categorization of the Contracts</u>

The Commission has, in some of its enforcement actions, taken the view that perpetual-duration digital-asset derivative products constitute swaps.[38] In all but one of these cases, the Commission looked only to features of the products at issue relevant to whether they fell within the scope of CEA Section 1a(47)(A)(iii). The Commission did not address whether such products were futures contracts, which would be excluded from the swap definition. As discussed above, the fact that a contract falls within the scope of CEA Section 1a(47)(A)(iii) because it "transfers, as between the parties to the transaction

---

*International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[35] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[36] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out' date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[37] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on KalshiEx.

[38] *See, e.g.,* Complaint, *CFTC* v. *Changpeng Zhao, et. al.*, No. 23-cv-01887 (March 27, 2023) ("*Binance*"); Complaint, *CFTC* v. *MEK Global Limited, et. al.,* No. 24-cv-2255 (March 26, 2024); Complaint, *CFTC* v. *Eisenberg,* No. 23-cv-00173 (Jan. 9, 2023); Complaint, *CFTC* v. *HDR Global Trading Limited, et. al.*, No. 20-cv-8132 (Oct. 1, 2020); *In the Matter of Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023).

… the financial risk associated with a future change" in the price of the underlying asset is not determinative of its regulatory categorization if the product qualifies as a futures contract.

The only instance in which the Commission has addressed the possibility that perpetual-duration digital-asset derivative products could be excluded from the "swap" definition as futures contracts is in a single footnote in the Commission's response to Binance's Motion to Dismiss.[39] However, as noted by the Commission, Binance failed to meaningfully address why the perpetual contracts at issue were futures contracts under the *Zelener* line of precedent; in particular, Binance relied on the sole point that positions in their contracts could be closed by offset, and they failed to reference any particular facts that indicated "trading in the contract."[40]

Because no party in the *Binance* litigation, or any other litigation or enforcement action that we have identified, has raised the question of whether perpetual-duration digital-asset derivative products are futures contracts under *Zelener*, the Commission has yet to squarely address this question. In fact, in a recent request for comment regarding "perpetual" style digital-asset derivatives, Commission Staff expressly requested public comment regarding the proper regulatory categorization of these contracts.[41]

C. Categorizing the Contracts as Futures Contracts Would Reduce Regulatory Arbitrage and Promote Competition

As noted above, other DCMs and DCOs already offer "perpetual-style" futures contracts that are designed to mimic the economics of the Contracts, but with an expiry date that presents unwanted risk near those contracts' expiry. One of those DCMs and DCOs has also begun to offer retail leveraged Bitcoin spot transactions, which it offers as futures contracts under Section 2(c)(2)(D) of the CEA.[42] Those transactions

---

[39] Plaintiff Response to Defendants' Motion to Dismiss, Binance at note 14 (Sept. 22, 2023).

[40] Brief in Support of Defendants' Motion to Dismiss, Binance at note 19 (July 27, 2023).

[41] CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* question 13 (Apr. 21, 2025).

[42] Section 2(c)(2)(D)(iii) of the CEA applies the exchange-trading requirement in Section 4(a) of the CEA to retail leveraged commodity transactions as though they are futures contracts. Congress added this provision to the CEA as part of the Dodd-Frank Act, at the same time it amended the CEA to regulate swaps. We think it is notable that Congress elected, at that time, to treat retail leveraged commodity transactions as though they are futures contracts, not swaps. Congress did so in order to fix the *Zelener* "loophole" by subjecting rolling spot contracts to futures regulation, not swaps regulation. *See* 156 Cong, Rec. S5,924 (daily ed. July 15,2010) (statement of Sen. Lincoln); *see also* Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture, 111th Cong. 52-664 (2009) (statement of Hon. Jim Marshall, United States Representatives) ("What we are talking about [regarding expanding the Commission's authority over retail commodity transactions] though is expanding the-well, correcting would be the argument the Zelener interpretation of what a futures contract is. If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftsmanship is."). It would contradict Congressional intent to place the

also bear a high degree of economic similarity to the Contracts, but with the added potential for custody and other risks associated with physical Bitcoin trading.

Categorizing the Contracts as futures contracts, like these other transaction types, would ensure a consistent regulatory treatment across economically equivalent transactions. In contrast, categorizing the Contracts as swaps would subject them to higher initial margin requirements,[43] transaction reporting under Parts 43 and 45 of the Commission's regulations in addition to Part 16,[44] and counting towards the swap dealer *de minimis* threshold. Applying those additional requirements to the Contracts would discourage trading in the Contracts, even though they exhibit less risk than these others transaction types. It also would foster continuing incentives for U.S. market participants to seek to trade on unregulated, non-U.S. markets offering perpetual contracts similar to the Contracts without the protections of Commission regulation.

III. Conclusion

For the foregoing reasons, the Commission should categorize the Contracts as futures contracts, not swaps.

* * *

Please do not hesitate to contact me at (212) 558-3040 or lloydc@sullcrom.com if you have any questions regarding these matters.

C.D.L.
N.V.

---

Contracts, which likewise provide for cash-settled, leveraged retail exposure to commodities, in a different regulatory category.

[43] *See* Note 2, *supra*.

[44] Commission Staff have previously provided a no-action letter to KalshiEx and Klear from Part 43 and 45 reporting for fully collateralized swaps, but that letter would not apply to the Contracts because they are not fully collateralized.