**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHICAGO MERCANTILE EXCHANGE INC.,

Plaintiff,

v.

MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission; COMMODITY FUTURES TRADING COMMISSION,

Defendants.

Case No. 1:26-cv-02157

**DEFENDANTS' REPLY BRIEF**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ....................................................................................................2

I. CME lacks standing to bring its claims ....................................................................................................2

A. CME has not met its burden to show a "financial injury" ....................................................................................................2

1. Competitor-injury standing requires a financial injury ....................................................................................................3

2. There is no financial injury to CME ....................................................................................................7

B. CME has not alleged an actual or imminent increase in competition ....................................................................................................12

C. CME's alleged injury would not be redressed by a favorable decision ....................................................................................................18

II. CME's claim is not in the "zone of interests" protected by the CEA ....................................................................................................23

CONCLUSION ....................................................................................................24

# TABLE OF AUTHORITIES

Cases

**Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)....................2, 5, 15

*Allen v. Wright*,
468 U.S. 737 (1984)....................19

**Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)....................2, 15–16, 18

*Alstom Transp., Inc. v. FRA*, __F.4th __,
2026 WL 2881203 (D.C. Cir. Sept. 25, 2026)....................6

*American Inst. of Certified Pub. Accts. v. IRS*,
804 F.3d 1193 (D.C. Cir. 2015)....................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................7

*Association of Data Processing Serv. Orgs., Inc. v. Camp*,
397 U.S. 150 (1970)....................4

*Bost v. Illinois State Board of Elections*,
607 U.S. 71 (2026)....................16

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*,
557 F. Supp. 3d 224 (D. Mass. 2021)....................11

*Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996)....................21

*Cherokee Nation v. DOI*,
2026 WL 2824551 (D.D.C. Sept. 21, 2026)....................3

*Chicago Mercantile Exchange v. SEC*,
883 F.2d 537 (7th Cir. 1989)....................23

*Citizens for Resp. & Ethics in Washington v. Trump*,
971 F.3d 102 (2d Cir. 2020)....................5

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................7, 11

*Department of Commerce v. New York*,
588 U.S. 752 (2019)....................19

*El Paso Nat. Gas. Co. v. FERC*,
50 F.3d 23 (D.C. Cir. 1995)....................5

*FDA v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ....................1, 2, 6, 7, 19

*Hecate Energy LLC v. FERC*,
126 F.4th 660 (D.C. Cir. 2025)....................21

*Honeywell International, Inc. v. EPA*,
374 F.3d 1363 (D.C. Cir. 2004)....................16, 17

*Ikon Global Markets, Inc. v. CFTC*,
859 F. Supp. 2d 162 (D.D.C. 2012)....................23–24

*Katin v. National Real Estate Info. Servs., Inc.*,
2009 WL 929554 (D. Mass. Mar. 31, 2009) ....................4

*KERM, Inc. v. FCC*,
353 F.3d 57 (D.C. Cir. 2004)....................3

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................23

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....................2, 19

*Mackinac Ctr. for Pub. Pol'y v. Cardona*,
102 F.4th 343 (6th Cir. 2024)....................5

*McConnell v. FEC*,
540 U.S. 93 (2003) ....................13

*Mobile Relay Associates. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006)....................4

*ModernWest Longmont, LLC v. FAA*,
177 F.4th 290 (D.C. Cir. 2026)....................22–23

*National Fair Hous. All. v. Carson*,
330 F. Supp. 3d 14 (D.D.C. 2018)....................11

*National Wrestling Coaches Ass'n v. Department of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)....................21, 22

*Organic Trade Ass'n v. USDA*,
370 F. Supp. 3d 98 (D.D.C. 2019)....................17

*PSSI Glob. Servs., L.L.C. v. FCC*,
983 F.3d 1 (D.C. Cir. 2020)....................3, 4, 5, 12

*Save Jobs USA v. DHS*,
942 F.3d 504 (D.C. Cir. 2019)....................16

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005)....................13, 16

*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010)....................5, 7

*Simon v. Eastern Kentucky Welfare Rights Organization,*
426 U.S. 26 (1976) ....................22

*Sorenson Commc'ns, LLC v. FCC*,
897 F.3d 214 (D.C. Cir. 2018)....................14

*United Transp. Union v. ICC*,
891 F.2d 908 (D.C. Cir. 1989)....................6

*Wannall v. Honeywell, Inc.*,
775 F.3d 425 (D.C. Cir. 2014)....................7

*Washington Alliance of Technology Workers v. DHS*,
892 F.3d 332 (D.C. Cir. 2018)....................4

Statutes

7 U.S.C. § 5....................18, 24

7 U.S.C. § 7a-2....................14

Other Authorities

CFTC Amended Order of Designation for Kalshi (Jan. 17, 2025)
https://www.cftc.gov/filings/documents/2025/orgdcmkexkalshiamord250117.pdf....................19

CME Group Q2 2026 Earnings Introductory Script at 3 (July 22, 2026),
https://investor.cmegroup.com/static-files/
f03a4407-750b-4ce3-a3db-02d59b60b8a6....................8–9, 12–13, 15

CME Group, CME Exchange Volume Report – Monthly (Oct. 5, 2026),
https://www.cmegroup.com/ftp/webmthly/....................10

CME Group, CME Exchange Volume Report – Monthly (Sept. 2, 2026)
https://www.cmegroup.com/ftp/webmthly/....................10

CME Group, CME Exchange Volume Report – Monthly (Aug. 5, 2026)
https://www.cmegroup.com/ftp/webmthly/ ........................................................................10

CME Group, CME Exchange Volume Report – Monthly (July 2, 2026)
https://www.cmegroup.com/ftp/webmthly/ ........................................................................10

Defendants Michael S. Selig and the Commodity Futures Trading Commission ("CFTC" or "Commission") file this reply brief in response to the opposition brief filed by Plaintiff Chicago Mercantile Exchange Inc. ("CME"), *see* Dkt. No. 45 ("Opp."), and in support of Defendants' motion to dismiss, *see* Dkt. No. 30-1 ("Mot.").

