**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC.,<br>*Plaintiff*,<br>–v.–<br>MICHAEL S. SELIG, *et al.*,<br>*Defendants.* | Case No. 26-cv-2157 |

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MOTION TO SUPPLEMENT THE RECORD

# TABLE OF CONTENTS

INTRODUCTION ..... 1

BACKGROUND ..... 3

I. Regulatory background ..... 3

II. Futures versus perpetuals: the basics ..... 4

III. In 2025, the government seeks public feedback on perpetuals. ..... 7

IV. The government approves the trading of perpetuals for the first time, relying only on materials Kalshi prepared. ..... 12

V. Kalshi and others expand their perpetual offerings. ..... 14

LEGAL STANDARD ..... 16

ARGUMENT ..... 17

I. CME has standing. ..... 17

II. The government's misclassification of perpetuals is contrary to the CEA and is arbitrary and capricious. ..... 22

A. The government's decision to not classify perpetuals as swaps is contrary to the CEA. ..... 22

1. Perpetuals are swaps under the CEA's plain text. ..... 23

2. Perpetuals are not contracts of sale of a commodity for future delivery. ..... 26

3. The government's and Kalshi's non-statutory arguments do not save their misclassification of the contracts. ..... 31

B. The government's actions are arbitrary and capricious. ..... 36

1. The government delegated its regulatory authority to Kalshi. ..... 36

2. The government reversed its position overnight without any acknowledgement whatsoever. ..... 39

3. The government failed to consider the relevant factors. ..... 40

III. The Court should consider extra-record evidence as part of its review. ..... 43

CONCLUSION ..... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accrediting Council for Indep. Colls. & Schs. v. DeVos*, 303 F. Supp. 3d 77 (D.D.C. 2018) .... 41

*Alstom Transp., Inc. v. Fed. R.R. Admin.*, 192 F.4th 496 (D.C. Cir. 2026) .... 21

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001) .... 16

*Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373 (D.C. Cir. 2021) .... 20

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) .... 39, 41, 45

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) .... 22

*Bost v. Ill. State Bd. of Elections*, 607 U.S. 71 (2026) .... 20, 21

*Bridgeport Hosp. v. Becerra*, 108 F.4th 882 (D.C. Cir. 2024) .... 35

*Butte County v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010) .... 39, 40

**Cap. Mkts. All. Ass'n v. CFTC*, No. 26-cv-9608 (LGS) (S.D.N.Y. Nov. 3, 2026) .... 16, 23, 27, 28

*Carlson v. Postal Regul. Comm'n*, 938 F.3d 337 (D.C. Cir. 2019) .... 36

*Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017) .... 16, 21

*Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971 (D.C. Cir. 2023) .... 30, 40, 43

*CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573 (9th Cir. 1982) .... 33

*CFTC v. Eisenberg*, No. 23-cv-173 (S.D.N.Y. Jan. 9, 2023) .... 26

*CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008) .... 30, 33

*CFTC v. HDR Glob. Trading Ltd.*, No. 20-cv-8132 (S.D.N.Y. Oct. 1, 2020) .... 26

*CFTC v. Mek Glob. Ltd.*, No. 24-cv-2255 (S.D.N.Y. Mar. 26, 2024) .... 26

*CFTC v. Standard Forex, Inc.*, No. CV-93-0088 (CPS), 1996 WL 435440 (E.D.N.Y. July 25, 1996) .... 34

---

*Cases and authorities upon which we chiefly rely are marked with an asterisk.

*CFTC v. UForex Consulting, LLC*, 551 F. Supp. 2d 513 (W.D. La. 2008), *amended in part*, No. 07-0046, 2008 WL 1836707 (W.D. La. Apr. 2, 2008) ........................ 31

*CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004) ........................ 31, 32

*CFTC v. Zhao*, No. 23-cv-1887 (N.D. Ill. Mar. 27, 2023) ........................ 25

*Chicago Mercantile Exchange v. SEC*, 883 F.2d 537 (7th Cir. 1989) ........................ 33, 34, 35

*City of Dania Beach v. FAA*, 628 F.3d 581 (D.C. Cir. 2010) ........................ 44

*Clark County v. FAA*, 522 F.3d 437 (D.C. Cir. 2008) ........................ 22

*Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) ........................ 18

**Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) ........................ 19, 20, 21

*Duncan v. Walker*, 533 U.S. 167 (2001) ........................ 35

*Dunn v. CFTC*, 519 U.S. 465 (1997) ........................ 30

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................ 39

*Foster v. Mabus*, 895 F. Supp. 2d 135 (D.D.C. 2012) ........................ 38

*Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002) ........................ 37

*Henson v. Santander Consumer USA Inc.*, 582 U.S. 79 (2017) ........................ 23

*Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir. 2010) ........................ 24, 30

*Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363 (D.C. Cir. 2004) ........................ 19

*In re NTE Conn., LLC*, 26 F.4th 980 (D.C. Cir. 2022) ........................ 38

*Int'l Swaps & Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259 (D.D.C. 2012) ........................ 24, 31

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ........................ 28

*KalshiEX LLC v. Schuler*, 192 F.4th 664 (6th Cir. 2026) ........................ 30

*La. Energy & Power Auth. v. FERC*, 141 F.3d 364 (D.C. Cir. 1998) ........................ 19

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ........................ 16, 27

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................ 31

*Ludlow Exch., LLC v. James*, No. 26-cv-6676 (CM), 2026 WL 3408217 (S.D.N.Y. Nov. 10, 2026) ..... 13, 38

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ..... 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ..... 4, 16, 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..... 36, 40, 42

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) ..... 43

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109 (2018) ..... 26

*New Jersey v. EPA*, 989 F.3d 1038 (D.C. Cir. 2021) ..... 18

*NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130 (D.C. Cir. 2001), *aff'd*, 537 U.S. 293 (2003) ..... 22

*Occidental Eng'g Co. v. INS*, 753 F.2d 766 (9th Cir. 1985) ..... 17

*Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62 (D.D.C. 2020) ..... 44

*Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294 (D.D.C. 2021) ..... 43

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209 (D.C. Cir. 2004) ..... 40

*Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267 (D.C. Cir. 2007) ..... 20

*Salomon Forex, Inc. v. Tauber*, 8 F.3d 966 (4th Cir. 1993) ..... 30

*Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 942 F.3d 504 (D.C. Cir. 2019) ..... 20

**Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ..... 20

**Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ..... 19

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ..... 17

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) ..... 17

**Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442 (D.C. Cir. 2017) ..... 36, 37, 38

*Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1 (D.D.C. 2001) ..... 44

*Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020) ..... 21

*Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731 (D.C. Cir. 2001) ..... 38

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) ........ 30

*United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) ........ 30

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332 (D.C. Cir. 2018) ........ 19

**Statutes**

5 U.S.C. § 706(2)(A) ........ 22

7 U.S.C. § 1a(27) ........ 33

7 U.S.C. § 1a(44) ........ 15, 27

*7 U.S.C. § 1a(47)(A)(iii) ........ 3, 23, 24

7 U.S.C. § 1a(47)(A)(iv), (vi) ........ 4

*7 U.S.C. § 1a(47)(B)(i) ........ 4, 26

7 U.S.C. § 2(a)(1)(A) ........ 3, 4

7 U.S.C. § 6(a)(3) ........ 4, 28, 43

7 U.S.C. § 7(d) ........ 42

7 U.S.C. § 7(d)(3) ........ 13, 37

7 U.S.C. § 7a-2(c)(5)(B) ........ 36, 38

**Regulations**

17 C.F.R. § 1.3 ........ 29

17 C.F.R. § 16.01(a)(1)(i) ........ 29

17 C.F.R. § 38.200 ........ 37

17 C.F.R. pt. 38 app. C ........ 29

17 C.F.R. § 40.3(b) ........ 42

17 C.F.R. § 147.1(a) ........ 12

**Other Authorities**

CFTC, *Futures Glossary* ........ 4, 29

CFTC, Industry Filings: Trading Organization Products, Filing No. 61857 ........ 15

CFTC, Industry Filings: Trading Organization Products, Filing Nos. 62925 & 62926 ........ 15

CFTC, Industry Filings: Trading Organization Products, Filing No. 64252 ........ 15

CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Apr. 21, 2025) ........ 7

*Coinbase Becomes First US Exchange Allowed to Offer Global Crypto Perps Trading*, Yahoo Fin. (May 29, 2026) ........ 15

Coinbase Derivatives, LLC, Product Filing (Nov. 5, 2026) ........ 15

*Delivery*, The American Heritage Dictionary of the English Language (5th ed. 2022) ........ 27

*Derivative*, Black's Law Dictionary (12th ed. 2024) ........ 3

*For*, The American Heritage Dictionary of the English Language (5th ed. 2022) ........ 27

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012) ........ 32

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969 (Oct. 19, 2026) ........ 3

*Future*, The American Heritage Dictionary of the English Language (5th ed. 2022) ........ 27

*Futures Contract*, Black's Law Dictionary (12th ed. 2024) ........ 27

*In re Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023) ........ 26

*In re Stovall*, CFTC No. 75-7, 1979 WL 11475 (CFTC Dec. 6, 1979) ........ 29, 33

KalshiEX LLC, Rule 40.2(a) Product Certification—HYPE Perpetual Contract (June 5, 2026) ........ 14

Michael S. Selig, Chairman, CFTC, Statement on Equity Perpetual Futures (Nov. 3, 2026) ........ 15

Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694 (July 21, 1989) ........ 30

## INTRODUCTION

Less than 24 hours after receiving an application from Kalshi, the Commodity Futures Trading Commission (CFTC) and Chairman Michael Selig (collectively, the government) approved the trading of a derivatives contract never before listed in the United States. The government itself recognized that this contract, known as a "perpetual," raises novel and complex questions. Still, that did not give the government pause. And since approving Kalshi's contract, the government has allowed perpetuals to proliferate across asset types with no signs of slowing down.

The government should have slowed down to read the applicable text in the Commodity Exchange Act (CEA). The government approved perpetuals as "contracts of sale of a commodity for future delivery," colloquially known as futures. But perpetuals are not "***for*** future delivery," because they lack an expiration date. The entire point of these contracts is that a party can maintain its position forever if it so desires. Without an expiration date, a perpetual does not require the future delivery of a commodity (or its cash equivalent). A perpetual contract, as its very name makes clear, is contrary to the statutory text the government must follow. Thus, overnight and relying solely on Kalshi's advocacy, the government fundamentally changed what it means to be a futures contract in violation of the CEA.

