**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission; COMMODITY FUTURES TRADING COMMISSION,<br><br>Defendants. | Case No. 1:26-cv-02157 |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 3

- A. Futures regulation ..... 3
- B. Perpetual futures enter U.S. derivatives market ..... 6
- C. CME files suit ..... 11

LEGAL STANDARD ..... 11

ARGUMENT ..... 11

- I. CME lacks standing to bring its claims ..... 11
  - A. CME has not met its burden to show a "financial injury" ..... 12
  - B. CME has not alleged, let alone shown, an actual or imminent increase in competition ..... 16
  - C. Any injury would not be redressed by a favorable decision ..... 19
- II. The Commission lawfully approved perpetual futures as futures ..... 22
  - A. Digital-asset perpetuals may be classified as futures ..... 22
  - B. The Commission was not required to classify digital-asset perpetuals as swaps ..... 31
- III. The Order was not arbitrary or capricious ..... 34
- IV. The Policy Statement is not reviewable agency action ..... 39
- V. Any relief in CME's favor should be tailored to mitigate market disruption ..... 42

CONCLUSION ..... 45

# TABLE OF AUTHORITIES

Cases

*Affirmed Energy, LLC v. FERC*,
166 F.4th 1070 (D.C. Cir. 2026)....35

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)....12, 16

*Alabama Ass'n of Realtors v. HHS*,
539 F. Supp. 3d 211 (D.D.C. 2021)....44, 45

*Allied-Signal v. United States Nuclear Regul. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993)....43

*Alstom Transp., Inc. v. FRA*,
192 F.4th 496 (D.C. Cir. 2026)....14

*Bennett v. Spear*,
520 U.S. 154 (1997) ....39, 40, 41, 42

*Bloomberg L.P. v. CFTC*,
949 F. Supp. 2d 91 (D.D.C. 2013)....24

*Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*,
557 F. Supp. 3d 224 (D. Mass. 2021)....14, 16

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ....37

*Broadgate Inc. v. USCIS*,
730 F. Supp. 2d 240 (D.D.C. 2010)....39

*Capital Markets Alliance Association v. CFTC*,
No. 1:26-cv-9608 (S.D.N.Y. Nov. 3, 2026) ....10

*Cboe Futures Exch., LLC v. SEC*,
77 F.4th 971 (D.C. Cir. 2023)....45

*Center for Auto Safety v. NHTSA*,
452 F.3d 798 (D.C. Cir. 2006)....39

*Center For Biological Diversity v. Zeldin*,
171 F.4th 356 (D.C. Cir. 2026)....43

*CFTC v. Calvary Currencies, LLC.*,
2004 WL 2330725 (D. Md. Oct. 15, 2004) ....................28

*CFTC v. Co Petro Mktg. Grp., Inc.*,
680 F.2d 573 (9th Cir. 1982) ....................23, 25

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) ....................22, 24

*CFTC v. International Fin. Servs. (New York), Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004) ....................22

*CFTC v. International Foreign Currency, Inc.*,
334 F. Supp. 2d 305 (E.D.N.Y. 2004) ....................2, 23, 24, 25, 28

*CFTC v. Zelener*,
373 F.3d 861 (7th Cir. 2004) ....................5, 22, 23, 24

*Cherokee Nation v. DOI*,
2026 WL 2824551 (D.D.C. Sept. 21, 2026)....................13

*Chicago Mercantile Exch. v. SEC,*
("*CME*"), 883 F.2d 537 (7th Cir. 1989) ....................24, 25, 26, 27, 29

*City of Port Isabel v. FERC*,
130 F.4th 1034 (D.C. Cir. 2025)....................43, 44

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................14

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ....................21

*Dzurka Bros., LLC v. Luckey Farmers, Inc.*,
712 F. Supp. 3d 979 (E.D. Mich. 2024) ....................29

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ....................37

*Hecate Energy LLC v. FERC*,
126 F.4th 660 (D.C. Cir. 2025)....................21

*Honeywell Int'l, Inc. v. EPA*,
374 F.3d 1363 (D.C. Cir. 2004)....................20

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013) ....................4, 5

*In re Stovall*,
No. 75-7, 1979 WL 11475 (CFTC Dec. 6, 1979)....24, 25

*Katin v. National Real Estate Info. Servs., Inc.*,
2009 WL 929554 (D. Mass. Mar. 31, 2009) ....13

*KERM, Inc. v. FCC*,
353 F.3d 57 (D.C. Cir. 2004)....13

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ....37

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ....4

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ....12, 14, 21

*Marin Audubon Soc'y v. FAA*,
129 F.4th 869 (D.C. Cir. 2025)....43

*MG Refining & Mktg., Inc.*,
No. 95-14, 1995 WL 447455 (CFTC July 27, 1995) ....23

*Mobile Relay Assocs. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006)....13

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....11, 34

*NAACP v. Trump*,
321 F. Supp. 3d 143 (D.D.C. 2018)....44

*National Fair Hous. All. v. Carson*,
330 F. Supp. 3d 14 (D.D.C. 2018)....14

*National Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006)....18

*National Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014)....40

*National Wrestling Coaches Ass'n v. Department of Educ.*,
366 F.3d 930 (D.C. Cir. 2004)....21

*PSSI Glob. Servs., L.L.C. v. FCC*,
983 F.3d 1 (D.C. Cir. 2020)....13, 16

*Reliable Automatic Sprinkler Co. v. CPSC*,
324 F.3d 726 (D.C. Cir. 2003)....................39

*Safari Club Int'l v. Jewell*,
842 F.3d 1280 (D.C. Cir. 2016)....................39

*Salomon Forex, Inc. v. Tauber*,
8 F.3d 966 (4th Cir. 1993)....................24

*Save Jobs USA v. DHS*,
664 F. Supp. 3d 143 (D.D.C. 2023)....................11

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)....................37

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)....................27

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025)....................34

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................12

*Susquehanna Int'l Group, LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017)....................35

*United States v. Eisenberg*,
784 F. Supp. 3d 579 (S.D.N.Y. 2025)....................37

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025)....................3, 32

*Wisconsin Cent. Ltd v. United States*,
585 U.S. 274 (2018)....................28

Statutes

5 U.S.C. § 553....................39

5 U.S.C. § 704....................39

5 U.S.C. § 705....................44

7 U.S.C. § 1a....................2, 22, 28, 31, 32, 33, 36

7 U.S.C. §§ 2....................3, 27, 28

7 U.S.C. § 6(a)....................3, 24

7 U.S.C. § 7a-2 .......... 10, 19, 35, 36, 38

Rule

Fed. R. Civ. P. 56 .......... 11

Regulations

17 C.F.R. § 40.2 .......... 9, 19

17 C.F.R. § 40.3 .......... 10, 36, 41

17 C.F.R. § 40.6 .......... 43

Other Authorities

Anastasia Chernikova, *How Perpetual Futures Could Make More Assets Tradable*, Forbes (Aug. 27, 2026), https://www.forbes.com/sites/digital-assets/2026/08/27/how-perpetual-futures-could-make-more-assets-tradable/ .......... 7

Bitcoin Volatility, CME Group, https://www.cmegroup.com/markets/cryptocurrencies/volatility/bitcoin-volatility.html .......... 27

CFTC, *Designated Contract Market Products*, https://www.cftc.gov/Industry Oversight/IndustryFilings/TradingOrganizationProducts .......... 11

CFTC, Release No. 9069-25, CFTC Staff Seek Public Comment Regarding Perpetual Contracts in Derivatives Markets (Apr. 21, 2025), https://www.cftc.gov/PressRoom/PressReleases/9069-25 .......... 38

Chicago HDD Monthly, CME Group, https://www.cmegroup.com/markets/weather/hdd/chicago-hdd-monthly.contractSpecs.html .......... 27

CME Group, 1-Ounce Gold Futures, https://www.cmegroup.com/markets/metals/precious/1-ounce-gold.html .......... 32

CME Group, *Cash Settlement vs. Physical Delivery*, https://www.cmegroup.com/articles/2025/cash-settlement-vs-physical-delivery.html (Mar. 25, 2025) .......... 26

CME Group, Understanding Futures Expiration & Contract Roll, https://www. cmegroup.com/education/courses/introduction-to-futures/understanding-futures-expiration-contract-roll .......... 29

E-mini S&P 500, CME Group, https://www.cmegroup.com/markets/equities/sp/e-mini-sandp500.html (last visited November 20, 2026) .......... 26

E-mini Nasdaq-100, CME Group, https://www.cmegroup.com/markets/equities/nasdaq/e-mini-nasdaq-100.html (last visited November 20, 2026) .......... 26

E-mini Communication Services Select Sector, CME Group, https://www.cmegroup com/markets/equities/select-sectors/e-mini-communication-services-select-sector-index.html ....................26

Exemption for Bilateral Transactions, 65 Fed. Reg. 39,033 (June 22, 2000) ....................23

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208 (Aug. 13, 2012) ....................19

Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160 (June 3, 2026) ....................9, 40, 41

Robert Shiller, *Measuring Asset Values for Cash Settlement in Derivatives Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, NBER Technical Working Paper #131 (1992) ....................7

Defendants Michael S. Selig and the Commodity Futures Trading Commission ("CFTC" or "Commission") file this statement of points and authorities in support of their motion for summary judgment against Plaintiff Chicago Mercantile Exchange Inc. ("CME").

**INTRODUCTION**

This case is about whether "perpetual futures" are futures. Just last year, CME said they could be: explaining that "depending on how they are structured, certain perpetual-style derivative contracts may accurately be classified as futures, while others may be swaps." Defendants' Statement of Material Facts ("SOF") ¶ 10 (quoting **Exhibit E**). Another dominant derivatives exchange, Cboe Global Markets, agreed: a "perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price," like "a funding rate mechanism." SOF ¶ 11 (quoting **Exhibit F**). In this litigation, however, CME reverses itself and makes the categorical claim that perpetual contracts are never futures and are always swaps.

Congress has never provided a definition of a "futures contract." But the core hallmarks are well established, and perpetual futures have them all: they are standardized, fungible contracts that provide exposure to future price changes in an underlying commodity, are exchange-traded, centrally cleared, subject to margin requirements, and capable of offset. In fact, they share key characteristics of many futures contracts that have long been on the market—often thanks to CME's pioneering innovation. For example, CME's cash-settled futures contracts are "delivered" through a cash payment rather than physical transfer of the underlying commodity. Likewise, perpetual futures are likewise "delivered" when the trader exits her position and receives (or pays) in cash the difference between her entry and exit prices. Also, futures with long-distant expiration

dates use a periodic "funding payment" to keep the futures price and the market (or "spot") price aligned; perpetual futures do the same.

