**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHICAGO MERCANTILE EXCHANGE INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL S. SELIG, in his official capacity as Chairman of the Commodity Futures Trading Commission; COMMODITY FUTURES TRADING COMMISSION,<br><br>Defendants. | Case No. 1:26-cv-02157-CKK |

# DEFENDANTS' STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7(h), Defendants Commodity Futures Trading Commission and Chairman Michael S. Selig (collectively, "CFTC" or "Commission") respectfully submit the following Statement of Material Facts as to which there is no genuine dispute in support of their Motion for Summary Judgment. Plaintiff Chicago Mercantile Exchange Inc. ("CME") does not oppose the admission of the exhibits cited herein.

Dated: November 20, 2026

Respectfully Submitted,

*<u>/s/ Henry J. Dickman</u>*
Henry J. Dickman (DC Bar No. 1724459)

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel

ANDREW WEISBERG
Senior Assistant General Counsel
ANNE W. STUKES
Senior Assistant General Counsel
CARLIN METZGER
Senior Assistant General Counsel
MARGARET P. AISENBREY
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel: (202) 418-5607
Fax: (202) 418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
aweisberg@cftc.gov
astukes@cftc.gov
cmetzger@cftc.gov
maisenbrey@cftc.gov

# TABLE OF EXHIBITS TO STATEMENT OF MATERIAL FACT

| Ex. | Description |
|---|---|
| A | Administrative Record (redacted pursuant to court-ordered protective order) |
| B | CME, *FAQ: Spot-Quoted Futures* (Dec. 15, 2025), available at https://www.cmegroup.com/articles/faqs/faq-spot-quoted-futures.html. |
| C | Cboe, Cboe Continuous Futures, available at https://cdn.cboe.com/resources/membership/Cboe_Continuous_Futures_Tear_Sheet.pdf. |
| D | CFTC, Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Apr. 21, 2025) |
| E | CME, Re: Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (May 21, 2025) |
| F | Cboe, Re: Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (May 21, 2025) |
| G | CFTC Letter No. 26-29, Re: No-Action Positions Regarding Removal of Expiration Dates from Existing Broad-Based Security Index Perpetual-Style Futures Contracts (Oct. 3, 2026) |
| H | CME, Re: Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping (July 22, 2011) |
| I | CME, Mark-to-Market, available at https://www.cmegroup.com/education/courses/introduction-to-futures/mark-to-market. |
| J | CME Exchange Volume Report – Monthly (May 2026) |
| K | CME Exchange Volume Report – Monthly (June 2026) |
| L | CME Exchange Volume Report – Monthly (July 2026) |
| M | CME Exchange Volume Report – Monthly (August 2026) |
| N | CME Exchange Volume Report – Monthly (September 2026) |
| O | CME Group Q2 2026 Earnings Introductory Script (July 22, 2026), available at https://investor.cmegroup.com/static-files/f03a4407-750b-4ce3-a3db-02d59b60b8a6. |

## STATEMENT OF MATERIAL FACTS

### I. Background on Derivatives Markets

1. A derivative is a financial instrument, the value of which depends on (i.e., is derived from) the value of some underlying asset, index, or other measure. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 61 n.1 (D.C. Cir. 2024) (internal citations omitted). Futures, options, and swap contracts are all examples of derivatives. In general, market participants use derivatives to hedge risks or speculate on price movements.

2. Futures contracts were originally designed to provide for the physical delivery of a commodity (typically an agricultural product) on a date certain, with traders having the opportunity to offset their position on a trading exchange and thereby accept a net profit or loss rather than physical delivery. *See* JERRY W. MARKHAM, THE HISTORY OF COMMODITY FUTURES TRADING AND ITS REGULATION 203–06 (1987). But the concept of a derivative has consistently evolved, thanks in substantial part to CME and other exchanges.

3. In 1981, CME launched the world's first cash-settled futures contract, called "Eurodollar futures." According to CME CEO Terry Duffy, these contracts "paved the way for future contracts, such as stock indexes and weather, which cannot be physically delivered." CME Group, *CME Celebrates 25th Anniversary of Benchmark CME Eurodollar Futures Contract* (Dec. 5, 2006), https://www.cmegroup.com/media-room/press-releases/2006/12/05/cme_celebrates_25thanniversaryofbenchmarkcmeeurodollarfuturescon.html.

