# EXHIBIT A

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

---

In the Matter of the Request for Approval
by KalshiEX LLC of the BTCPERP Futures Contract

---

## ORDER APPROVING KALSHIEX LLC BTCPERP FUTURES CONTRACT

On May 28, 2026, KalshiEX LLC ("Kalshi" or the "Exchange"), a designated contract market ("DCM"), submitted to the Commodity Futures Trading Commission (the "Commission") for review and approval, pursuant to section 5c(c)(4) of the Commodity Exchange Act ("CEA") and Commission Regulation 40.3, a perpetual futures contract that references the spot price of bitcoin (the "BTCPERP Contract").[1]

## THE BTCPERP CONTRACT

The BTCPERP Contract is a cash-settled derivative contract that references the spot price, in U.S. dollars, of one bitcoin, as measured by the CF Benchmarks Bitcoin Real Time Index ("BRTI").[2] The BRTI provides a continuous measure of the U.S. dollar price of bitcoin, derived from observable transactions on major crypto asset trading platforms.[3] The BRTI is administered by CF Benchmarks Ltd. ("CF Benchmarks"), which is the source agency for the

---

[1] Kalshi, KalshiEX LLC– Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the BTCPERP Futures Contract (May 28,2026) (the "Submission").

[2] *Id*. at 3 and App. A at 8-11.

[3] *Id*. at App. A at 8, App. C at 14-15, and App. D at 16-18.

BTCPERP Contract.[4] The BTCPERP Contract will trade in units of one ten-thousandth (1/10,000) of one bitcoin. It will trade 24 hours per day, 7 days per week, throughout the lifetime of the contract, subject to any trading halts imposed by the Exchange.

The BTCPERP Contract has an indefinite (or "perpetual") term, such that it will not expire on a fixed date. Positions are marked to market on a continuous basis. In order to maintain price convergence with the underlying reference price, the BTCPERP Contract employs a periodic funding mechanism whereby long and short position holders exchange funding payments that are based on the difference between the contract's mark price and the underlying reference price.

According to Kalshi, the BTCPERP Contract's "perpetual structure, combined with the funding rate mechanism is designed to maintain convergence with the spot reference price, makes the [BTCPERP] Contract functionally superior to dated alternatives for participants whose economic exposure [to bitcoin] is itself perpetual or indefinite in duration."[5] In this regard, Kalshi explains that perpetual contracts such as the BTCPERP Contract "eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates."[6]

## CONTRACT CLASSIFICATION

As required by Commission Regulation 40.3(a)(4), Kalshi included with its request for Commission approval of the BTCPERP Contract an explanation and analysis of the contract and

---

[4] CF Benchmarks is authorized by the UK Financial Conduct Authority under the EU/UK Benchmarks Regulation (FRN 847100), with compliance independently audited by KPMG under ISAE 3000 reasonable assurance. Submission, App. C at 14-15 and App. D at 16.

[5] *Id*. at App. C at 14.

[6] *Id*.

its compliance with applicable provisions of the CEA, including DCM Core Principles and the Commission's regulations thereunder.[7] Kalshi states that, based on its analysis, Kalshi is of the view that the BTCPERP Contract is appropriately categorized as a "futures contract" – a contract for sale of a commodity for future delivery – for purposes of compliance with the DCM Core Principles and other provisions of the CEA and Commission regulations thereunder.[8]

Kalshi states that it analyzed whether the BTCPERP Contract "constitutes a futures contract by evaluating the contract's characteristics against relevant judicial precedent and Commission guidance."[9] Kalshi notes that "[n]either the CEA nor Commission [regulations thereunder] offer a fixed definition of what constitutes a "futures contract,"' and that the Commission and courts have instead "assess[ed] each transaction 'as a whole with a critical eye toward its underlying purpose' by evaluating whether certain characteristics common to futures contracts are present."[10]

Kalshi explains that, historically, the Commission has described futures contracts "as 'standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or "margin" . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities.'"[11] Kalshi notes that courts "have similarly

[7] *Id*. at 1-3, App. E, and App. F.

[8] *Id.* at App. E at 20.

[9] *Id.*

[10] *Id.,* quoting *CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").

[11] Submission at App. E at 20, quoting *In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) (*"Stovall"*).

focused on standardization, fungibility, and offset as the key characteristics of futures contracts."[12]

Kalshi further notes, however, that more recently, in the case of contracts involving intangible commodities such as bitcoin, courts have shifted away from the kind of "totality of circumstances" analysis described above and "have identified whether an executory contract is a futures contract based on whether there is trading 'in the contract.'"[13] Kalshi states that, when evaluating whether trading "in the contract" exists for a given contract, "courts have looked to whether the contract is standardized and fungible, as evidenced by (i) the contract trading at a fixed, standardized unit quantity, (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements, and (iii) the ability of holders to exit their positions by offset."[14]

Kalshi submits that the BTCPERP Contract "will exhibit all of these futures contract characteristics: the [BTCPERP] Contract will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to … [a] central counterparty; holders will be able to exit their positions via offset; the [BTCPERP] Contract will be available to the general public, including retail participants; parties will enter into the [BTCPERP] Contract for the purpose of assuming or shifting the risk of change in value of the [u]nderlying [(*i.e.*, bitcoin)],

---

[12] Submission at App. E at 20, citing, as an example, to *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."), and to *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[13] *Id*. at App. E at 21, citing, as examples, to *CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) (*"Erskine"*), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) (*"CME v. SEC"*).

[14] *Id*. at App. E at 21(internal citations omitted).

without the possibility of transferring ownership of the [u]nderlying; and the [BTCPERP] Contract will trade on the centralized market of a DCM."[15]

Kalshi then analyzes whether the indefinite duration of the BTCPERP Contract should affect its categorization as a futures contract. Kalshi states that while courts, at times, have described a futures contract "as providing for the purchase or sale of a commodity 'at a fixed date in the future,' or 'on a date certain,' or 'at or before a stated future time,'"[16] courts have not viewed this characteristic as *necessary* to conclude that a contract is a futures contract.[17] Rather, Kalshi states that "courts have repeatedly explained that, '[w]hile futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[18] In particular, Kalshi notes that "the Seventh Circuit in *CME v. SEC* concluded that contracts of 'indefinite duration' can possess the attribute of 'futurity' – generally associated with futures contracts – because futurity means 'value that is set in the future' and exists where contracts provide for future executory payment obligations, not only where a contract has a final settlement date and fixed term."[19]

Based on its analysis, Kalshi concludes that the BTCPERP Contract is appropriately categorized as a "futures contract" – a contract for sale of a commodity for future delivery – and states that Kalshi intends to treat the BTCPERP Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder.[20]

---

[15] *Id*. at App. E at 21.

[16] *Id.* at App. E at 21(internal citations omitted), quoting, respectively, *CME v. SEC* at 542, *Tauber* at 971, and *Erskine* at 323.

[17] *Id.* at App. E at 21.

[18] *Id*. at App. E at 21-22, quoting *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29.

[19] *Id*. at App. E at 22, citing to *CME v. SEC* at 541.

[20] *Id*. at App. E at 22.

## LEGAL STANDARD

CEA section 5c(c)(5)(B) provides that, where a DCM has requested that the Commission approve a new contract pursuant to CEA section 5c(c)(4), the Commission shall approve the new contract unless the Commission finds that the contract violates the CEA, including the Commission's regulations.[21]

## FINDINGS AND RULINGS

Kalshi seeks Commission approval of the BTCPERP Contract, which it categorizes as a perpetual futures contract on the price of bitcoin, with a periodic funding rate mechanism designed to maintain price convergence with the underlying.

Having reviewed the complete record in this matter, the Commission makes the following findings:

The Commission finds that listing the BTCPERP Contract or making the BTCPERP Contract available for clearing or trading as a futures contract – a contract for sale of a commodity for future delivery – would not violate the CEA or the Commission's regulations thereunder. This finding is based on the Commission's review of Kalshi's analysis of the categorization of the BTCPERP Contract, as described above. This finding is additionally informed by certain characteristics of the bitcoin spot market that allow that funding rate mechanism to function consistently with DCM Core Principle 3.

Traditional futures contracts converge to the spot price because at expiry of the futures contract, the potential obligation to make or take delivery, or make a payment based on the settlement reference price, incentivizes the futures contract's price to converge to the spot market price of the underlying commodity. That terminal convergence is why a futures contract is a

[21] 7 U.S.C. § 7a-2(c)(5)(B).

hedging and price discovery instrument. A perpetual contract has no expiry and requires a different convergence mechanism. The BTCPERP Contract uses a funding rate mechanism. Market participants with long and short positions exchange periodic payments based on the difference between the mark price of the contract and a reference price that continuously changes reflecting the underlying spot market price. When the price of the contract is above the spot price, market participants with long positions are required to pay on settlement, while market participants with short positions receive payments; when the price of the contract is below the spot price, the reverse occurs. The requirement to make these payments imposes a periodic cost on whichever side is "trading away" from the spot price, creating a continuous economic incentive for the price of the contract to converge towards the spot price. When the price of the contract is below the spot price, there is an incentive to buy the contract to receive periodic payments, which drives up the price of the contract. When the price of the contract is above the spot price, the reverse is true.

Characteristics of the underlying bitcoin spot market support the effective functioning of the funding rate mechanism employed by the BTCPERP Contract, helping to ensure the accuracy of the periodic funding payments, promoting convergence, and reducing the susceptibility of the contract to manipulation. The bitcoin spot market trades 24/7 across broadly distributed trading venues, which allows for the reference price underlying the BTCPERP Contract to be continuously observable while the contract is trading. This broadly distributed trading and continuous observability protects against settlement payments being calculated against stale or synthesized prices that are less reliable convergence signals. Trading in the bitcoin spot market is also deep and liquid, such that the contract reference price cannot be changed at a relatively low cost. If the spot market were thinly traded, a market participant holding a large position in

the contract would need to spend relatively little to move the spot market price at the moment the settlement payment is calculated and thus receive larger settlement payments on the large position. Further, 24/7 trading in the spot bitcoin market enables arbitrageurs to trade in the spot market when they trade the BTCPERP Contract; otherwise, the price convergence incentive could not be acted upon in real time, and price dislocations could grow, triggering liquidations or leading to settlement at distorted levels before the spot market reopens. Accordingly, the deep, broadly distributed, active, and continuous trading in the bitcoin spot market supports the design of the BTCPERP Contract as a perpetual futures contract.

For the reasons set forth above, the Commission has determined that it would not violate the CEA or the Commission's regulations thereunder for Kalshi and other DCMs to list for trading, as futures contracts, the BTCPERP Contract.[22] Contract categorization analysis is done on a case-by-case basis, and the analysis in this Order is, therefore, limited to the BTCPERP Contract and similarly structured perpetual contracts that reference the spot price of bitcoin or other digital commodities[23] that have deep, active, and continuous spot market trading. This analysis does not extend to underlying asset classes other than digital commodities.[24] The Commission expects in the future to address the regulatory treatment of, and compliance considerations relating to, perpetual contracts more generally, but notes at this time that certain

---

[22] Any contract that a DCM seeks to list for trading must comply in all respects with applicable requirements of the CEA, including the DCM Core Principles, and Commission regulations thereunder. A DCM should ensure the compliance of any contract that it seeks to list for trading and should include in a contract submission to the Commission, pursuant to Part 40 of the Commission's regulations, the information prescribed by those regulations relating to contract compliance. Compliance with the requirements of the CEA and Commission regulations thereunder is assessed by the Commission on a contract-by-contract basis.

[23] For purposes of this Order, the term "digital commodity" has the meaning assigned to it in the U.S. Securities and Exchange Commission and CFTC guidance concerning the application of the federal securities laws to certain types of crypto assets and certain transactions involving crypto assets. *See* Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, 91 Fed. Reg. 13,714, 13,718 (Mar. 23, 2026), available at: https://www.federalregister.gov/d/2026-05635/p-105.

[24] The Commission encourages market participants that seek to list perpetual contracts on underlying asset classes other than digital commodities to engage with the Commission and CFTC staff.

jurisdictional[25] and market attributes of the asset class underlying a perpetual contract – including the presence, or absence, of continually available spot price data – may be relevant to such regulatory treatment and compliance considerations.

The Commission has reviewed the information and documentation that Kalshi included with its request for Commission approval of the BTCPERP Contract, including its explanation and analysis of the contract pursuant to Commission Regulation 40.3(a)(4), and finds that the BTCPERP Contract does not violate the CEA, including the Commission's regulations thereunder.

**NOW THEREFORE:**

**IT IS HEREBY ORDERED** that, pursuant to section 5c(c)(5)(B) of the CEA and Commission Regulation 40.3, the BTCPERP Contract is hereby approved to be listed for trading on Kalshi, and made available for clearing, as a contract for sale of a commodity for future delivery, or "futures contract."

**ACCORDINGLY**, as futures contracts, customer positions in BTCPERP Contracts, and collateral margining of such positions, shall be held in the futures account at both the futures commission merchant and the derivatives clearing organization.

Issued in Washington, DC, on this 29th day of May, 2026.

By the Commission,

Christopher J. Kirkpatrick
Secretary of the Commission

[25] These types of asset classes include, but are not limited to, agricultural products, precious metals, equity securities, and narrow-based security indexes. Each asset class will raise different considerations and merit independent analysis and review based on their unique circumstances. For example, perpetual contracts are likely particularly ill-suited for agricultural products based on the considerations identified in the Order, while perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission.

program in the same application under appeal during the next quarter of the program, but both of these filings count towards appellant's petition filing limit.

## III. Prosecution of the Application Granted Special Status Under the Pilot Program

*A. Replies by the Applicant Under the Pilot Program*

The time periods set for reply in Office actions for an application granted special status under the pilot program will be the same as those set forth in section 710.02(b) of the MPEP. A reply to an Office action must be fully responsive to the rejections, objections, and requirements made by the examiner. Any amendment filed in reply to an Office action may be treated as not fully responsive if it attempts to: (1) add claims that would result in more than three independent claims or more than 20 total claims pending in the application; or (2) add any multiple dependent claim(s).

If a reply to a non-final Office action is not fully responsive for failing to comply with the pilot program's claim requirements but is a bona fide attempt to advance the application to final action, the examiner may, at the examiner's discretion, issue a Notice of Non-Responsive Amendment and provide a shortened statutory period of two months for the applicant to supply a fully responsive reply. Extensions of this time period under 37 CFR 1.136(a) to the Notice of Non-Responsive Amendment will be permitted, but in no case can any extension carry the date for reply to this notice beyond the maximum period of six months set by statute (35 U.S.C. 133). However, any further non-responsive amendment typically will not be treated as bona fide, and as such, the time period set in the prior notice will continue to run.

*B. After-Final and Appeal Procedures*

Any amendment, affidavit, or other evidence after a final Office action and prior to appeal must comply with 37 CFR 1.116. During the appeal process, the application will be treated in accordance with the normal appeal procedure (*see* MPEP Chapter 1200) unless the appeal is granted special status under this program or another program.

*C. Application Cannot Be Withdrawn From the Pilot Program*

There is no provision to withdraw an application undergoing expedited examination from the pilot program. An applicant may abandon an application that has been granted special status under the pilot program in favor of a continuing application. A continuing application will not be granted special status based on the petition filed in the parent application. Each application (including each continuing application) must, on its own merit, meet all requirements for special status under the pilot program, and be accompanied by its own petition as detailed in Part I above.

## IV. Conduct of Appeals Accepted Into the Pilot Program

*A. Hearings*

A petition to participate in the pilot program may be filed for *ex parte* appeals in which the appellant seeks an oral hearing before the PTAB, that is, ''heard'' appeals, as well as those appeals for which no oral hearing is requested, that is, ''on-brief'' appeals. Hearings in *ex parte* appeals accorded special status under the pilot program will be conducted according to the standard PTAB hearing procedures. Appellants seeking an oral hearing should submit, along with the request for oral hearing, any preferences as to the time, date, or location of the hearing. The PTAB will make best efforts to schedule a hearing in accordance with such preferences. If the PTAB is unable to accommodate an appellant's preferences, it will schedule the hearing in an available hearing room at any office, including a regional office. An appellant may waive the hearing and continue under the pilot program for consideration and decision on the briefs. An appellant may not reschedule the date or time of a hearing and remain in the pilot program. If an appellant in an *ex parte* appeal accorded expedited status must reschedule the date or time of a hearing and is not willing to waive the oral hearing, then the appellant may opt out of the pilot program, thereby regaining the ability to reschedule or relocate the hearing as per standard PTAB hearing procedures.

*B. Termination of Expedited Status of Appeal*

Under the pilot program, special status will be maintained in an *ex parte* appeal from the date the petition for inclusion in the pilot program is granted until the PTAB's jurisdiction ends under 37 CFR 41.35(b). Activities subsequent to an appellant's withdrawal from the pilot program or the PTAB's decision, including any reopened prosecution, will not be treated as subject to expedited status, nor will filing a petition to expedite an appeal under the pilot program cause an application to be accorded expedited status outside the jurisdiction of the PTAB. Additionally, any request by an appellant causing a delay in the conduct of the appeal, such as for an extension of time under 37 CFR 1.136(b) or for additional briefing, will be cause for removal of expedited status.

**John A. Squires,**

*Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

[FR Doc. 2026–11098 Filed 6–2–26; 8:45 am]

BILLING CODE 3510–16–P

## COMMODITY FUTURES TRADING COMMISSION

## Policy Statement Concerning the Listing of Perpetual Contracts

**AGENCY:** Commodity Futures Trading Commission.

**ACTION:** Policy statement.

**SUMMARY:** This policy statement describes the views of the Commodity Futures Trading Commission (the ''CFTC'' or ''Commission'') concerning the listing of perpetual contracts. Contemporaneously with the issuance of this policy statement, the Commission has issued an order (the ''Order'') permitting the listing of a perpetual contract that references the spot price of bitcoin by a designated contract market (''DCM'') as a futures contract. Given the unique characteristics of perpetual contracts, which tend to vary based on the underlying asset they reference, the Commission is of the view that the case-by-case review process detailed in Commission Regulation 40.3 is appropriate for the listing of perpetual contracts that reference asset classes that are not contemplated in the Order.

**DATES:** The Commission's policy statement is adopted as of May 29, 2026.

**FOR FURTHER INFORMATION CONTACT:** Roger Smith, 202–418–5344, *rsmith@cftc.gov,* Division of Market Oversight, Commodity Futures Trading Commission, 77 West Jackson Blvd., Suite 800, Chicago, Illinois 60604 or Stephen Andrews, Deputy General Counsel for Regulation, 202–308–7563, *sdandrews@cftc.gov,* Office of the General Counsel, Commodity Futures Trading Commission, Three Lafayette Centre, 1151 21st Street NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

## I. Introduction and Background

Perpetual contracts are derivative contracts that have no fixed expiration date, and which rely on a periodic

funding rate mechanism, rather than a fixed expiration date, to maintain relative price parity with the underlying asset's spot price. Perpetual contracts have become a dominant form of crypto derivative trading in global markets. However, given the regulatory uncertainty concerning the appropriate classification of these types of contracts in the U.S. derivatives markets, the market for perpetual contracts has largely developed outside of the United States, with the majority of trading occurring on offshore trading venues.

The Commission has taken a series of steps over the past year to develop a workable domestic framework for these products. On April 21, 2025, Commission staff issued a Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (the "Request").[1] The Request solicited public input on the characteristics, use cases, regulatory classification, and risks of perpetual contracts. The Request was issued in conjunction with a Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis, which sought public input on the operational, surveillance, clearing, and margin implications of extending CFTC-regulated derivatives trading to a continuous basis.[2]

On July 30, 2025, the President's Working Group on Digital Asset Markets issued its report, Strengthening American Leadership in Digital Financial Technology (the "PWG Report").[3] The PWG Report recommended that the Commission and the U.S. Securities and Exchange Commission permit eligible market participants to access derivatives, including perpetual contracts, through regulated intermediaries and that the agencies use existing exemptive and interpretative authorities to provide near-term clarity for innovative derivatives products.

As discussed, this policy statement is being released in conjunction with the Order,[4] which approved the listing of a perpetual contract that references the spot price of bitcoin by a DCM as a futures contract. The Commission issues this policy statement to articulate, for the benefit of registrants, market participants, and the public, its view that perpetual contracts that reference underlying asset classes that are not contemplated in the Order[5] should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.[6]

This policy statement is a general statement of policy issued under 5 U.S.C. 553(b)(A). It does not impose any obligation on any person, modify or supersede any provision of the Commodity Exchange Act ("CEA") or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity, and is not subject to the notice-and-comment requirements of the Administrative Procedure Act. Each contract submitted to the Commission under part 40 will continue to be evaluated on its own terms.

## II. The Structural Distinctiveness of Perpetual Contracts

Traditional futures contracts rely primarily on a fixed expiration date to achieve convergence with the underlying asset's spot price. Futures contracts have emerged as a primary instrument in the U.S. derivatives markets for hedgers and traders to effectively secure a price for an asset today in connection with a transaction that will occur in the future. Price convergence with the underlying spot price at expiration is thus inherent to the design of a traditional futures contract and ultimately what makes them a useful instrument for hedging and price discovery.

A perpetual contract has no fixed expiration date through which it can achieve convergence. It therefore requires a substitute mechanism to maintain relative price parity with the underlying spot price of the asset that it references. The mechanism that has emerged in the global crypto asset markets is known as a funding rate, or a periodic payment between the long and short sides of the contract, the direction and magnitude of which is generally determined by the difference between the perpetual contract's market price and the underlying asset's spot price. When a perpetual contract trades above the spot price, the traders with long positions make payments while the traders with short positions receive payments; and vice versa. These payments are intended to create an economic incentive for market participants to arbitrage away the price differential by opening positions on whichever side of the market is accruing the payments. In this way, the funding rate is designed to keep closely aligned a perpetual contract's price to the underlying asset's price and functions as a replacement to the traditional expiration-based convergence mechanism upon which a futures contract typically relies.

Perpetual contracts raise novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency with the Core Principles applicable to registrants under the CEA. For example, a perpetual contract's design and characteristics raise important considerations with respect to DCM Core Principle 3, which requires that a DCM list only those contracts that are not readily susceptible to manipulation.[7] For a traditional, cash-settled futures contract, the susceptibility-to-manipulation analysis directed at the cash settlement reference price is an analysis of one moment in time: the settlement reference price must be reliable at expiry. For a perpetual contract, however, the reference must be reliable at every funding interval, without interruption, for as long as the contract remains active.

It is therefore the Commission's view that perpetual contracts that reference asset classes that are not contemplated in the Order should be submitted for Commission review and approval pursuant to the voluntary product approval process under Commission Regulation 40.3.

The Commission notes that Regulation 40.2 permits registrants to self-certify new products where the submitting registrant determines that the product complies with the CEA and Commission regulations thereunder.[8] However, given the novel characteristics of perpetual contracts, including their lack of a traditional expiration date and the complex questions concerning, among others, market structure and customer protections, the Commission

[1] CFTC Release No. 9069–25, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* (April 21, 2025).

[2] CFTC Release No. 9068–25, *Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis,* (April 21, 2025).

[3] President's Working Group on Digital Asset Markets, *Strengthening American Leadership in Digital Financial Technology* (July 30, 2025), available at *https://www.whitehouse.gov/wp-content/uploads/2025/07/Digital-Assets-Report-EO14178.pdf.*

[4] *See* Order Approving KalshiEX LLC BTCPERP Futures Contract, May 29, 2026.

[5] These types of asset classes include, but are not limited to, agricultural products, precious metals, equity securities, and narrow-based security indexes. Each asset class will raise different considerations and merit independent analysis and review based on their unique circumstances. For example, perpetual contracts are likely particularly ill-suited for agricultural products based on the considerations identified in the Order, while perpetual contracts that reference equity securities or narrow-based security indexes, among others, would benefit from review by the Commission and the U.S. Securities and Exchange Commission.

[6] 17 CFR 40.3.

[7] 7 U.S.C. 7(d)(3); *see also* 17 CFR part 38, app. C.

[8] 17 CFR 40.2.

believes that the public interest is best served by requiring perpetual contracts that reference assets that are not contemplated in the Order to undergo Commission review and approval pursuant to Commission Regulation 40.3.

### III. Submissions Under Commission Regulation 40.3

The Commission believes that the Commission Regulation 40.3 process provides important benefits for regulators, market participants, and the public. Prior review promotes transparency, facilitates engagement between Commission staff and registrants during product development, and provides greater regulatory clarity for market participants and members of the public seeking to responsibly innovate within the CFTC's regulatory framework.

In accordance with the purpose of the CEA, the Commission remains committed to promoting responsible innovation and fair competition in the U.S. derivatives markets.[9] The Commission believes that clear regulatory pathways and transparent supervisory expectations are essential to ensuring that emerging technologies and novel financial products can develop responsibly within regulated U.S. markets rather than migrating to less regulated jurisdictions outside of the United States.

This policy statement is intended solely to provide the Commission's views concerning the listing of perpetual contracts and does not alter or amend the CEA or the Commission's regulations thereunder. Nothing in this policy statement is intended to be binding or foreclose the possibility that, on appropriate facts and contract design, the Commission might in the future address perpetual contracts through separate policy statements, interpretative guidance, or the rulemaking process; the Commission makes no determination as to that possibility here.

Issued in Washington, DC, on May 29, 2026, by the Commission.

**Christopher Kirkpatrick,**

*Secretary of the Commission.*

**Note:** The following appendix will not appear in the Code of Federal Regulations.

[9] 7 U.S.C. 5(b).

### Policy Statement Concerning the Listing of Perpetual Contracts—Commission Voting Summary

On this matter, Chairman Selig voted in the affirmative. No Commissioner voted in the negative.

[FR Doc. 2026–11020 Filed 6–2–26; 8:45 am]

BILLING CODE 6351–01–P

## DEPARTMENT OF DEFENSE

### Office of the Secretary

**[Docket ID: DOD–2026–OS–1222]**

### Proposed Collection; Comment Request

**AGENCY:** Office of the Under Secretary of Defense for Acquisition and Sustainment (OUSD(A&S)), Department of Defense (DoD).

**ACTION:** 60-Day information collection notice.

**SUMMARY:** In compliance with the *Paperwork Reduction Act of 1995,* the OUSD(A&S) announces a proposed public information collection and seeks public comment on the provisions thereof. Comments are invited on: whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; the accuracy of the agency's estimate of the burden of the proposed information collection; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the information collection on respondents, including through the use of automated collection techniques or other forms of information technology.

**DATES:** Consideration will be given to all comments received by August 3, 2026.

**ADDRESSES:** You may submit comments, identified by docket number and title, by any of the following methods:

*Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Mail:* Department of Defense, Office of the Director of Administration and Management, Oversight and Compliance Directorate, Regulatory Division, 4800 Mark Center Drive, Mailbox #24, Suite 05F16, Alexandria, VA 22350–1700.

*Instructions:* All submissions received must include the agency name, docket number and title for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

**FOR FURTHER INFORMATION CONTACT:** To request more information on this proposed information collection or to obtain a copy of the proposal and associated collection instruments, please write to the Office of the Assistant Secretary of War for International Armaments Control, 3010 Defense Pentagon, Washington, DC 20301–3010, Katherine Coyne, 703–545–5899.

**SUPPLEMENTARY INFORMATION:**

*Title; Associated Form; and OMB Number:* America First Arms Transfer Strategy OMB Control Number 0704–AFAT.

*Needs and Uses:* Effective execution of Executive Order 14383 requires immediate, up-to-date market intelligence regarding defense articles and the private sector's current production capabilities, supply chain dependencies, product offerings, and export readiness. This information collection is a strategic market research effort to inform execution of Executive Order 14383. It is not an acquisition or procurement action, and no federal contracts will be solicited or awarded based on these submissions. The analysis derived from this collection will facilitate the analytical prioritization of U.S. defense articles, enabling the curation of a comprehensively assessed data set for the Government.

*Affected Public:* Businesses or other for-profit.

*Annual Burden Hours:* 375.

*Number of Respondents:* 150.

*Responses per Respondent:* 5.

*Annual Responses:* 750.

*Average Burden per Response:* 30 minutes.

*Frequency:* As required.

Dated: May 29, 2026.

