# EXHIBIT E

CME Group

May 21, 2025

**VIA ON-LINE SUBMISSION**
Mr. Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

**Re: REQUEST FOR COMMENT ON THE TRADING AND CLEARING OF "PERPETUAL" STYLE DERIVATIVES**

**REQUEST FOR COMMENT ON TRADING AND CLEARING DERIVATIVES ON A 24/7 BASIS**

Dear Mr. Kirkpatrick:

CME Group Inc. ("CME Group") appreciates the opportunity to comment on the Commodity Futures Trading Commission's (the "CFTC" or "Commission") Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (the "Perpetuals RFC") and Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis (the "24/7 RFC" and collectively, the "RFCs").[1] In the RFCs, the Commission raises important questions and considerations related to the foregoing topics.

CME Group is the parent of four U.S.-based DCMs: Chicago Mercantile Exchange Inc. ("CME"), Board of Trade of the City of Chicago, Inc. ("CBOT"), New York Mercantile Exchange, Inc. ("NYMEX") and Commodity Exchange, Inc. ("COMEX") (collectively, the "CME Group Exchanges" or "Exchanges"). These Exchanges offer a wide range of products available across all major asset classes, including futures and options based on interest rates, equity indexes, foreign exchange, energy, metals, agricultural, and environmental commodities. CME is also registered as a derivatives clearing organization ("DCO") (also known as "CME Clearing") which provides clearing and settlement services for exchange-traded and over-the-counter derivatives transactions.

## I. Background

The CME Group Exchanges have been pioneers of thoughtful product and market structure innovation historically and in the modern era of derivatives markets. From the listing of financial futures in the 1970s and cash-settled futures contracts in the 1980s, to mini-sized futures and electronic trading in the

---

[1] *Request for Comment Regarding Perpetual Contracts in Derivatives Markets*, Release No. 9069-25 (April 21, 2025); *Request for Comment on Trading and Clearing Derivatives on a 24/7 Basis*, Release Number 9068-25 (April 21, 2025).

1990s and futures on digital assets most recently, the Exchanges have continued to find ways to pursue responsible innovation.

In evaluating the innovative product and market developments on which the Commission currently seeks comment, the Findings and Purpose provision of the Commodity Exchange Act ("CEA") provides a useful North Star.

> Findings and purpose
> (a)Findings
>
> > **The transactions subject to this chapter** are entered into regularly in interstate and international commerce and **are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information** through trading in liquid, fair and financially secure trading facilities.
>
> (b)Purpose
>
> > It is the purpose of this chapter to serve the public interests described in subsection (a) through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission. **To foster these public interests, it is further the purpose of this chapter to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to this chapter and the avoidance of systemic risk**; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; **and to promote responsible innovation** and fair competition among boards of trade, other markets and market participants. (emphasis added) [2]

Further, the Core Principles applicable to designated contract markets ("DCMs") provide useful guardrails in considering potential innovations. In particular, Core Principle 3—which requires that DCMs list only contracts that are not readily susceptible to manipulation—and Core Principle 21—which requires that DCMs have adequate financial, operational, and managerial resources to discharge each responsibility of the DCM—are especially relevant considerations in the context of these RFCs.

## II. Comments

### 1. Trading and Clearing of "Perpetual" Style Derivatives

The Commission first asks for "an appropriate working definition of 'perpetual derivative.'" We do not offer one because we believe that perpetual-style derivatives are not all necessarily the same. While the marketplace undoubtedly requires regulatory clarity around this issue, we recommend focusing less on defining what a "perpetual derivative" is and more on establishing what elements of perpetual or perpetual-like derivatives will trigger various regulatory classifications. Specifically, regardless of the name a DCM initially chooses to assign to a product, it ought to be clear to the marketplace whether the product is classified as a futures contract or a swap. Indeed, depending on how they are structured, certain perpetual-style derivative contracts may accurately be classified as futures, while others may be swaps. The product's proper classification is important because it can result in significant business and regulatory consequences, including with respect to tax status, capital requirements, reporting, account structure, and risk management.

[2] 7 U.S. Code § 5

Beyond the product classification, CME Group believes differences will also exist based on the underlying asset. For example, what may be novel and complex for one asset class may be standard and accepted in others. And, similarly, perpetual-style derivatives may be effective tools for managing and assuming price risk in some asset classes, but less so in others. The key is that the design of a perpetual-style derivative contract should "meet[] the risk management needs of prospective users and promote[] price discovery of the underlying commodity."[3] The terms and conditions of the contract should also "reflect the underlying cash market" and "perform the intended risk management and/or price discovery functions."[4] These elements of a contract and others—including the pricing convention, notional or tradeable quantity, and term to expiry—vary significantly from one asset class to another. To the extent a perpetual-style derivative contract presents a novel or complex issue for its market or is of major economic significance, the Commission should take an appropriate amount of time under its regulations to consider whether such a contract complies with the Act. It may, and likely will, be the case that some perpetual-style derivatives contracts are not appropriate for a particular asset class.

### 2. Trading and Clearing Derivatives on a 24/7 Basis

CME Group is aware of the many and varied considerations and concerns raised by the futures industry related to trading and clearing derivatives on a 24/7 basis. Industry feedback is invaluable on this topic. We also know that prices in underlying markets are constantly changing and, therefore, certain market participants that use futures contracts for risk management would like to have uninterrupted access to trading and clearing.

We note that the move to a 24/7 model appears probable, as our exchanges have maintained 23/5 trading hours for many products for decades and our peers have recently commenced 24/7 trading and clearing of certain futures products. However, a broader transition to 24/7 trading in any given market should be driven by market demand to ensure strong participation, liquidity, and price discovery. We anticipate that demand is going to differ among asset classes. The Exchanges have worked closely with regulators, participants, industry associations, and other stakeholders to innovate, solve problems, improve markets, and enhance price discovery for decades. We would similarly expect that, in any transition to 24/7 trading and clearing, the Commission, DCMs and DCOs will take into account operational, risk management, and regulatory considerations.

## III. Conclusion

CME Group thanks the Commission for the opportunity to comment on these RFCs. As discussed throughout our comments, we appreciate the importance of balancing the Commission's obligation to promote responsible innovation while maintaining market and financial integrity and customer protection. If you have any comments or questions, please feel free to contact me at (312) 930-2324 or via email at **Jonathan.Marcus@cmegroup.com**.

---

[3] *See* 17 CFR § 38, Appendix C Guidance

[4] *Id*.

Sincerely,

Jonathan Marcus
Senior Managing Director and General Counsel
CME Group Inc.
20 South Wacker Drive
Chicago, IL 60606

cc: Acting Chairman Caroline Pham
Commissioner Kristin Johnson
Commissioner Summer Mersinger
Commissioner Christy Goldsmith Romero