# EXHIBIT F

May 21, 2025

Submitted via CFTC Portal

Mr. Christopher J. Kirkpatrick
Secretary
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street
Washington, DC 20581

Re: Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Release Number 9069-25)

Dear Mr. Kirkpatrick:

Cboe Global Markets, Inc. ("Cboe") appreciates the opportunity to provide comments to the Commodity Futures Trading Commission ("CFTC" or "Commission") regarding its request for comment on the trading and clearing of "perpetual" style derivatives ("Request").[1] The Request seeks public feedback on perpetual futures or other perpetual derivatives contracts, including characteristics of perpetual derivatives, the implications of their use in trading, clearing and risk management, and related risks.

Cboe currently operates four CFTC-registered entities: two designated contract markets ("DCMs") (Cboe Futures Exchange, LLC ("CFE") and Cboe Digital Exchange, LLC ("CDE")), a swap execution facility ("SEF") (Cboe SEF, LLC ("Cboe SEF")), and a derivatives clearing organization ("DCO") (Cboe Clear U.S., LLC ("CCUS")). Accordingly, Cboe is well-suited to provide comments in response to the Request, and does so specifically from the DCM and DCO perspective concerning perpetual derivatives that are futures contracts on financial instruments, which could include equities, indexes and digital assets. As a result, this comment letter does not seek to respond to all questions set forth in the Request.

The offshore derivatives market is dominated by perpetual derivatives, particularly in the digital asset space. To date, the U.S. has been unable to participate in this burgeoning perpetual derivatives marketplace. Cboe believes it is beneficial to bring products with similar mechanics to U.S.-regulated futures markets as regulated futures products. A thoughtful, principles-based approach to listing and clearing perpetual futures contracts would: support innovation, economic growth, and competitiveness in the U.S. markets; allow the U.S. marketplace to evolve around such products while DCMs and DCOs continue to meet their core responsibilities; and promote regulatory clarity, particularly driven by the industry through the product filing process.

---

[1] Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (Release Number 9069-25) (April 21, 2025).

Categorization of a Perpetual Derivatives Contract[2]

The Request asks whether perpetual derivatives should be classified as swaps or futures contracts. Ultimately, it is up to the exchange listing any perpetual derivatives product to determine whether a new contract is to be listed as a future or swap. A CFTC-registered exchange may self-certify its contracts pursuant to Part 40 of the CFTC's regulations, subject to the CFTC's oversight authority. If a DCM has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view.[3] A listing exchange should consider the contract's design and unique characteristics, as appropriate and as informed by the CEA and Commission Regulations, to determine its regulatory categorization as a derivatives product. An exchange may categorize products based on attributes such as but not limited to standardized versus bespoke terms of agreement, contract obligations versus rights, the design of the methodology that maintains a basis to the underlying, and the manner in which a financing component may be applied.

While we appreciate the Commission's current request for comment on perpetual derivatives, earlier regulatory clarity on these products may have better supported continued innovation in U.S. derivatives markets. Regulatory uncertainty creates uneven playing fields where some market participants face unclear or inconsistent pathways to product launch. To maintain U.S. market competitiveness, the Commission should consider establishing clear, consistent guidelines, as may be applicable, that protect market integrity without stifling innovation, allowing all exchanges to operate under transparent rules rather than navigating an opaque process. CFTC staff views about particular perpetual product features, terms and conditions, or regulatory posture should be conveyed to the wider market, rather than through individual consultations. This approach would ensure consistent standards, regulatory transparency, and equal access to information across all market participants.

Defining a Perpetual Futures Contract[4]

A perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price.

Cboe understands from feedback from industry participants and from other industry products that "long-term" to expiration is at least over 5 years, but is typically understood to be 10 or more years. Cboe generally agrees with this feedback.

Price "convergence" as we think of it in this context refers to the price relationship between a perpetual futures contract and the relevant underlying asset maintained throughout the life of a perpetual futures contract. It is not intended that prices converge for a perpetual futures contract at a specific point in time, but rather that prices remain closely aligned throughout the life of a perpetual future contract with only a minimal basis between the futures price and the underlying price. A perpetual futures product may incorporate a funding component (e.g., a funding rate mechanism) that periodically implements funding adjustments between long and short positions

---

[2] This section is in response to Questions 1 and 13 of the Request.
[3] 77 Fed. Reg. 48208, 48303 (Aug. 13, 2012).
[4] This section is in response to Question 1 of the Request.

maintaining close pricing convergence with the underlying asset. For perpetual futures with an expiry date, on the final day the price of the perpetual futures contract could simply settle to the underlying asset price. An exchange also could consider, as appropriate, an auto-roll mechanism at expiration or similar mechanism to support continuity beyond expiration if there is significant market interest to do so. The price convergence mechanisms for perpetual futures should be designed to ensure frequent and close convergence—they should be transparent, be a fair representation of the market price, and be without artificial bias.

A Place for Perpetual Futures in the Existing Futures Marketplace[5]

Given their distinct characteristics, perpetual futures products offer unique benefits from those of traditional futures contracts. Perpetual futures products may provide advantages that complement rather than replace traditional futures or spot markets. Cboe anticipates these products will serve as an addition to the existing ecosystem rather than subsuming traditional markets.

