# EXHIBIT G

**UNITED STATES**
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Division of Market Oversight

**Re: No-Action Positions Regarding Removal of Expiration Dates from Existing Broad-Based Security Index Perpetual-Style Futures Contracts**

## I. Introduction

The Division of Market Oversight ("**Division**" or "**DMO**") of the Commodity Futures Trading Commission ("**Commission**" or "**CFTC**") is issuing this letter in response to a request (the "**Request Letter**") dated October 1, 2026, from Coinbase Derivatives, LLC ("**Coinbase**" or the "**Exchange**"),[1] a designated contract market ("**DCM**"), pursuant to Commission Regulation 140.99.[2]

The Request Letter requests the Division issue a no-action letter confirming that the Division will not recommend an enforcement action against the Exchange if the Exchange removes the expiration dates from the terms and conditions of their existing perpetual-style broad-based security index ("**Broad-Based Security Index**")[3] futures contracts[4] (the "**Existing Perpetual-Style Contracts**"), with an immediate effective date upon publication of the amendments, notwithstanding the requirements of Commission Regulations 40.6(a)(3)[5] and 40.6(b)(1).[6] Further, the Exchange asks that the Division confirm that it will not recommend that the Commission, or exercise delegated authority from the Commission to, take action to issue a stay of the certification of such amendments to the Contracts pursuant to Commission Regulation 40.6(c)(1).[7]

---

[1] Coinbase, Request for No-Action Relief from CFTC Regulations 40.6(a)(3), 40.6(b)(1), October 1, 2026.
[2] 17 C.F.R. § 140.99.
[3] For purposes of this letter, an index is a broad-based security index if it does not meet the definition of a narrow-based security index under Section 1a(35) of the Commodity Exchange Act, 7 U.S.C. § 1a(35).
[4] *See* 7 U.S.C. § 2(a)(1)(C)(ii). A futures contract on a group or index of securities may be traded subject to the Commission's exclusive jurisdiction where (I) settlement is effected in cash or by means other than the transfer or receipt of any security; (II) the contract is not readily susceptible to manipulation of its price, nor to being used to manipulate the price of any underlying security or option thereon; and (III) the group or index of securities is not a narrow-based security index. *See also id.* § 2(a)(1)(C)(iv) (prohibiting the offer of such a contract except as permitted under clause (ii) or as a security futures product).
[5] 17 C.F.R. § 40.6(a)(3).
[6] 17 C.F.R. § 40.6(b)(1).
[7] 17 C.F.R. § 40.6(c)(1).

## II. Background

### *a. Regulatory Treatment of Digital Commodity Perpetual Futures*

On May 29, 2026, the Commission issued an order under Regulation 40.3 (the "**Order**"), stating that listing perpetual futures contracts[8] referencing the spot price of bitcoin or other digital commodities[9] with "deep, active, and continuous" spot market trading as futures contracts would not violate the Commodity Exchange Act ("**CEA**" or "**Act**") or the Commission's regulations.[10] The Commission emphasized that its analysis in the Order applies only to perpetual contracts tied to bitcoin and other digital commodities and noted that certain features of the asset class underlying these perpetual futures contracts may influence regulatory treatment and compliance matters.[11]

In addition to the Order, the Commission issued a policy statement ("**CFTC Perpetuals Policy Statement**") which stated the Commission's position "that the public interest is best served by requiring perpetual contracts that reference assets that are not contemplated in the Order to undergo Commission review and approval pursuant to Commission Regulation 40.3."[12]

### *b. Broad-Based Security Index Perpetual Futures Treatment*

Consistent with the CFTC Perpetuals Policy Statement, on August 18, 2026, the Commission received a filing from KalshiEX LLC seeking review under Commission Regulation 40.3 of a Broad-Based Security Index perpetual futures contract ("**Broad-Based Security Index Perpetual Future Contract**").[13] This contract was deemed approved by the Commission on October 2, 2026.

