# EXHIBIT H

CME Group

**Craig S. Donohue**
Chief Executive Officer

July 22, 2011

**VIA ON-LINE SUBMISSION**

David Stawick
Secretary of the Commission
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

Re: Further Definition of ''Swap,'' ''Security-Based Swap,'' and ''Security-Based Swap Agreement''; Mixed Swaps; Security-Based Swap Agreement Recordkeeping (RIN number 3038- AD46); (Federal Register Vol. 76, No 99, Page 29818)

Dear Mr. Stawick:

CME Group Inc. ("CME Group"), on behalf of its four designated contract markets, appreciates the opportunity to comment on the Commodity Futures Trading Commission's (the "CFTC" or "Commission") Notice of Proposed Rulemaking ("Release") that was published in the Federal Register on May 23, 2011. In the Release, the Commission seeks comment on proposed rules governing product definitions.

CME Group is the world's largest and most diverse derivatives marketplace. CME Group includes four separate Exchanges, including Chicago Mercantile Exchange Inc. ("CME"), the Board of Trade of the City of Chicago, Inc. ("CBOT"), the New York Mercantile Exchange, Inc. ("NYMEX") and the Commodity Exchange, Inc. ("COMEX"). The CME Group Exchanges offer the widest range of benchmark products available across all major asset classes, including futures and options based on interest rates, equity indexes, foreign exchange, energy, metals, agricultural commodities, and alternative investment products. CME includes CME Clearing, one of the largest central counterparty clearing services in the world, which provides clearing and settlement services for exchange-traded contracts, as well as for over-the-counter derivatives transactions through CME ClearPort®.[1]

---

[1] As a pioneer in the globalization of the futures markets, CME Group has helped to expand the customer base for futures products. CME Globex, for example, is available to users around the world for more than 23 hours a day and five days a week. To satisfy the increasing demands of the international marketplace, customers can access the CME Globex platform in more than 150 countries and foreign territories around the world. Telecommunications hubs in Singapore, London, Amsterdam, Dublin, Milan, Paris, Seoul, São Paolo Kuala Lumpur and Mexico City reduce our customers' connectivity costs, increase accessibility, and deliver faster, more efficient trading. Additionally, CME Group has established international offices in London, Singapore, Tokyo, Hong Kong, São Paolo and Calgary. CME Group believes that its significant global expertise and experience will provide the Commission with a unique and valuable perspective on the matters discussed herein.

**I. Overview**

We support the overarching goals of The Dodd-Frank Wall Street Reform and Consumer Protection Act (“Dodd-Frank” or “DFA”) to reduce systemic risk through central clearing and exchange trading of derivatives, to increase data transparency and price discovery, and to prevent fraud and market manipulation. Unfortunately, as the Commission is aware, Dodd-Frank left many important issues to be resolved by the regulators with little or ambiguous direction and set unnecessarily tight deadlines on rulemakings by the agencies charged with implementation of the Act.

DFA requires the Commission, in conjunction with the Securities and Exchange Commission (“SEC”) to further define “swap” and “security-based swap” (“SBS”). We commend the Commissions for attempting to fulfill their respective statutory obligations in this regard. The Release, however, fails to provide the guidance and clarity necessary for market participants to understand the scope of their obligations under DFA and the Commissions’ regulations. In particular, the Release fails to address (i) the distinction between contracts for the sale of a commodity for future delivery (“futures”) and swaps – a question which has been raised by market participants both in the pre-comment phase and in response to the Commission’s effective date order – and (ii) the CFTC’s view on the reach of the agency’s anti-evasion authority. As discussed in more detail below, we recommend that the CFTC clarify that nothing in the Release is intended to limit a designated contract market’s (“DCM’s”) ability to list for trading as a contract of sale for future delivery any contract regardless of whether that same contract could be characterized as a swap if traded OTC or on a SEF. We further recommend that the Commission clarify that, for purposes of its proposed anti-evasion rules, a market participant may enter into a transaction or structure an instrument or entity to avoid higher regulatory burdens and attendant costs as long as the transaction or entity has an overriding business purpose. Additional detailed comments also are provided below.

**II. Detailed Comments**

**A. Exclusion for Contracts for the Sale of a Commodity for Future Delivery**

Swap and futures contracts can be designed to replicate the same economic exposure to an underlying instrument, commodity or asset – making them indistinguishable in material economic effect for the user. Congress confirmed this fact in Dodd-Frank provisions that now codify equivalent regulatory treatment for futures and "economically equivalent" swaps. *See, e.g.*, CEA § 4a(a)(5). Such equivalency makes it extremely difficult, if not impossible, to separately define and categorize economically equivalent swaps and futures. That swaps and futures can be economic equivalents is not new and has existed for decades. Historically, however, swaps were distinguishable from futures in the following manner:

20 South Wacker Drive Chicago, Illinois 60606 T 312 930.8275 F 312 930.3209 craig.s.donohue@cmegroup.com cmegroup.com

| | Swaps | Futures |
|---|---|---|
| **Degree of Standardization** | Lack of standardization or negotiability of material terms | Fully standardized across all terms and conditions |
| **Trading Model** | Privately negotiated among sophisticated investors | Traded on or subject to the rules of a formal exchange |
| **Regulatory Framework** | Largely exempt from regulation within OTC space | Comprehensively regulated |
| **Credit Model** | Generally entail bilateral counterparty credit exposures | Centralized clearing model whereby exchange clearing houses, through legal novation, become the buyer to every seller and the seller to every buyer |

CFTC Regulations, reinforced by exemptions enacted by the Commodity Futures Modernization Act of 2000 ("CFMA") further blurred the line between swaps and futures. CFMA permitted futures on certain commodities to be traded between ECPs in the OTC market. CFMA also permitted so-called swaps to be traded on electronic markets and cleared, but not intermediated. Significantly, nothing in CFMA limited exchanges' ability to list for trading futures products that mimicked non-exchange "swap" products and vice versa.

As depicted in Table 1 below, ICE's LD1 natural gas swap contract is an example of the convergence between futures and swaps facilitated by CFMA. LD1 is a swap contract that is based on and prices off of NYMEX's physical delivery Henry Hub Natural Gas futures contract ("NG"). Both trade in a central limit order book environment, both are considered by the CFTC to be liquid "price discovery contracts" and both are centrally-cleared in the same manner as most actively-traded futures contracts; however, ICE's LD1 swap contract is traded as a swap on an Exempt Commercial Market whereas NYMEX's NG futures contract trades on a designated contract market.[2]

[2] NYMEX also lists for trading a cash-settled version of NG, NN. Like NG, NN is a futures contract. Unlike NG, significant NN volume is transacted by bilateral trades.

20 South Wacker Drive Chicago, Illinois 60606 T 312 930.8275 F 312 930.3209 craig.s.donohue@cmegroup.com cmegroup.com

**Table 1: Trading Activity in Contracts Supporting Natural Gas Price Discovery**




The market turmoil and financial crisis of 2008 highlighted the benefits of central counterparty clearing systems, long employed in the regulated futures markets, and the dangers of overreliance on bilateral OTC markets. Throughout the financial crisis, CFTC-regulated futures exchanges and clearing houses operated flawlessly, performing all of their essential functions without interruption. Indeed, while large financial firms regulated by other oversight agencies failed, CME Group's clearing house experienced no default and no customers on the futures side lost their collateral.

In response to the financial crisis, Congress enacted DFA in July 2010. Among other things, DFA is aimed at reducing systemic risk in the OTC derivative market through a central counterparty clearing system while also bringing more transparency, liquidity and efficiency to the OTC derivatives markets. To achieve these objectives, DFA established a new regulatory regime similar to that which exists for CFTC-regulated futures exchanges and their market participants, one that arguably mirrors the direction in which a number of OTC markets were headed under CFMA. In essence, DFA requires that standardized OTC products be cleared by a central counterparty and executed on a futures exchange or a SEF. DFA also establishes a comprehensive reporting regime for swaps products and imposes enhanced prudential regulations on persons and entities trading those products.

With the amendments to the CEA by DFA, virtually all significant distinctions between futures and swaps have been eliminated. DFA, however, preserves "customer choice." That is, under DFA market participants retain the option to trade products as either "futures" or "swaps"; in the case of an ECP, DFA allows market participants to choose the execution venue for trading swaps (with certain limitations). DFA does not – either in letter or spirit – force market participants out of the futures market and into the swaps market, or vice versa.

20 South Wacker Drive Chicago, Illinois 60606 T 312 930.8275 F 312 930.3209 craig.s.donohue@cmegroup.com cmegroup.com

In addition to the example of convergence between NG, NN and LD1 discussed above, the definition of swap in DFA arguably describes our NG contract, as well as many of our other mature, successful products, including:[3]

- CME Group's 3-Month Eurodollar Futures (Dec 1981)
- CME Group's S&P500 Index Futures (Apr 1982)
- CME Group's Feeder Cattle Futures (Cash Settled since Aug 1986)
- CME Group's 30-Day Fed Funds Futures (Mar 1988)
- CME Group's 1-Month Eurodollar Futures (Apr 1990)
- CME Group's S&P-Goldman Sachs Commodity Index Futures (Jul 1992)
- CME Group's Lean Hog Futures (Cash Settled since Dec 1996)
- CME Group's E-Mini NASDAQ-100 Futures (Jun 1999)
- CME Group's 10-Year Interest Rate Swap Futures (Oct 2001)
- CME Group's New York Harbor RBOB Gasoline (Oct 2005)

As this brief list evidences, the overlap between futures and swaps is not limited to products in any particular asset class—the overlap exists across the board. These and other CME Group products have been traded as futures contracts by market participants and regulated as such by the Commission because a DCM chose to offer them for trading as futures contracts rather than swaps. Congress clearly understood this market reality when enacting DFA and could have expressly precluded such products from being traded and regulated as futures. It did not do so. There is nothing in the statute or legislative history to suggest that Congress intended for the Commission to change the existing market structure in this regard.