## INTRODUCTION

CME challenges a CFTC Order and Policy Statement allowing all derivatives exchanges, including CME itself, to offer perpetual futures contracts on digital assets. These contracts, CME asserts, "compete with CME and its futures products" and therefore give CME standing to sue. Opp. 1. Yet CME does not allege that it has suffered *any* concrete financial injury because of perpetual futures. To the contrary, CME's public data shows that trading volumes in its digital-asset futures are substantially higher today than before the Commission approved perpetual futures. And CME's CEO has publicly acknowledged that the exchange is prepared to offer perpetual futures but chooses not to do so because customer demand is lacking. Nor does CME explain how the relief it seeks—a court order reclassifying perpetual futures as perpetual swaps—would affect its business in any tangible way. At bottom, then, CME's standing theory appears to be that the regulatory approval of any new product automatically gives incumbents the right to bring a lawsuit, since new products can generally increase competition in the market.

Competitor standing, however, is not some kind of Article III unicorn. Like any other federal case, the plaintiff must plausibly allege an injury in fact that is "concrete, meaning that it must be real and not abstract." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation modified). "The injury must also be particularized" in that it "must affect the plaintiff in a personal and individual way and not be a generalized grievance." *Id.* (citation modified). And the plaintiff must show that the alleged "injury likely would be redressed by the requested judicial

relief." *Id.* at 380. "Those specific standing requirements constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Accordingly, the Supreme Court has rejected the "boundless theory of standing" that "a market participant is injured for Article III purposes whenever a competitor benefits from something allegedly unlawful." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013). And the D.C. Circuit has rejected broad theories of competitor standing that would "vitiate Article III's case or controversy requirement" by "permit[ting] a business to superintend its industry's regulatory scheme, even if the agency action at issue threatens the business with only highly attenuated or wholly speculative consequences." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023). If that admonition means anything, it forecloses CME's suit.

Put simply, when a plaintiff cannot identify a dollar of harm, much less explain how the requested relief would remedy that non-existent harm, its case does not belong in a federal court. The label "competitor standing" does not change that elementary principle. The case should be dismissed.

## ARGUMENT

### I. CME lacks standing to bring its claims

#### A. CME has not met its burden to show a "financial injury"

CME fundamentally misstates the law on competitor standing. It claims that it "is not required to demonstrate a 'financial injury'—once it shows an increase in competition, it has competitor standing." Opp. 17. On that theory, it is supposedly "irrelevant" that CME's crypto futures are trading at higher volumes today than before the challenged agency action. Opp. 19. Also apparently "irrelevant" are the public admissions of Plaintiff's CEO that perpetual futures do not appeal to CME customers and that historically, its crypto futures have exponentially grown notwithstanding the existence of crypto perpetuals. Opp. 19.

All this is self-evidently wrong. Competitor standing, like any other kind of standing, requires a concrete injury. Injury-less competition does not cut it.

### 1. Competitor-injury standing requires a financial injury

In the D.C. Circuit, "a party asserting competitor standing must 'make a concrete showing that it is in fact likely to suffer financial injury as a result of the challenged action.'" *PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020) (quoting *KERM, Inc. v. FCC*, 353 F.3d 57, 60–61 (D.C. Cir. 2004)). Thus, in *PSSI*, the court held that even if the plaintiff satellite operators did "directly and currently compete with" larger satellite operators set to receive billions of dollars in payments, the plaintiffs still "made no concrete showing that the Order is likely to cause them *a financial injury*," which independently defeated their standing. *Id.* (emphasis added).[1] Likewise in *KERM*, the D.C. Circuit held that a plaintiff radio station's "vague[] assert[ion] only that it competes with [another station] and that its own radio stations serve much the same audience as [that station]" "fails to establish standing on the basis of any competitive injury." 353 F.3d at 61. The missing ingredient, the court explained, was any "evidence that KAYH's broadcast of the disputed announcements resulted in *lost advertising revenues* for KERM or otherwise adversely affected KERM's *financial interests*." *Id.* (emphasis added); *see Cherokee Nation v. DOI*, 2026 WL 2824551, at *7 (D.D.C. Sept. 21, 2026) (Kelly, J.) (reading *KERM* to require that "the plaintiff must put forward evidence that the challenged action has adversely affected its financial interest" "[t]o show competitor standing at summary judgment" (citation modified)). And in *Mobile Relay*, the D.C. Circuit held that, while plaintiffs were "direct and current competitor[s]" of a rival who

---

[1] Plaintiff claims that the plaintiff in *PSSI* "lacked standing precisely because they failed to allege an increase in competition." Opp. 18. That is a half-truth. Yes, the court held that the plaintiffs did "not directly and currently compete with" their rivals. 983 F.3d at 11. But the D.C. Circuit went on: "Moreover, even if the [plaintiffs] did directly compete with the [rivals], they made no concrete showing that the Order is likely to cause them a financial injury." *Id.* CME glaringly omits this half of the court's holding.

received favorable agency action, they still "lack[ed] competitor standing" because they "failed to make a concrete showing that they are likely to suffer *financial injury*." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006) (emphasis added, citation modified); *see also id.* at 14 (contrasting the plaintiffs' standing with another case involving "some future loss of profits" (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970))). Bottom line: "a concrete showing" of "financial injury" is required, *PSSI*, 983 F.3d at 11, so CME's representation that it "is not required to demonstrate a 'financial injury'" is flatly wrong, Opp. 17.

Unable to identify a financial injury, CME asserts that "[i]ncreased competition *is the injury*." Opp. 17 (emphasis in original). But as the District of Massachusetts has explained, "the competitor standing doctrine" does not "stand[] for the broad principle that 'injury in the simple fact of illegal competition' is sufficient to satisfy the constitutional requirement of an 'injury in fact.'" *Katin v. National Real Estate Info. Servs., Inc.*, 2009 WL 929554, at *4 (D. Mass. Mar. 31, 2009). Nor does it "permit a plaintiff in a commercial context to ground standing on the purely abstract injury of 'illegal competition.'" *Id.* at *5. Rather, "the focus in a competitor standing case is properly on the plaintiffs' ability to allege a likelihood of *actual economic harm*." *Id.* (emphasis added). Put another way, competition is not *per se* injurious; rather, it is injurious only insofar as it inflicts tangible economic harm.[2] Otherwise, a regulated firm could establish standing without showing lost customers, lost revenue, lost market share, lost profits, or any other real-world consequence.