Had the government faithfully read the statute, it would have understood that perpetuals are swaps, not futures. Congress began regulating swaps less than 20 years ago through Dodd-Frank in response to the role unregulated swaps played in the 2008 financial crisis. Perpetuals—contracts allowing for highly leveraged, intra-day bets on assets ranging from Bitcoin to gold to Nvidia stock—come comfortably within Congress' definition of swap.

By ignoring the text of the CEA, the government has allowed perpetuals to benefit from the more favorable regulatory regime applicable to futures. While that treatment certainly benefits Kalshi and others, it is no excuse for defying Congress' intent as expressed in the CEA.

Not only do the government's actions violate the plain text of the CEA, but its one-day approval of perpetuals is arbitrary and capricious. The record in this case shows that the government relied on nothing but Kalshi's advocacy materials in approving perpetuals. And its order approving Kalshi's contract is just a recitation and repackaging of Kalshi's submissions. The government abdicated its role as regulator and ceded its authority to the party with a vested interest in perpetuals' approval. Along the way, the government failed to recognize that it was reversing its policy position on perpetuals and ignored the many relevant factors it should have considered—including many comments the government itself solicited last year on this exact topic.

There is nothing wrong with novelty in the ever-evolving world of derivatives. In fact, Plaintiff Chicago Mercantile Exchange Inc. (CME) has been on the cutting edge of innovation in these markets for well over a century. But innovation must be responsible and lawful. Here, the government's actions were neither.

Because the government plainly violated the CEA by approving perpetuals to trade as contracts of sale of a commodity for future delivery and because its decisionmaking was arbitrary and capricious, this Court should grant CME's motion for summary judgment. And because perpetuals are swaps under the plain statutory text, this Court should reach the statutory issue and vacate the government's illegal actions without remand.

# BACKGROUND

## I. Regulatory background

This case concerns whether perpetual contracts, a novel derivative,[1] should be classified as swaps or as contracts of sale of a commodity for future delivery under the CEA. CME provided relevant background on the regulatory scheme in its opposition to the government's motion to dismiss, ECF 45 at 3-6, and briefly recounts that background here.

The CEA provides for CFTC jurisdiction over "contracts of sale of a commodity for future delivery," 7 U.S.C. § 2(a)(1)(A), colloquially known as futures contracts or futures. In response to the 2008 financial crisis, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) in 2010, which introduced the regulation of swaps. ECF 45 at 5. Relevant here, the CEA defines a "swap" as:

> any agreement, contract, or transaction … that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more … commodities … and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset … that incorporates the financial risk so transferred.

7 U.S.C. § 1a(47)(A)(iii). The definition of swap is capacious. *See* Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65969, 65972 (Oct. 19, 2026) ("Congress deliberately drafted a broad definition of a swap"). In addition to the above, swaps are also any "agreement … that is, or in the future becomes, commonly known to the trade as a swap" and "any combination or permutation of … any agreement" described in the subsection defining

---

[1] A derivative is "[a] financial instrument whose value depends on or is derived from the performance of a secondary source such as an underlying bond, currency, or commodity." Derivative, Black's Law Dictionary (12th ed. 2024).

swaps. 7 U.S.C. § 1a(47)(A)(iv), (vi). The definition of swap excludes "any contract of sale of a commodity for future delivery." *Id.* § 1a(47)(B)(i).

## II. **Futures versus perpetuals: the basics**

As CME explained in its opposition to the government's motion to dismiss, futures contracts developed to hedge against future changes in the price of commodities. ECF 45 at 3 (discussing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)). By entering into a futures contract, buyers could hedge against higher anticipated future prices by locking in a price today for delivery of the commodity in the future. *Id.* Sellers, on the other hand, could hedge against lower anticipated future prices by agreeing to deliver the commodity in the future at a price agreed to today. *Id.*

Congress has regulated futures contracts for more than 100 years. *Id.* at 4. Early statutes as well as the CEA have covered "contract[s] of sale of a commodity for future delivery." *Id.* (quoting 7 U.S.C. § 2(a)(1)(A)). In line with this statutory language, the CEA requires that any "contract for the purchase or sale of a commodity for future delivery" include the "terms of delivery." 7 U.S.C. § 6(a)(3). And the CFTC's futures glossary defines a "Futures Contract" as "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset." CFTC, *Futures Glossary*.[2] A contract cannot be "for future delivery" without an agreement for delivery on a date in the future.

[2] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#F (last visited Nov. 18, 2026).

Expiry is more than just a statutory requirement: it is the structural feature of a future that allows for effective hedging. The expiry date of a future causes what is known as "convergence with the underlying asset's spot price." AR 11.[3] That is, on the date the futures contract expires, the price of the contract can be expected to be the same as the price of the underlying commodity in the spot market.[4] *Id.*; *see also* AR 6. Convergence at expiration is a critical aspect of a futures contract. It is what allows a party to hedge, because the party knows that it can exit its position as the delivery date approaches in a manner that reflects the actual prevailing market price of the commodity. AR 11. That future prevailing market price is exactly what the party hedged against.

A hypothetical example demonstrates this function. Imagine a wheat farmer wishes to effectively guarantee a certain price at which she can sell her wheat six months from now and is concerned that the price of wheat in six months will drop to under $10 a bushel. To hedge against that possibility, she takes a short position in a financially settled six-month futures contract today, agreeing to sell 1,000 bushels of wheat for $10 per bushel in six months' time (a value of $10,000). The farmer guessed correctly; six months from today, wheat is selling for $9 per bushel. Because at the future's expiration in six months the contract will settle at $9 per bushel—the prevailing spot price—the farmer will pocket the $1,000 difference in the futures price and can sell her harvested wheat in the spot market for $9,000, accomplishing the effective price of $10 per bushel.

Unlike futures, perpetual contracts, as their name implies, have "indefinite (or 'perpetual') term[s]." AR 2. Perpetuals do not "expire on a fixed date"; that is, a party to a perpetual contract, no matter whether long or short, can hold its position in the contract forever if so desired. *Id.*

---

[3] CME has submitted the administrative record as an exhibit in conjunction with its motion for summary judgment.

[4] Convergence naturally follows because of arbitrage opportunities between the difference in spot pricing and the futures contract.

As a result of their lack of expiry, perpetuals do not naturally converge to the spot price of the underlying asset at any given time. For that reason, nothing naturally keeps a perpetual "economically tethered" to the underlying asset. AR 14. That is a problem, given that price convergence at expiration is what makes hedging against risk with futures possible. AR 11.

In an effort to solve this issue, exchanges offering perpetuals, like Kalshi, developed a so-called "substitute mechanism" known as a "funding rate." AR 11. The funding rate is a "periodic payment between the long and short sides of" a perpetual contract, "the direction and magnitude of which is generally determined by the difference between the perpetual contract's market price and the underlying asset's spot price." AR 11. In the case of Kalshi's Bitcoin perpetual, every eight hours, 24 hours per day, seven days a week, the long and short sides to the contract exchange payments based on the difference between the price of the perpetual contract and the spot price of Bitcoin. AR 20-21. When the perpetual contract is trading above the spot price, the long side (i.e., the buyer) pays the funding-rate amount to the short side (i.e., the seller). AR 11. When the inverse is true, the short side pays the long side. *Id.*

In theory, these three-times-a-day payments are meant to "keep closely aligned a perpetual contract's price to the underlying asset's price" (i.e., convergence) because they introduce incentives for arbitrage and changing positions. *Id.* But the funding-rate mechanism also introduces fundamental differences between the function of a true futures contract and a perpetual. Rather than convergence occurring at expiration, which a perpetual lacks, the funding rate is designed to maintain ***constant*** price convergence between the spot price of the underlying asset and the contract price. In other words, a perpetual provides continuous (and perhaps infinite) "economic exposure to the spot price of" the underlying asset. AR 102. A true future, on the other hand, is used to ***hedge against*** precisely this type of economic exposure. Thus, unlike a true future,

perpetuals let traders make intraday bets on the spot price of the underlying asset. *See* AR 11 (discussing the funding rate).

The farmer discussed above would not enter into a perpetual for her hedging needs. A perpetual would expose her to daily price fluctuations in wheat rather than allow for planning against a future price. Price certainty in the future is impossible with perpetuals. The farmer cannot guarantee a future price through a perpetual because the perpetual is designed to reflect only today's price. For that reason and others, trade organizations representing farmers and sellers of traditional commodities have opposed the expansion of perpetuals into other commodities. *See infra* Background § III.

## III. In 2025, the government seeks public feedback on perpetuals.

Within months of the Trump Administration's return to the White House, the CFTC signaled its intention to bring perpetuals trading to the United States. In April 2025, the CFTC issued a request for comment related to perpetuals. AR 11 (discussing CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Apr. 21, 2025) (RFC)).[5] Although the Request for Comment is not in the record of this case, the "request solicited public input on the characteristics, use cases, regulatory classification, and risks of perpetual contracts." *Id.* Among other issues pertaining to "this novel product set," the request sought input on (1) the proper definition of a perpetual derivative; (2) whether perpetuals "have advantages for market participants over traditional futures contracts"; (3) whether perpetuals present "unique risks"; (4) whether perpetuals present market-manipulation concerns; and (5) whether such contracts should be considered swaps or futures. RFC at 1.

[5] The RFC is also available at https://www.cftc.gov/media/12041/Perpetuals_RFC042125/download (last visited Nov. 18, 2026); *see also* ECF 1-3.

Many commenters offered feedback. Both proponents and opponents of perpetuals raised important points, many of which directly stem from perpetuals' distinctive lack of expiry and are directly implicated by the government's decisions in this case:[6]

***Perpetuals are like gambling, not a real hedge against future prices.*** Many commenters questioned whether perpetuals serve any real hedging function, or if they are instead simply gambling contracts. Commenter Better Markets, for example, explained that perpetuals' "round-the-clock trading model, synthetic pricing mechanisms, and infinite duration are more reminiscent of speculative gaming than structured risk management." Ex. 1,[7] Better Markets Comment at 1-2. As a result, "these products … often mirror[] the behavioral triggers found in gambling applications rather than the discipline of traditional futures contracts." *Id.* at 2.