CME makes two principal arguments for why perpetual futures are not futures. First, it claims that a futures contract must have an expiration date. But Congress has never required that, and caselaw reflects that "indefinite" futures contracts can be futures. *See, e.g., CFTC v. International Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004) (internal citations omitted) ("While futures contracts generally have a specified future delivery date . . . that date is not always specified thus allowing some futures to be of indefinite duration." (internal citations omitted)). And there is little if any functional difference between a futures contract that expires in 10, 100, or even 1,000 years and a true perpetual future; if the former are futures, it is hard to see why the latter would not be. Second, CME claims that perpetual futures satisfy the statutory definition of "swap." But that puts the cart before the horse, because Congress provided that a future is *not* a swap, notwithstanding the swap definitions. 7 U.S.C. § 1a(47)(B)(i). Absent that statutory exception, every futures contract could be a "swap," as CME itself once recognized. *See* SOF ¶ 22 (citing **Exhibit H**).

Interesting as the merits issues may be, the reality is that this case never should have gotten off the ground. CME's complaint fails to allege that it has standing, so the Court should dismiss this case for lack of subject-matter jurisdiction. *See* Dkt. No. 30. And CME has refused to provide any evidentiary support for its standing. Cryptocurrency perpetual futures have now traded on U.S. exchanges for six months, so presumably if CME faced an "actual or imminent" injury when it filed suit, that injury would be apparent by now. But all the publicly available evidence *refutes* any notion of an injury to CME. Trading volumes on CME's cryptocurrency futures contracts substantially *increased* after the Commission approved perpetual futures on cryptocurrency. And

CME's CEO and Chairman publicly stated to investors on earnings calls that perpetual futures are not demanded by CME's customers, that CME's "crypto futures volume is up over 7-fold in the past 3 years, despite the existence of crypto perpetuals," that the lack of expiration date is irrelevant to retail customers, and that CME is prepared to offer perpetual futures itself if demand arises. SOF ¶ 26. And even if there were some injury to CME, no order in its favor would provide relief. CME admits that these same contracts can trade on DCMs as swaps. Alternatively, exchanges could simply offer virtually identical contracts as futures by tacking on a long-distant expiration date, as Cboe does. If CME faces "competition" from perpetual futures now, it will still face that "competition" even if it wins this case.

The Court can straightforwardly resolve this case by holding that CME, based on its own data and public statements, has not been injured. Or, by holding that its litigation theory (that perpetuals can trade as swaps or as futures with some distant expiration date) would not redress the harm it allegedly suffers. If it gets to the merits, the Court should hold that—as CME recognized until recently—perpetual futures satisfy all the criteria of a futures contract, and so the Commission reached a reasonable and reasonably explained conclusion.

## BACKGROUND

### A. Futures regulation

**1.** In general, a "future" is a contract that "contemplate[s] delivery of or performance related to a commodity at some future time." *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). The contract gives a trader exposure to future price changes in an underlying commodity without having to actually acquire that commodity. Futures contracts trade on exchanges—called "designated contract markets," or "DCMs"—regulated by the CFTC. 7 U.S.C. §§ 2(a)(1)(A); 6(a).

To illustrate, consider CME's Chicago SRW wheat future, which is currently trading at about $6 per bushel. A trader who buys that contract (the "long" position) agrees to accept delivery of 5,000 bushels of wheat in Chicago on March 16, 2027 at $6 per bushel. Conversely, a trader who sells that contract (the "short" position) agrees to make delivery of 5,000 bushels of wheat at $6 per bushel. Now imagine that, at delivery, the market (or "spot") price of wheat has increased to $7 per bushel. The long position has achieved a $5,000 gain, and the short a $5,000 loss. This is because the long has a right to receive 5,000 bushels at $6 per bushel, and can immediately resell the crop in the spot market for $7 per bushel. The short, by contrast, must deliver 5,000 bushels at $6 per bushel that costs her $7 per bushel to procure in the spot market.

In reality, however, actual delivery is very rare. Rather, the parties to a futures contract will cancel out their delivery obligations by entering offsetting transactions, netting a profit or loss. *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173-74 (2d Cir. 2013). Thus, the "long" who bought a wheat future at $6 will offset his delivery obligation by selling that future for $7, netting a $5,000 gain (5,000 bushels x $1 gain), while the "short" who sold the wheat future at $6 will offset by buying the future at $7 and incurring a $5,000 loss. *See Leist v. Simplot*, 638 F.2d 283, 286–87 (2d Cir. 1980) ("Futures trading is a zero-sum game. Since money is made from the change in futures contract prices, and every contract has a long and a short, every gain can be matched with a corresponding loss.").

Futures contracts have several key features that make this offset dynamic possible. First, futures are fungible contracts that are listed and traded on an exchange. Second, futures contracts have standardized terms, such that a contract will reference the same number of units of the same commodity type. This fungibility and standardization allow contracts to be traded on a centralized platform; if terms were idiosyncratic, central trading would not be possible. Third, although a

"long" and "short" match on an exchange's orderbook, a clearinghouse novates that obligation—stepping in as a counterparty to each trader and eliminating bilateral credit risk. *See generally CFTC v. Zelener*, 373 F.3d 861, 865–66 (7th Cir. 2004) (describing these characteristics).

**2.** A critical benefit—and risk—of futures trading is leveraged exposure to the underlying asset. A trader need only post a security deposit, called "margin," which is a fraction of the total contract exposure. For example, if the clearinghouse requires 20% margin on the wheat future, a trader seeking exposure to $30,000 of wheat deposits only $6,000. That leverage magnifies gains and losses, making capital allocation more efficient. The "long" in the example above earns a $5,000 return on a $6,000 deposit—far more attractive than the return available to a trader who physically bought and sold 5,000 bushels by putting up the full $30,000. If a trader's position loses value that exceeds the required margin level, the trader will be required to either contribute more margin or close out their position.

To ensure that traders always have sufficient margin, open positions are "marked to market" every day. If a trader's position improves from the previous day, his account is credited with a gain; if the position loses value, the account is debited with a loss. *In re Amaranth*, 730 F.3d at 174 ("At the end of each trading day, the clearinghouse examines the change in value to these positions and determines whether the firm must post additional margin (generally the case if value has decreased) or receives payment on margin (generally the case if value has increased)."). Thus, as CME puts it, "[i]n the futures markets, losers pay winners every day." SOF ¶ 24 (quoting **Exhibit I**).

**3.** Innovation has always been a hallmark of the futures industry. Over the years, the range of commodities subject to futures contracts expanded beyond agriculture to energy, precious metals, foreign currencies, interest rates, stocks, equity and volatility indices, and cryptocurrencies.

The structure of futures has evolved, too. In the 1980s, CME introduced “cash-settled futures,” in which there is no delivery of the underlying asset but simply a cash settlement of the delta between (1) the contract price, and (2) the price at settlement—eliminating the need for traders to make offsetting transactions. SOF ¶ 3. Exchanges have also offered “perpetual-style” futures, which are futures contracts with far-distant expiration dates (10 or more years away) that eliminate the need to regularly roll a position from one expiration to the next. SOF ¶ 5; *see* **Exhibit C**. These contracts use a daily “funding rate” payment that keeps the futures price and spot price aligned. And more recently, CME has begun to offer “spot-quoted futures” which are “longer-dated contracts [that] trade near their respective underlying cash price” through “a daily financing adjustment that represents that day’s basis or difference between the corresponding lead-month quarterly or monthly futures contract and the related spot market.” SOF ¶ 4 (quoting **Exhibit B**).

**B. Perpetual futures enter U.S. derivatives markets**

**1.** A perpetual future is a futures contract without a fixed expiration date. In nearly every respect, perpetual futures resemble any other futures contract. Both are standardized and fungible contracts that provide exposure to future changes in the price of an asset. Both are exchange-traded at market prices. Both rely on a clearinghouse to eliminate counterparty credit risk. Both are traded on margin, enabling leveraged exposure. And both allow a party to close out its position by entering into an offsetting contract, netting a profit or loss.

The absence of an expiration date is a distinction of difference in only one respect. Expiration dates create an arbitrage dynamic called “convergence” that keeps the futures price tethered to the underlying spot price. For example, if the futures price is lower than the spot price, traders would buy the futures contract, take delivery of the commodity at the low price, and resell the commodity in the spot market at the high price (and vice versa if the futures price was high).

That arbitrage opportunity keeps the futures and spot prices aligned. Perpetual futures and long-dated futures, like those listed on Cboe, achieve this dynamic through periodic "funding payments" between the longs and the shorts. When the perpetual futures price trades above the spot price, holders of long positions pay holders of short positions; when it trades below, the payment runs in the opposite direction. These payments incentivize alignment between the futures price and the spot price, replicating the convergence that an expiration date would otherwise produce.

**2.** The concept of a perpetual future has existed for decades. *See* Robert Shiller, *Measuring Asset Values for Cash Settlement in Derivatives Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, NBER Technical Working Paper #131 (1992). In recent years, perpetual futures have begun trading outside the United States. By one estimate, offshore trading in perpetual futures exceeded $90 trillion in volume last year. *See* Anastasia Chernikova, *How Perpetual Futures Could Make More Assets Tradable*, Forbes (Aug. 27, 2026), https://www.forbes.com/sites/digital-assets/2026/08/27/how-perpetual-futures-could-make-more-assets-tradable/.

For well over a year, the federal government has devoted significant attention to onshoring perpetual futures, enabling Americans to access them in a U.S.-regulated environment. In April 2025, the CFTC put out a request for comment on the "Trading and Clearing of 'Perpetual' Style Derivatives." SOF ¶ 9 (**Exhibit D**). The Commission inquired, among other things, whether perpetuals were properly classified as futures or swaps. *Id.* In response, CME acknowledged that "certain perpetual-style derivatives may accurately be classified as futures, while others may be swaps." SOF ¶ 10 (**Exhibit E**). CME "recommend[ed] focusing less on what a 'perpetual derivative' is" and more on making "clear to the marketplace whether the product is classified as a futures contract or a swap." *Id.* Cboe Global Markets, another prominent derivatives exchange, stated: "A perpetual derivative that is a futures contract is a contract that 1) either does not have

an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price." SOF ¶ 11 (**Exhibit F**). Then in July 2025, the President's Working Group on Digital Asset Markets issued a report "recommend[ing] that the CFTC and Securities and Exchange Commission . . . permit eligible market participants to access derivatives, including perpetual contracts, through regulated intermediaries and that the agencies use existing exemptive and interpretative authorities to provide near-term clarity for innovative derivatives products." SOF ¶ 12 (quoting AR11).