4. Last year, CME began to offer "spot-quoted futures," which are "longer-dated contracts [that] trade near their respective underlying cash price" through "a daily financing adjustment that represents that day's basis or difference between the corresponding lead-month quarterly or monthly futures contract and the related spot market." **Exhibit B at 2.**

5. Cboe Global Markets, another prominent derivatives exchange, offers "perpetual-style" continuous futures with expirations extending up to 10 years. **Exhibit C.** Because the expiration is so distant, "market participants" do not "trade" these contracts "based on the spot price they expect at that future date." Rather, continuous futures use a "daily cash adjustment"—called a "Funding Amount"—to "keep[] futures prices closely aligned with their respective underlying reference rates." *Id.* By doing so, these long-dated futures "provide access to a perpetual-style futures product in a U.S.-regulated, intermediated environment and eliminate the need for investors to roll positions regularly." *Id.*

## II. Perpetual Futures Contracts

6. "Perpetual contracts are derivative contracts that have no fixed expiration date, and which rely on a periodic funding rate mechanism, rather than a fixed expiration date, to maintain relatively price parity with the underlying asset's spot price." **Exhibit A** (hereinafter Administrative Record or "AR") 10–11.

7. Perpetual contracts "eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates." AR2 (internal citations omitted).

8. The concept of a perpetual future has existed for decades. *See* Robert Shiller, *Measuring Asset Values for Cash Settlement in Derivatives Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, NBER Technical Working Paper #131 (1992). In recent years, perpetual futures have begun trading outside the United States. In 2025, perpetual futures traded nearly $90 trillion in volume offshore. *See* Anastasia Chernikova, *How Perpetual Futures Could*

*Make More Assets Tradable*, Forbes (Aug. 27, 2026), https://www.forbes.com/sites/digital-assets/2026/08/27/how-perpetual-futures-could-make-more-assets-tradable/.

9. On April 21, 2025, the CFTC sought feedback from the derivatives marketplace on how DCMs could list perpetual contracts structured as futures. **Exhibit D.** The Commission asked commenters to address "[s]hould Perpetual Derivatives be classified as swaps or futures contracts?" *Id.* at 3.

10. On May 21, 2025, CME responded to the Commission's April 21, 2025, request for comment. **Exhibit E.** CME stated that "depending on how they are structured, certain perpetual-style derivatives may accurately be classified as futures, while others may be swaps." *Id.* at 2. CME "recommend[ed] focusing less on what a 'perpetual derivative' is" and more on making "clear to the marketplace whether the product is classified as a futures contract or a swap." *Id.*

11. On May 21, 2025, Cboe Global Markets, Inc. ("Cboe") also responded to the Commission's April 21, 2025, request for comment. **Exhibit F**. Cboe stated that it should be "up to the exchange listing any perpetual derivatives product to determine whether a new contract is to be listed as a future or swap." *Id.* at 2. It also stated: "A perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price," like "a funding rate mechanism." *Id.* Cboe also explained that "[p]erpetual futures products may provide advantages that complement rather than replace traditional futures or spot markets. Cboe anticipates these products will serve as an addition to the existing ecosystem rather than subsuming traditional markets." *Id.* at 3. "Indeed, volumes in offshore perpetual derivative contracts, namely on digital assets, demonstrate a clear demand for perpetual futures products and

suggest there is a segment of the market that is not served by current U.S. futures product offerings. Perpetual futures simply represent another futures instrument through which market participants can meet different investment goals and manage risk." *Id.* at 4.

12. On July 30, 2025, the President's Working Group on Digital Asset Markets issued a report "recommend[ing] that the CFTC and Securities and Exchange Commission . . . permit eligible market participants to access derivatives, including perpetual contracts, through regulated intermediaries and that the agencies use existing exemptive and interpretative authorities to provide near-term clarity for innovative derivatives products." AR11.

## III. Approval of BTCPERP Contract

13. Against this backdrop, KalshiEX, LLC ("Kalshi"), a CFTC-registered derivatives exchange, commenced efforts to offer perpetual futures for trading and clearing in the United States. On February 18, 2026, counsel for Kalshi shared with the CFTC a memorandum of law titled "Categorization of Proposed Perpetual Contracts." AR101–110. This memorandum describes why perpetual derivatives "exhibit all of the relevant characteristics of futures contracts." AR104. Surveying the CEA, the caselaw, and regulatory developments, the memorandum maintained "that futures contracts are distinguished by standardization, fungibility, offset, and exchange trading," and that perpetual contracts "will exhibit all of the[se] futures contract characteristics." AR106. Furthermore, "other DCMs and DCOs already offer 'perpetual-style' futures contracts that are designed to mimic the economics of [perpetuals]," as well as "retail leveraged Bitcoin spot transactions," both of which "bear a high degree of economic similarity to" perpetuals. AR109–10. The memorandum urged the Commission to "ensure a consistent regulatory treatment across economically equivalent transactions." AR110.