**Aaron T. Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2026–11025 Filed 6–2–26; 8:45 am]

BILLING CODE 6001–FR–P

## DEPARTMENT OF EDUCATION

## DEPARTMENT OF LABOR

### Notice Announcing American History and Civics Education National Activities Program Competition; Correction

**AGENCY:** Department of Education; Department of Labor.

**ACTION:** Notice; correction.

May 28, 2026

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the BTCPERP Futures Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.3(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a designated contract market (DCM) registered with the Commission, hereby voluntarily submits the BTCPERP contract (the Contract) for Commission review and approval. The Exchange intends to list the Contract on a continuous basis. The Exchange intends to list this Contract shortly following approval by the Commission.

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Appendix B with enhanced trading prohibitions applicable to the Contract;
- Appendix C with further considerations regarding the Contract;
- Appendix D with information regarding the Source Agency for the Contract;
- Appendix E describing the Contract's compliance with the Core Principles;
- Confidential Appendix F with further information on the Contract's compliance with the Core Principles;
- Confidential Appendix G with the Exchange's agreement with the Source Agency; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**
**Summary: Bitcoin Perpetual Future**
**May 28, 2026**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Regulation 40.3(a)(4), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendices E and F), and the Commission's regulations thereunder.

### I. Introduction

The BTCPERP Contract is a perpetual futures contract related to digital assets.

**What is a perpetual future?** A perpetual future is a cash-settled futures contract with no fixed expiration or delivery date. Rather than converging to a deliverable cash price on a stated settlement day, it remains economically tethered to a continuously observed reference price through a periodic funding mechanism: at regular intervals, holders of the side trading at a premium to the reference price pay holders of the side trading at a discount, so that any divergence between the contract's mark price and the underlying spot price generates an offsetting carrying cost that draws the two back into alignment. The instrument therefore functions as an indefinitely renewing near-dated future, allowing a participant to hold a position open for as long as the underlying exposure persists without rolling from one expiration to the next.

**Why are these important?** Perpetual futures have become the dominant form of derivative and the principal locus of price discovery in the markets in which they have emerged, yet that activity occurs almost entirely on offshore, unregulated venues. Listing a perpetual on a CFTC-registered DCM brings this economically significant activity into a regulated environment featuring trade surveillance, know-your-customer verification, risk-based margin, central clearing, and disciplinary procedures consistent with the CEA, protecting U.S. participants and preserving U.S. price discovery rather than ceding both abroad. For hedgers whose economic exposure is itself continuous or indefinite—miners with ongoing production, ETP market makers and authorized participants carrying inventory, OTC desks, lenders holding collateral, and institutional holders of the underlying asset—a perpetual is structurally superior to a strip of dated futures: it eliminates roll cost and roll-date basis risk, tracks spot more tightly through the funding mechanism, and concentrates liquidity in a single instrument rather than fragmenting it across expirations. Listing a regulated domestic perpetual thus directly advances the Commission's stated objective of onshoring novel derivatives products that developed offshore due to regulatory uncertainty.

**Perpetuals are appropriate for Bitcoin, but likely not all commodities. Bitcoin is especially well-suited to the perpetual, 24/7 structure.** Bitcoin trades continuously and globally, has no delivery date, no storage or seasonality constraints, and no natural point of termination; the exposure it represents is itself perpetual. A cash-settled contract that never expires and stays tethered to spot through a funding mechanism therefore mirrors the economic reality of the underlying far more closely than a strip of dated futures, eliminating roll cost and roll-date basis risk for the continuous hedging needs described above. That fit is strongest for assets whose cash market is deep, continuously traded, and homogeneous across venues, as Bitcoin's is. Where a commodity's economic information lives instead in its calendar term structure — regional, seasonal, and grade- and location-specific cash prices, constrained deliverable supply, and date-certain physical exposure — dated contracts and the term structure they encode remain valuable hedging tools, so that the perpetual and dated structures are complementary rather than substitutes. The Commission should strongly consider and discuss with Exchanges whether or not such structures are appropriate and whether they comply with Core Principle 3’s requirements that Contracts not be readily susceptible to manipulation before novel perpetuals are listed.

The analysis that follows is strictly limited to Bitcoin, though many of its principles and arguments also would apply to other digital assets, in particular.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Appendices C, D and E and Confidential Appendix F.

**<u>General Contract Terms and Conditions:</u>** As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange’s Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract is a cash-settled futures contract with no fixed expiration date. Each Contract represents a continuous obligation to make or receive cash payments based on changes in the Contract’s mark price and periodic funding payments. Positions are marked to market on a continuous basis, and margin is collected and paid in accordance with the Exchange’s margin methodology. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. Members may enter and exit positions at any time during trading hours by executing offsetting trades. Members holding long positions profit when the Contract price increases and incur losses when it decreases; Members holding short positions profit when the Contract price decreases and incur losses when it increases. To maintain price convergence with the underlying reference price, the Contract employs a periodic funding mechanism whereby long position holders and short position holders exchange funding payments based on the difference between the Contract’s mark price and the Reference Price, as specified in

Appendix A. A Member's gain or loss at any point is equal to the change in the Contract's mark price since the position was established, multiplied by the Trading Unit, plus or minus net funding payments received or paid. Settlement of all payments is made in cash; no physical delivery occurs.

**CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.3, 17 C.F.R. § 40.3**

Based on the above analysis, the Exchange certifies that:

- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

______________________________

By: Xavier Sottile
Title: Head of Markets
Date: May 28, 2026

**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Appendix C - Further Considerations
Appendix D - Source Agency
Appendix E - Compliance with Core Principles
Appendix F - (Confidential) - Additional Compliance with Core Principles
Appendix G - (Confidential) - Agreement with CF Benchmarks

# APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**

# BTCPERP

**Scope:** These rules shall apply to this Contract.

**Underlying:** The Underlying for this Contract is the spot price of one Bitcoin (BTC) in U.S. dollars.

**Underlying Price Index:** For a given time t, the Underlying Price Index (UPIt) is the last recorded value of the CF Benchmarks Bitcoin Real Time Index.

**Source Agency:** The Source Agency is CF Benchmarks.

**Type:** The type of Contract is a Perpetual Futures Contract.

**Trading Hours:** 24 hours per day, 7 days per week, throughout the lifetime of the Contract, subject to any trading halts imposed by the Exchange.

**Trading Unit:** One ten-thousandth (1/10,000) of one Bitcoin (BTC).

**Price Quotation:** Prices for the Contract are quoted in U.S. dollars per one Bitcoin.

**Minimum Price Increment:** The Minimum Price Increment for the Contract shall be $1.00 per Bitcoin.

**Tick Value:** A one-increment price movement equals $0.0001 per Contract, calculated as the Minimum Price Increment multiplied by the Trading Unit ($1.00 × 1/10,000 BTC = $0.0001).

**Position Accountability Level:** $5,000,000 mark-to-market position value (in the case of a short position, the equivalent long position value is considered).

**Periodic Transfer Criterion:** At each Funding Calculation Interval, the Funding Rate is computed as defined below. If the Funding Rate is zero, no Periodic Transfer is made. If the Funding Rate is positive, long-side holders must contribute an amount equal to the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to short-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. If the Funding Rate is negative, short-side holders must contribute an amount equal to the absolute value of the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to long-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. Periodic Transfer obligations are determined at the end of each Funding Calculation Interval and are settled in cash at the next Settlement Time. Revisions to the Underlying made after any Funding Calculation Interval will not be accounted for in determining the applicable Periodic Transfer.

**Funding Calculation Interval:** The Funding Rate is calculated for each interval ending at 12:00 AM ET, 8:00 AM ET, and 4:00 PM ET. Each such interval ordinarily comprises eight (8) hours. Because these times are anchored to U.S. Eastern Time, on the calendar day on which U.S. daylight saving time commences the interval ending at 8:00 AM ET comprises seven (7) hours, and on the calendar day on which U.S. daylight saving time ceases the interval ending at 8:00

AM ET comprises nine (9) hours; in each case the Funding Rate for that interval is computed over the actual number of one-second observations in the interval, as set forth in the definition of Funding Rate below.

**Premium Index:** For each second during each funding interval, the Exchange computes a Premium Index as follows:

$$PI(t) = (max(0, IBP_t - UPI_t) - max(0, UPI_t - IAP_t)) / UPI_t$$

where:

*Impact Notional (IN)* is $1,000, meant to approximate the median trade size in the market.

*Impact Ask Price ($IAP_t$)* is the average execution price, per contract, of a long market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IAP_t$ is considered to be undefined.

*Impact Bid Price ($IBP_t$)* is the average execution price, per contract, of a short market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IBP_t$ is considered to be undefined.

If $IBP_t$ is undefined, $max(0, IBP_t - UPI_t)$ is considered to evaluate to 0. Similarly if $IAP_t$ is undefined, $max(0, UPI_t - IAP_t)$ is considered to evaluate to 0.

Within each one-second range, t is selected uniformly at random for the purposes of computing the IAP and IBP.

Number of Contracts = IN / (UPIt × Trading Unit). The resulting number of Contracts shall be rounded to the nearest whole Contract.

**Funding Rate:** The n per-second Premium Index calculations which make up each sample (in ascending chronological order PIt(1), PIt(2), …, PIt(n)) are combined to compute the Weighted Average Premium Index (WAPI) as: WAPI = ( Σ from i=1 to n of [ i × PIt(i) ] ) / ( Σ from i=1 to n of i ), where n is the number of one-second Premium Index calculations in the interval (28,800 for a standard eight-hour interval) and the denominator equals n(n+1)/2. For the avoidance of doubt, this is not a time-weighted average price (TWAP), which would weight each per-second sample equally. The Funding Rate for a given interval is derived from the Weighted Average Premium Index (WAPI) for that interval by applying the following adjustments to the WAPI:

(a) **Deadband:** If the absolute value of the WAPI falls below 0.01%, the Funding Rate shall be set to zero.

(b) **Clamp:** If the absolute value of the WAPI exceeds 2%, the Funding Rate shall be clamped to +2% or –2%, as applicable (the "Maximum Funding Magnitude").

**Clearing**: The Contract will be centrally cleared by Kalshi Klear LLC (Klear or the Clearinghouse), a derivatives clearing organization registered with the Commission, as central counterparty.

**Settlement Date/Times:** 12:00 PM ET and 4:00 PM ET, on every day throughout the lifetime of the Contract. At each Settlement Time, the Exchange settles all outstanding obligations, including variation margin and any accrued Periodic Transfer obligations calculated since the prior Settlement Time.

**Settlement Price:** For the purposes of calculating variation margin and Periodic Transfer obligations, the Settlement Price shall be determined according to the following tiered methodology, applied in order:

> **Tier 1 (Trade VWAP).** If one or more trades in the Contract occur during the 60 seconds immediately preceding the Settlement Time (the "Settlement Period"), the Settlement Price shall be the volume-weighted average price (VWAP) of those trades. Transactions occurring precisely at the Settlement Time are excluded. This VWAP calculation will be adjusted to exclude outliers; generally this will be performed via a median-based Mean Absolute Difference (MAD) filter, but the Exchange reserves the right to exercise discretion to exclude other outlier or manipulative transactions.
>
> For purposes of Tiers 2 and 3, sixty (60) Observation Points are defined, occurring at exactly N seconds before the Settlement Time for each integer N from 1 to 60. The prevailing best bid and prevailing best ask at an Observation Point are the best bid and best ask resting on the order book as of that instant. An Observation Point is "two-sided" if both a prevailing best bid and a prevailing best ask are present at that instant, and the Midpoint at a two-sided Observation Point is the arithmetic mean of its prevailing best bid and prevailing best ask.
>
> **Tier 2 (Sampled Midpoint Average).** If no trades in the Contract occur during the Settlement Period and at least one Observation Point is two-sided, the Settlement Price shall be the arithmetic mean of the Midpoints at all two-sided Observation Points.
>
> **Tier 3 (Index Net Change).** If no trades in the Contract occur during the Settlement Period and no Observation Point is two-sided, the Settlement Price shall equal the prior Settlement Price plus the net change in the CF Benchmarks Bitcoin Real Time Index between the prior Settlement Time and the current Settlement Time.

If a Settlement Price cannot be determined under any of the above Tiers, the Exchange may determine the Settlement Price pursuant to Rule 7.1 of the Rulebook.

**Initial and Maintenance Margin:** Initial margin and maintenance margin requirements for the Contract shall be calculated using the Exchange's risk-based margin methodology.

**Last Trading Date:** As this is a Perpetual Futures Contract, it has no Last Trading Date.

**Expiration Date:** As this is a Perpetual Futures Contract, it has no Expiration Date.

**Expiration Time:** As this is a Perpetual Futures Contract, it has no Expiration Time.

**Pre-Trade Risk Controls:** The Exchange may impose pre-trade risk controls, including price banding, order size limits, and position exposure limits, to ensure orderly trading and mitigate market disruption risk.

**Market Integrity:** The Exchange may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If a Funding Rate or Settlement Price cannot be determined, the Exchange has the right to determine payouts or margin requirements pursuant to Rule 7.1 of the Rulebook. If the Funding Rate cannot be determined for a given interval (including due to insufficient order book liquidity), the Funding Rate shall be set to zero. In the event of an Emergency, as defined in Rule 2.8 of the Rulebook, the Exchange may take such actions as it deems necessary and appropriate, including but not limited to adjusting the Maximum Funding Magnitude, modifying margin requirements, or imposing additional risk controls, in accordance with the procedures set forth in Rule 2.8. The Exchange will monitor the performance of the Funding Rate in keeping the Contract economically tethered to the Underlying Price Index and may amend the Funding Rate methodology in accordance with applicable Exchange rules and Commission filing requirements. Any such amendment shall apply prospectively only and shall not alter the Funding Rate or any Periodic Transfer obligation for any Funding Calculation Interval ending prior to the amendment's effective date.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the Contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Officers, directors, and employees of CF Benchmarks Ltd., including members of its Oversight Committee, and its parent company
- Members of the CME CF Oversight Committee responsible for governance of the CF Benchmarks index family
- Officers, directors, and employees of the Constituent Exchanges contributing data to the CF Benchmarks Bitcoin Real Time Index (currently Coinbase, Bitstamp, Kraken, Gemini, itBit/Paxos, LMAX Digital, Bullish, and Crypto.com), to the extent such persons have access to non-public order flow data, surveillance data, or advance knowledge of exchange operational changes that could materially affect the Underlying Price Index
- Third-party auditors (e.g., KPMG engagement teams) currently engaged in auditing or assuring CF Benchmarks' index methodology or BMR compliance
- Immediate family members (parents, siblings, spouses, domestic partners) and household members of all persons listed above

## APPENDIX C – FURTHER CONSIDERATIONS

The BTCPERP Contract serves critical risk mitigation functions for a broad range of market participants with bona fide economic exposure to Bitcoin. Bitcoin miners incur fixed costs denominated in U.S. dollars — electricity, hardware, facility leases — while earning revenue denominated in Bitcoin, creating a structural currency mismatch that a perpetual futures contract is uniquely suited to hedge. CoinShares' Q4 2024 mining report found that the weighted average cash cost to produce one Bitcoin among listed miners reached $82,162, with all-in costs at approximately $137,000 per BTC.[1] Riot Platforms reported a cost per BTC of approximately $49,645 in 2025, before depreciation, up from $32,216 in 2024.[2] Multiple publicly traded miners have disclosed derivatives-based hedging programs in SEC filings: Marathon Digital Holdings (now MARA Holdings) ran a bitcoin collar program overseen by a formal Investment Committee of its senior executives;[3] Bitfarms disclosed a board-approved hedging program authorizing management to implement hedges using BTC option contracts for up to 20% of expected monthly production;[4] and CleanSpark listed the possibility that mining costs may exceed mining revenues as a principal risk factor.[5] Academic research confirms the structural nature of this risk: Alexander, Deng & Zou (2023), published in the *European Journal of Operational Research*, find that perpetual futures hedging costs "are hardly influenced by the swings between backwardation and contango that can induce a high degree of roll-cost uncertainty into hedging with standard futures contracts."[6] Hashrate Index research quantifies the benefit: mining companies that hedge with derivatives achieve an average 109 basis point reduction in cost of equity, while a 12-month hashprice forward reduces cash flow volatility by 64%.[7]

Beyond miners, institutional holders of spot Bitcoin require continuous hedging instruments: U.S. spot Bitcoin ETFs now hold approximately $95–113 billion in assets under management, with 24% of U.S. Bitcoin ETF AUM held by 13F institutional filers including financial advisors holding an estimated 185,000 BTC-equivalent exposure.[8] Authorized participants and market makers for these ETPs — including Jane Street, Virtu Americas, Goldman Sachs, Citadel Securities, and others disclosed in IBIT's prospectus — carry inventory risk that must be hedged

---

[1] CoinShares, *Bitcoin Mining Report Q4 2024* (2025).

[2] Riot Platforms, *Full Year 2025 Financial Results and Strategic Highlights* (March 2026), available at https://www.riotplatforms.com/riot-platforms-reports-full-year-2025-financial-results-and-strategic-highlights/.

[3] MARA Holdings, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2023, filed with the SEC, available at https://www.sec.gov/Archives/edgar/data/0001507605/000162828024007680/mara-20231231.htm.

[4] Bitfarms Ltd., Annual Information Form, available at https://investor.bitfarms.com/static-files/d92f5e96-db8d-4453-a5cd-b193b3d187be

[5] CleanSpark, Inc., Annual Report (Form 10-K) for the fiscal year ended September 30, 2024, filed with the SEC.

[6] Carol Alexander, Jun Deng & Bin Zou, *Hedging with Automatic Liquidation and Leverage Selection on Bitcoin Futures*, 306 Eur. J. Operational Res. 478–493 (2023).

[7] Hashrate Index, relying on corporate-hedging literature and a hashprice-forward case study, estimates that miner hedging can reduce cost of equity by 109 basis points and that a 12-month hashprice-forward hedge would reduce cash-flow volatility by 64% in the modeled example.

[8] CoinShares, *Institutional Report: 13F Filings of Bitcoin ETFs Q3 2025* (2025), available at https://coinshares.com/us/insights/research-data/13f-filings-of-bitcoin-etfs-q3-2025-institutional-report/.

in real time.[9] Further, OTC crypto trading volumes more than doubled in 2024 (106% annual growth),[10] with OTC desks holding up to 410,000 BTC in inventory requiring continuous hedging.[11] And the crypto lending market reached $36.5 billion as of Q4 2024, growing to a record $73.6 billion by Q3 2025 — all collateralized lending that creates liquidation risk correlated to spot price declines and that a regulated perpetual futures contract would allow participants to hedge with precision.[12]

The perpetual structure, combined with the funding rate mechanism that maintains convergence with the spot reference price, makes the Contract functionally superior to dated alternatives for participants whose economic exposure is itself perpetual or indefinite in duration: as Coinbase Derivatives stated in its comment letter to the CFTC's request for comment on perpetual contracts, perpetual contracts eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates.[13]

Perpetual futures, such as the Contract, also provide substantial price discovery and transparency benefits that serve the public interest. Kaiko reports that perpetual futures account for 68% of all Bitcoin trading volume in 2025, up from 66% in 2024, and that derivatives make up over 75% of all trading activity in crypto markets;[14] CoinGecko's 2025 Annual Report found the top 10 centralized perpetual exchanges recorded $86.2 trillion in volume, up 47% year-over-year.[15] Academic research by Alexander & Heck (2020), published in the *Journal of Financial Stability*, established that perpetual swaps traded on unregulated exchanges are "the strongest instruments for bitcoin price discovery."[16]

Yet the vast majority of this activity occurs on offshore, unregulated venues. Listing the BTCPERP Contract on a CFTC-registered DCM brings this economically significant activity into a regulated environment with robust trade surveillance, know-your-customer verification, risk-based margin requirements, and disciplinary procedures consistent with the CEA and Commission regulations thereunder.

Further, the Contract's use of the CF Benchmarks Bitcoin Real Time Index ensures that the reference price is derived from a regulated benchmark administrator: CF Benchmarks is authorized by the UK Financial Conduct Authority under the EU/UK Benchmarks Regulation

---

[9] iShares Bitcoin Trust ETF (IBIT), Post-Effective Amendment to Form S-3 (May 9, 2025), SEC Archives, available at https://www.sec.gov/Archives/edgar/data/1980994/000143774925015853/bit20250418_posam.htm.

[10] Finery Markets, as reported in The Block, *Crypto OTC Trading Volume Surged Over 100% in 2024* (January 2025), available at https://www.theblock.co/post/334300/.

[11] CryptoQuant, as reported in CoinDesk, *Crypto OTC Desks Now Hold Over $22B in Bitcoin* (August 22, 2024); CoinDesk, *Bitcoin Bull Run in Question as Balances on OTC Desks Rise to 410K* (October 1, 2024).

[12] Galaxy Research, *The State of Crypto Lending* (April 2025); Yahoo Finance, *Crypto Lending Hits $73.6B Record as DeFi Captures Two-Thirds of Market* (November 19, 2025).

[13] Coinbase Derivatives, LLC, Comment Letter to the CFTC on Perpetual Derivatives (May 21, 2025), available at https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=35619.

[14] Kaiko, *Perps are Coming to America* (June 2025), available at https://www.linkedin.com/pulse/perps-coming-america-kaikoindices-girie/.

[15] CoinGecko, *2025 Annual Crypto Industry Report* (2025), available at https://www.coingecko.com/research/publications/2025-annual-crypto-report.

[16] Carol Alexander & Daniel F. Heck, "Price Discovery in Bitcoin: The Impact of Unregulated Markets," 50 J. Fin. Stability 100776 (2020).

(FRN 847100), with compliance independently audited by KPMG under ISAE 3000 reasonable assurance.[17] The CME CF Bitcoin Reference Rate, administered by CF Benchmarks, serves as the settlement benchmark for CME Group's Bitcoin futures[18] and is the pricing benchmark for six of the eleven U.S. spot Bitcoin ETFs, including BlackRock's IBIT.[19] And the funding rate mechanism has been rigorously studied in peer-reviewed literature: Ackerer, Hugonnier & Jermann (2025), published in *Mathematical Finance*, derive no-arbitrage perpetual futures prices and demonstrate that the pricing formula "is closely related to Covered Interest Parity used to price futures and forwards"[20] — while He, Manela, Ross & von Wachter (2024) find that deviations from no-arbitrage in crypto perpetuals "diminish over time as crypto markets develop and become more efficient."[21] A BIS Working Paper (No. 1087, Schmeling, Schrimpf & Todorov, 2023) documents that the CME Bitcoin basis can reach "exceptionally high levels, sometimes exceeding 40% per annum," and that a 10% increase in standardized carry predicts a 22% increase in short-futures liquidations — identifying "limited deployment of arbitrage capital due to regulatory and margin frictions" as a key driver, a friction that a regulated domestic perpetual futures contract directly addresses.[22]

Finally, CFTC Chairman Selig has stated that the CFTC will "use the tools at its disposal to onshore perpetual and other novel derivative products so that they can flourish across both centralized and decentralized markets, subject to appropriate safeguards," confirming that the listing of a regulated Bitcoin perpetual futures contract directly advances the Commission's stated policy objectives of deterring manipulation, protecting market participants, and promoting responsible innovation.[23]

---

[17] CF Benchmarks Ltd., FCA Financial Reference Number 847100; CF Benchmarks, *CF Benchmarks Authorised and Regulated by the FCA under EU BMR* (September 13, 2019), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr.
[18] CME Group, *FAQ: CME CF Cryptocurrency Benchmarks*, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html.
[19] BlackRock, iShares Bitcoin Trust ETF (IBIT) fact sheet, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf.
[20] Damien Ackerer, Julien Hugonnier & Urban Jermann, "Perpetual Futures Pricing," Mathematical Finance (2025). DOI: 10.1111/mafi.70018. NBER Working Paper No. 32936.
[21] Songrun He, Asaf Manela, Omri Ross & Victor von Wachter, *Fundamentals of Perpetual Futures* (2024), available at https://arxiv.org/abs/2212.06888.
[22] Maik Schmeling, Andreas Schrimpf & Karamfil Todorov, *Crypto Carry*, BIS Working Paper No. 1087 (April 2023, revised October 2025), available at https://www.bis.org/publ/work1087.pdf.
[23] Remarks of CFTC Chairman Michael Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (January 29, 2026), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

## APPENDIX D – SOURCE AGENCY

The Source Agency for the BTCPERP Contract is CF Benchmarks Ltd ("CF Benchmarks"), the administrator of the CF Benchmarks Bitcoin Real Time Index (the "Underlying Price Index" or "BRTI"), which provides a real-time measure of the U.S. dollar price of Bitcoin calculated from consolidated order book data from Constituent Exchanges, rather than from executed trade data.

### Regulatory Status and Governance

CF Benchmarks is authorized and regulated by the UK Financial Conduct Authority ("FCA") as a benchmark administrator under the UK Benchmarks Regulation (FCA Financial Reference Number 847100). CF Benchmarks was the first cryptocurrency index provider to obtain FCA authorization under the BMR framework, which it received in September 2019.[24] The UK Benchmarks Regulation transposes the IOSCO Principles for Financial Benchmarks (published July 2013) into binding regulatory requirements, imposing governance, methodology transparency, conflict-of-interest management, and oversight obligations on benchmark administrators. CF Benchmarks is registered in England and Wales (company number 11654816) and is a wholly owned subsidiary of Payward, Inc. (d/b/a Kraken), acquired in February 2019.

CF Benchmarks' BMR compliance has been independently verified through a KPMG audit conducted under International Standard on Assurance Engagements 3000 (ISAE 3000) — a reasonable assurance engagement — covering the period from September 2022 to September 2024. This is the same assurance standard applied to benchmark administrators of traditional financial indices. CF Benchmarks maintains an independent Oversight Committee, composed of industry experts and external members, that reviews the methodology and governance of all CF Benchmarks indices in accordance with BMR requirements. The Oversight Committee has authority to recommend changes to methodology, review complaints, and escalate concerns to the FCA.

### Index Methodology

The CF Benchmarks Bitcoin Real Time Index is calculated in real time based on the Relevant Order Books of its Constituent Exchanges. A Relevant Order Book consists of currently unmatched limit orders to buy or sell Bitcoin against the relevant quote asset on a Constituent Exchange, aggregated by price and reported through the exchange's API to CF Benchmarks' Calculation Agent. As of the date of this filing, the Constituent Exchanges include Coinbase, Bitstamp, Kraken, Gemini, itBit/Paxos, LMAX Digital, Bullish, and Crypto.com. For the CME CF Bitcoin Real Time Index, the methodology specifies an Effective Time every 200 milliseconds, a 10-second retrieval-lag threshold, a dynamic order size cap, a 0.5% deviation-from-mid parameter, and a 5% potentially erroneous data parameter. The methodology is publicly available and subject to periodic review and consultation in accordance with CF Benchmarks' benchmark-governance procedures.

---

[24] CF Benchmarks Ltd., CF Benchmarks Authorised and Regulated by the FCA under EU BMR (September 13, 2019), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr; FCA Financial Services Register, FRN 847100.

The BRTI is designed to provide a real-time indication of the Bitcoin-U.S. dollar exchange rate by consolidating order books across Constituent Exchanges. At each Effective Time, CF Benchmarks adds the Relevant Order Book from each Constituent Exchange to a joint list, aggregates those inputs into a consolidated order book, applies a dynamic order size cap, calculates bid, ask, mid-price, and mid-spread volume curves, determines the utilized depth, and weights the mid-price-volume curve using the normalized probability density of an exponential distribution to produce the index value. If an exchange's Relevant Order Book is delayed, erroneous, or potentially erroneous, that exchange's order book is disregarded for the affected Calculation Time, subject to the methodology's calculation-failure rules.

CF Benchmarks also administers the CME CF Bitcoin Reference Rate ("BRR"), a once-daily benchmark calculated during a one-hour observation window (3:00–4:00 PM London time), partitioned into twelve five-minute intervals, using an equally weighted average of volume-weighted median trade prices across constituent exchanges. While the BTCPERP Contract uses the real-time BRTI for funding rate calculations and settlement pricing, the BRR is referenced here to describe CF Benchmarks' broader institutional track record. The BRR and BRTI are administered under the CF Benchmarks/CME CF governance framework and use constituent exchanges selected under applicable constituent-exchange criteria, but they use different calculation methodologies: the BRR is a once-daily transaction-price benchmark based on volume-weighted medians during a one-hour observation window, while the BRTI is a real-time, order-book-based index.