Traditional futures have specified expiry dates and prices that represent the value of the underlying asset value at expiration. In order to maintain positions in traditional futures, the positions must be rolled on a relatively frequent basis (weekly, monthly, quarterly). Conversely, perpetual futures contracts, which either do not have an expiry date or have long-dated expirations, typically represent a one-day rolling forward of the underlying price while maintaining continuous and close pricing convergence between the futures and underlying prices.

These unique characteristics allow perpetual futures products to provide a combination of benefits to market participants, not generally accessible solely through traditional futures product offerings. Perpetual futures products provide the leverage capabilities typically associated with traditional futures products alongside the convenience of maintaining continuous asset exposure similar to spot products, while eliminating the operational burden of position rolling. Perpetual futures products would expand the investment and risk management toolkit, offering market participants enhanced hedging capabilities and capital efficiencies.

The benefits and design of perpetual futures products, however, may not necessarily translate to all asset classes. Traditional futures products remain better suited to the investment and risk management needs of certain asset classes. DCMs and DCOs should have the flexibility to evaluate and determine the appropriateness and potential advantages of perpetual futures on a market-by-market basis.

For example, traditional futures may remain more appropriate for agricultural futures where expiries relate to different growing seasons and physical deliveries, or for derivatives on treasuries with maturity dates. Whereas, for perpetual futures contracts on financial instruments, where monthly and quarterly expirations are largely unrelated to trading in the underlying markets, perpetual futures may significantly decrease trading costs by eliminating the need to roll expiries.

Perpetual futures may provide a more appropriate way to hedge a given spot portfolio, depending on the underlying market, but they are not necessarily the only way to hedge. Perpetual futures products provide another efficient means of hedging and tailoring investment strategies.

---

[5] This section is in response to Questions 2, 8, 9, 10, 11, 12 and 14 of the Request.

These products can attract users who traditionally rely on OTC markets for continuous exposure. Offering perpetual futures products on CFTC-regulated exchanges provides an opportunity to shift significant OTC trading volume to well-regulated, transparent markets.

These products can appeal to participants seeking to avoid delivery risk or that have no need for delivery of the underlying asset. While physical commodity market participants (producers/consumers) may have limited interest in perpetual futures due to their need for physical settlement, this does not preclude broader participation from traditional market participants, especially in perpetual futures on financial instruments such as those based on indexes or digital assets.

Like traditional futures with smaller notional values, perpetual futures products listed with smaller contract sizes may be more appealing to retail market participants.

Additionally, Cboe believes perpetual futures present increased arbitrage opportunities across futures and spot prices throughout a trading day. The pricing dynamics of perpetual futures will add to the pool of products that can be arbitraged due to their relationship to an underlying asset as well as their difference in expiration characteristics. The funding rate mechanism central to perpetual futures contracts serves a function analogous to the convergence process in traditional expiring contracts, but operates continuously (or continuously until a long-dated expiration). While traditional futures contracts experience a gradual decay in cost-of-carry as they approach expiration, perpetual futures maintain a consistent economic relationship through a rolling one-day forward rate structure. This creates a dynamic pricing ecosystem where perpetual futures prices reflect immediate market conditions relative to both the spot market and comparable traditional (short-term) futures contracts.

These pricing and arbitrage opportunities will serve to reduce price discrepancies, converge prices, and increase pricing transparency in the perpetual futures market and potentially across various related markets. Cboe recommends that exchanges publish any funding rates and price convergence mechanisms that they implement for increased transparency.

Cboe does not believe the perpetual derivatives market will function any less efficiently than traditional futures markets. The traditional futures ecosystem already accommodates a diverse range of futures products that are designed to serve different market participant types and needs. Indeed, volumes in offshore perpetual derivative contracts, namely on digital assets, demonstrate a clear demand for perpetual futures products and suggest there is a segment of the market that is not served by current U.S. futures product offerings. Perpetual futures simply represent another futures instrument through which market participants can meet different investment goals and manage risk.

Market Integrity and Risk Management

Cboe believes that the protections and safeguards addressed by the existing principles-based approach are more than adequate to mitigate associated risks and potential concerns about susceptibility to manipulation in connection with perpetual futures products.

Any perpetual futures contract design should be thoroughly considered by the listing exchange and applicable clearing participants including the clearinghouse and FCMs. Given their unique characteristics, perpetual futures products may present certain unique risks that warrant consideration, particularly around funding rate fluctuations that could potentially lead to funding or liquidity events, leverage, position limits, margin modeling, surveillances, and approaches to mitigation of susceptibility to manipulation.

Market Integrity Considerations: Offshore Perpetual Derivatives Market Products[6]

While Cboe believes it is important to design U.S.-regulated perpetual futures products in a manner that aligns with the offshore perpetual derivative product offerings to satisfy market participant demand here in the U.S., it is equally as important to understand key differences that should be considered when designing a perpetual futures offered on a U.S.-regulated market, particularly in connection with mitigating potential susceptibility to manipulation and providing price transparency.