### *c. The Rise of Perpetual-Style Futures Contracts*

Due to the regulatory uncertainty concerning the appropriate classification of perpetual futures contracts in the U.S. derivatives markets, the market for perpetual futures contracts

---

[8] For purposes of this letter, "perpetual futures contracts" or "perpetual contracts" are derivative contracts that have no fixed expiration date, and which rely on a periodic funding rate mechanism, rather than a fixed expiration date, to maintain relative price parity with the underlying asset's spot price.

[9] For purposes of this letter, the term "digital commodity" has the meaning assigned to it in the U.S. Securities and Exchange Commission and CFTC guidance concerning the application of the federal securities laws to certain types of crypto assets and certain transactions involving crypto assets. *See* Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets, 91 Fed. Reg. 13714, 13718 (Mar. 23, 2026), *available at* https://www.federalregister.gov/d/2026-05635/p-105.

[10] In the Matter of the Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract (May 29, 2026), *available at https://www.cftc.gov/filings/documents/2026/orgdcmkexbtxperporder26601.pdf*.

[11] *Id.* at 7–9.

[12] Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed Reg. 33160, 33161 (June 3, 2026) *available at https://www.federalregister.gov/documents/2026/06/03/2026-11020/policy-statement-concerning-the-listing-of-perpetual-contracts*.

[13] KalshiEX LLC Submission, KalshiEX LLC – Commission Regulation 40.3(a), Voluntary submission of new products for Commission review and approval regarding the Initial Listing of the US500 Futures Contract (Aug. 18, 2026).

largely developed outside of the United States, with the majority of trading occurring on offshore trading venues.

In order to bring perpetual type contracts to the U.S. derivatives markets, the Exchange listed perpetual-style futures contracts on certain Broad-Based Security Indices, *i.e.*, the Existing Perpetual-Style Contracts. However, unlike true perpetual futures contracts which have no fixed expiration date, these perpetual-style futures had long-dated expiration dates, including up to 25 years.

Despite the differences in expiration dates, as explained in the Request Letter, the fundamental mechanics of the Existing Perpetual-Style Contracts are identical to those of the Broad-Based Security Index Perpetual Future Contract, including relying on a periodic funding rate mechanism, rather than a fixed expiration date, that is designed to maintain relative price parity with the underlying asset's spot price.[14]

*d. Amendments to Contract Terms and Conditions for Contracts with Open Interest*

As explained above, due to the regulatory uncertainty concerning the appropriate classification of perpetual futures contracts in the U.S. derivatives markets, the Exchange listed the Existing Perpetual-Style Contracts, instead of true perpetual futures contracts.

Now that the Commission has affirmatively confirmed the regulatory classification of Broad-Based Security Index Perpetual Future contracts as futures contracts, the Exchange proposes to revise the terms and conditions of their Existing Perpetual-Style Contracts to remove the contracts' expiration dates. These amendments would effectively convert the Existing Perpetual-Style Contracts into Broad-Based Security Index Perpetual Futures Contracts. Importantly, however, several of these Existing Perpetual-Style Contracts currently have open interest.

When DCMs seek to amend contract terms and conditions of existing contracts with open interest, particularly material terms and conditions such as the expiration date, there must be meaningful consideration of the potential adverse impacts on the diverse sets of market participants with existing positions in the contract.

Where open interest exists in a contract,[15] the announcement or implementation of changes to contract terms and conditions can potentially affect prices. This dynamic may result in some current contract holders experiencing losses, while others benefit, depending on their

[14] Division staff notes that while the funding mechanism may be identical, the pricing of the Existing Perpetual-Style Contracts may deviate due to various factors.

[15] Division staff notes that amending the contract terms or conditions of contracts that are either not yet listed or lack open interest generally does not pose the same risks as amending contracts with open interest. Because no market participants have financial exposure or contractual obligations in such contracts, changes to the contract terms do not adversely affect any existing futures positions. Upon the implementation of the amended contract terms and conditions, traders can determine whether they want to trade in the contract based on the amended terms and conditions.

market position. Such movements are driven solely by the alteration of contract terms and conditions rather than changes in underlying market fundamentals, introducing the possibility for profits and losses based on these amendments.