Accordingly, we strongly recommend that the Commission confirm that the omission of this issue in the Release is intentional and that the Commission intends to continue to allow markets to choose whether to list for trading futures or swaps and allow market participants the choice as to whether to trade futures or swaps. In other words, the Commission should confirm that identical products may be listed for trading by different venues – even the same platform – one bearing the label "future" and one "swap"; in fact, sometimes a single instrument contains both terms in its label. We further recommend that the Commission adopt a final rule that further interprets the definition of "swap" by adding to the futures contract exclusion the following language after the word "delivery" – "listed for trading by a designated contract market". 7 U.S.C. § 1a(47)(B)(i). The modified language would read as follows (the suggested added text in bold and underlined text):

> (B) EXCLUSIONS.—The term "swap does not include –
>
> (i) any contract for the sale of a commodity for future delivery **<u>listed for trading by a designated contract market</u>** (or option on such contract), leverage contract authorized under section 19, security futures product, or agreement, contract, or transaction described in section 2(c)(2)(C)(i) or Section 2(c)(2)(D)(i);

---

[3] This list is not intended to be an exhaustive list of CME Group's futures products that arguably fall within DFA's definition of swap.

20 South Wacker Drive Chicago, Illinois 60606 T 312 930.8275 F 312 930.3209 craig.s.donohue@cmegroup.com cmegroup.com

Such a rule would clarify for market participants the scope of Section 4(a) of the Commodity Exchange Act ("CEA"), which makes it illegal – even for eligible contract participants ("ECPs") – to trade a futures contract unless executed on or subject to the rules of a DCM. 7 U.S.C. § 4(a).

**B. Anti-Evasion**

The Commission has proposed anti-evasion rules with broad, sweeping language and ambiguous terms. For example, Proposed Rule 1.3(xxx)(6) states that "[a]n agreement, contract or transaction that is *willfully structured* to *evade* any provision of Subtitle A [of Dodd-Frank], including any amendments made to the [CEA] thereby, shall be deemed a swap for purposes of Subtitle A and the rules, regulations, and orders of the Commission thereunder." (emphasis added). Similarly, Proposed Rule 1.6(a) broadly provides that, "it shall be unlawful to *conduct activities* outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to *willfully evade* or *attempt to evade* any provision of the [CEA] as enacted by Subtitle A of [Dodd-Frank] or the rules, regulations, and orders of the Commission thereunder." (emphasis added).

CME Group supports the Commission's efforts to prevent the evasion of the swap regulatory regime established under Subtitle A of Dodd-Frank. However, as explained further below, CME Group believes that the proposed anti-evasion rules are unworkable and problematic in two principal respects: 1) the meaning of "evasion" and hence the scope of the rules is not clarified by the Commission's interpretive guidance as proposed; and 2) the extraterritorial reach of Proposed Rule 1.6, in particular, will likely raise international jurisdictional issues and potential regulatory conflicts that the Commission has not provided guidance or a mechanism for addressing.

**1. <u>Scope of Rules: Meaning of "Evasion" Unclear</u>**

In light of the breadth of the proposed regulatory language, interpretive guidance on the meaning of "evasion" is critical. The Commission has recognized as much in its proposal, stating that its guidance is meant to "provide clarity concerning the anti-evasion rules" to market participants while allowing it flexibility to determine whether particular conduct constitutes evasion "on a case-by-case basis." 76 Fed. Reg. 29818, 29867 (May 23, 2011). CME Group believes, however, that the Commission has not struck an appropriate balance between clarity and flexibility, favoring the latter over the former. As a result, legal uncertainty as to the meaning of "evasion" and hence the scope of the rules prevails.

The Commission identifies the sources of its interpretive guidance as "legislative, administrative, and judicial precedent with respect to anti-evasion provisions in other federal statutes," including the tax evasion provision in the Internal Revenue Code ("IRC"). *Id.* As proposed, the Commission's interpretive guidance identifies two criteria – based on tax law principles – for determining what may constitute evasion of the Dodd-Frank swap requirements:[4] 1) *business purpose* – i.e. "the extent to which a person has a legitimate business purpose for structuring the instrument or entity or entering into the transaction in that particular manner," and 2) *fraud, deceit, or unlawful activity* – i.e. "the extent to which the conduct involves deceit, deception, or other unlawful or illegitimate activity."

---

4 The Commission notes that either criterion would be a sufficient basis for finding that "evasion" has occurred. *See* 76 Fed. Reg. at 29867 n. 326.

The "business purpose" criterion is unhelpful in discerning the contours of "evasion" for a couple of reasons. First, as a threshold matter, the Commission's asserted basis for its business purpose test – the tax law doctrine of business purpose or economic substance – is not used to prove tax *evasion*. In the tax context, the business purpose doctrine is applied to deny tax benefits that are technically permissible under the tax laws. More specifically, as codified in Section 7701 of the IRC, the business purpose test permits the IRS to deny tax benefits where "the taxpayer [does not have] a substantial purpose (apart from Federal income tax effects) for entering into [a] transaction," and ii) such transaction does not change the taxpayer's economic position. § 7701(o). The statute and legislative history (which relies on prior case law) suggest that "substantial purpose" means that any anticipated non-tax benefits must outweigh any anticipated tax benefits. This test is only applicable in civil tax cases; *violating the test does not prove tax evasion*.