---

[2] CME's quote (at 17) from *Washington Alliance of Technology Workers v. DHS* held that "exposure to increased competition" is fairly traceable to agency action rather than to third-party rivals. 892 F.3d 332, 341 (D.C. Cir. 2018). It did not hold that increased competition is an automatic injury; to the contrary, the upshot of its injury analysis is that the increased competition from the challenged agency action would make it more difficult for the plaintiff's members to obtain STEM jobs. *Id.* at 340–41.

That is the throughline of the D.C. Circuit's competitor-standing cases. "[T]he competitor standing doctrine supplies the link between increased competition and [the] tangible injury" that Article III requires. *Air Excursions*, 66 F.4th at 281. That "link" allows courts to infer economic injury when it follows "as a matter of 'economic logic.'" *PSSI*, 983 F.3d at 11 (quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)). Put another way, "[t]he nub of the 'competitor standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that *will almost surely cause petitioner to lose business*, there is no need to wait for injury from specific transactions to claim standing." *El Paso Nat. Gas. Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) (emphasis added); *see also Sherley*, 610 F.3d at 72 (emphasizing the "detriment of [the plaintiff's] bottom line").

Some forms of increased competition presumptively injure rivals "as a matter of economic logic"—for example, "orders permitting a new entrant into a fixed market" or "allowing a rival to sell a fungible good at a lower price." *PSSI*, 983 F.3d at 11. But other forms of increased competition—for example, "a rival's favorable tax treatment [that] create[s] an unfair competitive atmosphere" or "a rival's favorable regulatory treatment [that] create[s] a 'skewed playing field'"—do not harm rivals as a matter of economic logic. *Id.* Hence, a "concrete showing" of "financial injury" is required. *Id.* (citation modified); *see also Mackinac Ctr. for Pub. Pol'y v. Cardona*, 102 F.4th 343, 353–54 (6th Cir. 2024) (even "assuming we do not require facts regarding … a specific tangible loss, Plaintiffs have not provided sufficient facts that allow us to infer—by economic logic—that they would more likely sustain injury from the [challenged action]"); *Citizens for Resp. & Ethics in Washington v. Trump*, 971 F.3d 102, 107 (2d Cir. 2020) (Menashi, J., dissenting from denial of rehearing en banc) (Competitor-standing cases "do not say that a plaintiff is personally harmed as a matter of economic logic whenever that plaintiff's competitor

in the same market receives a benefit. Rather, the cases say that when a competitor receives a benefit, the plaintiff *may* be able to show that personal harm follows as a matter of economic logic. But the plaintiff must make that showing. The court should not simply assume that economic logic compels a finding of personal harm every time a plaintiff and defendant are competitors in the same market.").

Nor does CME's *per se* theory of competitor standing tally with how Article III works in any other context. "[T]o sue in federal court, a plaintiff must show that he or she has suffered or likely will suffer an injury in fact." *Alliance for Hippocratic Med.*, 602 U.S. at 382. That injury "must be 'concrete,' meaning that it must be real and not abstract." *Id.* at 381. An increase in competition, without any attendant harm to the plaintiff, would at most be an "abstract" injury—not a "concrete" or "real" one. *See United Transp. Union v. ICC*, 891 F.2d 908, 914 (D.C. Cir. 1989) (finding no standing where "it is wholly speculative whether decreased competition in the railroad industry will harm rather than help UTU members"). Thus, as Judge Walker recently explained, if competitor standing is to be squared with the rest of Article III jurisprudence, its "survival probably depends on a link between the competitive injury and an economic harm like profits." *Alstom Transp., Inc. v. FRA*, __ F.4th __, 2026 WL 2881203, at *11 n.41 (D.C. Cir. Sept. 25, 2026) (Walker, J., dissenting in part) (collecting cases). No economic harm means no injury.

CME also points to D.C. Circuit cases holding that a plaintiff need not wait for a competitive injury to materialize before bringing suit. Opp. 17 (citing, *e.g.*, *American Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015)). That argument is something of a distraction in this context. Perpetual futures have now been trading on U.S. exchanges for over four months, and even if CME was not immediately injured when that trading started, surely the injury—if it existed—would be evident by now. Regardless, while true that a plaintiff need not

wait to sue until an injury is "actual," it at least must allege that such injury is "imminent" rather than "speculative"—that is, the injury must "be likely to occur soon." *Alliance for Hippocratic Med.*, 602 U.S. at 381; *see Sherley*, 610 F.3d at 74 (competitors can sue based on "imminent" injury); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." (emphases in original, citation modified)). CME's *ipse dixit* allegations of future harm do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); Mot. 12–13. Allegations of increased competition, without any plausible inference of an imminent financial injury, therefore do not meet basic Article III standards.

**2. There is no financial injury to CME**

Because financial injury is required, this case must be dismissed. As Defendants pointed out in their motion to dismiss, CME's "complaint does not allege any concrete financial consequences that are likely to result from the approval of perpetual futures." Mot. 12. CME's opposition brief does not dispute that; indeed, it does not even *try* to argue that the complaint alleges any concrete injury, or even that CME has suffered any sort of financial injury since it filed this lawsuit. CME's choice not to rebut Defendants' arguments concedes the absence of financial injury. *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Defendants also pointed out that CME's *own public statements* and *own trade data* unequivocally refute any possibility of financial injury. Mot. 14–17. In remarkably cursory fashion, CME handwaves both away as "post-dating and outside of the Complaint," making them "irrelevant." Opp. 19. That objection is not serious. CME's opposition relies on *six exhibits* outside

the complaint, and apart from the administrative-record excerpts, each of these exhibits post-dates the complaint. *See* Dkt. Nos. 45-2, 45-3, 45-4, 45-5, 45-6, 45-7. If these third-party materials (including newspaper articles, social-media posts, and a Kalshi website) can be considered, surely CME's *own materials* can be. This Court, moreover, already held that it "may consider materials outside the pleadings to determine its jurisdiction, and that includes materials necessary to determine whether the plaintiff has standing." Dkt. No. 29 at 2.