Several commenters stated that perpetuals do not serve the function of hedging against future prices—the principal use case of true futures—because (1) the funding rate associated with perpetuals is meant to keep the contract price and spot price constantly tethered together; and (2) perpetuals do not naturally converge to the spot price because of their lack of expiry. *See, e.g.*, Ex. 6, American Cotton Shippers Association Comment at 2 ("In traditional asset markets, ACSA feels that perpetual contracts do not serve the needs of commercial hedgers and do not promote risk management against physical exposure or promote proper price discovery functions."); Ex. 2, Commodity Markets Council Comment at 3 ("Without convergence and expiration, these products do not suit [traditional market participants'] hedging needs."); Ex. 5, National Council of Farmer Cooperatives Comment at 2 ("[A]s the delivery month of a futures contract approaches, the cash

---

[6] The Court may properly consider the comments submitted by CME in connection with this filing. *See infra* Argument § III (explaining that the comments show that the government failed to consider relevant factors).

[7] Numbered exhibits are attached to CME's motion to supplement the record.

price and the futures price come together, and it is this convergence that makes hedging effective.”).

***The leverage and funding rate associated with perpetuals can lead to devastating losses, especially due to lack of expiry.*** Commenters also explained that several distinct structural aspects of perpetuals, including the funding rate, leverage, and lack of expiry, could lead to dramatic losses, especially in periods of market volatility. *See, e.g.*, Ex. 1, Better Markets Comment at 2 (“Retail investors lured by the promise of 24/7 trading and high leverage may unknowingly assume excessive risk, often with little understanding of how these contracts function or how losses can rapidly compound.”); Ex. 2, Commodity Markets Council Comment at 2 (perpetuals create “[d]ifficulty in managing long-term exposures due to lack of expiry” and are more “susceptibl[e] to speculative bubbles”); Ex. 3, Polygon.io Comment at 2 (“the high leverage often available in perpetual markets significantly amplifies potential losses for market participants” and “the funding rate mechanism can also be a source of risk and unexpected cost, especially during periods of extreme market sentiment”); Ex. 4, World Federation of Exchanges Comment at 7 (perpetuals present risks due to “[c]ontinuous pricing and funding adjustments,” “[l]everage levels,” and “[l]ack of expiry, which removes a natural position-closing mechanism and can result in more persistent risk exposure”). Indeed, perpetuals require the exchange of payments between parties to the contract multiple times per day. And the contracts’ lack of expiry provides no mechanism for capping any potential losses.

***Perpetuals present unique market-manipulation concerns and call for additional surveillance measures.*** Commenters also pointed out that perpetuals raise unique market-manipulation concerns surrounding funding rate payments and the need for additional surveillance by designated contract markets (DCMs). *See, e.g.*, Ex. 1, Better Markets Comment at 2 (“At the

same time, around-the-clock trading increases the strain on surveillance infrastructure and compliance personnel, heightening the likelihood that manipulation or disruptive trading activity will go undetected."); Ex. 2, Commodity Markets Council Comment at 3 ("The use of funding rates and synthetic indexes presents new manipulation vectors, including index price spoofing and front-running."); Ex. 4, World Federation of Exchanges Comment at 5 ("Perpetual derivatives necessitate enhanced surveillance frameworks given the absence of an expiry event.").

***Perpetuals can easily become detached from real-world value and market realities.*** True futures contracts come with expiration dates that naturally force convergence to the underlying asset's prevailing market price (the spot price) at expiration. Moreover, expiration often lines up with a real-world event or contingency against which a party is hedging, like the harvest. Given their lack of expiry and reliance on a funding rate to mimic what comes naturally to a true future, commenters explained that perpetuals may become untethered from real-world market realities and underlying assets' actual value, frustrating hedging and risking market volatility. *See, e.g.*, Ex. 1, Better Markets Comment at 4 (lack of expiry associated with perpetuals "increases the risk of market crowding, directional imbalances, and disorderly trading, particularly in fast-moving or illiquid conditions"); Ex. 2, Commodity Markets Council Comment at 2, 3 (perpetuals' "reliance on synthetic pricing mechanisms (e.g., funding rates) decouples them from physical supply and demand" and "lack of expiration date eliminates convergence with the cash market, which is essential for hedging agricultural production cycles, harvest timelines, and storage-driven seasonality"); Ex. 4, World Federation of Exchanges Comment at 4 (a unique risk associated with perpetuals is "[t]he absence of expiry vis-à-vis the traditional convergence mechanism that anchors futures prices to physical market realities, a cornerstone of risk management in agricultural and energy markets"); Ex. 5, National Council of Farmer Cooperatives Comment at 1 (lack of expiry

and lack of natural convergence "could cause a structural imbalance of supply and demand over time" in certain markets).

***Perpetuals can draw liquidity from markets for true futures, frustrating risk management.*** True futures markets provide for effective risk management and hedging because they are liquid markets—i.e., there are a sufficient number of willing buyers and sellers for the contracts and parties can efficiently take and exit positions given the trading volume. Commenters explained that perpetuals trading may disrupt market liquidity in established futures markets as speculators move away from futures to perpetuals. As a result, accomplishing effective hedging may become more difficult for parties participating in the futures markets. *See, e.g.*, Ex. 2, Commodity Markets Council Comment at 3 ("Introduction of perpetuals may siphon liquidity from dated contracts, reducing the efficiency of established markets."); Ex. 6, American Cotton Shippers Association Comment at 2 (perpetuals' "existence in traditional markets could potentially undermine traditional contracts' ability to achieve convergence, as they could draw liquidity into markets that are completely divorced from market fundamentals and cause price distortion"); Ex. 4, World Federation of Exchanges Comment at 5 ("The emergence of highly liquid perpetual markets may divert speculative or short-term trading activity away from expiring contracts, potentially reducing the depth and effectiveness of futures markets[.]"); Ex. 5, National Council of Farmer Cooperatives Comment at 2 ("We … have concerns of a bifurcated market where speculators trade in perpetual derivatives, while the physical industry uses a traditional delivery market, thus reducing the liquid[ity] that is needed for effective hedging while creating significantly more price volatility.").

The government never responded to a single comment submitted by the public in response to the 2025 request for comment. In reaching the decisions challenged in this case, the government

did not rely on either the request for comment or any of the many comments received from the public—not a single comment appears in the record, and the government has explicitly disclaimed considering anything other than the materials in its administrative record, which is composed ***solely*** of advocacy materials from Kalshi and its lawyers.

## IV. **The government approves the trading of perpetuals for the first time, relying only on materials Kalshi prepared.**

The administrative record in this case reveals that, in reaching its decisions, the government did not consider a single voice besides Kalshi's. Apart from the two CFTC actions challenged here, the record consists of only four Kalshi documents: its application for its Bitcoin perpetual contracts; two "draft" documents prepared by Kalshi; and one memorandum from Kalshi's outside counsel sent to Kalshi. Nothing in the record explains why or how the government came into possession of self-titled "draft" Kalshi documents or a confidential memorandum between Kalshi and its attorneys.

The administrative record does not contain a single government correspondence or document (except for the two actions challenged here). There is no evaluation, assessment, or analysis by the government of classifying perpetuals as futures instead of swaps. There are no meeting invitations, no notes of any meetings, and no evidence of any deliberations at all on this subject. *Cf.* 17 C.F.R. § 147.1(a) (applying Sunshine Act "to all deliberations of a quorum of the Commission which determine or result in the conduct or disposition of official Commission business"). The record is devoid of any prior CFTC policies, regulations, or enforcement actions, many of which bear directly on the issue here. Instead, the government was content to delegate its duties under the APA and CEA to Kalshi.

Given the close relationship between the government and Kalshi,[8] it is not surprising that on May 29, 2026—one day after Kalshi submitted its application—the government approved, for the first time, the trading of perpetual contracts. AR 6, 8, 9 (Kalshi Order). Despite perpetual contracts "rais[ing] novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency with [DCM] Core Principles," AR 11 (Policy Statement),[9] the government approved Kalshi's application after considering nothing more than a few Kalshi documents.

The May 29 Kalshi Order largely adopts, without further elaboration, arguments made by Kalshi. The first five pages of the nine-page Order rehash arguments made by Kalshi with respect to the appropriate classification of perpetuals. AR 1-5. Then, the Order concludes summarily that listing Kalshi's Bitcoin perpetual as a future "would not violate the CEA or the Commission's regulations thereunder … based on the Commission's review of Kalshi's analysis of the categorization of the" contract. AR 6. The Order does not explain how a perpetual is "for future delivery" as required by the CEA.

Instead, the final two-and-a-half pages conclude that the funding rate associated with Kalshi's perpetual contract does not violate DCM Core Principle 3: that DCMs list "only contracts that are not readily susceptible to manipulation." 7 U.S.C. § 7(d)(3). The Order explains that true futures converge to the spot price at expiration, and that because perpetuals do not expire, they utilize a funding-rate mechanism to keep the contract price tethered to the spot price. AR 6-7. It

[8] Another court has recognized that a different CFTC action benefiting Kalshi "smacks of a collusive effort between a regulator and regulatee." *Ludlow Exch., LLC v. James*, No. 26-cv-6676 (CM), 2026 WL 3408217, at *16 (S.D.N.Y. Nov. 10, 2026).

[9] Although the Policy Statement is dated June 3, 2026, in the Federal Register, it came out May 29, 2026. AR 10 (Policy Statement "adopted as of May 29, 2026.").

goes on to echo Kalshi's claim that the Bitcoin spot market supports the effective functioning of the funding rate, because the market is "deep, broadly distributed, active" and has "continuous trading." AR 8. The Order never addresses or even references the CEA's definitions of swap. And it contains no independent analysis of the caselaw or the statute with respect to the classification issue. Despite the fact that the Kalshi contract was the only contract under review, the Order also applies to "similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities[.]" *Id.*

The government also issued a related Policy Statement. AR 10-12. Like the Kalshi Order, the Policy Statement neither engages with nor references the definitions of swap under the CEA. It never acknowledges that a perpetual must be a "contract of sale of a commodity for future delivery" and never explains how a perpetual is "for future delivery." Instead, the Policy Statement focuses on the "[s]tructural [d]istinctiveness" of perpetuals: namely, the lack of expiration date and the use of the funding-rate mechanism. AR 11. The Policy Statement concludes that, due to the "novel characteristics of perpetual contracts," DCMs seeking to list perpetuals on other types of assets, not contemplated by the Kalshi Order, should first get approval from the CFTC under Regulation 40.3, rather than self-certifying. AR 11-12.