**3.** Against this backdrop, KalshiEX LLC ("Kalshi"), a CFTC-registered DCM, sought to offer perpetual futures for trading in the United States. On February 18, 2026, counsel for Kalshi shared with the CFTC a memorandum of law titled "Categorization of Proposed Perpetual Contracts." SOF ¶ 13 (citing AR101–10). This memorandum describes why perpetual derivatives "exhibit all of the relevant characteristics of futures contracts." *Id.* (quoting AR104). Surveying the CEA, the caselaw, and regulatory developments, the memorandum maintained "that futures contracts are distinguished by standardization, fungibility, offset, and exchange trading," and that perpetual contracts "will exhibit all of the[se] futures contract characteristics." *Id.* (quoting AR106). Furthermore, "other DCMs and DCOs already offer 'perpetual-style' futures contracts that are designed to mimic the economics of [perpetuals]," as well as "retail leveraged Bitcoin spot transactions," both of which "bear a high degree of economic similarity to" perpetuals. *Id.* (quoting AR109–10). The memorandum urged the Commission to "ensure a consistent regulatory treatment across economically equivalent transactions." *Id.* (quoting AR110).

Then on February 27, 2026, counsel for Kalshi asked the CFTC's Division of Market Oversight ("DMO") to confirm that it would "not recommend that the Commission stay Kalshi's listing of Perpetual Contracts . . . solely on the basis that Kalshi certifies the Perpetual Contracts

as contracts of sale of a commodity for future delivery . . . rather than swaps." SOF ¶ 14 (quoting AR92). Kalshi requested a no-action position to support a pending application from Klear to amend its DCO registration and allow futures to be cleared. *Id.* (citing AR93–94).

On March 18, 2026, Kalshi shared with the Commission a draft request to list a bitcoin perpetual contract as a futures contract under Commission Rule 40.3 ("BTCPERP Contract"). SOF ¶ 15 (citing AR57–91). After a period of review, Kalshi submitted the formal application on May 28, 2026. SOF ¶ 16 (citing AR13–56).

**4.** The Commission issued an approval order, informed by the submissions from Kalshi over the preceding months. SOF ¶ 16 (citing AR1–9 ("Order")). The Order recounts in detail Kalshi's argument for why perpetual futures are, in fact, futures. AR2–5. "[B]ased on the Commission's review of Kalshi's analysis of the categorization of the BTCPERP Contract," the Commission found that "listing the BTCPERP Contract or making the BTCPERP Contract available for clearing or trading as a futures contract – a contract for sale of a commodity for future delivery – would not violate the CEA or the Commission's regulations thereunder." AR6. The Commission elaborated that its finding was "additionally informed by certain characteristics of the bitcoin spot market that allow that funding rate mechanism to function consistently with DCM Core Principle 3." AR6–8. The Commission's approval is applicable to any "similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities." AR8. Therefore, any DCM—not just Kalshi—can list perpetual futures on digital assets by self-certifying to the Commission that the contracts comply with the CEA and Commission regulations. *See* 17 C.F.R. § 40.2.

The Commission concurrently issued a policy statement. SOF ¶ 17 (citing AR10–12 (91 Fed. Reg. 33,160, 33,160–62 (June 3, 2026))) ("Policy Statement"). The Policy Statement

requested "that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3," as opposed to the ordinary self-certification process under Commission Regulation 40.2. AR11. The policy statement makes clear that "[i]t does not impose any obligation on any person, modify or supersede any provision of the [CEA] or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity, and is not subject to the notice-and-comment requirements of the Administrative Procedure Act," and that "[e]ach contract submitted to the Commission under part 40 will continue to be evaluated on its own terms." *Id.*

**5.** Since the Commission's approval of perpetual futures on digital assets, the Commission has received applications from DCMs to list perpetual futures on securities and other commodities, including precious metals, energy, equity indices, and single stocks. The Commission has no ability to pause these applications; after no more than 90 days, the Commission must either issue a notice of non-approval, or they are "deemed approved" by Commission inaction. 7 U.S.C. § 7a-2(c)(4)(B) (90 days to process request for prior approval of a contract); 17 C.F.R. § 40.3(c)-(d) (detailing approval process). The Commission took no action on the precious-metals, single-stock, and stock-index applications, so they became "deemed approved" by operation of law.[1] 17 C.F.R. § 40.3(d)(1). Others, like foreign exchange, interest rates, and energy, remain pending. *See*

---

[1] The Commission's deemed approval of single-stock perpetual futures is the subject of litigation in another District. The emergency judge in that case denied a temporary restraining order, finding it "conjectural as to the harm Plaintiffs members would suffer." Minute Order, *Capital Markets Alliance Association v. CFTC*, No. 1:26-cv-9608 (S.D.N.Y. Nov. 3, 2026), ECF No. 11. While the minute order states that "[t]he perpetual contracts in question do not appear to satisfy the definition of a security future," *id.*, the court reached that conclusion in less than 24 hours and without any opposition briefing from the CFTC.

*generally* CFTC, *Designated Contract Market Products*, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts (last visited Nov. 20, 2026).

### C. CME files suit

CME filed this lawsuit several weeks later, alleging that perpetual futures are actually swaps. *See* Dkt. No. 1 ("Compl."). Defendants moved to dismiss, explaining that this Court lacks subject-matter jurisdiction because (1) CME has not satisfied the injury-in-fact requirement, and (2) a favorable decision would not redress CME's alleged injuries. *See* Dkt. Nos. 30, 30-1, 46. Defendants also moved to dismiss on the ground that CME is not within the zone of interests protected by the Commodity Exchange Act. *Id.* That motion remains pending.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an APA case, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Save Jobs USA v. DHS*, 664 F. Supp. 3d 143, 148 (D.D.C. 2023) (citation modified). "This standard of review is 'narrow,' and a court applying it 'is not to substitute its judgment for that of the agency.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

### I. CME lacks standing to bring its claims

Defendants' motion to dismiss recounts at length why CME's complaint fails to plausibly allege the injury-in-fact and redressability components of Article III standing. *See* Dkt. No. 30-1 at 10–24; Dkt. No. 46 at 1–24. The Court should grant that motion. But to the extent there is any doubt, the Court should grant summary judgment on standing grounds. "At the pleading stage,

general factual allegations of injury resulting from the defendant's conduct may suffice,"—"[i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation modified). CME has yet to offer any such evidence—indeed, it has adamantly refused to prove any semblance of injury at every stage of this case. It cannot carry its burden to prove standing with evidence.

### A. CME has not met its burden to show a "financial injury"

**1.** Time and again, CME has told this Court that it need not suffer any "financial injury" in order to have standing. Dkt. No. 42 at 7 ("CME is not required to show financial injury to have competitor standing."); Dkt. No. 45 at 17 ("CME is not required to demonstrate a 'financial injury'—once it shows an increase in competition, it has competitor standing."); Dkt. No. 27 at 5 ("On competitor standing, the Complaint easily pleads that CME faces an unlawful increase in competition as a result of Defendants' actions," which "is more than enough to show standing, full stop."); Dkt. No. 48 at 3 ("CME will demonstrate an increase in competition, which is sufficient."). That should set off jurisdictional alarm bells. After all, "injury in fact" is "the first and foremost of standing's three elements," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified), so plaintiffs can usually be expected to *highlight* their injuries. A plaintiff who repeatedly disclaims any interest in proving an injury presumably has not experienced one.

CME is wrong on the law: financial injury *is* required. Competitive-injury standing has two elements: (1) "a plaintiff must show that the challenged government action results in 'an actual or imminent increase in competition,'" and (2) "the plaintiff must also show that it is in fact 'a *direct* and *current* competitor' in that market, in which case the plaintiff's 'bottom line may be adversely affected by the challenged government action.'" *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279–80 (D.C. Cir. 2023) (internal citations omitted). To show that its "bottom line may be adversely

affected by the challenged government action," the plaintiff "must make a concrete showing that it is in fact likely to suffer *financial injury* as a result of the challenged action." *KERM, Inc. v. FCC*, 353 F.3d 57, 60–61 (D.C. Cir. 2004) (emphasis added).

Thus, the D.C. Circuit has held that even if a plaintiff "directly compete[s] with" a party benefited by governmental action, it must make a "concrete showing that the Order is likely to cause them a financial injury." *PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020); *see also id.* at 12 (no standing where plaintiffs did not "identify any specific harm … that will result as a matter of economic logic"); *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13 (D.C. Cir. 2006) (plaintiffs who were "direct and current competitor[s]" still "lack[ed] competitor standing" because they "failed to make a concrete showing that they are likely to suffer *financial injury*" (emphasis added, citation modified)). This Court has also expressly recognized that, "[t]o show competitor standing at summary judgment, the plaintiff must put forward evidence that the challenged action has adversely affected its financial interest," and that "it may not rest on bare allegations of injury." *Cherokee Nation v. DOI*, 2026 WL 2824551, at *7 (D.D.C. Sept. 21, 2026) (Kelly, J.) (citation modified).

According to CME, a showing of financial injury is not required because "[i]ncreased competition *is the injury*." Dkt. No. 45 at 17 (emphasis in original). But "the competitor standing doctrine" does not "stand[] for the broad principle that 'injury in the simple fact of illegal competition' is sufficient to satisfy the constitutional requirement of an 'injury in fact.'" *Katin v. National Real Estate Info. Servs., Inc.*, 2009 WL 929554, at *4 (D. Mass. Mar. 31, 2009). Nor does it "permit a plaintiff in a commercial context to ground standing on the purely abstract injury of 'illegal competition.'" *Id.* at *5. Rather, "the focus in a competitor standing case is properly on the plaintiffs' ability to allege a likelihood of *actual economic harm*." *Id.* (emphasis added). Put

another way, competition is not *per se* injurious; rather, it is injurious only insofar as it inflicts tangible economic harm. *See Alstom Transp., Inc. v. FRA*, 192 F.4th 496, 513 n. 41 (D.C. Cir. 2026) (Walker, J., dissenting in part) (explaining that the "survival" of competitor standing after *TransUnion* "probably depends on a link between the competitive injury and an economic harm like lost profits" (collecting cases)).

CME also claims that financial injury is not required because plaintiffs are permitted to bring suit before any injury materializes. Dkt. No. 45 at 17. True—injury need not be "actual" when a plaintiff files suit, but it at least must be "imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). And "in assessing a claim of imminent harm, it defies common sense not to consider the time after the complaint is filed in order to assess how imminent the risk of harm really was." *Boston All. of Gay, Lesbian, Bisexual & Transgender Youth v. HHS*, 557 F. Supp. 3d 224, 235 (D. Mass. 2021) (citing *National Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 46 (D.D.C. 2018) (Howell, C.J.)). If that is true at the pleadings stage, *id.*, it is especially so at summary judgment. After all, "general factual allegations of [imminent] injury" may suffice at the pleadings stage, but CME "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Lujan*, 504 U.S. at 561. If there is no evidence that CME has been injured now—nearly six months into the trading of perpetual futures—it simply did not face an "imminent" injury when it filed suit.