14. On February 27, 2026, counsel for Kalshi asked the CFTC's Division of Market Oversight ("DMO") to confirm that it would "not recommend that the Commission stay Kalshi's listing of Perpetual Contracts . . . solely on the basis that Kalshi certifies the Perpetual Contracts as contracts of sale of a commodity for future delivery . . . rather than swaps." AR92. Kalshi requested a no-action opinion to support a pending application from its derivatives clearing organization, Kalshi Klear, to amend its registration and allow futures to be cleared. AR93–94.

15. On March 18, 2026, Kalshi submitted a draft request to list a bitcoin perpetual contract as a future under Commission Rule 40.3 ("BTCPERP Contract"). AR57–110.

16. On May 28, 2026, Kalshi submitted an amended application under Rule 40.3 to list its BTCPERP Contract as a future. AR13–56.

On May 29, 2026, the CFTC issued an order approving Kalshi's application to list its BTCPERP Contract as a future. AR1–9. The Order recounts in detail Kalshi's argument for why perpetual futures are, in fact, futures. AR2–5. "[B]ased on the Commission's review of Kalshi's analysis of the categorization of the BTCPERP Contract," the Commission found that "listing the BTCPERP Contract or making the BTCPERP Contract available for clearing or trading as a futures contract – a contract for sale of a commodity for future delivery – would not violate the CEA or the Commission's regulations thereunder." AR6. The Commission elaborated that its finding was "additionally informed by certain characteristics of the bitcoin spot market that allow that funding rate mechanism to function consistently with DCM Core Principle 3." AR6–8. The Commission's approval is applicable to any "similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities." AR8. Therefore, any DCM—not just Kalshi—can list perpetual futures on digital assets by self-certifying to the Commission that the contracts comply with the CEA and Commission regulations. *See* 17 C.F.R. § 40.2.

17. On May 29, 2026, the CFTC promulgated a policy statement in which it recommended "that perpetual contracts that reference asset classes not contemplated in the Order [approving the Kalshi BTCPERP Contract] should be submitted for Commission review and approval . . . pursuant to [Rule] 40.3." AR10–12 (91 Fed. Reg. 33,160–62 (published June 3, 2026)).

18. The Commission's Division of Market Oversight subsequently issued no-action relief allowing DCMs to remove expiration dates from the terms and conditions of their existing perpetual-style futures contracts (*i.e.*, futures contracts with long-distant expirations and a funding-rate mechanism) on broad-based security indices. **Exhibit G.**

## IV. CME's Prior Views on the Relationship Between Futures and Swaps

19. CME's position in this litigation is that perpetual futures categorically fit the statutory definition of "swap" and therefore are categorically not "futures." Compl. ¶ 11. That is in significant tension with CME's prior discussions of the relationship between futures and swaps.

20. Most recently, CME stated that "certain perpetual-style derivatives may accurately be classified as futures, while others may be swaps." **Exhibit E at 2.**

21. In addition, shortly after the "swap" definition was enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the CFTC and the Securities Exchange Commission (SEC) issued "proposed rules and proposed interpretative guidance" on the definition of "swap." *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 76 Fed. Reg. 29,818 (May 23, 2011).

22. On July 22, 2011, CME provided comments on the CFTC's proposed rules on the swap definition. **Exhibit H.** In its comments, CME offered the following observations on the distinctions between swaps and futures after Dodd-Frank:

a. "Swap and futures contracts can be designed to replicate the same economic exposure to an underlying instrument, commodity or asset—making them indistinguishable in material economic effect for the user." *Id.* at 2.

b. "Such equivalency makes it extremely difficult, if not impossible, to separately define and categorize economically equivalent swaps and futures. That swaps and futures can be economic equivalents is not new and has existed for decades." *Id.* "Historically, however, swaps were distinguishable from futures" on the following grounds: (1) swaps lacked "standardization," whereas futures were "[f]ully standardized"; (2) swaps were "[p]rivately negotiated among sophisticated investors," while futures are "[t]raded on or subject to the rules of a formal exchange;" (3) swaps were "[l]argely exempt from regulation" whereas futures were "[c]omprehensively regulated, and (4) swaps "[g]enerally entail bilateral counterparty credit exposures," whereas futures had a "[c]entralized clearing model whereby exchange clearing houses, through legal novation, become the buyer to every seller and the seller to every buyer." *Id.* at 2–3.