**Institutional Adoption and Track Record**

The CF Benchmarks index family is among the most widely adopted cryptocurrency pricing benchmarks in the regulated financial industry. CME Group has used the CME CF Bitcoin Reference Rate as the settlement benchmark for its Bitcoin futures, Micro Bitcoin futures, and Bitcoin options contracts since the launch of CME Bitcoin futures in December 2017. Six of the eleven U.S. spot Bitcoin ETFs approved by the SEC in January 2024 use the CME CF Bitcoin Reference Rate – New York Variant ("BRRNY") as their pricing benchmark, including BlackRock's iShares Bitcoin Trust (IBIT), the world's largest Bitcoin ETF with approximately $68–70 billion in assets under management.[25] Other ETFs using BRRNY include ARK 21Shares Bitcoin ETF (ARKB), Bitwise Bitcoin ETF (BITB), Franklin Bitcoin ETF (EZBC), Valkyrie Bitcoin Fund (BRRR), and WisdomTree Bitcoin Fund (BTCW). In total, CF Benchmarks states that its indices carry over $80 billion of assets through investment funds, ETFs, and other financial products globally.

The selection of CF Benchmarks by BlackRock, CME Group, and other major regulated financial institutions reflects a market determination that the index methodology, governance, and regulatory oversight are sufficient to serve as the pricing backbone for products holding tens of billions of dollars in customer assets and settling billions of dollars in daily futures volume.

**Resilience and Manipulation Resistance**

---

[25] CME Group, FAQ: CME CF Cryptocurrency Benchmarks, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html; BlackRock, iShares Bitcoin Trust ETF (IBIT) fund page, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf

The multi-exchange, order-book-based construction of the BRTI provides inherent resistance to manipulation on any single venue. Any attempt to manipulate the index would require simultaneous, coordinated activity across multiple independently operated, regulated trading platforms — each of which maintains its own surveillance, KYC/AML, and market integrity programs. The constituent exchange selection criteria require that exchanges demonstrate adequate trade volume, operational reliability, and compliance with applicable regulatory standards; exchanges that fail to meet these standards are removed from the index. CF Benchmarks periodically reviews and updates its constituent exchange universe through a formal consultation process subject to Oversight Committee approval.

The transparency of the methodology — publicly documented and subject to regulatory review by the FCA — provides market participants, regulators, and the public with the ability to independently replicate and verify the index value at any point in time. This level of transparency stands in contrast to proprietary index calculations used by offshore, unregulated exchanges, where methodology changes may be made without notice or external review.

In addition, the BRTI's constituent exchanges are themselves subject to regulatory oversight: Coinbase operates under state money transmitter licenses and is a publicly traded company (NASDAQ: COIN) subject to SEC reporting requirements; Bitstamp holds a BitLicense from the New York Department of Financial Services; Gemini is a New York trust company regulated by NYDFS; itBit (Paxos) is a New York-chartered limited purpose trust company; Kraken holds licenses in multiple jurisdictions; LMAX Digital is part of the FCA-regulated LMAX Group; Bullish is a publicly traded company (NYSE: BLSH) that holds a BitLicense and Money Transmission License from NYDFS and is registered as a Money Services Business with FinCEN; and Crypto.com is registered as a Money Services Business with FinCEN.

**Accuracy and Continuity**

The BRTI has a multi-year operating history, including through significant crypto-market stress periods, such as during periods of extreme market stress — including the March 2020 COVID crash, the May 2021 China mining ban selloff, the November 2022 FTX collapse, and the August 2024 global carry-trade unwind, demonstrating operational resilience under adverse conditions. The redundancy of the multi-exchange data aggregation model ensures that the index remains calculable even if one or more constituent exchanges experience outages or trading halts.

In summary, the data used to determine the Reference Price and Funding Rate of the Contract is prepared and published by CF Benchmarks, an FCA-authorized benchmark administrator operating under the UK Benchmarks Regulation, independently audited by KPMG, adopted by CME Group and BlackRock as the pricing backbone for the world's largest regulated Bitcoin derivatives and ETF products, and constructed from consolidated order book data sourced from Constituent Exchanges selected under the applicable CME CF/CF Benchmarks criteria. The Exchange believes that CF Benchmarks is a highly reliable, transparent, and manipulation-resistant Source Agency.

# APPENDIX E – COMPLIANCE WITH CORE PRINCIPLES

## Compliance with Core Principles

*A. The Exchange has Exercised Reasonable Discretion by Categorizing the Contract as Futures Contracts for Purposes of Compliance with the Core Principles and Other Provisions of the CEA and Commission Regulations.*

Section 5(d)(1)(B)[26] of the CEA and Regulation 38.100(b)[27] thereunder provide that a DCM has reasonable discretion in establishing the manner in which it complies with the Core Principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Contract as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.[28]

*First,* we analyzed whether the Contract constitutes a futures contract by evaluating the characteristics of the Contract against relevant judicial precedent and Commission guidance. Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[29] by evaluating whether certain characteristics common to futures contracts are present.[30]

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[31] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[32]

---

[26] 7 U.S.C. § 7(d)(1)(B).
[27] 17 C.F.R. § 38.100(b).
[28] Kalshi and Klear intend to treat the Contract as a futures contract for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.
[29] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").
[30] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.
[31] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*"). *See, also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989) (adopting a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public) and Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993) (adopting an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility).
[32] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contracts involving intangible commodities such as the Underlying, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[33] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[34] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[35] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[36] and (iii) the ability of holders to exit their positions by offset.[37]

The Contract will exhibit all of these futures contract characteristics: the Contract will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty; holders will be able to exit their positions via offset; the Contract will be available to the general public, including retail participants; parties will enter into the Contract for the purpose of assuming or shifting the risk of change in value of the Underlying, without the possibility of transferring ownership of the Underlying; and the Contract will trade on the centralized market of a DCM.

*Then*, we analyzed whether the Contract's indefinite duration should affect their categorization. We focused on this term of the Contract because courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[38] or "on a date certain,"[39] or "at or before a stated future time."[40] Courts have not, however, viewed this characteristic as necessary to conclude that a contract is a futures contract. To the contrary, courts have repeatedly explained that, "While futures contracts generally have a specified future

---

purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[33] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). Because the Contract is a derivatives on the Underlying, which is an intangible commodity (*i.e.,* the spot price of Bitcoin), this request does not address the regulatory categorization of contracts on tangible commodities.

[34] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[35] *Id.*

[36] *CME v. SEC* at 542. Although the Dodd-Frank Act arguably changed the historical analysis, at least in part, by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on swap execution facilities, which may lack the centralized market characteristics of a DCM because they can permit trading via request for quote in addition to an order book.

[37] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

[38] *CME v. SEC* at 542.

[39] *Tauber* at 971.

[40] *Erskine* at 323.

delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[41] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[42] – because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[43] And, in *Zelener*, the Commission took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[44]

Based on this analysis, Kalshi is of the view that the Contract is appropriately categorized as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.

B. *The Contract Complies with the Core Principles*

The Exchange has conducted a comprehensive analysis of the designated contract market core principles ("Core Principles") as set forth in Part 38 of the Act. The Core Principles relevant to the Contract are outlined and discussed in further detail in the confidential appendices.

---

[41] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v. International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[42] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[43] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Contract in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contract, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out" date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[44] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on Kalshi.

## APPENDIX F – ADDITIONAL COMPLIANCE WITH CORE PRINCIPLES (CONFIDENTIAL)

**Core Principle 2 - Compliance with Rules and Impartial Access:** The Exchange has adopted the Rulebook, which provides the requirements for accessing and trading on the Exchange. Pursuant to Chapters 2, 3, and 5 of the Rulebook, in utilizing the Exchange's services, all Members must comply with the rules of the Rulebook ("Rules"), cooperate with Exchange investigations, inquiries, audits, examinations and proceedings, and engage in conduct consistent with just and equitable principles of trade. Chapter 3 of the Rulebook also provides clear and transparent access criteria and requirements for Exchange Members. Trading in the Contract will be subject to all of the Rules, which are aimed at enforcing market integrity and customer protection. Further, Section 3.2 of the Klear rulebook includes clear and transparent criteria for clearing members eligible to clear transactions in the Contracts through Klear, providing that the Contracts will be available to all clearing members of Klear, either directly (for clearing members who are eligible contract participants) or indirectly through a futures commission merchant clearing member.

In particular, Chapter 5 of the Rulebook sets forth the Exchange's Prohibited Transactions and Activities and specifically prescribes the methods by which Members trade contracts, including the Contract. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. As described in Rule 9.1, the Exchange conducts trade practice surveillance, market surveillance, and real-time market monitoring to ensure that Members adhere to the Rules of the Exchange. The Exchange, through the compliance department, initiates review and, where appropriate, investigates unusual trading activity. The compliance department also investigates any time it has other reason to believe that inappropriate activity of any sort is taking place on the Kalshi Platform or its website.

Core Principle 2 also stipulates that an exchange shall establish means to provide market participants with impartial access to the market. Chapter 3 of the Rulebook, and Rule 3.1 in particular, provides clear and transparent access criteria and requirements for Members. The Exchange will apply access criteria in an impartial manner, including through the application process described in Rule 3.1.

**Core Principle 3 - Contract not Readily Subject to Manipulation:**

Core Principle 3 and Rule 38.200 provide that a DCM shall not list for trading contracts that are readily susceptible to manipulation. The Exchange's marketplace and contracts, including this Contract, have been designed in accordance with this fundamental principle. The Exchange maintains various safeguards against price manipulation and all other forms of manipulation, including, (i) real-time market monitoring, automated trade surveillance, and suspicious behavior detection, (ii) Rulebook prohibitions, Member certification, and notification, (iii) Member monitoring and know-your-customer verification, and (iv) sanctions. These safeguards will be

applied with respect to trading in the Contracts and render the Contract not readily susceptible to manipulation.

(i) **Real-time market monitoring, automated trade surveillance, and suspicious behavior detection**: Kalshi conducts real-time market monitoring of all trading activity on the Exchange to identify disorderly trading and any market or system anomalies. As described in Rule 5.11, Kalshi has the authority to adjust trade prices or cancel trades when necessary to mitigate market disrupting events caused by malfunctions in its electronic trading platform or errors in orders submitted by members and market participants. Any trade price adjustments or trade cancellations must be transparent to the market and subject to standards that are clear, fair, and publicly available. Kalshi also maintains an automated trade surveillance system capable of detecting and investigating potential trade practice violations. [redacted] described in Rule 9.2(a), Kalshi's Compliance Department investigates unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of Kalshi's Rules, or upon the receipt of a request from Commission staff. The Exchange disciplinary process is conducted in accordance with Chapter 9 of the Exchange Rulebook, and penalties may be imposed in accordance with Rule 9.5.

(ii) **Rulebook prohibitions, member certification and notification:** The Exchange's Rulebook includes various provisions that prohibit manipulative behaviors. As noted above in the discussion of Core Principle 2, the Exchange's Rulebook gives the Exchange the authority to investigate potential violations of its rules. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. The Exchange's Surveillance Officers, which operate within the Compliance Department, perform trade practice surveillance and real-time market monitoring to ensure that Members adhere to the Exchange's rules. The Rulebook also imposes sanctions on Members who break rules. Potential penalties include fines, disgorgement, and revocation of membership in Kalshi. Only Members are allowed to trade on the Exchange, and the Exchange requires its Members to strictly comply with the Rulebook. Members cannot complete the account creation process and trade on the Exchange until they certify that they have read the Exchange's rules and agree to be bound by them.

(iii) **Member monitoring and know-your-customer verification ("KYC")**: The Exchange has a robust KYC process. The KYC process is an important tool that helps flag and uncover higher risk traders before they become Members of the platform. The Exchange's KYC process ensures that the Exchange has access to all of its members' personal identifying information, and the Exchange can leverage this information as part of its surveillance and to ensure the overall fairness and integrity of its markets. During the application process, individual applicants are

required to share personally identifiable information, such as their full legal name, social security number, date of birth, and address with the Exchange. Applicant information is run through a comprehensive set of databases that are actively compiled and maintained by an independent third party. The databases are utilized by the Exchange to identify applicants that are employees or affiliates of various governments and other agencies.

Additionally, as part of the KYC process for its individual members, the Exchange runs applicants through adverse media databases. The adverse media dataset is a real-time structured data feed of companies and individuals subject to adverse media. Monitoring thousands of news sources, business and trade journals, in addition to local, regional and national newspapers, the adverse media feed isolates and highlights any entities or individuals subject to a range of adverse media. The Exchange utilizes the database to trigger enhanced due diligence, because applicants with adverse media may be more likely to engage in certain types of unlawful activity including market manipulation.

(iv) **Sanctions**: Exchange Members must agree to the terms and conditions of the Exchange's Rulebook before being allowed to trade. As a result, Members are subject to disciplinary actions and fines for engaging in improper market conduct that is prohibited by the Exchange's Rulebook. In the event that suspicious trading activity is detected and results in an investigation initiated by the Exchange, market participants are required to provide the Exchange with information relevant to the scope of the investigation under Rule 3.6. Chapter 9 of the Exchange's Rulebook details the process for discipline and rule enforcement. Disciplinary action can range from a letter of warning to fines to referral to governmental authorities that can result in criminal prosecution.

In addition to the foregoing surveillance, enforcement, and KYC safeguards, the Exchange maintains pre-trade risk controls designed to prevent erroneous or manipulative order entry in the BTCPERP [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Moreover, the specifics of the BTCPERP Contract satisfy the Core Principle 3 standard through multiple, independent, and mutually reinforcing layers of structural design and institutional safeguards, as set forth below.

The Underlying Price Index for the Contract is the CF Benchmarks Bitcoin Real Time Index, an institutional-grade benchmark administered by CF Benchmarks Ltd., a UK Financial Conduct Authority authorized benchmark administrator under the UK Benchmarks Regulation.[44] The BRTI is calculated once per 200 milliseconds using consolidated order book data from all Constituent Exchanges.[45] CME Bitcoin futures and options settle to the CME CF Bitcoin Reference Rate family administered by CF Benchmarks; BRTI is the real-time BTC/USD index used by this Contract. CFTC- and FCA-regulated futures contracts have settled to CF Benchmarks indices, and six of eleven US spot Bitcoin ETFs, including BlackRock's iShares Bitcoin Trust, use the BRR New York Variant as their valuation benchmark.[46]

The BRTI aggregates order book data from eight regulated Constituent Exchanges: Bitstamp, Coinbase, Gemini, itBit (Paxos), LMAX Digital, Kraken, Bullish, and Crypto.com. Each Constituent Exchange must satisfy the CME CF Constituent Exchange Criteria, which require minimum volume thresholds, policies ensuring fair and transparent market conditions, processes to identify and impede manipulative trading practices, compliance with applicable KYC and AML regulations, and cooperation with regulatory inquiries including execution of data-sharing agreements with CME Group.[47] The multi-exchange composite structure means that a would-be manipulator cannot influence the index by operating on a single exchange. Any attempt to skew the consolidated order book requires coordinated activity across multiple independently regulated venues, each of which maintains its own surveillance and compliance infrastructure, dramatically increasing both the cost and the detection risk of any manipulation attempt. This design principle is well-grounded in the academic literature on optimal benchmark construction. Verstein has identified narrow time windows, single-venue data, and low transaction volumes as the precise features rendering benchmarks prone to manipulation;[48] the BRTI avoids all three. Researchers from Stanford and Northwestern Universities demonstrated that a benchmark administrator can reduce manipulation by broadening the benchmark's input set and reducing

---

[44] CF Benchmarks Ltd. is listed on the FCA Register under FRN 847100; CF Benchmarks in September 2019 become authorized and regulated by the FCA under the EU/UK BMR framework and described itself as the first cryptocurrency index provider registered as a Benchmark Administrator.

[45] CME CF Cryptocurrency Real Time Indices — Methodology Guide, v. 16.6, CF Benchmarks, May 18, 2026. Available at https://docs.cfbenchmarks.com/CME%20CF%20Real%20Time%20Indices%20Methodology.pdf

[46] See CF Benchmarks, CF Benchmarks Newsletter Issue 104 (May 4, 2026) (stating that six Bitcoin funds launched in January 2024 utilize BRRNY); CME Group, FAQ: CME CF Cryptocurrency Benchmarks; BlackRock, IBIT prospectus/fact sheet as of March 31, 2026.

[47] CME CF Constituent Exchanges Criteria, CF Benchmarks. Available at https://docs.cfbenchmarks.com/CME%20CF%20Constituent%20Exchanges%20Criteria.pdf.

[48] See Andrew Verstein, "Benchmark Manipulation," 56 B.C. L. Rev. 215 (2015) (identifying narrow time windows, single-venue data, and low transaction volumes as the precise features rendering benchmarks prone to manipulation).

reliance on narrow windows or single venues; those design principles are reflected in the BRTI's use of multiple Constituent Exchanges and consolidated order-book inputs.[49]

The BRTI calculation methodology incorporates four distinct design features that individually and collectively impede manipulation. First, if any bid or ask at a given price level on a Constituent Exchange exceeds a specified order size cap, it enters the consolidated order book with a size equal to the cap, preventing a manipulator from placing an outsized order at a single price level to disproportionately influence the index value. Second, rather than relying solely on top-of-book prices, the BRTI constructs a mid-price volume curve from the consolidated order book, requiring any manipulation attempt to involve a significant number of orders at significant size placed at multiple price levels. Third, only orders within 0.5% of the consolidated mid-price are included in the index calculation through a "utilized depth" threshold, excluding far-out orders unlikely to be executed while simultaneously ensuring that any orders placed within this narrow band to influence the index carry substantial execution risk. Fourth, within the utilized depth, orders are weighted using the normalized probability density of the exponential distribution, which places the greatest weight on prices closest to the best bid and ask, meaning that to materially influence the index a manipulator would need to concentrate orders at price levels where execution risk is highest.

The BRTI is "highly resistant against manipulation" — influencing it would require manipulation on several exchanges simultaneously over an extended period, and that the BRTI's order-book basis makes it a Markov process and martingale, preventing gaming of derivatives settlement.[50][51] This assessment is corroborated by the broader literature on benchmark manipulation. Eisl, Jankowitsch, and Subrahmanyam have demonstrated that alternative fixings using median-based outlier elimination — a technique employed by the BRR and, through the Potentially Erroneous Data Parameter, by the BRTI — significantly reduce manipulation potential.[52] Recent work extending the Duffie-Dworczak framework has shown that VWAP is optimal when fixed manipulation costs are negligible, the median is optimal when variable costs are negligible, and the trimmed mean is optimal when both costs are significant, providing the theoretical basis for the BRR's volume-weighted median approach.[53]

The BRTI also incorporates automated contingency rules that further protect against manipulation and erroneous data. If the order book data from any Constituent Exchange is more

---

[49] Darrell Duffie & Piotr Dworczak, "Robust Benchmark Design," 142 J. Fin. Econ. 775 (2021) (modeling benchmark fixings as estimators of market value based on inputs from market participants whose benchmark-linked positions may create incentives to manipulate the fixing, and showing how benchmark weighting and aggregation rules can reduce manipulation incentives).
[50] Alexander Paine & William J. Knottenbelt, "Analysis of the CME CF Bitcoin Reference Rate and CME CF Bitcoin Real Time Index," Imperial College Centre for Cryptocurrency Research and Engineering (Oct. 20, 2016). Available at https://www.cmegroup.com/trading/files/bitcoin-white-paper.pdf.
[51] *Id*. The authors noted that any manipulation of the BRTI would require manipulation on "several exchanges over an extended period" and that the BRTI's order-book basis makes it a Markov process and martingale, preventing gaming of derivatives settlement.
[52] Alexander Eisl, Rainer Jankowitsch & Marti G. Subrahmanyam, "The Manipulation Potential of Libor and Euribor," 23 Eur. Fin. Mgmt. 604 (2017) (demonstrating that alternative fixings using median-based outlier elimination significantly reduce manipulation potential).
[53] Ángel Hernando-Veciana, Optimal Benchmark Design Under Costly Manipulation, arXiv:2506.22142 (June 2025) (finding that a weighted mean is optimal when fixed manipulation costs are negligible, the median is optimal when variable costs are negligible, and the trimmed mean is optimal when both costs are significant).

than 10 seconds stale relative to the calculation time, that exchange is excluded from the index calculation for that timestamp. Order books that deviate from expected format, contain no bids or asks, or are crossed are automatically flagged and excluded. Most critically, for each Constituent Exchange, the methodology computes the mid-price of its order book and compares it to the median mid-price across all Constituent Exchanges; if any exchange's mid-price deviates by more than the Potentially Erroneous Data Parameter from this median, that exchange's data is excluded wholesale from the calculation. This means a manipulator cannot influence the index by distorting the order book on a single exchange, because the exchange's data would simply be dropped. CF Benchmarks reports that, e.g., in February 2025, this parameter was never triggered, with the maximum observed deviation only 2.41%.[54]

These index-level protections are embedded within an institutional framework that provides additional assurance. CF Benchmarks is subject to ongoing regulatory oversight by the FCA, periodic independent audits (including KPMG ISAE (UK) 3000 reasonable assurance and Deloitte ISAE (UK) 3000 audits),[55] and the governance of the CME CF Oversight Committee. The BRTI's methodology is designed in accordance with the IOSCO Principles for Financial Benchmarks,[56] which were established in the wake of the LIBOR scandal to promote benchmark governance, input-data quality, methodology transparency, conflicts management, and accountability mechanisms.[57] Researchers have demonstrated empirically that FCA regulatory supervision of benchmark administrators improves market quality,[58] and confirmed that the most robust benchmarks are those most costly to manipulate and offering the fewest manipulation incentives.[59] CF Benchmarks employees are contractually prohibited from trading on the markets in question, and the data is provided on a real-time basis to thousands of financial professionals

---

[54] CF Benchmarks, "Suitability Analysis of the CME CF Bitcoin Reference Rate – New York Variant as a Basis for Regulated Financial Products - March 2025 Update" (2025). Available at https://www.cfbenchmarks.com/blog/suitability-analysis-of-the-cme-cf-bitcoin-reference-rate-new-york-variant-as-a-basis-for-regulated-financial-products-march-2025-update.

[55] KPMG ISAE (UK) 3000 Reasonable Assurance Report, covering September 12, 2022 – September 12, 2024. Available at https://docs.cfbenchmarks.com/CF_Benchmarks_UK_BMR_.pdf. See also Deloitte ISAE (UK) 3000 Audit (completed September 2022).

[56] IOSCO, "Principles for Financial Benchmarks: Final Report," FR07/13 (July 2013). Available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

[57] See Martin Wheatley, "The Wheatley Review of LIBOR: Final Report," HM Treasury (Sept. 28, 2012) (recommending transaction-anchored submissions, delayed individual publication, and larger panel sizes to limit single-submission impact. These post-LIBOR reform principles are consistent with benchmarks grounded in observable market data and transparent governance; in the CF Benchmarks index family, the BRR is transaction-price based, while the BRTI is order-book based. Hou & Skeie document how LIBOR's survey-based methodology was vulnerable to manipulation — a vulnerability addressed by transparent, market-data-based methodologies such as the BRR and BRTI, although through different input-data types); see also David Hou & David R. Skeie, "LIBOR: Origins, Economics, Crisis, Scandal, and Reform," Fed. Res. Bank of N.Y. Staff Report No. 667 (March 2014) (documenting how LIBOR's survey-based methodology was vulnerable to manipulation — a vulnerability addressed by transparent, market-data-based methodologies such as the BRR and BRTI, although through different input-data types).

[58] Matteo Aquilina, Gbenga Ibikunle, Vito Mollica & Tom Steffen, "The Visible Hand: Benchmarks, Regulation, and Liquidity," 61 J. Fin. Mkts. 100734 (2022) (demonstrating that FCA regulatory supervision of ICE Swap Rate improved market quality in the $289 trillion interest rate swaps market).

[59] James Brugler, Marta Khomyn & Tālis Putniņš, "Benchmarking Benchmarks," J. Fin. Econ. (2025) (first comprehensive empirical evaluation of all major LIBOR and alternative reference rates, confirming that more robust benchmarks are those more costly to manipulate and offering fewer manipulation incentives).

worldwide, ensuring that any discrepancy between the reported value and the true market price would be swiftly detected.

The Settlement Price for the BTCPERP Contract is determined by the volume-weighted average price of trades executed on the Kalshi Exchange during the 60-second window preceding each Settlement Time. This VWAP-based settlement mechanism implements the benchmark design insights that academics have identified as optimal: volume weighting ensures that the price reflects the economically significant transactions rather than noise, and the 60-second averaging window ensures that a manipulator cannot influence the settlement value through a momentary spike or a single trade. The Exchange further applies a median-based Mean Absolute Difference filter to exclude outlier transactions from the VWAP calculation, and reserves the right to exclude transactions deemed manipulative. Transactions occurring precisely at the Settlement Time are excluded, preventing last-second manipulation attempts. If no trades occur during the Settlement Period, the Settlement Price is determined under Tier 2 using the arithmetic mean of midpoints at two-sided Observation Points; if no such Observation Point exists, Tier 3 uses the prior Settlement Price plus the net change in the CF Benchmarks Bitcoin Real Time Index, ensuring continuous and robust price determination even during periods of low liquidity. The twice-daily settlement schedule distributes any manipulation risk across multiple settlement events, reducing the expected value of any single manipulation attempt.

The BTCPERP Contract employs a periodic funding mechanism to maintain price convergence with the underlying spot price. Because the funding rate determines periodic cash transfers between long and short position holders, its resistance to manipulation is critical. The funding rate mechanism is grounded in a well-established theoretical literature. He, Manela, Ross, and von Wachter derive the no-arbitrage pricing of perpetual futures and show that the funding rate — periodic payments proportional to the futures-spot gap — is the key mechanism keeping futures prices close to spot.[60] Their model demonstrates that at each time $t$, the no-arbitrage price of a perpetual can be expressed as a function of the spot price scaled by a factor determined by the differential between the risk-free rate and the interest rate on the underlying asset.[61] Ackerer, Hugonnier, and Jermann provided theoretical treatment in *Mathematical Finance*, deriving explicit no-arbitrage prices for linear, inverse, and quanto perpetual contracts and identifying funding specifications that guarantee coincidence of futures and spot prices.[62] Angeris, Chitra, Evans, and Lorig derived model-free expressions for the funding rate and discount rate of perpetual contracts in continuous-time no-arbitrage settings.[63]

The BTCPERP funding rate is derived from the Premium Index, which measures the divergence between the Contract's order book and the Underlying Price Index at each second during each 8-hour funding interval. The Impact Bid Price and Impact Ask Price are computed as the average execution prices for hypothetical market orders with a notional value equal to the Impact Notional of $1,000, approximating the median trade size. This construction anchors the Premium

---

[60] Songrun He, Asaf Manela, Omri Ross & Victor von Wachter, "Fundamentals of Perpetual Futures," arXiv:2212.06888 (Dec. 2022, rev. Aug. 2024). Presented at the 2024 Utah Winter Finance Conference. Also SSRN Working Paper No. 4301150.
[61] *Id.* at 8–12 (deriving no-arbitrage pricing conditions for perpetual futures).
[62] Damien Ackerer, Julien Hugonnier & Urban Jermann, "Perpetual Futures Pricing," Mathematical Finance (2025). DOI: 10.1111/mafi.70018. NBER Working Paper No. 32936.
[63] Guillermo Angeris, Tarun Chitra, Alex Evans & Matthew Lorig, "Short Communication: A Primer on Perpetuals," 14 SIAM J. Fin. Math. SC17 (2023). DOI: 10.1137/22M1520931.

Index to achievable execution prices rather than top-of-book quotes, meaning orders that are exposed to genuine execution risk. If insufficient liquidity exists on either side of the order book to fill a $1,000 market order, the corresponding Impact Price is treated as undefined and the relevant term evaluates to zero, preventing manipulation in illiquid conditions.