The manner in which offshore perpetual derivatives are constructed may impact pricing transparency and increase susceptibility to manipulation. Offshore perpetual derivatives products, typically on digital assets, generally incorporate a static interest rate and caps on funding rates as a method to force price convergence. The static interest rate in offshore contracts forces convergence, creates bias, and is generally not transparent. Further, offshore markets typically employ caps on funding rates in a manner that tends to force a perpetual derivative contract's interest rate to align with participants' interests, lending to susceptibility to manipulation. By narrowly capping funding rates across diverging futures and spot markets, offshore platforms must adjust the static interest rate, artificially forcing price alignment which can result in additional incentives for one side of the market.

A perpetual futures contract listed on a DCM, unlike the typical offshore perpetual contracts, should be designed to allow natural market conditions to drive price discovery, permitting funding payments that more appropriately reflect actual market variance. As discussed below, DCMs should take a thoughtful approach when considering a cap on a perpetual futures contract's funding component to be sufficiently wide to accommodate natural market volatility while mitigating extreme market events that could pose significant market impact.

Market Protections and Surveillances[7]

As with any novel futures product, exchanges should seek to implement targeted protections that address the unique characteristics of a perpetual futures product within the existing regulatory frameworks. Exchanges should draw on established practices while acknowledging the distinct features of these contracts as part of their approach to volatility management and market surveillance for perpetual futures products.

To provide protections in connection with extreme market volatility, exchanges that offer perpetual futures may consider caps on daily funding rate changes, similar to circuit breakers in traditional

[6] This section responds to Questions 1, 3, and 6 of the Request.
[7] The section responds to Questions 6 and 7 of the Request.

futures markets. These should be implemented in a manner intended to mitigate extreme market stress and promote stability during periods of heightened volatility. Such caps may be determined by examining historical data across observable market conditions, *e.g.*, benchmarks based on average spread widths, average basis over a year or across a rolling 30-day average. DCM's should also consider how they will monitor and adjust caps for changing market conditions over time. A cap should be wide enough to allow for normal market fluctuations and natural price discovery, but narrow enough to mitigate manipulation concerns and excessive volatility. Caps on daily funding rate changes should serve as meaningful guardrails without unnecessarily constraining legitimate market activity.

Further, perpetual futures may introduce distinct surveillance considerations given their unique characteristics. While distinct, such surveillance considerations are manageable within existing regulatory frameworks. The specific structure of these contracts—particularly the mechanisms governing price convergence and financing calculations—may necessitate targeted surveillance to detect potential manipulation around these calculation periods; similar to how surveillance is used to monitor activity around the daily closing period or the settlement windows in traditional futures.

Cboe additionally notes that it does not believe perpetual futures products raise any further conflicts of interest concerns beyond those related to traditional futures. As with any futures products, conflict of interest concerns may arise if, among other things, the products are not offered through an intermediated model, or if a venue or firm implements an auto-liquidation logic while also affiliated with or operating as a market maker.

Managing Clearing Risk[8]

Similarly, the introduction of perpetual futures to U.S. markets necessitates thoughtful adaptation of existing clearing and risk management processes to accommodate their distinctive characteristics. The specific risk profile of perpetual futures contracts may adequately be addressed by established frameworks in connection with margin, default management, and position monitoring.

As with any new futures product offering, the specific characteristics of a perpetual futures product would require integration into industry margin frameworks. The market risk attributable to the funding rate component unique to perpetual futures may be incorporated into DCO and FCM margin models in conjunction with real-time funding rates made available from the DCMs. DCOs and FCMs would be able to issue margin calls at the same frequency for perpetual futures as they are issued for traditional futures.

Existing default processes should be able to adequately address a default in a perpetual derivative product. The default management process of a DCO is expiration-neutral, and any open positions on the books of an FCM would need to be handled whether those open positions are for contracts that expire in the near-term, long-term, or not at all.

Position sizes should be evaluated in relation to potential daily financing requirements to ensure proper risk management. While funding rates typically represent a smaller capital commitment than margin requirements, incorporating funding obligations as part of variation margin would

[8] The section responds to Questions 3, 15, and 16 of the Request.

enhance financial and operational resiliency. This approach would preserve the capital efficiency benefits that attract participants to perpetual futures products while providing an additional safeguard against funding-related liquidity events.

* * *

Cboe believes that the existing regulatory and risk management frameworks are readily applicable to perpetual futures via a principles-based approach. A listing exchange should determine how to categorize any new contract it seeks to list, including a perpetual derivative product, based on the characteristics of that product. Any unique views or approach that the CFTC determines in relation to perpetual futures contracts should apply to all market participants equally, ensuring consistent standards and fair and transparent regulatory treatment.

Cboe appreciates the opportunity to share its views in response to the Request and welcomes the opportunity to discuss these comments further.

Sincerely,

*/s/ Patrick Sexton*

Patrick Sexton
EVP, General Counsel, and Corporate Secretary
Cboe Global Markets, Inc.