Further, amending the terms and conditions of futures contracts with open interest poses challenges because the outcomes of any change are unpredictable. While exchanges should apply their expertise to craft effective amendments that avoid adverse impacts, it may be impossible to anticipate how such changes could affect price discovery and hedging in real-world scenarios.

*e. Certification of Amendments to Convert Perpetual-Style Contracts into True Perpetual Contracts*

As discussed above, the Exchange proposes to convert their Existing Perpetual-Style Contracts into Broad-Based Security Index Perpetual Futures Contracts through elimination of the expiration dates for the contracts.

To amend the terms and conditions of an existing non-enumerated agriculture futures contract,[16] such as the Existing Perpetual-Style Contracts, DCMs are required to submit a certification of such amendments under Commission Regulation 40.6(a)[17] or submit an approval request under Commission Regulation 40.5.[18]

For amendments of contract terms and conditions that are certified to the Commission under Commission Regulation 40.6(a), the Commission, or the Director of the Division through delegated authority from the Commission, may stay such amendments under Commission Regulation 40.6(c) by issuing a notification informing the DCM that the Commission is staying the certification of the amendments on the grounds that the rule or rule amendment presents novel or complex issues that require additional time to analyze, or the amendment is potentially inconsistent with the CEA or the Commission's regulations thereunder.[19] The Commission will have an additional 90 days from the date of the notification to conduct the review.[20] Further, the Commission will provide a 30-day comment period on the stayed amendments.[21]

[16] Amendments that materially change a term or condition of a contract for future delivery of an enumerated agricultural commodity as listed in Section 1a(9) of the Act, 7 U.S.C. § 1a(9), or an option on such a contract or commodity, in a delivery month having open interest must be submitted to submitted for prior Commission approval under Commission Regulation 40.4.
[17] 17 C.F.R. § 40.6(a).
[18] 17 C.F.R. § 40.5.
[19] 17 C.F.R. § 40.6(c)(1). Rule or rule amendments may also be stayed if it is accompanied by an inadequate explanation. *Id*.
[20] *Id*.
[21] 17 C.F.R. § 40.6(c)(2).

### III. Requested No-Action Positions

Recognizing these issues, as explained above, the Exchange requests that the Division issue a no-action letter confirming that the Division will not recommend an enforcement action against the Exchange if the Exchange removes expiration dates from the terms and conditions of their Existing Perpetual-Style Contracts ("**Proposed Contract Amendments**"), with an immediate effective date upon publication of the amendments, notwithstanding the requirements of Commission Regulations 40.6(a)(3) and 40.6(b)(1). Further, the Exchange asks that the Division confirm that it will not recommend that the Commission, or exercise delegated authority from the Commission to, take action to issue a stay of the certification of the Proposed Contract Amendments to the Existing Perpetual-Style Contracts pursuant to Commission Regulation 40.6(c)(1).

Specifically, the Exchange asks for a no-action position from the 10-business-day requirements of Commission Regulations 40.6(a)(3) and 40.6(b)(1), allowing it to expedite implementation of the Proposed Contract Amendments.[22] The Exchange argues that its request is "narrowly tailored" and aligns with the CEA, relevant Commission regulations, the Order and CFTC Perpetuals Policy Statement, and the CEA's objective to promote "responsible innovation and fair competition."[23]

Further, the Exchange argues that "absent expedited implementation of the amendments to the Contracts via no-action relief, the Exchange would be required to await expiration of the 10-business day framework of Commission Regulations 40.6(a)(3) and 40.6(b)(1).[24]

### IV. No-Action Positions

Based on the foregoing and the representations in the Request Letter, the Division has determined that, subject to the conditions below, conditional no-action positions are warranted. Further, subject to the conditions below, the Division has determined that it will not exercise its delegated authority to, or recommend that the Commission, take action to issue a stay of the certification of the Proposed Contract Amendments to existing Broad-Based Security Index perpetual-style futures, including the Existing Perpetual-Style Contracts, pursuant to Commission Regulation 40.6(c)(1). Specifically, and subject to the terms and conditions set forth below, the Division will not recommend the Commission initiate an enforcement action against the Exchange, or against any other DCM, for implementing with immediate effect the Proposed Contract Amendments for their existing Broad-Based Security Index perpetual-style futures, including the Existing Perpetual-Style Contracts,[25] resulting in those contracts becoming

---

[22] Coinbase Letter at 4.
[23] *Id.*
[24] *Id.*
[25] For avoidance of doubt, the no-action positions in this letter are not applicable to any perpetual-style futures contracts that reference assets that are not Broad-Based Security Indices.