Tax evasion, by contrast, is generally a criminal tax law concept with a legal standard that does not rely on business purpose. To prove tax evasion, the IRS must show that the person in question willfully violated a "known legal duty" under the tax laws. In other words, a taxpayer has not violated the anti-evasion provision in Section 7201 of the IRC where the law is uncertain or the defendant reasonably believed its actions did not violate the law. *See, e.g.*, *U.S. v. Cheek*, 498 U.S. 192 (1991). To the extent the Commission believes that the tax evasion statute is analogous to its anti-evasion authority, the Commission's reliance instead on the tax law business purpose test and cases is misplaced.

Second, even if business purpose were relevant in the tax context to distinguishing permissible activity from "evasion," the Commission has not applied that doctrine correctly. The Commission proposes to apply the "business purpose" test in the following manner:

> [T]he CFTC would not consider transactions, entities, or instruments structured in a manner *solely motivated* by a legitimate business purpose to constitute evasion. However, to the extent *a purpose* in structuring an entity or instrument or entering into a transaction *is to evade* the requirements of Title VII with respect to swaps, the structuring . . . may be found to *constitute evasion*.
>
> 76 Fed. Reg. at 29867 (emphasis added).

This articulation of the business purpose test is circular in that it essentially states that "X constitutes evasion when one of its purposes is to evade." As such, the Commission's business purpose standard leaves open many questions as to what constitutes "evasion" under the proposed anti-evasion rules. For example, market participants will not know whether their conduct in the following scenarios will be considered to be motivated solely by a "legitimate business purpose" or instead constitute "evasion":

1) Market participant sets up a foreign subsidiary or affiliate to take advantage of more favorable law in the United Kingdom or Asia.
2) Market participant sets up a subsidiary abroad because doing so is more cost-effective for his business due to lower regulatory burdens.

3) Market participant *attempts* to set up business abroad to avoid higher regulatory burdens, costs, etc., but ultimately fails to get the necessary infrastructure and documentation in place to run the foreign business.
4) Market Participant engages in swaps trading overseas to avoid position limits that apply to swaps and futures in CFTC-regulated markets.
5) Market Participant trades in London forward markets because those markets may have a looser understanding of what qualifies as a forward contract and hence are excluded from exchange-trading and clearing requirements.
6) Market Participant – an asset manager acting as a fiduciary for its clients – executes swap transactions on execution platforms located overseas to avoid the higher margining that applies to swaps traded on swap execution facilities in the U.S.
7) Market Participant structures transaction as a foreign exchange swap in part because he is aware that such instruments are exempt from swap regulation but also in part because he is looking to diversify the portfolio of instruments he trades.

The legal uncertainty in the above scenarios could be avoided, to some extent, by making the Commission's proposed business purpose test consistent with the business purpose test in the tax context. As indicated earlier, the tax law business purpose doctrine does not require that a taxpayer's conduct be *solely* motivated by a business purpose (understood as an anticipated non-tax benefit). *See* IRC § 7701(o). Rather, a taxpayer can have a tax avoidance motive so long as the non-tax motive is greater. Applying this standard to the CFTC "evasion" context, a market participant should be able to enter into a transaction or structure an instrument or entity to avoid higher regulatory burdens and attendant costs as long as the transaction or entity has an overriding business purpose.[5]

The Commission's second proposed criterion – fraud, deceit, or unlawful activity – is properly taken from the "tax evasion" context. Referring to the Internal Revenue Manual, the Commission explains that evasive activity generally involves "deceit, subterfuge, camouflage, concealment, or some attempt to color or obscure events or to make things seem other than they are." 76 Fed. Reg. at 29867. The Commission, however, does not provide any examples of legitimate conduct versus evasive activity as does the IRS in its Internal Revenue Manual. Specifically, the IRS identifies as legitimate the formation of a bona fide partnership to reduce tax liability of a business by dividing the income among several individual partners; the IRS goes on to identify as "tax evasion" a situation where a partnership was not in fact established and one or more of the alleged partners secretly returned his/her share of the profits to the real owner of the business, who, in turn, did not report this income. *See id.* at n.325. CME Group

---

[5] The Commission itself has recognized the legitimacy of deciding where to deploy capital based on factors such as "cost, innovation, and an appropriate regulatory environment." *See* CFTC Strategic Plan 2011-2015, Objective 4.2, *available at* http://www.cftc.gov/reports/strategicplan/2015/2015strategicplan1003.html. Although the Commission suggested that such "objective" factors come into play when standards across jurisdictions are consistent, the term "consistent" does not mean that regulatory systems must be the *same*. Indeed, the factor of "appropriate regulatory environment" would only seem applicable where there are regulatory differences among jurisdictions. Notably, even where countries' regulatory policies differ in significant respects, the Commission has never stated that deploying capital based on a "perceived gap in regulation in one jurisdiction" is illegal.

recommends that, like the IRS in its Manual, the Commission offer examples to illustrate its interpretive guidance. Such examples would prove helpful for market participants in CFTC-regulated markets and would not unduly constrain the Commission's flexibility, especially if the examples are explicitly treated as representative and not exhaustive.