Otherwise, CME only offers two, paltry footnotes in response to incontrovertible proof that perpetual futures are not causing it a lick of harm. Opp. 19 nn. 5–6. Footnote 5 addresses the public statements of CME's CEO, which disclaim any financial impact and boast that trading volumes in its crypto-futures complex is up by a factor of seven over the last three years notwithstanding crypto perpetuals. *See* Mot. 14–15. These statements, CME claims, "merely explain[] that perpetual Bitcoin contracts do not compete with CME's products designed for *institutional* clients, but that there is increased competition for *retail* business."[3] Opp. 19 n.5 (emphasis in original). Not true: CME's CEO stated that perpetuals "may appeal to certain retail traders," but he never said there is "increased competition" for that business. CME Group Q2 2026 Earnings, *supra* n.3, at 2–3. And if there is increased competition for retail business, CME clearly does not care about it. The CEO acknowledged that "[w]e have the full technical and operational capabilities to launch perpetual futures," but are not doing so because "we have not heard demand from our customers

[3] If this case advances to summary judgment, Defendants intend to hold CME to this theory and expect proof that its retail business is (1) actually competing with perpetual futures and (2) has suffered a financial injury due to perpetual futures. That may be a difficult burden to meet, given the CEO's admission that "[t]hrough the first half of 2026, 94% of our volume originated from institutional customers," and that these are CME's "core customers." CME Group Q2 2026 Earnings Introductory Script at 3 (July 22, 2026), https://investor.cmegroup.com/static-files/f03a4407-750b-4ce3-a3db-02d59b60b8a6.

for these products." *Id.* at 3–4. And why would it, when its "crypto futures volume is up over 7-fold in the past 3 years, despite the existence of crypto perpetuals"? *Id.* at 4.

Footnote 6 responds to CME's data demonstrating that trading volumes on its crypto futures materially increased since the Commission approved Bitcoin perpetual futures. This data, CME says, "at best paints an incomplete picture, and at worst is intentionally misleading." Opp. 19 n.6. But how? Is CME upset that Defendants did not also discuss its other crypto futures like Solana, Chain Link, XRP, Sui, and their micro equivalents? *See* Compl. ¶ 42. Because trading volumes on all but one of those futures is higher than before the May 2026 challenged agency action, too:

| | **May 2026** | June 2026 | July 2026 | Aug. 2026 | **Sept. 2026** | **Net Change** |
|---|---|---|---|---|---|---|
| Bitcoin | **259,329** | 292,118 | 246,072 | 298,958 | **267,693** | **+8,364** |
| Micro Bitcoin | **1,113,719** | 1,611,107 | 1,117,816 | 1,370,250 | **1,354,088** | **+240,369** |
| Ether | **326,981** | 369,358 | 320,040 | 344,084 | **378,292** | **+51,311** |
| Micro Ether | **735,326** | 960,484 | 674,601 | 787,603 | **911,822** | **+176,496** |
| Solana | **83,515** | 88,533 | 70,002 | 89,016 | **101,607** | **+18,092** |
| Micro Solana | **40,474** | 41,572 | 29,117 | 52,553 | **61,160** | **+20,686** |
| Link | **1,390** | 487 | 247 | 758 | **1,050** | **-340** |
| Micro Link | **6,198** | 2,418 | 1,187 | 5,509 | **11,308** | **+5,110** |
| XRP | **46,749** | 49,742 | 37,846 | 43,501 | **59,117** | **+12,368** |
| Micro XRP | **44,729** | 39,694 | 24,539 | 52,588 | **113,936** | **+69,207** |
| Sui | **217** | 183 | 251 | 455 | **1,655** | **+1,438** |
| Micro Sui | **2,333** | 2,895 | 1,981 | 10,863 | **20,802** | **+18,469** |
| Total Contracts | **2,660,960** | 3,458,591 | 2,523,699 | 3,056,138 | **3,282,530** | **+621,570** |

*See* CME Group, CME Exchange Volume Report – Monthly (Oct. 5, 2026); CME Group, CME Exchange Volume Report – Monthly (Sept. 2, 2026); CME Group, CME Exchange Volume Report – Monthly (Aug. 5, 2026); CME Group, CME Exchange Volume Report – Monthly (July 2, 2026), all available for download at https://www.cmegroup.com/ftp/webmthly/. True, four of the twelve products (Link, Micro Link, Micro XRP, and Sui) saw a dip in trading volume in the month immediately following the challenged agency action. But that dip (9,752 fewer contracts, collectively) was dwarfed by the massive gains in the other eight products that same month (807,383 more contracts, collectively). And the lone product whose trading volume remains lower than in May, Link, is down only 340 contracts, which is a rounding error compared to the net increase in CME's overall crypto-futures trading volume since May (621,570 contracts). The takeaway from CME's data is unmistakable: cryptocurrency perpetual futures have had no adverse impact on its crypto-futures suite.

It is entirely baffling how CME can claim that Defendants are "intentionally misleading" the Court with CME's own trade data. Opp. 19 n.6. Indeed, CME cannot even bring itself to say how that could possibly be the case. Instead, it invites the Court to blind itself to the exchange's own trade data until "summary judgment," when CME—take its word for it—can "discuss this data further." *Id.* But that argument "is premised on the possibility that Plaintiff survives Defendants' motion to dismiss and proceeds to summary judgment"—a premise that this Court rejected when it denied Defendants' request for limited jurisdictional discovery on precisely these issues. Dkt. No. 44 at 3; *see also id.* at 1 (describing anticipated motions for summary judgment as "potential").