## V. <u>Kalshi and others expand their perpetual offerings.</u>

Since the government's approval of Kalshi's Bitcoin perpetuals, Kalshi and other DCMs have vastly expanded their offering of perpetual contracts, including for non-digital assets. Almost immediately after the actions challenged here, Kalshi and other DCMs self-certified perpetual contracts for a variety of digital assets. *See, e.g.*, KalshiEX LLC, Rule 40.2(a) Product Certification—HYPE Perpetual Contract (June 5, 2026)[10] (Kalshi self-certifying trading in

[10] https://www.cftc.gov/filings/ptc/ptc0605265472.pdf (last visited Nov. 18, 2026).

perpetuals based on HYPE); *see also Coinbase Becomes First US Exchange Allowed to Offer Global Crypto Perps Trading*, Yahoo Fin. (May 29, 2026).[11] Next, Kalshi and other DCMs expanded into other asset types. For example, on September 3, 2026, the government approved Kalshi's applications to list perpetual contracts on gold, silver, and platinum. CFTC, Industry Filings: Trading Organization Products, Filing No. 61857.[12] On October 3, 2026, the government approved Kalshi's applications to list a perpetual contract for copper and a perpetual contract based on a broad-based securities index of the 500 largest companies in the United States. CFTC, Industry Filings: Trading Organization Products, Filing Nos. 62925 & 62926.[13] And, on November 2, 2026, the CFTC approved single-stock perpetuals as "security futures." *See* 7 U.S.C. § 1a(44) (defining security future as "a contract of sale for future delivery of a single security"); Michael S. Selig, Chairman, CFTC, Statement on Equity Perpetual Futures (Nov. 3, 2026)[14] (announcing deemed approval of equity perpetuals as security futures products under Regulation 40.3).[15]

An association of national securities exchanges and broker-dealers recently challenged the government's approval of Kalshi's single-stock perpetuals as security futures. *Cap. Mkts. All. Ass'n*

---

[11] https://finance.yahoo.com/markets/crypto/articles/coinbase-becomes-first-us-exchange-194134623.html (last visited Nov. 18, 2026).

[12] https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/61857 (last visited Nov. 18, 2026).

[13] https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/62925; https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/62926 (last visited Nov. 18, 2026).

[14] https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement110326 (last visited Nov. 18, 2026).

[15] *See also, e.g.*, CFTC, Industry Filings: Trading Organization Products, Filing No. 64252 (Kalshi security perpetual) https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts/64252 (last visited Nov. 18, 2026); Coinbase Derivatives, LLC, Product Filing (Nov. 5, 2026) (Coinbase security perpetual) https://www.cftc.gov/filings/ptc/ptc11052646162.pdf (last visited Nov. 18, 2026).

*v. CFTC*, No. 26-cv-9608 (LGS) (S.D.N.Y. Nov. 3, 2026). On its application for a temporary restraining order, a court within the Southern District of New York held that the plaintiff was likely to succeed on its claim "because the perpetual contracts, by definition, do not provide for a 'sale for future delivery of a single security,' they cannot be a security future over which the CFTC has statutory and regulatory authority." *Id.*, ECF 11 at 2 (citing and quoting *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980) ("The seller of [a futures] contract commits himself to deliver the commodity at a fixed date in the future."), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)). The court further recognized that "such contracts appear to satisfy the definition of a swap." *Id.*[16]

## LEGAL STANDARD

In assessing standing, "the complaint and declarations must together demonstrate a substantial probability of injury-in-fact, causation, and redressability." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). "[C]ourts do not conduct separate mini-trials on injury-in-fact, causation, and redressability," but "do their best based on the complaint and declarations to assess whether the plaintiff's assertions suffice to show the elements of standing." *Id.*

When a district court reviews agency action under the Administrative Procedure Act (APA), it "sits as an appellate tribunal" as "the entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted). The question under review is whether "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club v. Mainella*,

[16] CME submitted an amicus brief in support of the plaintiff's pending preliminary injunction motion in that case. The court denied the application for a temporary restraining order based on a lack of irreparable harm.

459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985)). Here, it did not.

## ARGUMENT

### I. <u>CME has standing.</u>

In its opposition to the government's motion to dismiss, CME showed why it has suffered a competitive injury as a result of the actions challenged here, and that its injury would be redressed through vacatur. ECF 45 at 11-26. CME briefly recounts why, as a legal matter, it has standing and respectfully refers the Court to its motion-to-dismiss briefing, which comprehensively addresses the legal issue. The remainder of the discussion below is dedicated to substantiating CME's standing as a factual matter. Because the facts show that the government's actions approving perpetuals as futures increased competition with CME's retail futures products, the conclusion today is no different than before: CME has standing.

CME competes for business from retail traders in the cryptocurrency futures markets. McCourt Decl. ¶¶ 7-12. CME offers micro cryptocurrency contracts specifically developed for the retail segment, such as Micro Bitcoin, Micro Ether, and others. *Id.* This retail business constitutes a growing part of CME's trading activity. *Id.* ¶ 11. Prior to the actions challenged here, perpetuals had never traded in the United States, let alone as futures contracts. *Id.* ¶ 16; *see also* AR 11, 14. And Kalshi did not offer futures contracts at all for any product. McCourt Decl. ¶ 16; *see also* AR 92. The challenged actions thus introduced both new entrants and new products into the futures markets.

These new products compete with CME's cryptocurrency futures designed for retail traders. McCourt Decl. ¶¶ 13-20 (explaining that Kalshi and others now trade cryptocurrency perpetuals as futures as a result of the government's actions). The administrative record confirms as much. *See, e.g.*, *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) ("[T]he petitioner must

either identify in that record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence[.]"); *New Jersey v. EPA*, 989 F.3d 1038, 1048 (D.C. Cir. 2021) (examining "evidence in the administrative record" as part of the standing inquiry (quoting *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382 (D.C. Cir. 2020))). Kalshi has touted that its perpetuals "will be available to the general public, including retail participants." AR 33; *accord* AR 4, 75, 97, 107; *see also* AR 99 n.30 (perpetuals "provide for cash-settled, leveraged retail exposure to commodities"). The record repeatedly references Kalshi's argument that "regulating the Perpetual Contracts as futures contracts would reduce regulatory arbitrage and ***promote competition***." AR 95 (emphasis added); *accord* AR 99, 109.

Kalshi and the government have said as much publicly. *See* Beaton Decl. ¶¶ 2, 4-7, 15-16 (cataloguing Kalshi statements explaining that CME is an incumbent, that CME fears competition from perpetuals, that perpetuals have fueled Kalshi's entry into financial products, and that perpetuals are superior to CME's futures with expiration dates, among others), ¶¶ 3, 17-18 (cataloguing statements by the CFTC and its Chair, including that CME chose not to "compete in the marketplace" by filing this lawsuit, that incumbents like CME fear the future, and that perpetuals may limit fees that CME can charge). Indeed, about a week before this motion, Kalshi again declared that lawsuits challenging the government's approval of Kalshi's perpetual products are "a tool for the current winners to prevent competition and protect the sweet deal they have going: Whether it's sports books, options, futures or stocks, it's all about keeping their market share." *Id.* ¶ 8.

Kalshi has directly compared its perpetual contracts to true futures contracts—like those offered by CME—in extensive literature on its website. For example, Kalshi's website contained

a demonstrative comparing the characteristics of perpetuals and dated futures and touted perpetuals' superiority, explaining "[p]erpetual futures, often called perps or perpetual swaps, eliminate one of the biggest complexities of traditional futures contracts: expiration dates." *Id.* ¶¶ 9-11. All of this evidence shows that perpetuals compete directly with retail futures—and that Kalshi sought, and the government granted, approval of perpetuals as futures, with Kalshi citing increased competition as a reason to do so. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 118-19 (2025) (relying on statements from California and EPA to find that fuel producers had standing to challenge EPA regulation).

These facts sufficiently demonstrate CME's standing. To be an injured competitor, all that CME must show is "an actual or imminent increase in competition." *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); ECF 45 at 12. CME does not need to demonstrate a financial injury or that it has suffered any tangible economic effects from the challenged actions, as increased competition will cause CME harm as a matter of economic logic. *See, e.g.*, *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 341 (D.C. Cir. 2018); ECF 45 at 17, 26.

The government's actions increased competition against CME in at least three distinct ways. First, they authorized entry of Kalshi—a new competitor—into the futures markets and introduced perpetuals—a new product—into those markets. Entry of a new competitor or product is classic competitive injury. *See, e.g.*, *Honeywell Int'l Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004); *Mendoza v. Perez*, 754 F.3d 1002, 1011 (D.C. Cir. 2014); ECF 45 at 13. Second, the government's actions "lift[ed] regulatory restrictions on … competitors" by allowing Kalshi and others to avail themselves of the more favorable regulatory regime governing futures, even though under the CEA perpetuals are swaps. *See, e.g.*, *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998); ECF 45 at 14-15; McCourt Decl. ¶¶ 13, 15-19; Beaton Decl. ¶¶ 13-14, 19.

This, too, makes out injury-in-fact. Third, the government's misclassification of perpetuals as futures, rather than swaps, in direct contravention of the CEA has forced CME to compete in an "illegally structure[d]" environment. *See, e.g.*, *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 942 F.3d 504, 508-09 (D.C. Cir. 2019); *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 83 (2026); ECF 45 at 15-16. Because CME must now compete ***differently*** and "account for additional ***practices***" due to the introduction of perpetuals to the futures markets, it has suffered injury. *Shays v. FEC*, 414 F.3d 76, 86 (D.C. Cir. 2005) (emphasis in original); ECF 45 at 16.

CME's injury would be redressed by vacatur of the actions that created this competition. *See, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 379-80 (D.C. Cir. 2021); ECF 45 at 23-26. And "the fact that a regulation was designed to produce a particular effect on the market"—here competition with true futures—"ordinarily means that the likely result of vacating that regulation would be to reduce that effect on the market." *Diamond*, 606 U.S. at 117. Put simply, "standing exists where the challenged government action authorized conduct that would otherwise have been illegal"—exactly what happened here. *Renal Physicians Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

The record also confirms redressability. Kalshi itself has repeatedly explained that perpetuals would not be competitive if they traded as swaps, as opposed to futures, because of the less favorable regulatory treatment to which swaps are subject. *See* AR 94-95, 99-100, 109-10. That admission explains why no one had traded perpetuals in the United States until the government approved them as futures. Vacating the government's actions would remove perpetuals from the futures markets and redress CME's injury.