**2.** CME cannot carry its burden to show financial injury. Its own public statements and trade data confirm as much.

Nearly two months after the Commission issued the Order and Policy Statement, CME Group's CEO and Chairman made statements on an earnings call that utterly refute any notion of financial injury, including:

- "Perpetual futures . . . do not appeal to our core customers" and "are in no way substitutes for the institutional hedging tools that these customers rely on." SOF ¶ 26(a).
- "[W]e have not heard demand from our customers for these products." SOF ¶ 26(b)
- "Crypto perpetuals are not new, and existed before we even launched our crypto futures complex. We have built that business over the last nine years because our futures fill a market need that was not met by traditional crypto products, including perpetuals. Our crypto futures volume is up over 7-fold in the past 3 years, despite the existence of crypto perpetuals." SOF ¶ 26(c).

CME's publicly available data confirms that it has not been injured by cryptocurrency perpetual futures. As explained in Defendants' motion-to-dismiss reply brief, trading volumes on almost all of CME's cryptocurrency futures contracts was substantially higher at the end of Q3 than before the May 2026 challenged agency action:

| | **May 2026** | June 2026 | July 2026 | Aug. 2026 | **Sept. 2026** | **Net Change** |
|---|---|---|---|---|---|---|
| Bitcoin | **259,329** | 292,118 | 246,072 | 298,958 | **267,693** | **+8,364** |
| Micro Bitcoin | **1,113,719** | 1,611,107 | 1,117,816 | 1,370,250 | **1,354,088** | **+240,369** |
| Ether | **326,981** | 369,358 | 320,040 | 344,084 | **378,292** | **+51,311** |
| Micro Ether | **735,326** | 960,484 | 674,601 | 787,603 | **911,822** | **+176,496** |
| Solana | **83,515** | 88,533 | 70,002 | 89,016 | **101,607** | **+18,092** |
| Micro Solana | **40,474** | 41,572 | 29,117 | 52,553 | **61,160** | **+20,686** |
| Link | **1,390** | 487 | 247 | 758 | **1,050** | **-340** |
| Micro Link | **6,198** | 2,418 | 1,187 | 5,509 | **11,308** | **+5,110** |
| XRP | **46,749** | 49,742 | 37,846 | 43,501 | **59,117** | **+12,368** |

| | | | | | | |
|---|---|---|---|---|---|---|
| Micro XRP | **44,729** | 39,694 | 24,539 | 52,588 | **113,936** | **+69,207** |
| Sui | **217** | 183 | 251 | 455 | **1,655** | **+1,438** |
| Micro Sui | **2,333** | 2,895 | 1,981 | 10,863 | **20,802** | **+18,469** |
| Total Contracts | **2,660,960** | 3,458,591 | 2,523,699 | 3,056,138 | **3,282,530** | **+621,570** |

*See* SOF ¶ 25 (citing **Exhibits J, K, L, M, N**). This evidence confirms that CME has never faced any injury, actual or imminent. *See Boston All.*, 557 F. Supp. 3d at 235 (post-complaint evidence shows that there was never an "imminent harm").

CME cannot make a "concrete showing" of "financial injury" to CME, and so the Court lacks jurisdiction. *PSSI*, 983 F.3d at 11.

### B. CME has not alleged, let alone shown, an actual or imminent increase in competition

CME also fails to prove an "actual or imminent increase in competition." *Air Excursions*, 66 F.4th at 279. For starters, CME has not asserted that perpetual futures have increased competition for its *institutional* customer base. Dkt. No. 45 at 13. Indeed, its CEO has expressly stated that "[t]hrough the first half of 2026, 94% of our volume originated from institutional customers," and perpetual futures "do not appeal to [these] core customers." SOF ¶ 26(a). He also stated that he has "spent a lot of time . . . talking to the highest levels of those institutions who participate in our business," that one energy firm "reassured [him] 19 times that [he] asked them if they wanted [him] to list [this product]," and that "[t]hey do not want this product." SOF ¶ 26(d). Thus, the overwhelming bulk of CME's business is—by CME's own account—unaffected by perpetual futures. *See also* Dkt. No. 45 at 19 n.5 ("On that call, CME's Chairman and CEO was merely explaining that perpetual Bitcoin contracts do not compete with CME's products designed for *institutional* clients, but that there is increased competition for *retail* business.").

In this litigation, CME claims that perpetual futures compete for its non-core, 6% retail base. Dkt. No. 45 at 13. But if that competition exists, CME is apparently not pursuing it—at least, not yet. The exchange has readily acknowledged that it could list perpetual futures if it wanted, but it has chosen not to do so because it "ha[s] not heard demand from our customers for these products." SOF ¶ 26(b). A senior managing director at CME explained this further: "we've seen over $1.5 billion traded over the first 8 weekends with a significant participation of retail," and so "we think the retail community in cryptocurrency is adequately served alongside the institutional community of clients at CME Group." SOF ¶ 26(l).

In fact, CME's CEO sees potential *upside* from perpetual futures. When asked whether CME saw "symbiotic opportunities between listed futures and perpetual futures in the long run, should they become a more substantial market for speculative retail," CME's CEO responded that he "do[es] see opportunities," and that "[s]ome of these entities that are listing some of these products, whether they're perps or other type of products on retail, I think directly or indirectly could benefit CME greatly as time continues to move forward." SOF ¶ 26(g). "It's like an incubator system that I'm not paying for, and they are." *Id.* Further: "I think that some of these new online offerings could feed right into the growth of CME's retail business with the products that we have and the cohort of institutions that we have . . . ." *Id.* And again: "I look at the competition and the landscape of this world as it relates to retail, and I can actually see a benefit of them coming into our markets ultimately." *Id.* How CME can make optimistic statements like these to investors, yet simultaneously claim in this litigation that it is injured, is a mystery.

After hammering that perpetual futures are no threat to CME's business, the CEO was asked "why on the retail side, you don't think there's demand yet?" SOF ¶ 26(e).[2] The CEO had

[2] Another derivatives exchange, Cboe Global Markets, Inc., has likewise stated to the Commission that "[p]erpetual futures products may provide advantages that complement rather

an answer: "we are not seeing anybody, nor do we hardly ever see anybody in the retail division hold on to [futures contracts] long enough to ever go to an expiration." *Id.* So the key benefit of perpetual futures—that "there is no expiration date associated with it"—is irrelevant to retail investors. *Id.* And even "if they did" hold a futures contract to maturity and incur rollover costs, "paying the funding rate and the cost to trade the [perpetual future] is sevenfold higher than CME's execution cost, [which] would way overshadow the cost that it would be to roll your position." *Id.*; *see also* SOF ¶ 26(a) ("when taking into account both of the transaction fee and the daily funding cost, the total cost to trade perpetual futures is typically orders of magnitude more expensive than our highly efficient futures contracts"). "That demand"—that is, *retail demand*—"is still not there." SOF ¶ 26(e).

To the extent CME's retail customers are substituting toward perpetual futures over dated futures (which, again, is contradicted by all available evidence), CME is injured only if it chooses not to offer perpetual futures alongside its futures with fixed expirations. That would be a "self-inflicted harm," which "doesn't satisfy the basic requirements for standing." *National Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). After all, CME has "the full technical and operational capabilities to launch perpetual futures" and "[i]n fact" has "contract specifications and [is] prepared to bring these products to market should evolving demand or structural shifts make it appropriate to do so." SOF ¶ 26(b). As the CEO put it, "I'm a pretty forward straight shooter," and "if I thought we needed to list these [perpetual futures], we

---

than replace traditional futures or spot markets. Cboe anticipates these products will serve as an addition to the existing ecosystem rather than subsuming traditional markets." SOF ¶ 11 (quoting **Exhibit F**). "Indeed, volumes in offshore perpetual derivative contracts, namely on digital assets, demonstrate a clear demand for perpetual futures products and suggest there is a segment of the market that is not served by current U.S. futures product offerings. Perpetual futures simply represent another futures instrument through which market participants can meet different investment goals and manage risk." *Id.*

would do so. And I said that we were prepared to do it if we needed to do it. But that's not what we are hearing." SOF ¶ 26(f).

In short, CME has trumpeted to the investing public that its customers do not want to buy perpetual futures, which would mean there is no competition. And if competition were to arise, CME has assuaged investors that it has the capability and willingness to meet the demand. If those assurances are to be taken as true—*i.e.*, that CME is uninjured and is on standby to rectify any injuries that may materialize—there is no injury in fact for this Court to remedy.

### C. Any injury would not be redressed by a favorable decision

CME also fails to satisfy Article III's redressability prong. No matter who wins this case, perpetual contracts will not be banned from designated contract markets. Rather, if CME wins, perpetuals can simply be rebranded as "swaps" rather than as "futures." *See, e.g.*, Compl. ¶ 191 ("Kalshi's Bitcoin perpetual meets the CEA's definition of a swap; it is not a 'contract of sale of a commodity for future delivery' under that statute."); *id.* ¶ 192 ("Perpetual contracts fit the CEA's statutory definition of a 'swap' hand in glove . . . .").

DCMs that list perpetuals could make that switch almost instantly. Under the CEA and the Commission's rules, DCMs can offer a product after certifying to the Commission that the product complies with the Act. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). And according to CME, a self-certification to list perpetual futures as swaps *would* comply with the Act. Compl. ¶ 11. So Kalshi and any other DCM could simply self-certify its perpetual contracts as swaps in compliance with the Court's order. *Cf.* 77 Fed. Reg. 48,208, 48,303 (Aug. 13, 2012) ("If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."). In that circumstance, CME would *still* have to "compete" against perpetual contracts—just wrapped in the "swap" label rather than the "futures" label. Because "a favorable opinion of the court" would not "remove the competing [products] from the market, redressability" is not

satisfied. *Honeywell Int'l, Inc. v. EPA*, 374 F.3d 1363, 1369–70 (D.C. Cir. 2004) (per curiam), *withdrawn in part on other grounds*, 393 F.3d 1315 (D.C. Cir. 2005).

To be sure, there are regulatory and tax differences between swaps and futures. *See* Compl. ¶¶ 106–10. But CME has shunned opportunities to explain whether these differences would materially affect its competitive prospects. For instance, Defendants' motion to dismiss queried whether "CME's other futures offerings fare better if they competed against 'perpetual swaps' that required a trader to post five days of margin, rather than competing against 'perpetual futures' that require a trader to post one day of margin?" or whether they "competed against 'perpetual swaps' taxed as ordinary income as opposed to 'perpetual futures' taxed partially as ordinary income and partially as capital gains?" Dkt. No. 30-1 at 21 (citing Compl. ¶ 107, 110). CME declined to respond; only "'economic'" "'clairvoyance'" would be required to give an answer. Dkt. 45 at 25. So CME invites the Court to simply assume that, if it wins, other DCMs would not list "perpetual swaps."