c. The Dodd-Frank Act eliminated "virtually all significant distinctions between futures and swaps." *Id.* at 4. "[T]he definition of swap in [Dodd-Frank] arguably describes … many of our [] mature, successful [futures] products," but "[t]here is nothing in the statute or legislative history to suggest that Congress intended for the

Commission to change the existing market structure" by requiring its futures to be traded as swaps. *Id.* at 5.

d. The Dodd-Frank Act "does not—either in letter or spirit—force market participants out of the futures market and into the swaps market, or vice versa." *Id.* at 4. Rather, "market participants retain the option to trade products as either 'futures' or 'swaps.'" *Id.*

e. CME recommended that "[t]he Commission should confirm that identical products may be listed for trading by different venues — even the same platform — one bearing the label 'future' and one 'swap.'" *Id.* at 5.

23. In the final rule, the CFTC and SEC stated that "it is difficult to distinguish between futures and swaps on a blanket basis," but that "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view." *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48,208, 48,303 (Aug. 13, 2012).

24. CME also has claimed that periodic funding-rate payments between "longs" and "shorts" demonstrates that perpetual futures are swaps. But CME's futures are "marked to market" each day, which involves an exchange of payments between opposite sides of futures contracts. Thus, "[i]n the futures markets, losers pay winners every day." **Exhibit I.**

## V. CME's Financial Performance Since the Commission's Approval Order

25. After the Commission approved perpetual futures on digital assets, and throughout the third quarter of 2026, CME's cryptocurrency futures have seen substantial growth in trading volume:

| | May 2026 | June 2026 | July 2026 | Aug. 2026 | Sept. 2026 | Net Change |
|---|---|---|---|---|---|---|
| Bitcoin | **259,329** | 292,118 | 246,072 | 298,958 | **267,693** | **+8,364** |
| Micro Bitcoin | **1,113,719** | 1,611,107 | 1,117,816 | 1,370,250 | **1,354,088** | **+240,369** |
| Ether | **326,981** | 369,358 | 320,040 | 344,084 | **378,292** | **+51,311** |
| Micro Ether | **735,326** | 960,484 | 674,601 | 787,603 | **911,822** | **+176,496** |
| Solana | **83,515** | 88,533 | 70,002 | 89,016 | **101,607** | **+18,092** |
| Micro Solana | **40,474** | 41,572 | 29,117 | 52,553 | **61,160** | **+20,686** |
| Link | **1,390** | 487 | 247 | 758 | **1,050** | **-340** |
| Micro Link | **6,198** | 2,418 | 1,187 | 5,509 | **11,308** | **+5,110** |
| XRP | **46,749** | 49,742 | 37,846 | 43,501 | **59,117** | **+12,368** |
| Micro XRP | **44,729** | 39,694 | 24,539 | 52,588 | **113,936** | **+69,207** |
| Sui | **217** | 183 | 251 | 455 | **1,655** | **+1,438** |
| Micro Sui | **2,333** | 2,895 | 1,981 | 10,863 | **20,802** | **+18,469** |
| Total Contracts | **2,660,960** | 3,458,591 | 2,523,699 | 3,056,138 | **3,282,530** | **+621,570** |

*See* **Exhibit J at 1–2; Exhibit K at 1–2; Exhibit L at 1–2; Exhibit M at 1–2; Exhibit N at 1–2.**

26. On CME's Q2 2026 earnings conference call, CEO and Chairman Terry Duffy was asked about perpetual futures. *See* **Exhibit O** (introductory remarks); Audio Recording of CME's Q2 2026 Conference Call at https://www.youtube.com/watch?v=NWbWqIvaFuA ("Audio").[1] On the call, representatives of CME made the following statements:

a. Duffy confirmed "[p]erpetual futures … do not appeal to our core customers. Through the first half of 2026, 94% of our volume originated from institutional customers. Perpetual futures are in no way substitutes for the institutional hedging

[1] Defendants have been unable to locate a public earnings call recording or transcript published by CME.