The Premium Index is computed once per second, yielding 28,800 one-second Premium Index observations over each 8-hour interval. These observations are aggregated into the Weighted Average Premium Index using a linearly increasing chronological weighting under the WAPI formula. This design has critical manipulation-resistance properties. Because the WAPI is computed from 28,800 observations, a manipulator cannot influence the funding rate by distorting the order book for a brief period; any short-lived perturbation is diluted by the overwhelming majority of non-manipulated observations. Within each one-second range, the precise timestamp at which the order book is observed is selected uniformly at random, preventing a manipulator from timing the placement and withdrawal of manipulative orders to coincide with known sampling times — a technique that has been exploited in traditional benchmark manipulation. Kim and Park analyzed path-dependent funding rates matching real-world 8-hour averaging practice and derived unique prices for perpetual futures anchored to non-tradable target values such as indices.[64] Zhang modeled funding rates as algorithmic feedback rules and demonstrated that a linear funding rule induces an endogenous mean-reverting basis, deriving the stability conditions that govern such mechanisms.[65]

The funding rate is further subject to a deadband of 0.01%, which sets the rate to zero if the absolute value falls below this threshold, filtering out noise and low-grade manipulation attempts, and a maximum funding magnitude clamp of ±2% per 8-hour interval, which bounds the potential profit from funding rate manipulation. The ±2% clamp is conservative relative to observed market conditions. The ±2% Maximum Funding Magnitude sits well above prevailing market levels: Binance, the largest BTC perpetual venue by volume, currently caps its BTCUSDT 8-hour funding rate at ±0.3%, so the clamp operates as a manipulation backstop rather than a routine constraint. The 2% cap therefore provides substantial headroom above historically observed extremes while still constraining the maximum periodic transfer in any single interval. Even in the theoretical scenario of a sustained deviation in which the clamp binds continuously, the funding mechanism would transfer value from the side trading at a premium at a rate of up to 6% per day (three 8-hour intervals at 2% each), creating powerful economic incentives for arbitrageurs and liquidity providers to close the basis through spot-versus-perpetual arbitrage, cross-venue hedging, and directional trading. The absence of expiration in the contract eliminates roll-related pressures that can temporarily disrupt convergence in dated futures, allowing the funding mechanism to operate as a continuous corrective force without interruption. In the extremely unlikely event that the funding rate mechanism alone proves insufficient to restore convergence, Kalshi and Kalshi Klear retain authority under their respective Emergency Rules — DCM Rule 2.8 and DCO Rule 2.12 — to take additional measures, including adjusting the Maximum Funding Magnitude, imposing

[64] Jaehyun Kim & Hyungbin Park, "Designing Funding Rates for Perpetual Futures in Cryptocurrency Markets," arXiv:2506.08573 (June 2025) (deriving unique prices for perpetual futures anchored to non-tradable target values, with analysis of path-dependent funding rates matching real-world 8-hour averaging practice).

[65] Tianyang Zhang, "Funding Rate Mechanism in Perpetual Futures," SSRN Working Paper No. 6185958 (Feb. 2026) (modeling funding rates as algorithmic feedback rules and deriving a stability condition and welfare-optimal feedback strength).

enhanced margin requirements, or implementing other risk controls as warranted by market conditions. The ability to adjust the funding rate clamp is expressly enumerated as an emergency power under DCM Rule 2.8.

Such clamping functions create a deliberate “dead zone” where small mispricings persist without correction, by design to prevent manipulation of funding payments, and researchers have confirmed using two years of Binance data that theoretical no-arbitrage bounds hold.[66] Empirical analysis confirms that funding rates virtually never approach the 2% cap under normal conditions. Gorton et al. report high correlations among perpetual-futures funding-rate series across Binance and FTX and across BTC, ETH, USDT-settled, BUSD-settled, and USD-settled contracts; this supports the narrower point that funding-rate variation is not principally exchange-specific or settlement-token-specific.[67] Thus, funding-rate variation is not principally exchange-specific or settlement-stablecoin-specific. The crypto carry trade literature, including work by Christin, Routledge, Soska, and Zetlin-Jones at Carnegie Mellon and by Schmeling, Schrimpf, and Todorov at the BIS, documents that funding rate arbitrage generates economically meaningful returns, confirming strong convergence forces that continuously operate against any manipulation-driven divergence.[68]

The funding mechanism itself functions as a natural manipulation deterrent. If a manipulator were to artificially push the perpetual price above spot, the resulting positive funding rate would impose costs on long positions, including the manipulator’s own, while incentivizing other market participants to enter short positions to collect funding payments, thereby pushing the price back toward fair value. Some have even found that perpetual derivatives lead prices on major Bitcoin spot exchanges and are informationally more efficient, confirming that the funding mechanism creates a tight, self-correcting linkage between the derivative and spot markets.[69]

Additionally, the Bitcoin spot market is among the most liquid markets in the world. Data from CF Benchmarks provided to the Commission demonstrates that the mean utilized depth of the BRTI index averaged approximately 413 BTC for Bitcoin — representing over $21 million in depth per second — with maximum utilized depth exceeding 547 BTC and a standard deviation of approximately 43.6 BTC. Brauneis, Mestel, Riordan, and Theissen concluded that the BTC-USD market can be more liquid than US equity markets, with bid-ask spreads often below 1 basis point, comparable to major foreign exchange markets.[70] Independent analysis reports an

---

[66] Min Dai, Linfeng Li & Chen Yang, "Arbitrage in Perpetual Contracts," SSRN Working Paper No. 5262988 (Sept. 2025) (deriving model-free no-arbitrage bounds for perpetual futures prices and showing that clamping functions create a deliberate "dead zone" that prevents manipulation of funding payments).

[67] Gary B. Gorton, Elizabeth C. Klee, Chase P. Ross, Sharon Y. Ross & Alexandros P. Vardoulakis, Leverage and Stablecoin Pegs, NBER Working Paper No. 30796, at 22, 43 & tbl. A.1 (Dec. 2022) (finding high correlations among perpetual-futures funding-rate series across Binance and FTX and across BTC, ETH, USDT-settled, BUSD-settled, and USD-settled contracts).

[68] Nicolas Christin, Bryan R. Routledge, Kyle Soska & Ariel Zetlin-Jones, "The Crypto Carry Trade," Working Paper, Carnegie Mellon University (2022/2023). See also Maik Schmeling, Andreas Schrimpf & Karamfil Todorov, "Crypto Carry," BIS Working Papers No. 1087 (2022/2023).

[69] Carol Alexander, Jaehyuk Choi, Heungju Park & Sungbin Sohn, "BitMEX Bitcoin Derivatives: Price Discovery, Informational Efficiency, and Hedging Effectiveness," 40 J. Futures Mkts. 23 (2020) (finding that perpetual derivatives lead prices on major Bitcoin spot exchanges and are informationally more efficient).

[70] Alexander Brauneis, Roland Mestel, Ryan Riordan & Erik Theissen, "Bitcoin Unchained: Determinants of Cryptocurrency Exchange Liquidity," 69 J. Emp. Fin. 106 (2022) (finding bid-ask spreads often below 1 basis point, comparable to major foreign exchange markets and significantly narrower than equity or bond markets).

average of over $16 million in Bitcoin orders within just 100 basis points of mid-price on major exchanges.[71]

Given this extraordinary depth, the cost of manipulating the consolidated order book across multiple exchanges simultaneously — while maintaining the manipulation within the 0.5% deviation parameter that determines the utilized depth — would be enormous. The academic literature on market impact provides a precise framework for quantifying this cost. Donier and Bonart analyzed a complete dataset enabling reconstruction of over one million metaorders in Bitcoin markets and confirmed that the square-root law of market impact holds across four decades of volume.[72] This result has been documented in many markets and further studied across large equity datasets.[73] The square-root law means that the total cost of price manipulation scales as the cost grows faster than linearly in the quantity of manipulation required, making large-scale manipulation prohibitively expensive.[74] Supply and demand vanish quadratically near the current price, confirmed empirically using Bitcoin order book data, which is why price impact universally behaves as the square root of order size.[75][76]

Bitcoin is also among the most actively arbitraged assets in the world.[77] While arbitrage opportunities existed historically, their magnitude decreased greatly from April 2018 onward, and since then it has been barely possible to exploit existing price differences across exchanges after accounting for transaction costs.[78][79] Hautsch, Scheuch and Voigt find that settlement latency and latency uncertainty are economically significant frictions in Bitcoin cross-exchange arbitrage; their estimated average arbitrage bounds range from roughly 91 to 197 basis points across exchanges, and latency uncertainty contributes materially to those bounds.[80] Bitwise Asset

---

[71] See, e.g., Amberdata, "How Liquidity Really Works in Crypto Markets" (2025) (reporting average of $16.53 million in Bitcoin orders within 100 basis points of mid-price on Binance).

[72] Jonathan Donier & Julius Bonart, "A Million Metaorder Analysis of Market Impact on the Bitcoin," 1 Mkt. Microstructure & Liquidity 1550008 (2015). arXiv: 1412.4503.

[73] Yuki Sato & Kiyoshi Kanazawa, "Strict Universality of the Square-Root Law in Price Impact Across Stocks," Phys. Rev. Lett. (2025). DOI: 10.1103/65jz-81kv. arXiv: 2411.13965.

[74] Fabrizio Lillo, J. Doyne Farmer & Rosario N. Mantegna, "Econophysics: Master Curve for Price-Impact Function," 421 Nature 129 (2003); see also Frédéric Bucci, Michael Benzaquen, Fabrizio Lillo & Jean-Philippe Bouchaud, "Crossover from Linear to Square-Root Market Impact," 122 Phys. Rev. Lett. 108302 (2019) (using 8 million institutional trades to establish the crossover between linear impact for small orders and square-root regime for larger orders).

[75] Jonathan Donier & Jean-Philippe Bouchaud, "From Walras' Auctioneer to Continuous Time Double Auctions," J. Stat. Mech. 123406 (2016) (empirically confirmed using Bitcoin order book data).

[76] J. Doyne Farmer, Austin Gerig, Fabrizio Lillo & Henri Waelbroeck, "How Efficiency Shapes Market Impact," 13 Quant. Fin. 1743 (2013); Bence Tóth et al., "Anomalous Price Impact and the Critical Nature of Liquidity in Financial Markets," 1 Phys. Rev. X 021006 (2011); Jim Gatheral, "No-Dynamic-Arbitrage and Market Impact," 10 Quant. Fin. 749 (2010) (demonstrating that power-law decay with exponent $\gamma \leq 1/2$ is required by no-dynamic-arbitrage).

[77] Igor Makarov & Antoinette Schoar, "Trading and Arbitrage in Cryptocurrency Markets," 135 J. Fin. Econ. 293 (2020).

[78] Tommy Crépellière, Matthias Pelster & Stefan Zeisberger, "Arbitrage in the Market for Cryptocurrencies," 64 J. Fin. Mkts. 100817 (2023).

[79] *Id.* ("Their magnitude decreased greatly from April 2018 onward" and "it has been barely possible to exploit existing price differences.")

[80] Nikolaus Hautsch, Christoph Scheuch & Stefan Voigt, Building Trust Takes Time: Limits to Arbitrage for Blockchain-Based Assets, 28 Rev. Fin. 1345, 1345–81 (2024), https://doi.org/10.1093/rof/rfae004 (finding that settlement latency and latency uncertainty are economically significant frictions in Bitcoin cross-exchange arbitrage;

Management's presentation to the SEC demonstrated that among the ten exchanges with verified real volume, the average price deviation of any one exchange from the aggregate price was "less than 0.10%" — well below the arbitrage band implied by exchange fees and hedging costs — and that arbitrage across these venues was "virtually perfect, … with no sustained deviations between prices," supporting the conclusion that the real Bitcoin spot market is efficient, tightly arbitraged, and resistant to single-venue manipulation.[81][82]

Any attempt to manipulate prices on a subset of Constituent Exchanges would induce arbitrageurs to trade against the manipulator, rapidly restoring prices to fair value and imposing losses on the manipulation attempt. The BRTI's multi-exchange composite structure harnesses this natural market correction mechanism: because the index aggregates across all Constituent Exchanges, arbitrage activity on any one exchange directly reduces the impact of manipulation on another. The academic literature on Bitcoin-specific manipulation confirms this assessment. Suspicious trading on the Mt. Gox exchange in 2013, when total cryptocurrency market capitalization was approximately $14 billion and trading was concentrated on a single unregulated venue;[83] today's market is over 100 times larger with robust multi-regulated-exchange surveillance. Manipulating the Bitcoin price is more difficult than for other cryptocurrencies, because the top ten whale users control only 6.30% of Bitcoin.[84] Improved liquidity reduces the effectiveness or profitability of manipulation.[85]

[redacted]

estimated average arbitrage bounds range from approximately 91 to 197 basis points across exchanges, and latency uncertainty contributes about 41% of median arbitrage bounds).

[81] Bitwise Asset Management, "Analysis of Real Bitcoin Trade Volume," Presentation to the U.S. SEC, March 19, 2019. Filed as comment on SR-NYSEArca-2019-01. Available at https://www.sec.gov/comments/sr-nysearca-2019-01/srnysearca201901-5164833-183434.pdf.

[82] *Id*.

[83] Neil Gandal, JT Hamrick, Tyler Moore & Tali Oberman, "Price Manipulation in the Bitcoin Ecosystem," 95 J. Monetary Econ. 86 (2018).

[84] Li et al., "Market Manipulation of Cryptocurrencies: Evidence from Social Media and Transaction Data," ACM Trans. Internet Tech. (2024). DOI: 10.1145/3643812.

[85] Peter Fratrič, Giovanni Sileno, Sander Klous & Tom van Engers, "Manipulation of the Bitcoin Market: An Agent-Based Study," 8 Fin. Innovation 60 (2022). DOI: 10.1186/s40854-022-00364-3.

[86] CFTC Press Release No. 7654-17, "CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE and Cantor Exchange" (Dec. 1, 2017).

The Commission's treatment of Bitcoin derivatives under Core Principle 3 has evolved significantly since the initial self-certifications in 2017, consistently in the direction of greater regulatory comfort with the maturation of Bitcoin markets. When CME self-certified its Bitcoin futures in December 2017, the contract was designed to settle against the BRR using the same CF Benchmarks infrastructure that underlies the BRTI.[87] The CFTC noted that the exchanges had agreed to significant enhancements to contract design and settlement at CFTC staff's request, including enhanced information sharing with underlying cash exchanges for surveillance,[88] and issued a backgrounder stating that the self-certification process requires the same determination — that the contract is not readily susceptible to manipulation — as the approval process.[89]

In May 2018, the CFTC issued Staff Advisory No. 18-14, which identified heightened expectations for virtual currency derivative product listings, including enhanced market surveillance with information-sharing agreements, close coordination with CFTC staff, and large trader reporting with low disclosure thresholds.[90] In March 2025, the CFTC withdrew Advisory 18-14 in its entirety, stating that the advisory was "no longer needed given additional staff experience with virtual currency derivative product listings and increasing market growth and maturity" and that digital asset derivatives would receive the same regulatory treatment as traditional derivatives.[91] In June 2025, Coinbase Derivatives self-certified BTC-PERP and ETH-PERP — US-based perpetual-style futures contracts — with no CFTC objection, establishing direct precedent for CFTC-regulated crypto perpetuals.[92] Even earlier, Bitnomial did the same.[93]

The BTCPERP Contract is not readily susceptible to manipulation. At the index level, the BRTI aggregates order book data from the aforementioned eight regulated exchanges using a methodology that incorporates order size caps, mid-price volume curves, a narrow 0.5% deviation parameter, exponential probability density weighting, and automated screening for delayed, erroneous, and potentially erroneous data — incorporating multiple features that academic literature and benchmark practice identify as relevant to manipulation resistance.[94] At the settlement price level, the 60-second VWAP with MAD outlier filtering prevents flash manipulation and requires sustained, detectable trading activity. At the funding rate level, the Premium Index's Impact Notional anchoring, undefined treatment for thin books, 28,800

---

[87] CME Group Self-Certification Submission No. 17-417 (Dec. 1, 2017). Available at https://www.cftc.gov/sites/default/files/filings/ptc/17/12/ptc120117cmedcm001.pdf.
[88] CFTC Press Release No. 7654-17, "CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE and Cantor Exchange" (Dec. 1, 2017).
[89] CFTC, "Backgrounder on Self-Certified Contracts for Bitcoin Products" (Dec. 1, 2017). Available at https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/bitcoin_factsheet120117.pdf.
[90] CFTC Staff Advisory No. 18-14, "Advisory With Respect to Virtual Currency Derivative Product Listings" (May 21, 2018).
[91] CFTC Letter No. 25-07, withdrawing Staff Advisory No. 18-14 (March 27–28, 2025). Press Release No. 9059-25. The withdrawal stated that "the advisory is no longer needed given additional staff experience with virtual currency derivative product listings and increasing market growth and maturity."
[92] Coinbase Derivatives self-certified BTC-PERP and ETH-PERP perpetual futures on June 26, 2025 (effective July 21, 2025), with no CFTC objection. Certain "perpetual-style" futures contracts, such as those self-certified by Coinbase Derivatives, are designed to mimic the economics of the Contracts, but with an expiration date, thus exhibiting residual expiry risk and requiring their holders to regularly "roll" positions in order to maintain exposure.
[93] See here: https://bitnomial.com/blog/us-perpetual-futures
[94] Darrell Duffie & Jeremy C. Stein, "Reforming LIBOR and Other Financial Market Benchmarks," 29 J. Econ. Persp. 191 (2015).

one-second Premium Index observations aggregated under the WAPI formula with random intra-second sampling, deadband filtering, and 2% clamp collectively ensure that the funding rate reflects genuine economic conditions and is resistant to both sustained and opportunistic manipulation. At the market structure level, the enormous liquidity of the underlying Bitcoin spot market, the near-elimination of cross-exchange arbitrage opportunities since 2018, the cost of manipulation scaling, and the self-correcting economic incentives of the funding mechanism all render manipulation economically infeasible.

**Core Principle 4 - Prevention of Market Disruption:** Trading in the Contracts will be subject to the Rules of the Exchange, which include prohibitions on manipulation. Trading activity in the Contract will be subject to monitoring and surveillance by the Exchange's Market Surveillance Department. In particular, the Exchange's trade surveillance system monitors the trading on the Exchange to detect and prevent activities that threaten market integrity and market fairness including manipulation, price distortion, and disruptions of the settlement process. The Exchange also performs real-time market surveillance. The Exchange sets position accountability limits, maintains both a trade practice and market surveillance program to monitor for market abuses, including manipulation, and has disciplinary procedures for violations of the Rulebook.

**Core Principle 5 - Position Limitations**: Kalshi has conducted an analysis of position limits in connection with this product and has determined that position accountability levels, rather than hard position limits, are the appropriate mechanism for this contract. The contract specification includes a Position Accountability Level of $5,000,000 in mark-to-market position value, with short positions evaluated on an equivalent long basis.

Several considerations support this approach. First, Bitcoin is not an enumerated commodity subject to the federal position limit regime under Part 150, and the contract is cash-settled with no deliverable supply constraints that would necessitate spot-month position limits to prevent corners or squeezes. Second, the underlying BTC/USD spot market is a highly liquid and globally distributed market, with tens of billions of dollars in daily trading volume spread across numerous venues and jurisdictions. The depth and fragmentation of the underlying market make it extremely difficult for any single participant to amass a position in Kalshi's perpetual futures contract that could exert meaningful influence on the reference price. Third, the perpetual futures funding rate mechanism itself acts as a natural economic check on position concentration — as positions become crowded on one side, the funding rate adjusts to impose carrying costs that discourage further accumulation and incentivize offsetting activity.

Critically, the liquidity of the underlying spot market is not confined to U.S. business hours. Because the BTCPERP Contract trades 24 hours per day, 7 days per week, the adequacy of position accountability levels — as opposed to hard limits — depends on the underlying market maintaining sufficient depth at all times to support orderly risk management and surveillance. Analysis of mean utilized depth on the constituent spot exchanges composing the CF Benchmarks Bitcoin Real Time Index confirms that the BTC/USD spot market operates as a genuinely global market without meaningful liquidity discontinuities at night or on weekends. Mean utilized depth during the 10:00 PM to 6:00 AM EST window averages approximately 426 BTC, compared to approximately 411 BTC during the 6:00 AM to 10:00 PM EST window — overnight depth does not decline relative to U.S. daytime hours but slightly exceeds them, reflecting the overlapping contribution of Asian and European trading sessions. Weekend

liquidity is similarly robust: mean utilized depth on Saturdays and Sundays runs at approximately 95.5% of weekday levels. The coefficient of variation across all 168 hour-of-week combinations is only 5.8%, indicating tight dispersion around the overall mean of approximately 416 BTC. Even the single lowest data point — Saturday at 11:00 AM EST, averaging 351 BTC — still represents over 75% of the peak hourly mean and constitutes substantial absolute depth on the order of tens of millions of dollars notional at prevailing prices. This flat liquidity profile means that there is no window in the 24/7 trading cycle during which a large position holder could exploit thin underlying markets to influence the reference price or funding rate, further supporting the appropriateness of accountability levels over hard limits.

The $5,000,000 accountability level provides Kalshi's market surveillance team with a trigger to examine the circumstances surrounding any large position, including the participant's trading activity, hedging rationale, and potential impact on market integrity, while preserving the flexibility to permit commercially justified positions above that threshold on a case-by-case basis. This approach is consistent with the practices of other DCMs listing cryptocurrency derivatives and appropriately balances market integrity objectives against the risk of unnecessarily constraining legitimate hedging and trading activity in a deeply liquid underlying market.

**Core Principles 7 and 8 - Availability of General Information and Daily Publication of Trading Information:** Core Principles 7 and 8, implemented by Regulations Sections Subsections 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges, the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market, and the rules and specifications describing the operation of the contract market's electronic matching platform.

Rule 2.17 of the Rulebook sets forth the rules for publicizing information. The Rulebook and the specifications of each contract listed on the Exchange, including the Contract, are made public on the Exchange website and remain accessible via the platform. The Exchange will post non-confidential materials associated with regulatory filings, including the Rulebook, at the time the Exchange submits such filings to the Commission. Consistent with Rule 2.17 of the Rulebook, the Exchange website will publish contract specifications, terms, and conditions, as well as daily trading volume and open interest for the Contract. Each contract has a dedicated "Market Page" on the Kalshi Exchange platform, which will contain the information described above as well as a link to the Underlying price index. Chapter 5 sets forth the rules, regulations and mechanisms for executing transactions, and the rules and specifications for Kalshi's trading systems.

**Core Principle 11 - Financial Integrity of Transactions:** Each Member must be in good standing and in compliance with the Member eligibility standards set forth in Chapter 3 of the Rulebook. All contracts offered by the Exchange, including the Contract, are cleared through the Clearinghouse, a Derivatives Clearing Organization ("DCO") registered with the CFTC and subject to all CFTC Regulations related thereto. The Exchange requires that Members post initial margin before entering into positions and maintain maintenance margin throughout the life of a

position. Margin requirements are calculated using the Exchange's risk-based margin methodology and are designed to ensure that the Exchange can liquidate positions in an orderly manner before losses exceed posted collateral. Positions that fall below maintenance margin levels are subject to liquidation. The protection of customer funds is monitored by the Exchange and ensured by the Clearinghouse as member property or futures commission merchant customer property.

**All Remaining Requirements:** All remaining Core Principles are satisfied through operation of the Exchange's Rules, processes, and policies applicable to the other contracts traded thereon.

## APPENDIX G (CONFIDENTIAL) – AGREEMENT WITH CF BENCHMARKS

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**SCHEDULE 2**

[redacted]

[redacted]

Kalshi

**FOIA CONFIDENTIAL TREATMENT REQUESTED by KalshiEX LLC – Pursuant to 17 C.F.R. §§ 40.8 and 145.9**

Assistant Secretary of the Commission
For FOI, Privacy and Sunshine Acts Compliance
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Re: FOIA Confidential Treatment Request (Detailed Written Justification of FOIA Confidential Treatment Request)

Dear Sir or Madam:

KalshiEX LLC ("Kalshi") hereby respectfully requests that the Commodity Futures Trading Commission (the "CFTC") accord confidential treatment under 17 C.F.R. §§ 40.8 and 145.9 to the confidential material transmitted today with this letter that are marked confidential, and all information derived therefrom (collectively, the "Confidential Information"). Pursuant to Commission Regulation 145.9(d)(4), please consider that this cover sheet has been clearly marked "FOIA Confidential Treatment Requested by KalshiEX LLC" and is securely attached to the group of records submitted for which confidential treatment is requested.

This request for confidential treatment is made pursuant to 17 C.F.R. §§ 40.8 and 145.9(d)(1) because Kalshi believes that the Confidential Information is covered by one or more exemptions in the Freedom of Information Act (the "FOIA") (5 U.S.C. §552(b)) and is therefore exempt from the CFTC's public disclosure requirements pursuant to 17 C.F.R. §145.5. In particular, 5 U.S.C. §552(b)(4) ("Exemption 4") and 17 C.F.R. §145.9(d)(1)(ii) exempts disclosure that would reveal the Kalshi's trade secrets or confidential commercial or financial information. Kalshi believes that the Confidential Information contains confidential, as well as proprietary, information regarding its legal and business analyses and business with the Commission that should be protected from public disclosure pursuant to this exemption. Confidential treatment is requested for a period of five years.

The Supreme Court most recently revisited its jurisprudence regarding FOIA Exemption 4 in Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2366 (2019), where the Court

explicitly expanded FOIA exemption 4 so that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." See also Ryan, L.L.C. v. United States Dep't of Interior, No. 22-10373, 2022 WL 17250186, at *2 (5th Cir. Nov. 28, 2022) ("In Food Marketing Institute v. Argus Leader Media, the Supreme Court laid out the new Exemption 4 standard: information may be exempt from a FOIA release as "confidential" if it is (1) "both customarily and actually treated as private by its owner" and (2) "provided to the government under an assurance of privacy." 139 S. Ct. 2356, 2363–66 (2019). Importantly, the Supreme Court did not clearly answer whether the latter prong is even necessary, finding "there's no need to resolve that question in this case" because the government's confidentiality was mandated by way of federal regulations. Id. at 2363."). Regardless, the CFTC's regulations at 17 C.F.R. §§ 40.8 and 145.9 satisfy this prong.

Under the Supreme Court's construction in Argus Leader, the information conveyed by Kalshi falls squarely under the confidential information exempted from FOIA disclosure by Exemption 4. Federal case law applying the Argus Leader framework considers submitted information to be deemed "confidential" under Exemption 4 if it is "customarily kept private, or at least closely held, by the person imparting it." Greenspan v. Bd. of Governors of Fed. Rsrv. Sys., No. 1:21-CV-01968 (TNM), 2022 WL 17356879, at *4 (D.D.C. Dec. 1, 2022) (quoting Food Mktg. Inst. v. Argus Leader Media, ––– U.S. ––––, 139 S. Ct. 2356, 2363, (2019)). Kalshi customarily keeps the Confidential Information "private" and "closely held" and it is therefore "confidential" for purposes of Exemption 4.

In another iteration of the Argus Leader holding, the U.S. District Court for the District of Columbia succinctly framed the applicability of Exemption 4 as dependent on whether that information was "of a kind that would customarily not be released to the public by the person from whom it was obtained." Naumes v. Dep't of the Army, No. CV 21-1670 (JEB), 2022 WL 17752206, at *4–5 (D.D.C. Dec. 19, 2022) (quoting Critical Mass Engine Project v. Nuclear Regul. Comm'n, 975 F.2d 871, 879 (D.C. Cir. 1992)). "The critical question in so determining is how the particular party customarily treats the information, not how the industry as a whole treats the information. A party can voluntarily make protected disclosures of information, and as long as the disclosures are not made to the general public, such disclosures do not constitute customary disclosures." Id. (internal citations and quotations omitted). In short, "The only question here, then, is whether [the submitter] "customarily" releases her [information] to the public. The answer is plainly no." Id. Kalshi's Confidential Information is likewise not customarily released to the public and therefore qualifies as confidential for purposes of Exemption 4. Additionally, submitter notes that the confidential information is valuable commercially because it took significant time and at substantial cost to develop.

If the Commission or its staff transmits any of the Confidential Submission to another federal agency, Kalshi requests that you forward a copy of this letter to any such agency with the Submission and further requests that you advise any such agency that Kalshi has requested that this material be accorded confidential treatment.

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcripts or other writings of any sort whatsoever that are made by, or at the request of, any employee of the Commission (or any other federal agency) and which (1) incorporate, include or relate to any aspect of the Confidential Submission; or (2) refer to any conference, meeting, or telephone conversation between Kalshi, its current or former employees, representatives, agents, auditors or counsel on the one hand and employees of the Commission (or any other government agency) on the other, relating to the Confidential Submission.