Broad-Based Security Index Perpetual Futures Contracts, provided that prior to implementing the Proposed Contract Amendments, the DCM:[26]

1. Will only amend those Existing Perpetual-Style Contracts that reference Broad-Based Security Indices;
2. Solicits feedback from its market participants[27] with open positions on any potential adverse impacts the proposed Contract Amendments may have on their open positions in the existing Broad-Based Security Index perpetual-style futures contracts;
3. Provides at least five calendar days of notice to its market participants with open positions that it intends to implement the Proposed Contract Amendments for its existing Broad-Based Security Index perpetual-style futures contracts;
4. Provides an opportunity for market participants to close out open positions under the existing terms of the existing Broad-Based Security Index perpetual-style futures contracts that the DCM is proposing to amend;
5. Provides appropriate risk disclosures to market participants regarding the risks associated with amendments to contract terms and conditions;
6. Amends no other material contract terms or conditions other than the expiration date;
7. Files the Proposed Contract Amendments under Commission Regulation 40.6(a) or Commission Regulation 40.5; and
8. Notifies the Division of its intention to rely on the no-action positions in this letter and certifies that it has complied with the above conditions.[28] This notice must specifically identify the existing Broad-Based Security Index perpetual-style futures contracts that the DCM intends to rely on the no-action positions for.

The no-action positions in this letter expire on October 20, 2026.

## IV. Conclusion

This letter, and the positions taken herein, represent the views of the Division only, and do not necessarily represent the positions or views of the Commission or of any other office or division of the Commission. This letter and the no-action positions taken herein are not binding

[26] Some of these conditions regarding the no-action position may constitute a collection of information, as that term is defined in the Paperwork Reduction Act, 44 U.S.C. §§ 3501 et seq. The Office of Management and Budget ("OMB")—in accordance with 44 U.S.C. § 3507(d) and 5 C.F.R. §§ 1320.8 and 1320.10—has approved collection 3038-0049, entitled "Procedural requirements for requests for interpretative, no-action and exemptive letters," for such purposes. This collection would encompass collections made as part of exemptive or no-action position from the Commission or its staff. The public is not required to respond to a collection of information that does not have a valid OMB control number.

[27] For avoidance of doubt, the Division would expect impacted customers of an intermediary to be part of "market participants" in the conditions set forth in 2, 3, 4, and 5.

[28] The notice and certification can be contained with its Commission Regulation 40.5 or Commission Regulation 40.6 filing, or in a submission to the dmoletters@cftc.gov.

on the Commission.[29] Further, this letter, and the positions taken herein, are based upon the facts and circumstances presented to staff of the Division. Any different, changed or omitted material facts or circumstances might render the positions taken in this letter void. Except as explicitly provided in this letter, the no-action position taken in this letter does not excuse persons relying on it from compliance with any other applicable requirements contained in the CEA or Commission regulations. This letter does not impose any obligation on any person, modify or supersede any provision of the CEA or the Commission's regulations thereunder, create any right or benefit enforceable at law or in equity. Each contract submitted to the Commission under part 40 will continue to be evaluated on its own terms. Finally, as with all staff letters, the Division retains the authority to condition further, modify, suspend, terminate, or otherwise restrict the terms of the positions taken in its discretion.

Questions concerning this no-action letter may be directed to Roger Smith, DMO, at rsmith@cftc.gov.

Sincerely,

__________________________

DJ Hennes
Acting Director
Division of Market Oversight

[29] *See* 17 C.F.R. § 140.99(a)(2) ("A no-action letter binds only the issuing Division . . . and not the Commission or other Commission staff.").