Although the Commission has yet to provide illustrative examples of "evasive" versus permissible activity, Proposed Rules 1.3(xxx)(6)(iv) and 1.6(b) provide some indication of how the Commission may proceed in making such distinctions. Specifically, those proposed rules state that "the form, label, and written documentation of an agreement, contract, or an entity, shall not be dispositive in determining whether [it] has been entered into or structured to willfully evade as provided in" Section 1.3(xxx)(6)(i)-(iii) and Section 1.6(a), respectively. In other words, the Commission will "look[] beyond the form of the transaction to examine its actual substance," explaining that doing so is "necessary to prevent evasion through clever draftsmanship." *See* 76 Fed. Reg. at 29891. CME Group agrees with the Commission's position that "form" or "label" might be used duplicitously, solely for the purpose of evasion, and therefore might not be determinative of a legitimate transaction. However, we take issue with the Commission's implicit treatment of "documentation" as equivalent to "form" or "label." Because the substance of a contract – its terms, conditions, etc. – derives from its documentation, such documentation would seem to be inextricably intertwined with substance. As such, CME Group believes that documentation should play a determinative or dispositive role in ascertaining whether a given instrument or entity "has been entered into or structured willfully to evade." If the Commission maintains that documentation should not be dispositive, CME Group urges the Commission to clarify what evidence or subject matter would be.
CME Group encourages the Commission to consider our aforementioned concerns and recommendations for amending its proposed anti-evasion guidance, including our suggestions for working with and learning from tax precedent. Ultimately, if the proposed anti-evasion rules are to be effective as written, the Commission must develop a clear, workable "evasion" standard that will provide market participants with the clarity they need and that will give it the flexibility it desires.

**2. <u>International Jurisdictional Issues</u>**

Section 772(d)(ii) of Dodd-Frank provides that the CEA provisions relating to swaps will apply to foreign activities if those activities "contravene such rules or regulations as the [CFTC] may prescribe or promulgate as are necessary or appropriate to prevent the evasion of any provision of [the CEA] that was enacted by [Title VII]." The Commission is proposing to implement this authority through Proposed Rule 1.6, which provides that foreign activities will be unlawful (and subject to the CEA provisions relating to swaps) if they willfully evade or attempt to evade any provision of the CEA (as enacted by Dodd-Frank) or CFTC rules, regulations, orders thereunder.

The extraterritorial application of the CEA to "evasive" foreign conduct, as called for by Dodd-Frank and Proposed Rule 1.6, is likely to raise complex jurisdictional issues and create regulatory conflicts – especially in light of the potentially broad scope of what constitutes "evasion" (see above comments). For instance, a conflict could arise where the Commission seeks to regulate "evasive" overseas swaps trading that is, already subject to some form regulation by a foreign regulator. The Commission's proposal is completely silent on how such regulatory conflicts should be addressed.

An insistence on applying the CEA extraterritorially without regard to otherwise applicable foreign regulatory schemes would prove problematic in several respects. For one, as pointed out in a recent association letter to the U.S. Department of Treasury and European Commission, "extra-territorial application of rules will lead to a more fragmented view of activity in financial markets, making it more difficult for regulators to monitor, much less prevent a build-up of systemic risk."[6] Moreover, a strict, uncompromising application of rules extraterritorially would be contrary to the spirit of Dodd-Frank Section 752 ["International Harmonization"], which requires the Commission to consult and coordinate with foreign authorities on issues related to derivatives regulation.

CME Group urges the Commission to develop a mechanism and/or provide some guidance for addressing international jurisdictional issues and regulatory conflicts that will invariably arise in the context of the Commission's efforts to prevent evasion overseas. To this end, CME Group endorses the approaches to extraterritoriality issues offered in the association letter referred to above, particularly the recommendation that: "regulators . . . work together towards a sensible and mutually acceptable solution that reflects the legitimate interest in regulatory oversight of entities active in a jurisdiction in a manner that gives due recognition to the rules that are applicable to an entity in its home jurisdiction."[7]

**C. Forward Contract Exclusion**

The Commission relies heavily on its 1990 Statutory Interpretation Concerning Forward Contracts ("Brent Interpretation") for guidance regarding what constitutes a "forward contract" excluded from CEA regulation. Indeed, the Commission treats the Brent Interpretation as creating a "safe harbor" for certain contracts – specifically, those that "are entered into between commercial participants in connection with their business, which create specific delivery obligations that impose substantial economic risks of a commercial nature, but which may involve, in certain circumstances, string or chain deliveries [of the type at issue in the 15-day Brent contracts]." *See* 76 Fed. Reg. at 29829 (quoting Brent Interpretation, 55 Fed. Reg. 39188 (Sept. 25, 1990). The Commission further proposes that for a forward contract to retain its character as a forward when the parties "book-out" their delivery obligations, the "book-out" transaction "must meet the requirements specified in the Brent Interpretation." (p. 45)