Nor should the Court wait for summary judgment to address CME's materials, whose authenticity and veracity are not disputed. Again, this Court already held that it "may consider

materials outside the pleadings to determine its jurisdiction," including "materials necessary to determine whether the plaintiff has standing." Dkt. No. 29 at 2 (citation modified). It expressly contemplated that "the administrative record" could "benefit" "the Court's review of Defendants' motion to dismiss for lack of standing." *Id.* That is not a one-way ratchet: if Plaintiff gets the benefit of extra-complaint materials, Defendants do too. And CME accepted the Court's invitation, submitting *six* extra-complaint exhibits to support its standing, five of which are from third-party sources. *See* Dkt. No. 45-2 (Reuters article); 45-3 (Wall Street Journal article), 45-4, 45-5 (social-media posts), 45-6 (Kalshi webpage); 45-7 (administrative record exhibits). Yet the exchange simultaneously claims there is "no basis for considering" its own, objective data and public statements. Opp. 19. CME cannot have it both ways.

Finally, CME claims that "standing is assessed at the time of the complaint," precluding the Court from considering post-complaint data and statements. Opp. 19. But again, CME only had standing when the complaint was filed if it faced an actual or imminent injury. *Clapper*, 568 U.S. at 409. And "in assessing a claim of imminent harm, it defies common sense not to consider the time after the complaint is filed in order to assess how imminent the risk of harm really was." *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 235 (D. Mass. 2021) (citing *National Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 46 (D.D.C. 2018) (Howell, C.J.)). Perpetual futures have traded on U.S. exchanges for over four months now. And CME's public statements and data over those four months show that, regardless of whether the exchange subjectively feared a financial injury when it filed suit, no such injury was truly imminent. So CME lacked standing right out of the gate. Were it otherwise, a plaintiff could always allege a fear of injury and get into court, even if the plaintiff's fear was objectively baseless.

* * *

D.C. Circuit precedent unequivocally requires "a concrete showing" of "financial injury" to establish competitor standing, *PSSI*, 983 F.3d at 11, and that showing is wholly absent from CME's complaint, or any of its other papers in this case. To the contrary, its own public statements and trading data affirmatively refute the notion that it ever faced a financial injury from perpetual futures on digital assets. There is no injury in fact, and this case should be dismissed for lack of standing.

**B. CME has not alleged an actual or imminent increase in competition**

Everyone agrees on at least this much: CME must plausibly allege an actual or imminent increase in competition. CME has not even done that.

**1.** At the outset, CME concedes that any increased competition is limited to its "*retail* customer business" as opposed to its *institutional* customer base. Opp. 13 (emphasis added). And rightly so: according to the exchange's CEO, "[t]hrough the first half of 2026, 94% of our volume originated from institutional customers," and perpetual futures "do not appeal to [these] core customers." CME Group Q2 2026 Earnings, *supra* n.3, at 3. Thus, the overwhelming bulk of CME's business is, by CME's own account, unaffected by perpetual futures.

The remaining question is whether perpetual futures compete for CME's non-core, 6% retail base. CME's business decisions answer that question too. The exchange has readily acknowledged that it has "the full technical and operational capabilities to launch perpetual futures" and "[i]n fact" has "contract specifications and [is] prepared to bring these products to market should evolving demand or structural shifts make it appropriate to do so." *Id.* at 3–4. But CME has chosen not to do so because it "ha[s] not heard demand from our customers for these

products." *Id.* at 4.[4] That can only mean that one of two things is true. Either CME's retail customers (like its institutional customers) are not demanding perpetual futures, in which case there is no basis to infer meaningful competition between perpetual futures and CME's dated futures. Or some demand exists, but CME has determined that the opportunity is too insignificant to justify launching the product. Either way, CME's own business judgment undermines its litigation theory: a firm that declines to enter a market because it sees insufficient customer demand can scarcely insist that competition in that market poses an imminent threat to its business.

Stated differently, CME cannot have it one way with the Court and another way with the investing public on earnings calls. CME told investors that it has "not heard demand from [its] customers for [perpetual futures]," which "are in no way substitutes" for CME's dated futures. *Id.* at 3–4. If that is true—and all the available evidence indicates that it is, *supra* 9–10—CME has no basis for filing litigation predicated on competitive harm. But if perpetual futures are a competitive threat, one would expect CME's public statements to acknowledge that, not dismiss it.

**2.** Next, CME claims that the Commission's classification of perpetual futures as futures, rather than as swaps, enables "rivals to more effectively compete." Opp. 14. Here, at least, CME gets the framing right. CME does not claim that perpetual futures are *per se* illegal, only that they must be characterized as swaps. Thus, in assessing whether perpetual futures "increase competition," the baseline comparison is not a world where there are no perpetuals, but rather a world where there are perpetual swaps.

---

[4] CME's apparent willingness to offer perpetual futures, if the economics supported it, belies that CME actually believes it has been "put to the choice of either violating [the statute] or suffering disadvantage." *Shays v. FEC*, 414 F.3d 76, 89 (D.C. Cir. 2005) (cited at Opp. 20); *see also McConnell v. FEC*, 540 U.S. 93, 228 (2003) (holding that plaintiffs were not competitively injured by "increased hard-money limits" because "[t]heir alleged inability to compete stems not from the operation of [the law], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice").

CME claims that the futures-versus-swaps classification does increase competition. It relies on "[m]aterials from Kalshi in the administrative record," which supposedly "demonstrate that Kalshi pitched approval of perpetuals as futures, not swaps, in order to improve its competitive footing given the different regulatory regime applicable to futures." Opp. 14–15 (citing AR 94–95, 99–100, 109–110). But CME misreads the record. Kalshi sought futures classification to achieve parity with other perpetual-style products and retail leveraged spot transactions that are "economically equivalent transactions." AR99; *see also* AR109–110. Kalshi did not, as CME claims, "pitch[] approval of perpetuals as futures" to compete with CME's futures, which on CME's own telling are not economically equivalent products. Opp. 14; *see, e.g.*, Compl. ¶ 200 (distinguishing economics of dated and perpetual futures).