CME expects that, beyond misreading competitor-standing law (which, correctly applied, alone establishes CME's standing), the government will once again attempt to question CME's

standing based on publicly available, post-complaint trading data. CME has explained why such data is irrelevant and will do so again in opposition. Briefly here, CME notes that, in evaluating standing, the Court "consider[s] only the facts as they stood when this lawsuit was filed," not data from months after. *Alstom Transp., Inc. v. Fed. R.R. Admin.*, 192 F.4th 496, 504 (D.C. Cir. 2026). And the government's cherry-picking of publicly available data cannot alter the fact that CME's retail cryptocurrency futures compete with perpetuals, or that the government has fundamentally changed what it means to be a future by now classifying, as futures, derivatives with no expiration date.

As CME explained in its opposition to the motion to dismiss, the government "make[s] standing law more complicated than it needs to be." *Bost*, 607 U.S. at 83 (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020)). The government's arguments (and repeated, frivolous attempts at discovery related to standing) are contrary to the D.C. Circuit's instruction that courts should not "conduct separate mini-trials on injury-in-fact, causation, and redressability." *Carpenters Indus. Council*, 854 F.3d at 5; *see also Diamond*, 606 U.S. at 120-21 (refusing to require expert declarations and additional evidence to demonstrate standing). The government's selective data harvesting ignores, for example, that from January through May 2026—the five-month period preceding and including the government's May 29, 2026 approval challenged in this case—to June through October 2026—the five months following that approval—CME's average monthly retail cryptocurrency trading volume is down nearly 29 percent. McCourt Decl. ¶¶ 22-23. But the Court need not wade into these publicly available statistics because "commonsense economic realities" under binding precedent show that CME has standing. *Diamond*, 606 U.S. at 116.

Because the facts demonstrate that the government's actions have increased competition, CME has standing.

## II. The government's misclassification of perpetuals is contrary to the CEA and is arbitrary and capricious.

Under the APA, a court reviewing government action "shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency acts contrary to law if its challenged action "conflicts with [its] own statute" or "with another federal law." *NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001), *aff'd*, 537 U.S. 293 (2003). Beyond compliance with the law, the APA—a bulwark against arbitrary government action—also requires reasoned agency decisionmaking. *See, e.g.*, *Clark County v. FAA*, 522 F.3d 437, 443 (D.C. Cir. 2008).

Here, the Kalshi Order and the Policy Statement fail on both counts. First, perpetual contracts like Kalshi's are swaps under the CEA and must be regulated as such. They do not fit into any exception. And second, even if the government could have classified perpetuals as futures and approved them as such, its actions were arbitrary and capricious.

### A. The government's decision to not classify perpetuals as swaps is contrary to the CEA.

Perpetuals are swaps. Dodd-Frank's amendments to the CEA broadly define swaps, and perpetuals fit that definition to a tee. Under the statute, the only way to avoid the capacious swap definition is to meet a statutory exclusion. Perpetuals meet none. This Court need not look beyond the plain language of the CEA to decide in favor of CME and to vacate the government's unlawful classification decision. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) ("We will not alter the text in order to satisfy the policy preferences of the Commissioner."); *Henson v.*

*Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) ("[I]t is of course our job to apply faithfully the law Congress has written.").

**1. Perpetuals are swaps under the CEA's plain text.**

Under Section 1a(47)(A)(iii) (the CEA's definitional section)—which the Kalshi Order and Policy Statement never address—a "swap" includes any agreement, contract, or transaction that

> provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more … commodities … and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset … that incorporates the financial risk so transferred.

7 U.S.C. § 1a(47)(A)(iii). Perpetuals check every box under that definition. *See Cap. Mkts. All.*, ECF 11 at 2 (holding that perpetuals on single stocks "appear to satisfy the definition of a swap").

First, perpetuals satisfy the ***executory basis*** element. They provide for repeated obligatory payments by each side to the contract for as long as they remain parties to the contract. AR 7 (Kalshi Order) (parties to a perpetual "exchange periodic payments"); *accord* AR 11 (Policy Statement) (a funding rate is "a periodic payment between" the parties to the perpetual). These payments occur every eight hours, every day, for as long as a party wishes. *See, e.g.*, AR 7 (Kalshi Order) ("A perpetual contract has no expiry."); *accord* AR 11 (Policy Statement); AR 14 (Kalshi Submission) (the contracts lack a "delivery date").

Second, perpetuals involve the "***exchange … of 1 or more payments based on the value or level of … commodities***." 7 U.S.C. § 1a(47)(A)(iii) (emphasis added). The funding-rate mechanism is a recurring bilateral exchange of payments whose direction and amount are functions of the underlying commodity's price. AR 7 (Kalshi Order) (funding-rate payments are "based on the difference between the mark price of the contract and a reference price that continuously

changes reflecting the underlying spot market price"); *accord* AR 93 ("'funding' payments … vary based on the price of the Subject Digital Asset relative to the price of a Perpetual Contract").

Third, perpetuals "***transfer[], as between the parties to the transaction … the financial risk associated with a future change in any such value or level***." 7 U.S.C. § 1a(47)(A)(iii) (emphasis added). The parties on either side of a perpetual have transferred the risk of future changes in the underlying asset's value. If the contract price goes above the value of the underlying asset, parties who are long pay parties who are short. *See* AR 11 (Policy Statement) ("When a perpetual contract trades above the spot price, the traders with long positions make payments while the traders with short positions receive payments; and vice versa."). When the inverse is true, parties who are short pay parties who are long. *Id.*; *see also, e.g.*, AR 2 (Kalshi Order).

Fourth, perpetuals do not ***convey a current or future direct or indirect ownership interest***. A perpetual provides pure price exposure to an underlying asset with no present or future interest in the asset. AR 3 (Kalshi Order) (perpetuals exist "primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities").

In short, every aspect of a perpetual contract fits the definition of a swap. *See, e.g.*, *Int'l Swaps & Derivatives Ass'n v. CFTC*, 887 F. Supp. 2d 259, 261-62 (D.D.C. 2012) ("Swaps involve one or more exchanges of payments based on changes in the prices of specified underlying commodities without transferring ownership of the underlying commodity."); *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 242-43 & n.6 (5th Cir. 2010) (similar). Perpetuals offer parties never-ending, leveraged payment exchanges based on the changes in price of the underlying asset every eight hours, 24 hours a day, seven days a week. They allow for continual intra-day

betting on assets with no obligation to exit the position. They are the type of instrument Congress regulated in Dodd-Frank.

Despite the government's failure to discuss or even cite the definition of swap in the Kalshi Order, Kalshi understood that, unless a statutory exception applied, perpetuals were swaps. Kalshi's February 2026 draft request for a no-action position from the CFTC assumes that perpetuals must qualify for an exception to the statutory definition of swap to avoid being treated as such. *See* AR 95-96 ("[W]e analyzed whether the Perpetual Contracts would fall within the CEA's 'swap' definition…. If the Perpetual Contracts fall within one of the exclusions, they are not swaps."); *id.* n.13 ("[b]ut for" a statutory exception, a cash-settled Bitcoin derivative "would fall within" the definition of swap); *see also* AR 103-04 (similar discussion).

Kalshi's evident purpose in seeking CFTC approval to trade perpetuals as futures was to avoid the less favorable regulatory regime that applies to swaps. *See, e.g.*, AR 94. Kalshi knew that classifying perpetuals as swaps would "subject them to higher initial margin requirements," additional "transaction reporting," and other burdens. AR 100. As Kalshi told the CFTC, "[a]pplying those additional requirements"—of swaps—to the "Perpetual Contracts would ***discourage*** trading in them." *Id.* (emphasis added).

Before Kalshi's push to classify perpetuals as futures, the CFTC had considered perpetuals as swaps, consistent with the CEA. The CFTC took enforcement actions against companies unlawfully offering perpetuals to U.S. customers in violation of the CEA. In 2023, the CFTC sued Binance for such conduct. *CFTC v. Zhao*, No. 23-cv-1887 (N.D. Ill. Mar. 27, 2023), ECF 1. In so doing, the agency explained that Binance's perpetual contracts—which, like Kalshi's, "cause[d] the counterparties to a transaction … to exchange a payment that Binance calls a 'funding fee'" every eight hours—are swaps. *Id.* ¶¶ 62-63. That is because the "perpetuals transfer the price risk

of the underlying digital asset as between the counterparties to a transaction" and because the contracts "do not have a pre-determined expiration date." *Id.* ¶ 62. The agency came to the exact same conclusion in several other enforcement actions. *See, e.g.*, *CFTC v. Mek Glob. Ltd.*, No. 24-cv-2255 (S.D.N.Y. Mar. 26, 2024), ECF 1 ¶ 41 (perpetual contracts with "no predetermined settlement time" that could "be held indefinitely" and involved "transfer, as between the parties to the transaction, the financial risk associated with a future change in one or more commodities" are swaps); *CFTC v. HDR Glob. Trading Ltd.*, No. 20-cv-8132 (S.D.N.Y. Oct. 1, 2020), ECF 1 ¶¶ 46, 125 (perpetuals are swaps); *CFTC v. Eisenberg*, No. 23-cv-173 (S.D.N.Y. Jan. 9, 2023), ECF 1 ¶ 23 (same); *In re Deridex, Inc.*, CFTC No. 23-42, at 5 (Sept. 7, 2023) (same).[17]

While the CFTC is now dancing to Kalshi's tune, the CEA remains the same. Perpetuals are swaps.

### 2. Perpetuals are not contracts of sale of a commodity for future delivery.

To avoid their treatment as swaps, perpetuals must fit a statutory exception to the swap definition. None applies. In its search for an applicable statutory exception, Kalshi argued and the government accepted that Kalshi's Bitcoin perpetual contract could be considered a "futures contract" and thus excluded from classification as a swap. *See, e.g.*, AR 3, AR 32, AR 103. But that is not what the CEA says. The statute carves out "contract[s] of sale of a commodity ***for future delivery***" from the swap definition. 7 U.S.C. § 1a(47)(B)(i) (emphasis added).

The government's decision to classify perpetuals as futures "ignores the statutory text" and cannot stand. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018). Unlike the government, we start with the statutory text, which supplies the answer to this case.

---

[17] https://www.cftc.gov/media/9221/enfderidexorder090723/download (last visited Nov. 18, 2026).