Alternatively, if CME wins this case, its "competitors" could simply do what Cboe does: offer identical contracts but with long-dated expirations. Coinbase, for instance, offered "perpetual-style" futures with long-distant expiration dates before the Commission approved true perpetual futures, and it received a no-action letter enabling it to remove expiration dates from those contracts and become true perpetuals. SOF ¶ 18 (citing **Exhibit G**). If CME prevails, Coinbase and other DCMs could simply seek to do the reverse: add long-distant expiration dates. That should not affect CME competitively at all; as its CEO has stated that "we are not seeing anybody, nor do we hardly ever see anybody in the retail division hold onto these products long enough to ever go to an expiration. That is not the issue." SOF ¶ 26(e).

CME has the burden to "adduce facts showing that" the "choices made by independent actors not before the courts" "will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. That is "'substantially more difficult' to establish," *id.*, as D.C. Circuit precedent bears out in spades. *See Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025) ("[R]edressability in cases where plaintiffs sue the government in order to change third-party behavior imposes a significant barrier to establishing standing—courts have routinely rejected suits for injunctive relief that are directed against executive agencies but that seek to change the behavior of third parties." (citation modified)); *National Wrestling Coaches Ass'n v. Department of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) ("In several cases, the Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries.").

Here, there is not a shred of evidence that third-party DCM would abandon perpetuals altogether rather than simply offer them as swaps or perpetual-style dated futures. At best, it is speculative whether this Court can remedy CME's alleged injuries, which is not enough for redressability. *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019) (requiring a "predictable effect of Government action on the decisions of third parties," not "mere speculation about the decisions of third parties"); *Lujan*, 504 U.S. at 561 ("It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (citation modified)).[3]

[3] As explained in Defendants' motion to dismiss and reply, CME is not within the zone of interests protected by the CEA. Dkt. No. 30-1 at 22–24; Dkt. No. 46 at 23–24. Defendants do not rehash that argument here because the Court's resolution of the issue in the motion-to-dismiss posture would necessarily be the same in the summary-judgment posture.

## II. The Commission lawfully approved perpetual futures as futures

CME does not dispute that the Commission has authority to authorize the listing and clearing of perpetual contracts based on digital commodities like bitcoin. Instead, it claims that the CEA required the Commission to re-classify the perpetuals Kalshi sought to list as "swaps" rather than "futures." Compl. ¶¶ 189–202. That argument is meritless. Perpetual futures have all the elements of a futures contract, *infra* § II.A, and there, the Commission was not required to reclassify them as "swaps," *infra* § II.B.

Indeed, just last year, CME stated in comments to the Commission that "depending on how they are structured, certain perpetual-style derivative contracts *may accurately be classified as futures, while others may be swaps*." SOF ¶ 10 (emphasis added); *see also* SOF ¶ 11 (Cboe Global Markets explaining "[a] perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price"). CME's categorical position in this lawsuit—that perpetuals are *always* swaps and *never* futures—has no basis, as CME itself recognized until this lawsuit.

### A. Digital-asset perpetuals may be classified as futures

**1.** "No statute . . . defines 'futures contract.'" *CFTC v. International Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 494 (S.D.N.Y. 2004). Although the CEA uses the phrasing "contracts of sale for future delivery," 7 U.S.C. § 1a(44), neither the courts nor the Commission have understood this language to fix the metes and bounds of a future. On the one hand, the phrase is overinclusive. *See CFTC v. Erskine*, 512 F.3d 309, 313 (6th Cir. 2008) ("this broad language . . . cannot reasonably be applied as broadly as it suggests"). Read literally, it would mean that "all contracts in which settlement lies ahead," such as an order placed in the summer for the delivery of heating oil in the winter, are futures that must trade on CFTC-registered exchanges. *CFTC v.*

*Zelener*, 373 F.3d 861, 865 (7th Cir. 2004). The phrase is also underinclusive. It would exclude contracts where no "future delivery" is possible, like futures tied to stock indices or "cash settled" futures contracts where the parties settle with money payments rather than delivery. *Id.*

"Although there is no precise definition as to what constitutes a futures contract, courts have distilled from case law and regulatory authorities [several] important elements," *CFTC v. International Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004), recognizing that there is "no bright-line definition" and that "[t]he transaction must be viewed as a whole with a critical eye toward its underlying purpose," *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 581 (9th Cir. 1982); *see also* CFTC, Exemption for Bilateral Transactions, 65 Fed. Reg. 39,033, 39,037 (June 22, 2000) ("Although there is no definitive list of the elements of futures contracts, the CFTC and the courts recognize certain elements as common to such contracts.").

<u>First</u>, futures contracts allow traders "to speculate on the intervening price changes without actually having to acquire the underlying [asset]." *International Foreign Currency*, 334 F. Supp. 2d at 310; *see* 65 Fed. Reg. at 39,037 ("futures contracts are undertaken principally to assume or shift price risk without transferring the underlying commodity"); *In re MG Refining & Mktg., Inc.*, No. 95-14, 1995 WL 447455, at *3 (CFTC July 27, 1995) (finding it an "essential element[] of a futures contract" to "primarily to speculate or hedge the risk of price change in the commodity without actually acquiring the underlying commodity"). Put another way, a futures contract "does not involve a sale *of the [asset]* at all. It involves a sale *of the contract*." *Zelener*, 373 F.3d at 865.

For example, a cash-settled gold future on CME never involves the transfer of any gold. Rather, the parties to the futures contract are obligated to pay, or entitled to receive, a monetary payment based on future changes in the price of gold. Even physical gold futures rarely involve an actual transfer of gold, as traders almost always offset their positions before actual delivery. *See*

*Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) ("Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss."); *In re Stovall*, No. 75-7, 1979 WL 11475, at *3 (CFTC Dec. 6, 1979) ("[M]ost parties to commodity futures contracts extinguish their legal obligations to make or take delivery by offsetting their contracts with equal and opposite transactions prior to the date on which delivery is called for, accepting a profit or loss for any differences in price between the initial and offsetting transactions.").

Second, "[f]utures contracts are fungible because they have standard terms and each side's obligations are guaranteed by a clearing house." *Chicago Mercantile Exch. v. SEC* ("*CME*"), 883 F.2d 537, 542 (7th Cir. 1989); *International Foreign Currency, Inc.*, 334 F. Supp. 2d at 310 ("standardization of contract terms" is an element of a futures contract); *In re Stovall*, 1979 WL 11475, at *3 ("Commodity futures transactions involve standardized contracts for the purchase or sale of commodities . . . ."). In other words, futures contracts are based on identical units—such as 5,000 bushels Chicago Soft Red Winter Wheat bushels, an ounce of gold, or, as here, 1/10,000th of a bitcoin.

This standardization ensures three significant consequences. One, that futures contracts can be traded on an exchange, as the CEA requires. *See* 7 U.S.C. § 6(a); *Erskine*, 512 F.3d at 325 (contract not a future where it "was not traded on an exchange" and "was not fungible"). Two, that a central clearinghouse can "use[] a novation to interpose itself between the two original counterparties to the derivatives contract, thereby assuming the credit risk of both counterparties." *Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 99 (D.D.C. 2013). And three, that a trader can exit its position by making an identical, offsetting transaction. *Zelener*, 373 F.3d at 865 ("Standard terms and an absence of counterparty-specific risk make the contracts fungible, which in turn

makes it possible to close a position by buying an offsetting contract."); *Co Petro Mktg. Grp.*, 680 F.2d at 580 ("Standardized form contracts facilitate the formation of offsetting or liquidating transactions.").

Third, futures contracts are generally "secured by earnest money, or 'margin.'" *In re Stovall*, *supra*, at *3 (CFTC Dec. 6, 1979); *CME*, 883 F.2d at 542 (futures "[c]ontracts are entered into without prepayment, although the markets and clearing house will set margin to protect their own interests"); *International Foreign Currency*, 334 F. Supp. 2d at 310 ("a margin system of investing" is an "important element[]" of "what constitutes a futures contract"). Returning to the example above, a trader does not make "prepayment" to CME to purchase a gold future. Rather, the trader simply posts "margin," which functions like a security deposit ensuring that the trader can meet his obligations in the event his position loses value.

Perpetual futures check all these boxes. First, perpetuals allow traders to speculate on the future price of an underlying commodity (like bitcoin) without having to actually transfer that commodity. *See* Order at 4–5 ("[P]arties will enter into the BTCPERP Contract for the purpose of assuming or shifting the risk of change in value of the underlying (*i.e.*, bitcoin), without the possibility of transferring ownership of the underlying…." (citation modified)). Rather, traders incur profits and losses based on movements in the price of bitcoin. Second, perpetuals are fungible, standardized contracts, and accordingly, they are (1) traded on a national derivatives exchange, (2) centrally cleared, and (3) subject to offset. *Id.* at 4 ("[T]he BTCPERP Contract will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to … [a] central counterparty; holders will be able to exit their positions via offset…."); *id.* at 5 ("[T]he BTCPERP Contract will trade on the centralized market of a DCM." (citation modified)). And third, trading in perpetual futures requires a margin payment to the central clearinghouse. *Id.*

at 4 ("each party's obligations [are] guaranteed by a clearing house that sets margin requirements").

**2.** CME nonetheless maintains that perpetuals are missing two ingredients of a futures contract: delivery and expiration. Neither objection holds water.

***Delivery.*** CME claims that perpetuals are not futures because they do not contemplate delivery of the underlying commodity. Compl. ¶ 195 (alleging that "a contract lacking 'future delivery'" is not a future). That objection might have force if futures contracts required delivery of the underlying commodity itself. But no one thinks that—and certainly not CME. *CME*, 883 F.2d at 549 ("[N]o one . . . doubts that a contract may be a futures contract even though it provides for cash settlement . . . ."). Indeed, CME's complaint in this case acknowledges that a future can call for "physical delivery of the underlying commodity *or delivery of the cash value of the underlying commodity*." Compl. ¶ 92 (emphasis added).

Rightly so. CME offers numerous cash-settled future contracts that, as the name suggests, must be settled in cash payments rather than through delivery of the physical commodity. *See* CME Group, *Cash Settlement vs. Physical Delivery*, https://www.cmegroup.com/articles/2025/cash-settlement-vs-physical-delivery.html (Mar. 25, 2025) ("[C]ash-settled contracts are not physically tied to the underlying commodity . . . . No one involved in the futures market is at risk of being compelled to make or take delivery of a physical product."). Indeed, CME offers many futures contracts on many commodities where the idea of actual delivery would be incoherent. For example, CME offers futures on stock index levels, like the S&P 500, the Nasdaq, or sector indices.[4] But of course, there is no way to deliver a stock index; it's just a measurement that tracks

[4] *E.g.*, E-mini S&P 500, CME Group, https://www.cmegroup.com/markets/equities/sp/e-mini-sandp500.html (last visited November 20, 2026); E-mini Nasdaq-100, CME Group, https://www.cmegroup.com/markets/equities/nasdaq/e-mini-nasdaq-100.html (last visited November 20, 2026); E-mini Communication Services Select Sector, CME Group, https://www.cmegroup.

the performance of a market. *CME*, 883 F.2d at 542 ("futures contracts" that are based on "the value of an index of stocks[] do not allow delivery"). Likewise, CME offers futures on asset-price *volatility* indices, which simply measure the magnitude of price movements—so again, there is no potential for delivery.[5] *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69 (2d Cir. 2021) (explaining that a volatility index "is not a tradable asset" but that "investors may take a position on future levels of market volatility by purchasing futures contracts on the [volatility] index"). And CME offers futures on weather that make settlement contingent on the number of days above or below a particular temperature; weather is obviously not capable of delivery.[6] All these contracts are "delivered" with a cash settlement reflecting intervening changes in the value of the underlying index.