tools that these customers rely on. Perpetuals do not provide price or time certainty, two necessary components for hedging exposures. Furthermore, when taking into account both the transaction fee and the daily funding costs, the total cost to trade perpetual futures is typically orders of magnitude more expensive than our highly efficient futures contracts." Audio 3:03; *see also* **Exhibit O at 3.**

b. CME has "the full technical and operational capabilities to launch perpetual futures. In fact, we have contract specifications and are prepared to bring these products to market should evolving demand or structural shifts make it appropriate to do so. However, we have not heard demand from our customers for these products." Audio at 4:00; *see also* **Exhibit O at 3–4.**

c. Duffy stated that "crypto perpetuals are not new and existed before [CME] even launched [its] crypto futures complex." Audio at 4:26. CME's "futures fill a market need that [is] not met by traditional crypto products including perpetuals." *Id.* at 4:40. And CME's "crypto futures volume is up over 7-fold in the past 3 years, despite the existence of crypto perpetuals." *Id.* at 4:47. *See also* **Exhibit O at 4.**

d. Duffy stated that he has "spent a lot of time … talking to the highest levels of those institutions who participate in our business," Audio at 9:33, that one energy firm "reassured [him] 19 times that [he] asked them if they wanted [him] to list [this product]," and that "[t]hey do not want this product," *id.* at 10:20. CME was confident that offering perpetual futures contracts "does not work for" its customers and CME's products are "critically important to what they do to manage their business." *Id.* at 10:40.

e. Duffy was asked "why on the retail side you don't think there's demand yet?" *Id.* at 12:30. In response, Duffy made a "really important" point "as it relates to perpetuals" which is "zero" people are "talking" about the funding rate or "auto-liquidation risk management on back end of the market" as it relates to perps. *Id.* at 13:21. The "only thing they're talking about [with] a perpetual is there is no expiration date associated with it. I will tell you that we are not seeing anybody, nor do we hardly ever see anybody in the retail division hold onto these products long enough to ever go to an expiration. That is not the issue. I have clearly outlined, if they did, the cost associated with going to roll the product versus paying the funding rate and the cost to trade the product, which is sevenfold higher than CME's execution cost, would way overshadow the cost that it would be to roll your position. That demand is still not there." *Id.* at 13:43.

f. Duffy said: "I'm a pretty forward straight shooter," and "if I thought we needed to list these [perpetual futures], we would do so. And I said that we were prepared to do it if we needed to do it. But that's not what we are hearing." *Id.* at 11:32.

g. When asked whether CME saw "symbiotic opportunities between listed futures and perpetual futures in the long run, should they become a more substantial market for speculative retail," *id.* at 50:10, CME's CEO responded that he "do[es] see opportunities," *id.* at 50:23. "Some of these entities that are listing some of these products, whether they're perps or other type of products on retail, I think directly or indirectly could benefit CME greatly as time continues to move forward." *Id.* at 50:57. "It's like an incubator system that I'm not paying for, and they are." *Id.* at 51:09. Further: "I think that some of these new online offerings could feed right

into the growth of CME's retail business with the products that we have and the cohort of institutions that we have." *Id.* at 52:09. And again: "I look at the competition and the landscape of this world as it relates to retail, and I can actually see a benefit of them coming into our markets ultimately." *Id.* at 53:14.

h. Tim McCourt, CME's Senior Managing Director and Global Head of Equities, FX, and Alternative Products, confirmed that CME's cryptocurrency business "has continued to grow year-over-year . . . alongside the existence of perpetuals and the crypto native ecosystem outside the U.S." *Id.* at 14:28.

i. McCourt touted the growth of CME's cryptocurrency products suite "despite the slightly more muted volatility environment we're seeing in crypto and that is in place with perpetuals being introduced the last two weeks." *Id.* at 15:00. CME's "suite of crypto products . . . grew 32% compared to Q2 2025, [its] suite of cryptocurrency futures and options is up 44% for H126 vs. H125, is up 76% in June [2026] versus June of 2025." *Id.* at 14:45.

j. According to McCourt, CME's cryptocurrency product suite volume was "between $4.5 billion and $6.5 billion per day of trading . . . versus about $270 million at the Bitcoin perp introduced by Kalshi in the month of July." *Id.* at 15:19.

k. McCourt also confirmed that CME's open interest, "which is a proxy for risk management and access to these markets," was at "between $9 and $10 billion of average daily open interest for June and July versus $10 million of open interest in [Kalshi's] perpetual product that was introduced at the end of May [or] beginning of June." *Id.* at 15:35.

l. McCourt declared that "these numbers speak for themselves and our long . . . almost nine-year growth trajectory of serving [the cryptocurrency investor] community along with the introduction of additional cryptocurrency futures." *Id.* at 15:55. Ultimately, "we've seen over $1.5 billion traded over the first 8 weekends with a significant participation of retail," and so "we think the retail community in cryptocurrency is adequately served alongside the institutional community of clients at CME Group." *Id.* at 16:10.