This request is not to be construed as a waiver of any other protection from disclosure or confidential treatment accorded by law, and Kalshi will rely on and invoke any such confidentiality protection. Kalshi requests that the CFTC advise the undersigned, pursuant to 17 C.F.R. §145.9(e)(1), in advance of any disclosure of the Confidential Information pursuant to the FOIA, so that this request for confidential treatment may be substantiated.

If you should have any questions or comments or require further information, please do not hesitate to contact the undersigned at xsottile@kalshi.com.

Yours,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

Draft of March 18, 2026
CONFIDENTIAL

Date of Submission

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the BTCPERP Futures Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.3(a) of the regulations of the Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a designated contract market (DCM) registered with the Commission, hereby voluntarily submits the BTCPERP contract (the Contract) for Commission review and approval. The Exchange intends to list the Contract on a continuous basis.

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract’s Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

**KalshiEX LLC**
**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**
**Summary: Bitcoin Perpetual Future**
**Date of Submission**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Regulation 40.3(a)(4), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix D), and the Commission's regulations thereunder.

### I. Introduction

The BTCPERP Contract is a perpetual futures contract related to digital assets.

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, E, F, and G.

**General Contract Terms and Conditions:** As outlined in Rule 5.16 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.13 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract is a cash-settled futures contract with no fixed expiration date. Each Contract represents a continuous obligation to make or receive cash payments based on changes in the Contract's mark price and periodic funding payments. Positions are marked to market on a continuous basis, and margin is collected and paid in accordance with the Exchange's margin methodology. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. Members may enter and exit positions at any time during trading hours by executing offsetting trades. Members holding long positions profit when the Contract price increases and incur losses when it decreases; Members holding short positions profit when the Contract price decreases and incur losses when it increases. To maintain price convergence with the underlying reference price, the Contract employs a periodic funding mechanism whereby long position holders and short position holders exchange funding payments based on the difference between the Contract's mark price and the Reference Price, as specified in Appendix A. A Member's gain or loss at any point is equal to the change in the Contract's mark price since the position was established, multiplied by the contract multiplier, plus or minus net funding payments received or paid. Settlement of all payments is made in cash; no physical delivery occurs.

## CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.3, 17 C.F.R. § 40.3

Based on the above analysis, the Exchange certifies that:

❑ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_________________________

By: Xavier Sottile
Title: Head of Markets
Date: Date of Submission

**Attachments:**

Appendix A - Contract Terms and Conditions
Appendix B - Trading Prohibitions
Appendix C (Confidential) - Further Considerations
Appendix D (Confidential) - Source Agency
Appendix E (Confidential) - Compliance with Core Principles
Appendix F (Confidential) - Agreement with CF Benchmarks

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: BTCPERP**
**Rulebook: BTCPERP**

# BTCPERP

**Scope:** These rules shall apply to this Contract.

**Underlying:** The Underlying for this Contract is the spot price of one Bitcoin (BTC) in U.S. dollars.

**Underlying Price Index:** For a given time t, the Underlying Price Index (UPIt) is the last recorded value of the CF Benchmarks Bitcoin Real Time Index.

**Source Agency:** The Source Agency is CF Benchmarks.

**Type:** The type of Contract is a Perpetual Futures Contract.

**Trading Hours:** 24 hours per day, 7 days per week, throughout the lifetime of the Contract, subject to any trading halts imposed by the Exchange.

**Trading Unit:** One ten-thousandth (1/10,000) of one Bitcoin (BTC).

**Price Quotation:** Prices for the Contract are quoted in U.S. dollars per one Bitcoin

**Minimum Tick:** The Minimum Tick size for this Contract shall be $0.0001.

**Position Accountability Level:** $5,000,000 mark-to-market position value (in the case of a short position, the equivalent long position value is considered).

**Periodic Transfer Criterion:** At each Funding Calculation Interval, the Funding Rate is computed as defined below. If the Funding Rate is zero, no Periodic Transfer is made. If the Funding Rate is positive, long-side holders must contribute an amount equal to the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to short-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. If the Funding Rate is negative, short-side holders must contribute an amount equal to the absolute value of the Funding Rate multiplied by the volume-weighted average price of the Contract during the 60 seconds preceding the Funding Calculation Interval to long-side holders, multiplied by the Trading Unit (0.0001 BTC), for each Contract held. Periodic Transfer obligations are determined at the end of each Funding Calculation Interval and are settled in cash at the next Settlement Time. Revisions to the Underlying made after any Funding Calculation Interval will not be accounted for in determining the applicable Periodic Transfer.

**Funding Calculation Interval:** The Funding Rate is calculated every 8 hours, for the intervals ending at 12:00 AM ET, 8:00 AM ET, and 4:00 PM ET.

**Premium Index:** For each second during each 8-hour funding interval, the Exchange computes a Premium Index as follows:

$$PI(t) = (max(0, IBP_t - UPI_t) - max(0, UPI_t - IAP_t)) / UPI_t$$

where:

*Impact Notional (IN)* is $1,000, meant to approximate the median trade size in the market.

*Impact Ask Price ($IAP_t$)* is the average execution price, per contract, of a long market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IAP_t$ is considered to be undefined.

*Impact Bid Price ($IBP_t$)* is the average execution price, per contract, of a short market order with size of the Impact Notional. If there does not exist sufficient contracts on the order book for an order of this size to fill in its entirety, $IBP_t$ is considered to be undefined.

If $IBP_t$ is undefined, $\max(0, IBP_t - UPI_t)$ is considered to evaluate to 0. Similarly if $IAP_t$ is undefined, $\max(0, UPI_t - IAP_t)$ is considered to evaluate to 0.

Within each one-second range, t is selected uniformly at random for the purposes of computing the IAP and IBP.

Number of Contracts = IN / (UPIt × Trading Unit). The resulting number of Contracts shall be rounded to the nearest whole Contract.

**Funding Rate:** The 28,800 per-second Premium Index calculations which make up each 8-hour sample (in ascending chronological order PI*t(1)*, PI*t(2)*, PI*t(3)*, …) are joined in a linearly time-weighted average to compute the Weighted Average Premium Index (WAPI). The Funding Rate for a given interval shall equal the Weighted Average Premium Index (WAPI) for that interval, subject to the following adjustments:

(a) **Deadband:** If the absolute value of the Funding Rate falls below 0.01%, the Funding Rate shall be set to zero.

(b) **Clamp:** If the absolute value of the Funding Rate exceeds 2%, the Funding Rate shall be clamped to +2% or –2%, as applicable (the "Maximum Funding Magnitude").

**Clearing**: The Contracts will be centrally cleared by Kalshi Klear LLC (Klear or the Clearinghouse), a derivatives clearing organization registered with the Commission, as central counterparty.

**Settlement Date/Times:** 12:00 PM ET and 4:00 PM ET, on every day throughout the lifetime of the Contract. At each Settlement Time, the Exchange settles all outstanding obligations, including variation margin and any accrued Periodic Transfer obligations calculated since the prior Settlement Time.

**Settlement Price:** For the purposes of calculating variation margin, the Settlement Price shall be the volume-weighted average price of the Contract during the 60 seconds preceding the Settlement Time. This VWAP calculation will be adjusted to exclude outliers; generally this will be performed via a median-based Mean Absolute Difference (MAD) filter, but the Exchange reserves the right to exercise discretion to exclude other outlier or manipulative transactions. Transactions which occur precisely at the Settlement Time are not considered in this calculation.

If insufficient trading data exists to compute a VWAP from trades during the 60 seconds preceding the Settlement Time, the Settlement Price shall be the volume-weighted average price of the Contract during the one-minute interval containing the most recent trade prior to the Settlement Time.

**Initial and Maintenance Margin:** Initial margin and maintenance margin requirements for the Contract shall be calculated using the Exchange's risk-based margin methodology.

**Last Trading Date:** As this is a Perpetual Futures Contract, it has no Last Trading Date.

**Expiration Date:** As this is a Perpetual Futures Contract, it has no Expiration Date.

**Expiration Time:** As this is a Perpetual Futures Contract, it has no Expiration Time.

**Market Integrity:** The Exchange may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 7.1 of the Rulebook. If a Funding Rate or Settlement Price cannot be determined, the Exchange has the right to determine payouts or margin requirements pursuant to Rule 7.1 of the Rulebook. If the Funding Rate cannot be determined for a given interval (including due to insufficient order book liquidity), the Funding Rate shall be set to zero.

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will institute additional prohibitions for trading the Contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Officers, directors, and employees of CF Benchmarks Ltd., including members of its Oversight Committee, and its parent company
- Members of the CME CF Oversight Committee responsible for governance of the CF Benchmarks index family
- Officers, directors, and employees of the Constituent Exchanges contributing data to the CF Benchmarks Bitcoin Real Time Index (currently Coinbase, Bitstamp, Kraken, Gemini, itBit/Paxos, LMAX Digital, Bullish, and Crypto.com), to the extent such persons have access to non-public order flow data, surveillance data, or advance knowledge of exchange operational changes that could materially affect the Underlying Price Index
- Third-party auditors (e.g., KPMG engagement teams) currently engaged in auditing or assuring CF Benchmarks' index methodology or BMR compliance
- Immediate family members (parents, siblings, spouses, domestic partners) and household members of all persons listed above

# APPENDIX C (CONFIDENTIAL) – FURTHER CONSIDERATIONS

The BTCPERP Contract serves critical risk mitigation functions for a broad range of market participants with bona fide economic exposure to Bitcoin. Bitcoin miners incur fixed costs denominated in U.S. dollars — electricity, hardware, facility leases — while earning revenue denominated in Bitcoin, creating a structural currency mismatch that a perpetual futures contract is uniquely suited to hedge. CoinShares' Q4 2024 mining report found that the weighted average cash cost to produce one Bitcoin among listed miners reached $82,162, with all-in costs at approximately $137,000 per BTC.[1] Riot Platforms reported an all-in cost per BTC of approximately $127,795 in Q1 2025.[2] Multiple publicly traded miners have disclosed derivatives-based hedging programs in SEC filings: MARA Holdings disclosed a $17.4 million realized loss on bitcoin hedging activities through costless collars, overseen by a formal Investment Committee;[3] Bitfarms disclosed a board-approved hedging program authorizing management to implement hedges using BTC option contracts for up to 20% of expected monthly production;[4] and CleanSpark listed the possibility that mining costs may exceed mining revenues as a principal risk factor.[5] Academic research confirms the structural nature of this risk: Alexander, Deng & Zou (2023), published in the *European Journal of Operational Research*, find that perpetual futures hedging costs "are hardly influenced by the swings between backwardation and contango that can induce a high degree of roll-cost uncertainty into hedging with standard futures contracts."[6] Hashrate Index research quantifies the benefit: mining companies that hedge with derivatives achieve an average 109 basis point reduction in cost of equity, while a 12-month hashprice forward reduces cash flow volatility by 64%.[7]

Beyond miners, institutional holders of spot Bitcoin require continuous hedging instruments: U.S. spot Bitcoin ETFs now hold approximately $95–113 billion in assets under management, with 24% of U.S. Bitcoin ETF AUM held by 13F institutional filers including financial advisors holding an estimated 185,000 BTC-equivalent exposure.[8] Authorized participants and market makers for these ETPs — including Jane Street, Virtu Americas, Goldman Sachs, Citadel Securities, and

---

[1] CoinShares, *Bitcoin Mining Report Q4 2024* (2025).

[2] Riot Platforms, *Full Year 2025 Financial Results and Strategic Highlights* (March 2026), available at https://www.riotplatforms.com/riot-platforms-reports-full-year-2025-financial-results-and-strategic-highlights/.

[3] MARA Holdings, Inc., Annual Report (Form 10-K) for the fiscal year ended December 31, 2023, filed with the SEC, available at https://www.sec.gov/Archives/edgar/data/0001507605/000162828024007680/mara-20231231.htm.

[4] Bitfarms Ltd., Annual Report (Form 20-F), filed with the SEC, available at https://investor.bitfarms.com/es-LA/sec-filings/.

[5] CleanSpark, Inc., Annual Report (Form 10-K) for the fiscal year ended September 30, 2024, filed with the SEC.

[6] Carol Alexander, Jun Deng & Bin Zou, *Hedging with Automatic Liquidation and Leverage Selection on Bitcoin Futures*, 306 Eur. J. Operational Res. 478–493 (2023).

[7] Hashrate Index (Luxor Technologies), *How Hedging Strategies Can Help Bitcoin Miners Lower Their Cost of Capital* (May 2023), available at https://hashrateindex.com/blog/bitcoin-miners-should-hedge-to-lower-their-cost-of-capital/.

[8] CoinShares, *Institutional Report: 13F Filings of Bitcoin ETFs Q3 2025* (2025), available at https://coinshares.com/us/insights/research-data/13f-filings-of-bitcoin-etfs-q3-2025-institutional-report/.

others disclosed in IBIT's prospectus — carry inventory risk that must be hedged in real time.[9] Further, OTC crypto trading volumes more than doubled in 2024 (106% annual growth),[10] with OTC desks holding up to 410,000 BTC in inventory requiring continuous hedging.[11] And the crypto lending market reached $36.5 billion as of Q4 2024, growing to a record $73.6 billion by Q3 2025 — all collateralized lending that creates liquidation risk correlated to spot price declines and that a regulated perpetual futures contract would allow participants to hedge with precision.[12]

The perpetual structure, combined with the funding rate mechanism that maintains convergence with the spot reference price, makes the Contract functionally superior to dated alternatives for participants whose economic exposure is itself perpetual or indefinite in duration: as Coinbase Derivatives stated in its comment letter to the CFTC's request for comment on perpetual contracts, perpetual contracts eliminate the need for traders to roll contracts regularly, trade with a much smaller basis to the spot market due to the funding rate mechanism, and allow liquidity to be concentrated in a single contract rather than fragmented across multiple expiration dates.[13]

Perpetual futures, such as the Contracts, also provide substantial price discovery and transparency benefits that serve the public interest. Kaiko reports that perpetual futures account for 68% of all Bitcoin trading volume in 2025, up from 66% in 2024, and that derivatives make up over 75% of all trading activity in crypto markets;[14] CoinGecko's 2025 Annual Report found the top 10 centralized perpetual exchanges recorded $86.2 trillion in volume, up 47% year-over-year.[15] Academic research by Alexander & Heck (2020), published in the *Journal of Financial Stability*, established that perpetual swaps traded on unregulated exchanges are "much the strongest instruments for bitcoin price discovery," while CME futures "have a very minor effect on price discovery, even less than the spot exchanges."[16]

Yet the vast majority of this activity occurs on offshore, unregulated venues: Binance, Bybit, and OKX account for nearly 70% of open contracts on BTC perpetual futures, with average daily volume ranging from $10 to $30 billion — but none of these entities are registered with the Commission as DCMs. The CFTC's enforcement record underscores the regulatory stakes implicated by allowing this activity to proliferate off-shore, rather than on registered platforms in the United States: BitMEX was ordered to pay $100 million for illegally operating a

---

[9] iShares Bitcoin Trust ETF (IBIT), Post-Effective Amendment to Form S-3 (May 9, 2025), SEC Archives, available at https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001980994.

[10] Finery Markets, as reported in The Block, *Crypto OTC Trading Volume Surged Over 100% in 2024* (January 2025), available at https://www.theblock.co/post/334300/.

[11] CryptoQuant, as reported in CoinDesk, *Crypto OTC Desks Now Hold Over $22B in Bitcoin* (August 22, 2024); CoinDesk, *Bitcoin Bull Run in Question as Balances on OTC Desks Rise to 410K* (October 1, 2024).

[12] Galaxy Research, *The State of Crypto Lending* (April 2025); Yahoo Finance, *Crypto Lending Hits $73.6B Record as DeFi Captures Two-Thirds of Market* (November 19, 2025).

[13] Coinbase Derivatives, LLC, Comment Letter to the CFTC on Perpetual Derivatives (May 21, 2025), available at https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=35619.

[14] Kaiko, *Perps are Coming to America* (June 2025), available at https://www.kaiko.com/reports/perps-are-coming-to-america.

[15] CoinGecko, *2025 Annual Crypto Industry Report* (2025), available at https://www.coingecko.com/research/publications/2025-annual-crypto-report.

[16] Carol Alexander & Daniel Heck, *Price Discovery in Bitcoin: The Impact of Unregulated Markets*, 50 J. Fin. Stability 100776 (2020).

cryptocurrency trading platform without registration or KYC/AML procedures;[17] Binance paid $2.7 billion — the largest CFTC penalty ever imposed against a single entity — for willful evasion of federal law;[18] and Falcon Labs was the first intermediary charged for facilitating U.S. customer access to offshore derivatives exchanges.[19] Listing the BTCPERP Contract on a CFTC-registered DCM brings this economically significant activity into a regulated environment with robust trade surveillance, know-your-customer verification, risk-based margin requirements, and disciplinary procedures consistent with the CEA and Commission regulations thereunder.

Further, the Contract's use of the CF Benchmarks Bitcoin Real Time Index ensures that the reference price is derived from a regulated benchmark administrator: CF Benchmarks is authorized by the UK Financial Conduct Authority under the EU/UK Benchmarks Regulation (FRN 847100), with compliance independently audited by KPMG under ISAE 3000 reasonable assurance.[20] The CME CF Bitcoin Reference Rate, administered by CF Benchmarks, serves as the settlement benchmark for CME Group's Bitcoin futures[21] and is the pricing benchmark for six of the eleven U.S. spot Bitcoin ETFs, including BlackRock's IBIT.[22] And the funding rate mechanism has been rigorously studied in peer-reviewed literature: Ackerer, Hugonnier & Jermann (2024), published in *Mathematical Finance*, derive no-arbitrage perpetual futures prices and demonstrate that the pricing formula "is closely related to Covered Interest Parity used to price futures and forwards"[23] — while He, Manela, Ross & von Wachter (2024) find that deviations from no-arbitrage in crypto perpetuals "diminish over time as crypto markets develop and become more efficient."[24] A BIS Working Paper (No. 1087, Schmeling, Schrimpf & Todorov, 2023) documents that the CME Bitcoin basis can reach "exceptionally high levels, sometimes exceeding 40% per annum," and that a 10% increase in standardized carry predicts a 22% increase in short-futures liquidations — identifying "limited deployment of arbitrage capital due to regulatory and margin frictions" as a key driver, a friction that a regulated domestic perpetual futures contract directly addresses.[25]

Finally, CFTC Chairman Selig has stated that he has "directed CFTC staff to facilitate the onshoring of novel derivatives products, including perpetual contracts, that have largely developed

---

[17] CFTC Press Release 8412-21, *Federal Court Orders BitMEX to Pay $100 Million* (August 10, 2021), available at https://www.cftc.gov/PressRoom/PressReleases/8412-21.

[18] CFTC Press Release 8680-23 (March 27, 2023) and Press Release 8837-23 (December 18, 2023), available at https://www.cftc.gov/PressRoom/PressReleases/8680-23 and https://www.cftc.gov/PressRoom/PressReleases/8837-23.

[19] CFTC Press Release 8909-24, *CFTC Issues Order Against Crypto Prime Brokerage Firm* (May 13, 2024), available at https://www.cftc.gov/PressRoom/PressReleases/8909-24.

[20] CF Benchmarks Ltd., FCA Financial Reference Number 847100; CF Benchmarks, *CF Benchmarks Authorised and Regulated by the FCA under EU BMR* (February 6, 2020), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr.

[21] CME Group, *FAQ: CME CF Cryptocurrency Benchmarks*, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html.

[22] BlackRock, iShares Bitcoin Trust ETF (IBIT) fact sheet, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf.

[23] Damien Ackerer, Julien Hugonnier & Urban Jermann, *Perpetual Futures Pricing*, Mathematical Finance (2024); NBER Working Paper No. 32936.

[24] Songrun He, Asaf Manela, Omri Ross & Victor von Wachter, *Fundamentals of Perpetual Futures* (2024), available at https://arxiv.org/abs/2212.06888.

[25] Matthias Schmeling, Andreas Schrimpf & Karamfil Todorov, *Crypto Carry*, BIS Working Paper No. 1087 (April 2023, revised October 2025), available at https://www.bis.org/publ/work1087.pdf.

*KalshiEX LLC - Confidential*

offshore due to regulatory uncertainty in the United States," confirming that the listing of a regulated Bitcoin perpetual futures contract directly advances the Commission's stated policy objectives of deterring manipulation, protecting market participants, and promoting responsible innovation.[26]

[26] Remarks of CFTC Chairman Michael Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (January 29, 2026), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

*KalshiEX LLC - Confidential Treatment Under Regulations 40.8 and 145.9 Requested*

**Confidential Treatment Requested by Kalshi**

## APPENDIX D (CONFIDENTIAL) – SOURCE AGENCY

The Source Agency for the BTCPERP Contract is CF Benchmarks Ltd ("CF Benchmarks"), the administrator of the CF Benchmarks Bitcoin Real Time Index (the "Underlying Price Index" or "BRTI"), which provides a continuous, second-by-second measure of the U.S. dollar price of Bitcoin derived from observable transactions on major cryptocurrency trading platforms.

### Regulatory Status and Governance

CF Benchmarks is authorized and regulated by the UK Financial Conduct Authority ("FCA") as a benchmark administrator under the UK Benchmarks Regulation (FCA Financial Reference Number 847100). CF Benchmarks was the first cryptocurrency index provider to obtain FCA authorization under the BMR framework, which it received on February 6, 2020.[27] The UK Benchmarks Regulation transposes the IOSCO Principles for Financial Benchmarks (published July 2013) into binding regulatory requirements, imposing governance, methodology transparency, conflict-of-interest management, and oversight obligations on benchmark administrators. CF Benchmarks is registered in England and Wales (company number 11654816) and is a wholly owned subsidiary of Payward, Inc. (d/b/a Kraken), acquired in February 2019.

CF Benchmarks' BMR compliance has been independently verified through a KPMG audit conducted under International Standard on Assurance Engagements 3000 (ISAE 3000) — a reasonable assurance engagement — covering the period from September 2022 to September 2024. This is the same assurance standard applied to benchmark administrators of traditional financial indices. CF Benchmarks maintains an independent Oversight Committee, composed of industry experts and external members, that reviews the methodology and governance of all CF Benchmarks indices in accordance with BMR requirements. The Oversight Committee has authority to recommend changes to methodology, review complaints, and escalate concerns to the FCA.

### Index Methodology

The CF Benchmarks Bitcoin Real Time Index is computed on a continuous basis, updated every second, using observable trade data from a defined set of constituent exchanges. As of the date of this filing, constituent exchanges include Coinbase, Bitstamp, Kraken, Gemini, itBit (Paxos), LMAX Digital, Bullish, and Crypto.com — all of which are regulated or licensed entities in their respective jurisdictions. The index methodology applies trade-weighted calculations with outlier-filtering and manipulation-resistant aggregation techniques designed to ensure that the published index value reflects genuine market prices rather than transient anomalies or attempted manipulation on any single venue. The methodology is publicly available and subject to periodic review and consultation in accordance with BMR governance requirements.

The BRTI is designed to provide a real-time indication of the Bitcoin-U.S. dollar exchange rate, drawing on order and trade data from constituent exchanges during each calculation interval. The index applies a cascading methodology: in each one-second interval, it computes the mid-price

[27] CF Benchmarks Ltd., CF Benchmarks Authorised and Regulated by the FCA under EU BMR (February 6, 2020), available at https://www.cfbenchmarks.com/blog/cf-benchmarks-authorised-and-regulated-by-the-fca-under-eu-bmr; FCA Financial Services Register, FRN 847100.

derived from the best bid and best ask on each constituent exchange, volume-weighted across exchanges, and publishes the resulting composite value. If insufficient data is available from any constituent exchange during a given interval, that exchange is excluded from the calculation for that interval without interrupting index publication.

CF Benchmarks also administers the CME CF Bitcoin Reference Rate ("BRR"), a once-daily benchmark calculated during a one-hour observation window (3:00–4:00 PM London time), partitioned into twelve five-minute intervals, using an equally weighted average of volume-weighted median trade prices across constituent exchanges. While the BTCPERP Contract uses the real-time BRTI for funding rate calculations and settlement pricing, the BRR and the BRTI share the same constituent exchange universe and the same underlying governance and methodology framework, ensuring consistency across the CF Benchmarks index family.

**Institutional Adoption and Track Record**

The CF Benchmarks index family is among the most widely adopted cryptocurrency pricing benchmarks in the regulated financial industry. CME Group has used the CME CF Bitcoin Reference Rate as the settlement benchmark for its Bitcoin futures, Micro Bitcoin futures, and Bitcoin options contracts since the launch of CME Bitcoin futures in December 2017. Six of the eleven U.S. spot Bitcoin ETFs approved by the SEC in January 2024 use the CME CF Bitcoin Reference Rate – New York Variant ("BRRNY") as their pricing benchmark, including BlackRock's iShares Bitcoin Trust (IBIT), the world's largest Bitcoin ETF with approximately $68–70 billion in assets under management.[28] Other ETFs using BRRNY include ARK 21Shares Bitcoin ETF (ARKB), Bitwise Bitcoin ETF (BITB), Franklin Bitcoin ETF (EZBC), Valkyrie Bitcoin Fund (BRRR), and WisdomTree Bitcoin Fund (BTCW). In total, CF Benchmarks states that its indices carry over $80 billion of assets through investment funds, ETFs, and other financial products globally.

The selection of CF Benchmarks by BlackRock, CME Group, and other major regulated financial institutions reflects a market determination that the index methodology, governance, and regulatory oversight are sufficient to serve as the pricing backbone for products holding tens of billions of dollars in customer assets and settling billions of dollars in daily futures volume.

**Resilience and Manipulation Resistance**

The multi-exchange, volume-weighted construction of the BRTI provides inherent resistance to manipulation on any single venue. Any attempt to manipulate the index would require simultaneous, coordinated activity across multiple independently operated, regulated trading platforms — each of which maintains its own surveillance, KYC/AML, and market integrity programs. The constituent exchange selection criteria require that exchanges demonstrate adequate trade volume, operational reliability, and compliance with applicable regulatory standards; exchanges that fail to meet these standards are removed from the index. CF Benchmarks

[28] CME Group, FAQ: CME CF Cryptocurrency Benchmarks, available at https://www.cmegroup.com/articles/faqs/cme-cf-cryptocurrency-benchmarks-faq.html; BlackRock, iShares Bitcoin Trust ETF (IBIT) fund page, available at https://www.blackrock.com/us/individual/products/333011/ishares-bitcoin-trust-etf

periodically reviews and updates its constituent exchange universe through a formal consultation process subject to Oversight Committee approval.

The transparency of the methodology — publicly documented and subject to regulatory review by the FCA — provides market participants, regulators, and the public with the ability to independently replicate and verify the index value at any point in time. This level of transparency stands in contrast to proprietary index calculations used by offshore, unregulated exchanges, where methodology changes may be made without notice or external review.

In addition, the BRTI's constituent exchanges are themselves subject to regulatory oversight: Coinbase operates under state money transmitter licenses and is a publicly traded company (NASDAQ: COIN) subject to SEC reporting requirements; Bitstamp holds a BitLicense from the New York Department of Financial Services; Gemini is a New York trust company regulated by NYDFS; itBit (Paxos) is a New York-chartered limited purpose trust company; Kraken holds licenses in multiple jurisdictions; LMAX Digital is part of the FCA-regulated LMAX Group; Bullish is a publicly traded company (NYSE: BLSH) that holds a BitLicense and Money Transmission License from NYDFS and is registered as a Money Services Business with FinCEN; and Crypto.com is registered as a Money Services Business with FinCEN.

**Accuracy and Continuity**

The BRTI has been in continuous operation since November 2016, providing an uninterrupted track record of over nine years. During periods of extreme market stress — including the March 2020 COVID crash, the May 2021 China mining ban selloff, the November 2022 FTX collapse, and the August 2024 global carry-trade unwind — the index continued to publish without interruption, demonstrating operational resilience under adverse conditions. The redundancy of the multi-exchange data aggregation model ensures that the index remains calculable even if one or more constituent exchanges experience outages or trading halts.