CME Group views the Brent Interpretation as a useful *part* of the body of CFTC forward contract precedent, especially because Brent recognizes that delivery need not happen under all circumstances for a contract to be a forward contract. In issuing the Brent Interpretation, the Commission even identified the various scenarios that "often" and "regularly" occurred in which parties to the 15-day Brent contracts decided to cancel delivery and cash-settle their obligations. *See* 55 Fed. Reg. at 39190. These situations included instances where two counterparties had multiple, offsetting positions with each other (and thus faced the prospect of making redundant deliveries) or where participants in the Brent market found themselves selling and purchasing oil more than once in the delivery chain for a particular cargo. *Id.* By concluding that transactions retained their character as forwards despite the cancellation of

[6] *See* International Swaps and Derivatives Association et al. Letter re "Extra-territorial Effects in EU and US regulation of derivatives," to Michel Barnier (Commissioner for the Internal Market and Services, European Commission) and Timothy Geithner (Secretary, Department of the Treasury) (July 5, 2011) at 3, available at http://www.gfma.org/pdf/JT-associations-letter-re-extra-territoriality-5july.pdf.

[7] *Id.* at 2.

20 South Wacker Drive Chicago, Illinois 60606 T 312 930.8275 F 312 930.3209 craig.s.donohue@cmegroup.com cmegroup.com

delivery in such situations, the Commission demonstrated an awareness of the need for flexibility in commercial forward transactions. The Commission did emphasize, however, that cancellation of the 15-day Brent contracts was effectuated through subsequent, separately negotiated "book-out" agreements and that the original contract provided no right of offset. *See id.* at 39192.

Although the Brent Interpretation is relevant precedent as noted above, CFTC opinions and orders subsequent to Brent are also instructive on the scope of the forward contract exclusion and could be construed to extend the Brent "safe harbor." Two such post-Brent cases that the Commission cites, but does not discuss at any length are *In re Grain Land Coop.* (2003)[8] and *In re Wright* (2010)[9]. In those cases, the Commission found that the contracts at issue were forwards even though they included cancellation provisions and thus technically would not meet the book-out "requirements" in Brent.

The Commission's discussion in *In re Grain Land Coop.* is particularly noteworthy because it often relied on expert testimony about the evolving and varied nature of forward contracts. In particular, Grain Land's expert testified that cancellations are not unusual for forward transactions in the context of crop failures or similar extraordinary circumstances.[10] The Commission thus found that the mere existence of a cancellation provision in the flexible hedge-to-arrive (FHTA) contracts at issue was insufficient to establish that the producers were using the provision to hedge or speculate without delivery to their commercial counterparties.[11] Again relying on expert testimony, the Commission held that the another flexible feature of the FHTA contracts – an option to roll the delivery date – did not render the contracts futures even though the rolling option created speculative opportunities different than those offered by more traditional forward contracts.[12] The testimony of Grain Land's expert had established that forward contracts can take many forms and that variations are frequently developed because they permit producers to speculate on factors affecting the price they will receive on delivery.[13] Ultimately, in determining that the subject FHTA contracts were forwards, the Commission recognized that forward contracts should be able to have the flexibility (in the form of rolling and/or cancellation options) to allow their users to adapt to changing market circumstances.[14]

---

[8] CFTC No. 97-01, Comm. Fut. L. Rep. P 29636, 2003 WL 22803511 (CFTC Nov. 25, 2003).

[9] CFTC No. 97-02, 2010 WL 4388247 (CFTC Oct. 25, 2010).

[10] *In re Grain Land Coop.*, 2003 WL 22803511 at *10.

[11] *Id.* at *16.

[12] *Id.* at *15.

[13] *Id.*

[14] The Commission cited the *In re Grain Land Coop.* decision with approval in *In re Wright*, stating that "This Commission . . . has specifically held that provisions within the four corners of an HTA contract allowing the parties to defer or avoid delivery do not automatically establish the lack of intent to deliver; the actual conduct of HTA users with respect to a cancellation provision is also a factor." 2010 WL 4388247 at *3. In *In re Wright*, the Commission found that the Division had failed to carry its burden of proof to establish that the parties lacked the intent to deliver in light of the following "facts and circumstances": 1) the parties to the contract were commercial actors; 2) though the HTA contracts contained provisions allowing the parties to defer or avoid delivery, the parties technically did not use

Although *In re Grain Land Coop.* and *In re Wright* seem at odds with the Brent Interpretation's "book out" theory (which recognized that contracts remain forwards where cancellation of delivery is effected through *separately negotiated, new* agreements), both Brent and the cases subsequent to Brent, at their core, recognize the need for flexibility and innovation in commercial merchandizing transactions. Brent finds this flexibility outside the original contract (in the form of a separate "book-out" agreement); *In re Grain Land Coop.* locates this flexibility within the original contract. To the extent that the Commission *requires* that parties seek flexibility through a Brent-style "book-out" in order to qualify as a forward, it would be elevating form over substance. CME Group thus urges the Commission to consider the body of forward contract precedent as a whole and extend the Brent "safe harbor" to situations like those presented in *In re Grain Land Coop.*[15]