By the same token, CME's string of cases about agency action "intended" to increase competition is not relevant here. *See, e.g.*, *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 226 (D.C. Cir. 2018) (challenging a "tiered-rate structure" whose "entire purpose" was "to promote competition and enable smaller VRS providers to expand their shares of th[e] market"). The Commission did not approve perpetual futures to put pressure on dated futures. Rather, the Commission was presented with a request to approve these contracts for trading as futures, and once the Commission determined that the application complied with the Commodity Exchange Act and CFTC regulations, it was statutorily obligated to approve them. *See* 7 U.S.C. § 7a-2(c)(5)(B) ("The Commission shall approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations)."). So any competitive implications of the Order are incidental, not "intended."[5]

---

[5] CME's own description of dated and perpetual futures undermines the notion that the two products are economically equivalent contracts that compete with each other. According to CME, "[b]ecause a [dated] future settles at the spot price on a fixed date, market participants trade based on the *spot price they expect at that future date*." Compl. ¶ 200 (emphasis added). By contrast, the

**3.** Moving on, CME tries out a broader standing theory: "the government's actions have fundamentally restructured the rules governing swaps and futures" and "now changed what it means to be a future—the exact products that CME lists." Opp. 15. "Those actions harm CME," it says, "by forcing CME to compete in an unlawfully structured market." Opp. 16. But this generalized grievance in the structure of the market does not establish competitor standing. If it did, CME could sue *anytime* the Commission classified a contract as a future on the theory that the government "changed what it means to be a future," leaving CME "in an unlawfully structured market." Opp. 15–16. That theory cannot be right: "Article III's case or controversy requirement" does not "permit a business to superintend its industry's regulatory scheme" where "the agency action at issue threatens the business with only highly attenuated or wholly speculative consequences." *Air Excursions*, 66 F.4th at 281.

The Supreme Court rejected a similarly expansive theory of standing in *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013). There, the footwear company Already argued "that, as one of Nike's competitors, it inherently has standing to challenge Nike's intellectual property." *Id.* at 96. But on that "sweeping argument," Already "could sue to invalidate [a] trademark simply because Already and Nike both compete in the athletic footwear market." *Id.* at 98–99. "Taken to its logical conclusion," the Supreme Court explained, "the theory seems to be that a market participant is

---

exchange alleges that "[a] perpetual contract is a derivative that is intended to track the *current ('spot') price* of an underlying asset." *Id.* ¶ 111 (emphasis added). Put another way, CME alleges that the price of a Bitcoin future that expires on December 31, 2026 reflects the market's expectation of Bitcoin's price *as of December 31, 2026*, whereas the price of a Bitcoin perpetual future tracks the *current* price of Bitcoin. There are good reasons to doubt that this is a distinction of any difference. *See* Hyperliquid Brief, Dkt. No. 38 at 5 (explaining that "[t]he price of a contract sold on a traditional futures market … accurately approximates the current price of the underlying asset" due to arbitrage dynamics). But accepting these allegations at the pleadings stage, CME's own theory undermines the notion that any trader, retail or otherwise, would view dated and perpetual futures as interchangeable. *See also* CME Group Q2 2026 Earnings, *supra* n.3, at 3 ("Perpetual futures are in no way substitutes for [CME's dated futures].").

injured for Article III purposes whenever a competitor benefits from something allegedly unlawful"—a "boundless theory of standing" that the Court had "never accepted." *Id.* at 99. CME's theory here—which would give it the green light to sue any time the Commission determined that a contract is a future—is more of the same. *Id.*

The cases CME cites are not to the contrary. In *Bost v. Illinois State Board of Elections*, the Supreme Court held that a candidate's "interest in a fair process" is enough to give rise to standing without any concrete showing of harm, but the Court distinguished candidates in political races from "common competitors in the economic marketplace." 607 U.S. 71, 77 (2026); *see also id.* at 86 (Barrett, J., concurring in the judgment) (explaining that majority's "bespoke standing rule for candidates" reflected the fact that they are not economic competitors). Likewise in *Shays v. FEC*, another election-law case, the D.C. Circuit held that "distortions that alter the competitive environment's overall rules" can be challenged where they "requir[e] competitors to account for adverse activity"—for instance, by "need[ing] to adjust their campaign strategy." 414 F.3d at 86–87. Similarly in *Save Jobs USA*, the D.C. Circuit acknowledged that competitors can sue "when regulations illegally structure a competitive environment," but the plaintiff nonetheless must "defend[] *concrete interests in that environment* [to] suffer legal harm under Article III." 942 F.3d 504, 508–09 (D.C. Cir. 2019) (emphasis added); *see also Shays*, 414 F.3d at 87 (same). In neither case did the Circuit say, as CME says, that illegal "structure" is *de facto* injurious.

**4.** CME also believes that a plaintiff can be competitively injured by "new product offerings" that "increase the pie for everyone." Opp. 20. (It is telling that CME never disputes the premise that perpetual futures increase the pie for everyone.) It cites *Honeywell International, Inc. v. EPA*, 374 F.3d 1363 (D.C. Cir. 2004), but that case only underscores the absence of injury. There, EPA promulgated a rule authorizing the use of certain ozone-depleting chemicals where it

was not "technically feasible" to use non-ozone-depleting chemicals. *Id.* at 1368. EPA argued that Honeywell—which produced the non-ozone-depleting chemical—lacked standing to challenge the rule because the rule "permits [ozone-depleting alternatives] only by parties who are not potential purchasers of Honeywell's product." *Id.* The Court rejected the premise, concluding that "some manufacturers would be forced, in the absence of [ozone-depleting] alternatives, to relax their performance standards and use" Honeywell's product. *Id.* Not only that, but Honeywell submitted affidavits confirming that its "projected losses" from competition against ozone-depleting alternatives would be substantial. *Id.* at 1369. The Court did not suggest that standing exists when the pie increases for everyone; rather, it found standing because the pie would *shrink* for Honeywell. *See also id.* (finding that Honeywell would lose money on net even though it also sold the competing product). Put another way, it concluded that the new competition not only affected Honeywell but would cause it financial injury. *See also Organic Trade Ass'n v. USDA*, 370 F. Supp. 3d 98, 107–08 (D.D.C. 2019) (Collyer, J.) (cited at Opp. 21) (agency action "prevents a shrinkage of the pool of producers eligible to compete in the organic livestock market, to the detriment of [plaintiff's] members," and thus, their "bottom line may be adversely affected by the challenged government action"). The same cannot be said here.