To be a "contract of sale of a commodity for future delivery," the contract must be ***for*** future delivery—future delivery must be the "object, aim, or purpose" of the contract. For, The American Heritage Dictionary of the English Language (5th ed. 2022). It must be for ***future*** delivery—delivery "that is to be or to come." Future, The American Heritage Dictionary of the English Language (5th ed. 2022). And it must require future ***delivery***: it must require the "act of transferring to another" the commodity or its economic equivalent. Delivery, The American Heritage Dictionary of the English Language (5th ed. 2022).[18]

Simply put, the contract must require one party to the contract to deliver the underlying commodity or its economic equivalent at a future time. Only one contractual term can force such future delivery: an expiration date—i.e., a date at which the contract matures, settles, or demands performance. Without expiry, a contract does not require future delivery at all. *See* Futures Contract, Black's Law Dictionary (12th ed. 2024) ("An agreement to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price ***at a future time***, usu. during a particular time of a month." (emphasis added)).

A court within the Southern District of New York already reached this preliminary conclusion as to the government's attempt to classify single-stock perpetuals as security futures. It held that "because the perpetual contracts, by definition, do not provide for a 'sale for future delivery of a single security,' they cannot be a security future over which the CFTC has statutory and regulatory authority." *Cap. Mkts. All.*, ECF 11 at 2 (quoting 7 U.S.C. § 1a(44)). For support, the court relied on *Leist*, 638 F.2d at 286, which explained that "[t]he seller of [a futures] contract commits himself to deliver the commodity at a fixed date in the future." *Id.*

---

[18] For: https://www.ahdictionary.com/word/search.html?q=for;
Future: https://www.ahdictionary.com/word/search.html?q=future; and
Delivery: https://www.ahdictionary.com/word/search.html?q=delivery.

While the government and Kalshi never addressed the "for future delivery" requirement, amici in support of the government in the New York case argued that perpetuals are "for future delivery" because perpetuals might be settled in the future. *See* Br. of Amici Curiae Coinbase, Inc. et al. in Supp. of CFTC's Opp'n to Mot. for Prelim. Inj. at 18, *Cap. Mkts. All.*, ECF 47-1. But that misreads the statute. As discussed, "***for*** future delivery" requires that the "object, aim, or purpose" is future delivery. *See Jennings v. Rodriguez*, 583 U.S. 281, 302 (2018) (defining "for"). This definition is the "only" one that "makes sense in the context of the statutory scheme as a whole." *Id*. Expiry forces delivery, which is what makes a contract "***for*** future delivery." That requirement describes a characteristic of the contract itself—its object or aim—not what the parties may or may not do. Nothing about perpetuals, given their lack of expiry, requires future delivery because the option to never deliver is the whole point of the contracts. That the parties to a perpetual might exit their positions in the future does not mean the contract is ***for*** future delivery. Without expiry, whether future delivery of a perpetual happens is a fortuity.

Were there any question that the statutory language means what it says, surrounding statutory language and regulatory guidance demonstrate that futures require delivery and thus must have expiration dates. For example, Section 6 of the CEA, concerning the "[r]egulation of futures trading and foreign transactions," imposes various "[r]estrictions on futures trading." It states clearly:

> It shall be unlawful for any person … to enter into … a contract for the purchase or sale of a commodity for future delivery … unless … ***such contract is evidenced by a record in writing which shows … the terms of delivery***.

7 U.S.C. § 6(a)(3) (emphasis added). The CFTC's own Futures Glossary agrees. It defines "delivery" as "[t]he tender and receipt of the actual commodity, the cash value of the commodity,

or of a delivery instrument covering the commodity … used to settle a futures contract."[19] Only one aspect of a futures contract ensures that the contract be "for future delivery": the expiration date.

The CFTC's own regulations make the same point: futures have an expiration date. For example, Appendix C to Part 38 of the CFTC's regulations states that futures contracts requiring physical delivery "should be designed to avoid any impediments to the delivery of the commodity … ***at the expiration*** of a futures contract." 17 C.F.R. pt. 38 app. C(b)(1) (emphasis added). Futures contracts that are cash settled shall be "settled by cash payment in lieu of physical delivery of the commodity" "***at contract expiration***." *Id.* app. C(c)(1) (emphasis added); *see also id.* (mentioning contract expiration eight different times). Highlighting the importance of an expiration date, the CFTC mandates that "futures" be reported by "commodity and by futures ***expiration date***." 17 C.F.R. § 16.01(a)(1)(i) (emphasis added); *see also* 17 C.F.R. § 1.3 (defining "delivery month" as "the month of delivery specified in a contract of sale of any commodity for future delivery").

Consistent with these on-the-book regulations, the CFTC's longstanding position—until now—was that futures contracts require delivery and must have expiration dates. *See In re Stovall*, CFTC No. 75-7, 1979 WL 11475, at *3 (CFTC Dec. 6, 1979) (futures "provide for future, as opposed to immediate, delivery," and a party "may eventually perform on the contract, that is, make or take delivery, at the maturation of the contract," or instead offset "prior to the date on which delivery is called for"). And decades ago, the CFTC identified a "necessary element" of a "futures contract" as "delivery in the future at a price that is established when the contract is

---

[19] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#F (last visited Nov. 18, 2026); *see also id.* (defining "delivery date" as "[t]he date on which the commodity or instrument of delivery must be delivered to fulfill the terms of a contract").

initiated, with both parties to the transaction obligated to fulfill the contract at the specified price." Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30694, 30695 (July 21, 1989).

In line with statutes and regulations, caselaw pre- and post-dating Dodd-Frank has consistently recognized that futures contracts must have expiration dates:

- *Dunn v. CFTC*, 519 U.S. 465, 469-70 (1997) (futures contracts are "agreements to buy or sell a specified quantity of a commodity at a particular price ***for delivery at a set future date***" (emphasis added));

- *Merrill Lynch*, 456 U.S. at 358 (futures developed with "standard terms describing the quantity and quality of the commodity, ***the time and place of delivery***, and the method of payment; the only variable was price" (emphasis added));

- *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 974 (D.C. Cir. 2023) ("A futures contract calls for the purchase or sale of an underlying asset ***on a specific future date*** at a specific price." (emphasis added));

- *United States v. Phillips*, 155 F.4th 102, 112-13 (2d Cir. 2025) ("Contrary to futures and traditional options, which contemplate delivery of or performance related to a commodity ***at some future time***, swaps are 'pure financial instrument[s] ... based on the difference between two fluctuating values.'" (emphasis added));

- *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) (a future "is generally understood to be an executory, mutually binding agreement providing ***for the future delivery of a commodity on a date certain*** where the grade, quantity, and price at the time of delivery are fixed" (emphasis added));

- *Hershey*, 610 F.3d at 242 & n.6 (under a futures contract "[t]he long party pays for the contract and is obligated to take delivery" and "[t]he short party receives payment for the future and is obligated to make delivery" when the contract "***comes due***" (emphasis added));

- *KalshiEX LLC v. Schuler*, 192 F.4th 664, 675 (6th Cir. 2026) ("A futures contract is best defined as an 'agreement to buy or sell a particular product or financial instrument at an agreed-upon price ***on an agreed-upon date in the future***.'" (emphasis added) (quoting *United States v. Chanu*, 40 F.4th 528, 532 (7th Cir. 2022)));

- *CFTC v. Erskine*, 512 F.3d 309, 322 (6th Cir. 2008) ("in common parlance, 'futures contract'" is a contract to buy or sell a commodity "***at or before a stated future time***" (emphasis added));

- *CFTC v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004) ("A futures contract, roughly speaking, is a fungible promise to buy or sell a particular commodity ***at a fixed date in the future***." (emphasis added));

- *Int'l Swaps & Derivatives Ass'n*, 887 F. Supp. 2d at 261-62 ("A futures contract is a contract between parties to buy or sell a specific quantity of a commodity ***at a particular date and location in the future***." (emphasis added));

- *CFTC v. UForex Consulting, LLC*, 551 F. Supp. 2d 513, 540, 542 (W.D. La. 2008) (cited at AR 32 n.30) (contract was not a future because it was not an agreement to buy or sell "***at or before a stated future time***" and court could not "excise ***the requirement of future delivery*** from the statute" (emphasis added)), *amended in part*, No. 07-0046, 2008 WL 1836707 (W.D. La. Apr. 2, 2008).

The statute, regulations, and caselaw all require expiration dates for futures. Perpetuals cannot satisfy the statutory exclusion for contracts of sale of a commodity ***for future delivery*** because they do not require future delivery.

#### 3. The government's and Kalshi's non-statutory arguments do not save their misclassification of the contracts.

Rather than address the text of the CEA, the government adopted Kalshi's reasoning that determining what "constitutes a futures contract" requires "evaluating the contract's characteristics against relevant judicial precedent and Commission guidance"—not the statute.[20] Based on this purported precedent and guidance, Kalshi and the government concluded that perpetuals ***functioned like*** futures, because they "exhibit all of these futures contract characteristics," namely "(i) the contract trading at a fixed, standardized unit quantity, (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements, and (iii) the ability of holders to exit their positions by offset." AR 4.

---

[20] Kalshi's and the government's heavy reliance on "Commission guidance"—particularly pre-Dodd-Frank guidance—rather than the statute is off-base. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024) ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.").

That non-textual argument eviscerates the distinction between swaps and futures that Congress carefully drew in Dodd-Frank. Under Dodd-Frank, swaps can be just as "standardized and fungible" as futures, so characteristics like whether the contract can be traded on an exchange, or be cleared, or have margin requirements—perhaps relevant to distinguishing futures from other types of contracts—shed no light on the issue here. *See, e.g.*, Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48303 (Aug. 13, 2012) (after Dodd-Frank, "[p]rior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant"). Because some swaps share these exact same characteristics, the government cannot rely on them to make its case. Elevating these purported "characteristics" of futures over the text of the statute ignores both Dodd-Frank's definition of swaps and Congress' "for future delivery" requirement. The only way perpetuals can avoid treatment as swaps is if they require future delivery, which they do not.

Other courts have likewise rejected this function-over-form analysis. The Seventh Circuit's decision in *Zelener* is instructive. There, the court addressed whether certain transactions were spot sales exempt from the CEA or whether they were futures subject to CFTC rules and regulations. 373 F.3d at 869. In support of its argument that the transactions were futures, the CFTC contended that they were "for future delivery in practice even though not in form" and "that fixed expiration dates and fungibility are irrelevant." *Id.* at 864. The court rejected that argument, "start[ing] with the statute itself" rather than the CFTC's proposed "multi-factor approach" to determine whether the contracts were futures versus spot transactions. *Id.* at 865. In so doing, the court emphasized that it is improper to "ignore the contract's form and focus on economic effects"—indeed the CEA is "***about*** form." *Id.* at 866 (emphasis in original). Kalshi and the government commit the same

function-over-form error by ignoring the statutory text. But Congress meant what it said: swaps are subject to one regime, and contracts of sale of a commodity for future delivery another. The government gets nowhere by avoiding the text.