Because cash settlement counts as delivery, perpetual futures *do* provide for "future delivery." For example, imagine that a trader buys 10,000 bitcoin perpetual contracts at a price of $65,000. When the trader goes to sell that contract at a price of $70,000, there is an obligation to deliver $5,000 to the trader. That is no different than a fixed-date bitcoin future offered by CME: a trader buys bitcoin futures contracts, and when she sells them, there is a cash settlement in the amount of the trader's gain or loss. Put simply, perpetual futures and dated, cash-settled futures both entail an economically equivalent form of "delivery": a cash payment reflecting the difference between the price paid to purchase the contract and the price paid to sell it. Thus, perpetuals *are* "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A).

---

com/markets/equities/select-sectors/e-mini-communication-services-select-sector-index.html (last visited November 20, 2026).

[5] *E.g.*, Bitcoin Volatility, CME Group, https://www.cmegroup.com/markets/cryptocurrencies/volatility/bitcoin-volatility.html (last visited November 20, 2026).

[6] *E.g.*, Chicago HDD Monthly, CME Group, https://www.cmegroup.com/markets/weather/hdd/chicago-hdd-monthly.contractSpecs.html (last visited November 20, 2026).

***Expiration.*** CME also claims that perpetuals are not futures because they have no "fixed future expiration." Compl. ¶ 149. But nothing in the CEA requires an expiration date. Congress provided only that there would be "future delivery" of a commodity, not delivery on any particular date. 7 U.S.C. § 2(a)(1)(A). As explained above, perpetual futures do provide for "future delivery"—they simply allow a trader to choose the time of delivery, rather than having a delivery time fixed for her by an exchange. Congress could have imposed an expiration-date requirement, as it did for other types of contracts enumerated in the CEA. For instance, a "foreign exchange forward" involves "a transaction that solely involves the exchange of 2 different currencies *on a specific future date*." *Id.* § 1a(24) (emphasis added). A "foreign exchange swap" likewise involves "an exchange of 2 different currencies *on a specific date*." *Id.* § 1a(25)(A) (emphasis added). That Congress omitted any such requirement for futures should be respected, not overrun. *See Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) (courts usually "presume differences in language like this convey differences in meaning").

Given the absence of an expiration-date requirement in the statute, courts have recognized that "a specified future delivery date is not determinative" to whether a contract is a future. *International Foreign Currency*, 334 F. Supp. 2d at 312. "While futures contracts generally have a specified future delivery date . . . that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'" *Id.*; *see also CFTC v. Calvary Currencies, LLC.*, 2004 WL 2330725, at *5 (D. Md. Oct. 15, 2004) (finding a futures contract, rather than a spot contract, because the positions "could be held open indefinitely"). And that makes sense: after all, CME's CEO stated that "we are not seeing anybody, nor do we hardly ever see anybody in the retail division hold onto these products long enough to ever go to an expiration. That is not the issue." SOF ¶ 26(e).

For example, in *CME*, the Seventh Circuit confronted "[i]ndex participations," which are "contracts of indefinite duration based on the value of a basket (index) of securities." 883 F.2d at 539. The buyer of an IP (or the "long") made an upfront payment for the IP "in cash on the date of the sale." *Id.* In exchange, the seller of an IP (or the "short") "promise[d] to pay the buyer the value of the index as measured on a 'cash-out day'"—specifically, by paying the long "a sum approximating the value of dividends the stocks in the index have paid during the quarter." *Id.* at 539–40. Critically, these "IPs last[ed] indefinitely," just like perpetuals. *Id.* at 545. And the Seventh Circuit held these "indefinite" contracts to be futures subject to CFTC jurisdiction, highlighting characteristics similar to that of perpetuals: IPs obligated the short "to pay the value of an index on a prescribed day" (much like a funding-rate payment); both sides owe their obligations "to the clearing house" rather than to each other; the contracts "may be settled by buying or selling an offsetting obligation"; and the short "must put up [] margin." *Id.* at 545-46.

Moreover, the absence of an expiration date is functionally of little to no difference from futures contracts that are already on the market. For instance, while CME's futures contracts have expiration dates, the exchange permits "rollover," which allows a trader to "move[] his position from the front month contract to another contract further in the future."[7] *See* Compl. ¶ 52 (explaining "CME's existing Bitcoin futures suite, in which customers seeking continuous Bitcoin exposure must roll their positions into a new future at each monthly expiration"). In essence, then, a perpetual contract is a futures contract that continuously rolls over, "eliminat[ing] the need for traders to roll contracts regularly." Order at 2; *cf. Dzurka Bros., LLC v. Luckey Farmers, Inc.*, 712

---

[7] CME Group, Understanding Futures Expiration & Contract Roll, https://www.cmegroup.com/education/courses/introduction-to-futures/understanding-futures-expiration-contract-roll (last visited Nov. 20, 2026).

F. Supp. 3d 979, 996 (E.D. Mich. 2024) (contracts that "could be rolled over indefinitely; basically, rolled out to infinity" were futures).

Likewise, derivatives exchanges already offer long-dated futures that function like perpetuals. For instance, Cboe Global Markets offers "continuous futures," which are "perpetual-style" futures with expirations extending up to 10 years. SOF ¶ 5. Because the expiration is so distant, "market participants" do not "trade" these contracts "based on the spot price they expect at that future date," *id.*, which CME says is how "a true future" works, Compl. ¶ 200. Rather, continuous futures use a "daily cash adjustment"—called a "Funding Amount"—to "keep[] futures prices closely aligned with their respective underlying reference rates." SOF ¶ 5. By doing so, these long-dated futures "provide access to a perpetual-style futures product in a U.S.-regulated, intermediated environment and eliminate the need for investors to roll positions regularly." *Id.*

If "perpetual-style" continuous futures are futures, it is hard to see how economically equivalent perpetual futures are anything else. Both have a funding rate; both have standardized terms; both are traded on an exchange; both are cleared; both are subject to offset; and both rely on a system of margin. The only difference is an expiration date. But when the expiration is 10 years off, it may as well be a fiction—no one enters into a futures contract to take delivery of a commodity in a subsequent decade. Indeed, CME's CEO stated that "we are not seeing anybody, nor do we hardly ever see anybody in the retail division hold onto these products long enough to ever go to an expiration." SOF ¶ 26(e). If expiration dates are a paper tiger for CME's dated futures, the bulk of which expire in a matter of months, then that is exponentially truer of continuous futures expiring many years into the future.

As the existence of "perpetual-style" futures demonstrates, the presence of an expiration date has little if any practical significance to distinguishing between futures and non-futures. After

all, if exchanges can offer "perpetual-style" futures that expire in 10 years, they can also offer perpetual-style futures that expire in 100 years, or 1,000 years, or more. In other words, Kalshi (or any other DCM) could offer contracts with the exact same mechanics as its perpetuals, but tack on an expiration date in the long-distant future, and all would have to agree that those contracts are futures. Indeed, Cboe is *already doing that*. That Kalshi and other exchanges cut to the chase and dropped a toothless expiration date does not turn these contracts into something else altogether.

**B. The Commission was not required to classify digital-asset perpetuals as swaps**

Last year, CME told the Commission that "depending on how they are structured, certain perpetual-style derivative contracts *may accurately be classified as futures, while others may be swaps*." SOF ¶ 10 (emphasis added). Yet now, it claims that perpetual contracts are categorically swaps, and never futures. CME got it right the first time.

The CEA contains several "swap" definitions, and CME focuses on the third one: a swap is a contract that "provides on an executory basis for the exchange . . . of 1 or more payments based on the value or level of . . . commodities," which allows the parties to "transfer[] . . . the financial risk associated with a future change in [the commodity price] without also conveying a current or future direct or indirect ownership interest in an asset." 7 U.S.C. § 1a(47)(A)(iii). "Perpetual contracts," CME says, "fit the CEA's statutory definition of a 'swap' hand in glove." Compl. ¶ 192. And because Congress drew a line between swaps and futures, *see* 7 U.S.C. § 1a(47)(B)(i), CME contends that perpetuals are necessarily not futures. This reasoning goes wrong on several fronts.

**1.** For starters, CME gets the order of operations backwards. Its theory is that a contract fitting the definition of "swap" is necessarily not a "future," Compl. ¶¶ 3, 89, but the statute actually says the opposite: a contract that is a *future* is not a swap. Consider the text. The Act's several definitions of "swap" apply only "*[e]xcept as provided in subparagraph (B)*." 7 U.S.C. § 1a(47)(A) (emphasis added). And subparagraph (B) provides that "[t]he term 'swap' does not

include" futures contracts. *Id.* § 1a(47)(B), (B)(i). Thus, if the Commission reasonably determines that a contract is a future, there is no need to consult the "swap" definitions.

That order of operations makes sense. The "swap" definitions are strikingly "broad[]," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), and could encompass even traditional futures contracts. Consider a basic, cash-settled gold future offered by CME.[8] That contract "provides on an executory basis for the exchange [of] payment[] based on the value [of a] … commodit[y]" that "transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any such value . . . without also conveying a current or future direct or indirect ownership interest." 7 U.S.C. § 1a(47)(A)(iii). On CME's theory, because these definitions fit a gold future "hand in glove," it should actually be classified as a swap. *See* Compl. ¶ 192. But Congress said the opposite: futures contracts are excepted from the "swap" definition.

CME itself has recognized this. After Congress added swaps to the CFTC's jurisdiction in the 2010 Dodd-Frank Act, CME commented to the Commission on the distinction between futures and swaps. CME explained that "the definition of swap in [Dodd-Frank] arguably describes . . . many of our [] mature, successful [futures] products," and it argued that "[t]here is nothing in the statute or legislative history to suggest that Congress intended for the Commission to change the existing market structure" by requiring its futures to be traded as swaps. SOF ¶ 22(c). In other words, the Dodd-Frank Congress did not restrict the definition of a "future"; rather, it preserved the concept of a future, 7 U.S.C. § 1a(47)(B)(i), while ensuring that the Commission's jurisdiction extended to analogous derivatives called "swaps." So it makes no sense to assert, as CME now does, that a contract is not a future simply because it could also be described as a "swap."