In summary, the data used to determine the Reference Price and Funding Rate of the Contract is prepared and published by CF Benchmarks, an FCA-authorized benchmark administrator operating under the UK Benchmarks Regulation, independently audited by KPMG, adopted by CME Group and BlackRock as the pricing backbone for the world's largest regulated Bitcoin derivatives and ETF products, and constructed from trade data sourced exclusively from regulated or licensed trading venues. The Exchange believes that CF Benchmarks is a highly reliable, transparent, and manipulation-resistant Source Agency.

## APPENDIX E (CONFIDENTIAL) – COMPLIANCE WITH CORE PRINCIPLES

### Compliance with Core Principles

*A. The Exchange has Exercised Reasonable Discretion by Categorizing the Contracts as Futures Contracts for Purposes of Compliance with the Core Principles and Other Provisions of the CEA and Commission Regulations.*

Section 5(d)(1)(B)[29] of the CEA and Regulation 38.100(b)[30] thereunder provide that a DCM has reasonable discretion in establishing the manner in which it complies with the Core Principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Contracts as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.[31]

*First,* we analyzed whether the Contracts constitute futures contracts by evaluating the characteristics of the Contracts against relevant judicial precedent and Commission guidance. Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[32] by evaluating whether certain characteristics common to futures contracts are present.[33]

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the

---

[29] 7 U.S.C. § 7(d)(1)(B).
[30] 17 C.F.R. § 38.100(b).
[31] Kalshi and Klear intend to treat the Contracts as futures contracts for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.
[32] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").
[33] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

actual commodities."[34] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[35]

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contracts involving intangible commodities such as the Underlying, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[36] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[37] as evidenced by (i) the contract trading at a fixed, standardized unit

---

[34] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*"). *See, also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989) (adopting a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public) and Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993) (adopting an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility).

[35] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[36] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). Because the Contracts are derivatives on the Underlying, which is an intangible commodity (*i.e.,* the spot price of Bitcoin), this request does not address the regulatory categorization of contracts on tangible commodities.

[37] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

quantity,[38] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[39] and (iii) the ability of holders to exit their positions by offset.[40]

The Contracts will exhibit all of these futures contract characteristics: the Contracts will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty; holders will be able to exit their positions via offset; the Contracts will be available to the general public, including retail participants; parties will enter into the Contracts for the purpose of assuming or shifting the risk of change in value of the Underlying, without the possibility of transferring ownership of the Underlying; and the Contracts will trade on the centralized market of a DCM.

*Then*, we analyzed whether the Contracts' indefinite duration should affect their categorization. We focused on this term of the Contracts because courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[41] or "on a date certain,"[42] or "at or before a stated future time."[43] Courts have not, however, viewed this characteristic as necessary to conclude that a contract is a futures contract. To the contrary, courts have repeatedly explained that, "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[44] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[45] – because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[46] And, in *Zelener*, the Commission

---

[38] *Id.*

[39] *CME v. SEC* at 542. Although the Dodd-Frank Act arguably changed the historical analysis, at least in part, by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on swap execution facilities, which may lack the centralized market characteristics of a DCM because they can permit trading via request for quote in addition to an order book.

[40] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

[41] *CME v. SEC* at 542.

[42] *Tauber* at 971.

[43] *Erskine* at 323.

[44] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v. International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[45] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[46] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of

took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[47]

Based on this analysis, Kalshi is of the view that the Contracts are appropriately categorized as futures contracts for purposes of compliance with the Core Principles and other provisions of the CEA and Commission regulations thereunder.

*B. The Contracts Comply with the Core Principles*

The Exchange has conducted a comprehensive analysis of the designated contract market core principles ("Core Principles") as set forth in Part 38 of the Act. The Core Principles relevant to the Contract are outlined and discussed in further detail below:

**Core Principle 2 - Compliance with Rules and Impartial Access:** The Exchange has adopted the Rulebook, which provides the requirements for accessing and trading on the Exchange. Pursuant to Chapters 2, 3, and 5 of the Rulebook, in utilizing the Exchange's services, all Members must comply with the rules of the Rulebook ("Rules"), cooperate with Exchange investigations, inquiries, audits, examinations and proceedings, and engage in conduct consistent with just and equitable principles of trade. Chapter 3 of the Rulebook also provides clear and transparent access criteria and requirements for Exchange Members. Trading in the Contract will be subject to all of the Rules, which are aimed at enforcing market integrity and customer protection. Further, Section 3.2 of the Klear rulebook includes clear and transparent criteria for clearing members eligible to clear transactions in the Contracts through Klear, providing that the Contracts will be available to all clearing members of Klear, either directly (for clearing members who are eligible contract participants) or indirectly through a futures commission merchant clearing member.

In particular, Chapter 5 of the Rulebook sets forth the Exchange's Prohibited Transactions and Activities and specifically prescribes the methods by which Members trade contracts, including the Contract. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the

---

the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out" date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[47] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on Kalshi.

Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. As described in Rule 9.1, the Exchange conducts trade practice surveillance, market surveillance, and real-time market monitoring to ensure that Members adhere to the Rules of the Exchange. The Exchange, through the compliance department, initiates review and, where appropriate, investigates unusual trading activity. The compliance department also investigates any time it has other reason to believe that inappropriate activity of any sort is taking place on the Kalshi Platform or its website.

Core Principle 2 also stipulates that an exchange shall establish means to provide market participants with impartial access to the market. Chapter 3 of the Rulebook, and Rule 3.1 in particular, provides clear and transparent access criteria and requirements for Members. The Exchange will apply access criteria in an impartial manner, including through the application process described in Rule 3.1.

**<u>Core Principle 3 - Contract not Readily Subject to Manipulation:</u>**

Core Principle 3 and Rule 38.200 provide that a DCM shall not list for trading contracts that are readily susceptible to manipulation. The Exchange's marketplace and contracts, including this Contract, have been designed in accordance with this fundamental principle. The Exchange maintains various safeguards against price manipulation and all other forms of manipulation, including, (i) real-time market monitoring, automated trade surveillance, and suspicious behavior detection, (ii) Rulebook prohibitions, Member certification, and notification, (iii) Member monitoring and know-your-customer verification, and (iv) sanctions. These safeguards will be applied with respect to trading in the Contracts and render the Contract not readily susceptible to manipulation.

(i) **Real-time market monitoring, automated trade surveillance, and suspicious behavior detection**: Kalshi conducts real-time market monitoring of all trading activity on the Exchange to identify disorderly trading and any market or system anomalies. As described in Rule 5.11, Kalshi has the authority to adjust trade prices or cancel trades when necessary to mitigate market disrupting events caused by malfunctions in its electronic trading platform or errors in orders submitted by members and market participants. Any trade price adjustments or trade cancellations must be transparent to the market and subject to standards that are clear, fair, and publicly available. Kalshi also maintains an automated trade surveillance system capable of detecting and investigating potential trade practice violations. [redacted] described in Rule 9.2(a), Kalshi's Compliance Department investigates unusual trading activity or other activity that the Compliance Department has reasonable cause to believe could constitute a violation of Kalshi's Rules, or upon the receipt of a request from Commission staff. The Exchange disciplinary process is conducted in accordance with Chapter 9 of the Exchange Rulebook, and penalties may be imposed in accordance with Rule 9.5.

(ii) **Rulebook prohibitions, member certification and notification:** The Exchange's Rulebook includes various provisions that prohibit manipulative behaviors. As noted above in the discussion of Core Principle 2, the Exchange's Rulebook gives the Exchange the authority to investigate potential violations of its rules. Pursuant to Rule 3.6, each Member is required to cooperate promptly and fully with an Exchange investigation by providing access to information on the activities of the Member in any referenced market, which includes books and records of trading. Pursuant to Rule 9.2, the Exchange may compel testimony, subpoena documents, and require statements under oath from any Member. The Exchange's Surveillance Officers, which operate within the Compliance Department, perform trade practice surveillance and real-time market monitoring to ensure that Members adhere to the Exchange's rules. The Rulebook also imposes sanctions on Members who break rules. Potential penalties include fines, disgorgement, and revocation of membership in Kalshi. Only Members are allowed to trade on the Exchange, and the Exchange requires its Members to strictly comply with the Rulebook. Members cannot complete the account creation process and trade on the Exchange until they certify that they have read the Exchange's rules and agree to be bound by them.

(iii) **Member monitoring and know-your-customer verification ("KYC")**: The Exchange has a robust KYC process. The KYC process is an important tool that helps flag and uncover higher risk traders before they become Members of the platform. The Exchange's KYC process ensures that the Exchange has access to all of its members' personal identifying information, and the Exchange can leverage this information as part of its surveillance and to ensure the overall fairness and integrity of its markets. During the application process, individual applicants are required to share personally identifiable information, such as their full legal name, social security number, date of birth, and address with the Exchange. Applicant information is run through a comprehensive set of databases that are actively compiled and maintained by an independent third party. The databases are utilized by the Exchange to identify applicants that are employees or affiliates of various governments and other agencies.

Additionally, as part of the KYC process for its individual members, the Exchange runs applicants through adverse media databases. The adverse media dataset is a real-time structured data feed of companies and individuals subject to adverse media. Monitoring thousands of news sources, business and trade journals, in addition to local, regional and national newspapers, the adverse media feed isolates and highlights any entities or individuals subject to a range of adverse media. The Exchange utilizes the database to trigger enhanced due diligence, because applicants with adverse media may be more likely to engage in certain types of unlawful activity including market manipulation.

(iv) **Sanctions**: Exchange Members must agree to the terms and conditions of the Exchange's Rulebook before being allowed to trade. As a result, Members are subject to disciplinary actions and fines for engaging in improper market conduct that is prohibited by the Exchange's Rulebook. In the event that suspicious trading activity is detected and results in an investigation initiated by the Exchange, market participants are required to provide the Exchange with information relevant to the scope of the investigation under Rule 3.6. Chapter 9 of the Exchange's Rulebook details the process for discipline and rule enforcement. Disciplinary action can range from a letter of warning to fines to referral to governmental authorities that can result in criminal prosecution.

Moreover, the specifics of the BTCPERP Contract satisfy the Core Principle 3 standard through multiple, independent, and mutually reinforcing layers of structural design and institutional safeguards, as set forth below.

The Underlying Price Index for the Contract is the CF Benchmarks Bitcoin Real Time Index, an institutional-grade benchmark administered by CF Benchmarks Ltd., a UK Financial Conduct Authority authorized benchmark administrator under the UK Benchmarks Regulation.[48] The BRTI is calculated once per second using consolidated order book data from all Constituent Exchanges.[49] It is used by the Chicago Mercantile Exchange for its Bitcoin futures and options contracts — products with tens of billions of dollars in open interest — and serves as one of the most widely relied-upon Bitcoin price references in regulated derivatives markets worldwide. Over $500 billion in CFTC- and FCA-regulated futures contracts have settled to CF Benchmarks indices, and six of eleven US spot Bitcoin ETFs, including BlackRock's iShares Bitcoin Trust, use the BRR New York Variant as their valuation benchmark.[50]

The BRTI aggregates order book data from eight regulated Constituent Exchanges: Bitstamp, Coinbase, Gemini, itBit (Paxos), LMAX Digital, Kraken, Bullish, and Crypto.com. Each Constituent Exchange must satisfy the CME CF Constituent Exchange Criteria, which require minimum volume thresholds, policies ensuring fair and transparent market conditions, processes to identify and impede manipulative trading practices, compliance with applicable KYC and AML regulations, and cooperation with regulatory inquiries including execution of data-sharing agreements with CME Group.[51] The multi-exchange composite structure means that a would-be manipulator cannot influence the index by operating on a single exchange. Any attempt to skew the consolidated order book requires coordinated activity across multiple independently regulated venues, each of which maintains its own surveillance and compliance infrastructure, dramatically increasing both the cost and the detection risk of any manipulation attempt. This design principle is well-grounded in the academic literature on optimal benchmark construction. Verstein has identified narrow time windows, single-venue data, and low transaction volumes as the precise features rendering benchmarks prone to manipulation;[52] the BRTI avoids all three. Researchers from Stanford and Northwestern Universities demonstrated that a benchmark administrator can reduce manipulation by widening the time window and broadening the set of

---

[48] CF Benchmarks Ltd (FRN 847100) was authorized by the UK Financial Conduct Authority on September 13, 2019, as the first cryptocurrency index provider registered as a Benchmark Administrator under the UK Benchmarks Regulation (Regulation (EU) 2016/1011, as onshored). See CF Benchmarks, "CF Benchmarks Authorised and Regulated by the FCA Under EU BMR" (2019).

[49] CME CF Bitcoin Real Time Index — Methodology Guide, Version 2, Crypto Facilities Ltd. (now CF Benchmarks), March 6, 2017. Available at https://www.cmegroup.com/trading/files/bitcoin-real-time-index-methodology-version-2.pdf.

[50] Over $500 billion in CFTC- and FCA-regulated futures contracts have settled to CF Benchmarks indices; over $80 billion in assets are referenced through ETFs, ETPs, and other products; six of eleven US spot Bitcoin ETFs — including BlackRock's iShares Bitcoin Trust (IBIT) — use the BRR New York Variant.

[51] CME CF Constituent Exchanges Criteria, CF Benchmarks. Available at https://docs.cfbenchmarks.com/CME%20CF%20Constituent%20Exchanges%20Criteria.pdf.

[52] See Andrew Verstein, "Benchmark Manipulation," 56 B.C. L. Rev. 215 (2015) (identifying narrow time windows, single-venue data, and low transaction volumes as the precise features rendering benchmarks prone to manipulation).

instruments and transaction types from which the benchmark is derived — both core features of the BRTI methodology.[53]

The BRTI calculation methodology incorporates four distinct design features that individually and collectively impede manipulation. First, if any bid or ask at a given price level on a Constituent Exchange exceeds a specified order size cap, it enters the consolidated order book with a size equal to the cap, preventing a manipulator from placing an outsized order at a single price level to disproportionately influence the index value. Second, rather than relying solely on top-of-book prices, the BRTI constructs a mid-price volume curve from the consolidated order book, requiring any manipulation attempt to involve a significant number of orders at significant size placed at multiple price levels. Third, only orders within 0.5% of the consolidated mid-price are included in the index calculation through a “utilized depth” threshold, excluding far-out orders unlikely to be executed while simultaneously ensuring that any orders placed within this narrow band to influence the index carry substantial execution risk. Fourth, within the utilized depth, orders are weighted using the normalized probability density of the exponential distribution, which places the greatest weight on prices closest to the best bid and ask, meaning that to materially influence the index a manipulator would need to concentrate orders at price levels where execution risk is highest.

The BRTI is “highly resistant against manipulation” — influencing it would require manipulation on several exchanges simultaneously over an extended period, and that the BRTI’s order-book basis makes it a Markov process and martingale, preventing gaming of derivatives settlement.[54][55] This assessment is corroborated by the broader literature on benchmark manipulation. Eisl, Jankowitsch, and Subrahmanyam have demonstrated that alternative fixings using median-based outlier elimination — a technique employed by the BRR and, through the Potentially Erroneous Data Parameter, by the BRTI — significantly reduce manipulation potential.[56] Recent work extending the Duffie-Dworczak framework has shown that VWAP is optimal when fixed manipulation costs are negligible, the median is optimal when variable costs are negligible, and the trimmed mean is optimal when both costs are significant, providing the theoretical basis for the BRR’s volume-weighted median approach.[57]

---

[53] Darrell Duffie & Piotr Dworczak, "Robust Benchmark Design," 142 J. Fin. Econ. 775 (2021) (demonstrating that the administrator can reduce manipulation by widening the time window and broadening the set of instruments and transaction types — both features of the BRR/BRTI methodology).

[54] Alexander Paine & William J. Knottenbelt, "Analysis of the CME CF Bitcoin Reference Rate and CME CF Bitcoin Real Time Index," Imperial College Centre for Cryptocurrency Research and Engineering (Oct. 20, 2016). Available at https://www.smallake.kr/wp-content/uploads/2017/11/bitcoin-white-paper.pdf.

[55] *Id*. The authors noted that any manipulation of the BRTI would require manipulation on "several exchanges over an extended period" and that the BRTI's order-book basis makes it a Markov process and martingale, preventing gaming of derivatives settlement.

[56] Alexander Eisl, Rainer Jankowitsch & Marti G. Subrahmanyam, "The Manipulation Potential of Libor and Euribor," 23 Eur. Fin. Mgmt. 604 (2017) (demonstrating that alternative fixings using median-based outlier elimination significantly reduce manipulation potential).

[57] "Optimal Benchmark Design under Costly Manipulation," arXiv:2506.22142 (June 2025) (showing VWAP is optimal when fixed costs are negligible, the median is optimal when variable costs are negligible, and the trimmed mean is optimal when both costs are significant).

The BRTI also incorporates automated contingency rules that further protect against manipulation and erroneous data. If the order book data from any Constituent Exchange is more than 30 seconds stale relative to the calculation time, that exchange is excluded from the index calculation for that timestamp. Order books that deviate from expected format, contain no bids or asks, or are crossed are automatically flagged and excluded. Most critically, for each Constituent Exchange, the methodology computes the mid-price of its order book and compares it to the median mid-price across all Constituent Exchanges; if any exchange's mid-price deviates by more than the Potentially Erroneous Data Parameter from this median, that exchange's data is excluded wholesale from the calculation. This means a manipulator cannot influence the index by distorting the order book on a single exchange, because the exchange's data would simply be dropped. CF Benchmarks reports that between January 2022 and March 2023, this parameter was never triggered, with the maximum observed deviation only 4.59%.[58]

These index-level protections are embedded within an institutional framework that provides additional assurance. CF Benchmarks is subject to ongoing regulatory oversight by the FCA, periodic independent audits (including KPMG ISAE (UK) 3000 reasonable assurance and Deloitte ISAE (UK) 3000 audits),[59] and the governance of the CME CF Oversight Committee. The BRTI's methodology is designed in accordance with the IOSCO Principles for Financial Benchmarks,[60] which were established in the wake of the LIBOR scandal precisely to ensure that financial benchmarks are anchored by observable transactions, with robust governance, transparent methodology, and accountability mechanisms.[61] Researchers have demonstrated empirically that FCA regulatory supervision of benchmark administrators improves market quality,[62] and confirmed that the most robust benchmarks are those most costly to manipulate and offering the fewest manipulation incentives.[63] CF Benchmarks employees are contractually prohibited from trading on the markets in question, and the data is provided on a real-time basis

---

[58] CF Benchmarks, "Suitability Analysis: Benchmarking the Price of Bitcoin" (2023). Available at https://docs.cfbenchmarks.com/BRR-suitability-analysis.pdf.

[59] KPMG ISAE (UK) 3000 Reasonable Assurance Report, covering September 12, 2022 – September 12, 2024. Available at https://docs.cfbenchmarks.com/CF_Benchmarks_UK_BMR_.pdf. See also Deloitte ISAE (UK) 3000 Audit (completed September 2022).

[60] IOSCO, "Principles for Financial Benchmarks: Final Report," FR07/13 (July 2013). Available at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

[61] See Martin Wheatley, "The Wheatley Review of LIBOR: Final Report," HM Treasury (Sept. 28, 2012) (recommending transaction-anchored submissions, delayed individual publication, and larger panel sizes to limit single-submission impact — the post-LIBOR reform principles that the BRR/BRTI methodology implements); see also David Hou & David R. Skeie, "LIBOR: Origins, Economics, Crisis, Scandal, and Reform," Fed. Res. Bank of N.Y. Staff Report No. 667 (March 2014) (documenting how LIBOR's survey-based methodology was vulnerable to manipulation — the precise vulnerability that transaction-based benchmarks like the BRTI are designed to eliminate).

[62] Matteo Aquilina, Gbenga Ibikunle, Vito Mollica & Tom Steffen, "The Visible Hand: Benchmarks, Regulation, and Liquidity," 61 J. Fin. Mkts. 100734 (2022) (demonstrating that FCA regulatory supervision of ICE Swap Rate improved market quality in the $289 trillion interest rate swaps market).

[63] James Brugler, Marta Khomyn & Tālis Putniņš, "Benchmarking Benchmarks," J. Fin. Econ. (2025) (first comprehensive empirical evaluation of all major LIBOR and alternative reference rates, confirming that more robust benchmarks are those more costly to manipulate and offering fewer manipulation incentives).

to thousands of financial professionals worldwide, ensuring that any discrepancy between the reported value and the true market price would be swiftly detected.

The Settlement Price for the BTCPERP Contract is determined by the volume-weighted average price of trades executed on the Kalshi Exchange during the 60-second window preceding each Settlement Time. This VWAP-based settlement mechanism implements the benchmark design insights that academics have identified as optimal: volume weighting ensures that the price reflects the economically significant transactions rather than noise, and the 60-second averaging window ensures that a manipulator cannot influence the settlement value through a momentary spike or a single trade.[64] The Exchange further applies a median-based Mean Absolute Difference filter to exclude outlier transactions from the VWAP calculation, and reserves the right to exclude transactions deemed manipulative. Transactions occurring precisely at the Settlement Time are excluded, preventing last-second manipulation attempts. If insufficient trading data exists during the 60-second window, the Settlement Price defaults to the VWAP from the one-minute interval containing the most recent trade, ensuring continuous and robust price determination even during periods of low liquidity. The twice-daily settlement schedule distributes any manipulation risk across multiple settlement events, reducing the expected value of any single manipulation attempt.

The BTCPERP Contract employs a periodic funding mechanism to maintain price convergence with the underlying spot price. Because the funding rate determines periodic cash transfers between long and short position holders, its resistance to manipulation is critical. The funding rate mechanism is grounded in a well-established theoretical literature. He, Manela, Ross, and von Wachter derive the no-arbitrage pricing of perpetual futures and show that the funding rate — periodic payments proportional to the futures-spot gap — is the key mechanism keeping futures prices close to spot.[65] Their model demonstrates that at each time *t*, the no-arbitrage price of a perpetual can be expressed as a function of the spot price scaled by a factor determined by the differential between the risk-free rate and the interest rate on the underlying asset.[66] Ackerer, Hugonnier, and Jermann provided theoretical treatment in *Mathematical Finance*, deriving explicit no-arbitrage prices for linear, inverse, and quanto perpetual contracts and identifying funding specifications that guarantee coincidence of futures and spot prices.[67] Angeris, Chitra, Evans, and Lorig derived model-free expressions for the funding rate and discount rate of perpetual contracts in continuous-time no-arbitrage settings.[68]

---

[65] Songrun He, Asaf Manela, Omri Ross & Victor von Wachter, "Fundamentals of Perpetual Futures," arXiv:2212.06888 (Dec. 2022, rev. Aug. 2024). Presented at the 2024 Utah Winter Finance Conference. Also SSRN Working Paper No. 4301150.

[66] *Id*. at 8–12 (deriving no-arbitrage condition P_t = S_t / (1 - (r - r')), where S_t is the spot price, r is the risk-free rate, and r' is the instantaneous interest rate on the underlying).

[67] Damien Ackerer, Julien Hugonnier & Urban Jermann, "Perpetual Futures Pricing," Mathematical Finance (2025). DOI: 10.1111/mafi.70018. NBER Working Paper No. 32936.

[68] Guillermo Angeris, Tarun Chitra, Alex Evans & Matthew Lorig, "Short Communication: A Primer on Perpetuals," 14 SIAM J. Fin. Math. SC17 (2023). DOI: 10.1137/22M1520931.

The BTCPERP funding rate is derived from the Premium Index, which measures the divergence between the Contract's order book and the Underlying Price Index at each second during each 8-hour funding interval. The Impact Bid Price and Impact Ask Price are computed as the average execution prices for hypothetical market orders with a notional value equal to the Impact Notional of $1,000, approximating the median trade size. This construction anchors the Premium Index to achievable execution prices rather than top-of-book quotes, meaning orders that are exposed to genuine execution risk. If insufficient liquidity exists on either side of the order book to fill a $1,000 market order, the corresponding Impact Price is treated as undefined and the relevant term evaluates to zero, preventing manipulation in illiquid conditions.

The Premium Index is computed once per second, yielding 28,800 independent observations over each 8-hour interval. These observations are aggregated into the Weighted Average Premium Index using a linearly time-weighted average. This design has critical manipulation-resistance properties. Because the WAPI is computed from 28,800 independent observations, a manipulator cannot influence the funding rate by distorting the order book for a brief period; any short-lived perturbation is diluted by the overwhelming majority of non-manipulated observations. Within each one-second range, the precise timestamp at which the order book is observed is selected uniformly at random, preventing a manipulator from timing the placement and withdrawal of manipulative orders to coincide with known sampling times — a technique that has been exploited in traditional benchmark manipulation. Kim and Park analyzed path-dependent funding rates matching real-world 8-hour averaging practice and derived unique prices for perpetual futures anchored to non-tradable target values such as indices.[69] Zhang modeled funding rates as algorithmic feedback rules and demonstrated that a linear funding rule induces an endogenous mean-reverting basis, deriving the stability conditions that govern such mechanisms.[70]

The funding rate is further subject to a deadband of 0.01%, which sets the rate to zero if the absolute value falls below this threshold, filtering out noise and low-grade manipulation attempts, and a maximum funding magnitude clamp of ±2% per 8-hour interval, which bounds the potential profit from funding rate manipulation. Such clamping functions create a deliberate "dead zone" where small mispricings persist without correction, by design to prevent manipulation of funding payments, and researchers have confirmed using two years of Binance data that theoretical no-arbitrage bounds hold.[71] Empirical analysis confirms that funding rates virtually never approach the 2% cap under normal conditions. Gorton and co-authors have analyzed funding rates across different exchanges and found that they are highly correlated and rarely diverge significantly, as they are all driven by the same underlying spot-futures basis

---

[69] Jaehyun Kim & Hyungbin Park, "Designing Funding Rates for Perpetual Futures in Cryptocurrency Markets," arXiv:2506.08573 (June 2025) (deriving unique prices for perpetual futures anchored to non-tradable target values, with analysis of path-dependent funding rates matching real-world 8-hour averaging practice).

[70] Tianyang Zhang, "Funding Rate Mechanism in Perpetual Futures," SSRN Working Paper No. 6185958 (Feb. 2026) (modeling funding rates as algorithmic feedback rules and deriving a stability condition and welfare-optimal feedback strength).

[71] Min Dai, Linfeng Li & Chen Yang, "Arbitrage in Perpetual Contracts," SSRN Working Paper No. 5262988 (Sept. 2025) (deriving model-free no-arbitrage bounds for perpetual futures prices and showing that clamping functions create a deliberate "dead zone" that prevents manipulation of funding payments).

arbitrage.[72] The crypto carry trade literature, including work by Christin, Routledge, Soska, and Zetlin-Jones at Carnegie Mellon and by Schmeling, Schrimpf, and Todorov at the BIS, documents that funding rate arbitrage generates economically meaningful returns, confirming strong convergence forces that continuously operate against any manipulation-driven divergence.[73]

The funding mechanism itself functions as a natural manipulation deterrent. If a manipulator were to artificially push the perpetual price above spot, the resulting positive funding rate would impose costs on long positions, including the manipulator's own, while incentivizing other market participants to enter short positions to collect funding payments, thereby pushing the price back toward fair value. Some have even found that perpetual derivatives lead prices on major Bitcoin spot exchanges and are informationally more efficient, confirming that the funding mechanism creates a tight, self-correcting linkage between the derivative and spot markets.[74]

Additionally, the Bitcoin spot market is among the most liquid markets in the world. Data from CF Benchmarks demonstrates that the mean utilized depth of the BRTI index averaged approximately 413 BTC for Bitcoin — representing over $21 million in depth per second — with maximum utilized depth exceeding 547 BTC and a standard deviation of approximately 43.6 BTC.[75] Brauneis, Mestel, Riordan, and Theissen concluded that the BTC-USD market can be more liquid than US equity markets, with bid-ask spreads often below 1 basis point, comparable to major foreign exchange markets.[76] Independent analysis reports an average of over $16 million in Bitcoin orders within just 100 basis points of mid-price on major exchanges.[77]

Given this extraordinary depth, the cost of manipulating the consolidated order book across multiple exchanges simultaneously — while maintaining the manipulation within the 0.5% deviation parameter that determines the utilized depth — would be enormous. The academic literature on market impact provides a precise framework for quantifying this cost. Donier and Bonart analyzed a complete dataset enabling reconstruction of over one million metaorders in Bitcoin markets and confirmed that the square-root law of market impact holds across four

[72] Gary B. Gorton et al., "Leverage and Stablecoin Pegs," NBER Working Paper No. 30796 (2022) (analyzing funding rates across different exchanges and finding they are highly correlated and rarely diverge significantly, as they are all driven by the same underlying spot-futures basis arbitrage).