CME Group also requests that the Commission clarify the availability of the Brent safe harbor to certain market participants. By its terms, the Brent Interpretation applies to "commercial participants in connection with their business." *See* 55 Fed. Reg. at 39192. The Commission interprets this standard as being met by "*market participants* that regularly make or take delivery of the referenced commodity . . . in the ordinary course of their business." 76 Fed. Reg. at 29829. (emphasis added). Because the Commission's interpretation does not explicitly refer to *commercial* market participants, it would seem to cover financial players as long as those entities regularly make or take delivery of the underlying commodity in connection with their business. Examples of such entities would be hedge funds or other investment vehicles that regularly make or take delivery of commodities (e.g. gold) in conjunction with their line of business – that is, as part of their investment strategies. CME Group asks that the Commission confirm that the Brent safe harbor would be available to these types of market participants that technically are not "commercial" actors.

### D. Foreign Exchange Swaps and Foreign Exchange Forwards

The Commissions should defer rulemaking or interpretive guidance regarding "foreign exchange swaps" and "foreign exchange forwards" until after the Secretary of the Treasury has issued a final determination exempting foreign exchange swaps and foreign exchange forwards from the definition of "swap." Section

---

such provisions – they simply ceased operations due to intervening factors; and 3) the ALJ found that the substitute farmer testimony, taken *arguendo* as credible, did not establish that a critical mass of farmers entered the substitute HTAs without an expectation of making delivery. *Id.* at 4-5.

[15] Although the Commission's "request for comment" questions on the forward contract exclusion generally invite public comment on potential ways to expand the Brent safe harbor, one question suggests possible limitations on the applicability of Brent. In particular, question 27 asks whether "minimum contract size [should] be required in order for the transaction to qualify as a forward contract under the Brent Interpretation" and whether Brent should be "limited to market participants that meet certain requirements." 76 Fed. Reg. at 29831. CME Group believes that the Commission should not adopt any such limitations or restrictions on the scope of the Brent safe harbor given that Brent and subsequent forward contract precedent do not make any reference to contract size and have already provided guidance regarding the nature of qualifying market participants.

721 of Dodd-Frank defines "foreign exchange swap"[16] and "foreign exchange forward"[17] and includes these instruments in the definition of "swap," but provides the Secretary of the Treasury with the authority to exempt them, under enumerated findings. The Secretary of the Treasury has proposed to provide such an exemption[18] and, in the proposing release, provides its own interpretative guidance as to what constitutes each category. CME Group believes that in light of the Secretary of the Treasury's role in this matter, the proposal in this regard is premature and it would be most prudent to defer rulemaking on these instruments until the Secretary has enacted a final rulemaking on this matter.[19]

If Treasury Department prevails in its recommended exemptions, then options on FX forwards and options on FX swaps will be regulated as "swaps," at the same time they are contractually defined to exercise into underlyings that will not be regulated as "swaps." This state of affairs promises to be awkward, both for CFTC and for market participants. It exhibits the same lack of consistency and clarity for market participants identified in the context of Section II.E. below.

### E. Title VII Instruments Based on Certain Foreign Government Debt Securities

CME Group submits that Title VII instruments based on certain foreign government debt securities should be swaps rather than SBS. Specifically, we recommend that Title VII instruments involving futures on foreign government debt securities enumerated in Rule 3a12-8 of the Securities Exchange Act (the "Exchange Act") should be characterized as swaps rather than SBS. Under Exchange Act Rule 3a12-8,[20] debt securities of 21 foreign governments are considered "exempted securities" for the purpose of

---

[16] CEA § 1(a)(25) (as amended by Dodd-Frank § 721(a)(12) defines a "foreign exchange swap" as "a transaction that solely involves—(A) an exchange of 2 different currencies on a specific date at a fixed rate that is agreed upon on the inception of the contract covering the exchange; and (B) a reverse exchange of the 2 currencies described in subparagraph (A) at a later date and at a fixed rate that is agreed upon on the inception of the contract covering the exchange."

[17] CEA § 1(a)(24) (as amended by Dodd-Frank § 721(a)(12) defines a "foreign exchange forward" as "transaction that solely involves the exchange of 2 different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange.").

[18] Determination of Foreign Exchange Swaps and Foreign Exchange Forwards under the Commodity Exchange Act, 76 Fed. Reg. 25,774 ("Treasury Proposal") (proposed May 5, 2011).

[19] To the extent that the Commissions intend to address foreign exchange swaps and foreign exchange forwards in their final rulemaking, the Commissions should make clear that spot foreign exchange transactions are not "foreign exchange forwards" or "foreign exchange swaps" under Title VII. "Foreign exchange forward" is defined as "a transaction that solely involves the exchange of two different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange." Without the suggested clarification, some may claim there is ambiguity as to whether typical foreign exchange spot transactions, which are settled within a standard settlement cycle of two trading days, are either foreign exchange swaps or foreign exchange forwards. Nothing in DFA's legislative history suggests that Congress intended to regulate spot foreign exchange transactions as swaps.