**5.** Finally, CME leans hard on quotations from the Commission, Kalshi, and others stating that incumbents "fear the future."[6] *E.g.*, Opp. 1, 10. Those statements are certainly true so far as they go—CME wouldn't be bringing this lawsuit if it didn't have a *subjective* fear of perpetual

[6] CME repeatedly claims that "the government's own motion to dismiss describes this lawsuit as 'designed to stifle … competition among boards of trade.'" Opp. 14 (quoting Mot. 24); *see also* Opp. 10, 19, 26 n.7 (same). That quotation in no way implies that there is *actual* competition to CME. Rather, Defendants observed that CME's stated purpose in bringing this lawsuit is to squelch perceived competition, *see* Compl. ¶¶ 29–68, and accordingly, Defendants argued that claims "designed to stifle innovation and competition among boards of trade" fall outside the statute's zone of interests, Mot. 24.

futures. But that does not mean CME's subjective fear has a legitimate basis; in fact, its data squarely shows otherwise. *Supra* 9–10. As for CME's claim that perpetual futures put "'competitive pressure' on rollover fees for true futures," Opp. 9–10 (emphasis omitted), CME itself apparently does not believe this. Its CEO has taken the position that its futures are far *less* costly than perpetual futures, saying: "[W]hen taking into account both the transaction fee and the daily funding costs, the total cost to trade perpetual futures is typically orders of magnitude more expensive than our highly efficient futures contracts." CME Group Q2 2026 Earnings, *supra* n.3, at 3. And more fundamentally, the statements of market participants that a new product is good for "competition" do not control this Court's Article III analysis. American capitalism—no less the CEA, *see* 7 U.S.C. § 5(b)—is premised on competition being a positive thing, so market participants can naturally be expected to tout their products as pro-competitive. If that sufficed to establish injury, the Court's competitor-standing docket will be very full indeed.

* * *

CME's standing theory ultimately reduces to the proposition that every time an agency approves a new product, any incumbent firm in the market has standing to sue, regardless of whether the new product has any real-world implications for that firm. The Court should reject that "boundless" theory of standing. *Already*, 568 U.S. at 99.

### C. CME's alleged injury would not be redressed by a favorable decision

If nothing else, the redressability prong is not satisfied here. As Defendants explained, CME does not seek to remove perpetuals from derivatives markets; it seeks simply to re-classify them as "swaps" rather than "futures." Mot. 19–21. Thus, CME must show that its alleged injury would be abated if it "competed" against perpetual swaps rather than perpetual futures. There is nothing to support that notion.

CME first claims that "[a] favorable decision here would remove perpetuals *from the futures markets*, which would redress CME's injury." Opp. 23. But futures and swaps trade on the same markets—specifically, on "Designated Contract Markets" ("DCMs"), which are CFTC-registered derivatives exchanges that can offer futures, options, and swaps. Reclassifying perpetuals from "futures" to "swaps" would not remove them from DCMs any more than reclassifying a movie from "action" to "thriller" would remove it from a streaming platform. CME therefore would face the same alleged competition that it currently faces. As for CME's related suggestion that the CFTC has created "new rivals" in the futures market, Opp. 12, that is belied by the fact that Kalshi has been a licensed DCM since 2020 and permitted to offer intermediated futures since 2025.[7]

Next, CME accuses the government of "rank speculation concerning what competitors *might* do." Opp. 24. But that gets it backwards. CME has the burden to allege (and ultimately prove) standing, so it must show that its supposed competitive injuries would be alleviated if it competed against perpetual swaps rather than perpetual futures. *Alliance for Hippocratic Med.*, 602 U.S. at 380 ("[A]s this Court has often stated, *a plaintiff must demonstrate* … that the injury likely would be redressed by the requested judicial relief." (emphasis added)). It must do so not with "mere speculation about the decisions of third parties," but rather by demonstrating "the predictable effect of Government action on the decisions of third parties." *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019); *see also Lujan*, 504 U.S. at 561 ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (citation modified)); *Allen v. Wright*, 468 U.S. 737, 752 (1984) (courts must ask whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative").

[7] CFTC Amended Order of Designation for Kalshi (Jan. 17, 2025) https://www.cftc.gov/filings/documents/2025/orgdcmkexkalshiamord250117.pdf.

If that inquiry yields speculative answers rather than predictable ones, that is CME's problem—not Defendants'.

CME had ample opportunity to give concrete answers. Specifically, Defendants queried whether CME's "other futures offerings [would] fare better" if perpetuals were subject to the rules for swaps rather than futures. Mot. 21. If CME actually believed that the application of the swap rules would enhance its competitive prospects, it would presumably have answered (quite emphatically) "yes." Instead, CME says only that it "is not required to disprove the[se] counterfactuals" and that it would require "economic" "clairvoyance" to give an answer. Opp. 25. But CME is the one who alleged that "[c]lassifying a derivative as a swap rather than a [future] has significant consequences," and it pointed to divergent margin and tax rules as paradigmatic examples. Compl. ¶¶ 102, 107, 110.

Instead, CME tries to suggest that Kalshi would not even *offer* perpetuals if it had to list those contracts as swaps. To support this conjecture, CME again points to Kalshi's statements in the administrative record that "the regulatory framework governing swaps would make its perpetuals uncompetitive." Opp. 24. But as explained, Kalshi made that statement about regulatory arbitrage in the context of perpetual-style futures and retail leverage spot transactions. *Supra* 14. Nothing about that claim indicates that Kalshi would have thrown in the towel on perpetuals if it were required to list them as swaps rather than as futures. And even if CME had made a non-speculative showing that Kalshi would not list perpetual swaps, CME ignores that other DCMs can offer perpetuals. So for CME's redressability argument to hold—*i.e.*, an order that perpetuals are swaps would result in CME not having to "compete" against perpetuals—it must show that *no DCM* would list perpetual swaps. This it has not done.