The caselaw and Commission guidance on which the government relied in its Order do not support perpetuals' classification as "futures." To start, the only "Commission guidance" cited in the Order was *In re Stovall*. AR 3. But as discussed above, *Stovall* supports the plain meaning of the CEA that futures contracts have an expiration date.

As to caselaw, the government and Kalshi selectively relied on only ***pre-Dodd-Frank*** caselaw. Those cases did not concern the statutory provisions at issue and have nothing to do with the issue at hand: whether perpetuals are a swap or a future. For example, the Kalshi Order discusses cases applying a "totality of circumstances" approach to classifying contracts as futures and whether there is trading "in the contract." AR 4. But those cases concern differentiating futures from non-swap contracts, like forward or spot contracts. Because both forward[21] contracts and futures require delivery, unlike swaps, courts have developed other ways to distinguish such contracts from each other. *See, e.g.*, *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573 (9th Cir. 1982).

The government also misreads the Seventh Circuit's decision in *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537 (7th Cir. 1989) (*CME v. SEC*). As with the government's other cases, *CME v. SEC* did not concern whether to classify a derivative as a swap as opposed to a future. It instead concerned whether the instrument there was a future (regulated by the CFTC) or a security (regulated by the SEC). Because the instrument had traits of both products, the legal

[21] A forward is a "sale of any cash commodity for deferred shipment or delivery" and is not considered a future. 7 U.S.C. § 1a(27). Given this language, "[d]rawing a distinction between futures contracts and forward contracts has proven difficult." *Erskine*, 512 F.3d at 315.

question presented was akin to "decid[ing] whether tetrahedrons belong in square or round holes." *Id.* at 539. Fortunately, no such complicated question is presented here, because perpetuals clearly fit the swap definition.

Even on its own terms, the case does not help the government. According to Kalshi and the government, *CME v. SEC* "concluded that contracts of 'indefinite duration' can possess the attribute of 'futurity'—generally associated with futures contracts—because futurity means 'value that is set in the future' and exists where contracts provide for future executory payment obligations, not only where a contract has a final settlement date and fixed term." AR 5, 34.[22]

But *CME v. SEC* cannot support classifying perpetuals as contracts of sale of a commodity for future delivery. Unlike perpetuals, the seller of the contract at issue in *CME v. SEC* "promise[d] to pay the buyer the value of the index as measured on a 'cash-out day,'" which occurred quarterly. 883 F.2d at 539-40. The court equated those quarterly cash-out days with an expiration date. *Id.* at 540 ("The short sees the [contract] as a speculative or hedging instrument scarcely distinguishable from a futures contract that terminates on the cash-out day."); *id.* at 545-46 ("Shorts on [the at-issue contracts] make the same pledge as shorts on stock-index futures contracts: to pay the value of an index on a prescribed day (the expiration date for the futures contract, the cash-out date for the [at-issue contract]).").

Although *CME v. SEC* described the at-issue contracts as having "indefinite duration," that was "no more than a prepaid rollover privilege." *Id.* at 546. It did not mean that a "contract of sale of a commodity for future delivery" could be a contract not for future delivery. No doubt, the

---

[22] The Kalshi Order also cites *CFTC v. Standard Forex, Inc.*, No. CV-93-0088 (CPS), 1996 WL 435440, at *10 (E.D.N.Y. July 25, 1996), which quotes *CME v. SEC* for the "indefinite duration" proposition. AR 5 n.18. Like the government's other cases, *Standard Forex* is pre-Dodd-Frank, did not involve the statutory provision at issue here, and incorrectly read *CME v. SEC* as not requiring expiration dates for futures.

contracts in *CME v. SEC* were complex instruments. Nonetheless, like all futures and unlike perpetuals, they had expiration dates.

For the same reason, Kalshi's and the government's focus on "futurity"—a term from *CME v. SEC* found nowhere in the CEA—as a substitute for expiry is incorrect and irrelevant. By "futurity," Kalshi and the government mean "value that is set in the future." AR 5. But as discussed, the at-issue contract in *CME v. SEC* exhibited "futurity" because its expiration date was the same "as the settlement date of any futures contract." 883 F.2d at 546.

Regardless of what *CME v. SEC* meant, Dodd-Frank forecloses this extra-textual argument. The government and Kalshi contend that perpetuals exhibit futurity because they "provide for future executory payment obligations" due to the funding rate even if they do not have a "final settlement date and fixed term." AR 5. Under Dodd-Frank, that just makes them swaps. *See supra* Argument § II.A.1. Accepting the government's argument that recurring future payment obligations render a contract a future would swallow the definition of swap that Congress crafted in Dodd-Frank. Such a reading of the statutory language must be avoided. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (a court must "give effect, if possible, to every clause and word of a statute" and avoid "treat[ing] statutory terms as surplusage" (citations omitted)).

Because perpetuals are not contracts of sale of a commodity for future delivery, they are swaps. The government thus acted contrary to law when it approved Kalshi's contract and issued its corresponding Policy Statement. The Court must vacate the Kalshi Order and Policy Statement. And because the government cannot classify perpetuals as futures under the CEA, vacatur is the only proper remedy, not remand. *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) ("Because an agency can't 'cure' the fact that it lacks authority to take a certain action, remand-without-vacatur is unavailable here.").

### B. The government's actions are arbitrary and capricious.

The government's actions are also arbitrary and capricious, multiple times over. The APA requires that an agency engage in "reasoned decisionmaking" and show its work with "an adequate explanation" for its course of action. *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343 (D.C. Cir. 2019). The government failed to do so here in three ways: first, it did not engage in reasoned decisionmaking because it delegated its authority to Kalshi; second, the government abruptly changed its position on perpetuals without acknowledging its prior position; and third, the government failed to consider many important factors in deciding to regulate perpetuals as futures.

#### 1. The government delegated its regulatory authority to Kalshi.

With respect to the Kalshi Order—which not only approved Kalshi's contract as a future but also approved "similarly structured perpetual contracts" as futures, AR 8—the only "path [that] may reasonably be discerned" is the one charted by Kalshi, not the government. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Order is a recitation of points and findings made by Kalshi in its advocacy materials submitted to the agency, which are the only materials the government considered when issuing both the Order and the broader Policy Statement. But it was the government, not Kalshi, that was required to evaluate whether perpetuals are futures or swaps and whether they comply with the CEA and Commission regulations. *See* 7 U.S.C. § 7a-2(c)(5)(B); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446 (D.C. Cir. 2017). Because the government failed to do so, its actions must be set aside.

*Susquehanna* is directly on point. There, the SEC considered and approved a regulated entity's plan that required advance agency approval. 866 F.3d at 445-46. Under its review provision, the SEC "shall approve" such a plan "if it finds that such proposed rule change is consistent with" the Exchange Act. *Id.* Though the plaintiff raised several improprieties, the Circuit identified a basic—and more troubling—deficiency: the SEC "abdicated [its] responsibility" to

make the findings relevant to approval or disapproval by deferring to the findings made by the regulated party. *Id.* The Circuit concluded that this was no "decisionmaking" at all; the agency cannot "delegate its responsibility to the regulated party." *Id.*

The same abdication dooms the government's actions here. *See, e.g.*, *Gerber v. Norton*, 294 F.3d 173, 185-86 (D.C. Cir. 2002) (an agency cannot "delegate its responsibility to the regulated party," especially when a finding is "a prerequisite"). That abdication is apparent from the face of the government's actions and the record in this case. The Kalshi Order's first five pages consist of a mere recitation of Kalshi's arguments concerning contract classification, with citations only to Kalshi's materials. AR 1-5. The Commission then proceeds to lay out its "finding" that the contract would not violate the CEA or Commission regulations "***based on the Commission's review of Kalshi's analysis … as described above***." AR 6 (emphasis added). The Order then purports to be "additionally informed by certain characteristics of the bitcoin spot market that allow that funding rate mechanism to function consistently with DCM Core Principle 3," regarding manipulation concerns. *Id.*; *see also* 7 U.S.C. § 7(d)(3) & 17 C.F.R. § 38.200. What informs these conclusory findings concerning the Bitcoin spot market and its connection to the funding rate?[23] Evidently Kalshi's advocacy, and that advocacy alone.[24]

This is not the "reasoned analysis" that the CEA "and the APA require." *Susquehanna*, 866 F.3d at 447. Indeed, just like in *Susquehanna*, when approving Kalshi's contract, the government was required to "***find***[]" whether "the new contract …would violate" the CEA or its regulations. 7

[23] For example, the Order concludes, with no evident basis, that "[c]haracteristics of the underlying bitcoin spot market support the effective functioning of the funding rate mechanism employed by the BTCPERP Contract, helping to ensure the accuracy of the periodic funding payments, promoting convergence, and reducing the susceptibility of the contract to manipulation." AR 7.

[24] CME has corresponded with the government concerning the thin record in this case, and the government has disclaimed reliance on anything other than Kalshi's materials.

U.S.C. § 7a-2(c)(5)(B) (emphasis added). But just like there, here the government took Kalshi's word at face value concerning perpetuals' contract classification, basic facts about the functioning of the market, and the efficacy of the funding rate. *See, e.g.*, *Tourus Recs., Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (an agency fails to "articulate a satisfactory explanation" for its action when "it does not explain 'why'" it made its decision). Given that the Order does not even ***mention*** the word swap, for instance, it is unclear whether the government even considered the relevant statutory language or the contract's proper classification.

That the government simply accepted Kalshi's argument is self-evident from the first half of the Order, which does nothing more than accept the conclusions of Kalshi. *See, e.g.*, AR 3, 4 ("Kalshi explains …"; "Kalshi further notes …"; "Kalshi submits …"). And the government's "findings"—lacking citation and completely reliant on Kalshi's say-so—"raise[] more questions than [they] answer," including how the agency drew such conclusions, what informed them, and what considerations the agency weighed. *Susquehanna*, 866 F.3d at 447. The Order answers none of that, leading to the ineluctable conclusion that the government "blindly tether[ed] its decisionmaking to" Kalshi. *Foster v. Mabus*, 895 F. Supp. 2d 135, 147-48 (D.D.C. 2012). The APA forbids this type of "decisionmaking." *See, e.g.*, *In re NTE Conn., LLC*, 26 F.4th 980, 988 (D.C. Cir. 2022) (an agency cannot "simply summarize[] some of the parties' argument in broad strokes" and then "rubberstamp" one party's analysis). This is not the first time the government has given its power to Kalshi. *See Ludlow Exch.*, 2026 WL 3408217, at *16 (recognizing the "collusive effort between a regulator [the CFTC] and regulatee [Kalshi]").