[8] CME Group, 1-Ounce Gold Futures, https://www.cmegroup.com/markets/metals/precious/1-ounce-gold.html (last visited Nov. 20, 2026).

CME's 2011 comment went so far as to say that "[s]wap and futures contracts can be designed to replicate the same economic exposure to an underlying instrument, commodity or asset," and that "[s]uch equivalency makes it extremely difficult, if not impossible, to separately define and categorize economically equivalent swaps and futures." SOF ¶ 22(a)–(b); *see also* SOF ¶ 22(c) (arguing that "virtually all significant distinctions between futures and swaps" have been eliminated as a result of Dodd-Frank). CME's solution? "[T]he Commission should confirm that identical products may be listed by different venues – even the same platform – one bearing the label 'future' and one 'swap,'" SOF ¶ 22(e), which would allow exchanges like CME "the option to trade products as either 'futures' or 'swaps,'" SOF ¶ 22(d). That is a total about-face from this lawsuit, which alleges that perpetual contracts are categorically swaps, even though they are "economically equivalent" to futures.

**2.** CME relies heavily on the existence of a funding-rate payment, designed to keep perpetual-future price aligned with the spot price, as proof positive of a swap. *See* Compl. ¶ 192 ("[A] perpetual contract 'provides on an executory basis for the exchange[] . . . of [one] or more payments based on the value or level of . . . commodities'—those are the funding payments, which rise and fall with the difference between the perpetual contract price and the price of the underlying asset. 7 U.S.C. § 1a(47)(A)(iii)."). But again, whether the funding rate would otherwise satisfy the "swap" definition in § 1a(47)(A)(iii) is a red herring: futures are necessarily not swaps, 7 U.S.C. § 1a(47)(B)(i).

Indeed, there are already futures contracts on the market that use funding-rate payments to keep the spot and futures price aligned. Cboe's "perpetual-style" continuous futures are one example. SOF ¶ 5. And CME offers "spot-quoted futures" that—like perpetual futures—keep "contract[] [prices] near their respective underlying cash price" through "a daily financing

adjustment that represents [the] difference between the corresponding lead-month quarterly or monthly futures contract and the related spot market." SOF ¶ 4. It is entirely unclear why "spot-quoted futures" contracts can have this true-up feature without losing their status as "futures," but perpetual futures cannot.

In fact, CME's most basic, traditional futures contracts "require[] frequent payments exchanged between the long and short sides of the contract." Compl. ¶ 113. Every day, futures accounts are "marked to market." The exchange calculates a "daily settlement price," compares it to the previous day's settlement price, and credits or debits each trader's account for the difference. For instance, if a trader is long in a wheat contract for 5,000 bushels, and the price of wheat increases by 10 cents a bushel over the course of a day, then the trader will receive a credit of $500 that day. By contrast, the trader who is short in the same contract will incur a $500 debit. Thus, as CME itself explains: "In the futures markets, losers pay winners every day." SOF ¶ 24. If CME's own contracts require losers to pay winners every day, the fact that perpetual futures have a similar mechanism does not distinguish them from other futures—let alone converts them into swaps.

### III. The Order was not arbitrary or capricious

CME also claims that the Order should be vacated as arbitrary and capricious, for a smattering of reasons. *See* Compl. ¶¶ 203–221. In applying the APA's "deferential arbitrary-and-capricious standard," "a court asks not whether it agrees with the agency action, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025). In other words, the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Order easily clears that hurdle.

*First*, CME accuses the Commission of "rubberstamp[ing] Kalshi's application" for listing perpetual futures. Compl. ¶ 208. The Commission did no such thing. Rather, it "carefully described [Kalshi's] submission and explained why the submission was suitable for its intended purpose," which is "more than satisfactory." *Affirmed Energy, LLC v. FERC*, 166 F.4th 1070, 1085 (D.C. Cir. 2026); *see* AR2–6. After all, the decision whether to approve perpetuals for trading was a purely legal one, as the Commission is required to "approve a new contract or other instrument unless the Commission finds that the new contract or other instrument would violate this chapter (including regulations)." 7 U.S.C. § 7a-2(c)(5)(B). So by restating and ultimately accepting Kalshi's legal arguments, the Commission did not simply "t[ake] [Kalshi's] word for it." *Susquehanna Int'l Group, LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). Rather, it rationally concluded that Kalshi's legal arguments were persuasive on the merits. Nothing more is required.

Moreover, the Commission's Order was "additionally informed" by the funding-rate mechanism used by perpetuals. Order at 6. As the Commission explained, "[t]raditional futures contracts converge to the spot price because at expiry of the futures contract, the potential obligation to make or take delivery, or make a payment based on the settlement reference price, incentivizes the futures contract's price to converge to the spot market price of the underlying commodity," which is "why a futures contract is a hedging and price discovery instrument." *Id.* at 6–7. Perpetual contracts, the Commission explained, "use[] a funding rate mechanism" to keep the spot and futures price aligned, which replicates the same hedging and price discovery functions of a traditional future. *Id.* at 7. So the Commission did not uncritically greenlight Kalshi's application, as it offered its own "findings and determinations." *Susquehanna*, 866 F.3d at 447 (citation modified).

*Second*, CME argues that the Order is deficient for not "analyz[ing] whether a perpetual contract qualifies as a swap." Compl. ¶ 213. But the Commission's role was limited to determining whether Kalshi's proposal to list perpetuals as futures "would violate this chapter (including regulations." 7 U.S.C. § 7a-2(c)(5)(B). Once the Commission determined that Kalshi's application to list perpetuals as futures was lawful, it was required to issue the approval—full stop. In fact, an extended discussion of the swap definition would have been useless: the CEA excludes futures from the definition of swap. 7 U.S.C. § 1a(47)(B)(i).

More fundamentally, the Commission was not required to say anything *at all*. Any product submitted for Commission approval under Rule 40.3 (as Kalshi's application was) is "deemed approved by the Commission" when a 45-day review period closes, "unless the Commission issues a notice of non-approval." 17 C.F.R. § 40.3(c)(1), (d)(1). In other words, the Commission could simply have sat on Kalshi's application for 45 days, said nothing, and the perpetuals would have been "deemed approved." *Id.* If the Commission can approve by silence, then it can hardly be faulted for omitting superfluous analysis (*i.e.*, because perpetuals are futures, they are excepted from the definition of "swap").

*Third*, CME claims that the Order is arbitrary for not "acknowledg[ing] the CFTC's prior classification of these products as swaps" or "explain[ing] the change in position." Compl. ¶ 213. By "prior classification," CME refers to CFTC civil complaints involving offshore perpetual contracts, in which the Commission alleged that the subject contracts were swaps. But in those complaints, the Commission also recognized that those perpetuals had the features of a futures contract. *See, e.g.*, *CFTC v. MEK Global Ltd.*, No. 1:24-cv-2255, Compl. ¶ 41 (S.D.N.Y. Mar. 26, 2024) (describing defendant's "perpetual futures" both as "'swaps' under the Act" *and* as "similar to quarterly delivery futures, except that they have no predetermined settlement time"). And in a

criminal prosecution involving perpetuals, the Southern District of New York recognized a similar point, holding that "[t]he MNGO Perpetuals are swaps" yet that these contracts were "essentially a futures contract—that is, an 'agreement to purchase or sell a particular asset on a later date at a predetermined price.'" *United States v. Eisenberg*, 784 F. Supp. 3d 579, 588, 602 (S.D.N.Y. 2025). So the Commission's approval of perpetuals as futures was hardly a 180-degree turn.

Even if there were tension with prior civil complaints, that does not mean the Commission acted arbitrarily and capriciously here. "The change-in-position doctrine" applies only when "an agency changed existing *policy*." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025) (emphasis added). But an "agency counsel's interpretation of a statute where the agency itself has articulated no position on the question" does not reflect agency policy. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). Indeed, it is black-letter administrative law that an agency's litigating position is *not* official agency policy. For example, a "'convenient litigating position' or '*post hoc* rationalizatio[n] advanced' to 'defend past agency action against attack'" is not entitled to *Auer*/*Kisor* deference because it does not reflect the agency's "fair and considered judgment." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019). Nor were such positions ever entitled to *Chevron* deference. *Bowen*, 488 U.S. at 212. Likewise, it is "a simple but fundamental rule of administrative law" that courts "must judge the propriety of [agency] action solely by the grounds invoked by the agency"—not agency litigating positions. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Put simply, if the agency's litigating positions lack deference because they do not represent official agency policy or decisionmaking, then agency policy can hardly be restrained by prior litigating positions.

What is more, the Commission has clearly never believed that it had a policy of treating perpetuals as swaps. In May 2025, the Commission put out a request for comment asking: "Should

Perpetual Derivatives be classified as swaps or futures contracts?" SOF ¶ 9. Some exchanges, like Cboe, agreed they are futures. SOF ¶ 11 ("A perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price.") Others, like CME, responded that "certain perpetual-style derivative contracts may accurately be classified as futures, while others may be swaps." SOF ¶ 10. So the notion that the Commission had a policy that perpetuals are swaps, and then pulled a bait-and-switch for the first time in May 2026, is belied by reality.

*Fourth*, CME faults the Commission for issuing the Order "one day after receiving an application from Kalshi." Compl. ¶ 7. That ignores a much larger picture. Kalshi communicated with the agency about the potential to list perpetuals long before it filed a formal application; indeed, its counsel submitted a legal memorandum on the classification of perpetuals more than 3 months before the approval. The Commission did not have to hold a notice-and-comment period on this request; the Commission was tasked solely with determining whether the application before it complied with the CEA and Commission regulations. 7 U.S.C. § 7a-2(c)(5)(B). And before that, the Commission issued a request for comment on perpetual derivatives, receiving and considering numerous submissions.[9] The President's Working Group had also studied the issue of perpetuals and made recommendations to the Commission. SOF ¶ 12. So by the time the Commission approved Kalshi's request to list perpetuals, the issue had been percolating for over a year.

---

[9] CFTC, Release No. 9069-25, CFTC Staff Seek Public Comment Regarding Perpetual Contracts in Derivatives Markets (Apr. 21, 2025), https://www.cftc.gov/PressRoom/PressReleases/9069-25.

In sum, digital-asset perpetuals are properly classified as futures. *Supra* § II. And the Order provided a reasonable explanation for why these contracts are lawful under the CEA. That satisfies the agency's obligations under the APA.

## IV. The Policy Statement is not reviewable agency action

CME also challenges the Policy Statement that the Commission released the same day as the BTCPERP Contract. But the Statement is not subject to APA review, because it is not "final agency action." 5 U.S.C. § 704; *see Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731 (D.C. Cir. 2003) ("The District Court's authority to review the conduct of an administrative agency is limited to cases challenging 'final agency action.'"). So regardless of whether CME has a viable claim as to the Order, it certainly does not as to the Policy Statement.