[73] Nicolas Christin, Bryan R. Routledge, Kyle Soska & Ariel Zetlin-Jones, "The Crypto Carry Trade," Working Paper, Carnegie Mellon University (2022/2023). See also Maik Schmeling, Andreas Schrimpf & Karamfil Todorov, "Crypto Carry," BIS Working Papers No. 1087 (2022/2023).

[74] Carol Alexander, Jaehyuk Choi, Heungju Park & Sungbin Sohn, "BitMEX Bitcoin Derivatives: Price Discovery, Informational Efficiency, and Hedging Effectiveness," 40 J. Futures Mkts. 23 (2020) (finding that perpetual derivatives lead prices on major Bitcoin spot exchanges and are informationally more efficient).

[75] CF Benchmarks, "Suitability Analysis: Benchmarking the Price of Bitcoin" (2023) at 14–16.

[76] Alexander Brauneis, Roland Mestel, Ryan Riordan & Erik Theissen, "Bitcoin Unchained: Determinants of Cryptocurrency Exchange Liquidity," 69 J. Emp. Fin. 106 (2022) (finding bid-ask spreads often below 1 basis point, comparable to major foreign exchange markets and significantly narrower than equity or bond markets).

[77] See, e.g., Amberdata, "How Liquidity Really Works in Crypto Markets" (2025) (reporting average of $16.53 million in Bitcoin orders within 100 basis points of mid-price on Binance).

decades of volume.[78] This result has been confirmed as universal across all asset classes.[79] The square-root law means that the total cost of price manipulation scales as the cost grows faster than linearly in the quantity of manipulation required, making large-scale manipulation prohibitively expensive.[80] Supply and demand vanish quadratically near the current price, confirmed empirically using Bitcoin order book data, which is why price impact universally behaves as the square root of order size.[81][82]

Bitcoin is also among the most actively arbitraged assets in the world.[83] While arbitrage opportunities existed historically, their magnitude decreased greatly from April 2018 onward, and since then it has been barely possible to exploit existing price differences across exchanges after accounting for transaction costs.[84][85] Settlement latency on the Bitcoin blockchain accounts for 88% of observed cross-exchange price differences, with professional arbitrageurs actively eliminating dislocations by pre-positioning inventory across exchanges.[86] Bitwise Asset Management's presentation to the SEC demonstrated that among ten exchanges with verified real volume, average price deviation from the aggregate was less than 0.10%, with discrepancies eliminated in a matter of seconds, leading to the conclusion that the Bitcoin market is "uniquely resistant to manipulation" and "trades at a unified global price."[87][88]

---

[78] Jonathan Donier & Julius Bonart, "A Million Metaorder Analysis of Market Impact on the Bitcoin," 1 Mkt. Microstructure & Liquidity 1550008 (2015). arXiv: 1412.4503.

[79] Yuki Sato & Kiyoshi Kanazawa, "Strict Universality of the Square-Root Law in Price Impact Across Stocks," Phys. Rev. Lett. (2025). DOI: 10.1103/65jz-81kv. arXiv: 2411.13965.

[80] Fabrizio Lillo, J. Doyne Farmer & Rosario N. Mantegna, "Econophysics: Master Curve for Price-Impact Function," 421 Nature 129 (2003); see also Frédéric Bucci, Michael Benzaquen, Fabrizio Lillo & Jean-Philippe Bouchaud, "Crossover from Linear to Square-Root Market Impact," 122 Phys. Rev. Lett. 108302 (2019) (using 8 million institutional trades to establish the crossover between linear impact for small orders and square-root regime for larger orders).

[81] Jonathan Donier & Jean-Philippe Bouchaud, "From Walras' Auctioneer to Continuous Time Double Auctions," J. Stat. Mech. 123406 (2016) (empirically confirmed using Bitcoin order book data).

[82] J. Doyne Farmer, Austin Gerig, Fabrizio Lillo & Henri Waelbroeck, "How Efficiency Shapes Market Impact," 13 Quant. Fin. 1743 (2013); Bence Tóth et al., "Anomalous Price Impact and the Critical Nature of Liquidity in Financial Markets," 1 Phys. Rev. X 021006 (2011); Jim Gatheral, "No-Dynamic-Arbitrage and Market Impact," 10 Quant. Fin. 749 (2010) (demonstrating that power-law decay with exponent $\gamma \leq 1/2$ is required by no-dynamic-arbitrage).

[83] Igor Makarov & Antoinette Schoar, "Trading and Arbitrage in Cryptocurrency Markets," 135 J. Fin. Econ. 293 (2020).

[84] Tommy Crépellière, Matthias Pelster & Stefan Zeisberger, "Arbitrage in the Market for Cryptocurrencies," 64 J. Fin. Mkts. 100817 (2023).

[85] *Id.* ("Their magnitude decreased greatly from April 2018 onward" and "it has been barely possible to exploit existing price differences.")

[86] Nikolaus Hautsch, Christoph Scheuch & Stefan Voigt, "Building Trust Takes Time: Limits to Arbitrage for Blockchain-Based Assets," 28 Rev. Fin. 1345 (2024) (finding that settlement latency on the Bitcoin blockchain, approximately 124 basis points, accounts for 88% of observed cross-exchange price differences).

[87] Bitwise Asset Management, "Analysis of Real Bitcoin Trade Volume," Presentation to the U.S. SEC, March 19, 2019. Filed as comment on SR-NYSEArca-2019-01. Available at https://www.sec.gov/comments/sr-nysearca-2019-01/srnysearca201901-5164833-183434.pdf.

[88] *Id.*

Any attempt to manipulate prices on a subset of Constituent Exchanges would induce arbitrageurs to trade against the manipulator, rapidly restoring prices to fair value and imposing losses on the manipulation attempt. The BRTI's multi-exchange composite structure harnesses this natural market correction mechanism: because the index aggregates across all Constituent Exchanges, arbitrage activity on any one exchange directly reduces the impact of manipulation on another. The academic literature on Bitcoin-specific manipulation confirms this assessment. Suspicious trading on the Mt. Gox exchange in 2013, when total cryptocurrency market capitalization was approximately $14 billion and trading was concentrated on a single unregulated venue;[89] today's market is over 100 times larger with robust multi-regulated-exchange surveillance. Manipulating the Bitcoin price is more difficult than for other cryptocurrencies, because the top ten whale users control only 6.30% of Bitcoin versus 22.20% of Ethereum and 42.90% of Dogecoin, and no specific individual has been found who has enough influence to affect the Bitcoin price.[90] Improved liquidity makes manipulation ineffective.[91]

[redacted]

The Commission's treatment of Bitcoin derivatives under Core Principle 3 has evolved significantly since the initial self-certifications in 2017, consistently in the direction of greater regulatory comfort with the maturation of Bitcoin markets. When CME self-certified its Bitcoin futures in December 2017, the contract was designed to settle against the BRR using the same

[89] Neil Gandal, JT Hamrick, Tyler Moore & Tali Oberman, "Price Manipulation in the Bitcoin Ecosystem," 95 J. Monetary Econ. 86 (2018).

[90] Li et al., "Market Manipulation of Cryptocurrencies: Evidence from Social Media and Transaction Data," ACM Trans. Internet Tech. (2024). DOI: 10.1145/3643812.

[91] Peter Fratrič, Giovanni Sileno, Sander Klous & Tom van Engers, "Manipulation of the Bitcoin Market: An Agent-Based Study," 8 Fin. Innovation 60 (2022). DOI: 10.1186/s40854-022-00364-3.

[92] CFTC Press Release No. 7654-17, "CFTC Statement on Self-Certification of Bitcoin Products by CME, CFE and Cantor Exchange" (Dec. 1, 2017).

CF Benchmarks infrastructure that underlies the BRTI.[93] The CFTC noted that the exchanges had agreed to significant enhancements to contract design and settlement at CFTC staff's request, including enhanced information sharing with underlying cash exchanges for surveillance,[94] and issued a backgrounder stating that the self-certification process requires the same determination — that the contract is not readily susceptible to manipulation — as the approval process.[95]

In May 2018, the CFTC issued Staff Advisory No. 18-14, which identified heightened expectations for virtual currency derivative product listings, including enhanced market surveillance with information-sharing agreements, close coordination with CFTC staff, and large trader reporting with low disclosure thresholds.[96] In March 2025, the CFTC withdrew Advisory 18-14 in its entirety, stating that the advisory was "no longer needed given additional staff experience with virtual currency derivative product listings and increasing market growth and maturity" and that digital asset derivatives would receive the same regulatory treatment as traditional derivatives.[97] In June 2025, Coinbase Derivatives self-certified BTC-PERP and ETH-PERP perpetual futures — the first US-based perpetual-style futures contracts — with no CFTC objection, establishing direct precedent for CFTC-regulated crypto perpetuals.[98] The CFTC's enforcement action against Gemini Trust Company for making false statements relevant to assessing whether a proposed Bitcoin futures contract would be readily susceptible to manipulation confirms the Commission's active oversight of Core Principle 3 integrity for cryptocurrency products.[99]

The BTCPERP Contract is not readily susceptible to manipulation. At the index level, the BRTI aggregates order book data from the aforementioned eight regulated exchanges using a methodology that incorporates order size caps, mid-price volume curves, a narrow 0.5% deviation parameter, exponential probability density weighting, and automated screening for delayed, erroneous, and potentially erroneous data — implementing every feature that the post-

[93] CME Group Self-Certification Submission No. 17-417 (Dec. 1, 2017). Available at https://www.cftc.gov/sites/default/files/filings/ptc/17/12/ptc120117cmedcm001.pdf.

[95] CFTC, "Backgrounder on Self-Certified Contracts for Bitcoin Products" (Dec. 1, 2017). Available at https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/bitcoin_factsheet120117.pdf.

[96] CFTC Staff Advisory No. 18-14, "Advisory With Respect to Virtual Currency Derivative Product Listings" (May 21, 2018).

[97] CFTC Letter No. 25-07, withdrawing Staff Advisory No. 18-14 (March 27–28, 2025). Press Release No. 9059-25. The withdrawal stated that "the advisory is no longer needed given additional staff experience with virtual currency derivative product listings and increasing market growth and maturity."

[98] Coinbase Derivatives self-certified BTC-PERP and ETH-PERP perpetual futures on June 26, 2025 (effective July 21, 2025), with no CFTC objection. Certain "perpetual-style" futures contracts, such as those self-certified by Coinbase Derivatives, are designed to mimic the economics of the Contracts, but with an expiration date, thus exhibiting residual expiry risk and requiring their holders to regularly "roll" positions in order to maintain exposure.

[99] CFTC v. Gemini Trust Company, LLC, Case No. 1:22-cv-04563 (S.D.N.Y.), filed June 2, 2022; settled January 2025 ($5 million civil monetary penalty). CFTC Press Release No. 8540-22.

LIBOR academic literature identifies as optimal for manipulation resistance.[100][101][102] At the settlement price level, the 60-second VWAP with MAD outlier filtering prevents flash manipulation and requires sustained, detectable trading activity. At the funding rate level, the Premium Index's Impact Notional anchoring, undefined treatment for thin books, 28,800-observation time-weighted averaging with random intra-second sampling, deadband filtering, and 2% clamp collectively ensure that the funding rate reflects genuine economic conditions and is resistant to both sustained and opportunistic manipulation. At the market structure level, the enormous liquidity of the underlying Bitcoin spot market, the near-elimination of cross-exchange arbitrage opportunities since 2018,[103] the cost of manipulation scaling,[104] and the self-correcting economic incentives of the funding mechanism all render manipulation economically infeasible.

**Core Principle 4 - Prevention of Market Disruption:** Trading in the Contracts will be subject to the Rules of the Exchange, which include prohibitions on manipulation. Trading activity in the Contract will be subject to monitoring and surveillance by the Exchange's Market Surveillance Department. In particular, the Exchange's trade surveillance system monitors the trading on the Exchange to detect and prevent activities that threaten market integrity and market fairness including manipulation, price distortion, and disruptions of the settlement process. The Exchange also performs real-time market surveillance. The Exchange sets position limits, maintains both a trade practice and market surveillance program to monitor for market abuses, including manipulation, and has disciplinary procedures for violations of the Rulebook.

**Core Principles 7 and 8 - Availability of General Information and Daily Publication of Trading Information:** Core Principles 7 and 8, implemented by Regulations Sections Subsections 38.400, 38.401, 38.450, and 38.451, require a DCM to make available to the public accurate information regarding the contract terms and conditions, daily information on contracts such as settlement price, volume, open interest, and opening and closing ranges, the rules, regulations, and mechanisms for executing transactions on or through the facilities of the contract market, and the rules and specifications describing the operation of the contract market's electronic matching platform.

Rule 2.17 of the Rulebook sets forth the rules for publicizing information. The Rulebook and the specifications of each contract listed on the Exchange, including the Contract, are made public on the Exchange website and remain accessible via the platform. The Exchange will post non-confidential materials associated with regulatory filings, including the Rulebook, at the time the Exchange submits such filings to the Commission. Consistent with Rule 2.17 of the Rulebook, the

---

[102] Darrell Duffie & Jeremy C. Stein, "Reforming LIBOR and Other Financial Market Benchmarks," 29 J. Econ. Persp. 191 (2015).

Exchange website will publish contract specifications, terms, and conditions, as well as daily trading volume and open interest for the Contract. Each contract has a dedicated "Market Page" on the Kalshi Exchange platform, which will contain the information described above as well as a link to the Underlying price index. Chapter 5 sets forth the rules, regulations and mechanisms for executing transactions, and the rules and specifications for Kalshi's trading systems.

**Core Principle 11 - Financial Integrity of Transactions:** Each Member must be in good standing and in compliance with the Member eligibility standards set forth in Chapter 3 of the Rulebook. All contracts offered by the Exchange, including the Contract, are cleared through the Clearinghouse, a Derivatives Clearing Organization ("DCO") registered with the CFTC and subject to all CFTC Regulations related thereto. The Exchange requires that Members post initial margin before entering into positions and maintain maintenance margin throughout the life of a position. Margin requirements are calculated using the Exchange's risk-based margin methodology and are designed to ensure that the Exchange can liquidate positions in an orderly manner before losses exceed posted collateral. Positions that fall below maintenance margin levels are subject to liquidation. The protection of customer funds is monitored by the Exchange and ensured by the Clearinghouse as member property or futures commission merchant customer property.

**All Remaining Requirements:** All remaining Core Principles are satisfied through operation of the Exchange's Rules, processes, and policies applicable to the other contracts traded thereon.

## APPENDIX F (CONFIDENTIAL) – AGREEMENT WITH CF BENCHMARKS

S&C Draft of February 27, 2026
CONFIDENTIAL

[Kalshi Letterhead]

17 C.F.R. § 40.2(c)

February [●], 2026

**Via E-mail**

Frank Fisanich
Acting Director
Division of Market Oversight
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581

***Re: Request for No-Action Position Concerning CFTC Regulation 40.2(c)***

Dear Mr. Fisanich:

KalshiEx LLC (**Kalshi**) is writing to request that the Division of Market Oversight (the **Division**) of the Commodity Futures Trading Commission (**Commission** or **CFTC**) issue a no-action letter pursuant to 17 C.F.R. § 140.99 confirming that the Division will not recommend that the Commission stay Kalshi's listing of Perpetual Contracts (as described in Part II below) under Regulation 40.2(c)[1] or commence enforcement action against Kalshi for a false certification, solely on the basis that Kalshi certifies the Perpetual Contracts as contracts of sale of a commodity for future delivery (**futures contracts**), rather than swaps.

## I. Background on Kalshi

Kalshi was designated as a contract market (**DCM**) in 2020, when it became the first federally-regulated platform for event-contract trading. Kalshi currently lists a wide variety of fully collateralized event contracts on the outcomes of events ranging from global news, to macro-economic indicators to popular culture and sports. All contracts traded on Kalshi are cleared by Kalshi Klear LLC (**Klear**), a registered designated clearing organization (**DCO**). Klear's order of registration currently limits its activities to clearing fully collateralized positions in swaps.

## II. Proposed Perpetual Contracts

Klear has applied to the Commission to expand its DCO registration to permit it to clear margined positions. As an initial matter, Klear intends to clear margined positions in Perpetual Contracts, which will be listed on Kalshi and trade in its central

[1] 17 C.F.R. § 40.2(c)

limit order book, with pre- and post-trade transparency.

Each Perpetual Contract will provide its holder either long or short, as applicable, exposure to the spot price of a standard, fixed unit amount of digital asset that is neither a security nor a representation of, or an interest in, a nonfinancial commodity (such a digital asset, a **Subject Digital Asset**). Initially, Perpetual Contracts will reference 0.0001 Bitcoin.

Perpetual Contracts will provide exposure to a Subject Digital Asset by providing for the holder to make or receive "funding" payments that vary based on the price of the Subject Digital Asset relative to the price of a Perpetual Contract. When the Perpetual Contract price exceeds the price of the Subject Digital Asset, payment will be due from the long-side holders to short-side holders, and vice versa if the price of the Subject Digital Asset exceeds the Perpetual Contract price.

This funding mechanism is intended to align the price of the Perpetual Contracts with the price of the Subject Digital Asset by incentivizing market participants to (i) take on short positions in the Perpetual Contracts when the Perpetual Contract price exceeds the price of the Subject Digital Asset, thereby bringing the Perpetual Contract price down towards the price of the Subject Digital Asset and (ii) take on long positions in the Perpetual Contracts when the price of the Subject Digital Asset exceeds the Perpetual Contract price, increasing the Perpetual Contract price towards the price of the Subject Digital Asset.

Settlement in the Perpetual Contracts will occur twice daily and, upon settlement, Klear will calculate the mark-to-market value of all open positions in the Perpetual Contracts and, accordingly, determine and distribute or collect margin obligations from all of its members with open long or short positions in the Perpetual Contracts. A member's net margin obligation for each settlement period will include aggregate funding payment obligations and/or entitlements accrued since the prior settlement period, in addition to other risk-based margin charges.

The Perpetual Contracts will have an indefinite (or "perpetual") term. As such, they will not expire on a fixed date. Instead, a member of Kalshi wishing to exit all or part of its position in a Perpetual Contract will enter into an offsetting Perpetual Contract on Kalshi. Because Perpetual Contracts will be standardized and centrally cleared by Klear, acting as DCO and central counterparty, they will be fungible with each other. The Perpetual Contracts will not provide for physical settlement of the Subject Digital Asset, and will settle solely via the cash payments and offset.

## III. Need for No-Action Position

There is considerable uncertainty regarding the regulatory categorization of perpetual-term derivative contracts, such as the Perpetual Contracts, under the Commodity Exchange Act (**CEA**) and Commission regulations thereunder. For example, in a recent

request for comment regarding "perpetual" style digital-asset derivatives, Commission Staff expressly requested public comment regarding the proper regulatory categorization of these contracts.[2] That uncertainty presents challenges because swaps and futures contracts are subject to substantially different regulatory frameworks. For example, categorization of the Perpetual Contracts will affect matters such as the minimum initial margin requirements for the Perpetual Contracts,[3] reporting obligations for Kalshi and Klear, and registration obligations for market participants trading in the Contracts.[4] As a result, key aspects of Klear's pending application to amend its DCO registration depend on the categorization of the Perpetual Contracts.

The Commission has previously made clear that a DCM may self-certify a product as a futures contract, even if the product is "indistinguishable in material economic effects" from a swap.[5] In the present instance, however, Kalshi cannot self-certify the Perpetual Contracts in either category until the Commission approves Klear's application to amend its DCO registration because, in the absence of such approval, Kalshi could not list the Perpetual Contracts in compliance with the CEA and Commission regulations thereunder. On the other hand, determining the categorization of the Perpetual Contracts is a prerequisite to amending Klear's DCO registration to permit the listing and clearing of the Perpetual Contracts.[6] Accordingly, Kalshi is seeking the requested no-action position so that Klear's DCO application can proceed on the basis that, following approval, Kalshi can self-certify the Perpetual Contracts in a category that is consistent with how Klear's application treats them.

---

[2] CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* question 13 (Apr. 21, 2025). Further, the Commission has taken the view in past enforcement actions that certain perpetual-duration digital-asset derivative products constitute swaps. *See, e.g.,* Complaint, *CFTC* v. *Changpeng Zhao, et. al.*, No. 23-cv-01887 (March 27, 2023) ("*Binance*"); Complaint, *CFTC* v. *MEK Global Limited, et. al.,* No. 24-cv-2255 (March 26, 2024); Complaint, *CFTC* v. *Eisenberg,* No. 23-cv-00173 (Jan. 9, 2023); Complaint, *CFTC* v. *HDR Global Trading Limited, et. al.*, No. 20-cv-8132 (Oct. 1, 2020); *In the Matter of Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023). The Commission did not, however, analyze address whether such products were futures contracts in any of these enforcement actions. Moreover, the products at issue in each of these cases differ from the Perpetual Contracts in that they were not listed on Commission-regulated DCMs or centrally cleared by registered DCOs.

[3] *See* Commission Regulation 39.13(g)(2)(ii), 17 C.F.R. 39.13(g)(2)(ii) (setting different minimum liquidation times for futures, options, and swaps).

[4] These considerations are discussed in greater detail in Part IV.B. below.

[5] Specifically, the Commission noted, in response to a market participant's question regarding whether a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a [swap execution facility], since futures and swaps are indistinguishable in material economic effects", that "[i]f a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48303 (Aug. 13, 2012) ("*2012 Definitions Release*").

[6] For the same reasons, it would not be practicable for Kalshi to seek Commission review and approval of the Perpetual Contracts under Regulation 40.3.

## IV. Rationale for No-Action Position

The requested no-action position is supported by Kalshi's exercise of reasonable discretion to categorize the Perpetual Contracts for purposes of Regulation 40.2. In addition, regulating the Perpetual Contracts as futures contracts would reduce regulatory arbitrage and promote competition.

### A. Kalshi Has Exercised Reasonable Discretion to Categorize the Perpetual Contracts for Purposes of Regulation 40.2

Regulation 40.2 requires a DCM's product self-certification to include, among other items, a concise explanation and analysis of the product's compliance with applicable provisions of the CEA, including core principles, and the Commission's regulations thereunder.[7] CEA Section 5(d)(1)(B)[8] and Regulation 38.100(b)[9] provide that a DCM has reasonable discretion in establishing the manner in which it complies with the core principles. Through the analysis laid out below, Kalshi has exercised reasonable discretion by categorizing the Perpetual Contracts as futures contracts for purposes of compliance with the core principles and other provisions of the CEA and Commission regulations thereunder.[10]

*First,* we analyzed whether the Perpetual Contracts would fall within the CEA's "swap" definition. Section 1a(47) of the CEA[11] provides that, "[e]xcept as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction" that meets any of six clauses set out in subparagraph (A) of that definition. Subparagraph (B) then sets out ten exclusions from the "swap" definition. If the Perpetual Contracts fall within one of the exclusions, they are not swaps, regardless of whether they would otherwise fit within one of the clauses set out in subparagraph (A).[12] One of those exclusions—clause (B)(i)—covers futures contracts.[13] We therefore turned to analyzing whether the Perpetual Contracts would constitute futures contracts.

---

[7] 17 C.F.R. § 40.2(a)(3)(v).

[8] 7 U.S.C. § 7(d)(1)(B).

[9] 17 C.F.R. § 38.100(b).

[10] Consistent with self-certification under Regulation 40.2, Kalshi and Klear intend to treat the Perpetual Contracts as futures contracts for purposes of compliance with the CEA and Commission regulations thereunder by themselves and their participants.

[11] 7 U.S.C. § 1a(47).

[12] Our analysis here is limited to the Perpetual Contracts. In contrast, the event contracts listed on Kalshi can be "structured as options" or "futures contracts." 73 Fed. Reg. 25,669, 25,670-71 (May 7, 2008).

[13] The *per se* nature of this exclusion is illustrated by the treatment of traditional, cash-settled futures contracts, such as a financially settled, quarterly Bitcoin contract. Such a contract provides for cash settlement at quarterly expiry based on the price of Bitcoin, without any physical delivery. But for

*Next*, we evaluated the characteristics of the Perpetual Contracts against relevant judicial precedent and Commission guidance. Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[14] by evaluating whether certain characteristics common to futures contracts are present.[15]

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[16] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[17]

---

subparagraph (B) of the "swap" definition, such a contract would fall within clause (A)(iii) of that definition as an agreement, contract, or transaction "that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . commodities . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred." 7 U.S.C. § 1a(47)(A)(iii). However, contracts of this sort are listed by other DCMs and regulated by the Commission as a futures contract because they fall within clause (B)(i), which provides, in relevant part, that "the term 'swap' does not include . . . any contract of sale of a commodity for future delivery." 7 U.S.C. § 1a(47)(B)(i)

[14] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").
[15] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

[16] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*"). *See, also* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989) (adopting a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public) and Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993) (adopting an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility).

[17] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contracts involving intangible commodities, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[18] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[19] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[20] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[21] and (iii) the ability of holders to exit their positions by offset.[22]

The Perpetual Contracts will exhibit all of these futures contract characteristics: the Perpetual Contracts will have a fixed, standardized unit quantity; each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty; holders will be able to exit their positions via offset; the Perpetual Contracts will be available to the general public, including retail participants; parties will enter into the Perpetual Contracts for the purpose of assuming or shifting the risk of change in value of the Subject Digital Asset, without the possibility of transferring ownership of the Subject Digital Asset; and the Perpetual Contracts will trade on the centralized market of a DCM.

---

transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[18] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). Because the Perpetual Contracts are derivatives on Subject Digital Assets, which are intangible commodities, this request does not address the regulatory categorization of contracts on tangible commodities.

[19] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[20] *Id.*

[21] *CME v. SEC* at 542. Although the Dodd-Frank Act arguably changed the historical analysis, at least in part, by reducing the saliency of central clearing as a distinguishing factor of futures contracts, other characteristics remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on swap execution facilities, which may lack the centralized market characteristics of a DCM because they can permit trading via request for quote in addition to an order book.

[22] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

*Finally*, we analyzed whether the Perpetual Contracts' indefinite duration should affect their categorization. We focused on this term of the Perpetual Contracts because courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[23] or "on a date certain,"[24] or "at or before a stated future time."[25] Courts have not, however, viewed this characteristic as necessary to conclude that a contract is a futures contract. To the contrary, courts have repeatedly explained that, "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[26] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[27] – because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[28] And, in *Zelener*, the Commission took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[29]

---

[23] *CME v. SEC* at 542.

[24] *Tauber* at 971.

[25] *Erskine* at 323.

[26] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v. International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[27] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[28] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Perpetual Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out" date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[29] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that

Based on this analysis, Kalshi intends to categorize the Perpetual Contracts as futures contracts in its Regulation 40.2 self-certification.

### B. Regulating the Perpetual Contracts as Futures Contracts Would Reduce Regulatory Arbitrage and Promote Competition

As indicated above, categorization of the Perpetual Contracts as futures contracts or swaps will have significant implications for their regulatory treatment, and the regulatory categorization of perpetual digital-asset derivative contracts is unclear under existing law. The lack of clarity regarding the categorization of such contracts creates opportunity for unnecessary regulatory arbitrage due to the inconsistent treatment of substantively similar products.

The indefinite term of the Perpetual Contracts aligns them with similar products offered by non-U.S. exchanges. Meanwhile, other DCMs and DCOs have already begun offering "perpetual-style" futures contracts that are designed to mimic the economics of true perpetual contracts, but with an expiry date that presents unwanted risk near the contracts' expiry. One of those DCMs and DCOs has also begun to offer retail leveraged spot digital asset transactions, which it offers as futures contracts under Section 2(c)(2)(D) of the CEA.[30] Those transactions also bear a high degree of economic similarity to the Perpetual Contracts, but with the added potential for custody and other risks associated with physical digital asset trading.