[20] SEC Rule 3a12-8, Exemption for Designated Foreign Government Securities for Purposes of Futures Trading, codified at 17 C.F.R. § 240.3a12-8.

providing the CFTC with exclusive jurisdiction over futures on those securities. In determining whether a particular foreign government securities should be treated as "exempted securities," the SEC considers several factors, including: (i) how much information about the government is available;[21] (ii) to what extent English-language information is available;[22] (iii) whether other securities with similar disclosure requirements are already available in the U.S. market;[23] (iv) credit rating;[24] and (v) whether market evidence indicated that an active and liquid secondary trading market exists.[25] These factors indicate that the SEC believes that there is sufficient disclosure available about the government and its securities prior to designating foreign government securities as "exempted securities," rendering further disclosure unnecessary.

Consistency and clarity for market participants should be of utmost concern for the Commissions. Therefore, given that futures on the 21 exempted foreign government debt securities are subject to CFTC regulation, swaps *on those futures* should also be subject to CFTC regulation. To do otherwise and subject such swaps to SEC regulation would make no sense from a regulatory perspective. In furtherance of the interest in consistency and clarity, the Commissions should also treat Title VII instruments based on the exempted foreign government debt securities the same as instruments based on exempted U.S. government securities. In short, futures on exempted securities (whether foreign debt securities or U.S. government securities), swaps on such exempted securities, and swaps on futures on such exempted securities should all be subject to the CFTC's jurisdiction.

**F. Constant Maturity Swaps**

CME Group submits that constant maturity swaps ("CMS") should be swaps, rather than mixed swaps. This should be the case irrespective of whether the constant maturity rate leg is based on an interest rate, a single exempted security, a narrow-based index of exempted securities, a broad-based index of exempted securities or a security issued by a foreign government. In a CMS, counterparties exchange payments based on rates determined from instruments of significantly different tenors. The rates on both sides are reset at regular intervals such that the party receiving payments based on the longer-dated instrument – generally referred to as the constant maturity leg – obtains exposure to the shape of the yield curve. The constant maturity leg may be based on, among other things, U.S. Treasury yields, Treasury auction rates, yields on debt of foreign governments, and debt related to indices of mortgage-backed securities. Market participants generally view CMS as rates trades rather than trades on securities, with the bulk of CMS rates based on exempted securities. With uniformity in a mature market

---

[21] Final Rule: Exemption for Certain Foreign Government Securities for Purposes of Futures Trading, 49 Fed. Reg. 8595, 8598 (Mar. 8, 1984).

[22] *Id*.

[23] *Id*.

[24] Final Rule: Exemption of the Securities of the Kingdom of Sweden under the Securities Exchange Act of 1934 for Purposes of Trading Futures Contracts on Those Securities, SEC Release 34-41453 (May 26, 1999).

[25] *Id*.

such as CMS, it makes no sense to regulate a CMS differently depending on the instrument underlying the constant maturity leg, as proposed.

**G. Interpretations Regarding the Characterizations of Title VII Instruments**

CME Group believes that the Commissions should modify the proposed process by which market participants would be able to request interpretations of the characterization of a Title VII instrument. Specifically, the 120-day time frame for issuance of a requested joint interpretation is significantly too long and should be reduced to 30 days. The value of receiving an interpretation as to the characterization of an instrument would be virtually eliminated if market participants had to wait 120 days. Not only may the business opportunity giving rise to the request for the interpretation be lost by the time the interpretation is issued, foreign competitors likely will gain a competitive advantage to U.S. market participants as they will not need to wait for such jurisdictional decisions before trading similar or identical products.

Additionally, the Commissions should issue an interpretation for all requests submitted by market participants that satisfy the Commissions' submission criteria, unless a request is withdrawn. If a market participant chooses to seek an interpretation regarding characterizations of Title VII instruments, CME Group submits that that interpretation is critically important for legal certainty in the swaps and SBS markets. The Commissions' refusal to respond to any request, and instead list the reasons why such an interpretation will not be issued, will add uncertainty into the market. To the extent the Commissions cannot agree on a characterization, they should seek expedited judicial review to resolve the dispute.

* * * * *

CME Group thanks the Commission for the opportunity to comment on this matter. We would be happy to discuss any of these issues with Commission staff. If you have any comments or questions, please feel free to contact me at (312) 930-8275 or via email at Craig.Donohue@cmegroup.com, or Christal Lint, Director, Associate General Counsel, at (312) 930-4527 or Christal.Lint@cmegroup.com.

Sincerely,

Craig S. Donohue

Craig S. Donohue

cc: Chairman Gary Gensler
Commissioner Michael Dunn
Commissioner Bart Chilton
Commissioner Jill Sommers
Commissioner Scott O'Malia
Chairman Mary Schapiro
Elizabeth M. Murphy