Falling back, CME again tries to claim that the usual Article III standards do not apply in the competitor-standing world. The black-letter principle that standing is harder to establish where "potential redress depend[s] on third-party behavior," CME claims, is "'inconsistent with the competitor standing doctrine.'" Opp. 25 (citing *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499 (D.C. Cir. 1996)). False. In *Bristol-Myers*, the court saw no "reason for doubt[ing]" redressability because the plaintiff's injury—competition from a generic drug—would be eliminated by the relief sought—an order staying the FDA's approval of the generic drug. 91 F.3d at 1497, 1499.[8] CME's claimed injury—alleged competition from perpetual futures—would only be mitigated by the relief sought—an order requiring perpetuals to trade as swaps rather than futures—*if* third parties opt not to trade perpetual swaps.

More fundamentally, the caselaw is abundantly clear that redressability is an uphill battle when the prospect of relief ultimately turns on the response of third parties. *See, e.g.*, *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) ("[R]edressability in cases where plaintiffs sue the government in order to change third-party behavior imposes a significant barrier to establishing standing—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." (citation modified)); *National Wrestling Coaches Ass'n v. Department of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) ("In several cases, the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries."). Consider *Simon v.*

[8] The injury to the plaintiff was inflicted by third-party physicians and pharmacists prescribing the generic drug to patients, but that did not affect redressability because "[a] physician cannot prescribe and a pharmacist cannot sell what a manufacturer cannot market." *Bristol-Myers*, 91 F.3d at 1499. In other words, the requested relief would have prevented third parties from inflicting the injury. Not so here.

*Eastern Kentucky Welfare Rights Organization*, a challenge to an IRS ruling that allowed hospitals to qualify as nonprofit corporations so long as they provided emergency care to all comers regardless of their ability to pay. 426 U.S. 26, 29–31 (1976). A group of indigent plaintiffs sued, claiming that the ruling encouraged hospitals to deny non-emergency services to indigents and that a grant of the "requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would 'discourage' hospitals from denying their services to respondents." *Id.* at 42. The Supreme Court accepted the premise "that the IRS's new policy encourages a hospital to provide fewer services to indigents than it might have under the previous policy." *Id.* at 42 n.23. But the plaintiffs nonetheless lacked standing because it is "speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to [plaintiffs] of such services." *Id.* at 43. "So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services." *Id.* Without a "substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire," the complaint had to be dismissed. *Id.* at 45–46.

Likewise here, CME has made no showing of a "substantial likelihood that victory in this suit would result in" relief from alleged competition against perpetuals, since it is "just as plausible" that DCMs would offer the same contracts as perpetual swaps. *Id.* at 43, 45–46. So too is it plausible that exchanges would revert to perpetual-*style* futures, whose expiration dates are so distant as to effectively mimic the economic dynamics of true perpetual futures. *See* Mot. 8, 21. Since either would leave CME "no better off than they are under the [] current policies," redressability is not satisfied. *National Wrestling Coaches*, 366 F.3d at 944; *see ModernWest*

*Longmont, LLC v. FAA*, 177 F.4th 290, 297–98 (D.C. Cir. 2026) (holding that although a favorable decision "might give [the petitioner] better odds of a favorable outcome," "ill-defined better odds are not close to what is required for redressability, because they require guesswork about what the final outcome will be" (citation modified)).

**II. CME's claim is not in the "zone of interests" protected by the CEA**

A claim should be dismissed "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (citation omitted). Nothing in the Commodity Exchange Act ("CEA") suggests that Congress intended to authorize one exchange to challenge the Commission's oversight of another exchange. *See* Mot. 22–24.

The cases cited by CME are not to the contrary. For example, in *Chicago Mercantile Exchange v. SEC*, the Seventh Circuit held that CME's claim fell within the CEA's zone of interests because "if the SEC is right that [the contracts at issue] are not futures, then the futures markets not only must suffer competition with their existing contracts but also *would be forbidden to trade [those contracts] themselves*." 883 F.2d 537, 541 (7th Cir. 1989) (emphasis added). Thus, CME was challenging a restriction on its own operations as an exchange. There is no such restriction here. To the contrary, the Commission's Order and Policy Statement *allow* CME, like any other exchange, to offer a class of futures contracts.

CME's citation to *Ikon Global Markets, Inc. v. CFTC*, 859 F. Supp. 2d 162 (D.D.C. 2012) (Contreras, J.), is also inapt. There, a futures broker challenged the fairness of arbitration procedures conducted by the National Futures Association, which the broker itself was subject to. *Id.* at 165. Based on a CEA provision requiring futures associations like the NFA to "'provide a fair, equitable, and expeditious procedure through arbitration,'" the court held that "the members

of futures associations" like Ikon have "a protected interest in the fairness of the arbitration procedures established by such associations." *Id.* at 167. The CEA contains no comparable provision insulating one exchange against purported competition from another.

CME also points to the CEA's statement of purpose, which is to promote "responsible innovation and fair competition." 7 U.S.C. § 5(b); *see* Opp. 27. This lawsuit, CME claims, "challenges *unfair competition*." Opp. 28. But again, the Commission has not stopped CME from competing with other exchanges—if it had, its claim would likely fall within the interests protected by § 5(b). CME instead seeks to deputize itself as a financial regulator and prohibit fellow CFTC registrants from offering products that CME can, but chooses not to, list. CME's theory at the heart of this lawsuit—that any registrant can sue whenever the CFTC approves a product, whether that registrant is injured or not—runs directly counter to the statute's directive that the federal regulator "promote responsible innovation and fair competition." 7 U.S.C. § 5(b).

**CONCLUSION**

The Court should dismiss the complaint.

Dated: October 16, 2026

Respectfully Submitted,

*/s/ M. Jordan Minot*
M. Jordan Minot (DC Bar No. 1722554)

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel

ANNE W. STUKES
Senior Assistant General Counsel
CARLIN METZGER
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 209-1087
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
aweisberg@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
maisenbrey@cftc.gov

*Attorneys for Defendants*