The Policy Statement fares no better. It simply repackages the Kalshi Order for broader dissemination. And as with the Order, the government relied on nothing more than Kalshi's advocacy when reaching its decision. Worse still, the Policy Statement expressly recognizes the

novelty and complexity of the issues before the agency yet falls back on the Order's (Kalshi's) logic, or lack thereof. AR 11.

Because the government's decisionmaking must reflect ***its own*** "reasoning," not Kalshi's, its actions must be set aside. *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

**2. The government reversed its position overnight without any acknowledgement whatsoever.**

The government failed to address its reversal of its prior position treating perpetuals as swaps. No mention of that reversal appears in the challenged actions. But the government was required to "acknowledge [its] change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). The government failed to do so, so its actions must be set aside.

Over the past several years, the government has taken a series of enforcement actions related to perpetuals. In each one, the government classified the at-issue perpetual as a swap. *See supra* Argument § II.A.1. Those enforcement actions set forth a clear and consistent position: perpetual contracts, just like the ones at issue here, are swaps. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009) (change-in-position doctrine comes into effect where position is embodied in enforcement actions).

Despite this position—established in enforcement actions that subjected entities to more than a billion dollars in liability—the government changed its mind over the span of a day. Even if the government were allowed to classify perpetuals as futures, rather than swaps, this "failure even to acknowledge its past practice … let alone to explain its reversal of course," is the hallmark of arbitrary and capricious action. *Am. Wild Horse*, 873 F.3d at 927. The government did not "display" the slightest "awareness" that it had abandoned its position of treating perpetuals as swaps. *Fox Television*, 556 U.S. at 515. For that reason alone, its actions must be vacated.

### 3. The government failed to consider the relevant factors.

Finally, the government did not consider relevant factors when taking the actions challenged here. Government action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. "An agency need not address every conceivable implication of its decision," but it must, at a minimum, address "statutorily mandated factor[s]," which "by definition [are] an important aspect of any issue before an administrative agency." *Cboe Futures Exch.*, 77 F.4th at 980 (internal quotation marks omitted). And even when not specified by statute, certain factors are sufficiently relevant and important that the agency must consider them as part of the agency's reasoned decisionmaking. *See, e.g.*, *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004).

For one, the government's complete failure to acknowledge, let alone consider, comments that the government itself solicited demonstrates that the government failed to consider important issues when taking the actions challenged here. "[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706." *Butte County*, 613 F.3d at 194. Even if the government was not required to solicit public comments, it did so. And it even acknowledged in its Policy Statement the 2025 request for comment concerning "the characteristics, use cases, regulatory classification, and risks of perpetual contracts." AR 11. So the government unquestionably knew of "evidence bearing on the issue before it" in the form of issues, analysis, and arguments raised by other parties, *see supra* Background § III, yet deliberately ignored that evidence in favor of Kalshi's advocacy only. That is likely because, as CME highlighted, *see supra* Background § III, many of the comments the government received rebut its understanding of perpetuals. This failure to consider any of the comments is alone arbitrary and capricious. *See Accrediting Council for Indep. Colls. & Schs. v.*

*DeVos*, 303 F. Supp. 3d 77, 104 (D.D.C. 2018) (an agency must consider evidence it has that bears on the issue before it).

The government erred twice over because the substance of the comments also reveals relevant factors that the government should have, but did not, consider. Again, the government completely overlooked these important aspects of how to classify perpetuals and whether to approve trading in them at all because it delegated its responsibility to Kalshi. Among the relevant factors the government overlooked, it failed to consider:

- Whether perpetuals fulfill a real hedging function for traders, or are merely akin to intra-day betting on the spot price of commodities, *see supra* Background § III;

- Whether perpetuals' unique structure, including their every-eight-hour exchange of payments and lack of expiry, creates a heightened risk of devastating investor losses, *id.*;

- Whether perpetuals present unique market-manipulation concerns and call for additional and novel surveillance measures given their 24/7 trading and every-eight-hour exchange of payments, *id.*;

- Whether perpetuals accurately reflect real-world market conditions and value given they lack a natural mechanism for convergence to spot, *id.*; and

- Whether perpetuals draw trading out of true futures markets—thus negatively impacting liquidity in those markets—such that true futures markets no longer function as efficiently, *id.*

The government considered none of this. Beyond regurgitating Kalshi's analysis and blindly assenting to it, the Kalshi Order reflects no reasoned evaluation of these key issues. The Policy Statement, which repackages the Kalshi Order, reflects the exact same failures. Though the government might be free to disagree with the views of the commenters, it could not ignore the issues they raised. *Am. Wild Horse*, 873 F.3d at 923 ("[T]he agency [must] examine all relevant factors and record evidence, and [] articulate a reasoned explanation for its decision.").

Moving beyond the issues raised by the comments reveals even more fundamental failures. Even if the government could have unthinkingly adopted Kalshi's views without running afoul of the APA, the government appears to have considered only points concerning contract classification and whether perpetuals can be expected to accurately converge to spot as a function of the funding rate. *See* AR 6 (concluding that "listing the BTCPERP Contract … as a futures contract … would not violate the CEA or the Commission's regulations" based on "Kalshi's analysis of the categorization of the BTCPERP contract"); AR 6-7 (discussing the funding rate in the context of price convergence). That is true of both the Kalshi Order and the Policy Statement. *See* AR 11 (Policy Statement discussing only contract classification and DCM Core Principle 3).

Based on consideration of these factors and these factors alone, the government concluded that it "would not violate the CEA or the Commission's regulations thereunder" for Kalshi to list its contract as a futures contract. AR 8. That conclusion does not follow. *See State Farm*, 463 U.S. at 43 (there must be a "rational connection between the facts found and the choice made"). When issuing the Kalshi Order, the government was, at a bare minimum, required to consider all of the CEA and Commission regulations, not just matters of contract classification and market manipulation. 17 C.F.R. § 40.3(b) ("The Commission shall approve a new product unless the terms and conditions of the product violate the Act or the Commission's regulations."). That includes whether the contract is consistent with all relevant DCM Core Principles. *See* 7 U.S.C. § 7(d).[25] Yet nowhere in the Kalshi Order or Policy Statement is there any discussion of DCM Core Principles beyond Core Principle 3 concerning market manipulation. There is no discussion of preventing market disruption (Core Principle 4), addressing position limits and excessive

[25] The CEA lists 23 core principles. Many of the concerns raised by commenters, such as fractured market liquidity and the need for additional surveillance, cleanly map onto these core principles.

speculation (Core Principle 5), or protecting customers (Core Principle 12). Nor is there any explanation, for example, of how a perpetual contract will be "evidenced by a record in writing which shows … the terms of delivery" when perpetuals do not call for delivery. 7 U.S.C. § 6(a)(3). These are "statutorily mandated factor[s]"—by definition "important aspect[s]" of the problem—yet their consideration shows up nowhere in the Kalshi Order or Policy Statement. *Cboe Futures Exch.*, 77 F.4th at 980 (internal quotation marks omitted); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 60 (D.C. Cir. 2019).

Because the government failed to consider the substantial issues raised by the 2025 comments and its own organic statute and regulations, it acted arbitrarily and capriciously. The Court should vacate and set aside the government's arbitrary and capricious actions.

## III. <u>The Court should consider extra-record evidence as part of its review.</u>

Although not necessary to rule in favor of CME on both APA counts, this Court should consider extra-record evidence, in the form of 2025 comments the government solicited, as part of its review here. The government does not oppose the Court's consideration of this evidence.

In an ordinary APA case, a court's review is limited to the administrative record. *See, e.g.*, *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 306 (D.D.C. 2021). But this is not an ordinary APA case and this is not an ordinary administrative record. Despite expressly recognizing the novel and complex questions presented by perpetual contracts—never before legally traded in the United States—the government purports to have reached its decision to approve Kalshi's perpetual contract and to issue its even broader Policy Statement based on nothing more than Kalshi's advocacy materials. This, despite the government soliciting public comments that addressed important issues that the government should have considered but never did. Because review of extra-record evidence in the form of comments received by the agency is

necessary to demonstrate that the government entirely failed to consider certain relevant factors, this Court should look beyond the record Kalshi prepared for the government.

A court can consider extra-record evidence in an APA case in certain circumstances. *See City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010). Relevant here, review of extra-record evidence is appropriate to provide necessary "background information" used "to determine whether the agency considered all the relevant factors." *Id.* To that end, extra-record evidence is appropriate to examine "whether the agency considered all factors relevant to its decision." *Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 69-70 (D.D.C. 2020); *accord Sw. Ctr. for Biological Diversity v. Babbitt*, 131 F. Supp. 2d 1, 7-8 (D.D.C. 2001). That is, extra-record evidence should "point out an entirely new general subject matter that the defendant agency failed to consider." *Oceana*, 454 F. Supp. 3d at 69-70 (citation modified).

The 2025 comments submitted with this motion play just this role. The comments identify key issues that the agency should have, but did not, consider when determining (1) whether to classify perpetuals as swaps or as futures; and (2) whether to approve perpetuals trading at all. The supplementation of the record with these comments is necessary because the record relied on by the government consists ***solely*** of Kalshi's advocacy materials. It should come as no surprise, then, that the government completely overlooked whole subject matters—including, for example, the potential that perpetuals may be used for gambling rather than hedging, that they may disrupt market integrity, and that they may call for additional surveillance measures—by looking only to the views of a regulated entity with a vested interest in the approval of perpetuals. The comments provide the Court with the information necessary to appreciate these deficiencies. By completely failing to even ***consider*** the 2025 comments, the government ignored relevant evidence at its

disposal. *Am. Wild Horse*, 873 F.3d at 923. Submission of extra-record evidence is thus appropriate to demonstrate the government's failures that are not reflected by the record in this case.

**CONCLUSION**

For the above reasons, this Court should grant CME's motion for summary judgment and vacate the Kalshi Order and Policy Statement.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Aitan D. Goelman*

Aitan D. Goelman (D.C. Bar No. 446636)
Ivano M. Ventresca (D.C. Bar No. 1045769)
Brian J. Beaton, Jr. (D.C. Bar No. 90020963)

ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
agoelman@zuckerman.com
iventresca@zuckerman.com
bbeaton@zuckerman.com

*Attorneys for Plaintiff Chicago Mercantile Exchange Inc.*