**1.** "Under the Administrative Procedure Act, an agency action is final if it meets two conditions. First, it must 'mark the consummation of the agency's decisionmaking process,' *i.e.*, it is not 'merely tentative or interlocutory.' Second 'the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (citation modified). Neither condition is satisfied here.

Most evidently, no "rights or obligations" are "determined" by the Policy Statement, and no "legal consequences will flow" from it. *Id.* The Policy Statement identifies itself as "a general statement of policy issued under 5 U.S.C. § 553(b)(A)," 91 Fed. Reg. at 33,161, and it is black-letter law that "'general statements of policy' [] are unreviewable." *Center for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006); *see Broadgate Inc. v. USCIS*, 730 F. Supp. 2d 240, 244 (D.D.C. 2010) ("if the Memorandum is an interpretive rule or general policy statement, . . . it is not final agency action subject to judicial review under the APA"). Further, the Policy Statement expressly states that "[i]t does not impose any obligation on any person," does not modify the CEA

or the Commission's regulations, and does not "create any right or benefit enforceable at law or in equity." 91 Fed. Reg. at 33,161. By "disclaim[ing] any intent to require anyone to do anything or to prohibit anyone from doing anything," the agency made plain that the Policy Statement has no actual legal effect. *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (looking to "the agency's characterization of the guidance").

This language, moreover, is not meaningless "boilerplate." *Id.* The balance of the Policy Statement observes that "[p]erpetual contracts raise novel and complex questions," and it explained that "[i]t is therefore the Commission's view that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3." 91 Fed. Reg. at 33,161. As the Commission explained, different "asset class[es] will raise different considerations and merit independent analysis and review based on their unique circumstances," and it noted that "perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission." *Id.* at 33,161 n.5. So far from establishing any legal consequences, the Policy Statement expressly *defers* consideration of whether other perpetual contracts can be listed for trading or accepted for clearing, instead inviting registrants to submit requests to list or clear perpetuals on a case-by-case basis.

By the same token, the Policy Statement does not "mark the 'consummation' of the [CFTC's] decisionmaking process" as to perpetuals. *Bennett*, 520 U.S. at 178. Again, the Policy Statement simply acknowledges the novelty and complexity of perpetuals and expresses a preference that registrants submit requests to list or clear perpetuals under Rule 40.3, at which point the Commission can make a definitive determination about whether a particular contract

"violate[s] the Act or the Commission's regulations." 17 C.F.R. § 40.3(b). Indeed, the Commission recognized that the SEC's input may be needed depending on the asset class at issue. 91 Fed. Reg. at 33,161 n.5. The Policy Statement is thus of "interlocutory nature" and does not make any definitive determination as to how the Commission would view other perpetuals. *Bennett*, 520 U.S. at 178.

**2.** CME only halfheartedly suggests otherwise. It alleges that "the Policy Statement is final agency action" only "[t]o the extent [it] . . . purports to independently establish the authority of futures exchanges to list similar perpetual contracts referencing digital commodities as futures." Compl. ¶ 18; *see id.* ¶ 201 (claiming that "[t]he Policy Statement is invalid because it authorizes DCMs to self-certify cryptocurrency-based perpetual contracts as futures in reliance on the Kalshi Order"). To be sure, *the Order* allows registrants to self-certify perpetual contracts that reference the spot price of bitcoin or other digital commodities that have deep, active, and continuous spot market trading." Order at 8 (footnote omitted). And the Policy Statement recognizes that aspect of the Order. 91 Fed. Reg. at 33,160 ("Contemporaneously with the issuance of this policy statement, the Commission has issued an order (the 'Order') permitting the listing of a perpetual contract that references the spot price of bitcoin by a designated contract market (''DCM'') as a futures contract."). But the Policy Statement does not *itself* "independently establish the authority of futures exchanges to list similar perpetual contracts referencing digital commodities as futures." Compl. ¶ 18. Rather, it is directed to "perpetual contracts that reference underlying asset classes that are *not* contemplated in the Order." 91 Fed. Reg. at 33,161 (emphasis added). And as explained above, the Policy Statement takes no position on the status of those contracts; it invites registrants to file a Rule 40.3 application before listing such contracts. *Id.*

CME also alleges that "[t]he Policy Statement further privileges th[e] class of perpetual contracts [based on digital commodities]" because it indicates that "other perpetuals" should be submitted for approval under Rule 40.3, whereas digital-commodity perpetuals can be self-certified under Rule 40.2. Compl. ¶¶ 215–17. But nothing in the Policy Statement legally obligates registrants to follow the Rule 40.3 process for other perpetuals; rather, it *encourages* registrants to submit a Rule 40.3 application rather than self-certify so that the Commission can analyze "novel and complex" issues related to these types of perpetuals. *See also* Order at 8 n.24 ("The Commission *encourages* market participants that seek to list perpetual contracts on underlying asset classes other than digital commodities to engage with the Commission and CFTC staff." (emphasis added)). So again, the Policy Statement does not create any "legal consequences" about the status of non-digital-commodity perpetuals. *Bennett*, 520 U.S. at 178. And in any event, CME has no standing to argue that digital-commodity perpetuals and other perpetuals should be on equal footing, as CME does not allege that it wishes to offer *any* perpetual.

**3.** Even if the Policy Statement were reviewable, CME's arguments as to why the Statement is unlawful are duplicative of its arguments as to the Order. As explained above, perpetual contracts based on digital commodities are properly classified as "futures," *supra* § III.A, and the Commission's approval of these perpetual contracts for listing and clearing was well-reasoned, *supra* § III.B. Because there is no basis to vacate the Order, there is necessarily no basis to vacate the Policy Statement.

## V. Any Relief in CME's Favor Should Be Tailored to Mitigate Market Disruption

If the Court is inclined to rule in CME's favor, it should craft appropriate relief to minimize disruption to the Commission's exchanges and market participants. Specifically, it should either (1) remand without vacatur, or (2) stay implementation of its decision for Defendants to appeal and to allow market participants to adapt.

**1.** If the Court rules in CME's favor on Count Two (*i.e.*, that the Commission's reasoning was arbitrary and capricious, *see supra* § III), the Court should remand without vacatur given the "practical difficulties" of "vacating agency action" here. *Marin Audubon Soc'y v. FAA*, 129 F.4th 869, 872 (D.C. Cir. 2025). Courts consider two factors when evaluating whether vacatur, as opposed to remand, is warranted: (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the 'disruptive consequences of an interim change that may itself be changed.'" *Center For Biological Diversity v. Zeldin*, 171 F.4th 356, 382 (D.C. Cir. 2026) (quoting *Allied-Signal v. United States Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

As for the first factor, to the extent there are any "deficiencies" in the Order, the Commission can easily rectify those on remand by explaining in further detail why perpetual futures are, in fact, futures rather than swaps, as well as any other factors the Court finds relevant. After all, if the Court only rules against Defendants on Count Two, that would only mean its "choices were . . . merely inadequately explained," not that they are "unjustifiable." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1038 (D.C. Cir. 2025). The perpetual-futures market need not be wiped out while the Commission rectifies any explanatory shortcomings.

The second factor counsels especially strongly in favor of remand without vacatur. If the Court vacates, perpetual-futures trading will come to a grinding halt, likely requiring forced liquidations of open positions. *See id.* ("[T]he seriousness of the . . . order['s] deficiencies does not outweigh the disruptive effects of vacatur."). That would cause substantial disruption to both exchanges and market participants. For one, exchanges would likely need to make an emergency rule change and file it with the Commission before implementing liquidations of open positions. *See* 17 C.F.R. § 40.6(a)(6) (procedure for emergency-rule changes). For another, market

participants could face significant risk from having their open positions instantly liquidated. Any derivatives trader, including perpetual-futures trader, owns a contract, and it relies on its contractual entitlements to inform their decision making. For instance, a trader may rely on its bitcoin perpetual future as a hedge against other bitcoin investments, such as ownership of bitcoin itself, shares in a bitcoin-invested company, or bitcoin futures contracts with an expiration date. If the perpetual-futures position is force-liquidated by an order vacating the Commission's Order, then the trader's portfolio risks will instantly change through no fault of its own. That disruption to financial markets should be mitigated, particularly if the Commission will have an opportunity on remand to augment its reasoning. *See City of Port Isabel*, 130 F.4th at 1038 ("The Commission's procedural missteps, though important, are not so fundamental as to justify throwing the projects and those reliant upon them into disarray.").

**2.** If the Court is inclined to vacate the Order (whether on Count One or Two), it should stay its order pending an appeal to minimize any harm to market participants. *See* 5 U.S.C. § 705 (allowing court to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings"). A stay pending appeal turns on "four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Alabama Ass'n of Realtors v. HHS*, 539 F. Supp. 3d 211, 213 (D.D.C. 2021). "[C]ourts in this Circuit have continued to analyze the factors 'on a sliding scale whereby a strong showing on one factor could make up for a weaker showing on another.'" *Id.* (quoting *NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018)). Here, Defendants have at least "raise[d] a serious legal question," both as to CME's standing and as to the proper classification of perpetual futures.

*Id.* at 214. And the other factors "strongly favor issuing a stay" pending D.C. Circuit review. *Id.* As explained above, there would be irreparable harm to the Commission and its registrants if markets are forced to suddenly halt perpetual-futures trading and unwind open positions. Given that there is at least a significant probability that the D.C. Circuit would uphold the Commission's Order, an interim, needless disruption to financial markets should be avoided. CME, by contrast, would suffer little if any harm from a stay, since there is no evidence that its trading volumes have been adversely impacted from perpetual futures.

If nothing else, the Court should grant a three-month stay to allow exchanges and market participants to adapt to the Court's order. As the D.C. Circuit has recognized, even when "[t]he concerns with assuring adequate time for investors to unwind transactions do not counsel against ordering vacatur altogether," they nonetheless are consistent with "building in a grace period . . . during which market participants can wind down their open transactions." *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 982 (D.C. Cir. 2023). This grace period would also allow time for exchanges, if they wished, to convert their true perpetual futures to perpetual-style futures with long-distant expiration dates, and for the Commission to consider whether to issue no-action relief. *See* SOF ¶ 18 (citing **Exhibit G**). Alternatively, it would also allow time for exchanges to convert their perpetual futures to perpetual swaps. Consistent with *Cboe*, the Commission submits that a three-month winddown period would be appropriate. *Cboe*, 77 F.4th at 982.

## CONCLUSION

Because the Court lacks subject-matter jurisdiction, it should dismiss. *See* Dkt. No. 30. If that motion is denied, the Court should grant summary judgment to Defendants.

Dated: November 20, 2026

Respectfully Submitted,

*/s/ Henry J. Dickman*
Henry J. Dickman (DC Bar No. 1724459)

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel
ANNE W. STUKES
Senior Assistant General Counsel
CARLIN METZGER
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 418-5607
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
maisenbrey@cftc.gov

*Attorneys for Defendants*