Confirmation that Kalshi may self-certify the Perpetual Contracts under Regulation 40.2, like these other transaction types, without the threat of a stay or other enforcement action for false certification, would promote a consistent regulatory treatment across economically equivalent transactions. In contrast, requiring such contracts to be

---

case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Perpetual Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Perpetual Contracts bought or sold on Kalshi.

[30] Section 2(c)(2)(D)(iii) of the CEA applies the exchange-trading requirement in Section 4(a) of the CEA to retail leveraged commodity transactions as though they are futures contracts. Congress added this provision to the CEA as part of the Dodd-Frank Act, at the same time it amended the CEA to regulate swaps. We think it is notable that Congress elected, at that time, to treat retail leveraged commodity transactions as though they are futures contracts, not swaps. Congress did so in order to fix the *Zelener* "loophole" by subjecting rolling spot contracts to futures regulation, not swaps regulation. *See* 156 Cong, Rec. S5,924 (daily ed. July 15,2010) (statement of Sen. Lincoln); *see also* Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture, 111th Cong. 52-664 (2009) (statement of Hon. Jim Marshall, United States Representatives) ("What we are talking about [regarding expanding the Commission's authority over retail commodity transactions] though is expanding the-well, correcting would be the argument the Zelener interpretation of what a futures contract is. If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftsmanship is."). It would contradict Congressional intent to place the Perpetual Contracts, which likewise provide for cash-settled, leveraged retail exposure to commodities, in a different regulatory category.

categorized as swaps would subject them to higher initial margin requirements,[31] transaction reporting under Parts 43 and 45 of the Commission's regulations in addition to Part 16, and counting towards the swap dealer *de minimis* threshold. Applying those additional requirements to the Perpetual Contracts would discourage trading in them, even though they exhibit less risk than the over-the-counter swaps those requirements were designed to address. Regulating the Perpetual Contracts as swaps also would foster continuing incentives for U.S. market participants to seek to trade on unregulated, non-U.S. markets offering similar contracts without the protections of Commission regulation.

## V. Requested No-Action Position

For the foregoing reasons, and without asking that the Division or the Commission concur with our categorization analysis, we request that the Division issue a no-action letter confirming that it will not recommend that the Commission stay Kalshi's listing of Perpetual Contracts under Regulation 40.2(c) or commence enforcement action against Kalshi for a false certification, solely on the basis that Kalshi certifies the Perpetual Contracts as futures contracts, rather than swaps. This no-action position would expire on the effectiveness of any future rulemaking or interpretation by the Commission, guidance by the Division, or federal legislation addressing the categorization of Perpetual Contracts.

* * *

Thank you for your consideration of this letter. Please do not hesitate to contact me at [•] with any questions you may have.

Pursuant to Regulation 140.99(c)(3), the undersigned hereby certifies that the material facts set forth herein are true and complete to the best of their knowledge, and undertakes that, if at any time prior to the issuance of a no-action letter, any material representation made in this letter ceases to be true and complete, they will promptly inform Commission Staff in writing of all materially changed facts and circumstances.

Respectfully submitted,

[31] *See* Note 3, *supra*.

SULLIVAN & CROMWELL LLP

February 18, 2026

MEMORANDUM TO: KalshiEX LLC
Kalshi Klear LLC

FROM: Colin D. Lloyd
Natasha Vasan
(Sullivan & Cromwell LLP)

RE: Categorization of Proposed Perpetual Contracts

Kalshi Klear LLC ("Klear") has submitted to the Commodity Futures Trading Commission (the "Commission" or "CFTC") an application to amend Klear's order of registration as a derivatives clearing organization ("DCO") to permit it to clear perpetual contracts referencing Bitcoin (the "Contracts"), which will be traded on KalshiEX LLC ("KalshiEx"), a board of trade designated by the Commission as a contract market ("DCM").

To assist Klear with this application, you have asked that we address the categorization of the Contracts under the Commodity Exchange Act ("CEA") and Commission rules thereunder. Categorization of the Contracts will affect such matters as the scope of Klear's amended order of registration,[1] the minimum initial margin requirements for the Contracts,[2] reporting obligations for KalshiEx and Klear, and registration obligations for market participants trading in the Contracts.[3] For the reasons and subject to the assumptions set out below, in our view the Commission should categorize the Contracts as contracts of sale of a commodity for future delivery ("futures contracts"), not swaps.[4]

---

[1] Klear's existing order of registration permits it to clear fully collateralized swaps. Klear is applying to amend the order because the Contracts will be leveraged, not fully collateralized.

[2] *See* Commission Regulation 39.13(g)(2)(ii), 17 C.F.R. 39.13(g)(2)(ii) (setting different minimum liquidation times for futures, options, and swaps).

[3] These considerations are discussed in greater detail in Part II.C. below.

[4] The analysis herein is limited in scope to the Contracts and does not address any other contract listed or proposed to be listed by Kalshi, including event contracts. The regulatory categorization of any contract necessarily must take into account all of its terms, characteristics and other relevant facts and circumstances.

## I. Factual Background

Each Contract will provide its holder either long or short, as applicable, economic exposure to the spot price of Bitcoin[5] by providing for the holder to make or receive "funding" payments that vary based on the price of Bitcoin relative to the price of a Contract. When the Contract price exceeds the price of Bitcoin, payment will be due from the long-side holders to short-side holders, and vice versa if the price of Bitcoin exceeds the Contract price. This funding mechanism is intended to align the price of the Contracts with the Bitcoin price by incentivizing market participants to (i) take on short positions in the Contracts when the Contract price exceeds the price of Bitcoin, thereby bringing the Contract price down towards the Bitcoin price and (ii) take on long positions in the Contracts when the Bitcoin price exceeds the Contract price, increasing the Contract price towards the Bitcoin price.

Klear will calculate funding payments due or owing to each Member with an open position in the Contracts every eight hours.[6] A Member that holds Contract positions through a funding rate period (*i.e.,* every eight hours) will accrue a funding payment obligation or entitlement. Contract settlement will take place in U.S. dollars, and will occur twice per day, at mid-day and end-of-day. Upon settlement, Klear will calculate the mark-to-market value of all open Contract positions and, accordingly, determine and distribute or collect margin obligations from all Members with open long or short positions in the Contracts. A Member's net margin obligation for each settlement period will include aggregate funding payment obligations and/or entitlements accrued since the prior settlement period, in addition to other risk-based margin charges (*i.e.,* a base margin obligation, a liquidity risk charge and an anti-procyclicality buffer).

Each Contract will have a standard notional size corresponding to 0.0001 Bitcoin. They will trade on KalshiEx's central limit order book, with pre- and post-trade price transparency. The Contracts will be centrally cleared by Klear, acting as central counterparty. Standardization and central clearing will make the Contracts fungible with each other.

The Contracts will have an indefinite (or "perpetual") term. As such, they will not expire on a fixed date. Instead, a Member wishing to exit all or part of its position will enter into an offsetting Contract on KalshiEx. The Contracts will not provide for physical settlement of Bitcoin; they will solely settle via the cash payments described above.

The indefinite term of the Contracts aligns them with similar products offered by non-U.S. exchanges. Klear has considered instead offering a product that has a fixed final settlement date but with margin payments adjusted to reflect spot prices,

---

[5] Klear will calculate the spot price of Bitcoin by reference to CF Benchmark's Bitcoin Real Time Index.

[6] Each funding payment will be the product of (i) a funding rate, determined by Klear pursuant to the Klear Margin Risk Framework, (ii) the Member's open position quantity, (iii) the Member's position side (long or short) and (iv) the Contract's mark-to-market price as determined by a 60-second volume-weighted average price formula.

which some other DCMs and DCOs offer as "perpetual-style" futures. However, Klear has received feedback from its Members that the residual expiry risk associated with those products, and resulting need to "roll" positions around expiry, presents risk management challenges and causes confusion, even if the expiry date is far into the future.

## II. Discussion and Analysis

Below we address why, from legal and policy perspectives, the Commission should categorize the Contracts as futures contracts.

### A. The CEA's "Swap" Definition *Per Se* Excludes Futures Contracts

Section 1a(47) of the CEA[7] provides that, "[e]xcept as provided in subparagraph (B), the term 'swap' means any agreement, contract, or transaction" that meets any of six clauses set out in subparagraph (A) of that definition. Subparagraph (B) then sets out ten exclusions from the "swap" definition. The exclusions are not qualified in any respect; if an agreement, contract, or transaction falls within one of the exclusions, it is not a swap, regardless of whether it would otherwise fit within one of the clauses set out in subparagraph (A).

The *per se* nature of these exclusions is illustrated by the treatment of securities options. Clause (A)(i) covers any agreement, contract, or transaction "that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . . securities."[8] Clause (B)(iii) then further provides that "the term 'swap' does not include . . . any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities, including any interest therein or based on the value thereof, that is subject to . . . the Securities Act of 1933 [and] the Securities Exchange Act of 1934."[9] As a consequence, securities options are not categorized as swaps, even though they would, but for the exclusion in clause (B)(iii), fall within clause (A)(i) of the "swap" definition.

The same is true for futures contracts. Take the financially settled Bitcoin futures contract listed by the Chicago Mercantile Exchange ("CME"). That contract provides for cash settlement at expiry (which is either monthly or quarterly) based on the price of Bitcoin, without any physical delivery.[10] But for subparagraph (B) of the "swap" definition, this CME contract would fall within clause (A)(iii) of that definition as an agreement, contract, or transaction "that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . commodities . . . and that transfers, as between the parties to the transaction, in

---

[7] 7 U.S.C. § 1a(47).

[8] 7 U.S.C. § 1a(47)(A)(i).

[9] 7 U.S.C. § 1a(47)(B)(iii).

[10] For more details about this contract's specifications, *see* https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/bitcoin.contractSpecs.html.

whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred."[11] However, this contract is instead listed by CME and regulated by the Commission as a futures contract because it falls within clause (B)(i), which provides, in relevant part, that "the term 'swap' does not include . . . any contract of sale of a commodity for future delivery."[12]

As these examples demonstrate, if the Contracts qualify as futures contracts, then they are not swaps.

B. The Contracts Should Qualify as Futures Contracts

Neither the CEA nor Commission rules offer a fixed definition for what constitutes a "futures contract." Instead, the Commission and the courts assess each transaction "as a whole with a critical eye toward its underlying purpose"[13] by evaluating whether certain characteristics common to futures contracts are present.[14] As laid out below, the Contracts exhibit all of the relevant characteristics of futures contracts.

1. The Contracts Exhibit the Characteristics of Futures Contracts

The Commission has historically described futures contracts as "standardized contracts for the purchase or sale of commodities which provide for future, as opposed to immediate, delivery, and which are directly or indirectly offered to the general public and generally secured by earnest money, or 'margin' . . . [and that] are entered into primarily for the purpose of assuming or shifting the risk of change in value of commodities, rather than for transferring ownership of the actual commodities."[15] Courts have similarly focused on standardization, fungibility, and offset as the key characteristics of futures contracts.[16]

---

[11] 7 U.S.C. § 1a(47)(A)(iii).

[12] 7 U.S.C. § 1a(47)(B)(i).

[13] *See CFTC v. Co Petro Marketing Group, Inc.* 680 F.2d 573, 581 (9th Cir. 1982) ("*Co Petro*").

[14] *See* CFTC Interpretive Letter No. 98-73, Comm. Fut. L. Rep. ¶27, 449 (Oct. 8, 1998) ("Letter 98-73"); *see, also* CFTC Interpretive Letter No. 97-01, Comm. Fut. L. Rep. ¶26, 937 (Dec. 12, 1996); *CFTC v. UForex Consulting,* 551 F.Supp.2d, 513, 529 (W.D.La. 2008), *CFTC v. Fleury*, 2010 WL 5146283 (S.D. Fl.) at *7.

[15] *See In re Stovall, et. al.*, [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) 20,941, p. 6 (CFTC Dec. 6, 1979) ("*Stovall*").

[16] *See, e.g.*, *Co Petro* at 579-80 ("Except for price, all the futures contracts for a specified commodity are identical in quantity and other terms. The fungible nature of these contracts facilitates offsetting transactions by which purchasers or sellers can liquidate their positions by forming opposite contracts."); *see, also Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1492-93 (S.D.N.Y. 1990) (following *Stovall* and *Co Petro* to define what constitutes a futures contract) and *Salomon Forex, Inc. v. Tauber* 8 F.3d 966, 971 (4th Cir. 1993) ("*Tauber*") ("To facilitate the development of a liquid market for these transactions, these contracts are standardized and transferrable. Trading in futures seldom results in

In the 1980s and 1990s, the Commission distinguished swaps from futures contracts based on similar characteristics. In 1989, the Commission adopted a safe harbor from futures regulation for a swap if: the swap has individually tailored terms; there is an absence of exchange-style offset; there is no clearing organization or margin system; the swap is undertaken in connection with a line of business; and the swap is not marketed to the public.[17] In 1993, the Commission adopted an exemption that, similarly, distinguished swaps from futures contracts based on whether: the swap agreement was entered into solely between sophisticated parties ("eligible swap participants") at the time such persons entered into the swap agreement; the swap agreement is not part of a fungible class of agreements that are standardized as to their material economic terms; the creditworthiness of any party having an actual or potential obligation under the swap agreement would be a material consideration in entering into or determining the terms of the swap agreement, including pricing, cost, or credit enhancement terms of the swap agreement; and the swap agreement is not entered into and traded on or through a multilateral transaction execution facility.[18]

More recently, courts have turned away from the "totality of circumstances" analysis reflected by the foregoing precedent. Instead, at least in the cases of contacts involving intangible commodities, courts have identified whether an executory contract is a futures contract based on whether there is trading "in the contract."[19] When evaluating whether trading "in the contract" exists for a given contract, courts have looked to whether the contract is standardized and fungible,[20] as evidenced by (i) the contract trading at a fixed, standardized unit quantity,[21] (ii) each party's obligations being guaranteed by a clearing house that sets margin requirements,[22] and (iii) the ability of holders to exit their positions by offset.[23]

---

physical livery of the subject commodity, since the obligations are often extinguished by offsetting transactions that product a net profit or loss.").

[17] *See* Policy Statement Concerning Swap Transactions, 54 Fed. Reg. 30,694 (July 21, 1989).

[18] Exemption of Certain Swap Agreements, 58 Fed. Reg. 5,587 (Nov. 12, 1993).

[19] *See, e.g., CFTC* v. *Erskine*, 512 F.3d 309, 325 (6th Cir. 2008) ("*Erskine*"), *CFTC* v. *Zelener*, 373 F.3d 861, 865 (7th Cir. 2004) ("*Zelener*"), and *Chicago Mercantile Exchange* v. *SEC*, 883 F.2d 537, 542 (7th Cir. 1989) ("*CME v. SEC*"). Courts evaluating the regulatory categorization of contracts on tangible commodities have, at least in some instances, stuck with the "totality of circumstances" approach from *Co Petro*. *See Andersons, Inc.* v. *Horton Farms, Inc.*, 166 F.3d 308, 318 (6th Cir. 1998). The Contracts are derivatives on Bitcoin, an intangible commodity. Accordingly, the analysis herein does not address the regulatory categorization of contracts on tangible commodities.

[20] *See Erskine* at 325 ("the distinction [between futures and forward contracts] turns on standardization and fungibility of the contract.")

[21] *Id.*

[22] *CME v. SEC* at 542.

[23] *Zelener* at 868, quoting *Nagel* v. *ADM Investor Services, Inc.,* 217 F.3d 436, 441 (7th Cir. 2000) (noting that a seller's promise to "sell another contract against which the buyer can offset the first contract" makes a contract "work *as if* fungible.")

The Dodd-Frank Act arguably changed this analysis, at least in part, by granting the Commission authority to mandate swaps for central clearing at DCOs[24] and trading on DCMs and swap execution facilities ("SEFs").[25] These changes led market participants to ask the Commission to clarify that a DCM can "list for trading a futures contract regardless of whether it could be viewed as a swap if traded over-the-counter or on a SEF, since futures and swaps are indistinguishable in material economic effects."[26] The Commission declined to provide that clarification, noting, "Prior distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant."[27] The Commission then went on to say, "If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view."[28]

Taken together, this precedent evidences a clear understanding, over multiple decades, that futures contracts are distinguished by standardization, fungibility, offset, and exchange trading. Even post-Dodd-Frank, those characteristics should remain relevant, given that even many centrally cleared swaps (such as interest rate swaps) are not fully standardized as to tenor or size (among other terms) and trading can take place on SEFs, which may lack the centralized market characteristics of a DCM (*e.g.*, SEFs can permit trading via request for quote in addition to an order book). The Commission's post-Dodd-Frank guidance also makes clear that a DCM can self-certify a product as a futures contract, even if the product is "indistinguishable in material economic effects" from a swap.[29]

The Contracts will exhibit all of the futures contract characteristics described above:

- The Contracts will have a fixed, standardized unit quantity;
- Each party's obligations will be guaranteed via novation to Klear, which will act as central counterparty;

---

[24] *See* 7 U.S.C. 2(h)(1).

[25] *See* 7 U.S.C. 2(h)(8).

[26] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Record Keeping, 77 Fed. Reg. 48,208, 48303 (Aug. 13, 2012) ("*2012 Definitions Release*").

[27] *Id.*

[28] *Id.*

[29] We recognize that the Dodd-Frank Act also envisions that a DCM can list swaps. In particular, Section 2(e) of the CEA makes it unlawful for a person that is not an eligible contract participant to enter into a swap that is not entered into on, or subject to the rules of, a DCM. 7 U.S.C. 2(e). This accords with the fact that some exchange-traded contracts can fall within subparagraph (A) of the "swap" definition without being excluded by subparagraph (B)'s futures contract exclusion. For example, commodity options contracts (other than options on futures contracts) are swaps under the CEA. *See* 2012 Definitions Release at 48236.

- Klear will set and collect margin;
- Holders will be able to exit their positions via offset;
- The Contracts will be available to the general public, including retail participants;
- Parties will enter into the contracts for the purpose of assuming or shifting the risk of change in value of Bitcoin, without the possibility of transferring ownership of Bitcoin; and
- The Contracts will trade on, and be self-certified as futures contracts by, a DCM.[30]

2. The Contracts' Indefinite Duration Does Not Make Them Swaps

One characteristic that could be argued to distinguish the Contracts from a conventional futures contract is that they have an indefinite duration. Courts have, at times, described a futures contract as providing for the purchase or sale of a commodity "at a fixed date in the future,"[31] or "on a date certain,"[32] or "at or before a stated future time."[33]

But that is a red herring. Courts have repeatedly explained that, "While futures contracts generally have a specified future delivery date, or settlement date, that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'"[34] For example, the Seventh Circuit in *CME v. SEC* concluded that contracts

---

[30] Trading on a DCM is not a necessary precondition for a transaction to qualify as a futures contract and be excluded from the "swap" definition. When legislating to enact Dodd-Frank, Congress considered the possibility of limiting the futures exclusion from the CEA's swap definition only to exchange-traded futures, but ultimately determined not to do so. *See,* H.R. 4173, as engrossed in the House of Representatives, excluded "(i) any contract of sale of a commodity for future delivery … traded on or subject to the rules of any board of trade designated as a contract market under section 5 or 5f" (emphasis added). *See* H.R. 4173 (E.H.), Section 3101. The Senate incorporated a similar exclusion in the Bill in its considerations in March 2010: "any contract of sale of a commodity for future delivery or security futures product traded on or subject to the rules of any board of trade designated as a contract market under section 5 or 5f." (emphasis added); *but see* 7 U.S.C. 1a(47)(B)(i) (excluding the requirement that futures contracts subject to exclusion from the swap definition be exchange-traded). Also, Section 4(a) of the CEA still prohibits off-exchange futures contracts, without treating them as swaps. That said, the fact that the Contracts will trade on a DCM and be cleared by a DCO bolsters the conclusion that there is trading "in the contract."

[31] *CME v. SEC* at 542.

[32] *Tauber* at 971.

[33] *Erskine* at 323.

[34] *Standard Forex II,* 1996 WL 435440, at *10, 1996 U.S. Dist. LEXIS 14778, at *29. *See, also CFTC v. Intern. Fin. Servs.*, 323 F.Supp.2d 482. 498 (S.D.N.Y. 2004) ("As a matter of law, defendants wrongly characterize certain indicia of futures contract as essential features of such contracts. Principally, they argue at length that without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction. They cite no authority for this proposition, however") and *CFTC v.*

of "indefinite duration" can possess the attribute of "futurity" – generally associated with futures contracts[35] - because futurity means "value that is set in the future" and exists where contracts provide for future executory payment obligations, not only where a contract has a final-settlement date and fixed term.[36] And, in *Zelener*, the Commission itself took the position that the transactions at issue were futures contracts because customers' positions were held open indefinitely.[37]

Accordingly, the Contracts' indefinite duration does not disqualify them from categorization as futures contracts. And, as discussed above, if the Contracts qualify as futures contracts, then they are not swaps.

3. <u>Prior Commission Enforcement Actions Do Not Bear on Categorization of the Contracts</u>

The Commission has, in some of its enforcement actions, taken the view that perpetual-duration digital-asset derivative products constitute swaps.[38] In all but one of these cases, the Commission looked only to features of the products at issue relevant to whether they fell within the scope of CEA Section 1a(47)(A)(iii). The Commission did not address whether such products were futures contracts, which would be excluded from the swap definition. As discussed above, the fact that a contract falls within the scope of CEA Section 1a(47)(A)(iii) because it "transfers, as between the parties to the transaction

---

*International Foreign Curren.*, 334 F.Supp.2d 305, 312 (E.D.N.Y. 2004) ("[T]he fact that Defendants' contracts failed to have a specified future delivery date is not determinative").

[35] *See CFTC v. First Lexington Group, LLC et. Al.*, 03 CV 9124 (GBD) (S.D.N.Y. Mar. 24, 2008).

[36] *CME v. SEC* at 541. The contracts at issue in *CME v. SEC* – "index participations" or "IPs" – were perpetual-term contracts based on the value of a securities index. The seller of an IP promised to pay the buyer the value of the underlying index as measured on a "cash-out day", while the buyer paid the seller for the IP in cash on the date of the sale. *Id.* at 539. The IPs were settled on a quarterly basis, and upon settlement the seller would owe the buyer a payment obligation approximating the value of dividends the stocks in the index paid out during the prior quarter. *Id.* The IPs thus resemble the Contracts in that (i) long-side holders were not subject to a binding, final-settlement date and (ii) they provide for executory payments (for the IPs, the seller's quarterly dividend payments; for the Contracts, the funding payments) determined following initiation of the contract. Although long-side holders of the IPs could exercise, on a quarterly or semi-annual basis, their privilege to "cash-out" and thereby trigger the short-side holder's obligation to pay the value of the underlying index, delivery on the "cash-out' date was not the dominant characteristic of the IPs as final-settlement was not a binding obligation on both parties to the contract (*i.e.,* long-side holders would ordinarily never face an obligation to cash-out).

[37] *See Zelener* at 863. Although the Court ruled against the CFTC in *Zelener*, the facts in that case contrast with those here. In that case, retail customers traded foreign exchange on an over-the-counter basis with a company controlled by the defendant, and the parties rolled their transactions so that customers were exposed to foreign currency prices without taking delivery. *Zelener* at 863. Notably, customers in that case did not purchase identical contracts, and their contracts did not provide a right of offset. *Id.* at 867. By contrast, here each Contract would be identical, and offset would be guaranteed by operation of Klear as central counterparty to all Contracts bought or sold on KalshiEx.

[38] *See, e.g.,* Complaint, *CFTC* v. *Changpeng Zhao, et. al.*, No. 23-cv-01887 (March 27, 2023) ("*Binance*"); Complaint, *CFTC* v. *MEK Global Limited, et. al.,* No. 24-cv-2255 (March 26, 2024); Complaint, *CFTC* v. *Eisenberg,* No. 23-cv-00173 (Jan. 9, 2023); Complaint, *CFTC* v. *HDR Global Trading Limited, et. al.*, No. 20-cv-8132 (Oct. 1, 2020); *In the Matter of Deridex, Inc.*, CFTC No. 23-42 (Sept. 7, 2023).

… the financial risk associated with a future change" in the price of the underlying asset is not determinative of its regulatory categorization if the product qualifies as a futures contract.

The only instance in which the Commission has addressed the possibility that perpetual-duration digital-asset derivative products could be excluded from the "swap" definition as futures contracts is in a single footnote in the Commission's response to Binance's Motion to Dismiss.[39] However, as noted by the Commission, Binance failed to meaningfully address why the perpetual contracts at issue were futures contracts under the *Zelener* line of precedent; in particular, Binance relied on the sole point that positions in their contracts could be closed by offset, and they failed to reference any particular facts that indicated "trading in the contract."[40]

Because no party in the *Binance* litigation, or any other litigation or enforcement action that we have identified, has raised the question of whether perpetual-duration digital-asset derivative products are futures contracts under *Zelener*, the Commission has yet to squarely address this question. In fact, in a recent request for comment regarding "perpetual" style digital-asset derivatives, Commission Staff expressly requested public comment regarding the proper regulatory categorization of these contracts.[41]

C. <u>Categorizing the Contracts as Futures Contracts Would Reduce Regulatory Arbitrage and Promote Competition</u>

As noted above, other DCMs and DCOs already offer "perpetual-style" futures contracts that are designed to mimic the economics of the Contracts, but with an expiry date that presents unwanted risk near those contracts' expiry. One of those DCMs and DCOs has also begun to offer retail leveraged Bitcoin spot transactions, which it offers as futures contracts under Section 2(c)(2)(D) of the CEA.[42] Those transactions

---

[39] Plaintiff Response to Defendants' Motion to Dismiss, Binance at note 14 (Sept. 22, 2023).

[40] Brief in Support of Defendants' Motion to Dismiss, Binance at note 19 (July 27, 2023).

[41] CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* question 13 (Apr. 21, 2025).

[42] Section 2(c)(2)(D)(iii) of the CEA applies the exchange-trading requirement in Section 4(a) of the CEA to retail leveraged commodity transactions as though they are futures contracts. Congress added this provision to the CEA as part of the Dodd-Frank Act, at the same time it amended the CEA to regulate swaps. We think it is notable that Congress elected, at that time, to treat retail leveraged commodity transactions as though they are futures contracts, not swaps. Congress did so in order to fix the *Zelener* "loophole" by subjecting rolling spot contracts to futures regulation, not swaps regulation. *See* 156 Cong, Rec. S5,924 (daily ed. July 15,2010) (statement of Sen. Lincoln); *see also* Hearing to Review Implications of the CFTC v. Zelener Case Before the Subcomm. on General Farm Commodities and Risk Management of the H. Comm. on Agriculture, 111th Cong. 52-664 (2009) (statement of Hon. Jim Marshall, United States Representatives) ("What we are talking about [regarding expanding the Commission's authority over retail commodity transactions] though is expanding the-well, correcting would be the argument the Zelener interpretation of what a futures contract is. If in substance it is a futures contract, it is going to be regulated. It doesn't matter how clever your draftsmanship is."). It would contradict Congressional intent to place the

also bear a high degree of economic similarity to the Contracts, but with the added potential for custody and other risks associated with physical Bitcoin trading.

Categorizing the Contracts as futures contracts, like these other transaction types, would ensure a consistent regulatory treatment across economically equivalent transactions. In contrast, categorizing the Contracts as swaps would subject them to higher initial margin requirements,[43] transaction reporting under Parts 43 and 45 of the Commission's regulations in addition to Part 16,[44] and counting towards the swap dealer *de minimis* threshold. Applying those additional requirements to the Contracts would discourage trading in the Contracts, even though they exhibit less risk than these others transaction types. It also would foster continuing incentives for U.S. market participants to seek to trade on unregulated, non-U.S. markets offering perpetual contracts similar to the Contracts without the protections of Commission regulation.

III. Conclusion

For the foregoing reasons, the Commission should categorize the Contracts as futures contracts, not swaps.

* * *

Please do not hesitate to contact me at (212) 558-3040 or lloydc@sullcrom.com if you have any questions regarding these matters.

C.D.L.
N.V.

---

Contracts, which likewise provide for cash-settled, leveraged retail exposure to commodities, in a different regulatory category.

[43] *See* Note 2, *supra*.

[44] Commission Staff have previously provided a no-action letter to KalshiEx and Klear from Part 43 and 45 reporting for fully collateralized swaps, but that letter would not apply to the Contracts because they are not fully collateralized.